No. 23-1472

# In the United States Court of Appeals for the Fourth Circuit

360 VIRTUAL DRONE SERVICES LLC et al., Plaintiffs-Appellants,

*v.*

ANDREW L. RITTER, in his official capacity as Executive Director of the North Carolina Board of Examiners for Engineers and Surveyors, et al., Defendants-Appellees.

On Appeal from the United States District Court
for the Eastern District of North Carolina, Case No. 5:21-cv-00137-FL
(Hon. Louise W. Flanagan)

## CORRECTED JOINT APPENDIX
## VOLUME I OF II
### (Pages J.A. 1 to J.A. 486)

Douglas W. Hanna
FITZGERALD HANNA &
SULLIVAN PLLC
   3737 Glenwood Avenue, Suite 375
   Raleigh, North Carolina 27612
   (919) 863-9091

*Counsel for Appellees*

Samuel B. Gedge
James T. Knight II
INSTITUTE FOR JUSTICE
   901 North Glebe Road, Suite 900
   Arlington, VA 22203
   (703) 682-9320

David G. Guidry
GUIDRY LAW FIRM PLLC
   338 South Sharon Amity Rd., #337
   Charlotte, NC 28211
   (917) 376-6098

*Counsel for Appellants*

# TABLE OF CONTENTS

## VOLUME I

U.S. District Court docket report ...................................................J.A. 1

Complaint (Mar. 22, 2021) (Dist. Ct. Doc. 1)....................................J.A. 8

Defendants' statement of undisputed material facts
    (Mar. 25, 2022) (Dist. Ct. Doc. 32).........................................J.A. 31

Plaintiffs' statement of undisputed material facts
    (Mar. 25, 2022) (Dist. Ct. Doc. 37).........................................J.A. 41

Exhibits to plaintiffs' motion for summary judgment (Mar. 25, 2022):

    Exhibit 1—Declaration of Alex Abatie
        (Dist. Ct. Doc. 38-1).........................................................J.A. 65

    Exhibit 3—Declaration of Michael Jones
        (Dist. Ct. Doc. 38-3).........................................................J.A. 87

    Exhibit 4—Michael Jones's webpage
        (Dist. Ct. Doc. 38-4).........................................................J.A. 94

    Exhibit 5—Michael Jones map with scale bar
        (Dist. Ct. Doc. 38-5).........................................................J.A. 98

    Exhibit 6—Board's December 2018 letter to 360 Virtual Drone
        Services LLC (Dist. Ct. Doc. 38-6)...............................J.A. 100

    Exhibit 7—E-mails between Michael Jones and board
        investigator (Dist. Ct. Doc. 38-7)...................................J.A. 102

    Exhibit 8—Board's June 2019 letter to 360 Virtual Drone
        Services LLC (Dist. Ct. Doc. 38-8)...............................J.A. 109

    Exhibit 9—Michael Jones's e-mail to client
        (Dist. Ct. Doc. 38-9).......................................................J.A. 112

Exhibit 10—Declaratory opinion of the Mississippi Board of
  Licensure for Professional Engineers and Surveyors
  (Dist. Ct. Doc. 38-10) .................................................................... J.A. 115

Exhibit 11—Advisory opinion of the Kentucky State Board for
  Licensure for Professional Engineers & Land Surveyors
  (Dist. Ct. Doc. 38-11) .................................................................... J.A. 119

Exhibit 12—Board's letter to Air Source One
  (Dist. Ct. Doc. 38-12) .................................................................... J.A. 123

Exhibit 13—Board's letter to NSight Drone Services, LLC
  (Dist. Ct. Doc. 38-13) .................................................................... J.A. 126

Exhibit 14—Board's letter to Firmatek, LLC
  (Dist. Ct. Doc. 38-14) .................................................................... J.A. 129

Exhibit 15—Board's letter to Lappert Smith Industries d/b/a
  Charlotte UAV (Dist. Ct. Doc. 38-15) ........................................ J.A. 132

Exhibit 16—Board's letter to NC Drone Pro, LLC
  (Dist. Ct. Doc. 38-16) .................................................................... J.A. 135

Exhibit 17—E-mail from Board's counsel to Roger Armstrong
  (Dist. Ct. Doc. 38-17) .................................................................... J.A. 138

Exhibit 18—Excerpts of deposition of David Tuttle, Board's
  counsel (Dist. Ct. Doc. 38-18) ...................................................... J.A. 143

Exhibit 19—Board's file on 360 Virtual Drone Services
  (Dist. Ct. Doc. 38-19) .................................................................... J.A. 169

Exhibit 20—Excerpts of deposition of board investigator
  William Casey (Dist. Ct. Doc. 38-20) .......................................... J.A. 232

Exhibit 21—Board's investigative report on 360 Virtual Drone
  Services LLC (Dist. Ct. Doc. 38-21) ............................................ J.A. 253

Exhibit 22—Excerpts of deposition of board investigator
  Clyde Alston (Dist. Ct. Doc. 38-22) ............................................ J.A. 260

Exhibit 23—Report of Mark Schall, Board's expert witness
(Dist. Ct. Doc. 38-23)......................................................J.A. 275

Exhibit 24—Excerpts of deposition of Board's 30(b)(6) designee
(Dist. Ct. Doc. 38-24)......................................................J.A. 292

Exhibit 25—Excerpts of deposition of Mark Schall, Board's
expert witness (Dist. Ct. Doc. 38-25)..........................J.A. 325

Exhibit 26—Excerpts of deposition of Andrew Ritter, Board's
executive director (Dist. Ct. Doc. 38-26)....................J.A. 380

Exhibit 27—Michael Jones's map with no scale bar
(Dist. Ct. Doc. 38-27)......................................................J.A. 417

Exhibit 28—Defendants' response to plaintiffs' interrogatory
number ten (Dist. Ct. Doc. 38-28).................................J.A. 419

Exhibit 29—Board's investigative report on Firmatek, LLC
(Dist. Ct. Doc. 38-29)......................................................J.A. 428

Exhibit 30—Board's investigative report on Lappert Smith
Industries d/b/a Charlotte UAV (Dist. Ct. Doc. 38-30)............J.A. 438

Exhibit 31—Board's investigative report on Mark Fronrath/
NC Drone Pro, LLC (Dist. Ct. Doc. 38-31)................J.A. 455

Exhibit 32—Board's investigative report on Droners.io
(Dist. Ct. Doc. 38-32)......................................................J.A. 461

Exhibit 33—Board's investigative report on NSight Drone
Services, LLC (Dist. Ct. Doc. 38-33)..........................J.A. 469

Exhibit 34—Board's investigative report on Swampfox
Aerial, LLC (Dist. Ct. Doc. 38-34).............................J.A. 477

Exhibit 35—Board's investigative report on Air Source
One, LLC (Dist. Ct. Doc. 38-35) ..................................J.A. 482

# VOLUME II

Exhibits to defendants' motion for summary judgment (Mar. 28, 2022):

    Exhibit 1—Affidavit of Andrew Ritter, Board's executive
        director (Dist. Ct. Doc. 39-1)........................................J.A. 487

    Exhibit 2—Transcript of deposition of 360 Virtual Drone
        Services LLC's 30(b)(6) designee (Dist. Ct. Doc. 39-2) ...........J.A. 494

    Exhibit 3—Transcript of deposition of Michael Jones[*] ................J.A. 582

    Exhibit 4—Plaintiff 360 Virtual Drone Services LLC's
        responses to requests for admission (Dist. Ct. Doc. 39-4).......J.A. 781

    Exhibit 5—Transcript of deposition of Board's Rule 30(b)(6)
        designee (Dist. Ct. Doc. 39-5)......................................J.A. 786

    Exhibit 6—Defendants' disclosure of expert testimony
        (Dist. Ct. Doc. 39-6).............................................J.A. 817

    Exhibit 7—Transcript of deposition of Alex Abatie
        (Dist. Ct. Doc. 39-7).............................................J.A. 837

Defendants' response to plaintiffs' statement of undisputed
    material facts (Apr. 28, 2022) (Dist. Ct. Doc. 43) ................J.A. 926

Plaintiffs' response to defendants' statement of undisputed
    material facts (Apr. 29, 2022) (Dist. Ct. Doc. 45) ................J.A. 933

Order (motions for summary judgment)
    (Mar. 31, 2023) (Dist. Ct. Doc. 50)........................................J.A. 959

Judgment (Mar. 31, 2023) (Dist. Ct. Doc. 51) ..........................J.A. 983

---

[*] The version of this transcript filed in the district court (at docket number 39-3) was a condensed transcript. In accordance with directions from the clerk's office, an uncondensed version has been included in this appendix.

Plaintiffs' notice of appeal (Apr. 25, 2023) (Dist. Ct. Doc. 52) ................J.A. 985

APPEAL,CLOSED

# U.S. District Court
# EASTERN DISTRICT OF NORTH CAROLINA (Western Division)
# CIVIL DOCKET FOR CASE #: 5:21−cv−00137−FL

360 Virtual Drone Services LLC et al v. Ritter et al
Assigned to: District Judge Louise Wood Flanagan
Case in other court:  USCA, 23−01472
Cause: 28:1983 Civil Rights

Date Filed: 03/22/2021
Date Terminated: 03/31/2023
Jury Demand: None
Nature of Suit: 950 Constitutional − State
Statute
Jurisdiction: Federal Question

**Plaintiff**

**360 Virtual Drone Services LLC**    represented by    **Samuel B. Gedge**
Institute for Justice
901 North Glebe Road, Suite 900
Arlington, VA 22203
703−682−9320
Fax: 703−682−9321
Email: sgedge@ij.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James T. Knight**
Institute for Justice
901 North Glebe Road, Suite 900
Arlington, VA 22203
703−682−9320
Fax: 703−682−9321
Email: jknight@ij.org
*ATTORNEY TO BE NOTICED*

**David Glen Guidry**
5434 Robin Hood Rd.
Charlotte, NC 28211
917−376−6098
Email: davidglenguidry@gmail.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Michael Jones**    represented by    **Samuel B. Gedge**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James T. Knight**
(See above for address)
*ATTORNEY TO BE NOTICED*

**David Glen Guidry**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Andrew L. Ritter**    represented by    **Douglas W. Hanna**
*in his official capacity as Executive*
*Director of the North Carolina Board of*
*Examiners for Engineers and Surveyors*

Fitzgerald Hanna & Sullivan, PLLC
3737 Glenwood Avenue
Ste 375
Raleigh, NC 27612

J.A. 1

919−863−9091
Fax: 919−863−9095
Email: dhanna@fhslitigation.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**John M. Logsdon**
*in his official capacity as member of the*
*North Carolina Board of Examiners for*
*Engineers and Surveyors*

represented by **Douglas W. Hanna**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Jonathan S. Care**
*in his official capacity as member of the*
*North Carolina Board of Examiners for*
*Engineers and Surveyors*

represented by **Douglas W. Hanna**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Dennis K. Hoyle**
*in his official capacity as member of the*
*North Carolina Board of Examiners for*
*Engineers and Surveyors*

represented by **Douglas W. Hanna**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Richard M. Benton**
*in his official capacity as member of the*
*North Carolina Board of Examiners for*
*Engineers and Surveyors*

represented by **Douglas W. Hanna**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Carl M. Ellington, Jr.**
*in his official capacity as member of the*
*North Carolina Board of Examiners for*
*Engineers and Surveyors*

represented by **Douglas W. Hanna**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Cedric D. Fairbanks**
*in his official capacity as member of the*
*North Carolina Board of Examiners for*
*Engineers and Surveyors*

represented by **Douglas W. Hanna**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Brenda L. Moore**
*in her official capacity as member of the*
*North Carolina Board of Examiners for*
*Engineers and Surveyors*

represented by **Douglas W. Hanna**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Carol Salloum**
*in her official capacity as member of the*
*North Carolina Board of Examiners for*
*Engineers and Surveyors*

represented by **Douglas W. Hanna**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Andrew G. Zoutwelle**
*in his official capacity as member of the*
*North Carolina Board of Examiners for*
*Engineers and Surveyors*

represented by **Douglas W. Hanna**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

J.A. 2

| Date Filed | # | Docket Text |
|---|---|---|
| 03/22/2021 | 1 | COMPLAINT against All Defendants ( Filing fee $ 402 receipt number 0417−5942952.), filed by Michael Jones, 360 Virtual Drone Services LLC. (Attachments: # 1 Exhibit 1 − Letter from Andrew L. Ritter to 360 Virtual Drone Services LLC, # 2 Proposed Summons for Andrew L. Ritter, # 3 Proposed Summons for John M. Logsdon, # 4 Proposed Summons for Jonathan S. Care, # 5 Proposed Summons for Dennis K. Hoyle, # 6 Proposed Summons for Richard M. Benton, # 7 Proposed Summons for Carl M. Ellington, Jr., # 8 Proposed Summons for Cedric D. Fairbanks, # 9 Proposed Summons for Brenda L. Moore, # 10 Proposed Summons for Carol Salloum, # 11 Proposed Summons for Andrew G. Zoutwelle, # 12 Civil Cover Sheet) (Guidry, David) (Entered: 03/22/2021) |
| 03/22/2021 | 2 | Notice of Appearance filed by David Glen Guidry on behalf of All Plaintiffs. (Guidry, David) (Entered: 03/22/2021) |
| 03/22/2021 | 3 | Financial Disclosure Statement by 360 Virtual Drone Services LLC (Guidry, David) (Entered: 03/22/2021) |
| 03/22/2021 | 4 | Financial Disclosure Statement by Michael Jones (Guidry, David) (Entered: 03/22/2021) |
| 03/24/2021 | 5 | **CORRECTED AND REFILED** Summons Issued as to Richard M. Benton, Jonathan S. Care, Carl M. Ellington, Jr, Cedric D. Fairbanks, Dennis K. Hoyle, John M. Logsdon, Brenda L. Moore, Andrew L. Ritter, Carol Salloum, Andrew G. Zoutwelle. *(*NOTICE: Counsel shall print the attached summons and serve with other case opening documents in accordance with Fed.R.Civ.P. 4.*)* (Rudd, D.) Modified on 4/6/2021 (Collins, S.). (Entered: 03/24/2021) |
| 03/26/2021 | 6 | Notice of Special Appearance for non−district by Samuel B. Gedge on behalf of All Plaintiffs. (Gedge, Samuel) (Entered: 03/26/2021) |
| 03/26/2021 | 7 | Notice of Special Appearance for non−district by James T. Knight on behalf of All Plaintiffs. (Knight, James) (Entered: 03/26/2021) |
| 03/26/2021 | 8 | SUMMONS Returned Executed by Michael Jones, 360 Virtual Drone Services LLC. All Defendants. (Gedge, Samuel) (Entered: 03/26/2021) |
| 03/31/2021 | | NOTICE OF DEFICIENCY regarding 8 Summons Returned Executed. Counsel shall refile each document separately indicating who was served and date of service. (Collins, S.) (Entered: 03/31/2021) |
| 04/01/2021 | 9 | SUMMONS Returned Executed by Michael Jones, 360 Virtual Drone Services LLC. − Served on Andrew Zoutwelle on 3/25/21, answer due 4/15/21. (Gedge, Samuel) Modified on 4/6/2021 to revise docket text. (Collins, S.) (Entered: 04/01/2021) |
| 04/01/2021 | 10 | SUMMONS Returned Executed by Michael Jones, 360 Virtual Drone Services LLC. − Served on Andrew Ritter on 3/25/21, answer due 4/15/21. (Gedge, Samuel) Modified on 4/6/2021 to revise docket text. (Collins, S.) (Entered: 04/01/2021) |
| 04/01/2021 | 11 | SUMMONS Returned Executed by Michael Jones, 360 Virtual Drone Services LLC. − Served on Brenda Moore on 3/25/21, answer due 4/15/21. (Gedge, Samuel) Modified on 4/6/2021 to revise docket text. (Collins, S.) (Entered: 04/01/2021) |
| 04/01/2021 | 12 | SUMMONS Returned Executed by Michael Jones, 360 Virtual Drone Services LLC. − Served on Carl Ellington, Jr. on 3/25/21, answer due 4/15/21. (Gedge, Samuel) Modified on 4/6/2021 to revise docket text. (Collins, S.) (Entered: 04/01/2021) |
| 04/01/2021 | 13 | SUMMONS Returned Executed by Michael Jones, 360 Virtual Drone Services LLC. − Served on Carol Salloum on 3/25/21, answer due 4/15/21. (Gedge, Samuel) Modified on 4/6/2021 to revise docket text. (Collins, S.) (Entered: 04/01/2021) |
| 04/01/2021 | 14 | SUMMONS Returned Executed by Michael Jones, 360 Virtual Drone Services LLC. − Served on Cedric Fairbanks on 3/25/21, answer due 4/15/21. (Gedge, Samuel) Modified on 4/6/2021 to revise docket text. (Collins, S.) (Entered: 04/01/2021) |

| | | |
|---|---|---|
| 04/01/2021 | 15 | SUMMONS Returned Executed by Michael Jones, 360 Virtual Drone Services LLC. − Served on Dennis Hoyle on 3/25/21, answer due 4/15/21. (Gedge, Samuel) Modified on 4/6/2021 to revise docket text. (Collins, S.). (Entered: 04/01/2021) |
| 04/01/2021 | 16 | SUMMONS Returned Executed by Michael Jones, 360 Virtual Drone Services LLC. − Served on John Logsdon on 3/25/21, answer due 4/15/21. (Gedge, Samuel) Modified on 4/6/2021 to revise docket text. (Collins, S.). (Entered: 04/01/2021) |
| 04/01/2021 | 17 | SUMMONS Returned Executed by Michael Jones, 360 Virtual Drone Services LLC. − Served on Jonathan Care on 3/25/21, answer due 4/15/21. (Gedge, Samuel) Modified on 4/6/2021 to revise docket text. (Collins, S.). (Entered: 04/01/2021) |
| 04/01/2021 | 18 | SUMMONS Returned Executed by Michael Jones, 360 Virtual Drone Services LLC. − Served on Richard Benton on 3/25/21, answer due 4/15/21. (Gedge, Samuel) Modified on 4/6/2021 to revise docket text. (Collins, S.). (Entered: 04/01/2021) |
| 04/05/2021 | | **DISREGARD − CLERK CORRECTED ENTRIES FOR COUNSEL** NOTICE OF DEFICIENCY regarding 15 Summons Returned Executed, 17 Summons Returned Executed, 10 Summons Returned Executed, 14 Summons Returned Executed, 18 Summons Returned Executed, 16 Summons Returned Executed, 11 Summons Returned Executed, 13 Summons Returned Executed, 12 Summons Returned Executed, 9 Summons Returned Executed. Counsel did not indicate which defendant was served with process, nor date of service, for each of these documents. Counsel shall refile, completely filling out the information when prompted to do so when using the event "Summons Returned Executed". (Collins, S.) Modified on 4/6/2021 (Collins, S.). (Entered: 04/05/2021) |
| 04/07/2021 | 19 | Notice of Appearance filed by Douglas W. Hanna on behalf of All Defendants. (Hanna, Douglas) (Entered: 04/07/2021) |
| 04/07/2021 | 20 | MOTION for Extension of Time to File Answer filed by Richard M. Benton, Jonathan S. Care, Carl M. Ellington, Jr, Cedric D. Fairbanks, Dennis K. Hoyle, John M. Logsdon, Brenda L. Moore, Andrew L. Ritter, Carol Salloum, Andrew G. Zoutwelle. (Attachments: # 1 Text of Proposed Order) (Hanna, Douglas) (Entered: 04/07/2021) |
| 04/08/2021 | | Motion Referred to Peter A. Moore, Jr., Clerk of Court regarding 20 MOTION for Extension of Time to File Answer. (Collins, S.) (Entered: 04/08/2021) |
| 04/08/2021 | | **TEXT ORDER granting Defendants' Motion for Extension of Time 20 . For good cause shown, it is ordered that Defendants have up to and including May 14, 2021, within which to answer or otherwise respond to the Complaint 1 . Signed by Peter A. Moore, Jr., Clerk of Court on 4/8/2021.** (Hockaday, A.) (Entered: 04/08/2021) |
| 05/14/2021 | 21 | ANSWER to 1 Complaint,,, by Richard M. Benton, Jonathan S. Care, Carl M. Ellington, Jr, Cedric D. Fairbanks, Dennis K. Hoyle, John M. Logsdon, Brenda L. Moore, Andrew L. Ritter, Carol Salloum, Andrew G. Zoutwelle. (Hanna, Douglas) (Entered: 05/14/2021) |
| 05/25/2021 | 22 | **INITIAL ORDER REGARDING PLANNING AND SCHEDULING − Discovery Plan due by 6/29/21. Counsel should read attached order in its entirety for critical information and deadlines. Signed by District Judge Louise Wood Flanagan on 5/25/2021.** (Collins, S.) (Entered: 05/25/2021) |
| 06/18/2021 | 23 | Rule 26(f) Report (joint) filed by 360 Virtual Drone Services LLC, Michael Jones. (Gedge, Samuel) (Entered: 06/18/2021) |
| 06/25/2021 | 24 | **CASE MANAGEMENT ORDER: *Discovery in this case may be governed by a protective order.* Discovery due by 2/25/22. Motions due by 3/25/22. The parties should review the attached order in its entirety for additional critical deadlines and information. Signed by District Judge Louise Wood Flanagan on 6/25/21.** (Collins, S.) (Entered: 06/25/2021) |
| 11/02/2021 | 25 | Joint MOTION regarding 24 Scheduling Order, filed by Richard M. Benton, Jonathan S. Care, Carl M. Ellington, Jr, Cedric D. Fairbanks, Dennis K. Hoyle, John M. Logsdon, Brenda L. Moore, Andrew L. Ritter, Carol Salloum, Andrew G. Zoutwelle. (Attachments: # 1 Text of Proposed Order) (Hanna, Douglas) (Entered: 11/02/2021) |

| | | |
|---|---|---|
| 11/03/2021 | | Motion Submitted to District Judge Louise Wood Flanagan regarding 25 Joint MOTION regarding 24 Scheduling Order. (Collins, S.) (Entered: 11/03/2021) |
| 11/03/2021 | 26 | **ORDER MODIFYING CASE MANAGEMENT ORDER granting 25 Joint MOTION regarding 24 Scheduling Order. Counsel is reminded to read the order in its entirety for critical deadlines and information. Signed by District Judge Louise Wood Flanagan on 11/3/2021.** (Collins, S.) (Entered: 11/03/2021) |
| 12/27/2021 | 27 | Joint MOTION regarding 24 Scheduling Order, filed by 360 Virtual Drone Services LLC, Michael Jones. (Attachments: # 1 Text of Proposed Order) (Gedge, Samuel) (Entered: 12/27/2021) |
| 12/28/2021 | | Motion Submitted to District Judge Louise Wood Flanagan regarding 27 Joint MOTION regarding 24 Scheduling Order. (Collins, S.) (Entered: 12/28/2021) |
| 12/28/2021 | 28 | **ORDER granting 27 Joint MOTION regarding 24 Scheduling Order. Counsel is reminded to read the order in its entirety for critical deadlines and information. Signed by District Judge Louise Wood Flanagan on 12/28/2021.** (Collins, S.) (Entered: 12/28/2021) |
| 01/14/2022 | 29 | Notice of Change of Address filed by Douglas W. Hanna filed by on behalf of Richard M. Benton, Jonathan S. Care, Carl M. Ellington, Jr, Cedric D. Fairbanks, Dennis K. Hoyle, John M. Logsdon, Brenda L. Moore, Andrew L. Ritter, Carol Salloum, Andrew G. Zoutwelle. (Hanna, Douglas) (Entered: 01/14/2022) |
| 01/19/2022 | | Notice to Counsel regarding: 29 Notice of Change of Address. Counsel should refer to Pages 5 and 6 of the CM/ECF Policy and Procedure Manual for instructions on updating law firm information. Once updated, the new contact information will be reflected on the docket of all cases in which counsel entered an appearance. (Collins, S.) (Entered: 01/19/2022) |
| 03/25/2022 | 30 | AFFIDAVIT *of Andrew Ritter* by Richard M. Benton, Jonathan S. Care, Carl M. Ellington, Jr, Cedric D. Fairbanks, Dennis K. Hoyle, John M. Logsdon, Brenda L. Moore, Andrew L. Ritter, Carol Salloum, Andrew G. Zoutwelle. (Hanna, Douglas) (Entered: 03/25/2022) |
| 03/25/2022 | 31 | MOTION for Summary Judgment filed by Richard M. Benton, Jonathan S. Care, Carl M. Ellington, Jr, Cedric D. Fairbanks, Dennis K. Hoyle, John M. Logsdon, Brenda L. Moore, Andrew L. Ritter, Carol Salloum, Andrew G. Zoutwelle. (Hanna, Douglas) (Entered: 03/25/2022) |
| 03/25/2022 | 32 | Statement of Material Facts regarding 31 MOTION for Summary Judgment filed by Richard M. Benton, Jonathan S. Care, Carl M. Ellington, Jr, Cedric D. Fairbanks, Dennis K. Hoyle, John M. Logsdon, Brenda L. Moore, Andrew L. Ritter, Carol Salloum, Andrew G. Zoutwelle. (Hanna, Douglas) (Entered: 03/25/2022) |
| 03/25/2022 | 33 | **CORRECTED AND REFILED AT 39 ** Appendix to the Statement of Facts regarding 31 MOTION for Summary Judgment filed by Richard M. Benton, Jonathan S. Care, Carl M. Ellington, Jr, Cedric D. Fairbanks, Dennis K. Hoyle, John M. Logsdon, Brenda L. Moore, Andrew L. Ritter, Carol Salloum, Andrew G. Zoutwelle. (Attachments: # 1 Exhibit Exhibit 1, # 2 Exhibit Exhibit 2, # 3 Exhibit Exhibit 3, # 4 Exhibit Exhibit 4, # 5 Exhibit Exhibit 5, # 6 Exhibit Exhibit 6, # 7 Exhibit Exhibit 7) (Hanna, Douglas) Modified on 3/29/2022 (Collins, S.). (Entered: 03/25/2022) |
| 03/25/2022 | 34 | Memorandum in Support regarding 31 MOTION for Summary Judgment filed by Richard M. Benton, Jonathan S. Care, Carl M. Ellington, Jr, Cedric D. Fairbanks, Dennis K. Hoyle, John M. Logsdon, Brenda L. Moore, Andrew L. Ritter, Carol Salloum, Andrew G. Zoutwelle. (Hanna, Douglas) (Entered: 03/25/2022) |
| 03/25/2022 | | NOTICE OF DEFICIENCY regarding 33 Appendix to the Statement of Facts. Counsel did not properly identify exhibits pursuant to Section V.E. of the CM/ECF Policies and Procedures Manual (i.e., "Exhibit 1" is not a sufficient description). Counsel is directed to refile. (Collins, S.) (Entered: 03/25/2022) |
| 03/25/2022 | 35 | MOTION for Summary Judgment filed by 360 Virtual Drone Services LLC, Michael Jones. (Gedge, Samuel) (Entered: 03/25/2022) |

| 03/25/2022 | 36 | Memorandum in Support regarding 35 MOTION for Summary Judgment filed by 360 Virtual Drone Services LLC, Michael Jones. (Gedge, Samuel) (Entered: 03/25/2022) |
|---|---|---|
| 03/25/2022 | 37 | Statement of Material Facts regarding 35 MOTION for Summary Judgment filed by 360 Virtual Drone Services LLC, Michael Jones. (Gedge, Samuel) (Entered: 03/25/2022) |
| 03/25/2022 | 38 | Appendix to the Statement of Facts regarding 35 MOTION for Summary Judgment filed by 360 Virtual Drone Services LLC, Michael Jones. (Attachments: # 1 Exhibit 1 − Abatie declaration, # 2 Exhibit 2 − Abatie report, # 3 Exhibit 3 − Jones declaration, # 4 Exhibit 4 − Jones's webpage, # 5 Exhibit 5 − Jones's map with scale, # 6 Exhibit 6 − Board's December 2018 letter to Jones, # 7 Exhibit 7 − E−mail exchange between Jones and Board, # 8 Exhibit 8 − Board's June 2019 letter to Jones, # 9 Exhibit 9 − E−mail exchange between Jones and potential client, # 10 Exhibit 10 − Mississippi declaratory opinion, # 11 Exhibit 11 − Kentucky advisory board opinion, # 12 Exhibit 12 − Board letter to Air Source One, # 13 Exhibit 13 − Board letter to NSight Drone Services, # 14 Exhibit 14 − Board letter to Firmatek, # 15 Exhibit 15 − Board letter to Lapport Smith Industries, # 16 Exhibit 16 − Board letter to NC Drone Pro, # 17 Exhibit 17 − Board counsel e−mail, # 18 Exhibit 18 − Tuttle deposition excerpts, # 19 Exhibit 19 − Board's investigative file (360 Virtual Drone Services LLC), # 20 Exhibit 20 − Casey deposition excerpts, # 21 Exhibit 21 − Board's investigative report (360 Virtual Drone Services LLC), # 22 Exhibit 22 − Alston deposition excerpts, # 23 Exhibit 23 − Board expert's report, # 24 Exhibit 24 − Board 30(b)(6) deposition excerpts, # 25 Exhibit 25 − Schall deposition excerpts, # 26 Exhibit 26 − Ritter deposition excerpts, # 27 Exhibit 27 − Jones map without scale, # 28 Exhibit 28 − Boards response to interrogatory 10, # 29 Exhibit 29 − Boards investigative report (Firmatek), # 30 Exhibit 30 − Boards investigative report (Lappert Smith Industries, LLC), # 31 Exhibit 31 − Boards investigative report (NC Drone Pro, LLC), # 32 Exhibit 32 − Boards investigative report (Droners.io), # 33 Exhibit 33 − Boards investigative report (NSight Drone Services, LLC), # 34 Exhibit 34 − Boards investigative report (Swampfox, LLC), # 35 Exhibit 35 − Boards investigative report (Air Source One, LLC)) (Gedge, Samuel) (Entered: 03/25/2022) |
| 03/28/2022 | 39 | Appendix to the Statement of Facts regarding 31 MOTION for Summary Judgment filed by Richard M. Benton, Jonathan S. Care, Carl M. Ellington, Jr, Cedric D. Fairbanks, Dennis K. Hoyle, John M. Logsdon, Brenda L. Moore, Andrew L. Ritter, Carol Salloum, Andrew G. Zoutwelle. (Attachments: # 1 Exhibit Andrew Ritter Affidavit, # 2 Exhibit Rule 30(b)(6) Deposition Transcript of Plaintiff 360 Virtual Drone Services, LLC, # 3 Exhibit Deposition Transcript of Plaintiff Michael Jones, # 4 Exhibit Plaintiffs' Response to Request for Admissions, # 5 Exhibit Rule 30(b)(6) Deposition Transcript of the North Carolina Board of Examiners and Surveyors, # 6 Exhibit Defendants' Disclosure of Expert Testimony, # 7 Exhibit Deposition Transcript of Alex Abate) (Hanna, Douglas) (Entered: 03/28/2022) |
| 03/31/2022 | 40 | MOTION for Extension of Time to File Response/Reply as to 35 MOTION for Summary Judgment , 31 MOTION for Summary Judgment filed by 360 Virtual Drone Services LLC. (Attachments: # 1 Text of Proposed Order) (Gedge, Samuel) (Entered: 03/31/2022) |
| 03/31/2022 | 41 | **ORDER granting 40 Motion for Extension of Time to File Responses regarding 31 MOTION for Summary Judgment, 35 MOTION for Summary Judgment. Responses due by 4/29/2022. Signed by District Judge Louise Wood Flanagan on 3/31/2022.** (Collins, S.) (Entered: 03/31/2022) |
| 04/28/2022 | 42 | Memorandum in Opposition regarding 35 MOTION for Summary Judgment filed by Richard M. Benton, Jonathan S. Care, Carl M. Ellington, Jr, Cedric D. Fairbanks, Dennis K. Hoyle, John M. Logsdon, Brenda L. Moore, Andrew L. Ritter, Carol Salloum, Andrew G. Zoutwelle. (Attachments: # 1 Exhibit Response Brief of Appellees in Billups v. City of Charleston) (Hanna, Douglas) (Entered: 04/28/2022) |
| 04/28/2022 | 43 | RESPONSE regarding 37 Statement of Material Facts filed by Richard M. Benton, Jonathan S. Care, Carl M. Ellington, Jr, Cedric D. Fairbanks, Dennis K. Hoyle, John M. Logsdon, Brenda L. Moore, Andrew L. Ritter, Carol Salloum, Andrew G. Zoutwelle. (Hanna, Douglas) Modified on 4/29/2022 to create docket entry relationship to motion 35 . (Collins, S.). (Entered: 04/28/2022) |

| | | |
|---|---|---|
| 04/29/2022 | | **TEXT ORDER regarding <u>35</u> MOTION for Summary Judgment, <u>31</u> MOTION for Summary Judgment. The court DIRECTS the parties to deliver to the court a courtesy copy of the documents filed by that party, and all outstanding motions and briefs related thereto, including all exhibits and attachments thereto, tabbed by docket entry and exhibit number, (but <u>not bound,</u> including no notebooks) no later than ten (10) days from the date of the text order, or sooner if possible. Counsel is requested to send the copies with no signature required.**<br><br>Such courtesy copies are to be addressed for delivery to the Honorable Louise W. Flanagan, United States District Court, Eastern District of North Carolina, ATTN: Ms. Sandra Collins, 413 Middle St., New Bern, NC 28560. Signed by District Judge Louise Wood Flanagan on 4/29/2022.<br><br>(Collins, S.) (Entered: 04/29/2022) |
| 04/29/2022 | <u>44</u> | RESPONSE in Opposition regarding <u>31</u> MOTION for Summary Judgment filed by 360 Virtual Drone Services LLC, Michael Jones. (Gedge, Samuel) (Entered: 04/29/2022) |
| 04/29/2022 | <u>45</u> | RESPONSE regarding <u>32</u> Statement of Material Facts, filed by 360 Virtual Drone Services LLC, Michael Jones. (Gedge, Samuel) Modified on 5/2/2022 to create docket entry relationship to motion <u>31</u> . (Collins, S.) (Entered: 04/29/2022) |
| 05/12/2022 | <u>46</u> | REPLY to Response to Motion regarding <u>35</u> MOTION for Summary Judgment filed by 360 Virtual Drone Services LLC, Michael Jones. (Gedge, Samuel) (Entered: 05/12/2022) |
| 05/13/2022 | <u>47</u> | REPLY to Response to Motion regarding <u>31</u> MOTION for Summary Judgment filed by Richard M. Benton, Jonathan S. Care, Carl M. Ellington, Jr, Cedric D. Fairbanks, Dennis K. Hoyle, John M. Logsdon, Brenda L. Moore, Andrew L. Ritter, Carol Salloum, Andrew G. Zoutwelle. (Attachments: # <u>1</u> Exhibit A (Recht v. Morrisey)) (Hanna, Douglas) (Entered: 05/13/2022) |
| 05/16/2022 | | Motions Submitted to District Judge Louise Wood Flanagan regarding <u>35</u> MOTION for Summary Judgment, <u>31</u> MOTION for Summary Judgment. (Collins, S.) (Entered: 05/16/2022) |
| 05/26/2022 | <u>48</u> | Notice of Suggestion of Subsequently Controlling Decided Authority filed by 360 Virtual Drone Services LLC, Michael Jones . (Attachments: # <u>1</u> Opinion & Order, Upsolve, Inc. v. James, No. 22−cv−627 (S.D.N.Y. May 24, 2022)) (Gedge, Samuel) (Entered: 05/26/2022) |
| 03/16/2023 | <u>49</u> | Notice of Suggestion of Subsequently Controlling Decided Authority filed by 360 Virtual Drone Services LLC, Michael Jones . (Gedge, Samuel) (Entered: 03/16/2023) |
| 03/31/2023 | <u>50</u> | **ORDER granting <u>31</u> Motion for Summary Judgment; denying <u>35</u> Motion for Summary Judgment. Judgement shall be entered in favor of defendants, and each side shall bear its own costs. The clerk is DIRECTED to close this case. Signed by District Judge Louise Wood Flanagan on 3/31/2023.** (Collins, S.) (Entered: 03/31/2023) |
| 03/31/2023 | <u>51</u> | **JUDGMENT − In accordance with the court's order entered March 31, 2023, and for the reasons set forth more specifically therein, it is ordered that defendant's motion for summary judgment is GRANTED. Signed by Peter A. Moore, Jr., Clerk of Court on 3/31/2023.** (Collins, S.) (Entered: 03/31/2023) |
| 04/25/2023 | <u>52</u> | Notice of Appeal filed by 360 Virtual Drone Services LLC, Michael Jones as to <u>50</u> Order on Motion for Summary Judgment,,, <u>51</u> Judgment,. Filing fee, receipt number ANCEDC−7055707. (Gedge, Samuel) (Entered: 04/25/2023) |
| 04/26/2023 | <u>53</u> | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals regarding <u>52</u> Notice of Appeal. (Foell, S.) (Entered: 04/26/2023) |
| 05/01/2023 | <u>54</u> | US Court of Appeals Case Number 23−1472 (Emily Borneisen, Case Manager) as to <u>52</u> Notice of Appeal filed by 360 Virtual Drone Services LLC, Michael Jones. (Foell, S.) (Entered: 05/01/2023) |

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION**

No. \_\_:\_\_-CV-_____

| | |
|---|---|
| 360 VIRTUAL DRONE SERVICES LLC and MICHAEL JONES, <br><br> Plaintiffs, <br><br> v. <br><br> ANDREW L. RITTER, in his official capacity as Executive Director of the North Carolina Board of Examiners for Engineers and Surveyors; and JOHN M. LOGSDON, JONATHAN S. CARE, DENNIS K. HOYLE, RICHARD M. BENTON, CARL M. ELLINGTON, JR., CEDRIC D. FAIRBANKS, BRENDA L. MOORE, CAROL SALLOUM, and ANDREW G. ZOUTWELLE, in their official capacities as members of the North Carolina Board of Examiners for Engineers and Surveyors, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

**INTRODUCTION**

1.      This is a First Amendment lawsuit to vindicate the right of Plaintiffs 360 Virtual

Drone Services LLC and Michael Jones to create useful information (aerial images and related

data) and disseminate that information to willing customers. In 2017, Michael Jones's business,

360 Virtual Drone Services LLC, began harnessing cutting-edge drone technology to capture

aerial images and data about land and property—including orthomosaic aerial pictures, thermal

maps, and other visualizations of information about land. Similar small businesses have thrived

nationwide. In North Carolina, however, drone start-ups have found themselves targeted by a

centuries-old profession: land surveyors. As most people would understand it, "land surveying"

involves establishing legal boundaries between tracts of land. Yet the North Carolina Board of

Examiners for Engineers and Surveyors (Board) takes a far more aggressive view. According to the Board, capturing and disseminating data about the dimensions or elevations of land—or the size of objects on land—requires a full-blown land-surveyor license. Drawing even rough approximations of property lines on images requires a land-surveyor license. Even stitching aerial photos together using orthomosaic software requires a land-surveyor license.

2.      Michael Jones learned all this the hard way: in December 2018, the Board began investigating 360 Virtual Drone Services LLC for engaging in unlicensed land surveying. Michael has never purported to be a "surveyor," and he and his business have never purported to mark the legal boundaries of land; like many similar businesses, they sought merely to create and convey images and information. Even so, the Board told them to stop. The Board formally warned 360 Virtual Drone Services LLC that without a land-surveyor license, it was unlawful to engage in "mapping," "providing location and dimension data," and "producing orthomosaic maps, quantities, and topographic information." Unless the company "c[a]me into compliance," the Board cautioned, it would face civil and even criminal consequences.

3.      Plaintiffs' experience is far from unique; in recent years, the Board has issued similar cease-and-desist letters to at least a half-dozen drone companies. In this way, both the Board and the statutes it enforces violate the First Amendment at a bedrock level. Simply, the projects the Board targets—aerial photos, data, 3D digital models, and the like—are speech that is fully protected by the First Amendment. Plaintiffs thus bring this civil-rights lawsuit to vindicate their constitutional right to create and communicate images and data about land.

## JURISDICTION AND VENUE

4.      Plaintiffs 360 Virtual Drone Services LLC and Michael Jones bring this civil-rights lawsuit seeking declaratory and injunctive relief pursuant to the First and Fourteenth Amendments to the United States Constitution; the Civil Rights Act of 1871, 42 U.S.C. § 1983; and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202.

5.      This Court has jurisdiction under 28 U.S.C. §§ 1331, 1343, and 2201-2202, and 42 U.S.C. § 1983.

6.      Venue lies in this District under 28 U.S.C. § 1391(b) because Defendants reside in this District and a substantial part of the events giving rise to Plaintiffs' claims occurred in this District.

7.      Pursuant to Local Rules 40.1(b) and 40.1(c), this action is properly filed in the Western Division because Plaintiffs reside in Wayne County.

## PARTIES

8.      Plaintiff 360 Virtual Drone Services LLC is a North Carolina limited liability company. It is wholly owned by Plaintiff Michael Jones.

9.      Plaintiff Michael Jones is a resident of the City of Goldsboro in Wayne County, North Carolina. He is a United States citizen.

10.     Defendant Andrew L. Ritter is the Executive Director of the North Carolina Board of Examiners for Engineers and Surveyors, the agency responsible for enforcing the North Carolina Engineering and Land Surveying Act. He is sued in his official capacity only.

11.     Defendants John M. Logsdon, Jonathan S. Care, Dennis K. Hoyle, Richard M. Benton, Carl M. Ellington, Jr., Cedric D. Fairbanks, Brenda L. Moore, Carol Salloum, and

Andrew G. Zoutwelle are members of the North Carolina Board of Examiners for Engineers and Surveyors. They are sued in their official capacities only.

## FACTUAL ALLEGATIONS

**I.    MICHAEL JONES'S DRONE PHOTOGRAPHY BUSINESS**

    **A.    Commercial drone use**

12.    A drone is an unmanned aircraft that can fly autonomously and navigates through a combination of human input and guiding from the Global Positioning System (GPS).

13.    While drones often are used recreationally, recent years have also seen the rise of a thriving commercial-drone industry.

14.    Using cameras, drones can take photographs of—and collect data about— buildings, land, construction sites, and other property.

15.    Drone-captured photos and data can be used for many different purposes.

16.    Using drones, for example, operators can create detailed two-dimensional photographs of property by flying a drone over the area, capturing images, and then stitching those images together using computer software that combines the discrete photos into a single, high-resolution image. An image created in this way is called an orthomosaic map.

17.    Metadata are secondary data about an image (for example, the time and date an image was captured or the GPS coordinates for where it was captured). Virtually any picture taken with a modern smartphone contains metadata. Similarly, drone-captured images can include metadata as well, including data about ground elevation, heat, locations, and distances.

18.    Using this metadata, computer software can use drone-captured images to calculate the distance from Point *A* to Point *B*. The software can calculate the size of objects as well. For example, a drone can photograph a stockpile of building materials. In doing so, the drone can capture metadata on the materials' location and elevation. That data, in turn, can be

used to quickly calculate the approximate volume of the stockpile as a whole—often called a "volumetric calculation."

19.    Drone-captured images and data can also be used to create 3D digital models of land and structures.

20.    In addition, drones can use heat-sensor imaging to identify thermal leaks in large buildings and storage units.

21.    In short, drones can capture and create information—about the conditions of land and structures and about distances, locations, elevations, and volumes.

**B.    Michael Jones's business**

22.    Michael Jones has provided professional photography and videography services in North Carolina since around 2016. Soon after launching his photography business, he recognized the extraordinary potential of drones and branched out to drone-based aerial photography too.

23.    Michael is certified by both the Federal Aviation Administration and the North Carolina Department of Transportation to fly drones commercially.

24.    Between 2017 and 2019, Michael offered drone photography services through a single-member LLC (360 Virtual Drone Services LLC) to clients, including real-estate developers, property managers, realtors, entertainment companies, retail stores, and individuals.

25.    For example, one real-estate developer hired Michael to perform weekly flyovers of the developer's property, capture images, stitch the images together using computer software, and provide him with an updated orthomosaic picture of his property. In this way, the client could regularly monitor the state of the property.

26.    Similarly, a local Walmart hired Michael to fly his drone over a distribution center and capture images using a thermal sensor, allowing the company to identify potential

heat leaks. These images, too, were stitched together to create an orthomosaic thermal map of the roof.

27.      A mall in Wilmington, North Carolina, also hired Michael to capture aerial images of its parking lot for composition into an orthomosaic map.

28.      Realtors hired Michael to take aerial photographs of properties to use for promotional purposes. For some of these images, Michael would add lines to his aerial photographs indicating the rough boundaries of a piece of property based on approximations provided to him by the realtor. At no point, however, did Michael create or offer to create images or documents that have legal effect (such as setting property boundaries).

29.      At no point has Michael been licensed as a land surveyor in North Carolina or anywhere else.

30.      At no point has 360 Virtual Drone Services LLC been licensed as a land-surveying business in North Carolina or anywhere else.

31.      At no point has Michael marketed his or 360 Virtual Drone Services LLC's services as land surveying or as a substitute for a land survey.

32.      At no point has Michael or 360 Virtual Drone Services LLC established or purported to establish legal descriptions of property.

33.      Even so, in December 2018 Michael received a letter from the North Carolina Board of Examiners for Engineers and Surveyors. The letter announced that the Board had opened an investigation into whether 360 Virtual Drone Services LLC was engaged in the unlicensed practice of land surveying.

**II.      REGULATION OF LAND SURVEYING IN NORTH CAROLINA**

34.      North Carolina regulates land surveying through its Engineering and Land Surveying Act (Act), N.C. Gen. Stat. §§ 89C-1 *et seq.*, through rules and regulations

promulgated pursuant to the Act, and through policies issued by the North Carolina Board of Examiners for Engineers and Surveyors.

35.    Generally speaking, land surveyors are the professionals who measure and update boundary lines. Often, their surveys have legal effect, as, for example, when a land plat is recorded in the local register of deeds.

36.    The Act prohibits any person from practicing or offering to practice land surveying in North Carolina without first being licensed by the Board. *Id.* §§ 89C-2, 89C-23. To become a licensed land surveyor, an applicant must meet a combination of educational, examination, and practice requirements. 21 N.C. Admin. Code 56.0601. For example, an applicant without a surveying-related B.S. or associate degree must have sixteen years of "progressive practical experience," nine of them under a practicing licensed land surveyor. N.C. Gen. Stat. § 89C-13(b)(1a)(d). All applicants also must pass three examinations: Fundamentals of Surveying, Principles and Practice of Surveying, and a North Carolina-specific exam. And all applicants must submit a sample map complying with the state's standards for practice of land surveying. *See* N.C. Bd. of Exam'rs for Eng'rs & Surveyors, *Individual Applicants: Professional Land Surveyor*, <https://tinyurl.com/5xbstx69>.

37.    The Act also prohibits any corporation or business firm from engaging in the practice of land surveying in North Carolina without first being licensed by the Board. N.C. Gen. Stat. § 89C-24. The license is available only for entities that are at least two-thirds owned by individual North Carolina-licensed land surveyors. N.C. Gen. Stat. §§ 55B-2(6), 55B-6(a), 57D-2-02(a); N.C. Bd. of Exam'rs for Eng'rs & Surveyors, *Businesses*, <https://tinyurl.com/srfmmfrt>. "Licensure of a corporation or business firm does not affect the requirement that all . . . land surveying work done by the corporation or business firm be

performed by or under the responsible charge of individual registrants . . . ." N.C. Gen. Stat. § 89C-24.

38.     Violating the Act is a Class 2 misdemeanor and may give rise to $1,000 in fines and up to 60 days' imprisonment. *Id.* § 89C-23; *see also id.* § 15A-1340.23. In addition, the Board is empowered to enforce the Act, including through conducting investigations and suing for injunctive relief. *Id.* § 89C-10(c), (f); 21 N.C. Admin. Code 56.1302.

39.     In defining what kind of work requires a land-surveyor license, the Act sweeps exceptionally broadly: It requires a land-surveyor license before people can collect basic data and information about land and structures.

40.     As relevant here, the "[p]ractice of land surveying" is defined to include:

(a) Providing professional services such as consultation, investigation, testimony, evaluation, planning, mapping, assembling, and interpreting reliable scientific measurements and information relative to the location, size, shape, or physical features of the earth, improvements on the earth, the space above the earth, or any part of the earth, whether the gathering of information for the providing of these services is accomplished by conventional ground measurements, by aerial photography, by global positioning via satellites, or by a combination of any of these methods, and the utilization and development of these facts and interpretations into an orderly survey map, plan, report, description, or project. The practice of land surveying includes the following:

1.     Locating, relocating, establishing, laying out, or retracing any property line, easement, or boundary of any tract of land;

2.     Locating, relocating, establishing, or laying out the alignment or elevation of any of the fixed works embraced within the practice of professional engineering;

3.     Making any survey for the subdivision of any tract of land, including the topography, alignment and grades of streets and incidental drainage within the subdivision, and the preparation and perpetuation of maps, record plats, field note records, and property descriptions that represent these surveys;

4.  Determining, by the use of the principles of land surveying, the position for any survey monument or reference point, or setting, resetting, or replacing any survey monument or reference point;

5.  Determining the configuration or contour of the earth's surface or the position of fixed objects on the earth's surface by measuring lines and angles and applying the principles of mathematics or photogrammetry;

6.  Providing geodetic surveying which includes surveying for determination of the size and shape of the earth both horizontally and vertically and the precise positioning of points on the earth utilizing angular and linear measurements through spatially oriented spherical geometry; and

7.  Creating, preparing, or modifying electronic or computerized data, including land information systems and geographic information systems relative to the performance of the practice of land surveying.

N.C. Gen. Stat. § 89C-3(7).

41.    As enforced by the Board, the "practice of land surveying" covers all manner of data- and information-collection about land and structures. And in recent years, the Board has enforced the Act vigorously against drone operators whose work includes creating and selling images and data.

42.    On information and belief, the Board cautioned one drone operator that he would need a land-surveyor license if he were to provide a client with aerial photographs of land containing any metadata or other information about coordinates or distances.

43.    According to the Board, a drone operator needs a land-surveyor license if he or she takes aerial photographs and uses orthomosaic software to stitch the photos together.

44.    According to the Board, a drone operator needs a land-surveyor license if he or she takes aerial photographs of land or structures and uses software to process the photos into a 3D digital model.

45.     According to the Board, a drone operator needs a land-surveyor license if he or she creates "accurate aerial maps."

46.     On information and belief, the Board maintains that a drone operator needs a land-surveyor license if he or she takes aerial photographs and processes those photographs into an image showing elevations.

47.     On information and belief, the Board maintains that a drone operator needs a land-surveyor license if he or she takes aerial photographs and processes them in such a way that a client can make rough measurements of distances and volumes using computer software.

48.     According to the Board, a drone operator needs a land-surveyor license if he or she performs "[t]he service of oblique aerial imaging."

49.     On information and belief, the Board maintains that a person without a land-surveyor license would be violating the Act if he or she were to perform any of the activities detailed in Paragraphs 41 through 48 above—even if (1) he or she were to clearly inform the client that the photographs and data are not the work of a licensed land surveyor and (2) the photographs and data were not created to establish legal boundaries on property.

50.     Since 2018, the Board has issued no fewer than six cease-and-desist letters to drone companies. Those letters have ordered the recipients to stop providing (among other things) "3D model[s] of an object or land mass"; "aerial photogrammetry"; "digital elevation models, contour lines, and calculations"; and "analysis of volumes of stockpiles."

51.     On information and belief, a representative of the Board provided the following answers to the following questions:

> 1. I take aerial photographs of land for a developer and use software to stitch the images together. I sell him the individual photographs without any geological references.

**Answer:**
**If there is no meta data or other information about coordinates, distances,**
**property boundaries or anything that falls within the definition of land**
**surveying in GS 89C-3(7) then simple [sic] taking and providing the**
**photographs does not require a land surveying license.**

2. I take the same photographs and process them into a topographic contour map
to show elevation so the developer can determine if too much grading would be
needed before buying the land and paying for a surveyor.
**Answer:**
**No, this would be within the definition of land surveying.**

3. There is a structure on this land, so I take the same photographs and process
them into a 3D model so the developer can get a sense of its appearance from all
sides and from top to bottom.
**Answer:**
**No, this would be within the definition of land surveying.**

4. The developer wants to know the relative size of the land, so I process the same
photographs so the developer can go online and do rough order of magnitude
measurements using a distance tool.
**Answer:**
**No, this would be within the definition of land surveying.**

5. The developer also wants to get a feel for the area and volume of a large stock
pile of stone left on the property, so I process the same photographs so the
developer can go online and draw a polygon around the stock pile and use a
software tool to tell him area and cubic yards contained in the stock pile.
**Answer:**
**No, this would be within the definition of land surveying, as further**
**explained in the Board's Volume Computation Surveys Policy.**

6. Would it make a difference if I delivered the photographs to the developer
stating that the images are not a licensed survey?
**Answer:**
**No, it would still be within the definition of land surveying.**

52.     The Board cannot articulate any public health or safety rationale that would

justify a licensing requirement for the universe of speech falling within the statutory definition of

the "practice of land surveying."

53.     In fact, much of the unlicensed land surveying the Board has investigated in

recent years is similar to basic data provided by online platforms such as Google Maps.

54.    For example, the Board maintains that "creation of break lines, reference points, digital elevation models, contour lines, and calculations" all are the practice of land surveying. As Michael Jones would learn, the Board also maintains that creating and disseminating "topographic information" is the practice of land surveying.

55.    Google Maps makes topographic information and contour lines available for many parts of North Carolina. Below is an example:



56.     Similarly, many other public websites (for example, www.randymajors.org)
provide elevation data about land in North Carolina. Below, for example, is a screenshot from a
website displaying the elevation and coordinates of the Board's office:



57.     As Michael would learn, the Board has said that drawing lines on images of land
to approximate property lines is the practice of land surveying. The Board also maintains (on
information and belief) that creating aerial images containing "meta data or other information
about coordinates, distances, [or] property boundaries" is the practice of land surveying.

58.     Many public websites display lines representing property boundaries in North
Carolina. Below, for example, is a screenshot from Google Maps displaying lines representing
the boundary of the property where the Board's office is located:



-13-

59.     Many public websites also display aerial images that contain information about coordinates and distances. Below, for example, is a screenshot from Google Maps displaying the distance between the Board's office and a nearby art gallery:



## III.   THE BOARD INVESTIGATES MICHAEL'S BUSINESS

60.     After receiving notice of the Board's investigation into his business, Michael met with a Board investigator in early 2019.

61.     The Board investigator told Michael that giving a client an aerial photograph that contained geospatial metadata is the unlicensed practice of land surveying.

62.     The Board investigator told Michael that stitching aerial photographs together to create a larger, orthomosaic picture is the unlicensed practice of land surveying.

63.     The Board investigator told Michael that giving a client aerial photographs on which he had drawn lines is the unlicensed practice of land surveying.

64.    The Board investigator told Michael that providing a disclaimer did not matter in determining whether Michael's activities were the unlicensed practice of land surveying.

65.    On or around June 13, 2019, the Board sent Michael another letter.

66.    A true and correct copy of the Board's June 13, 2019 letter is attached to this complaint as Exhibit 1.

67.    The letter asserted that "[a]fter a thorough consideration of the investigative materials, the Board's Review Committee has determined that there is sufficient evidence to support the charge that 360 Virtual Drone Services, LLC is practicing, or offering to practice, surveying in North Carolina . . . without being licensed with this Board."

68.    The letter also asserted that "[a]t its regular meeting on June 12, 2019 the Board concurred with the recommendation of the Review Committee, which was to place 360 Virtual Drone Services, LLC on notice that practicing, or offering to practice, land surveying in North Carolina, as defined in G.S. 89C-3(7) without being licensed with this Board and to place the company on notice that practicing, or offering to practice land surveying in North Carolina without being licensed with the Board, is a violation of G.S. 89C-24, 55B and 57D."

69.    The letter listed prohibited activities as including "mapping, surveying and photogrammetry; stating accuracy; providing location and dimension data; and producing orthomosaic maps, quantities, and topographic information."

70.    Disclaimers would not suffice, the letter added. A "marketing disclaimer is not appropriate," the letter asserted, "as the services still fall within the practice of land surveying."

71.    If 360 Virtual Drone Services LLC "fails to come into compliance," the Board threatened "to apply to the court for an injunction or pursue criminal prosecution."

## IV.   INJURY TO PLAINTIFFS

72.     Before the Board issued its June 13, 2019 letter, Plaintiffs offered and provided drone services such as aerial orthomosaic maps, aerial images containing location information, and aerial images of land that include lines indicating the rough position of property lines.

73.     Since receiving the Board's June 13, 2019 letter, Plaintiffs have heeded the Board's demand that they "come into compliance."

74.     Since receiving the Board's June 13, 2019 letter, Plaintiffs have ceased offering and providing drone services such as aerial orthomosaic maps, aerial images containing location information, and aerial images of land that include lines indicating the rough position of property lines.

75.     Plaintiffs have complied with the Board's demands—and they have ceased offering and providing various drone services—solely to avoid exposing themselves to government enforcement actions.

76.     Michael still uses his drone for certain projects (for example, filming aerial footage at weddings). But since receiving the Board's June 13, 2019 letter, Michael has avoided projects that would expose him to enforcement at the hands of the Board.

77.     Plaintiffs wish to offer and provide drone services that include the following:

a.     Capturing aerial images on behalf of paying clients and using orthomosaic software to stitch those aerial images together to form orthomosaic maps.

b.     Creating marketing images of land on behalf of paying clients and drawing on those images lines indicating the approximate position of property boundaries. (If they were to provide aerial images of land that include lines indicating the approximate position of property boundaries, Plaintiffs would include a disclaimer to the following effect: "The

-16-

property lines on this image are approximations for visualization purposes only. They are not based on a survey created by a licensed surveyor and are not to be used to replace a survey created by a licensed surveyor.")

c.    Capturing aerial images of land and structures (along with location data, coordinates, elevation data, and volume data) and making those images and that data available to paying clients.

d.    Capturing aerial images of and data about land and structures; processing those images and data to create 3D digital models of land and structures; and making those 3D digital models available to paying clients.

78.    If Plaintiffs were to offer and provide the services detailed at Paragraph 77, however, they would face enforcement for violating the Act and the Board's associated rules and policies.

79.    Because of the Act and the Board's associated rules and policies, Plaintiffs are not offering and providing the services detailed at Paragraph 77 to paying clients.

80.    But for the Act and the Board's associated rules and policies, Plaintiffs would offer and provide the services detailed at Paragraph 77 to paying clients.

81.    So long as the Act and the Board's associated rules and policies remain in place, Plaintiffs will be prohibited from offering and providing the services detailed at Paragraph 77 to paying clients.

82.    The Act and the Board's associated rules and policies thus prohibit and prevent Plaintiffs from offering and providing the services detailed at Paragraph 77 to paying clients, and these laws (and the Board's enforcement of them) are enough to chill or silence persons of ordinary firmness from communicating information in this way.

83.    But for the Act and the Board's associated rules and policies, Plaintiffs would be free to resume creating and collecting images, data, and information with drones; processing images, data, and information; and conveying those images, data, and information to paying clients.

84.    Plaintiffs would offer and provide the services described at Paragraph 77 but for the fact that the Act and the Board's associated rules and policies make it illegal to do so.

85.    The Act and the Board's associated rules and policies are triggered only if Plaintiffs create or disseminate images and information about certain subjects.

86.    The Act and the Board's associated rules and policies impose special burdens on Plaintiffs because of the content of their speech. If Plaintiffs were to create 3D digital artwork, for example, the Board would not suppress their speech. If Plaintiffs were to create a 3D digital model of a field, by contrast, they would be in violation of the Act.

87.    In order to create and communicate the images and information described at Paragraph 77, Plaintiffs would be forced to comply with burdensome licensing requirements.

88.    These requirements are burdens placed on Plaintiffs solely because of the content of their speech.

89.    These requirements restrict Plaintiffs from offering and providing services to willing customers without first obtaining a license.

90.    If Plaintiffs offer or provide the services described at Paragraph 77 without a land-surveyor license, they face a threat of enforcement at the hands of the Board.

## CAUSE OF ACTION

### (First Amendment's Speech Clause)

91.     Plaintiffs reassert and reallege Paragraphs 1 through 90 as if fully set forth herein.

92.     The First Amendment to the United States Constitution (incorporated against the states through the Fourteenth Amendment) provides, in relevant part, that "Congress shall make no law . . . abridging the freedom of speech."

93.     Plaintiffs want to create, process, and communicate information—for example, aerial images, 3D digital models, and data about land and structures. These services consist entirely of speech protected by the First Amendment.

94.     Creating, processing, and disseminating images of land and structures is fully protected speech under the First Amendment and does not fall within any recognized exception to the First Amendment.

95.     Creating, processing, and disseminating 3D digital models of land and structures is fully protected speech under the First Amendment and does not fall within any recognized exception to the First Amendment.

96.     Creating, processing, and disseminating data about land and structures (including data about distances, coordinates, elevations, and volumes) is fully protected speech under the First Amendment and does not fall within any recognized exception to the First Amendment.

97.     Creating and disseminating information about the approximate boundaries of property (including by drawing lines on marketing images to approximate property boundaries) is fully protected speech under the First Amendment and does not fall within any recognized exception to the First Amendment.

98.     N.C. Gen. Stat. §§ 89C-2, 89C-3(7), 89C-23, and 89C-24 prohibit Plaintiffs from creating, processing, and disseminating images of land and structures. That is a content-based

restriction on speech; the law applies to Plaintiffs only because of the type of information—the communicative content—their images would convey.

99.     N.C. Gen. Stat. §§ 89C-2, 89C-3(7), 89C-23, and 89C-24 prohibit Plaintiffs from creating, processing, and disseminating 3D digital models of land and structures. That is a content-based restriction on speech; the law applies to Plaintiffs only because of the type of information—the communicative content—their 3D digital models would convey.

100.    N.C. Gen. Stat. §§ 89C-2, 89C-3(7), 89C-23, and 89C-24 prohibit Plaintiffs from creating, processing, and disseminating data about land and structures (including data about distances, coordinates, elevations, and volumes). That is a content-based restriction on speech; the law applies to Plaintiffs only because of the communicative content the data would convey.

101.    N.C. Gen. Stat. §§ 89C-2, 89C-3(7), 89C-23, and 89C-24 prohibit Plaintiffs from creating and disseminating information about the approximate boundaries of property (including by drawing lines on marketing images to approximate property boundaries). Again, that is a content-based restriction on speech; the law applies to Plaintiffs only because of the information—the communicative content—their images would convey.

102.    As the Board's past enforcement, policies, and statements have demonstrated, N.C. Gen. Stat. §§ 89C-2, 89C-3(7), 89C-23, and 89C-24 prohibit everything from stitching together aerial photos to collecting information about distances, coordinates, elevations, and volumes.

103.    Defendants lack a state interest, compelling or otherwise, in preventing Plaintiffs from creating, processing, and disseminating images of land and structures.

104.    Defendants lack a state interest, compelling or otherwise, in preventing Plaintiffs from creating, processing, and disseminating 3D digital models of land and structures.

105.     Defendants lack a state interest, compelling or otherwise, in preventing Plaintiffs from creating, processing, and disseminating data about land and structures (including data about distances, coordinates, elevation, and volume).

106.     Defendants lack a state interest, compelling or otherwise, in preventing Plaintiffs from creating and disseminating information about the approximate boundaries of property (including by drawing lines on marketing images to approximate property boundaries).

107.     Defendants' ban of Plaintiffs' speech is not sufficiently tailored to any state interest, much less a compelling state interest, in preventing people from receiving the images, data, and information Plaintiffs wish to convey.

108.     Defendants' ban of Plaintiffs' speech is not sufficiently tailored to any other state interest, compelling or otherwise.

109.     Under North Carolina law, as interpreted and enforced by the Board, only licensed land surveyors may create aerial orthomosaic maps; 3D digital models of land and structures; aerial images containing location, distance, volumetric, and elevation data; and aerial images of land that include lines indicating the approximate position of property boundaries.

110.     On their face and as applied to Plaintiffs, N.C. Gen. Stat. §§ 89C-2, 89C-3(7), 89C-23, and 89C-24 restrain Plaintiffs' ability to create, use, and disseminate information.

111.     On their face and as applied to Plaintiffs, N.C. Gen. Stat. §§ 89C-2, 89C-3(7), 89C-23, and 89C-24 restrain Plaintiffs' ability to create aerial orthomosaic maps, 3D digital models, aerial images containing information, and aerial images of land that indicate the approximate position of property lines.

112.     On their face, N.C. Gen. Stat. §§ 89C-2, 89C-3(7), 89C-23, and 89C-24 sweep up a broad swath of speech, including orthomosaic images, 3D digital models, oblique aerial

images, and images containing data about locations, distances, elevations, and sizes of land or objects. In this way, North Carolina's land-surveying licensing law is substantially overbroad, as it sweeps in significant amounts of speech that North Carolina has no conceivable interest in regulating.

113. Application of N.C. Gen. Stat. §§ 89C-2, 89C-3(7), 89C-23, and 89C-24 to Plaintiffs acts as a content- and speaker-based restriction on the availability and use of information.

114. Unless N.C. Gen. Stat. §§ 89C-2, 89C-3(7), 89C-23, and 89C-24 are declared unconstitutional and Defendants are enjoined, Plaintiffs will suffer continuing and irreparable harm to their First Amendment rights.

## **REQUEST FOR RELIEF**

Plaintiffs request the following relief:

A. A judgment declaring that N.C. Gen. Stat. §§ 89C-2, 89C-3(7), 89C-23, and 89C-24 on their face and as applied to Plaintiffs and others similarly situated violate the Speech Clause of the First Amendment to the United States Constitution;

B. A permanent injunction prohibiting the Board from enforcing N.C. Gen. Stat. §§ 89C-2, 89C-3(7), 89C-23, and 89C-24 against Plaintiffs and others similarly situated for taking aerial photographs and for collecting, processing, disseminating, and selling images of and information about land and property (including distances, coordinates, elevations, and volumes);

C. An award of attorneys' fees, costs, and expenses in this action pursuant to 42 U.S.C. § 1988; and

D. Any other legal and equitable relief as the Court may deem just and proper.

Respectfully submitted this 22nd day of March, 2021.

/s/ Samuel B. Gedge
Samuel B. Gedge (VA Bar No. 80387)*
James T. Knight II (DC Bar No. 1671382)*
INSTITUTE FOR JUSTICE
901 North Glebe Road, Suite 900
Arlington, VA 22203
Phone: (703) 682-9320
Fax: (703) 682-9321
E-mail: sgedge@ij.org
        jknight@ij.org
*Notice of Special Appearance pursuant to Local Rule 83.1(e) forthcoming*

/s/ David G. Guidry
David G. Guidry
MAINSAIL LAWYERS
338 South Sharon Amity Rd., #337
Charlotte, NC 28211
Phone: (917) 376-6098
Fax: (888) 501-9309
E-mail: dguidry@mainsaillawyers.com
State Bar No.: 38675
*Local Civil Rule 83.1(d) Counsel for Plaintiffs*

*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
CASE NO. 5:21-cv-0137-FL

360 VIRTUAL DRONE SERVICES )
LLC and MICHAEL JONES, )
 )
     Plaintiffs, )
 )
v. )
 )
ANDREW L. RITTER, in his official )
capacity as Executive Director of the )
North Carolina Board of Examiners for )    **LR 56.1 STATEMENT OF**
Engineers and Surveyors; and JOHN )    **UNDISPUTED MATERIAL FACTS**
M. LOGSDON, JONATHAN S. CARE, )
DENNIS K. HOYLE, RICHARD M. )
BENTON, CARL M. ELLINGTON, JR, )
CEDRIC D. FAIRBANKS, BRENDA L. )
MOORE, CAROL SALLOUM, and )
ANDREW G. ZOUTWELLE, in their )
official capacities as members of the )
North Carolina Board of Examiners for )
Engineers and Surveyors, )
 )
     Defendants. )

NOW COMES Defendants, through counsel, and provides the following statement of undisputed material facts.

1.    North Carolina regulates land surveying through it Engineering and Land Surveying Act. [ECF Doc. 1, Complaint at ¶ 34; N.C.G.S. §§ 89C-1, *et seq*.].

2.    The Act establishes a State Board of Examiners for Engineers and Surveyors (the "Board") to administer the provisions of the Act. [N.C.G.S. § 89C-4; Ritter Affidavit ¶ 3 (Appendix Exhibit 1)].

3.     The Legislature designated the practice of Land Surveying as a profession.  [N.C.G.S. § 89C-3(7)(a); Ritter Affidavit ¶ 4].

4.     "Land surveying encompasses a number of disciplines including geodetic surveying, hydrographic surveying, cadastral surveying, engineering surveying, route surveying, photogrammetric (aerial) surveying, and topographic surveying." [N.C.G.S. § 89C-13(b); Ritter Affidavit ¶ 5].

5.     "The Act prohibits any person from practicing or offering to practice land surveying in North Carolina without first being licensed by the Board."  [ECF Doc. 1 at ¶ 36; N.C.G.S. §§ 89C-2 and 89C-23; Ritter Affidavit ¶ 6].

6.     The alleged unlawful practice by an unlicensed person shall be subject to Board investigation.  [21 NCAC 56 .1302; Ritter Affidavit ¶ 7].

7.     Plaintiff Michael Jones incorporated 360 Virtual Drone Services, LLC ("Virtual Drone") in October 2017.  [Rule 30(b)(6) Deposition of Virtual Drone ("Virtual Drone Depo") p. 25 (Appendix Exhibit 2)].

8.     Virtual Drone is wholly owned by Michael Jones.  [ECF Doc. 1 at ¶ 8].

9.     Michael Jones does not individually offer any services or transact any business under his name.  [Michael Jones Depo p. 48 (Appendix Exhibit 3)].

10.    Between 2017 and 2021, Virtual Drone has provided drone photography-related services, including videography and photography for commercial and real-estate marketing and weddings.  [Virtual Drone Depo p. 27].

11.    Virtual Drone uses a drone and a camera to perform its services. [Virtual Drone Depo p. 87].

12.    Between October 2017 and June 2019, Virtual Drone provided drone-related photography and videography services to clients.  [Virtual Drone Depo p. 41].

13.    Michael Jones received no formal instruction regarding photography. [Michael Jones Depo p. 29].

14.    Michael Jones received no formal instruction regarding the use of drones.  [Michael Jones Depo. P. 29].

15.    Michael Jones has no experience in the field of photogrammetry. [Virtual Drone Depo p. 13].

16.    Virtual Drone has never provided photogrammetry services to paying customers.  [Virtual Drone Depo p. 12].

17.    Michael Jones is not a licensed land surveyor in North Carolina or anywhere else.  [ECF Doc. 1 at ¶ 29].

18.    Virtual Drone is not licensed as a land surveying business in North Carolina or anywhere else.  [ECF Doc. 1 at ¶ 30; Michael Jones Depo p. 143].  Michael Jones does not want to be a licensed land surveyor.  [Michael Jones Depo p. 143].

19.    In early 2019, the Board mailed Michael Jones and Virtual Drone a notice that the Board "had initiated an investigation concerning charges that 360 Virtual Drone Services, LLC is practicing or offering to practice surveying without a license as required by F.S. 89C."  [ECF Doc. 1 at ¶ 60; Ritter Affidavit ¶ 8].

20.    Prior to receiving notice from the Board, Virtual Drone advertised that it offered "surveying" and "mapping" services.  [Michael Jones Depo. pp. 56 and 66; Ritter Affidavit ¶ 9].

21.    Michael Jones told the Board that Virtual Drone offered orthomosiac maps or measurable maps.  [Michael Jones Depo p. 67; Ritter Affidavit ¶ 10].

22.    Prior to June 2019, Virtual Drone never provided measurable maps to clients.  [Virtual Drone Depo p. 41].

23.    Prior to June 2019, Virtual Drone was never hired to provide an orthomosaic map.  [Virtual Drone Depo pp. 51-52].

24.    Prior to June 2019, Virtual Drone was never hired to provide maps with location data.  [Virtual Drone Depo p. 41; Michael Jones Depo p. 108].

25.    Prior to June 2019, Virtual Drone was never hired to provide maps with coordinates.  [Michael Jones Depo p. 108].

26.    Prior to June 2019, Virtual Drone was never hired to provide maps with elevation data.  [Virtual Drone Depo p. 42; Michael Jones Depo p. 108].

27.    Prior to June 2019, Virtual Drone was never hired to provide maps with volume data.  [Virtual Drone Depo p. 42; Michael Jones Depo p. 108].

28.    Virtual Drone was never hired by a client to do measurements. [Michael Jones Depo p. 114].

29.    Prior to June 2019, Virtual Drone was never hired to provide a 3D model.  [Virtual Drone Depo. p. 50; Michael Jones Depo p. 116].

30.    Prior to June 2019, Virtual Drone "didn't get far enough in the learning process" to produce a 3D model.  [Virtual Drone Depo p. 50].  Michael Jones has no experience or training in 3D modeling.  [Michael Jones Depo p. 191].

31.    The Board mailed Michael Jones a letter dated June 13, 2019 that, after conducting an investigation, "the Board's Review Committee has determined that there is sufficient evidence to support the charge that 360 Virtual Drone Services, LLC is practicing, or offering to practice, surveying in North Carolina, as defined in G.S. 89C-3(6) without being licensed with this Board." [ECF Doc. 1 at ¶ 67; Exhibit 1; Ritter Affidavit ¶ 11].

32.    Plaintiffs were placed on notice that practicing, or offering to practice, land surveying in North Carolina without being licensed with the Board is a violation of the Act. [ECF Doc. 1 at ¶ 68; Exhibit 1; Ritter Affidavit ¶ 12].

33.    The following notice was provided to Plaintiff Jones in Exhibit 1 [ECF Doc. 1-1]:

> You are hereby notified that the opinion expressed herein is not a final legal determination. An occupational licensing board does not have the authority to order discontinuance of current practices. Only a court may determine that the law has been violated or is being violated and, if appropriate, impose a remedy or penalty for the violation. Further, pursuant to G.S. 150B-4, and per Board Rule 21 NCAC 56 .1205, you may have the right, prior to initiation of any court action by the occupational licensing board, to request a declaratory ruling regarding whether your particular conduct is lawful.

34.    At no time has the Board initiated any enforcement proceedings against Plaintiffs Michael Jones and 360 Virtual Drone. [Ritter Affidavit ¶ 13].

35.    Plaintiffs did not seek a declaratory ruling from the Board for any of the services identified in Paragraph 77 of the Complaint. [Plaintiff's Response to Request for Admission No. 2 (Appendix Exhibit 4)].

36. In 2019, Plaintiff Virtual Drone created one PDF image of an orthomosaic map for marketing purposes, but no client hired him to perform this service. [Virtual Drone Depo. pp. 23, 29, 35 and 45].

37. A PDF copy of an orthomosaic map does not provide clients the ability to perform calculations or measurements on volume or distance. [Michael Jones Depo pp. 181 and 185].

38. Plaintiffs have no intent to offer clients any type of mapping other than a PDF copy of the orthomosaic map. [Michael Jones Depo p. 159].

39. After receiving the June 2019 notice from the Board, Plaintiff Virtual Drone continued to provide aerial images to clients. [Virtual Drone Depo pp. 52 63].

40. After receiving the June 2019 notice from the Board, Plaintiff Virtual Drone continued to provide aerial videography to clients. [Virtual Drone pp. 52 and 63-64].

41. As part of the lawsuit, Plaintiffs are not trying to provide data to allow clients the ability to perform calculations for location, size, shape, and physical features of the earth. [Michael Jones Depo p. 159].

42. All photographs taken by Plaintiffs, whether for weddings, real estate marketing or some other purpose, all have the same date in the digital image. [Virtual Drone Depo p. 69].

43. Following receipt of the June 2019 notice from the Board, Plaintiff Virtual Drone stopped providing aerial images of land that included approximate boundary lines for marketing purposes. [Virtual Drone Depo p. 53].

44.    It is the position of the Board that taking aerial photographs for the purpose of producing a PDF picture without measurable information is not the practice of land surveying.  As such, the Board disavows any intent to initiate enforcement proceedings against Plaintiffs based on the act of producing a PDF image of a map that does not contain measurable information.  [Ritter Affidavit ¶ 15].

45.    The Board actively updates and publishes policies to include or exclude activities that fall within, or outside, the definition of the practice of land surveying. A copy of the inclusion/exclusion list is attached hereto as Exhibit A.  [Ritter Affidavit ¶ 16].

46.    It is the position of the Board that the act of producing an aerial photograph that includes lines indicating the approximate position of property lines for marketing purposes is not the practice of land surveying.  As such, the Board disavows any intent to initiate enforcement proceedings against Plaintiff based on the act of producing an aerial photograph that includes lines indicating the approximate position of property lines for marketing purposes.  [Ritter Affidavit ¶ 17].

47.    The definition of land surveying includes photogrammetry. [N.C.G.S. § 89C-13(b); Ritter Affidavit ¶ 5].

48.    Photogrammetry is the art, science, and technology of obtaining reliable information about physical objects and the environment through processes of recording, measuring, and interpreting photographic images and patterns of recorded radiant electromagnetic energy and other phenomena.  Photogrammetry is primarily

concerned with making precise measurements of three-dimensional (3D) objects and terrain features from two-dimensional (2D) photographs.  Applications include the measuring of coordinates; the quantification of distances, heights, areas, and volumes; the preparation of topographic maps; and the generation of digital elevation models and orthophotographs.  [Defendants' Disclosure of Expert Testimony at p. 2 (Appendix Exhibit 6)].

49.    Land Surveying is regulated in North Carolina "in order to safeguard life, health, and property, and to promote the public welfare" and is "subject to regulation in the public interest."  [N.C.G.S. § 89C-2; Rule 30(b)(6) Deposition of the Board at p. 10 (Appendix Exhibit 5); Defendants' Disclosure of Expert Testimony at p. 14].

50.    The regulation and licensing of land surveying in North Carolina works to establish a minimum level of competence (education, exam, and experience) and the Act works to protect the public from negligence, incompetence, and professional misconduct in the profession of land surveying.  [Defendants' Disclosure of Expert Testimony at p. 14; Rule 30(b)(6) Deposition of the Board at pp. 10-11].

51.    Errors in land surveying could have significant adverse consequences on the public, including the client who hired the surveyor and who relies on the accuracy of the work product.  [Defendants' Disclosure of Expert Testimony at p. 14; Alex Abate Deposition at pp. 57-58 and 65-66 (Appendix Exhibit 7)].

Respectfully submitted this the 25th day of March, 2022.

FITZGERALD HANNA & SULLIVAN, PLLC


/s/ Douglas W. Hanna
Douglas W. Hanna, NCSB #18225
3737 Glenwood Avenue, Suite 375
Raleigh, NC 27612
Telephone: (919) 863-9091
Facsimile: (919) 424-6409
*Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this day filed the foregoing **LR 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

David G. Guidry, Mainsail Lawyers, dguidry@mainsaillawyers.com

Samuel B. Gedge, Institute for Justice, sgedge@ij.org

James T. Knight II, Institute for Justice, jknight@ij.org

This the 25th day of March, 2022.

/s/ Douglas W. Hanna
Douglas W. Hanna, NCSB #18225

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

| | | |
|---|---|---|
| 360 VIRTUAL DRONE SERVICES LLC et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| ANDREW L. RITTER, in his official capacity as Executive Director of the North Carolina Board of Examiners for Engineers and Surveyors, et al., | ) ) ) ) ) | Case No.: 5:21-cv-0137-FL |
| Defendants. | ) ) ) | |

_____

**PLAINTIFFS' STATEMENT OF UNDISPUTED FACTS**

_____

 **1.**  A drone is an unmanned aircraft that can fly either autonomously or with a remote pilot on the ground. Recent years have seen the rise of a thriving commercial-drone industry nationwide. Using cameras, drones can take photographs of—and collect data about—buildings, land, construction sites, and other property. The images and data can be used for many different purposes. **Appendix Exhibit 1 (Abatie Decl. ¶¶ 20-30, 54-69).**

 **2.**  Using drones, operators can create detailed two-dimensional maps of property by flying a drone over the area, capturing images, and stitching those images together using computer software that combines the images into a single, high-resolution photograph. These composite photos are often called "orthomosaic" or "measurable" maps. **Appendix Exhibit 1 (Abatie Decl. ¶¶ 58-61)**.

 **3.**  Because each individual image is geo-referenced, an orthomosaic aerial map can also convey useful information about the land—for example, about distances, elevations, and the

like. It can be used to measure the distance from Point *A* to Point *B*. It can be used to estimate the area of a piece of land. It can be used to identify the elevation of a particular point. Some of this information can be conveyed using traditional means—for example, a scale bar at the bottom of the map. Alternatively, commercially available mapping platforms (well-known examples include Pix4D and DroneDeploy) let users annotate maps and use other tools to derive information from the maps, including distances, areas, elevations, and volumes. **Appendix Exhibit 1 (Abatie Decl. ¶¶ 50-53, 58-61)**.

    **4.**      One of the benefits of aerial orthomosaic maps is currency. While the images and data on sites like Google Earth may be months or years out of date, a custom aerial map can document up-to-date conditions. That currency can provide useful information in many different contexts. For example, a farmer may want to estimate the amount of crop loss in a field after a storm. A real-estate developer may want to estimate the size of a piece of land. Developers, project managers, and other stakeholders may want up-to-date progress reports on construction projects. These are just a few examples. **Appendix Exhibit 1 (Abatie Decl. ¶ 60)**.

    **5.**      Drones can also be used to capture images for photorealistic 3D models of land and structures. Much like a two-dimensional aerial map, a 3D model can be created by combining geotagged photos to create a three-dimensional representation of a piece of property. As with two-dimensional maps, these models can offer information in various settings. They can be used to inspect hard-to-reach areas (cell towers, for instance). They can be used as a form of cultural preservation—for example, by capturing a three-dimensional representation of a historical site. They can be used to recreate crime-scenes. In short—and much like two-dimensional maps—3D models are a source of useful information. **Appendix Exhibit 1 (Abatie Decl. ¶¶ 62-65, 82-86)**.

**6.**     Michael Jones has provided photography and videography services in North Carolina since around 2016. **Appendix Exhibit 3 (Jones Decl. ¶ 4).**

**7.**     What started off as a hobby soon grew into a small business, with Jones offering photography services for pay. **Appendix Exhibit 3 (Jones Decl. ¶ 5)**.

**8.**     Jones soon recognized the extraordinary potential of drones, and he branched out into drone-based aerial photography as well. He got certified by the Federal Aviation Administration to fly drones commercially. And in 2017, he founded a single-member company—360 Virtual Drone Services LLC—and began offering drone-photography services to clients, including real-estate developers, property managers, realtors, entertainment companies, and individuals. **Appendix Exhibit 3 (Jones Decl. ¶¶ 6-9)**.

**9.**     Along with standard photography jobs (aerial shots for weddings, for instance), Jones began offering aerial mapping services as well. He made a profile on a popular commercial-drone website, Droners.io, and selected "Surveying & Mapping" as one of his project categories. **Appendix Exhibit 3 (Jones Decl. ¶¶ 10-13).**

**10.**     On his own website, too, Jones began advertising "video, pictures and orthomosaic maps (Measurable Maps) of [construction] sites." "With this information," he wrote, "construction companies can monitor the elevation changes, volumetrics for gravel/dirt/rock, and watch the change and progression of the site as it forms over time." A true and correct copy of this webpage is attached as Exhibit 1 to Jones's declaration. **Appendix Exhibit 3 (Jones Decl. ¶ 14); Appendix Exhibit 4 (Jones webpage (Jones Decl. Ex. 1)).**

**11.**     Over the next year or so, Jones started making progress. A drone-data company hired him to fly his drone over a Walmart distribution center and capture the images needed to create a thermal map of the roof. He also was hired to capture aerial images of a shopping-mall

parking lot, which likewise could be used to create an aerial map. **Appendix Exhibit 3 (Jones Decl. ¶¶ 15-18)**.

12.    Jones also started trying to make orthomosaic maps himself. One repeat client, for instance, had hired him to take periodic photos and videos of a real-estate development site. To try to expand his portfolio, Jones processed those images into an aerial map and pitched the client on incorporating maps into Jones's existing business. (The map he created is attached to Jones's declaration as Exhibit 2.) That client chose not to make use of the maps. Undeterred, though, Jones continued to advertise mapping as one of his company's offerings. **Appendix Exhibit 3 (Jones Decl. ¶¶ 19-23); Appendix Exhibit 5 (Jones map (Jones Decl. Ex. 2))**.

13.    At no point has Jones been a licensed land surveyor. **Appendix Exhibit 3 (Jones Decl. ¶ 24).**

14.    At no point has 360 Virtual Drone Services LLC been licensed as a surveying business. **Appendix Exhibit 3 (Jones Decl. ¶ 24).**

15.    At no point has Jones deliberately marketed himself as a licensed land surveyor. **Appendix Exhibit 3 (Jones Decl. ¶ 25).**

16.    At no point has Jones he ever purported to establish legal descriptions of property. **Appendix Exhibit 3 (Jones Decl. ¶ 26)**.

17.    In December 2018, Jones received a letter from the North Carolina Board of Examiners for Engineers and Surveyors (Board). That letter stated (in excerpted part):

> At its meeting on December 19, 2018, the Board authorized an investigation to determine if 360 Virtual Drone Services, LLC is in violation of G. S. 89C-24, 57D and 55B for practicing or offering to practice land surveying in North Carolina without a license. Based upon a review of the firm's web site (www.carolinadronehome.com) by the Surveying Committee of the Board and an advertisement on the Droners.io web site, it is alleged that the firm may be practicing or offering to practice

land surveying. The services include, but are not limited to, "Surveying & Mapping," and providing orthomosaic maps of construction sites.

The purpose of this letter is to advise you that in accordance with G. S. 89C, an investigation has been initiated. You are requested to provide this office with your written explanation of, or comments on, the charges along with any documents or papers, which support your position in this matter within fifteen (15) business days of the receipt of this letter.

**Appendix Exhibit 6 (Board's 2018 letter to Jones (Jones Decl. Ex. 3, at 1))**.

18.  Between 2016 and 2020, the Board issued at least a half-dozen cease-and-desist letters to drone operators. **Appendix Exhibits 12, 13 (Board letters to Air Source One and NSight Drone Services (Tuttle Dep. Exs. 29, 30)); Appendix Exhibits 14, 15, 16 (Board letters to Firmatek, Lappert Smith Industries, and NC Drone Pro (Alston Dep. Exs. 15, 18, 23)); Appendix Exhibit 8 (Board 2019 Letter to 360 Virtual Drone Services (Jones Decl. Ex. 5)).**

19.  In one cease-and-desist letter, the Board stated:

If the company fails to come into compliance, further action may be pursued by the Board as authorized in G.S. 89C-10(c) and 89C-23 to apply to the court for an injunction. The activities include, but are not limited to: collection of survey data; aerial surveying and mapping services; any resulting map or drawing; 3D models; and aerial photogrammetry.

**Appendix Exhibit 13 (Board letter to NSight Drone Services (Tuttle Dep. Ex. 30, at 1)).**

20.  In another cease-and-desist letter, the Board stated:

If the company fails to come into compliance, further action may be pursued by the Board as authorized in G.S. 89C-10(c) and 89C-23 to apply to the court for an injunction. The activities include continuing to represent the offering of surveying services that, while renamed, are still within the definition of the practice of land surveying in G.S. 89C-3(7), including but are not limited to, use of orthomosaic software, aerial orthomasaics and models with control point accuracy, high resolution 3/D modeling, property modeling, earthwork data, gradework projects, detailed inspection data, and structural inspection data.

**Appendix Exhibit 12 (Board letter to Air Source One (Tuttle Dep. Ex. 29, at 2)).**

21.    By e-mail, the Board's in-house counsel provided the following responses (in blue text) to the following questions submitted by a drone operator:

> As to your questions:
> 1. I take aerial photographs of land for a developer and use software to stitch the images together. I sell him the individual photographs without any geological references.
> If there is no meta data or other information about coordinates, distances, property boundaries or anything that falls within the definition of land surveying in GS 89C-3(7) then simple taking and providing the photographs does not require a land surveying license.
>
> 2. I take the same photographs and process them into a topographic contour map to show elevation so the developer can determine if too much grading would be needed before buying the land and paying for a surveyor.
> No, this would be within the definition of land surveying.
>
> 3. There is a structure on this land, so I take the same photographs and process them into a 3D model so the developer can get a sense of its appearance from all sides and from top to bottom.
> No, this would be within the definition of land surveying.
>
> 4. The developer wants to know the relative size of the land, so I process the same photographs so the developer can go online and do rough order of magnitude measurements using a distance tool.
> No, this would be within the definition of land surveying.
>
> 5. The developer also wants to get a feel for the area and volume of a large stock pile of stone left on the property, so I process the same photographs so the developer can go online and draw a polygon around the stock pile and use a software tool to tell him area and cubic yards contained in the stock pile.
> No, this would be within the definition of land surveying, as further explained in the Board's Volume Computation Surveys Policy.
>
> Would it make a difference I delivered the photographs to the developer stating that the images are not a licensed survey?
> No, it would still be within the definition of land surveying.

**Appendix Exhibit 17 at 1 (Tuttle e-mail (Tuttle Dep. Ex. 28)); Appendix Exhibit 18 (Tuttle Dep. 31:9-33:2).**

22.    Having received the Board's December 2018 investigation letter, Michael Jones responded quickly. **Appendix Exhibit 3 (Jones Decl. ¶ 28).**

23.    On January 2, 2019, Jones sent an e-mail to the board investigator identified in the December 2018 letter. **Appendix Exhibit 3 (Jones Decl. ¶ 28).**

24.     A true and correct copy of the January 2, 2019 e-mail sent by Jones to the board investigator (and the ensuing e-mail chain) is attached to Jones's declaration as Exhibit 4. **Appendix Exhibit 3 (Jones Decl. ¶ 28); Appendix Exhibit 7 at 4-6 (Jones e-mail chain (Jones Decl. Ex. 4))**.

25.     A true and correct copy of the Board investigative file on 360 Virtual Drone Services LLC is attached to this Statement as Exhibit 3 to the Casey deposition. **Appendix Exhibit 19 (Casey Dep. Ex. 3)**.

26.     On February 1, 2019, the board investigator responded by e-mail to Jones's January 2, 2019 e-mail. **Appendix Exhibit 7 at 3-4 (Jones e-mail chain (Jones Decl. Ex. 4))**.

27.     On February 7, 2019, the board investigator and Jones met in person for an interview. **Appendix Exhibit 3 (Jones Decl. ¶ 29)**.

28.     At the meeting, Jones recalls, the investigator told him that giving a client an aerial photograph that contains geospatial metadata would qualify as the unlicensed practice of surveying. **Appendix Exhibit 3 (Jones Decl. ¶ 30)**.

29.     The investigator also told Jones that stitching aerial photographs together to create an orthomosaic map would qualify as the unlicensed practice of surveying. **Appendix Exhibit 3 (Jones Decl. ¶ 31)**.

30.     Jones also recalls that the investigator told him that giving a client aerial images on which he had drawn lines (for example, to approximate property boundaries) would qualify as the unlicensed practice of surveying. **Appendix Exhibit 3 (Jones Decl. ¶ 32)**.

31.     The board investigator would later deny having offered Jones any guidance on what he could and could not legally do. **Appendix Exhibit 20 (Casey Dep. 44:15-45:3)**.

32.     In accordance with the Board's practices, the investigator did not make an audio recording of his interview with Jones. **Appendix Exhibit 20 (Casey Dep. 19:14-19:16)**.

33.     The investigator shredded his contemporaneous notes of the interview with Jones. **Appendix Exhibit 20 (Casey Dep. 19:17-20:2)**.

34.     A true and correct copy of the investigator's later report of the interview is attached to this Statement as Exhibit 2 to the deposition of William Casey. **Appendix Exhibit 21 (360 Virtual Drone Services investigative report (Casey Dep. Ex. 2))**.

35.     In late June or early July 2019, Jones received another letter from the Board. The letter was dated June 13, 2019, and it stated (in excerpted part):

> You were previously notified that the North Carolina Board of Examiners for Engineers and Surveyors had initiated an investigation concerning charges that 360 Virtual Drone Services, LLC is practicing or offering to practice surveying without a license as required by G.S. 89C. You were given the full opportunity to respond on behalf of the company and you responded via email and acknowledged that you were aware that 360 Virtual Drone Services, LLC is neither licensed nor allowed to offer surveying or engineering.

> After a thorough consideration of the investigative materials, the Board's Review Committee has determined that there is sufficient evidence to support the charge that 360 Virtual Drone Services, LLC is practicing, or offering to practice, surveying in North Carolina, as defined in G.S. 89C-3(6) without being licensed with this Board.

> At its regular meeting on June 12, 2019 the Board concurred with the recommendation of the Review Committee, which was to place 360 Virtual Drone Services, LLC on notice that practicing, or offering to practice, land surveying in North Carolina, as defined in G.S. 89C-3(7) without being licensed with this Board and to place the company on notice that practicing, or offering to practice land surveying in North Carolina without being licensed with the Board, is a violation of G. S. 89C-24, 55B and 57D.

> If the company fails to come into compliance, further action may be pursued by the Board as authorized in G. S. 89C-10(c) and 89C-23 to apply to the court for an injunction or pursue criminal prosecution. The activities include, but are not limited to: mapping, surveying and photogrammetry; stating accuracy; providing location and dimension data; and producing orthomosaic maps, quantities, and topographic information. In addition, marketing disclaimer is not appropriate as the services still fall within the practice of land surveying.

A true and correct copy of the Board's June 13, 2019 letter is attached as Exhibit 5 to Jones's declaration. **Appendix Exhibit 3 (Jones Decl. ¶ 33)**; **Appendix Exhibit 8 (Board 2019 letter to 360 Virtual Drone Services (Jones Decl. Ex. 5))**.

36.    In response to the Board's June 13, 2019 letter, Jones stopped trying to develop his mapping business. He stopped offering aerial maps. He even stopped taking jobs to capture images for *other* people to use for aerial maps. He refrained from branching out into other mapping-related work as well—for instance, using aerial images to create 3D digital models. Given the investigator's warning, he also stopped adding lines on real-estate marketing images to indicate the rough position of property boundaries. **Appendix Exhibit 3 (Jones Decl. ¶¶ 34, 36-39)**.

37.    A true a correct copy of an October 14, 2019 e-mail Jones sent to a potential client is attached as Exhibit 6 to Jones's declaration. **Appendix Exhibit 3 (Jones Decl. ¶ 35); Appendix Exhibit 9 (Jones Decl. Ex. 6)**.

38.    The Board has a history of enforcing its survey-practice law against unlicensed natural persons and unlicensed entities. **Appendix Exhibit 22 (Alston Dep. 89:17-90:13)**.

39.    The Board's current position is that Plaintiffs can create aerial orthomosaic maps but cannot give the maps to anyone if the maps contain location information, georeferenced data, or any information that a recipient could use to make measurements on the maps. **Appendix Exhibit 23 at 15, 16 (Board expert report (Schall Dep. Ex. 31); Appendix Exhibit 24 (Board 30(b)(6) Dep. 11:19-12:1, 25:8-26:13); Appendix Exhibit 25 (Schall Dep. 39:13-40:15); Appendix Exhibit 26 (Ritter Dep. 52:2-52:5).**

40.    The expert report of the Board's designated expert states (in relevant part):

*A. "Capturing aerial images on behalf of paying clients and using orthomosaic software to stich those aerial images together to form orthomosaic maps."*

In my opinion, this could be a gray area because of the use of the word "map" and whether or not the orthomosaic is printed or in a digital format.

The word "map" may imply or be interpreted as a survey, or document that is corrected for distortion, is scalable and can be used for accurate measurements.

If the document was printed, also called "hard-copy", and didn't include a reference grid, scale bar, north arrow, title block, etc., basically just a printed picture, this would not be regulated.

If the orthomosaic is in a digital format such as Adobe PDF and doesn't include georeferencing information in the file header as metadata, in my opinion, this would not be regulated. If the orthomosaic was any other digital format such as TIFF, TIFFJPG, JPG2000, MrSID, etc., and didn't include georeferencing information in the file header as metadata or accompanied by a separate georeferencing metadata file, in my opinion, this also would not be regulated.

If the orthomosaic is in a digital format such as TIFF, TIFFJPG, JPG2000, MrSID, etc., and does include geo-referencing information in the file header as metadata or is accompanied by a georeferencing metadata file, in my opinion, this would be regulated as it falls under the definition of Land Surveying within N.C.G.S. § 89C-3(7).

**Appendix Exhibit 23 at 15 (Board expert report (Schall Dep. Ex. 31)).**

41.    The Board's 30(b)(6) designee testified that the Board agrees with the statements of the Board's expert reproduced at Paragraph 40 of this Statement. **Appendix Exhibit 24 (Board 30(b)(6) Dep. 25:8-26:13).**

42.    At deposition, the Board's expert testified as follows:

Q. Turn to page 15 of your report.

A. Sure.

Q. You'll see the section, section A which is titled -- I'll just read it for the record but it's titled capturing aerial images on behalf of paying clients and using orthomosaic software to stitch those aerial images together to form orthomosaic maps.

A. Correct.

Q. Okay. So I think that's a quote from the complaint in this case; is that right?

A. That's correct, yeah. These were specifically addressed in the complaint so I just followed that.

Q. Did you read the complaint as a whole?

A. Pretty much.

Q. So I think what we're talking about here is basically orthomosaic maps; is that right?

A. Correct. Right.

Q. Couple of paragraphs, three parahgraphs [sic], we see the report says, if the document was printed, also called hard copy, and didn't include a reference grid, scale bar, north arrow, title block, etc., basically just a printed picture, this would not be regulated, right?

A. In my opinion it would not be regulated. In my opinion at that point you're just doing a portrait for someone. You're just doing a portrait photograph for someone.

**Appendix Exhibit 25 (Schall Dep. 33:12-34:13).**

43.    At deposition, the Board's designated expert testified as follows:

Q. . . . So I'm posting Exhibit 34. You got it?

(Plaintiff's Exhibit 34 was marked for identification.)

A. Right.

Q. It may not be -- it might not be -- it's up on its side but if you can take a look at that. Based on what we're talking about my understanding of what you're telling me is that this orthomosaic map would not -- would not qualify as surveying; is that right?

A. If it was a printed on a piece of paper in my opinion no it would not be because it doesn't have anything on it but an image. At that point it's just a picture.

Q. Post an Exhibit 35. I'll let you take a look at as well. Looks like there's an option to rotate it. Might be easier.

(Plaintiff's Exhibit 35 was marked for identification.)

A. That's fine. I can see it.

Q. I'm going to rotate it so I can see it. Okay. So in contrast to the one we were just talking about, Exhibit 34, as I understand what we've been discussing this orthomosaic map would qualify under the definition of survey; is that right?

A. I see a scale bar on there which implies that the map is scaled correctly and measurable so I would have to say yes.

**Appendix Exhibit 25 (Schall Dep. 36:16-37:20)**. *See also* **Appendix Exhibit 27 (Jones map with no scale bar (Schall Dep. Ex. 34)), Appendix Exhibit 5 (Jones map with scale bar (Jones Decl. Ex. 2))**.

44.    At deposition, the Board's executive director testified as follows:

A. . . . I would say just because you put a title block on something doesn't make it surveying, and just because you put a north arrow on a block -- on a piece of paper doesn't make it surveying. Just because you put a north arrow on a piece of paper, it doesn't make it surveying, but if you start putting three or four of those things together on a piece of paper, you're going to start getting closer.

**Appendix Exhibit 26 (Ritter Dep. 25:13-25:25)**.

45.    At deposition, the Board's expert testified as follows:

Q. So if we were to have our orthomosaic map available digitally and we hadn't stripped the metadata out what you're saying, and correct me if I'm wrong, is that you can go on there and based on the georeferecing [sic] data in the image you can start taking measurements, correct?

A. If you deliver someone a digital product and there's no means for them to open that product so that it positions itself correctly in any kind of software, doesn't matter if its GIS software, Google Earth, CAD software that a surveyor would use or the design engineer would use, if that information is not there, that image is not going to be useable to do any type of measuring calculations, etc. But if the information is there and you hand that over to somebody that has the means to use it in that capacity with any type of engineering, surveying, or any type of GIS software they're going to use it in that capacity.

Q. Okay. That makes sense. So really the georeferencing information is what triggers the surveying definition, is that what you're saying?

A. That's correct. That's correct. You are now taking that image and you're locating it -- you're basically locating it in the real world. You're telling people where it is and you're guaranteeing that it's scaled to the correct scale and that if you take measurements from it they'll be correct.

**Appendix Exhibit 25 (Schall Dep. 39:13-40:15).**

**46.** The Board's current position is that unlicensed persons and entities cannot provide clients with 3D digital models of land or structures. **Appendix Exhibit 23 at 16 (Board expert report (Schall Dep. Ex. 31)); Appendix Exhibit 24 (Board 30(b)(6) Dep. 25:8-26:22).**

**47.** At deposition, the Board's 30(b)(6) designee testified as follows:

Q. I talked with Mr. Schall about this a little bit yesterday, and I did touch on the board's view too. I understand the board's position to be that providing a client with a 3D digital model or a measurable orthomosaic map -- providing a client with that kind of information counts as surveying, right?

A. Yes. As you described it, I think it meets the statutory definition of surveying.

**Appendix Exhibit 24 (Board 30(b)(6) Dep. 11:19-12:1).**

**48.** The expert report of the Board's designated expert also states (in relevant part):

*D. "Capturing aerial images of and data about land and structures; processing those images and data to create 3D digital models of land and structures; and making those 3D digital models available to paying clients."*

In my opinion, this would be regulated as it falls under the definition of Land Surveying within N.C.G.S. § 89C-3(7).

**Appendix Exhibit 23 at 16 (Board expert report (Schall Dep. Ex. 31)).**

**49.** The Board's 30(b)(6) designee testified that the Board agrees with the statements of the Board's expert reproduced at Paragraph 48 of this Statement. **Appendix Exhibit 24 (Board 30(b)(6) Dep. 25:8-26:22).**

**50.** At deposition, the Board's in-house counsel testified as follows:

Q. So if I'm understanding you correctly, the only way safely for Mr. Armstrong to provide that without being in violation would be to somehow to strip all the metadata out of the 3D digital model; is that right?

A. I'm not going to say it's the only way but that is a way.

Q. Physically is there a way to do that?

A. The only thing I can -- I'm trying to think of -- I'm not sure. I'm not familiar enough with the file types and the conversions and all that can be done with handling that data. I'm not qualified to answer that.

**Appendix Exhibit 18 (Tuttle Dep. 37:13-37:25)**.

**51.**    At deposition, the Board's expert testified as follows:

Q. Okay. I just don't know the answer to this. Is it possible to strip the georeferencing metadata out of a 3D digital model?

A. There is no metadata in a 3D digital model. A 3D digital model is all on its own completely georeferenced. All the features in the 3D model are geographically -- they're all -- a 3D model is all geographically located. It's a survey. A ortho photo -- an image can be stripped of its metadata and its positioning data. A binary CAD file -- a binary file or point cloud of a 3D model contains points, poly lines, shapes, there are already attributed with coordinate data, there's no stripping that data.

**Appendix Exhibit 25 (Schall Dep. 55:2-55:14)**.

**52.**    The Board's current position is that its surveying law does not cover marketing images that contain lines indicating the approximate position of property boundaries. **Appendix Exhibit 25 (Schall Dep. 44:8-44:18); Appendix Exhibit 23 at 15-16 (Board expert report (Schall Dep. Ex. 31)); Appendix Exhibit 24 (Board 30(b)(6) Dep. 25:8-26:18)**.

**53.**    At deposition, the Board's expert testified as follows:

Q. As I understand your view on this those kinds of images with those approximate drawings of lines, that would not qualify as surveying under the statute; is that right?

A. No. Again, if you're handing someone a piece of paper that has a picture on it with some -- again, anybody can recreate that same document by just going to a GIS website. I don't know why someone would pay

someone to do that, no idea because information is readily available in a
public resource at all times. But no, I would not consider that surveying.

**Appendix Exhibit 25 (Schall Dep. 44:8-44:18).**

54.     The expert report of the Board's designated expert also states (in relevant part):

> B. *"Creating marketing images of land on behalf of paying clients and
> drawing on those images lines indicating the approximate position of
> property boundaries."*

> In my opinion, this would not be regulated, as long as the marketing
> images are printed with no reference grid, scale bar, north arrow, title
> block, etc., Or, are in a digital format with no georeferencing information
> in the file header as metadata, or accompanied by a georeferencing
> metadata file.

> A client could just as easily use screen capture software to create the same
> image with boundaries from a County GIS website although, these types
> of websites include disclaimers the User must acknowledge and agree to,
> and the client wouldn't be paying a fee for the image.

**Appendix Exhibit 23 at 15-16 (Board expert report (Schall Dep. Ex. 31))**.

55.     The Board's 30(b)(6) designee testified that the Board agrees with the statements

of the Board's expert reproduced at Paragraph 54 of this Statement. **Appendix Exhibit 24**

**(Board 30(b)(6) Dep. 25:8-26:18)**.

56.     At deposition, the Board's designated expert testified as follows:

> Q. Quickly turning back up to page 14. Might have actually been on 14. Get
> yourself over to page 14 of your report I have a couple of questions. So we're
> looking at the third paragraph from the bottom. Furthermore, land surveying and
> photogrammetry as a profession, is not artistic impression protected under the
> First Amendment. Art or artistic impression is for entertainment purposes, while
> surveying is providing useful information for a functional use.

> A. Correct.

> Q. Is that a fair characterization of your view?

> A. Yes.

**Appendix Exhibit 25 (Schall Dep 65:4-65:15).**

57.     The governmental interests the Board claims support the surveying-licensing law are "safeguarding life, health, and property." **Appendix Exhibit 24 (Board 30(b)(6) Dep. 9:10-11:18); Appendix Exhibit 28, at 2 (Defs.' Resp. to Pls.' Interrog. 10).**

58.     A true and correct copy of a February 6, 2019 declaratory opinion of the Mississippi Board of Licensure for Professional Engineers and Surveyors is attached as Exhibit 10 to Jones's declaration. **Appendix Exhibit 3 (Jones Decl. ¶ 40); Appendix Exhibit 10 (Mississippi opinion (Jones Decl. Ex. 7)).**

59.     A true and correct copy of an advisory opinion of the Kentucky State Board of Licensure for Professional Engineers & Land Surveyors is attached as Exhibit 11 to Jones's declaration. **Appendix Exhibit 3 (Jones Decl. ¶ 41); Appendix Exhibit 11 (Kentucky opinion (Jones Decl. Ex. 8)).**

60.     North Carolina's surveying law did not regulate photogrammetry until 1998. **Appendix Exhibit 25 (Schall Dep. 11:21-12:6).**

61.     The Board's designated expert spent several years performing unlicensed photogrammetry in North Carolina before photogrammetry became regulated by the surveying law. **Appendix Exhibit 25 (Schall Dep. 11:21-12:6)**.

62.     The Board has no evidence that unlicensed mapping and modeling jeopardizes life, health, and property to a greater degree in any of the states whose laws are less restrictive than North Carolina's. **Appendix Exhibit 25 (Schall Dep. 58:1-63:20); Appendix Exhibit 24 (Board 30(b)(6) Dep. 16:8-20:24)**.

63.     The Board's expert estimated that, as of 2015, "approximately 17" states did not regulate "3D modeling and topographic mapping and surveying" at all. **Appendix Exhibit 25 (Schall Dep. 61:4-61:7, 62:21-63:1).**

64.    The Board's expert testified that he had no evidence that unlicensed mapping and modeling caused more instances of harm in states that do not regulate those activities as surveying. **Appendix Exhibit 25 (Schall Dep. 58:1-61:1, 63:6-63:20).**

65.    At deposition, the Board's executive director testified as follows:

> Q. So can that non-licensee give that same orthomosaic map to a client if the non-licensee puts a disclaimer on the map?

> A. No. It's my understanding you cannot disclaim your way out of complying with the law. That's my understanding. You cannot disclaim your way out of that.

**Appendix Exhibit 26 (Ritter Dep. 52:22-53:3)**.

66.    At deposition, the Board's designee testified as follows:

> Q.  . . . [A]s the board's designee, can you point to any instance where the board has informed a non-licensee that they can give an orthomosaic map to a client as long as they include some kind of disclaimer language on that map?

> A. I don't recall that happening.

> Q. Okay. I have a similar question for 3D digital models. As the board's designee, can you point me to any instance where the board has informed a non-licensee that they can provide 3D digital models to a client as long as they include certain disclaimer language with that?

> A. Not that I recall.

**Appendix Exhibit 24 (Board 30(b)(6) Dep. 28:15-29:2)**.

67.    Between 2016 and 2020, no board investigation into a drone operator (or drone-related company) was prompted by a complaint from an injured consumer. **Appendix Exhibit 26 (Ritter Dep. 60:23-61:9).**

68.    Between 2016 and 2020, every board investigation into a drone operator (or drone-related company) was prompted by the Board itself or by a Board-licensed surveyor or engineer. **Appendix Exhibit 26 (Ritter Dep. 29:7-16, 42:14-42:25); Appendix Exhibit 29 at 1-2 (Firmatek investigative report); Appendix Exhibit 30 at 2 (Lappert Smith/Charlotte UAV**

-17-

investigative report); **Appendix Exhibit 31 at 1 (Fronrath/NC Drone Pro, LLC investigative report); Appendix Exhibit 32 at 1 (Droners.io investigative report); Appendix Exhibit 33 at 1 (NSight Drone Services, LLC investigative report); Appendix Exhibit 34 at 1 (Swampfox Aerial, LLC investigative report); Appendix Exhibit 35 at 1 (Air Source One, LLC Investigative Report); Appendix Exhibit 21 at 1 (360 Virtual Drone Services investigative report (Casey Dep. Ex. 2)).**

69.     In none of the board investigations into drone operators (or drone-related companies) between 2016 and 2020 did the board investigator interview a single customer of the operator or company being investigated. **Appendix Exhibit 26 (Ritter Dep. 64:14-65:1); Appendix Exhibit 29 at 1-2 (Firmatek investigative report); Appendix Exhibit 30 at 2 (Lappert Smith/Charlotte UAV investigative report); Appendix Exhibit 31 at 1 (Fronrath/NC Drone Pro, LLC investigative report); Appendix Exhibit 32 at 1 (Droners.io investigative report); Appendix Exhibit 33 at 1 (NSight Drone Services, LLC investigative report); Appendix Exhibit 34 at 1 (Swampfox Aerial, LLC investigative report); Appendix Exhibit 35 at 1 (Air Source One, LLC investigative report); Appendix Exhibit 21 at 1 (360 Virtual Drone Services investigative report (Casey Dep. Ex. 2)).**

70.     At deposition, the Board's expert testified as follows:

> Q. Yeah, yeah. So am I right the ASPRS certification is a voluntary credential; am I understanding that correctly?
>
> A. That's correct. That's correct. But it is a voluntarily credential as far as the individual. But again, if you followed or understood contracting procedures for this type of work over the last 40 years typically most requests for proposals and request for qualifications at the higher levels is through state agencies, you know, utility companies and stuff like that typically require a ASPRS CP.
>
> Q. So even though the state doesn't say you have to have the certification if you want to get decent jobs --
>
> A. Yeah. It was in a number of project procurements it was a requirement, yes.

Q. Does that continue to be the case, is it still a pretty well regarded credential?

A. Excuse me?

Q. Does that continue to be the case now?

A. I'm sorry, I'm not understanding what you're saying.

Q. Sure. I can try to rephrase it. Currently does it continue to be the case that these higher level requests or bids asks for applicants to have the ASPRS certification?

A. It is still sometimes a requirement, yes, along with regulated licenses as well.

**Appendix Exhibit 25 (Schall Dep. 10:18-11:20)**.

71.     At deposition, the Board's expert testified as follows:

Q. Well, since we have the benefit of both having computers, one of the few upside of doing depositions remotely so go to Google Maps. Maybe I misspoke and said Google Maps.

A. Google Earth, they're both pretty much the same thing.

Q. Yeah. And --

A. They both use the same name source.

Q. Right, right. So if we do the search thing we can both plug in the North Carolina Board of Examiners.

A. I'm in High Point right now. The measuring tool there is displaying to a hundredth of a foot, not a ten thousandth of a foot. And I do believe there's settings in here where you can actually change that resolution.

Q. Sorry. I missed that. Can you repeat that?

A. Yeah. The measuring tool that's in there right now currently the way I have is set up is measuring to a hundredth of a foot.

Q. Okay.

A. Which is vastly different than ten thousandth of a foot. And again, I believe that is in here where you can set the resolution. You can minimize the decimal places.

Q. Okay. I see it. I guess I misspoke on the ten thousandth. But it looks like, and we don't need to go through the motions, but you can measure at least to the tenth of a foot from point A to point B, right?

A. Right.

Q. And make a square or any shape and it can tell you the area, right?

A. Right.

Q. And I guess the question that I kind of derailed myself on before is it seems like ordinary people who want to make low level decisions about how much picket fence to buy for their house, right, they could easily go on Google Maps and rely on the figures that are given?

A. Exactly. Why would they pay somebody to do it?

Q. I think that's a decent question but I guess my question is, don't we have the same concerns about harm to the public if they're using these maybe not super precise numbers off Google Maps as if they're using potentially not super precise numbers --

A. If they're just using it to get approximate numbers for how much fence to buy how much harm can that do? When you're talking about 3D models and actual survey data we're talking about actual engineering design projects going wrong, bridges being built incorrectly, roadways being -- sewers being built incorrectly. You can't obtain information from Google Earth or Google Maps that could ever be used for an engineering or surveying application. This is free public data meant for navigation and for people to locate destinations. You know, go online and go to Google Earth or Google's actual web page they have paragraphs and paragraphs of disclaimers for this information.

**Appendix Exhibit 25 (Schall Dep. 71:13-73:21).**

72.    At deposition, the Board's expert witness testified as follows:

Q. Okay. I think we might been talking over each other a bit. Let me try to start from the beginning for the benefit of everyone. I think what I understood you saying was that for those kind of lower stakes, small time measuring needs that people might need, the kind of concerns that you had expressed about bridges collapsing, for example, and these kind of engineering failures, that those kind of dangers are less present when we're talking about those smaller scale projects; is that fair to say?

MR. HANNA: Object to the form.

A. Yeah.

**Appendix Exhibit 25 (Schall Dep. 75:20-76:6).**

73.    At deposition, the Board's 30(b)(6) designee testified as follows:

Q. It's my understanding that some states create an exemption from licensure for employees when they're simply performing surveying on their employer's property. I don't think North Carolina has that exemption, but am I wrong on that? Does North Carolina have an exemption that resembles that?

A. Yes, we do. Now -- go ahead. I'm sorry.

Q. Explain that.

A. Well, the answer is yes, and then the second part is maybe. The previous question, if you're working for your employer and the work product is for your employer, you don't need to be licensed except if that product is going to be used for public consumption.

Q. I'm sorry. It's probably my fault, but can you repeat that?

A. So we have what's called the industrial exemption in North Carolina, which says if you're performing this service for your employer, not for the public, you don't need to be licensed. However, if your work product is to be out in the public for public consumption, then the industrial exemption does not apply. So an example of that is more common in the engineering world where you'll do the engineering for your company, but you can't call that person on the phone and ask him for engineering services. You see that more on the engineering side. You don't see it much on the surveying side because there's not much surveying that's not going to be out in the public. So if you're working for Duke Energy and you're surveying the easement lines, those easements are going to be in the public and the industrial exemption doesn't apply, and that work of surveying has to be signed and sealed.

Q. Okay. I see.

MR. HANNA: Just for my clarification, Sam, what topic are you under right now from the 12 30(b)(6)?

MR. GEDGE: Let me pull it up. It's, I think, 6 -- between 6 and 9. All of them with the notes.

MR. HANNA: 6, 7, 8, and 9 seem to be about the basis for each governmental interest that the board contends is advanced by North Carolina's surveying licensing law, but I thought -- you seem to be getting into the industrial exemption or what's in the -- I'm not sure it relates to governmental interests, but go ahead. I didn't -- this is not a topic that we covered prior to coming here, so go ahead. You can go a little bit. I just -- this is getting a little far field.

MR. GEDGE: That's fine.

BY MR. GEDGE:

Q. Mr. Ritter, we're talking about the industrial exemption. Give your best answer. It seems like you're familiar with it. I lost track a little bit, but just to make sure I understand how the industrial exemption works, let's say you have a company that owns a piece of land and they're planning to build a private facility for themselves on that piece of land, and as part of that, they construct it themselves. They are digging a hole, and one of their employees does some volumetric calculations as part of helping his employer build this facility. Is that -- would that be the kind of scenario that would fall within the industrial exemption, or am I not --

A. To my knowledge, that --

MR. HANNA: I want to object again to that question. I'm not sure that's covered by the notice of deposition, but you can answer. Go ahead.

THE WITNESS: To my knowledge, that would be an activity that would not require a license. If you're establishing the volume of that hole for your employer on his property, it's my belief that that doesn't need a license and that comes under the industrial exemption.

BY MR. GEDGE:

Q. Okay. But if the employer instead were to hire 360 Virtual Drone Services to do those same volumetric calculations, am I understanding correctly that that would not fall within the industrial exemption?

A. That is correct.

Q. As though the person actually performing the calculations doesn't have a surveyor license?

A. Well, we would require 360 Drone to have a surveyor license to do it.

Q. Exactly. But just to clarify, in each of those scenarios if the employee is performing those volumetric calculations without a surveyor license, that's okay because he falls within the industrial exemption, right?

A. Yes. That's in the statute as an exemption.

Q. Okay. And am I correct that if 360 Virtual Drone performs those same volumetric calculations for the employer, they would be in violation because they are not an employee of the property owner?

A. Correct. They would not come under the industrial exemption clause. Therefore, they would need a license to do that.

**Appendix Exhibit 24 (30(b)(6) Dep. 20:25-24:25)**.

74.     At deposition, the Board's expert witness testified as follows:

Q. It sounds like those kind of pictures just don't seem to raise the public health and welfare concern that you've been talking about?

A. No, no, no. Although you never know. You could publish a document like that and two neighbors could get over -- in a squabble over looking at it and saying my property line is here, no mine's there, and next thing you know there's some kind of domestic dispute. People get shot over that stuff.

Q. Yeah, yeah. Okay. But regardless -- setting aside kind of the domestic fight there those images aren't covered in your view by the statute?

A. Right

**Appendix Exhibit 25 (Schall Dep. 44:19-45:6)**.

Dated: March 25, 2022.                    Respectfully submitted,

/s/ Samuel B. Gedge
Samuel B. Gedge (VA Bar No. 80387)*
James T. Knight II (DC Bar No. 1671382)*
INSTITUTE FOR JUSTICE
901 North Glebe Road, Suite 900
Arlington, VA 22203
Phone: (703) 682-9320
Fax: (703) 682-9321
E-mail: sgedge@ij.org
        jknight@ij.org
*Special Appearance pursuant to Local Rule 83.1(e)*

/s/ David G. Guidry
David G. Guidry
MAINSAIL LAWYERS
338 South Sharon Amity Rd., #337
Charlotte, NC 28211
Phone: (917) 376-6098
Fax: (888) 501-9309
E-mail: dguidry@mainsaillawyers.com
State Bar No.: 38675
*Local Civil Rule 83.1(d) Counsel for Plaintiffs*

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of March, 2022, a true and correct copy of the

foregoing was electronically filed with the Clerk of Court using the CM/ECF system, which will

send notification of such filing and, pursuant to Local Civil Rule 5.1(e), shall constitute service

upon, the following:

Douglas W. Hanna (NC Bar No. 18225)
Fitzgerald Hanna & Sullivan, PLLC
3737 Glenwood Avenue, Suite 375
Raleigh, NC 27612
Telephone: (919) 863-9091
Facsimile: (919) 424-6409
Email: dhanna@fhslitigation.com

*Attorney for Defendants*

/s/ Samuel B. Gedge
Samuel B. Gedge (VA Bar No. 80387)

# Plaintiffs' Summary-Judgment Appendix Exhibit 1

Declaration of Alex Abatie

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
## WESTERN DIVISION

| | | |
|---|---|---|
| 360 VIRTUAL DRONE SERVICES LLC et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| ANDREW L. RITTER, in his official capacity as Executive Director of the North Carolina Board of Examiners for Engineers and Surveyors, et al., | ) ) ) ) ) | Case No.: 5:21-cv-0137-FL |
| Defendants. | ) ) ) | |

---

## DECLARATION OF ALEX ABATIE IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

---

I, Alex Abatie, declare under penalty of perjury that the following is true:

1.       I am more than eighteen years of age.

2.       I am a citizen of the United States and a resident of California.

3.       The Institute for Justice has retained me to give an opinion on how Unmanned

Aircraft Systems (more commonly known as drones) collect and process information about land

and structures and to give an opinion on the different ways in which drone-captured data can be

used to provide useful information to clients.

4.       I prepared an expert report through DARTDrones, which has been paid $7,500 for

the preparation of this report. Any additional time spent testifying or preparing for testimony will

be billed at $250 per hour. To date, DARTDrones has been paid a total of $8,750 for my services

as an expert witness in this case.

5.      My expert report was timely disclosed to the Defendants on October 15, 2021. A copy of that report is attached to this Declaration as Exhibit 1.

6.      In preparing my export report and this Declaration, and forming the opinions expressed in them, I relied on my knowledge of drones, photography, mapping, and image processing, as well as the material cited in my report and this Declaration.

7.      In this Declaration, I (1) describe my qualifications as an expert in this case; (2) provide a primer on modern unmanned aircraft systems; (3) explain the processes of mapping and modeling; and (4) show several use cases for drone-captured data.

## SECTION I: QUALIFICATIONS

8.      I am currently the CEO and Chief Pilot of Hawkeye Workshop, an aerial data collection and UAV training firm that I founded in 2016.

9.      Since 2017, I have also taught basic drone flight and FAA certification courses for DARTDrones, a national Unmanned Aircraft System (UAS) training and development company.

10.     Since 2017 or 2018, I have also taught mapping and utility inspection courses for DARTDrones.

11.     Through DARTDrones, I have taught mapping to (among other groups) NBC, Philips 66, the National Transportation Safety Board, and the Dubai Police Department.

12.     I have also been a San Marcos Pass Volunteer Fire Fighter running drone operations and training for search and rescue operations since June 2018.

13.     In 2018, I worked with the Association for Unmanned Vehicle Systems International (AUVSI) on a taskforce that developed the Trusted Operator Program (TOP) Certification for drone pilots.

2

14.    I earned a B.A. in Photography from the University of California, Santa Barbara in 1997.

15.    I am FAA certified as both a sport pilot and a remote pilot. My sport pilot certification was issued May 2016, Credential ID #3862540. My remote pilot certification was issued September 2016, Credential ID #3913263.

16.    I also hold a Pix4Dmapper Essentials certification in technical knowledge of drone mapping using Pix4D software.

17.    Before founding Hawkeye Workshop and teaching for DARTDrones, I worked as a photographer and design director for over two decades, including as the Design Director of the *Santa Barbara Independent*.

18.    I am also a longtime hobby RC aircraft enthusiast.

19.    While I have taught many classes on aerial mapping and related subjects, I have not authored any publications in the previous 10 years. Nor have I testified as an expert at trial or by deposition during the previous 4 years.

## SECTION II: PRIMER ON MODERN UNMANNED AIRCRAFT SYSTEMS

### Part A: What is a drone?

20.    A drone is an unmanned aircraft system (UAS), which is an aircraft that is flown either autonomously or with remote input from a pilot on the ground (or a combination of the two).

21.    Drones available to the public for aerial photography and data collection fall into two categories: rotor aircraft and fixed-wing aircraft.

22.    Rotor aircraft achieve flight through any number of constantly spinning rotors, much like a helicopter.

3

23.    Fixed-wing aircraft achieve flight through propellers combined with wings, much like an airplane.

24.    Rotor aircraft and fixed-wing aircraft each have advantages and disadvantages for aerial data capture. Rotor aircraft can hover, are more maneuverable, and are easier to use, but are less energy efficient and are therefore limited to shorter flights. Fixed-wing aircraft are more energy efficient, allowing them to fly for longer periods of time, carry heavier payloads (cameras, sensors, and so forth), and cover larger areas, but are harder to use and cannot hover. Rotor aircraft are currently much more popular with drone pilots for aerial photography and data capture. They are also more commercially available.

25.    Both rotor and fixed-wing aircraft can be outfitted with various sensors, including visual cameras, IR (infrared) sensors, and LiDAR (Light Detection And Ranging) sensors, each of which are useful for different purposes.

26.    Visual cameras are useful for many applications, including orthomosaic mapping, 3D modeling, still images, and videos.

27.    Orthomosaic (or "ortho") mapping is the process of creating a composite aerial image from many smaller images that are combined and tiled into an image showing a larger area than any single original image depicts.

28.    IR sensors are used to capture temperature data of a large area, which are usually displayed as an ortho map.

29.    LiDAR sensors use lasers to determine the distance between the sensor and many points on the ground, which can be later assembled using software into topographic maps, 3D models, and more.

4

30.    Although visual cameras are the most popular payload for a drone to carry when capturing aerial images and data, IR and LiDAR sensors can accomplish certain specialized tasks that visual cameras cannot handle. For example, LiDAR is particularly useful when there is substantial ground cover such as foliage that would prevent a standard visual camera from being able to accurately capture the topography of the land. Unlike standard visual cameras, LiDAR sensors can pierce foliage and determine the shape of the underlying topography.

## Part B: Why use drones?

31.    Drones are useful for aerial mapping and modeling for three main reasons: (1) drones offer a distinct technological advantage; (2) drones are safer than older methods; and (3) they are faster and less expensive than alternative methods of gathering data.

32.    First, drones have distinct technological advantages that allow drone pilots to capture data that cannot be captured without a drone. For example, a drone can quickly and easily capture images of a cell tower from every angle and altitude. These images can then be combined into a photorealistic 3D model of the tower that could not be created without drone technology. Even when capturing data that could also be captured by a manned aircraft or approximated by a ground-based surveying team, drone technology has distinct advantages. Drones can fly and hover much lower to the ground while capturing data than a manned aircraft can, tagging each image captured with time and GPS stamps. Recordkeeping and processing are easier with drones than with alternatives, where available, because of this level of data granularity.

33.    Second, where the data being captured by drones can be approximated with older methods, drones are still safer. Drones can examine and capture data about hazardous environments and structures without endangering a person. If a utility pole, radio tower, or

building under construction needs to be inspected, using a drone can eliminate the need for a person to climb up to dangerous heights. In search and rescue operations, drones can be used to examine areas such as ravines, canyons, or cliffs that would be dangerous for a human to access. In industrial applications, drones allow for mapping, 3D modeling, and volumetric calculations to be performed without introducing more people onto hazardous worksites.

34.    Third, using drones to gather data is faster and less expensive than alternatives. A single drone pilot can arrive on site, capture the necessary data and images, and leave in just hours. Traditional surveying teams and manned aircraft each take longer to perform analogous tasks and cost clients more money. Drones are far more versatile than either of those more traditional options, and they allow the product to be tailored to the needs of the client. For many uses of drones, including many of the uses identified in Section 4 of this Declaration, neither a surveying team nor a manned aircraft would be worth the cost to the client. When previously a client would have simply gone without aerial data, drones now allow them easy, cheap access to information.

## SECTION III: MAPPING AND MODELING

## Part A: Key Concepts

### Subpart 1: Mapping and Modeling

35.    Aerial mapping and modeling involve the process of making measurements from geo-referenced photographs.

36.    Because of lens distortion, a single image taken straight down from above (called a nadir image) is not able to provide reliable measurements. By combining multiple, overlapping images into one composite image, however, points that appear in multiple images can be triangulated and measurements become possible.

6

37.    Using modern software, a user can input multiple overlapping images and have the software return one composite image from which measurements can be taken. The software finds objects or geographical points that repeat in multiple photos, called "key points," and uses these objects and the geo-reference locations where the photos were taken to orient the key points in three-dimensional space. The composite image is the result, and it can take various forms such as a geo-referenced composite image (called an orthomosaic) or a 3D model.

38.    Before modern computers, aerial mapping and modeling was a largely manual process. Today, widely available software packages such as Pix4D, DroneDeploy, and others can now perform the necessary calculations automatically. Some software packages also allow users to fine-tune the results by inputting more information about the set of images being analyzed. This fine-tuning leads to increased accuracy within the resulting composite image. The availability and ease of use of modern software means that anyone who knows how to use one of these software packages can now process a set of images and generate a composite image without advanced mathematical training. In turn, the software has been an enormously useful innovation for photographers like me.

## Subpart 2: Accuracy

39.    In mapping and modeling, there are two types of accuracy: relative accuracy and absolute accuracy.

40.    Relative accuracy is the margin of error for measurements made within a map or model. If a drone makes an aerial map of a town that shows locations such as stores, homes, churches, and schools, relative accuracy tells you the margin of error when measuring between those locations. For example, measuring the distance between a church and a school may tell you that they are 2 ½ miles apart, plus or minus one yard.

7

41.     Absolute accuracy, by contrast, is the margin of error for the placement of a given point on the map or model within a larger coordinate system such as latitude or longitude. In the example in the previous paragraph, while relative accuracy concerns how far the church is from the school, absolute accuracy concerns where those structures are physically located on the planet.

42.     Put simply, relative accuracy concerns measurement while absolute accuracy concerns location.

43.     Depending on the consumer's need, relative or absolute accuracy may be more important. For example, consider a construction company that wants to place a fence around a job site. The company could hire a drone pilot to take aerial photos of the site and then use software to measure the perimeter of the site. If the company wants to know how much fencing to purchase, relative accuracy is more important than absolute accuracy. It matters how long the perimeter is, not where it is on Earth. By contrast, if the company wants to know precisely where to place the fence so that it does not trespass on a neighbor's property, absolute accuracy may be essential. In that scenario, it matters where the boundary is on the planet, not how long it is.

44.     Because drones have GPS receivers built in, images and other data captured with a drone are geo-referenced, or "geotagged." This means that the latitude, longitude, and altitude of the drone at the time the image was captured are attached to the image or data as metadata. (Geotagging is not unique to images captured with drones; pictures taken with modern smartphones are similarly geotagged automatically, allowing the user to see where the picture was taken.)

45.     Geo-referencing combined with software like DroneDeploy or Pix4D gives maps and models generated from drone images a high degree of relative accuracy and a modest

of absolute accuracy. The level of accuracy needed depends on the specific application and the needs of the client and can vary considerably.

46.     For many applications, the level of accuracy generated by geotagging and processing alone is sufficient.

47.     When a very high degree of accuracy, particularly absolute accuracy, is required, then a drone pilot might use "ground control points," or GCPs. GCPs are commercially available objects that can be placed around the area being mapped or modelled. The pilot can determine the coordinates of GCPs using GPS data and input this information into their software. The GCPs are visible in the captured images, allowing the software to have precise reference points when it analyzes the images. Using more GCPs generally leads to increased accuracy, and the number used depends on both the environment being captured and the needs of the client.

## Part B: Drone Mapping and Modeling Processes

### Subpart 1: Collection

48.     Mapping and modeling with drones begin with collecting the images or other data required with a drone. The sensor used to collect data depends on the specific application, but cameras are the most common payload.

49.     The quality of the maps and models ultimately generated through software greatly depends on the quality of the data collected. It is crucial for the pilot to have strong photography skills to ensure that he or she captures good images. Knowledge of what angles to take photos from, what light conditions are appropriate, how much to overlap images, and how many to take are all vital. Knowledge of the drone itself, of course, is also important. Although many commercially available drones are easy to learn to fly, experience is required to fly them well. The pilot must understand how different weather conditions will affect flight, which conditions

9

are unsafe to fly in, and what to do in an emergency such as a collision with an obstacle or a power-train malfunction (though most popular drones are small and are unlikely to cause significant damage).

## Subpart 2: Software Processing

50.     Once a good data set is collected with the drone, the next step is to process the images into the product requested by the client, often using the computer software. Different software packages have different advantages and disadvantages and choosing one over another depends on the needs of the client.

51.     DroneDeploy, for example, is a cloud-based software solution. The pilot uploads the data captured and the software handles the rest, automatically combining the data into a map or model. Clients can then access the results through the internet and use DroneDeploy's online tools to take measurements and extract other data. Cloud solutions such as DroneDeploy are simple to use for both the pilot and the client and generate good results usable for many different applications. For example, construction companies that simply want to see how a job site is progressing, get approximate measurements, or get a rough sense of topography often prefer this method.

52.     When clients need a very high degree of accuracy, want to put the maps or models into their own software packages, or want the map or model adjusted to be more visually appealing, more complex software such as Pix4D may be helpful. Pix4D offers local software (as well as a cloud solution) that runs directly on the user's computer. Like DroneDeploy, Pix4D generates composite maps and models automatically. Pix4D also allows the user to fine tune the results by giving the program more information to work with. Images can be made more visually appealing using tools much like those found in programs like Adobe Photoshop, and accuracy

can be heightened by manually identifying "key points" for the program to use in triangulating the location of the images.

53.     Pix4D also gives users the ability to easily export files for client use, as one of several types of files that the customer can view using software on their own computers. The software could be another copy of Pix4D, CAD (Computer Assisted Design) software, GIS (Geographic Information System) software, or even just an image viewer if the client simply needs to look at a composite ortho map without making measurements. In any case, the product provided to the client is a file with information that their software will interpret and present in a format that fits the client's needs. Sophisticated clients such as architects often prefer this method so that they can use their own software to view the results, as do law enforcement officers because local programs such as Pix4D allow them to maintain chain of evidence.

## Part C: Products

54.     Images and data captured with a drone can be processed into several different types of products for the client. The most common of these products are point clouds, orthomosaic maps, 3D models, and topographical maps.

### Subpart 1: Point Clouds

55.     One advantage of drones is that they can capture information from multiple angles, using different cameras and sensors, and generate three-dimensional information. The most basic form of three-dimensional information that can be generated from a drone is a point cloud.

56.     A point cloud is a collection of points that have a specific location within a coordinate system. In other words, they are points in virtual space. These points can be generated either through analyzing photographs taken with cameras or through LiDAR sensors. In either

case, the points are combined into a three-dimensional "cloud" that shows the location of each point relative to the others. When viewed together, these point clouds show the physical shape of land or structures.

57.     Although sophisticated clients may want to receive only a point cloud and further process it using their own software, a point cloud is also the first step in making an orthomosaic map or topographical map or 3D digital model.

## Subpart 2: Orthomosaic Maps

58.     Orthomosaic maps are top-down images of large areas and are geo-referenced and measurable. Creating an ortho map requires taking aerial photographs and cannot be done from the ground. It used to be that the only way to capture aerial photographs for ortho maps was to use manned aircraft, but drones have made the process substantially cheaper, faster, and more accessible.

59.     Ortho maps are useful for a number of different applications, including measuring distances and areas, identifying elevations, performing volumetrics, and monitoring progress on a job site or piece of land being developed. Software like Pix4D or Drone Deploy can let users annotate the ortho maps or use distance tools to calculate distances, areas, elevations, and volumes. (Progress-monitoring in particular is highly useful to construction companies and land developers and is generally cost-effective only if drones are used.)

60.     The images for ortho maps are very easy to take because drones can automate their flight patterns so that they fly in very straight lines and trigger the camera to take pictures at set intervals. This automation gives the pilot very consistent data that is significantly harder to achieve through manual operation. In addition, one of the benefits of ortho maps is currentness. While the images and data on websites like Google Earth may be months or years out of date, an

ortho map can document up-to-date conditions, which can provide useful information in many different contexts. A farmer may want to estimate the amount of crop loss in a field after a storm. A developer may want to estimate the size of a piece of land. Developers, project managers, and other stakeholders may want up-to-date progress reports on construction projects. These are just a few examples.

61.     Although most ortho maps are created using cameras, a type of ortho map can also be created using data gathered by an IR sensor. Using an IR sensor, a drone can capture "images" of the temperature of the surface below by measuring reflectance values. These thermal images can then be stitched together using software in much the same way as visual images can. Although the resulting composite image is not accurate enough to be used to measure distances, it allows a client to see a comprehensive map of the temperature of various objects across a large area. This is useful in many fields, such as agriculture and solar energy. Although the product looks different from a visual ortho map, the data is gathered and processed in much the same way.

## Subpart 3: 3D Models

62.     3D models are created by combining (a) the point cloud generated and (b) the collected images. Software such as Pix4D takes all the points from the point cloud, connects them, and makes surfaces out of them. The program then overlays these surfaces with the images in a process called "meshing" to create a mesh model that is both three dimensional and photorealistic.

63.     The advantage of a full 3D mesh model over a point cloud is its photorealism and such models are often used to visualize structures, examine buildings under construction, and create visually appealing models for clients to use in promotional material.

64.     Creating a 3D model requires a careful collection process. Unlike an ortho map, which requires only nadir, or top-down, photographs that can be taken autonomously by the drone, a 3D model requires taking oblique images, or images from multiple angles and altitudes. The drone is generally flown and the camera triggered manually by the pilot during this process. Photography experience is particularly helpful here to adequately capture the subject being photographed. Manual flight is necessary both to avoid physical hazards and to set the correct angles for taking pictures.

65.     Although images for a 3D model can be gathered from the ground, drones make the process significantly easier, particularly if the model is of a tall structure or if the top of the structure is important to capture.

## Subpart 4: Topographical Maps

66.     Topographical maps are three-dimensional maps that show the height of terrain.

67.     Like 3D models, topographical maps are generated using the point cloud. The points in the point cloud are, as in a 3D model, connected by software to form a contoured, three-dimensional image of the surface.

68.     The data for a topographical map can be captured with either a camera or with LiDAR depending on the terrain. Cameras allow for a more photorealistic map to be generated but are less precise in gauging the height of the terrain, particularly when there is substantial foliage obscuring the ground. Although software like Pix4D tries to overcome these shortcomings and can generate a fairly accurate map, LiDAR is used where precision is needed.

69.     Creating a topographical map does not require using a drone, but using a drone is significantly faster. While creating a topographical map from the ground requires people to

14

collect data by traversing the entire mapped area, creating one using a drone simply requires a fly-over and a single pilot.

## SECTION IV: USE CASES

70.    Practically speaking, there are many ways drones-captured data can provide helpful information for clients, and clients may request drone-captured data for many different reasons, including: (1) bidding, planning, and design; (2) comparison over time; (3) easy and repeated progress reports; (4) inventory management; (5) visualizing property; (6) safety and accuracy; and (7) law enforcement.

## Use Case 1: Bidding, Planning, and Design

71.    Often one of the firsts steps in the construction process is for developers to get a general understanding of the topography of a piece of land to help clearly understand and visualize the environment of the project.

72.    Topographic maps created with the help of a drone and image-processing software can indicate drainage points, elevation discrepancies, and other factors that can support the planning process.

73.    With orthophotos and 3D models, clients can also virtually insert new construction into a preexisting environment to get a clear picture of how a new building might affect the surrounding area. Stakeholders can use this information to visualize the impact the new construction will have from both a practical and an aesthetic perspective.

74.    3D models also allow for visualization of cast shadows and outlooks/views, for making measurements, and estimating the cost of construction materials. You can also extract precise data such as curb or manholes measurements and import them into CAD or GIS software.

## Use Case 2: Comparison Over Time

75.     Using unmanned aircraft throughout the entire process of a construction project to assess and record changes and progress provides clear insights on the state of the site at a detailed level. Because the cost of using drones is less expensive than other methods, visualization of the jobsite can be provided monthly, bi-weekly, or even weekly and from unique angles not available through other methods.

76.     The automation available with these aircraft makes repeated flights possible and the tracking of progress consistent and adjustable to the specific needs of the clients. In this context, the simplest application is recording the state of the job site over time through orthomosaic maps; this information allows project managers a visual, time-stamped status of the job. Using automated flights, work performed by subcontractors can be verified and progress shown to stakeholders in a clear, visual way. This is especially useful if multiple owners and executive teams are at a distance from the job site, making regular visits infeasible.

## Use Case 3: Easy and Repeated Progress Reports

77.     Repeated drone mapping on a project can provide a complete record of the life of the project. In the case where a project progresses despite faulty construction, it can be next to impossible to trace where and when an error was made (and who made it). Drone data provides clear, accurate and retrievable documentation at regular points in the construction process. Project managers can review and pinpoint where mistakes were made and settle these disputes out of court since the evidence is clearer than it would be without drone data.

78.     An added benefit of better, drone-generated documentation is that the data the drone collects can be analyzed, learned from, and compared for benchmarking purposes. Below, for example, is a sample of progress images over time on a house construction:



## Use Case 4: Inventory Management

79.     Stockpile measurements of construction materials and aggregates can be conducted safely, quickly, and accurately with unmanned aircraft.

80.     The traditional methods to obtain volume measurements have, in the past, required people to climb stockpiles, introducing safety and liability issues, and with results that have a high margin of error. Unmanned aircraft can effectively reduce these risks and increase accuracy.

81.     Cement manufacturers, for example, keep their ready-mix stored and stockpiled at their facilities. Raw materials arrive and completed ready-mix is trucked away to job sites. If the amount of material stockpiled and the amount of product is not assessed at a regular interval, the cement manufacturer is at risk of overbuying or running out of supply. Flying a drone monthly to gather volumetric information on the current levels of stockpiles reduces the risk to the manufacturer. Materials can also be codified, so specific tonnage information is provided as well.

## Use Case 5: Visualizing Property

82.     Drones can even be used to capture and preserve cultural sites by creating detailed three-dimensional models. For example, Pix4D software has been used to digitally preserve historical sites worldwide, from Michigan Central Station in Detroit[1] to the Domino Sugar Refinery Factory in Brooklyn[2] to Pearl Harbor, Hawaii,[3] to Clifden Castle in Ireland.[4] On the island of Cyprus, drone-captured aerial images were taken of an ancient amphitheater and processed into a 3D digital model, after which a 3D printer was used to make a physical model of the site with Braille explanations for the visually impaired.[5]

83.     Beyond just historical or culturally significant sites, there is also a demand for three-dimensional visualizations of ordinary property and buildings. Property owners often want to get a basic sense of what their land looks like; point clouds or 3D digital models are a low-cost way to meet that demand. Others may want to visually inspect a structure on their land. Again, 3D digital models offer a safe way to recreate and inspect the surface of a structure. Likewise for something like a roof inspection, a two-dimensional orthomosaic map can allow the property owner to identify damaged areas and, through using platforms like Pix4D and DroneDeploy, to annotate the orthomosaic image and identify the location and size of damaged areas.

---

[1] 3D modeling using drone images for architecture, Pix4D (updated June 9, 2020), https://www.pix4d.com/blog/drone-based-3d-modeling-architecture.

[2] Mesh-side story: saving a Brooklyn landmark digitally, Pix4D (December 2, 2015), https://www.pix4d.com/blog/mesh-side-story-saving-a-brooklyn-landmark-on-a-hard-drive.

[3] Mapping the buried secrets of Pearl Harbor, Pix4D (October 9, 2019), https://www.pix4d.com/blog/mapping-pearl-harbor.

[4] Reconstructing heritage assets in Ireland with drones, Pix4D (May 3, 2016), https://www.pix4d.com/blog/reconstructing-heritage-assets-in-ireland.

[5] Now you see it: 3D modeling a World Heritage Site, Pix4D (May 23, 2016), https://www.pix4d.com/blog/making-a-world-heritage-site-perceptible-for-visually-impaired-people.

## Use Case 6: Safety and Accuracy

84.     One issue that drones help solve is inspecting a cell tower that can't be climbed. At times monopole telecommunication towers may be judged unclimbable by a contracted tower crew, due to structural limitations. Drones solve this problem due to their low cost, their speed, and their efficiency, and also because of the lower risk incurred when compared to traditional inspection methods.

85.     A geo-referenced 3D point cloud of the cell tower that can later be used with CAD software can be created quickly and safely using drones. Flying a series of orbits around the structure and processing the resulting images in Pix4D can give engineers an accurate model that allows for the modification of the antenna arrays and development of mounting brackets for new wireless-panel style antennas. In the past, a crane crew would have been needed to inspect a tower deemed unclimbable, but the resulting higher cost and limited perspective that the crane allows would be problematic. Below are sample images depicting a 3D model of a cell tower:







## Use Case 7: Law Enforcement

86.    Law enforcement can employ 3D models for a wide range of applications, from

documenting and recreating crime scenes, to recording evidence, to providing a clear picture for

investigators and forensics. Measurable orthomosaic maps are also used. In Lake County,

Illinois, for example, law enforcement use drone-captured images to create orthomosaic maps of crash sites, allowing investigators to quickly make measurements and determine vehicle speeds.[6]

87.    Imagery and data can also be collected after natural disasters, allowing officials to understand how areas have suffered and changed. In this way, drone captured images can provide a clearer picture of infrastructure damage. Geotagged orthomosaic maps can pinpoint areas of concern easily, and resources can be allocated effectively. To give one example, the Alameda County Sheriff's Department enlisted 16 agencies to collect images of the 17,000 acres that were impacted by the Camp Fire in Northern California in 2018. The resulting map was created in two days, using 70,000 images over 518 flights. This data allowed homeowners to check on their homes without entering the fire zone, and expedited insurance claims and FEMA funds.

I declare under penalty of perjury that all of the foregoing is true and correct.

Signed on March 24, 2022.

Alex Abatie

---

[6] Bob Susnjara, How drones help Lake County police investigate crashes, get roads open faster, Daily Herald (May 7, 2017), https://www.dailyherald.com/news/20170506/how-drones-help-lake-county-policeinvestigate-crashes-get-roads-open-faster.

# Plaintiffs' Summary-Judgment Appendix Exhibit 3

Declaration of Michael Jones

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

| | |
|---|---|
| 360 VIRTUAL DRONE SERVICES LLC et al., | ) ) ) |
|      Plaintiffs, | ) ) |
| v. | ) ) |
| ANDREW L. RITTER, in his official capacity as Executive Director of the North Carolina Board of Examiners for Engineers and Surveyors, et al., | ) ) ) )   Case No.: 5:21-cv-0137-FL ) |
|      Defendants. | ) ) ) |

**DECLARATION OF MICHAEL JONES IN SUPPORT OF PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT**

I, Michael Jones, declare under penalty of perjury that the following is true:

1.    I make this statement based on my personal knowledge of the facts set forth below.

2.    I am more than eighteen years of age.

3.    I am a citizen of the United States and a resident of Goldsboro, North Carolina.

4.    I have provided photography and videography services in North Carolina since around 2016.

5.    Photography and videography began as a hobby but soon grew into a small business through which I provide photography and videography services for pay.

6.    Soon after I began providing photography and videography services, I recognized the potential of drones and branched out into drone-based aerial photography.

7.    I received a Federal Aviation Administration Part 107 certification to fly drones commercially.

8.    In 2017, I founded a single-member company—360 Virtual Drone Services LLC.

9.    Through 360 Virtual Drone Services, I began to offer drone-photography services to clients, including real-estate developers, property managers, realtors, entertainment companies, and individuals.

10.    The drone-photography services I offered included standard photography jobs, such as capturing aerial photographs and videos at weddings.

11.    In addition to standard photography jobs, I also began to offer aerial mapping services.

12.    I made a profile on Droners.io, a popular commercial-drone website.

13.    One of the project categories I selected for my Droners.io profile was "Surveying & Mapping." (Droners.io did not offer a standalone "Mapping" project category.)

14.    On my own website, I began to advertise "video, pictures, and orthomosaic maps (Measurable Maps) of [construction] sites."  My website also said: "With this information, construction companies can monitor the elevation changes, volumetrics for gravel/dirt/rock, and watch the change and progression of the site as it forms over time." A true and correct copy of an excerpt from my webpage is attached to this declaration as Exhibit 1.

15.    Over the next year or so, I began to make progress towards my goal of developing a mapping business.

16.    Realtors hired me to take marketing photographs and videos of properties they were selling and asked me to draw lines in these photographs and videos indicating the approximate property boundaries.

17.    A drone-data company hired me to fly my drone over a Walmart distribution center and capture the images needed to create a thermal map of the roof.

18.    I was hired to fly my drone over a shopping-mall parking lot and capture the images needed to create an aerial map.

19.    In addition to capturing the images to create maps, I began to make maps myself.

20.    I did repeat work for a client who would hire me to take periodic photos and videos of a real-estate development site.

21.    One time, I processed images of that repeat client's real-estate development site into an aerial map and pitched the client on incorporating the maps into my existing business with him.  A copy of that map is attached to this declaration at Exhibit 2.

22.    The repeat client chose not to make use of the aerial maps I offered.

23.    Even so, I continued to advertise mapping as one of the services my company offered.

24.    At no point have I been a licensed land surveyor.  Nor has 360 Virtual Drone Services LLC been licensed as a surveying business.

25.    At no point have I deliberately marketed myself as a licensed land surveyor.

26.    At no point have I purported to establish legal descriptions of property lines.

27.    In late December 2018, I received a letter from the North Carolina Board of Examiners for Engineers and Surveyors. A true and correct copy of this letter is attached to this declaration as Exhibit 3.

28.    I responded quickly to the Board's December 2018 letter by sending the Board's investigator an email on January 2, 2019. A true and correct copy of my e-mail is attached to this declaration as Exhibit 4, along with the e-mail chain that followed from that e-mail.

29.    On February 7, 2019, I met with the Board's investigator in person.

30.    At the meeting with the Board investigator, I recall the investigator telling me that giving a client an aerial photograph that contains geospatial metadata would qualify as the unlicensed practice of surveying.

31.    I also recall the investigator telling me that stitching aerial photographs together to create an orthomosaic map would qualify as the unlicensed practice of surveying.

32.    I also recall the investigator telling me that giving a client aerial photos on which I had drawn lines, such as lines indicating approximate property boundaries, would qualify as the unlicensed practice of surveying.

33.    In mid-summer of 2019, I received another letter from the Board dated June 13, 2019. A true and correct copy of this letter is attached to this declaration as Exhibit 5.

34.    Because of the Board's June 2019 letter and the investigator's warnings, I stopped trying to develop my mapping business. I stopped offering aerial orthomosaic maps. I also stopped taking jobs to capture images for other people to use for aerial orthomosaic maps. In addition, I've refrained from branching out into other mapping-related projects as well (for example, using aerial images to make 3D digital models). Given the investigator's warning, I also stopped adding lines on real-estate marketing images to indicate the rough position of property boundaries. In short, I'm not comfortable doing these kinds of projects or trying to develop my business into these areas while it is the Board's position that doing so will put me in violation of the surveying laws.

35.    A true and correct copy of an e-mail I sent to a potential client on October 14, 2019, is attached to this declaration as Exhibit 6.

36.    If the Board could no longer go after me for doing these kinds of projects, I would start offering aerial orthomosaic maps again.

37.    Without disclosing any privileged communications with my lawyers, I can state that I am aware that representatives of the Board have testified in this case that the Board's current view is that some of the work I'd like to do is not covered by the surveying law. For example, it's my understanding that the Board now says that providing real-estate marketing photos with approximate boundary lines to clients is not "surveying." It's also my understanding that the Board now says that aerial orthomosaic maps are okay for me to make as long as I take out any geospatial metadata and as long as I don't give my customers access to the mapping software I'm using and as long as I don't include anything else on my maps that might let someone make any measurements (even a scale bar or possibly even a north arrow).

38.    I was aware of the Board witnesses' testimony roughly contemporaneously with their depositions, but I'm still not sure what to believe about the Board's actual policy. After all, the Board's investigator told me almost the direct opposite of all these things. So it's not entirely clear to me what I can safely do. But I do understand that at least some of the work I previously advertised and that I'd like to offer again is still off-limits. For example, I would like to resume offering orthomosaic maps that *do* include metadata or that do let my customers annotate them and use mapping software to make basic measurements on the maps. It's my understanding that the Board still says I can't do any of that. Even for hard copy aerial maps, I also want to have the flexibility to include basic things like a scale bar like I've done in the past. It's my understanding that the Board says I can't do even that.

39.    I would also still like to have the freedom to develop my business with 3D digital modeling. Early on when I was starting up my business, I started practicing making 3D models

-5-

for myself. But it's my understanding that the Board still says that unlicensed people can't legally offer 3D models to anyone. I'm not going to expose myself to having the Board come after me again, so I'm not going to develop a 3D model side of my business while it's illegal. But if I could do it without the Board coming after me, I would start building up my skills with 3D modeling and start developing a 3D modeling side of my mapping business too.

40.    Attached to this declaration as Exhibit 7 is a declaratory opinion I downloaded from the website of the Mississippi Board of Licensure for Professional Engineers and Surveyors, https://www.pepls.ms.gov/sites/pepls/files/PEPLS%202020/Board%20Opinions%2C%20communications%20etc/Opinion%20-%20Surveying%20-%20pg%201-3%20v2%20(6).pdf.

41.    Attached to this declaration as Exhibit 8 is an advisory opinion I downloaded from the website of the Kentucky State Board of Licensure for Professional Engineers and Land Surveyors, https://kyboels.ky.gov/SiteAssets/Pages/Whats-New/Mapping%20Sciences%20Advisory%20Opinion.pdf.

I declare under penalty of perjury that all of the foregoing is true and correct.

Signed on March 24, 2022.

Michael Jones

# Plaintiffs' Summary-Judgment Appendix Exhibit 4

Jones Webpage (Jones Decl. Ex. 1)

USCA4 Appeal: 23-1472    Doc: 19-1    Filed: 06/28/2023    Pg: 101 of 258

Case 5:21-cv-00137-FL    Document 38-4    Filed 03/25/22    Page 2 of 4

J.A. 95

# CONSTRUCTION

Contact us for a quote

  

Create PDF in your applications with the Pdfcrowd HTML to PDF API

PDFCROW

NCBELS 000959

USCA4 Appeal: 23-1472    Doc: 19-1    Filed: 06/28/2023    Pg: 102 of 258

Case 5:21-cv-00137-FL    Document 38-4    Filed 03/25/22    Page 3 of 4

J.A. 96

| Area | 2721 ft$^2$ |
| Cut | 394 y$^3$ |
| Fill | -1.2 y$^3$ |
| Volume | 392.8 y$^3$ |

**Annotation & Measurement**


Location


Distance


Area


Volume



| Horizontal Length | 1560.4 ft |
| Surface Length | 1627.6 ft |
| Slope | 0.11°, 0.2% |

**Elevation Profile**



The drone business is quickly moving into the construction industry. So to see an unmanned aerial vehicle flying around the construction site is a pretty common thing these days. And thats' because unmanned aerial systems are offering very valuable information to the industry.

We offer video, pictures and orthomosaic maps (Measurable Maps) of the sites. With this information, construction companies can monitor the elevation changes, volumetrics for gravel/dirt/rock, and watch the changes and progression of the site as it forms over time.

We offer monthly, bi-weekly, and weekly progression media packages.

Create PDF in your applications with the Pdfcrowd HTML to PDF API    

NCBELS 000960

Case 5:21-cv-00137-FL   Document 38-4   Filed 03/25/22   Page 4 of 4

J.A. 97

# CONTACT US

YOUR NAME

Phone

EMAIL

How can we help?

Submit

Create PDF in your applications with the Pdfcrowd HTML to PDF API

PDFCROWD

NCBELS 000961

# Plaintiffs' Summary-Judgment Appendix Exhibit 5

Jones Map With Scale Bar

(Jones Decl. Ex. 2)

(Schall Dep. Ex. 35)

STEVE KEEN
ADAIR LLC

**11/1/19** | January 11, 2019

**Exhibit**
PI 0035



Powered by DroneDeploy

50m 100m
100ft 200ft



NCBELS 000988

# Plaintiffs' Summary-Judgment Appendix Exhibit 6

Board's 2018 Letter to Jones

(Jones Decl. Ex. 3)



## NORTH CAROLINA BOARD OF EXAMINERS
## FOR ENGINEERS AND SURVEYORS
4601 Six Forks Rd    Suite 310
Raleigh, North Carolina 27609

December 19, 2018

**Linda A. Thurman, Public Chair**
**Andrew G. Zoutewelle, PLS Vice-Chair**
**Jonathan S. Care, Public Secretary**

**Richard M. Benton, PLS**
**Carl M. Ellington, Jr., PE**
**John M. Logsdon, PLS**
**David L. Pond, PE**
**Bobbie Shields, PE**
**Stacey A. Smith, PE**

**Andrew L. Ritter**
**Executive Director**

360 Virtual Drone Services, LLC
Attn: Michael Jones
4971 Wayne Memorial Drive
Goldsboro, NC 27534

Re: Case No. V2019-003 – 360 Virtual Drone Services, LLC

Dear Mr. Jones:

The North Carolina Board of Examiners for Engineers and Surveyors administers the provisions of the Engineering and Land Surveying Act, Chapter 89C, and certain provisions of the Professional Corporation Act, Chapter 55B, and the Limited Liability Company Act, Chapter 57D, of the North Carolina General Statutes.

At its meeting on December 19, 2018, the Board authorized an investigation to determine if 360 Virtual Drone Services, LLC is in violation of G. S. 89C-24, 57D and 55B for practicing or offering to practice land surveying in North Carolina without a license. Based upon a review of the firm's web site (www.carolinadronehome.com) by the Surveying Committee of the Board and an advertisement on the Droners.io web site, it is alleged that the firm may be practicing or offering to practice land surveying. The services include, but are not limited to, "Surveying & Mapping," and providing orthomosaic maps of construction sites.

The purpose of this letter is to advise you that in accordance with G. S. 89C, an investigation has been initiated. You are requested to provide this office with your written explanation of, or comments on, the charges along with any documents or papers, which support your position in this matter within fifteen (15) business days of the receipt of this letter.

Should you have any questions you are directed to contact Board Investigator William Casey at 919/740-5874 or by e-mail at wcasey@ncbels.org.

Sincerely,

*David J. Evans*

David J. Evans
Assistant Executive Director

Enclosures: 1. G. S. 89C
2. G. S. 55B
3. G. S. 57D (excerpt)

CERTIFIED MAIL - Return Receipt Requested

| Telephone | FAX | EMAIL Address | WEB Site |
|---|---|---|---|
| (919) 791-2000 | (919) 791-2012 | ncbels@ncbels.org | www.ncbels.org |

# Plaintiffs' Summary-Judgment Appendix Exhibit 7

## Jones E-Mail Chain (Jones Decl. Ex. 4)

Re: Case No. V2019-003 (360 Virtual Drone Services)

Michael Jones <michael@360vdrone.com>
Fri 2/8/2019 1:36 PM
To: William P. Casey <WCasey@ncbels.org>

Hi William,

Yes sir. As far as accredited courses, no, these were just for my education, in hopes to learn what surveyors looked for when utilizing drones. None of the courses had certificates or anything like that except maybe a "Completion certificate" which being it's not accredited, I didn't bother printing it. But if you need it or if it helps my case, I am sure I could go back and find if they have printable certificates, just let me know!

The sources were Youtube videos, and Udemy has a couple of courses like level 1-3. And then there is a company called Ask Drone u that you have to be a member of that has several beginner, intermediate, advanced levels of mapping courses.

Every class from every source is sort of redundant. GCP's, what altitude to fly, where to set your gcp's, how to get your deliverable to the surveyor, correcting GSP coordinates, what equipment you should or shouldn't use for best results. etc. And, (in general) what you can and cannot do, etc. Like signing off on jobs or offering surveying or engineering services without being a licensed surveyor or engineer.

Drone Deploy also has a few courses if you search in youtube for "Drone Deploy How to." And I think they are also on their website somewhere under training. O'm sure Pix4D has "Educational videos as well for their product, but I have never used them that much.

Let me know if that's what you needed William. Thanks for your help!


Warmly,

Michael Jones

---

**From:** William P. Casey <WCasey@ncbels.org>
**Sent:** Friday, February 8, 2019 10:17 AM
**To:** Michael Jones
**Subject:** RE: Case No. V2019-003 (360 Virtual Drone Services)

Mr. Jones,

Yesterday you mentioned taking online courses for mapping. Can you elaborate on that and tell me what courses and what you learned from them? If you would, provide specific course information, and any certificates you may have obtained through these courses.

Thanks,

William P. Casey
Board Investigator
NC Bd. Of Examiners
For Engineers & Surveyors
4601 Six Forks Rd., Ste 310
Raleigh, NC 27609
919-740-5874 (Cell)
www.ncbels.org


---

**From:** Michael Jones <michael@360vdrone.com>
**Sent:** Thursday, February 7, 2019 10:53 AM
**To:** William P. Casey <WCasey@ncbels.org>
**Subject:** Re: Case No. V2019-003 (360 Virtual Drone Services)

Plaintiffs000014

J.A. 103





Sent from my iPhone

On Feb 4, 2019, at 9:45 AM, William P. Casey <WCasey@ncbels.org> wrote:

Mr. Jones,

The library's address is 1001 E. Ash St., Goldsboro, NC.  I'll meet you there on Thursday (2/7/19) at 10:00 AM.  Let's plan to meet at the main entrance and we'll find a quiet spot from there.

Thanks,

William P. Casey
Board Investigator
NC Bd. Of Examiners
For Engineers & Surveyors
4601 Six Forks Rd., Ste 310
Raleigh, NC 27609
919-740-5874 (Cell)
www.ncbels.org
<image001.gif> <image002.gif>

Plaintiffs000015

J.A. 104

**From:** Michael Jones <michael@360vdrone.com>
**Sent:** Friday, February 1, 2019 6:25 PM
**To:** William P. Casey <WCasey@ncbels.org>
**Subject:** Re: Case No. V2019-003 (360 Virtual Drone Services)

Sounds good William. Thanks a bunch.

Have a great Weekend!

Michael Jones

Sent from my iPhone

On Feb 1, 2019, at 5:52 PM, William P. Casey <WCasey@ncbels.org> wrote:

> Okay let's do 10:00 A. M. at the library on Ash St. I'll look it up Monday to get the location and confirm that with you then.
>
> William Casey
> Board Investigator
> NC Bd. of Examiners
> for Engineers & Surveyors
> 4601 Six Forks Rd., Ste. 310
> Raleigh, NC 27609
> 919-740-5874 - cell
>
>
> On Feb 1, 2019, at 5:23 PM, Michael Jones <michael@360vdrone.com> wrote:
>
>> There is a Starbucks of course. Not sure about being quiet though. And there is an Library in Ash street, I have never been to it, but I know where it is, and I don't mind meeting you there.
>>
>> I know there are some local coffee places downtown, but I am from Wilson so I am not sure the names of them. Just let me know William.
>>
>> Warmly,
>>
>> Michael Jones
>>
>> Sent from my iPhone
>>
>> On Feb 1, 2019, at 5:13 PM, William P. Casey <WCasey@ncbels.org> wrote:
>>
>>> Do you know of a library or quiet coffee shop where we can meet?
>>>
>>> William P. Casey
>>> Board Investigator
>>> NC Bd. Of Examiners
>>> For Engineers & Surveyors
>>> 4601 Six Forks Rd., Ste 310
>>> Raleigh, NC 27609
>>> 919-740-5874 (Cell)
>>> www.ncbels.org
>>> <image001.gif> <image002.gif>
>>>
>>> ---
>>>
>>> **From:** Michael Jones <michael@360vdrone.com>
>>> **Sent:** Friday, February 1, 2019 5:11 PM
>>> **To:** William P. Casey <WCasey@ncbels.org>
>>> **Subject:** Re: Case No. V2019-003 (360 Virtual Drone Services)
>>>
>>> Hey William,
>>>
>>> Yes sir that would be great. Just let me know, I can make whatever time slot you need available  Thanks so much.
>>>
>>> Sent from my iPhone
>>>
>>> On Feb 1, 2019, at 5:08 PM, William P. Casey <WCasey@ncbels.org> wrote:
>>>
>>>> Mr. Jones,
>>>>
>>>> Would you have availability to meet next Thursday (2/7/19) around mid-morning?  I would meet you in Goldsboro and we can go over the allegations and your response.
>>>>
>>>> Thanks,

Plaintiffs000016

J.A. 105

William P. Casey
Board Investigator
NC Bd. Of Examiners
For Engineers & Surveyors
4601 Six Forks Rd., Ste 310
Raleigh, NC 27609
919-740-5874 (Cell)
www.ncbels.org
<image001.gif> <image002.gif>

---

**From:** Michael Jones <michael@360vdrone.com>
**Sent:** Wednesday, January 2, 2019 3:56 PM
**To:** William P. Casey <WCasey@ncbels.org>
**Subject:** Case No. V2019-003 (360 Virtual Drone Services)

**360 Virtual Drone Services** <image003.jpg>
4971 Wayne Memorial Drive
Goldsboro North Carolina
(252)360-9021
michael@360vdrone.com

December 3rd, 2019

**North Carolina Board of Examiners for Engineers & Surveyors**
4601 Six Forks Rd Suite 310
Raleigh, North Carolina 27609

Dear Board,

My name is Michael Jones, owner of 360 Virtual Drone Services. I hope you all are well. First I would like to apologize for any violation on behalf, for I am aware that we are not licensed surveyors/engineers, nor are we allowed to offer any services in that field claiming such. Any such violation I can assure you was by mistake and was not meant to mislead any persons or companies to thinking we were licensed surveyors or engineers. I would ask you for any help in making sure that my company is not overstepping any boundaries or are in violation of any codes.

Here are some steps we have taken immediately to correct this and hopefully clear up any misleading information on my part.

1.

2. We

3. added this to the company's website. And to any of the videos that offer any services for construction industry. Also any videos that have property lines added to them in post video production, we also addressed those videos as well stating that the lines

4. are for visual purposes ONLY and are NOT accurate nor do they represent any city or county documentation for that property.

5.

    (Please feel free to correct or offer any revisions that need to be made to this disclaimer.)
    Here is a link to our website: www.carolinadronehome.com

**DISCLAIMER:  PLEASE READ**

Our Orthomosaic maps are not for surveying purposes, nor will they stand code for surveying or engineering purposes.  We can work with a licensed surveyor to assist in data capture and processing, but we can NOT sign off on, nor make claims to ANY accuracy when it comes to any surveying or engineering project for global or relative accuracy. The purpose and service for our maps in the construction industry is for stockholders, insurance appraisers, investors,  or anyone that could benefit from photogrammetry documentation on their project over a period of time for various reasons.  These maps do have a RELATIVE accuracy of 1-3 inches. This means the measurable points on the map are within 1-3 inches accurate to a ground measurement.  HOWEVER THIS IS NOT SURVEY GRADE ACCURACY NOR CAN IT BE USED BY ANY STATE, COUNTY, OR CITY CODE for these purposes.

Plaintiffs000017

J.A. 106

2.  We also addressed the droners.io website profile.  On this website, there are categories that you are opted to select from.  The title of the one I had added to my "Area of expertise" was "Mapping and Surveying."  This group title is only offered as a services "together" as "mapping and surveying." You are not able to just select "Mapping" per say.  So what we did was just remove that completely from our profile.

Here is a link to our profile:   https://droners.io/accounts/360vdrone/

**Questions I would like to ask:**

I do have a few questions about the wording and terms of use and how they may or may not violate any codes.

1.
2.  So
3. we of course offer orthrectified mapping (Orthomosaic maps) (measurable maps)  With RTK and Ground Control Points we have the ability to offer global accurate maps and relative accurate maps.  We do however have to work with a licensed surveyor to sign off
4. on and work with us capturing this data and with processing.
5.
    So my question here is...If for example a construction company hired a survey crew, then the survey crew came to us, hired us, aware we were not licensed but only offered assistance in capturing and processing the data, (in other words, a "cog in the wheel" of the whole process) Can we work with that surveying company?  Also, can we advertise towards construction companies that "working with the licensed surveyors...we can give you XYZ service, but make it very clear we are just a part and can't sign off on any project, would that be violation any codes?

2. Second question.  With the addition to the disclaimer on our website;  Is it in violation of any code to offer "Relative accurate" maps and NOT Globally accurate.  Still understanding that we are not able to sign off on any projects?

What we offer to the construction industry is generally used for the following purposes:

- 
- monitoring
- the site/property by flying it every week or bi-weekly
- 
- 
- Stockholders,
- insurance adjusters, investors can see the site as it constructs
- 

Plaintiffs000018

- 
- Quality
- Control
- 
- Safety
- Control/Monitoring
- 
- 
- Annotations
- for marking spots on the site
- 
- 
- Equipment
- verification etc.
- 
- 
- The
- Measurements in our "Software tool box" are for purposes such as the Project manager getting a quick but relatively accurate measurement of an area, or how much cable they would need to get from this point X to point Z.  (If this is in ANY violation of any
- code, please let us know. (Please keep in mind, this would be working WITH the disclaimer on our site and also with the project manager's knowledge that we are not licensed surveyors.)
- 

We do not offer and we are aware that it is against the law and in violation to offer surveying and/or engineering services without being licensed by the North Carolina Board of Surveyors and Engineers.  Please if we have missed anything or need rewording of any thing we have changed in our disclaimers or such, I would please ask that you let us know, we want your help in making sure we are working within the legal means in North Carolina.

Please feel free to contact me at 252-360-9021 or email me at michael@360vdrones.com if you have any questions or need to talk with me.  Thank you for your time and have a great day!

Sincerely,

Michael R. Jones

Plaintiffs000019

J.A. 108

# Plaintiffs' Summary-Judgment Appendix Exhibit 8

Board 2019 Letter to
360 Virtual Drone Services

(Jones Decl. Ex. 5)



**NORTH CAROLINA BOARD OF EXAMINERS
FOR ENGINEERS AND SURVEYORS**
4601 Six Forks Rd  Suite 310
Raleigh, North Carolina 27609

June 13, 2019

Andrew G. Zoutewelle, PLS
Chair
Stacey A. Smith, PE
Vice-Chair
John M. Logsdon, PLS
Secretary

Richard M. Benton, PLS
Carl M. Ellington, Jr., PE
Dennis K. Hoyle, PE, PLS
Carol W. Salloum, Public
Bobbie Shields, PE
Linda A. Thurman, Public

Andrew L. Ritter
Executive Director

Mr. Michael Jones
360 Virtual Drone Services, LLC
4971 Wayne Memorial Drive
Goldsboro, NC 27534

RE: Case No. V2019-003
360 Virtual Drone Services, LLC

Dear Mr. Jones:

You were previously notified that the North Carolina Board of Examiners for Engineers and Surveyors had initiated an investigation concerning charges that 360 Virtual Drone Services, LLC is practicing or offering to practice surveying without a license as required by G.S. 89C. You were given the full opportunity to respond on behalf of the company and you responded via email and acknowledged that you were aware that 360 Virtual Drone Services, LLC is neither licensed nor allowed to offer surveying or engineering.

After a thorough consideration of the investigative materials, the Board's Review Committee has determined that there is sufficient evidence to support the charge that 360 Virtual Drone Services, LLC is practicing, or offering to practice, surveying in North Carolina, as defined in G.S. 89C-3(6) without being licensed with this Board.

At its regular meeting on June 12, 2019 the Board concurred with the recommendation of the Review Committee, which was to place 360 Virtual Drone Services, LLC on notice that practicing, or offering to practice, land surveying in North Carolina, as defined in G.S. 89C-3(7) without being licensed with this Board and to place the company on notice that practicing, or offering to practice land surveying in North Carolina without being licensed with the Board, is a violation of G. S. 89C-24, 55B and 57D.

If the company fails to come into compliance, further action may be pursued by the Board as authorized in G. S. 89C-10(c) and 89C-23 to apply to the court for an injunction or pursue criminal prosecution. The activities include, but are not limited to: mapping, surveying and photogrammetry; stating accuracy; providing location and dimension data; and producing

| Telephone | FAX | EMAIL Address | WEB Site |
| --- | --- | --- | --- |
| (919) 791-2000 | (919) 679-3696 | ncbels@ncbels.org | www.ncbels.org |

Case 5:21-cv-00137-FL  Document 38-8  Filed 03/25/22  Page NCBELS 000991

J.A. 110

360 Virtual Drone Services, LLC
Attn: Michael Jones
June 13, 2019
Page 2

orthomosaic maps, quantities, and topographic information. In addition, marketing disclaimer is not appropriate as the services still fall within the practice of land surveying.

You are hereby notified that the opinion expressed herein is not a final legal determination. An occupational licensing board does not have the authority to order discontinuance of current practices. Only a court may determine that the law has been violated or is being violated and, if appropriate, impose a remedy or penalty for the violation. Further, pursuant to G.S. 150B-4, and per Board Rule 21 NCAC 56.1205, you may have the right, prior to initiation of any court action by the occupational licensing board, to request a declaratory ruling regarding whether your particular conduct is lawful. You are further notified that any right to a declaratory ruling supplements any other legal rights that you may already have to establish the legality of your conduct with respect to the engineering services that are offered or provided.

We are available to answer questions and assist you in complying with the statutes. You may contact David S. Tuttle, Board Counsel, at dstuttle@ncbels.org or (919) 791-2000, extension 111.

For the Board,

Andrew L. Ritter
Executive Director

DST/ch

CERTIFIED MAIL – RETURN RECEIPT REQUESTED

# Plaintiffs' Summary-Judgment Appendix Exhibit 9

Jones E-mail to Client (Jones Decl. Ex. 6)

Re: Drone Aerial Photos - recommended by Tony Stone

**Michael Jones** <michael@360vdrone.com>
Mon 10/14/2019 6:33 PM
To: Walter House <walter@houseauctioncompany.com>

Hey Walter,

Sorry for the late reply, I have been doing work on Ocracoke Island for a few days and my signal is not great in the area but I did have my laptop so I figured I would reply to your email.

So first thanks for contacting me, and yes I have done some work for the Stone brothers before glad they recommended me.

I took a look at your maps and from what I can see, there shouldn't be a problem to capture some great aerials for those.

As far as my prices. For still photography for a parcel or business, home, etc. The standard price is $175.00 That usually includes 15-20 Photos color graded and ready to use.

If there are lots next to each other or in close proximity I will try to help everyone out by pro-rating the job accordingly. So for instance I see that Vail Heirs map has two properties next to each other, so the cost would run around $185.00-$200.00

If you are looking to do videos of the property, I charge a standard shooting fee of $175.00 for the shoot, and then editing cost are $90 per hr. If you are looking to a real estate video of a lot or property, it really shouldn't be more than 2:00-3:00 min max. Editing time on one of those style videos runs minimum 2-3 hours according to how much information you want added in the video. So you are looking somewhere around the $450 - $500 for a video package. (similar to this one) Although I can no longer put lines around the property because the NC board of Engineering and Surveying filed a complain against my company for "Practicing Surveying without a license." So other than that I can do everything you see here in the example below. I can add a pointer, or a Navigation pin, just can't draw lines.

Let me know what you are looking for Walter and I am sure we can accommodate you. I will be around tomorrow, we aren't going back to the island for a couple of days.


https://www.youtube.com/watch?v=IJCL-PYOf5Q&t

I look forward to hearing back from you! Have a great day.

Warmly,

Michael Jones
360 Virtual Drone Services
www.carolinadronehome.com

---

**From:** Walter House <walter@houseauctioncompany.com>
**Sent:** Monday, October 14, 2019 3:18 PM
**To:** Michael Jones <michael@360vdrone.com>
**Subject:** Drone Aerial Photos - recommended by Tony Stone

Michael,

I got your name from Tony Stone with Stone Auction & Realty. Tony and I have partnered on numerous Real estate Auctions in the last couple of years, and he has recommended you for drone aerial photos and videos. We need aerial photos and possibly videos on teo properties in the Fremont area (Wayne County), and one large commercial property on Forest Hills Road in Wilson, NC.

Can you please call me at your earliest opportunity to discuss an estimate, scope of work and turn-around time.

Attached are GIS and satellite photos of the two Fremont properties.

I will send the Wilson property in a separate email.

I work long hours, so feel free to call at any hour. I look forward to talking with you.

Thank you,

Walter

**Walter L. House, CAI, AARE, CES**
House Auction Company

PO Box 220
Marshallberg, NC 28553
Office  252-729-1162
Fax  252-729-7611
CELL  252-725-5373
**www.HouseAuctionCompany.com**

Plaintiffs000033

J.A. 114

# Plaintiffs' Summary-Judgment Appendix
# Exhibit 10

Mississippi Opinion (Jones Decl. Ex. 7)



# MISSISSIPPI BOARD OF LICENSURE
# FOR PROFESSIONAL ENGINEERS & SURVEYORS
### 660 North Street • Suite 400
### JACKSON, MISSISSIPPI 39202
### (601) 359-6160

## DECLARATORY OPINION
## THE PRACTICE OF SURVEYING
### (February 6, 2019)

### Introduction

Questions regarding the law as it pertains to the practice surveying have been raised with the Board of Licensure for Professional Engineers and Surveyors (Board). These uncertainties have led to confusion on the part of the public and to litigation in in both federal and state courts.

In an effort to clarify what is meant by the practice of surveying in Mississippi, the Board developed and adopted this Declaratory Opinion. It is based on a review of the Mississippi Law and Rules and affirmed through comparative examination of opinions and clarifications offered by other licensure boards in this region; in particular, Kentucky.

### Definition of Terms

Authoritative – An accurately and precisely established location of a feature, object or boundary sufficient for use in establishing property rights, legal proceedings, or to protect the safety of the public from hazardous assets or other man-made or natural features.

Precise Location – A description of the position of a feature, object or boundary that meets or exceeds surveying accuracy standards per Rule 21.4, Appendix B.

Generalized Location – A description of the position of a feature, object or boundary using general mapping accuracy standards that do not meet or exceed surveying accuracy standards.

### Opinion

The definition of the practice of land surveying includes all activities where the resulting work product represents the precise location of a feature, object, or boundary with reference to the surface or subsurface of the earth and is a work product upon which the public is intended to reasonably rely as being the precise location of that feature, object, or boundary so located. This is true regardless of the technology or method employed. These activities must be accomplished by, or under the direct supervisory control of, a professional land surveyor.

Page 1 of 3

J.A. 116

Land surveying does not encompass work products which represent only a generalized location of a feature, object, or boundary upon which the public would not reasonably rely as the precise location of that feature, object, or boundary. The following items are not to be considered as activities within the definition of the practice of land surveying:

1. The creation of general maps as illustrations, in electronic or print media, prepared by private entities, educational institutions, or governmental agencies as:

    a. guides to motorists, boaters, aviators, or pedestrians:

    b. resources for the purposes of coordinating or administering public services, asset management and emergency response activities;

    c. part of a publication in a gazetteer or atlas as an educational tool or reference publication;

    d. part of the curriculum of any course of study;

    e. guides to the geographic location of any event; or

    f. part of conversational or illustrative documents, including advertising materials and users guides.

2. The transcription of previously georeferenced data into a GIS or LIS by manual or electronic means, and the maintenance thereof, provided the data are clearly not intended to indicate the authoritative location of property boundaries, the precise definition of the shape or contour of the earth, or the precise location of fixed works of humans.

3. The transcription of public record data, without modification except for graphical purposes, into a GIS-based or LIS-based cadastre (showing the extent, value, or ownership of land for taxation and associated records) by manual or electronic means, and the maintenance of that cadastre, provided the data are clearly not intended to authoritatively represent property boundaries.  This would include the production of tax maps and zoning maps.

4. The preparation of any document by any government agency that does not depict real property boundaries. These documents includes: civilian and military versions of quadrangle topographic maps, military maps, satellite imagery, and similar documentation.

5. The incorporation or use of documents or databases prepared by any governmental agency into a GIS or LIS, including census and demographic data, quadrangle topographic maps, and military maps.

6. Inventory maps and databases created by any organization, in either hard-copy or electronic form, of physical features, facilities, or infrastructure that are wholly contained within properties to which they have rights or for which they have

Page 2 of 3

management, service or administrative responsibility. The distribution of these maps and databases outside the organization must contain appropriate metadata describing, at a minimum, the accuracy, method of compilation, data source(s) and date(s), and disclaimers of use clearly indicating that the data are not intended to be used as a survey product.

7.  Maps and databases depicting the distribution of natural resources or phenomena prepared by foresters, geologists, soil scientists, geophysicists, biologists, archaeologists, historians, or other persons qualified to document such data.

8.  Maps and georeferenced databases depicting physical features and events prepared by any government agency where the access to that data is restricted by statute. These items include georeferenced data generated by law enforcement agencies involving crime statistics and criminal activities.

9.  Work products containing the following written disclaimer in at least twelve point font:

> *"This work product represents only generalized locations of features, objects or boundaries and should not be relied upon as being legally authoritative for the precise location of any feature, object or boundary."*

Page 3 of 3

# Plaintiffs' Summary-Judgment Appendix Exhibit 11

## Kentucky Opinion (Jones Decl. Ex. 8)

# ADVISORY OPINION
# EXCLUSIONS TO THE PRACTICE OF SURVEYING

## Kentucky State Board of Licensure for
## Professional Engineers & Land Surveyors

## Kentucky Association of Mapping Professionals

## Kentucky Association of Professional Surveyors

<u>Definition of Terms</u>
*Authoritative – An accurately and precisely established location of a feature, object or boundary sufficient for use in establishing property rights, legal proceedings, or to protect the safety of the public from hazardous assets or other man-made or natural features.*

*Precise Location – A description of the position of a feature, object or boundary that meets or exceeds surveying accuracy standards per 201 KAR 18:150 Sections 7 and 8.*

*Generalized Location - A description of the position of a feature, object or boundary using general mapping accuracy standards that do not meet or exceed surveying accuracy standards per 201 KAR 18:150 Sections 7 and 8.*

The definition of the practice of land surveying includes all activities where, regardless of the technology or method employed, the resulting work product represents the precise location of a feature, object, or boundary with reference to the surface or subsurface of the earth, and is a work product upon which the public is intended to reasonably rely as being the precise location of that feature, object, or boundary so located.   These activities must be accomplished by or under the direct supervisory control of a professional land surveyor.

Land surveying does not encompass work products which represent only a generalized location of a feature, object, or boundary upon which the public would not reasonably rely as the precise location of that feature, object, or boundary.  The following items are not to be included as activities within the definition of the practice of land surveying:

1. The creation of general maps:

a. Prepared by private firms or government agencies for use as guides to motorists, boaters, aviators, pedestrians, or for purposes of

J.A. 120

coordinating/administering public services, asset management and emergency response activities;

b. Prepared for publication in a gazetteer or atlas as an educational tool or reference publication;

c. Prepared for or by education institutions for use in the curriculum of any course of study;

d. Produced by any electronic or print media firm as an illustrative guide to the geographic location of any event; or

e. Prepared by laypersons for conversational or illustrative purposes. This includes advertising material and users guides.

2. The transcription of previously georeferenced data into a GIS or LIS by manual or electronic means, and the maintenance thereof, provided the data are clearly not intended to indicate the authoritative location of property boundaries, the precise definition of the shape or contour of the earth, or the precise location of fixed works of humans.

3. The transcription of public record data, without modification except for graphical purposes, into a GIS- or LIS-based cadastre (tax maps and associated records) by manual or electronic means, and the maintenance of that cadastre, provided the data are clearly not intended to authoritatively represent property boundaries. This includes tax maps and zoning maps.

4. The preparation of any document by any government agency that does not depict real property boundaries. This includes civilian and military versions of quadrangle topographic maps, military maps, satellite imagery, and other such documents.

5. The incorporation or use of documents or databases prepared by any governmental agency into a GIS/LIS, including census and demographic data, quadrangle topographic maps, and military maps.

6. Inventory maps and databases created by any organization, in either hard-copy or electronic form, of physical features, facilities, or infrastructure that are wholly contained within properties to which they have rights or for which they have management, service or administrative responsibility. The distribution of these maps and databases outside the organization must contain appropriate metadata describing, at a minimum, the accuracy, method of compilation, data source(s) and date(s), and disclaimers of use

clearly indicating that the data are not intended to be used as a survey product.

7. Maps and databases depicting the distribution of natural resources or phenomena prepared by foresters, geologists, soil scientists, geophysicists, biologists, archaeologists, historians, or other persons qualified to document such data.

8. Maps and georeferenced databases depicting physical features and events prepared by any government agency where the access to that data is restricted by statute. This includes georeferenced data generated by law enforcement agencies involving crime statistics and criminal activities.

9. Work products containing the following written disclaimer in at least ten point font:

*"This work product represents only generalized locations of features, objects or boundaries and should not be relied upon as being legally authoritative for the precise location of any feature, object or boundary."*

# Plaintiffs' Summary-Judgment Appendix Exhibit 12

Board Letter to Air Source One

(Tuttle Dep. Ex. 29)



**NORTH CAROLINA BOARD OF EXAMINERS**
**FOR ENGINEERS AND SURVEYORS**
4601 Six Forks Rd   Suite 310
Raleigh, North Carolina 27609

June 2, 2020

**Bobbie Shields, PE**
Chair
**John M. Logsdon, PLS**
Vice-Chair
**Carl M. Ellington, Jr., PE**
Secretary

**Richard M. Benton, PLS**
**Jonathan S. Care, Public**
**Cedric D. Fairbanks, PhD, PE**
**Dennis K. Hoyle, PE, PLS**
**Carol W. Salloum, Public**
**Andrew G. Zoutewelle, PLS**

**Andrew L. Ritter**
**Executive Director**

Air Source One, LLC
Attn: Brian Reeves, Owner
222 N. Main Street
Mooresville, NC 28115

RE: Case No. V2019-091
    Air Source One, LLC

Dear Mr. Reeves:

You were previously notified that the North Carolina Board of Examiners for Engineers and Surveyors had initiated an investigation concerning charges that Air Source One, LLC is practicing or offering to practice land surveying without a license as required by G.S. 89C. You were given the full opportunity to respond and you provided a written response and participated in a telephone interview.

After a thorough consideration of the investigative materials, the Board's Review Committee has determined that there is sufficient evidence to support the charges that Air Source One, LLC is practicing, or offering to practice, land surveying in North Carolina, as defined in G.S. 89C-3(7), without being licensed with this Board and to place the company on notice that practicing, or offering to practice, land surveying in North Carolina without being properly licensed with the Board, is a violation of G.S. 89C-24, 57D and 55B. If the company fails to come into compliance, further action may be pursued by the Board as authorized in G.S. 89C-10(c) and 89C-23 to apply to the court for an injunction. The activities include continuing to represent the offering of surveying services that, while renamed, are still within the definition of the practice of land surveying in G.S. 89C-3(7), including but are not limited to, use of orthomosaic software, aerial orthomasaics and models with control point accuracy, high resolution 3/D modeling, property modeling, earthwork data, gradework projects, detailed inspection data, and structural inspection data.

At its regular meeting on May 20, 2020 the Board concurred with the recommendation of the Review Committee, which was to place Air Source One, LLC on notice that practicing, or offering to practice, land surveying in North Carolina without being properly licensed with the Board, is a violation

**Exhibit**
PI 0029

| Telephone | FAX | EMAIL Address | WEB Site |
|---|---|---|---|
| (919) 791-2000 | (919) 791-3606 | ncbels@ncbels.org | www.ncbels.org |

J.A. 124

Mr. Brian Reeves
Air Source One, LLC
June 2, 2020
Page 2

of G.S. 89C-23. Board issue letter that there is sufficient evidence to support the charge that the company is practicing, or offering to practice, land surveying in North Carolina, as defined in G.S. 89C-3(7), without being licensed with this Board and to place the company on notice that practicing, or offering to practice, land surveying in North Carolina without being properly licensed with the Board, is a violation of G.S. 89C-24, 57D and 55B. If the company fails to come into compliance, further action may be pursued by the Board as authorized in G.S. 89C-10(c) and 89C-23 to apply to the court for an injunction. The activities include continuing to represent the offering of surveying services that, while renamed, are still within the definition of the practice of land surveying in G.S. 89C-3(7), including but not limited to, use of orthomosaic software, aerial orthomasaics and models with control point accuracy, high resolution 3/D modeling, property modeling, earthwork data, gradework projects, detailed inspection data, and structural inspection data.

You are hereby notified that the opinion expressed herein is not a final legal determination. An occupational licensing board does not have the authority to order discontinuance of current practices. Only a court may determine that the law has been violated or is being violated and, if appropriate, impose a remedy or penalty for the violation. Further, pursuant to G.S. 150B-4, and per Board Rule 21 NCAC 56.1205, you may have the right, prior to initiation of any court action by the occupational licensing board, to request a declaratory ruling regarding whether your particular conduct is lawful. You are further notified that any right to a declaratory ruling supplements any other legal rights that you may already have to establish the legality of your conduct with respect to the engineering services that are offered or provided.

We are available to answer questions and assist you in complying with the statutes. You may contact David S. Tuttle, Board Counsel, at dstuttle@ncbels.org or (919) 791-2000, extension 111.

For the Board,

Andrew L. Ritter
Executive Director

DST/ch

CERTIFIED MAIL – RETURN RECEIPT REQUESTED

# Plaintiffs' Summary-Judgment Appendix Exhibit 13

Board Letter to NSight Drone Services
(Tuttle Dep. Ex. 30)



**NORTH CAROLINA BOARD OF EXAMINERS
FOR ENGINEERS AND SURVEYORS**
4601 Six Forks Rd   Suite 310
Raleigh, North Carolina 27609

February 20, 2019

Andrew G. Zoutewelle, PLS
Chair
Stacey A. Smith, PE
Vice-Chair
John M. Logsdon, PLS
Secretary

Richard M. Benton, PLS
Jonathan S. Care, Public
Carl M. Ellington, Jr., PE
David L. Pond, PE
Bobbie Shields, PE
Linda A. Thurman, Public

Andrew L. Ritter
Executive Director

NSight Drone Services, LLC
Attn: Tracy Terrell
283 Old Barbour Road
Benson, NC 27504

RE: Case No. V2018-069
    NSight Drone Services, LLC

Dear Mr. Terrell:

You were previously notified that the North Carolina Board of Examiners for Engineers and Surveyors had initiated an investigation concerning charges that NSight Drone Services, LLC is practicing or offering to practice land surveying without a license as required by G.S. 89C. You were given the full opportunity to respond and you responded in writing, participated in an interview with our investigator, and took some corrective measures.

After a thorough consideration of the investigative materials, the Board's Review Committee has determined that there is sufficient evidence to support the charges that NSight Drone Services, LLC is practicing, or offering to practice, land surveying in North Carolina, as defined in G.S. 89C-3(7) without being licensed with this Board and to place the company on notice that practicing, or offering to practice, land surveying in North Carolina without being properly licensed with the Board, is a violation of G.S. 89C-24, 57D and 55B.

If the company fails to come into compliance, further action may be pursued by the Board as authorized in G.S. 89C-10(c) and 89C-23 to apply to the court for an injunction. The activities include, but are not limited to: collection of survey data; aerial surveying and mapping services; any resulting map or drawing; 3D models; and aerial photogrammetry.

At its regular meeting on February 13, 2019, the Board concurred with the recommendation of the Review Committee, which was to place NSight Drone Services, LLC on notice that practicing, or offering to practice, engineering in North Carolina without being properly licensed with the Board, is a violation of G.S. 89C-23.

**Exhibit
PI 0030**

| Telephone | FAX | EMAIL Address | WEB Site |
| --- | --- | --- | --- |
| (919) 791-2000 | (919) 791-2012 | ncbels@ncbels.org | www.ncbels.org |

Case 5:21-cv-00137-FL   Document 38-13   Filed 03/23/22   Page 2 of 3

J.A. 127

NSight Drone Services, LLC
Attn: Tracy Terrell
February 20, 2019
Page 2


You are hereby notified that the opinion expressed herein is not a final legal determination. An occupational licensing board does not have the authority to order discontinuance of current practices. Only a court may determine that the law has been violated or is being violated and, if appropriate, impose a remedy or penalty for the violation. Further, pursuant to G.S. 150B-4, and per Board Rule 21 NCAC 56.1205, you may have the right, prior to initiation of any court action by the occupational licensing board, to request a declaratory ruling regarding whether your particular conduct is lawful. You are further notified that any right to a declaratory ruling supplements any other legal rights that you may already have to establish the legality of your conduct with respect to the engineering services that are offered or provided.

We are available to answer questions and assist you in complying with the statutes. You may contact David S. Tuttle, Board Counsel, at dstuttle@ncbels.org or (919) 791-2000, extension 111.

For the Board,

Andrew L. Ritter
Executive Director

DST/ch

CERTIFIED MAIL – RETURN RECEIPT REQUESTED

# Plaintiffs' Summary-Judgment Appendix
# Exhibit 14

Board Letter to Firmatek

(Alston Dep. Ex. 15)



**NORTH CAROLINA BOARD OF EXAMINERS
FOR ENGINEERS AND SURVEYORS**
4601 Six Forks Rd　Suite 310
Raleigh, North Carolina 27609

November 15, 2017

Richard M. Benton, PLS
Chair
Linda A. Thurman, Public
Vice-Chair
Stacey A. Smith, PE
Secretary

Jonathan S. Care, Public
Carl M. Ellington, Jr., PE
John M. Logsdon, PLS
David L. Pond, PE
Bobbie Shields, PE
Andrew G. Zoutewelle, PLS

Andrew L. Ritter
Executive Director

Mr. Brian R. Brown
K&L Gates
430 Davis Dr., Ste. 400
Morrisville, NC  27560

RE:  Firmatek, LLC
　　　Case No. V2016-041

Dear Mr. Brown:

Firmatek, LLC was previously notified that the North Carolina Board of Examiners for Engineers and Surveyors had initiated an investigation concerning charges that your client is practicing or offering to practice land surveying without a license as required by G.S. 89C. Your client was given the full opportunity to respond on behalf of the company and you, and your client provided letters and you, your client and Ms. Susan K. Hackney with your firm participated in a phone interview with the Board investigator.

After a thorough consideration of the investigative materials and the company's response, the Board's Review Committee has determined that there is sufficient evidence to support the charges that Firmatek, LLC is practicing, or offering to practice, land surveying in North Carolina, as defined in G.S. 89C-3 (7) without being licensed with this Board

At its regular meeting on November 15, 2017, the Board concurred with the recommendation of the Review Committee, which was to issue this letter to place Firmatek, LLC on notice that practicing, or offering to practice land surveying in North Carolina without being properly licensed with the Board, is a violation of G.S. 89C-24, 57D and 55B.  The activities include, but are not limited to, stockpile measurements, drone solutions, mine mapping, landfill mapping, and 3D underground scanning, as indicated on its web site. Data for inventory management of stockpiles for authoritative measurement or for a stated accuracy is the practice of surveying and requires a Professional Land Surveyor.

**Exhibit
PI 0015**

| Telephone | FAX | EMAIL Address | WEB Site |
|---|---|---|---|
| (919) 791-2000 | (919) 791-2012 | ncbels@ncbels.org | www.ncbels.org |

Mr. Brian R. Brown
K&L Gates
Page 2
November 15, 2017

If the company fails to take steps to come into compliance, further action may be pursued by the Board as authorized in G.S. 89C-10(c) and 89C-23 to apply to the court for an injunction.

You are hereby notified that the opinion expressed herein is not a final legal determination. An occupational licensing board does not have the authority to order discontinuance of current practices. Only a court may determine that the law has been violated or is being violated and, if appropriate, impose a remedy or penalty for the violation, Further, pursuant to G.S. 150B-4, and per Board Rule 21 NCAC 56.1205, you may have the right, prior to initiation of any court action by the occupational licensing board, to request a declaratory ruling regarding whether the company's particular conduct is lawful. You are further notified that any right to a declaratory ruling supplements any other legal rights that the company may already have to establish the legality of your conduct with respect to the surveying services that are offered or provided.

We are available to answer questions and assist the company in complying with the statutes. You may contact David S. Tuttle, Board Counsel, at dstuttle@ncbels.org or (919) 791-2000, extension 111.

For the Board,

Andrew L. Ritter
Executive Director

DST/sd
cc: Ms. Susan K. Hackney \ K&L Gates

CERTIFIED MAIL – RETURN RECEIPT REQUESTED

# Plaintiffs' Summary-Judgment Appendix Exhibit 15

Board Letter to Lappert Smith Industries

(Alston Dep. Ex. 18)



**NORTH CAROLINA BOARD OF EXAMINERS
FOR ENGINEERS AND SURVEYORS**
4601 Six Forks Rd   Suite 310
Raleigh, North Carolina 27609

March 22, 2018

Linda A. Thurman, Public
Chair
Andrew G. Zoutewelle, PLS
Vice-Chair
Jonathan S. Care, Public
Secretary

Richard M. Benton, PLS
Carl M. Ellington, Jr., PE
John M. Logsdon, PLS
David L. Pond, PE
Bobbie Shields, PE
Stacey A. Smith, PE

Andrew L. Ritter
Executive Director

Mr. Douglas J. Brocker
The Brocker Law Firm, P.A.
5540 Centerview Dr., Ste. 200
Raleigh, NC  27606-3363

RE:  Lappert Smith Industries, LLC d/b/a Charlotte UAV
       Case No. V2017-025

Dear Mr. Brocker:

Lappert Smith Industries, LLC d/b/a Charlotte UAV was previously
notified that the North Carolina Board of Examiners for Engineers and
Surveyors had initiated an investigation concerning charges that your
client is practicing or offering to practice land surveying and engineering
without a license as required by G.S. 89C. You responded on behalf of
the company and provided a letter and you and your client participated in
an interview with the Board investigator.

After a thorough consideration of the investigative materials and the
company's response, the Board's Review Committee has determined that
there is sufficient evidence to support the charges that Lappert Smith
Industries, LLC d/b/a Charlotte UAV is practicing, or offering to practice,
engineering or surveying in North Carolina, as defined in G.S. 89C-3(6)
and (7) without being licensed with this Board.

At its regular meeting on March 21, 2018, the Board concurred with the
recommendation of the Review Committee, which was to issue this letter
to place Lappert Smith Industries, LLC d/b/a Charlotte UAV on notice that
practicing, or offering to practice, engineering or surveying in North
Carolina without being properly licensed with the Board, is a violation of
G.S. 89C-24, 57D and 55B.  The activities include, but are not limited to,
the website described services of accurate aerial maps; creation of break
lines, reference points, digital elevation models, contour lines, and
calculations; analysis of volumes of stockpiles; aerial mapping,
photogrammetry and engineering services; and the RFP that includes the
following: collection and extraction of data for engineering and mapping,
and the delivery of the products; photogrammetric interpretation,
compilation, and rectification; and the requirement of a PLS license.

**Exhibit
PI 0018**

| Telephone | FAX | EMAIL Address | WEB Site |
|---|---|---|---|
| (919) 791-2000 | (919) 670-3606 | ncbels@ncbels.org | www.ncbels.org |

Mr. Douglas J. Brocker
The Brocker Law Firm, P.A
March 22, 2018
Page 2

If the company fails to take steps to come into compliance, further action may be pursued by the Board as authorized in G.S. 89C-10(c) and 89C-23 to apply to the court for an injunction.

You are hereby notified that the opinion expressed herein is not a final legal determination. An occupational licensing board does not have the authority to order discontinuance of current practices. Only a court may determine that the law has been violated or is being violated and, if appropriate, impose a remedy or penalty for the violation, Further, pursuant to G.S. 150B-4, and per Board Rule 21 NCAC 56.1205, you may have the right, prior to initiation of any court action by the occupational licensing board, to request a declaratory ruling regarding whether the company's particular conduct is lawful. You are further notified that any right to a declaratory ruling supplements any other legal rights that the company may already have to establish the legality of your conduct with respect to the engineering or surveying services that are offered or provided.

We are available to answer questions and assist the company in complying with the statutes. You may contact David S. Tuttle, Board Counsel, at dstuttle@ncbels.org or (919) 791-2000, extension 111.

For the Board,

Andrew L. Ritter
Executive Director

DST/sd

CERTIFIED MAIL – RETURN RECEIPT REQUESTED

# Plaintiffs' Summary-Judgment Appendix Exhibit 16

Board Letter to NC Drone Pro

(Alston Dep. Ex. 23)



## NORTH CAROLINA BOARD OF EXAMINERS
## FOR ENGINEERS AND SURVEYORS
4601 Six Forks Rd   Suite 310
Raleigh, North Carolina 27609

March 22, 2018

**Linda A. Thurman, Public Chair**
**Andrew G. Zoutewelle, PLS Vice-Chair**
**Jonathan S. Care, Public Secretary**

**Richard M. Benton, PLS**
**Carl M. Ellington, Jr., PE**
**John M. Logsdon, PLS**
**David L. Pond, PE**
**Bobbie Shields, PE**
**Stacey A. Smith, PE**

**Andrew L. Ritter**
**Executive Director**

NC Drone Pro, LLC
Attn:  Mark Fronrath
18937 Southport Dr.
Cornelius, NC  28031

RE:  Case No. V2017-059
      NC Drone Pro, LLC

Dear Mr. Fronrath:

You were previously notified that the North Carolina Board of Examiners for Engineers and Surveyors had initiated an investigation concerning charges that NC Drone Pro, LLC is practicing or offering to practice land surveying and engineering without a license as required by G.S. 89C. You were given the full opportunity to respond on behalf of the company and you provided a letter and participated in an interview with the Board investigator.

After a thorough consideration of the investigative materials and the company's response, the Board's Review Committee has determined that there is sufficient evidence to support the charges that NC Drone Pro, LLC is practicing, or offering to practice, land surveying and engineering in North Carolina, as defined in G.S. 89C-3(6) or 7 without being licensed with this Board.

At its regular meeting on March 21, 2018, the Board concurred with the recommendation of the Review Committee, which was to issue NC Drone Pro, LLC this letter to place the company on notice that practicing, or offering to practice, land surveying and engineering in North Carolina without being properly licensed with the Board, is a violation of G.S. 89C-24, 55B and 57D.  The activities include, but are not limited to, the website holding out services of "Mapping & Surveying," as well as the manipulation of aerial data for CAD and GIS programs and commercial roof inspections.

If the company fails to take steps to come into compliance, further action may be pursued by the Board as authorized in G.S. 89C-10(c) and 89C-23 to apply to the court for an injunction.

**Exhibit**
**PI 0023**

| Telephone | FAX | EMAIL Address | WEB Site |
|---|---|---|---|
| (919) 791-2000 | (919) 791-2012 | ncbels@ncbels.org | www.ncbels.org |

Case 5:21-cv-00137-D   Document 38-1   Filed 03/25/22   Page 83 of 119

J.A. 136

NC Drone Pro, LLC
Attn: Mark Fronrath
March 22, 2018
Page 2

You are hereby notified that the opinion expressed herein is not a final legal determination. An occupational licensing board does not have the authority to order discontinuance of current practices. Only a court may determine that the law has been violated or is being violated and, if appropriate, impose a remedy or penalty for the violation, Further, pursuant to G.S. 150B-4, and per Board Rule 21 NCAC 56.1205, the company may have the right, prior to initiation of any court action by the occupational licensing board, to request a declaratory ruling regarding whether the company's particular conduct is lawful. You are further notified that any right to a declaratory ruling supplements any other legal rights that the company may already have to establish the legality of your conduct with respect to the engineering or surveying services that are offered or provided.

We are available to answer questions and assist the company in complying with the statutes. You may contact David S. Tuttle, Board Counsel, at dstuttle@ncbels.org or (919) 791-2000, extension 111.

For the Board,

Andrew L. Ritter
Executive Director

DST/sd

CERTIFIED MAIL – RETURN RECEIPT REQUESTED

# Plaintiffs' Summary-Judgment Appendix Exhibit 17

Tuttle E-Mail (Tuttle Dep. Ex. 28)

| From: | David S. Tuttle |
|---|---|
| To: | armstrong5750@roadrunner.com |
| Cc: | Mark Mazanek |
| Subject: | RE: UAS topographic maps for surveying |
| Date: | Thursday, July 6, 2017 3:31:00 PM |
| Attachments: | image006.png |
| | image011.png |
| | image012.png |

Mr. Armstrong,

As to your questions:

1. I take aerial photographs of land for a developer and use software to stitch the images together. I sell him the individual photographs without any geological references.
If there is no meta data or other information about coordinates, distances, property boundaries or anything that falls within the definition of land surveying in GS 89C-3(7) then simple taking and providing the photographs does not require a land surveying license.

2. I take the same photographs and process them into a topographic contour map to show elevation so the developer can determine if too much grading would be needed before buying the land and paying for a surveyor.
No, this would be within the definition of land surveying.

3. There is a structure on this land, so I take the same photographs and process them into a 3D model so the developer can get a sense of its appearance from all sides and from top to bottom.
No, this would be within the definition of land surveying.

4. The developer wants to know the relative size of the land, so I process the same photographs so the developer can go online and do rough order of magnitude measurements using a distance tool.
No, this would be within the definition of land surveying.

5. The developer also wants to get a feel for the area and volume of a large stock pile of stone left on the property, so I process the same photographs so the developer can go online and draw a polygon around the stock pile and use a software tool to tell him area and cubic yards contained in the stock pile.
No, this would be within the definition of land surveying, as further explained in the Board's Volume Computation Surveys Policy.

Would it make a difference I delivered the photographs to the developer stating that the images are not a licensed survey?
No, it would still be within the definition of land surveying.

Let me know if further questions.

Sincerely,
David

David S. Tuttle
Board Counsel
NC Board of Examiners for Engineers and Surveyors
4601 Six Forks Rd., Suite 310, Raleigh, NC 27609
dstuttle@ncbels.org
(919) 791-2000 x 111
www.ncbels.org

**Exhibit**
Pl 0028



**From:** Roger Armstrong [mailto:armstrong5750@roadrunner.com]
**Sent:** Thursday, June 29, 2017 12:09 PM
**To:** Mark Mazanek <MMazanek@ncbels.org>
**Cc:** David S. Tuttle <DSTuttle@ncbels.org>
**Subject:** RE: UAS topographic maps for surveying

Mr. Mazanek,

Thank you for your quick response to my question.  Based on reading the definition of land surveying in NCGS 89C-3(7), the part that still confuses me is the end of the last sentence. "... and the utilization and development of these facts and interpretations into an orderly survey map, plan, report, description, or project."

People are taking aerial pictures, drawing pictures or creating computer animation to use as maps or view elevation changes. So, I think the key is to understand what constitutes an orderly survey map, plan, report, description or project.

More specifically to my interest...what would the Board say about the following scenarios?

1. I take aerial photographs of land for a developer and use software to stitch the images together. I sell him the individual photographs without any geological references.

2. I take the same photographs and process them into a topographic contour map to show elevation so the developer can determine if too much grading would be needed before buying the land and paying for a surveyor.

3. There is a structure on this land, so I take the same photographs and process them into a 3D model so the developer can get a sense of its appearance from all sides and from top to bottom.

4. The developer wants to know the relative size of the land, so I process the same photographs so the developer can go online and do rough order of magnitude measurements using a distance tool.

5. The developer also wants to get a feel for the area and volume of a large stock pile of stone left on the property, so I process the same photographs so the developer can go online and draw a polygon around the stock pile and use a software tool to tell him area and cubic yards contained in the stock pile.

Would it make a difference I delivered the photographs to the developer stating that the images are not a licensed survey?

Sorry for all the questions, but I really do want to make sure I am following the rules for what I can and cannot do with my business.

Sincerely,

Roger

Roger Armstrong

336-253-5158

http://www.linkedin.com/in/rogerwarmstrong

---

**From:** Mark Mazanek [mailto:MMazanek@ncbels.org]
**Sent:** Tuesday, June 20, 2017 07:53
**To:** Roger Armstrong
**Cc:** David S. Tuttle
**Subject:** RE: UAS topographic maps for surveying

Mr. Armstrong,

Any service that falls within the definition of land surveying or engineering would require a licensed NC PLS and firm to perform. The definition of land surveying can be found in NCGS 89C-3(7): http://www.ncbels.org/rules/Chapter_89C%20thru%202016%20Session%20Laws.pdf.

Certainly, the Mapping & 3D Modeling section of the web site would cause an issue.

NC has a Professional Corporation Act that requires all entities wishing to offer professional services to be licensed with this Board and to do so as professional entities. To be a professional entity, it must be at least two-thirds owned by licensees. Up to one-third may be owned by non-licensed employees.

If you want to review the Statues they can be found here: http://www.ncbels.org/rulesandlaws.html. After doing this, if you have additional questions then can let me know. Board Counsel, David Tuttle can also be of assistance for questions involving the Statutes.

*Sincerely,*

*Mark Mazanek*
*NC Board of Examiners for Engineers and Surveyors*
*Director of Business Licensure & Compliance*
*(919) 791-2000 x 102*
*www.ncbels.org*

Now On Facebook
Now on Twitter

**\*\*\*Reminder to all Firms – Board Rules .1103(a)(6) & (b)(5) require the firm's license number be placed on all documents, specifications, reports, etc.\*\*\***

**From:** Roger Armstrong [mailto:armstrong5750@roadrunner.com]
**Sent:** Monday, June 19, 2017 11:24 AM
**To:** Mark Mazanek <MMazanek@ncbels.org>
**Subject:** UAS topographic maps for surveying

NCBELS 001557

Hi Mark,

My name is Roger Armstrong and I own a UAS Service Provider company called BirdsiVideo. Are you the person I would talk to regarding compliance for using UAS's in surveying in North Carolina?

I want to make sure I am following the NC Board of Examiners for Engineers and Surveyors rules for how I advertise and sell topographic maps.

Sincerely,

Roger

Roger Armstrong
336-253-5158
http://www.linkedin.com/in/rogerwarmstrong

# Plaintiffs' Summary-Judgment Appendix Exhibit 18

David Tuttle Deposition Transcript Excerpts

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2          FOR THE EASTERN DISTRICT OF NORTH CAROLINA
 3                     WESTERN DIVISION
 4             CIVIL ACTION NO. 5:21-cv-0137-FL
 5     360 VIRTUAL DRONE SERVICES, )
       LLC, ET AL.,                )
 6                                 )
            Plaintiffs,            )
 7                                 )
       vs.                         )
 8                                 )
       ANDREW L. RITTER, in his    )
 9     official capacity as        )
       Executive Director of the   )
10     North Carolina Board of
       Examiners for Engineers and
11     Surveyors,  et al.,
12          Defendants.
13     _____
14
15
16
17              DEPOSITION OF DAVID TUTTLE
18                (TAKEN BY PLAINTIFF)
19                 Taken via Zoom
20             Wednesday, January 19, 2021
21
22
23
24
                 Reported in Stenotype by
25                    Erin Ramsey
         Transcript produced by computer-aide transcription
```

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 5:21-cv-00137-FL  Document 88-18  Filed 03/25/22  Page 2 of 26

J.A. 144

Page 2

```
 1              APPEARANCES
 2      ON BEHALF OF PLAINTIFFS:
 3               SAMUEL B. GEDGE, ESQUIRE
                 JAMES T. KNIGHT, II, ESQUITE
 4               Institute for Justice
                 901 North Glebe Road
 5               Suite 900
                 Arlington, Virginia 22203
 6               (703) 682-9320
                 Sgedge@ij.org
 7               Jknight@ij.org
 8
        ON BEHALF OF DEFENDANTS:
 9
                 DOUGLAS HANNA, ESQUIRE
10               Graebe Hanna & Sullivan, PLLC
                 4350 Lassiter at North Hills Avenue
11               Suite 325
                 Raleigh, North Carolina 27609
12               (919) 863-9091
                 Dhanna@ghslawfirm.com
13
14
15
16
17
18
19
20
21              DEPOSITION OF DAVID TUTTLE, a witness called on
22      behalf Plaintiff, before Erin Ramsey, Notary Public,
23      in and for the Commonwealth of Virginia, taken via
24      Zoom, on Wednesday, January 19, 2021, commencing at
25      10:04 a.m.
```

Page 3

1                  INDEX OF EXAMINATIONS

2     BY MR. GEDGE............................... PAGE 4

3

4

5                   INDEX OF EXHIBITS

6     NUMBER          EXHIBIT                    MARKED

7     Exhibit 6   Notice of Noncompliance..............14

8     Exhibit 5   Recommendation......................18

9     Exhibit 27  E-mail...............................23

10    Exhibit 28  E-mail...............................31

11    Exhibit 29  Notice of Noncompliance..............38

12    Exhibit 30  Notice of Noncompliance..............39

13    Exhibit 31  Mark Schall Report...................43

14    Exhibit 32  E-mail...............................61

15

16

17

18

19

20

21

22

23

24

25

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 5:21-cv-00137-FL  Document 88-18  Filed 03/25/22  Page 4 of 26

J.A. 146

Page 4

```
 1                        DAVID TUTTLE,
 2      called as a witness by the Plaintiffs, was first duly
 3      sworn, as hereinafter certified, examined, and
 4      testified as follows:
 5                        EXAMINATION
 6      BY MR. GEDGE:
 7          Q.   Good morning, Mr. Tuttle.  I'm Sam Gedge, I
 8      represent the plaintiffs in 360 Virtual Drone Services
 9      versus Ritter.  How are you?
10          A.   Just fine.
11          Q.   Before we start, can you just state your full
12      name for the record.
13          A.   David, middle initial, S, Tuttle, T-u-t-t-l-e.
14          Q.   Okay.  And you understand that this deposition
15      is being taken as part of 360 Virtual Drone Services
16      versus Ritter?
17          A.   Yes.
18          Q.   Okay.  Have you ever had your deposition taken
19      before?
20          A.   Believe it or not as an attorney for many years
21      I never have.
22          Q.   Have you yourself taken any depositions?
23          A.   No, I have not.
24          Q.   Okay.  I guess just to go over a ground rules
25      which I assume will come as no surprise to you.  The
```

1    after the board meeting.  Sorry for the confusion.

2        Q.  That makes perfect sense.  In this particular

3    instance did the full board discuss the investigation

4    into 360 Virtual Drone Services or was it handled more

5    summarily?

6        A.  It's more summarily.  It's a recommendation

7    that is only considered agenda typically.

8        Q.  I think Mr. Alstein (phonetic) yesterday

9    described it as the board rubber stamps the

10    recommendations from the subject matter; is that a

11    fair characterization?

12        A.  Not necessarily language that I use but I

13    guess -- and the reason I say that is that these can

14    possibly trigger someone wanting to pull it from the

15    agenda, possible to discuss it -- and there again,

16    what they see are the charges and then what the

17    recommendation is based on that.  And so if they want

18    to open it for discussion that is possible.

19        Q.  Does that happen very often?

20        A.  No.

21        Q.  Do you recall -- setting aside the meeting of

22    the review committee on this investigation, do you

23    recall ever having discussed 360 Virtual Drone

24    Services with William Casey?

25        A.  I'm sure I would have.  I can't recall at a

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 5:21-cv-00137-FL   Document 38-18   Filed 03/25/22   Page 6 of 26

J.A. 148

Page 30

1  specific time or what we would have talked about.  And

2  typically the investigators from time to time bounce

3  things off of me.  They may call me, they may e-mail

4  me, other communications sometimes in the process.  I

5  don't recall specifically on this case.

6      Q.  Okay.  You mentioned e-mails, is it possible

7  that there would be e-mails between you and Mr. Casey

8  about 360 Virtual Drone Services?

9      A.  After what you showed me a little bit ago I

10  would say yes, it's possible.  I'm not going to say

11  it's not possible.

12      Q.  Understood.  Have you searched for those

13  e-mails at any point?

14      A.  At the point that we were asked to provide

15  information, yes, I've done that and so if it's not in

16  the -- what's been provided such as the other ones you

17  showed me a minute ago that was something we did

18  provide and I do not recall finding anything.

19      Q.  Okay.  Apart from Mr. Casey and the members of

20  the review committee setting, do you recall having --

21  setting aside Mr. Hanna.  Do you recall having

22  discussed 360 Virtual Drone Services with anybody

23  else?

24      A.  Well, the case would have always been, you

25  know, discussed with our assistant executive director

Page 31

```
1    David Evans, he heads up the investigations.  So from

2    the original charge letter potentially to anything

3    else that comes up during the case, you know, there

4    could have been discussions.  Right off I can't really

5    think of anybody else outside of the formal process we

6    just talked about as far as the review committee

7    members and the investigator.  I can't think of any

8    other discussions I would have had.

9       Q.  So posting up another exhibit in your folder

10   which is marked Exhibit 28.  I'll have a few questions

11   about that once you had a chance to look it over.

12               (Plaintiff's Exhibit 28 was marked for

13               identification.)

14      A.  Okay.  Yes.  I've seen this as a result of some

15   of the materials that have been put together for

16   today.

17      Q.  Okay.  This is an e-mail thread involving you

18   and Mark Mazanek and man named Robert Armstrong,

19   right?

20      A.  Correct.

21      Q.  And walking through from the bottom up.

22      A.  Okay.

23      Q.  Looks like on June 19th, 2017, Mr. Armstrong

24   e-mailed Mr. Mazanek asking about compliance with

25   using drones and surveying in North Carolina, correct?
```

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 5:21-cv-00137-FL ~ Document 38-18 ~ Filed 03/25/22 ~ Page 8 of 26

J.A. 150

Page 32

```
 1      A.  Correct.
 2      Q.  Then we see a response from Mr. Mazanek the
 3   next day which copies you, right?
 4      A.  Yes.
 5      Q.  Is that your first e-mail contact with Robert
 6   Armstrong?
 7      A.  To my knowledge.
 8      Q.  And then a week later, June 29th, Mr. Armstrong
 9   sent an e-mail back to you and Mr. Mazanek with an
10   itemized list of questions, correct?
11      A.  Yes.  And that was based, I think, Mark Mazanek
12   will often times say here's my answer on it and it
13   said once you look at this information off if you have
14   additional questions then you can let me know or
15   counsel David Tuttle can also be assistance with
16   questions involving the statutes.  That's kind how we
17   do a team approach to address any question that
18   somebody has.
19      Q.  So this is kind of the standard practice for
20   you and Mr. Mazanek?
21      A.  Yes.
22      Q.  And then finally we get to July 6th on that
23   first page of Exhibit 28, and the way I read it is
24   these are the original questions that Mr. Armstrong
25   had asked you and the text in blue is your responses,
```

Page 33

```
 1    correct?
 2         A.  Correct.
 3         Q.  Before you provided these responses did you
 4    communicate with Mr. Mazanek about the context of the
 5    of your responses?
 6         A.  The reason I'm hesitating just a minute is
 7    sometimes I do and sometimes I don't need to.  If
 8    there's any further clarification I need -- that he
 9    might have but I think in this case it's pretty
10    straightforward that he had provided certain
11    information and then the answers that came back
12    typically at that point I would just provide the
13    answers to those.
14         Q.  Do you recall communicating with anybody else
15    at the board about what the answers to these questions
16    should be?
17         A.  No, I do not recall that.
18         Q.  Okay.  Did you -- your answers -- may have
19    answered this question too but I assume nobody else
20    helped you put together the answers to these
21    questions?
22         A.  Correct.
23         Q.  Are these answers -- to the best of your view
24    are these answers accurate statements?
25         A.  Based upon this kind of early stage and the way
```

J.A. 152

Page 34

1    the question is posed based upon the facts and

2    information provided here I feel it's consistent with

3    what I had experienced over the years with the board

4    when they looked at different situations and all and

5    my understanding from that standpoint and that's how I

6    respond on these.  Since I'm not speaking for the

7    board but I am trying to help someone understand what

8    the thinking may be, you know, as if it were to go

9    further with the facts and all.  So yeah, that's kind

10   of where I put it out there.

11       Q.  Okay.  That makes sense.  So based on the

12   information that he provided you think these are the

13   right answers?

14       A.  You know, I'm sure I've gone back on it I can

15   pick apart a little bit but in general I feel like the

16   answers are correct but as -- when I talk to people

17   little bit different in the e-mails, I guess, as far

18   as expressing it, but my approach on these is to try

19   to be in such interpreting it that I don't fall under

20   the standards and the interpretation that the board

21   will have at that statute or that rule.  On their own

22   when I think about that may have impacted it is I may

23   not have fully understood -- or addressed all the

24   potential for the facts on number three.

25           I gave fairly short, you know, no, this would

Page 35

1    be the definition of land surveying but looking at it

2    now so the developer can get a sense of appearance

3    from all sides of it from top to bottom.  3D model

4    typically triggers it being the practice and I didn't

5    put further, however, if it's just a picture of it for

6    somebody to look at it so they can see it from top to

7    bottom then that would not be a concern.

8        So looking at it now I can say sometimes if my

9    answers may need further explanation or exploring.

10   And typically I would have somebody come back and say

11   wait a minute, how can I do this or why is this a

12   problem and they would point out to me, look at it

13   again, look at it again and say wait a minute if

14   they're just looking at the way the building looks,

15   you know, without any other information then I can see

16   where that's -- a tip of advice would be good but I

17   can't say that if I'd gone back and analyzing it that

18   it's a clear or inclusive as it should be.

19   Q.   I guess that makes sense.  But am I

20   understanding correctly that in your view the question

21   whether a particular 3D model is surveying depend on

22   how the client have chooses to use it on the back end;

23   am I understanding that correctly?

24   A.   It's not absolutely how the client is going to

25   use it, it's how when that product is issued it may be

Page 36

1    used because sometimes it's shared with others and

2    specifically the client may say that but then if

3    they're working with a contractor or somebody else who

4    then looks at the metadata and says there's

5    measurements in here, there's other information that I

6    should be able to rely upon because it's part of the

7    work product.  That's what becomes more difficult that

8    on the surface the client may have one need for it but

9    it may be actually being used by that client to pass

10   it to someone else or somebody else is involved in it

11   and relying upon it.

12       Q.   Okay.  So what happens if the developer goes to

13   Mr. Armstrong and says, hey, you know got this

14   building, like to get a sense of its appearance from

15   all sides, can you put me together a 3D digital model

16   and Mr. Armstrong sends it along to him and then the

17   developer uses it -- without telling Mr. Armstrong

18   uses it to, you know, estimate measurements; does that

19   retroactively make Mr. Armstrong in violation or how

20   does it work?

21       A.   I think it comes down to how that work product

22   is issued and delivered and what does it encompass

23   and, you know, if it's -- if it has -- because it's

24   difficult to control obviously how someone may use a

25   product but depending on what information you have in

Veritext Legal Solutions
215-341-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 5:21-cv-00137-FL   Document 38-18   Filed 03/25/22   Page 13 of 26

J.A. 155

1    that, you know, if it's given just as pictures, just

2    as photographs, then that's one thing.  If it's given

3    with something that's as some of the references have

4    been, easily measurable, easy to take quantities off

5    of, those types of things, then that raises based on

6    the facts of that situation it raises it to a level

7    whether members of the public should be able to rely

8    upon that information including if that client though

9    they initially said they needed that or didn't need

10   it.  If they got it then at any point in time they

11   could then go into it and start, you know, pulling the

12   measurements and all.

13       Q.  So if I'm understanding you correctly, the only

14   way safely for Mr. Armstrong to provide that without

15   being in violation would be to somehow to strip all

16   the metadata out of the 3D digital model; is that

17   right?

18       A.  I'm not going to say it's the only way but that

19   is a way.

20       Q.  Physically is there a way to do that?

21       A.  The only thing I can -- I'm trying to think

22   of -- I'm not sure.  I'm not familiar enough with the

23   file types and the conversions and all that can be

24   done with handling that data.  I'm not qualified to

25   answer that.

Veritext Legal Solutions
215-341-1000 ~ 610-434-8888 ~ 302-571-0510 ~ 202-803-8830
Case 5:21-cv-00137-FL   Document 38-18   Filed 03/25/22   Page 14 of 26

J.A. 156

Page 38

1       Q.  So I'm posting Exhibit 29.  Want you to take a
2    look at it when you have a chance.
3               (Plaintiff's Exhibit 29 was marked for
4               identification.)
5       A.  Okay.
6       Q.  Okay.  And this is another notice of
7    noncompliance, right?
8       A.  Correct.
9       Q.  And based on the initials it looks like you
10   were responsibile for putting it together, right?
11      A.  Right.
12      Q.  And was the process the same as what you
13   described more generally in these investigations?
14      A.  Yes.
15      Q.  So the review committee would have settled on
16   the investigation specific language that we see on the
17   paragraphs 2 and paragraph 3?
18      A.  Correct.
19      Q.  Okay.  And so here you're referring to high
20   resolution 3D model, right?
21      A.  Right.
22      Q.  And I don't see any -- as I read this letter it
23   doesn't seem to -- it sounds like a blanket ban on
24   them doing that or am I missing something?
25      A.  I guess the context of those things that could

Veritext Legal Solutions
215-341-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8820
Case 5:21-cv-00137-FL   Document 38-18   Filed 03/25/22   Page 15 of 26

J.A. 157

Page 39

1    be included but not limited to those includes like use

2    of orthomosaic software, aerial orthomosaics, and

3    models with control point accuracy, high resolutions

4    in 3D modeling, property modeling, earthwork data,

5    gradework projects, detailed inspection data, and

6    structural inspection data.  I think in the context of

7    those it's looking at there being information as part

8    of that package other than just the visual appearance

9    of them.  So that would give the sense of what those

10   items are to prompt the individual to come back and

11   say, okay, just what can we do within this and what

12   can't we do.

13       Q.  Okay.  I interrupted you.  Go ahead.

14       A.  That's fine.

15       Q.  Okay.  So I subjectively -- one of your goals

16   in issuing this letter is to encourage them to come

17   back and talk with you about what they can do?

18       A.  Yes.  The last paragraph, we're available to

19   answer questions and assist you in complying with the

20   statutes and you may contact, and I give all my

21   contact information, yes.

22       Q.  So I posted another document.  It's Exhibit 30,

23   notice of noncompliance.

24               (Plaintiff's Exhibit 30 was marked for

25               identification.)

Veritext Legal Solutions
215-341-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8820
Case 5:21-cv-00137-FL   Document 38-18   Filed 03/25/22   Page 16 of 26

J.A. 158

Page 65

1                  REPORTER'S CERTIFICATE

2          I, Erin Ramsey, a Notary Public in and for the

3     Commonwealth of Virginia, do hereby certify that there

4     came before me on Wednesday, the 19th day of January,

5     2022, the person hereinbefore name, who was by me duly

6     sworn to testify to the truth and nothing but the

7     truth of his knowledge concerning the matters in

8     controversy in this cause; that the witness was

9     thereupon examined under oath, the examination reduced

10    to typewriting under my direction, and the deposition

11    is a true record of the testimony given by the

12    witness.

13         I further certify that I am neither attorney or

14    counsel for, nor related to or employed by, any

15    attorney or counsel employed by the parties hereto or

16    financially interested in the action.

17         IN WITNESS WHEREOF, I have hereto set my hand,

18    this the 2nd day of February, 2022.

19

20                    _Erin C Ramsey_

21                    _____

22                    Erin Ramsey, Notary Public
                      Notary Number: 7941836

23                    Expiration Date: August 31, 2025

24

25

Veritext Legal Solutions
215-341-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 5:21-cv-00137-FL  Document 38-18  Filed 03/25/22  Page 17 of 26

J.A. 159

Page 66

1    Douglas Hanna, Esquire

2    Dhanna@ghslawfirm.com

3                    February 2, 2022

4    RE: 360 Virtual Drone Services LLC v. Andrew L. Ritter Et Al.

5       1/19/2022, David Tuttle (#5024766)

6       The above-referenced transcript is available for

7    review.

8       Within the applicable timeframe, the witness should

9    read the testimony to verify its accuracy. If there are

10   any changes, the witness should note those with the

11   reason, on the attached Errata Sheet.

12      The witness should sign the Acknowledgment of

13   Deponent and Errata and return to the deposing attorney.

14   Copies should be sent to all counsel, and to Veritext at

15   cs-midatlantic@veritext.com;

16

17    Return completed errata within 30 days from

18   receipt of testimony.

19     If the witness fails to do so within the time

20   allotted, the transcript may be used as if signed.

21

22                    Yours,

23                    Veritext Legal Solutions

24

25

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 5:21-cv-00137-FL   Document 38-18   Filed 03/25/22   Page 18 of 26

J.A. 160

1    360 Virtual Drone Services LLC v. Andrew L. Ritter Et Al.

2    David Tuttle (#5024766)

3                    E R R A T A   S H E E T

4    PAGE____5____ LINE____19____ CHANGE___non-license to non-licensed

5    _____

6    REASON___was not what I said

7    PAGE____6____ LINE____21____ CHANGE___gain to beginning

8    _____

9    REASON___was not what I said

10   PAGE____7____ LINE____5____ CHANGE___summer to settlement

11   _____

12   REASON___was not what I said

13   PAGE____7____ LINE____6____ CHANGE___non-license to non-licensed

14   _____

15   REASON___was not what I said

16   PAGE____8____ LINE____3____ CHANGE___That's to That

17   _____

18   REASON___was not what I said

19   PAGE____10____ LINE____99____ CHANGE___in to an

20   _____

21   REASON___was not what I said

22

23

24

25

Page 68

1   360 Virtual Drone Services LLC v. Andrew L. Ritter Et Al.

2   David Tuttle (#5024766)

3                     E R R A T A   S H E E T

4   PAGE____10____ LINE____10____ CHANGE____conjunction to injunction

5   _____

6   REASON____was not what I said

7   PAGE____10____ LINE____10____ CHANGE____in to an

8   _____

9   REASON____was not what I said

10  PAGE____10____ LINE____11____ CHANGE____conjunction to injunction

11  _____

12  REASON____was not what I said

13  PAGE____11____ LINE____11____ CHANGE____"say hey" to "us"

14  _____

15  REASON____was not what I said

16  PAGE____11____ LINE____12____ CHANGE____a"n --" to "a non-objection"

17  _____

18  REASON____transcript did not capture

19  PAGE____16____ LINE____19____ CHANGE____license to licensed

20  _____

21  REASON____was not what I said

22

23

24

25

Page 69

1   360 Virtual Drone Services LLC v. Andrew L. Ritter Et Al.

2   David Tuttle (#5024766)

3                    E R R A T A  S H E E T

4   PAGE___16___ LINE___21___ CHANGE___non-license to non-licensed

5   _____

6   REASON___was not what I said

7   PAGE___19___ LINE___19___ CHANGE___piece to pieces

8   _____

9   REASON_____

10  PAGE___22___ LINE___4___ CHANGE___you to you've

11  _____

12  REASON___was not what I said

13  PAGE___25___ LINE___13___ CHANGE___often to off

14  _____

15  REASON___was not what I said

16  PAGE___27___ LINE___5___ CHANGE___"be" to "may be"

17  _____

18  REASON___was not what I said

19  PAGE___28___ LINE___11___ CHANGE___an to a

20  _____

21  REASON___was not what I said

22

23

24

25

Veritext Legal Solutions
215-341-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 5:21-cv-00137-FL  Document 38-18  Filed 03/25/22  Page 21 of 26

J.A. 163

Page 70

1    360 Virtual Drone Services LLC v. Andrew L. Ritter Et Al.

2    David Tuttle (#5024766)

3                    E R R A T A   S H E E T

4    PAGE 28    LINE 17    CHANGE license to licensed

5    _____

6    REASON was not what I said

7    PAGE 29    LINE 7    CHANGE considered to consent

8    _____

9    REASON was not what I said

10   PAGE 32    LINE 13    CHANGE off to or

11   _____

12   REASON was not what I said

13   PAGE 32    LINE 16    CHANGE "kind how" to "kind of how"

14   _____

15   REASON was not what I said

16   PAGE 35    LINE 5    CHANGE put to look

17   _____

18   REASON was not what I said

19   PAGE 35    LINE 16    CHANGE tip to bit

20   _____

21   REASON was not what I said

22

23

24

25

Veritext Legal Solutions
215-341-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 5:21-cv-00137-FL   Document 38-18   Filed 03/25/22   Page 22 of 26

J.A. 164

Page 71

1   360 Virtual Drone Services LLC v. Andrew L. Ritter Et Al.

2   David Tuttle (#5024766)

3                   E R R A T A   S H E E T

4   PAGE 37    LINE 3    CHANGE as to has

5   _____

6   REASON was not what I said

7   PAGE 42    LINE 20    CHANGE add "of the" between "kind" and "go"

8   _____

9   REASON was not what I said

10  PAGE 45    LINE 19    CHANGE apart to a part

11  _____

12  REASON was not what I said

13  PAGE 51    LINE 7    CHANGE delete "third"

14  _____

15  REASON was not what I said

16  PAGE 54    LINE 2    CHANGE a to or

17  _____

18  REASON was not what I said

19  PAGE 54    LINE 15    CHANGE adjourner to adjoiner

20  _____

21  REASON was not what I said

22

23

24

25

Page 72

1　360 Virtual Drone Services LLC v. Andrew L. Ritter Et Al.

2　David Tuttle (#5024766)

3　　　　　　　　E R R A T A   S H E E T

4　PAGE___54___ LINE___17___ CHANGE___you got to you've got___

5　_____

6　REASON___was not what I said_____

7　PAGE___54___ LINE___20___ CHANGE___comes to come_____

8　_____

9　REASON___was not what I said_____

10　PAGE___55___ LINE___8___ CHANGE___delete "of" before process

11　_____

12　REASON___was not what I said_____

13　PAGE___55___ LINE___9___ CHANGE___flush to blush_____

14　_____

15　REASON___was not what I said_____

16　PAGE___56___ LINE___24___ CHANGE___airing to erring_____

17　_____

18　REASON___was not what I said_____

19　PAGE___57___ LINE___13___ CHANGE___"by" to "to"_____

20　_____

21　REASON___was not what I said_____

22

23

24

25

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 5:21-cv-00137-FL  Document 38-18  Filed 03/25/22  Page 24 of 26

J.A. 166

```
                                              Page 73
1    360 Virtual Drone Services LLC v. Andrew L. Ritter Et Al.

2    David Tuttle (#5024766)

3                  E R R A T A  S H E E T

4     PAGE  58   LINE  10    CHANGE  division to definition

5    _____

6    REASON   was not what I said _____

7     PAGE_____ LINE_____ CHANGE_____

8    _____

9     REASON_____

10    PAGE_____ LINE_____ CHANGE_____

11   _____

12    REASON_____

13    PAGE_____ LINE_____ CHANGE_____

14   _____

15    REASON_____

16    PAGE_____ LINE_____ CHANGE_____

17   _____

18    REASON_____

19    PAGE_____ LINE_____ CHANGE_____

20   _____

21    REASON_____

22

23

24

25
```

Page 74

1    360 Virtual Drone Services LLC. v. Andrew L. Ritter Et Al.

2    David Tuttle (#5024766)

3               ACKNOWLEDGEMENT OF DEPONENT

4      I, David Tuttle, do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11    _____      2/26/22

12    David Tuttle              Date

13    *If notary is required

14               SUBSCRIBED AND SWORN TO BEFORE ME THIS

15      26 DAY OF February , 2022.

16

17

18             _____

19          NOTARY PUBLIC

20                     NaTasha Streater
                            NOTARY PUBLIC

21                        Granville County, NC
                My Commission Expires October 27, 2026

22

23

24

25

J.A. 168

# Plaintiffs' Summary-Judgment Appendix
# Exhibit 19

Board File on 360 Virtual Drone Services

(Casey Dep. Ex. 3)

Evidence # _1_ (1.) -1.2)
Will Casey, Board Investigator
Case # V2019-003
Date Received 12/12/18
Received From NC Sec. of State Website
Description Search results for 360 Virtual
Drone Services LLC and 2018 Annual Rept

**Exhibit**
PI 0003

• File an Annual Report/Amend an Annual Report • Upload a PDF Filing • Order a Document Online • Add Entity to My Email Notification List • View Filings • Print an Amended a Annual Report form • Print a Pre-Populated Annual Report form

## Limited Liability Company

### Legal Name
360 VIRTUAL DRONE SERVICES LLC

## Information

**SosId:** 1631081
**Status:** Current-Active
**Annual Report Status:** Current
**Citizenship:** Domestic
**Date Formed:** 10/16/2017
**Registered Agent:** Jones, Michael

## Addresses

**Reg Office**
4971 Wayne Mem Dr
Goldsboro, NC 27534

**Reg Mailing**
4971 Wayne Mem Dr
Goldsboro, NC 27534

**Mailing**
4971 wayne memorial drive
Goldsboro, NC 27534

**Principal Office**
4971 wayne memorial drive
Goldsboro, NC 27534

## Company Officials

All LLCs are managed by their managers pursuant to N.C.G.S. 57D-3-20.

**Member**
Michael Jones
4971 Wayne Mem Dr
Goldsboro NC 27534





# LIMITED LIABILITY COMPANY ANNUAL REPORT

NAME OF LIMITED LIABILITY COMPANY:    360 VIRTUAL DRONE SERVICES LLC

SECRETARY OF STATE ID NUMBER: 1631081        STATE OF FORMATION: NC

REPORT FOR THE CALENDAR YEAR: 2018

Filing Office Use Only
E - Filed Annual Report
1631081
CA201810304323
4/13/2018 12:40

☐ Changes

## SECTION A: REGISTERED AGENT'S INFORMATION

**1.** NAME OF REGISTERED AGENT:    Jones, Michael

**2.** SIGNATURE OF THE NEW REGISTERED AGENT:

SIGNATURE CONSTITUTES CONSENT TO THE APPOINTMENT

**3.** REGISTERED OFFICE STREET ADDRESS & COUNTY

4971 Wayne Mem Dr

Goldsboro, NC 27534 Wayne County

**4.** REGISTERED OFFICE MAILING ADDRESS

4971 Wayne Mem Dr

Goldsboro, NC 27534

## SECTION B: PRINCIPAL OFFICE INFORMATION

**1.** DESCRIPTION OF NATURE OF BUSINESS:  Commercial drone and media services

**2.** PRINCIPAL OFFICE PHONE NUMBER: (252) 360-9021    **3.** PRINCIPAL OFFICE EMAIL: Privacy Redaction

**4.** PRINCIPAL OFFICE STREET ADDRESS & COUNTY

4971 wayne memorial drive

Goldsboro, NC 27534 Wayne County

**5.** PRINCIPAL OFFICE MAILING ADDRESS

4971 wayne memorial drive

Goldsboro, NC 27534

**6. Select one of the following if applicable. (Optional see instructions)**

☐ The company is a veteran-owned small business

☐ The company is a service-disabled veteran-owned small business

## SECTION C: COMPANY OFFICIALS (Enter additional company officials in Section E.)

NAME: Michael Jones        NAME:            NAME:

TITLE: Member            TITLE:            TITLE:

ADDRESS:            ADDRESS:            ADDRESS:

4971 Wayne Mem Dr

Goldsboro, NC 27534

## SECTION D: CERTIFICATION OF ANNUAL REPORT. Section D must be completed in its entirety by a person/business entity.

Michael Jones                        4/13/2018

SIGNATURE                            DATE
Form must be signed by a Company Official listed under Section C of This form.

Michael Jones                        Member

Print or Type Name of Company Official        Print or Type Title of Company Official

This Annual Report has been filed electronically.

MAIL TO: Secretary of State, Business Registration Division, Post Office Box 29525, Raleigh, NC 27626-0525

NCBELS 000931

Evidence # __2__ (2.1 - 2.5)
Will Casey, Board Investigator
Case # V2019-003
Date Received 12/12/18
Received From Mark Mozeny
Description Packet of info.

Case Request                                                                                    12/12/18, 12:52 PM

# Case Request

MM  **Mark Mazanek**
Today, 10:11 AM
David J. Evans ⌄

Deleted Items

You replied on 12/12/2018 10:18 AM.

2. Business Card.pdf          3. Homepage.pdf          4. FAQ.pdf
36 KB          4 MB          801 KB

⌄ Show all 9 attachments (7 MB)     Download all     Save all to OneDrive - NCBELS

David,

This is the matter the Surveying Committee requested I give to you for the opening of a case against 360 Virtual Drone Services.  They requested a case opened versus an inquiry.

*Sincerely,*

*Mark Mazanek*
*NC Board of Examiners for Engineers and Surveyors*
*Director of Business Licensure & Compliance*
*(919) 791-2000 x 102*
*www.ncbels.org*

**Now On Facebook** 📘
**Now on Twitter** 🐦

**\*\*\*Reminder to all Firms – Board Rules .1103(a)(6) & (b)(5) require the firm's license number be placed on all documents, specifications, reports, etc.\*\*\***

*(2.1)*

https://outlook.office.com/owa/projection.aspx                                          Page 1 of 1



A PROFESSIONAL AERIAL DATA & MEDIA DRONE SERVICE COMPANY

-RESIDENTIAL REAL ESTATE
-COMMERCIAL REAL ESTATE
-ROOF INSPECTIONS
-CONSTRUCTION
-AERIAL MAPPING
-EVENTS
-CINEMATOGRAPHY
-SEARCH & RESCUE
-DRONE TRAINING

360VDRONE

WWW.NCDRONEHOME.COM
MICHAEL@360VDRONE.COM
252-360-9021



USCA4 Appeal: 23-1472      Doc: 19-1      Filed: 06/28/2023      Pg: 182 of 258



About Us    HOME    Professional Commercial Photography    FAQ Page    Services    Video Gallery    Equipment

www.carolinadronehome.com

360 VIRTUAL DRONE
SERVICES

A Professional Aerial Data & Media Drone Service Company

2.3

Create PDF in your applications with the Pdfcrowd HTML to PDF API

PDFCROWD

NCBELS 000935



# WE ARE NORTH CAROLINA'S TOP FULL SERVICE DRONE COMPANY

We cater to many industries such as solar, roofing, construction, marketing and advertising, commercial & residential real estate, search and rescue, agriculture, thermal inspection, Orthomosaic maps, ground footage, and more.

WATCH OUR VIDEOS

*"Being able to deal with just Michael and his company was great! They took care of everything, filming, editing, producing, and made it all very easy!"*

Lisa Morris, Morris Realty

Create PDF in your applications with the Pdfcrowd HTML to PDF API

PDFCROWD



ABOUT US

Create PDF in your applications with the Pdfcrowd HTML to PDF API

PDFCROWD

USCA4 Appeal: 23-1472    Doc: 19-1    Filed: 06/28/2023    Pg: 185 of 258



- North Carolina DOT Certified
- Pilots are Part 107 Certified
- Fully insured

- Vetted and Experienced
- Professional Standards
- Range of Industries
- Multiple FAA Authorizations

- Finished Product: video footage is delivered edited, with your graphics and sound integrated.

## SEE OUR WORK



Create PDF in your applications with the Pdfcrowd HTML to PDF API

PDFCROWD



# WHAT PEOPLE ARE SAYING

Create PDF in your applications with the Pdfcrowd HTML to PDF API

PDFCROWD

NCBELS 000939

USCA4 Appeal: 23-1472     Doc: 19-1     Filed: 06/28/2023     Pg: 187 of 258



"One really quick note, whoever did the drone shots for the latest Harbor Freight job was the BEST I've seen! LOTS of fantastic shots that looked great, captured the action and surroundings well.

*Uplift data Operations Manager*



"I am a builder so I wanted to document a new home I just finished. Michael and his team captured it perfect! It was already a VEY nice home, but it looked twice as nice in the video! Thanks guys!"

*Donald Poland*
*Poland Builders*



"You guys do amazing work! You are very professional & responsive! Thank you for everything you do!"

*Patricia Fritzinger*
*Top Selling Remax Agent*



# OUR CLIENTS

We provide high quality aerial media data to the top name brands in their industry.

Create PDF in your applications with the Pdfcrowd HTML to PDF API



Case 5:21-cv-00137-FL   Document 38-19   Filed 03/25/22   Page 13 of 63       NCBELS 000940



# WE KEEP SAFETY...

*Our mission is to provide the best customer service experience you can have using an aerial media company. The only thing we put above your satisfaction is SAFETY! We strive to provide safe flying environments where ever we fly. Accidents rarely happen, but when they do, you want to make sure the company you hired has a certified pilot behind the controls that is knowledgeable and has the skills to safely work around or avoid any dangerous hazards that may occur while flying.*

~Michael Jones
Owner/Operator
360 Virtual Drone Services

# IN OUR CONTROL

# CONTACT US

YOUR NAME

Phone

EMAIL

How can we help?

Submit

Create PDF in your applications with the Pdfcrowd HTML to PDF API

PDFCROWD



Create PDF in your applications with the Pdfcrowd HTML to PDF API





# FAQ's

Make sure your company is abiding by the FAA Laws for commercial drone use.

The commercial real estate business itself has enough rules, regulations, stipulations, etc. It's hard enough to keep up with and to make sure you are following it all, it can be a real stress.

If you are wanting to keep up with the industry, you will end up using unmanned aerial systems better known as "drones" in your commercial real estate marketing. You simply won't be able to compete. It is inevitable as the use of the internet was in the 90's. A lot of people resisted for a while, but eventually, to keep up with the market, they had to make use and implement the technology.

Well unmanned aerial systems / Drones are the new technology when it comes to marketing for your commercial real estate. It simply goes hand and hand. There is no better way to show case a property whether it is bare land, or an existing booming business, than

Create PDF in your applications with the Pdfcrowd HTML to PDF API

PDFCROW

USCA4 Appeal: 23-1472    Doc: 19-1    Filed: 06/28/2023    Pg: 190 of 258

with the use of aerial unmanned systems / "drones."

But just like with everything else, there are rules, regulations, laws, myths, facts, privacy issues and safety.  Can you or someone you know go buy a drone, and do this work yourself?  Sure, if you become certified, become educated in Adobe Lightroom, Adobe Photoshop, Final Cut Pro or Adobe Premier.  Have experience in photography, videography, camera settings, video editing, real estate, familiar with airspace, familiar with privacy laws (per state), knowledgable in RC radio signals and interference's that can cause disconnects between you and the aircraft. Familiar with safety and emergency procedures in case you lose connection between you and the unmanned aircraft.

Point being, you are in commercial real estate, you have enough on you without having to study and educate yourself on an entire other industry.  We here at 360 Drone Services, are familiar and very knowledgable on the FAA laws, rules, regulations, and restrictions.  We are FAA Certified, hold a NC Permit, insured with State Farm and Verifly.

The only thing that comes before getting you the best aerial media on the market, is safety and legalities.  We have you covered in that department.  But if you want to read through our FAQ page, maybe some of your questions will be answered.  But if it is not, feel free to email any questions you have to Michael@360vdrone.com

(FAQ Page Continued Below)

Q:  How can drones REALLY benefit my real estate business?

### Potential ROI: Landing and Marketing Listings

Since there is so much buzz (no pun intended) around drones these days and the FAA just relaxed their strict rules, your clients WILL probably at least ask about using a drone for your listing. We'll go over which types

Create PDF in your applications with the Pdfcrowd HTML to PDF API


PDFCROW

of listings benefit most from real estate drone photography and which don't next, but for now, we're going to focus on the potential value add for marketing.

Here's what drone photography can add to your marketing efforts:

1. Novelty (For Now)

Like most real estate journalists I would bet my life savings that this is about to change dramatically, but for now, drones are hot. There are going to be articles in newspapers, fluff pieces on the evening news, and a ton of coverage on blogs. This intends that drone photos and videos are a novelty. There is still a "wow" factor to drone videos, and I don't think that's going away anytime soon. Since home buying is a primarily emotional decision, novelty sells.

Brian Dougherty ($23 million sales volume in 2015), co-owner of Boston and Cambridge-based real estate firm Robert Paul Properties leveraged the novelty factor of drone video to sell a property sight-unseen:

"Recently, a cash buyer from overseas purchased one of my properties sight unseen after watching a video shot partially with drones.  Drone video footage adds an exciting dimension and a unique perspective that standard marketing photos can't convey.

Drone photos and videos also help us secure listings and prospective sellers realize that we are offering a tool and resource that not all of our competitors do."

## You Can Show the Entire Property

If there is one universal truth about home buyers, it's that they are terrible at visualizing space. Most listing photography does little to help. For example, say your listing has a huge 3 acre backyard, but 75% of it is obscured by trees. The photo on your listing makes it look tiny. With a drone shot, you could capture the entire yard in one picture to show them just how big a space it really is.

Create PDF in your applications with the Pdfcrowd HTML to PDF API    

### Potentially Viral (People WILL Share Drone Videos)

Home hunters share listing photos with friends and family all the time. They may tell you they're asking for a second opinion, but a lot of the time they're just sharing something pretty. My cousin, a successful attorney from Atlanta, posted dozens of listing pictures on her facebook feed when she was hunting for a house. If any of those listings had well-shot drone videos I guarantee she would have posted every single one of them.

### Use It As a Prospecting Tool

Most people only see real estate drone photography as a way to market their listings, but you can use them for a lot more. Can you imagine pitching a FSBO or Expired listing by offering to show them the gorgeous aerial footage of their house and neighborhood you shot last weekend? Can you imagine showing up to your pitch with a picture like this?

### You Can Capture the Entire Neighborhood

Instead of just shooting houses, you can create drone videos of the local neighborhood. These videos can make amazing "stock" footage to use on your website and general videos about your services.
6. You Can Show Distances to Amenities
Is there a beautiful little park or nice beach close to your listing? Again, most home buyers are terrible about estimating space or distances. How long does it take to walk 1000 feet? With drone photography instead of telling them, you can show them. You would need to shoot ten standard pictures to get the same effect.

### Roof Access

Did your seller just spend $20,000 on a new roof? With aerial photography, you can show off that expensive work and put potential buyers at ease.

Create PDF in your applications with the Pdfcrowd HTML to PDF API



## It Helps You Sell Land

While real estate drone photography is indeed perfect for marketing houses, the real benefit is in land sales. Instead of a blurry google map or illustration, you can show clients what the property looks like today.

How Much Should You Pay for Real Estate Drone Photography?

Like most creative services, pricing for drone photography can vary wildly. Your location, the skill and reputation of the photographer, the amount of editing needed, and the difficulty of what you want to shoot all effect price.

As a general rule of thumb, though, you should expect to pay around $150-$300 for 1-10 aerial still photos, and around $300-$1000 for a 1-5 minute video. Editing and revisions may or may not be included in the price so always ask before hiring someone.

With the new FAA regulations in place, you should expect to see real estate drone photography popping up in more and more real estate marketing. In order to stay ahead of the competition, you should take the time to learn how to integrate drones into your current marketing efforts.

Create PDF in your applications with the Pdfcrowd HTML to PDF API



## CONTACT US

YOUR NAME

Phone

EMAIL

How can we help?

Create PDF in your applications with the Pdfcrowd HTML to PDF API    PDFCROWD



Create PDF in your applications with the Pdfcrowd HTML to PDF API          PDFCROW

Case 5:21-cv-00137-FL    Document 38-19    Filed 03/25/22    Page 22 of 63      **NCBELS 000949**

J.A. 190

USCA4 Appeal: 23-1472    Doc: 19-1    Filed: 06/28/2023    Pg: 197 of 258

# POWER, ELECTRICAL & HAZARDOUS INSPECTIONS

Contact us for a quote



If you need high definition detailed close up photos, but don't want to put someones life in danger to get them, or you do not have the equipment to get the data you need- drone video

Create PDF in your applications with the Pdfcrowd HTML to PDF API

PDFCROW

and photography is the solution. We get detailed high resolution photographs from 30-50 meters back from the structure. With our zoom lens on the DJI Inspire w/Zenmuse 20 Megapixel camera, we are able to provide customers with things like:

-Insurance claims on roofs
-Serial numbers of HVAC equipment on high roofs
-Capture close up photographs of electrical equipment that's too high voltage to risk reaching on a ladder etc.

So not only can we get you the data you need, but we can increase safety by doing these jobs with UAS (drones) instead of risking the safety of your workers.

## CONTACT US

Create PDF in your applications with the Pdfcrowd HTML to PDF API

PDFCROW

©2018 360 Virtual Drone

Create PDF in your applications with the Pdfcrowd HTML to PDF API

PDFCROWD

NCBELS 000952

USCA4 Appeal: 23-1472    Doc: 19-1    Filed: 06/28/2023    Pg: 200 of 258

# ROOFING INSPECTIONS

Contact us for a quote



We can provide companies or individuals orthomaps of their entire roof, (permitting trees and structures) showing very detailed high resolution photos of the roof. You may want this done

Create PDF in your applications with the Pdfcrowd HTML to PDF API

PDFCROW

after a roof replacement for warranty or insurance purposes. You may want to have this after a storm or wind damage for insurance purposes. Or if you have a multi story home that you wanted to get detailed pics of the roof for damage assessment. Whatever it is, we can help you with a variety of roof services.

## CONTACT US

YOUR NAME

Phone

EMAIL

How can we help?

PDFCROW

Create PDF in your applications with the Pdfcrowd HTML to PDF API



Create PDF in your applications with the Pdfcrowd HTML to PDF API

PDFCROW

NCBELS 000955

J.A. 196

About Us    HOME    Professional Commercial Photography    FAQ Page    Services    Video Gallery    Equipment

# THERMAL IMAGING

Contact us for a quote

We offer thermal imaging to the solar farm industry. Frequent thermal inspections can end up saving you lots of money in the long run. This will allow the client to get monthly, bi-weekly, and weekly reports of the site, showing any dead cells, panels, or sections. Instead of someone walking around and checking each individual panel, let us do it from the air in a fraction of the time, saving you money!



Create PDF in your applications with the Pdfcrowd HTML to PDF API

PDFCROW





CONTACT US

YOUR NAME

Create PDF in your applications with the Pdfcrowd HTML to PDF API

PDFCROW

USCA4 Appeal: 23-1472    Doc: 19-1    Filed: 06/28/2023    Pg: 204 of 258



©2018 360 Virtual Drone

Create PDF in your applications with the Pdfcrowd HTML to PDF API

PDFCROW

NCBELS 000958

About Us      HOME      Professional Commercial Photography      FAQ Page      Services      Video Gallery      Equipment

# CONSTRUCTION

Contact us for a quote

  

Create PDF in your applications with the Pdfcrowd HTML to PDF API

PDFCROW

| | | | |
|---|---|---|---|
| Area | 2721 ft$^2$ | | Horizontal Length | 1560.4 ft |
| Cut | 394 y$^3$ | | Surface Length | 1627.6 ft |
| Fill | -1.2 y$^3$ | | Slope | 0.11°, 0.2% |
| Volume | 392.8 y$^3$ | | |

**Annotation & Measurement**

Location  Distance  Area  Volume

**Elevation Profile**

The drone business is quickly moving into the construction industry. So to see an unmanned aerial vehicle flying around the construction site is a pretty common thing these days. And thats' because unmanned aerial systems are offering very valuable information to the industry.

We offer video, pictures and orthomosaic maps (Measurable Maps) of the sites. With this information, construction companies can monitor the elevation changes, volumetrics for gravel/dirt/rock, and watch the changes and progression of the site as it forms over time.

We offer monthly, bi-weekly, and weekly progression media packages.

Create PDF in your applications with the Pdfcrowd HTML to PDF API    PDFCROW

# CONTACT US

YOUR NAME

Phone

EMAIL

How can we help?

Submit

Create PDF in your applications with the Pdfcrowd HTML to PDF API

PDFCROW

About Us    HOME    Professional Commercial Photography    FAQ Page    Services    Video Gallery    Equipment

# SEARCH AND RESCUE

 

In addition to the services we offer.  We also offer our services in a charitable

Create PDF in your applications with the Pdfcrowd HTML to PDF API

PDFCROW

form of search and rescue to local Law Enforcement, and fire department, as well as individuals for the following.

- Lost pets
- Lost farm animals
- Lost loved ones (those who suffer from mental disease such as Alzheimer's, dementia, etc.)
- Automobile Accidents (Especially submerged cars in water such as rivers, lakes, etc.)
- Law Enforcement (such as escape inmates)
- Fire departments

Drones are a marvel in modern technology, we feel that it is our service and duty to use them in a progressive, safe and helpful manner.  Please contact us if you are ever in need of these services.

Create PDF in your applications with the Pdfcrowd HTML to PDF API    PDFCROW

# CONTACT US

YOUR NAME

Phone

EMAIL

How can we help?

Submit

Create PDF in your applications with the Pdfcrowd HTML to PDF API

PDFCROW

**NCBELS 000964**

USCA4 Appeal: 23-1472    Doc: 19-1    Filed: 06/28/2023    Pg: 212 of 258



# DRONERS.IO

## 360 Virtual Drone Services

Member since: Jan. 17, 2017
Location: Goldsboro, NC

ABOUT 360 VIRTUAL DRONE SERVICES    DETAILS



Create PDF in your applications with the Pdfcrowd HTML to PDF API    PDFCROWD

Case 5:21-cv-00137-FL    Document 38-19    Filed 03/25/22    Page 38 of 63    NCBELS 000965

My name is Michael Jones, I am the owner and head operator of 360 Virtual Drone Company. This company was started right here in Goldsboro NC. home of the Seymour Johnson US Air Force Base.

We have been flying drones for about 3 years now and are currently certified by the FAA, an NCDOT for commercial drone use. In addition we also hold several certificates from accredited training courses and classes on real estate aerial photography. We have done work for Berkshire Hathaway, Remax, Coldwell Bankers, Verizon, Dronebase, Better Vue, Brother's Side Entertainment, Tom Wilson Investments, Edwards Commercial Real Estate, to name a few. We aim to capture stunning aerial video or photography of the property you wish to take to the next level in your marketing.

We also have a Wide area authorization for the following:
KGSB - Goldsboro, NC
KPGV - Greenville, NC
KCLT - Charlotte, NC
KRDU - Raleigh Durham, NC
And we also have the 107.29 Daylight Waiver to fly at night.

Whether it be a piece of land, a luxury home, or a prime spot of commercial real estate downtown a busy city, we have you covered. If you want your property to get the attention of buyers, the buyers you want the attention of, contact us now to schedule

---

**REQUEST A QUOTE**



**360 VIRTUAL DRONE SERVICES**

Member since: Jan. 17, 2017
License #: 3958073

📍 **Location:**

Goldsboro, NC

🛡 **Insurance Coverage**

$1.0 Million

$ **Hourly Rates**

| | |
|---|---|
| Real Estate | $100/hr |

The listed above rates are their average rates for pilot & drone per man hour. Price may vary depending

---

Create PDF in your applications with the Pdfcrowd HTML to PDF API    PDFCROWD

the flight and let's sell that property. We love shooting challenging shots, approaches, reveals etc. So please contact us if you have something challenging. We hope to hear from you soon.

on the job. See our **FAQs page** for more details.



---

PORTFOLIO

---

### SHARE THIS PILOT

Like this pilot? Spread some love.

 Sign Up to see what your friends like.





Investment Properties

Create PDF in your applications with the Pdfcrowd HTML to PDF API

PDFCROWD

USCA4 Appeal: 23-1472    Doc: 19-1    Filed: 06/28/2023    Pg: 215 of 258

Categories: Real Estate



Residential Real Estate (Upper)

Categories: Real Estate

Create PDF in your applications with the Pdfcrowd HTML to PDF API

PDFCROWD

NCBELS 000968



Commercial Land Overlay

Categories: Real Estate

Create PDF in your applications with the Pdfcrowd HTML to PDF API

PDFCROWD



Promotional Commercials (For your business)

Categories: Editing , Other

Create PDF in your applications with the Pdfcrowd HTML to PDF API

PDFCROWD

USCA4 Appeal: 23-1472    Doc: 19-1    Filed: 06/28/2023    Pg: 218 of 258



Commercial Land Real Estate (with Overlays)

Categories: Real Estate

Create PDF in your applications with the Pdfcrowd HTML to PDF API

PDFCROWD



225 Yards

Golf Course (Lane Tree in Goldsboro North Carolina)

Categories: Cinematography

Create PDF in your applications with the Pdfcrowd HTML to PDF API

PDFCROWD



360 Promotional Video

Categories: Cinematography

Create PDF in your applications with the Pdfcrowd HTML to PDF API    PDFCROWD



Event Videography

Categories: Cinematography , Editing , Event , Other

Create PDF in your applications with the Pdfcrowd HTML to PDF API          PDFCROWD

USCA4 Appeal: 23-1472    Doc: 19-1    Filed: 06/28/2023    Pg: 222 of 258

REVIEWS

**LOGIN** TO LEAVE A REVIEW

**RESOURCES & LINKS**

How it Works

FAQs

Media Kit

Blog

Terms Of Service - Client / Pilot

Privacy Policy

Know Before You Fly

**SERVICES**

Agriculture | Boating & Water Sports | Cinematography | Construction | Drone Maintenance | Drone Training |
Editing | Events | Infrastructure | Real Estate ▾ | Roof Inspection | Surveying & Mapping | Weddings

Create PDF in your applications with the Pdfcrowd HTML to PDF API          PDFCROWD

## ABOUT DRONERS.IO

Droners.io enables on-demand aerial imagery by connecting businesses to commercially licensed pilots. Using the network, businesses get insight where they want it and when they need it—and in a safe and compliant way.

## CONNECT WITH US



## CONTACT US

Send us an email

Create PDF in your applications with the Pdfcrowd HTML to PDF API

PDFCROWD

NCBELS 000976

J.A. 217

DRONERS.IO
POWERED BY PRECISIONHAWK

© 2018 Droners.io, All rights reserved.

Create PDF in your applications with the Pdfcrowd HTML to PDF API

PDFCROWD

| | |
|---|---|
| **From:** | Mike Benton |
| **To:** | Mark Mazanek |
| **Cc:** | John Logsdon |
| **Subject:** | 360 Virtual Drone Services |
| **Date:** | Wednesday, November 7, 2018 5:22:32 PM |
| **Attachments:** | image001.png |
| | image002.png |

Mark,

Please add this to the SC agenda for discussion.

https://droners.io/accounts/360vdrone/

Mike
Richard M. Benton, PLS L-3354

## Benton & Associates

Land Surveying and Mapping, P.A.
119 E. Walnut Street
Goldsboro, NC 27530
(919) 735-0440 Office
(919) 735-0840 Fax
mbenton@bentonandassociatesnc.com
Proud Member of






J.A. 219

Evidence # 3
Will Casey, Board Investigator
Case # V2019-003
Date Received 2/6/19
Received From Internet
Description ncdronehome website info

# CONSTRUCTION

Contact us for a quote









Case 5:21-cv-00137-FL   Document 38-19   Filed 03/25/22   Page 53 of 63   **NCBELS 000980**

J.A. 221

The drone business is quickly moving into the construction industry. So to see an unmanned aerial vehicle flying around the construction site is a pretty common thing these days. And thats' because unmanned aerial systems are offering very valuable information to the industry.

We offer video, pictures and orthomosaic maps (Measurable Maps) of the sites. With this information, construction companies can monitor the elevation changes, volumetrics for gravel/dirt/rock, and watch the changes and progression of the site as it forms over time.

We offer monthly, bi-weekly, and weekly progression media packages.

# DISCLAIMER:  PLEASE READ

Our Orthomosaic maps are not for surveying purposes, nor will they stand code for surveying or engineering purposes. We can work with a licensed surveyor to assist in data capture and processing, but we can NOT sign off on, nor make claims to ANY accuracy when it comes to any surveying or engineering project for global or relative accuracy.

The purpose and service for our maps in the construction industry is for stakeholders, insurance appraisers, investors, or anyone that could benefit from photogrammetry documentation on their project over a period of time for various reasons. These maps do have a RELATIVE accuracy of 1-3 inches. This means the measurable points on the map are within 1-3 inches accurate to a ground measurement.

However this is not survey accurate nor is it intended for these purposes. We are not allowed or licensed to sign off on any city, county, state, or federal project. We are not licensed surveyors, nor can we offer services that fall under the guide lines of surveying according to the North Carolina Board of Surveying and Civil Engineering.

Case 5:21-cv-00137-FL    Document 38-19    Filed 03/25/22    Page 54 of 63

NCBELS 000981

USCA4 Appeal: 23-1472      Doc: 19-1      Filed: 06/28/2023      Pg: 228 of 258

Construction Projects | Raleigh North Carolina | 360Vdrone

HOME          About Us          Professional Commercial Photography          FAQ Page          Services          Video Gallery          Equipment

CONTACT US

YOUR NAME

Phone                                    EMAIL

How can we help?

Submit

0   0   2   4   9   0   3                    ©2018 360 Virtual Drone Services

  

Case 5:21-cv-00137-FL    Document 38-19    Filed 03/25/22    Page 55 of 63          NCBELS 000982          3/3

USCA4 Appeal: 23-1472          Doc: 19-1          Filed: 06/28/2023          Pg: 229 of 258



J.A. 223

Evidence # ___4___
Will Casey, Board Investigation
Case # V3019-003
Date Received 2/7/19
Received From Respondent Michael Jones
Description Packet of info.

Messenger                                                        2/6/19, 9:32 PM

We are bidding on a Major Contract out of NC and need a PLS in NC that can also pilot our LiDAR Drone. In order to bid we need to have selected, screened and tested our NC PLS/PILOT. ***NO PHOTOGRAMMETRY WILL BE USED. STRICTLY LIDAR.***

**Date:**                            Not specified

**Service**                        Surveying & Mapping

  



https://www.facebook.com/messages/t/Alanny.pratt.14

Page 1 of 1



Danny Grant

Well I think (as the rules go) I can produce, dtms, dsms, contour lines flood maps, BUT...A surveyor has to sign off on my work. So I dont know but it could be as simple as you sign off on the work. Idk. Lol. I make ortho maps and etc for customers, I just can't legally sign off on them.

11/29/18, 8:02 PM

I'll check into it and see what I can do

11/29/18, 9:05 PM

Land surveying license requires me to supervise the work. The standards of practice are very specific as to supervision. Also very specific about practicing outside my area of expertise. You may find someone else better suited to help you with your needs in this regard.

No problem, I will at least notify you if I hear back from him about what kind of work it is. But I get what you are saying. I appreciate you checking into it.

I would love to help you so get back to me when you find out what the scope of the project it

Is

Absolutely. Thanks again Danny.

Sure thing.

Depending on the scope of work we could set control with the GPS unit to establish accuracy and then I may be able to sign off on the work

And ya know because of those "very tight rules" that may be why they were looking a PLS..with their Part 107 drone license. So he would be the one actually flying it

But I will def tell you what he says if he replies, he still hasnt read it...may be on the west coast

# DISCLAIMER: PLEASE READ

Our Orthomosaic maps are not for surveying purposes, nor will they stand code for surveying or engineering purposes. We can work with a licensed surveyor to assist in data capture and processing, but we can NOT sign off on, nor make claims to ANY accuracy when it comes to any surveying or engineering project for global or relative accuracy.

The purpose and service for our maps in the construction industry is for stakeholders, insurance appraisers, investors, or anyone that could benefit from photogrammetry documentation on their project over a period of time for various reasons. These maps do have a RELATIVE accuracy of 1-3 inches. This means the measurable points on the map are within 1-3 inches accurate to a ground measurement. HOWEVER THIS IS NOT SURVEY GRADE ACCURACY NOR CAN IT BE USED BY ANY STATE, COUNTY, OR CITY CODE for those purposes.





HARBOR FREIGHT

USCA4 Appeal: 23-1472   Doc: 19-1   Filed: 06/28/2023   Pg: 235 of 258

STEVE KEEN

ADAIR LLC

**11/1/19** | January 11, 2019



Powered by ● DroneDeploy



## William P. Casey

| | |
|---|---|
| **From:** | Michael Jones <michael@360vdrone.com> |
| **Sent:** | Thursday, February 7, 2019 10:53 AM |
| **To:** | William P. Casey |
| **Subject:** | Re: Case No.  V2019-003 (360 Virtual Drone Services) |





1

J.A. 230





Sent from my iPhone

On Feb 4, 2019, at 9:45 AM, William P. Casey <WCasey@ncbels.org> wrote:

Mr. Jones,

The library's address is 1001 E. Ash St., Goldsboro, NC. I'll meet you there on Thursday (2/7/19) at 10:00 AM. Let's plan to meet at the main entrance and we'll find a quiet spot from there.

Thanks,

William P. Casey
Board Investigator
NC Bd. Of Examiners
For Engineers & Surveyors
4601 Six Forks Rd., Ste 310
Raleigh, NC 27609

# Plaintiffs' Summary-Judgment Appendix Exhibit 20

William Casey Deposition
Transcript Excerpts

Page 1

```
1            IN THE UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF NORTH CAROLINA
2                    WESTERN DIVISION
     - - - - - - - - - - - - - - - - - :
3    360 VIRTUAL DRONE SERVICE      :
     LLC, et al.,                   :
4                                   :
              Plaintiffs,           :   CASE NO.
5                                   :
              vs.                   :   5:21-cv-0137 FL
6                                   :
     ANDREW L. RITTER, in his       :
7    official capacity as Executive :
     Director of the North Carolina :
8    Board of Examiners for         :
     Engineers and Surveyors, et    :
9    al.                            :
                                    :
10            Defendants.           :
     - - - - - - - - - - - - - - - - - :
11
12            DEPOSITION OF WILLIAM CASEY
13
14   DATE:                January 18, 2022
15   TIME:                12:07 p.m.
16   LOCATION:            Via Zoom Videoconference
17
18   REPORTED BY:         Constance H. Rhodes
                          Reporter, Notary
19
20
21            Veritext Legal Solutions
              1250 Eye Street, Northwest
22               Washington, DC 20005
```

Page 2

1              A P P E A R A N C E S

2

3    On behalf of Plaintiff:

4         SAMUEL B. GEDGE, ESQUIRE
          Institute of Justice
5         901 North Glebe Road
          Suite 900
6         Arlington, Virginia 22203
          (703) 682-9320
7         Sgedge@ij.com

8

9    On behalf of Defendant:

10        DOUGLAS W. HANNA, ESQUIRE
          Graibe Hanna & Sullivan, PLLC
11        4350 Lassiter at North Hills Avenue
          Suite 375
12        Raleigh, North Carolina 27609
          Dhanna@ghslawfirm.com

13

14   ALSO PRESENT:

15        John Logsdon

16                    *  *  *  *  *

17

18

19

20

21

22

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 5:21-cv-00137-FL   Document 88-20   Filed 03/25/22   Page 3 of 21

J.A. 234

Page 3

1                    C O N T E N T S

2     EXAMINATION BY:                                    PAGE

3          Counsel for Plaintiff                            4

4          Counsel for Defendant                           69

5

6     CASEY DEPOSITION EXHIBITS:*

7     Exhibit 1   Board Authorized Case Opening           21

8     Exhibit 2   Investigative Report                    27

9     Exhibit 3   Evidence Packet                         28

10    Exhibit 4   Email Chain between William Casey and

11                Michael Jones 2/8/19                    56

12    Exhibit 5   Review Committee Agency 5/1/19          59

13    Exhibit 6   Decision Letter to Michael Jones from

14                the Board 6/13/19                       60

15    Exhibit 7   7/21/17 Letter of Inquiry from Board

16                to Droners.io                           64

17    Exhibit  8   Board Authorized Case Opening for

18                Droners.io.                             65

19    Exhibit 9   Investigative Report in Swampfox Aerial  67

20

21

22    (* Exhibits attached to transcript.)

Page 4

```
 1              P R O C E E D I N G S
 2    WHEREUPON,
 3                   WILLIAM CASEY
 4    called as a witness, and having been first duly
 5    sworn, was examined and testified as follows:
 6              EXAMINATION BY COUNSEL FOR PLAINTIFFS
 7    BY MR. GEDGE:
 8         Q    Good morning or good afternoon, Mr.
 9    Casey.  How are you?
10         A    I'm good.  Thank you.
11         Q    Great.  May I please have you state your
12    name just for record up front?
13         A    Sure.  William Patrick Casey.
14         Q    So my name is Sam Gedge.  I represent
15    the plaintiff in the lawsuit 360 Virtual Drone
16    Services v. Ritter in the Eastern District of
17    North Carolina.
18              This deposition, as I'm sure you know, is
19    being taken as part of that case.  I just have a few
20    opening ground rule questions, but have you ever had
21    your deposition taken before?
22         A    No.
```

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 5:21-cv-00137-FL   Document 88-20   Filed 03/25/22   Page 5 of 21

J.A. 236

Page 17

1    investigators.

2         Q    It sounds like each investigator is kind

3    of a subject matter expert.  Does a certain type

4    of investigation goes to a certain person?

5         A    That's correct.

6         Q    So about how many investigations do you

7    do in a typical year?

8         A    Fifteen to -- I would say 15 would be an

9    average number.

10        Q    Does it mostly involve licensees?

11        A    Yes.

12        Q    And what kind of violations do you

13   typically investigate for licensees?

14        A    For surveyors it's creating

15   encroachments onto adjoining property, failure to

16   do adequate research, clear and factual maps,

17   maybe unclear or unfactual mapping.  On the

18   engineering side it's generally deficiency or

19   substandard work product.

20        Q    You mentioned interviews a couple

21   minutes ago.  Can you explain the interview

22   process for me?

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 5:21-cv-00137-FL ~ Document 38-20 ~ Filed 03/25/22 ~ Page 6 of 21

J.A. 237

```
 1        A     Sure.  Sure.  I will schedule it for a
 2    certain time and day and location.  And I will
 3    meet with the person I'm interviewing and start
 4    out by explaining -- if it's a respondent or a
 5    complainant I will start out by explaining the
 6    investigative process and then explain my role in
 7    the matter and how I will proceed and how things
 8    will go.  And then I jump right in to my line of
 9    questions that I have for them.  It's back and
10    forth, generally informal.  So it's -- when I get
11    to the end of my interview I typically will ask if
12    they have anything they would like to say that I
13    didn't ask about and then that usually wraps it
14    up.
15        Q     Do you have a prepared list of questions
16    or are they done on the fly?
17        A     Usually I will develop a list of
18    questions that I would like to cover or a list of
19    items that I would like to cover while I'm with
20    them.
21        Q     How do you develop that list?
22        A     Based upon the allegations outlined in
```

```
 1    the case opening letter and then what evidence we

 2    have I would ask questions about.  That's how I

 3    develop my line of questions.

 4         Q    So I've seen a number of the case

 5    opening letters and then a number of the -- I

 6    don't know what we would call them -- letters that

 7    tend to be at the end of the investigation.

 8              It looks like the opening ones were

 9    assigned by the Mr. Evans, the closing ones are

10    signed Mr. Ritter.  And I'm wondering -- maybe you

11    don't know the answer, but is there a reason for

12    that division of labor?

13         A    I don't know.

14         Q    Do you record the interviews?  Audio

15    recording, visual recording?

16         A    No.

17         Q    Do you take notes as you are conducting

18    the interview?

19         A    Yes.  Handwritten notes.

20         Q    Are you typically keep those notes

21    afterwards?

22         A    Just until my report is completed.
```

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 5:21-cv-00137-FL ~ Document 38-20 ~ Filed 03/25/22 ~ Page 8 of 21

J.A. 239

Page 20

```
 1          Q    Then what happens?

 2          A    They are shredded.

 3          Q    Shredded.  Okay.  So you use the notes

 4     as a basis for the report that you put together?

 5          A    Correct.

 6          Q    Okay.  So I'd like to turn to the 360

 7     Virtual Drone investigation.  I understand you

 8     were the investigator in charge of investigating

 9     the 330 Virtual Drone Services.  Is that right?

10          A    Yes.

11          Q    Have you served as an investigator on

12     many -- I know that there are a couple that you

13     talked about before.  About how many other

14     investigations have you been involved in that

15     involved drones?

16          A    There were two to my recollection.

17          Q    Is that the Swampfox and -- what was the

18     other one?

19          A    Droners.io.

20          Q    Do you know how 360 Virtual Drones came

21     to the Board's attention?

22          A    Originally through a Board member's
```

Page 21

```
 1    inquiry.
 2         Q    Do you know why the -- first question,
 3    do you know what Board member that was?
 4         A    Mike Benton.
 5         Q    Is he one of the surveying members of
 6    the Board?
 7         A    He is.
 8         Q    Do you know why 360 Virtual Drones came
 9    to his attention?
10         A    I don't.
11              (CASEY Exhibit Number 1 was marked for
12              identification.)
13    BY MR. GEDGE:
14         Q    Okay.  I'm going to try to introduce the
15    first exhibit.  So if I do it right it should pop
16    up in your folder in just a minute.
17         A    I don't see it, but let me back out of
18    this.
19              MR. GEDGE:  Just hit refresh.
20              THE WITNESS:  I got it.  I see it now.
21    BY MR. GEDGE:
22         Q    Mr. Casey, have you seen this document
```

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 5:21-cv-00137-FL   Document 38-20   Filed 03/25/22   Page 10 of 21

J.A. 241

Page 22

```
 1    before.
 2         A    Yes.
 3         Q    Can you tell me what that is?
 4         A    It's a case opening sheet is what I
 5    would call it.  It's based on a Board authorized
 6    investigation.
 7         Q    Is that what you were just discussing
 8    when you mentioned Mr. Benton initiating the
 9    matter; is that right?
10         A    Yes.  This is telling the investigator
11    how the case came about.
12         Q    In the second paragraph first sentence
13    it says:  Information regarding the company in
14    question was presented by a Board member for the
15    consideration by the surveying committee at the
16    meeting on November 28th, 2018.
17              Do you see that paragraph there?
18         A    Yes.
19         Q    Do you recall, were you present at that
20    meeting?
21         A    I do not recall.
22         Q    I assume you don't remember what was
```

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 5:21-cv-00137-FL   Document 38-20   Filed 03/25/22   Page 11 of 21

J.A. 242

Page 42

```
 1          Q    Okay.  Can you take a look at that and
 2     tell me if you remember what questions would have
 3     elicited that information?
 4          A    Well, he's describing his disclaimer so,
 5     so I probably would have asked him what does he
 6     mean -- what is meant by his disclaimer and the
 7     reference to accuracy.
 8          Q    If we go down to the next page, 916,
 9     what questions -- for the first full paragraph
10     there beginning with "Mr. Jones indicated he
11     considers," if you can take a look at that and see
12     if that triggers any recollection about what you
13     were asking about, I'd appreciate it.
14          A    My question would have been along the
15     lines of what -- in his mind what is mapping.
16          Q    In the last paragraph Mr. Jones stated
17     that he never has or will produce maps showing
18     property lines or measurements, if you can take a
19     look at that.  Do you remember what kind of
20     questions you were asking that elicited that
21     information?  That would be useful.
22          A    I mean my question would likely have
```

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 5:21-cv-00137-FL   Document 38-20   Filed 03/25/22   Page 12 of 21

J.A. 243

Page 43

1    been along the lines of -- it appears that I

2    already had the evidence taken -- let's see,

3    4.6 -- and so the question would have been

4    something revolving around that and the real

5    estate videos, or maybe there was a screen shot.

6    I'd have to go back and look to see what 4.6 is,

7    but it would have been a screen shot of a video

8    that had property -- had an outline around a

9    certain parcel.  And that would have -- so my

10   question would probably have been along the lines

11   was that did he believe that was surveying lines

12   or what -- something to that effect.

13        Q    When you're having these interviews with

14   these investigated respondents, do they ever ask

15   you whether what they were doing was a violation

16   of the law?

17        A    Yes.

18        Q    Does that happen very often?

19        A    I don't know.  I would say 50 percent of

20   the time maybe.  That's just a rough estimate.

21        Q    So what do you -- how do you respond to

22   questions like that?

Veritext Legal Solutions
215-341-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 5:21-cv-00137-FL   Document 38-20   Filed 03/25/22   Page 13 of 21

J.A. 244

Page 44

```
 1        A    That it's not my decision to make.  I'm

 2   just a fact gatherer, and I'll take the

 3   information they provided back to the review

 4   committee and let them make the decision.

 5        Q    Do you ever offer them any answers about

 6   whether you think their activities are or are not

 7   the practice of surveying or engineering?

 8        A    No.

 9        Q    So I assume you are aware that we filed

10   a complaint in this case that started the federal

11   lawsuit.  Do you understand that?

12        A    Yes.

13        Q    Have you read that complaint?

14        A    No.

15        Q    And I'll tell you that the complaint

16   alleges that during your interview with Mr. Jones

17   that you told him that giving a client an aerial

18   photograph that contains geospatial metadata is

19   the unlicensed practice of land surveying.  And

20   I'm wondering if you recall saying that or

21   something to that effect.

22        A    No.
```

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 5:21-cv-00137-FL   Document 38-20   Filed 03/25/22   Page 14 of 21

J.A. 245

Page 45

1        Q    You do not recall or you know that you

2    didn't?

3        A    I know I did not.

4        Q    How do you know that?

5        A    Because that's -- that's the standard

6    practice of my investigations.  I don't offer

7    opinions as to whether something is a violation.

8        Q    Do you ever provide the Board's policy

9    statement or guidelines to respondents in these

10   investigations?

11       A    Yes.

12       Q    What's the context in which you would do

13   that?

14       A    If the allegation was that they violated

15   some rule or policy, then I would probably couch

16   the question:  Do you believe what you did

17   complies with the Board's policy on this matter?

18       Q    Why would you ask that question?

19       A    To see if they are following the

20   guidelines and policies of the Board.

21       Q    Why would it matter what they think, you

22   know, like if they either violated it or they

Veritext Legal Solutions
215-241-1000   610-434-8588   302-571-0510   202-803-8820
Case 5:21-cv-00137-FL   Document 38-20   Filed 03/25/22   Page 15 of 21

J.A. 246

Page 46

```
 1    didn't.  Right?

 2         A    Yeah.  Clarify your question for me.

 3         Q    Sure.  I mean you -- I understood you to

 4    say that you have the practice sometimes of

 5    providing policy statements or guidelines to the

 6    target of the investigation and ask them do you

 7    think that you violated this.  I'm curious as to

 8    why it matters what they think about that.

 9         A    I will clarify that when I'm asking

10    about the guidelines, that would be to licensees,

11    not to unlicensed individuals.

12         Q    Would you ever provide a policy or

13    guideline to an unlicensed individual who is the

14    subject of one of your investigations?

15         A    No.

16         Q    To my knowledge, do any of the other

17    investigators ever provide policies or guidelines

18    to unlicensed respondents in their investigation?

19         A    I have no knowledge of that one way or

20    the other.

21         Q    Do you discuss your investigations with

22    your fellow investigators?
```

Page 47

```
1          A     Sometimes.

2          Q     Do you recall if you discussed your

3     investigation of 360 Virtual Drone Services with

4     any of your fellow investigators?

5          A     I don't recall ever discussing it with

6     anyone.

7          Q     The complaint that we filed also alleges

8     that in your interview you told Mr. Jones that

9     stitching aerial photographs together to create a

10    large orthomosaic picture, that that is also the

11    unlicensed practice of surveying.

12          Do you recall saying anything to that

13    effect?

14          A     No.  I did not say anything to that

15    effect.

16          Q     Have you ever told anybody that

17    providing a stitched-together aerial photograph

18    would be a practice of surveying?

19          A     I don't recall if I have or not.

20          Q     And my kind of last question along this

21    line is that we also allege that in that interview

22    you told Mr. Jones that giving a client aerial
```

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 5:21-cv-00137-FL   Document 38-20   Filed 03/25/22   Page 17 of 21

J.A. 248

Page 73

1                CERTIFICATE OF NOTARY PUBLIC

2                I, CONSTANCE HUNT RHODES, the officer

3     before whom the foregoing deposition was taken, do

4     hereby certify that the witness whose testimony

5     appears in the foregoing deposition was duly sworn

6     by me; that the testimony of said witness was

7     taken by me in stenotypy and thereafter reduced to

8     typewriting under my direction; that said

9     deposition is a true record of the testimony given

10    by said witness; that I am neither counsel for,

11    related to, nor employed by any of the parties to

12    the action in which this deposition was taken; and

13    further, that I am not a relative or employee of

14    any attorney or counsel employed by the parties

15    thereto, nor financially or otherwise interested

16    in the outcome of the action.

17                                    *Constance Hunt Rhodes*

18                            _____
                              CONSTANCE HUNT RHODES

19                            Notary Public in and for
                              the District of Columbia

20

      My commission expires:

21    January 14, 2023

22

J.A. 249

Page 74

1    Douglas Hanna, Esquire

2    Dhanna@ghslawfirm.com

3

4    RE: 360 Virtual Drone Services LLC v. Andrew L. Ritter, Et Al.

5        1/18/2022, William Casey (#5024742)

6        The above-referenced transcript is available for

7    review.

8        Within the applicable timeframe, the witness should

9    read the testimony to verify its accuracy. If there are

10   any changes, the witness should note those with the

11   reason, on the attached Errata Sheet.

12       The witness should sign the Acknowledgment of

13   Deponent and Errata and return to the deposing attorney.

14   Copies should be sent to all counsel, and to Veritext at

15   cs-midatlantic@veritext.com

16

17    Return completed errata within 30 days from

18   receipt of testimony.

19     If the witness fails to do so within the time

20   allotted, the transcript may be used as if signed.

21

22            Yours,

23            Veritext Legal Solutions

24

25

Page 75

1    360 Virtual Drone Services LLC v. Andrew L. Ritter, Et Al.

2    William Casey (#5024742)

3                    E R R A T A   S H E E T

4    PAGE__9__ LINE_2-3__ CHANGE New Jersey to

5    North Carolina

6    REASON__Paraphrase Incorrect

7    PAGE_17__ LINE_2-5__ CHANGE__Investigators are not subject
8    matter experts.  Cases are randomly assigned to any of
     the four Investigators

9    REASON__Paraphrase Incorrect

10   PAGE_61__ LINE_12__ CHANGE__Initials DFT/ch to DST/ch

11

12   REASON__Paraphrase Incorrect

13   PAGE_____ LINE_____ CHANGE_____

14

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17

18   REASON_____

19   PAGE_____ LINE_____ CHANGE_____

20

21   REASON_____

22

23

24   William Casey                        Date

25

Page 76

1    360 Virtual Drone Services LLC v. Andrew L. Ritter, Et Al.

2    William Casey (#5024742)

3    ACKNOWLEDGEMENT OF DEPONENT

4    I, William Casey, do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11    _____        3/4/22

12    William Casey                  Date

13    *If notary is required

14    SUBSCRIBED AND SWORN TO BEFORE ME THIS

15    4th DAY OF March , 2022.

16

17

18    Mariana Bautista

19    NOTARY PUBLIC
20    My Commission Exp: 8/17/2025

21

22

23

24

25