# Plaintiffs' Summary-Judgment Appendix Exhibit 21

360 Virtual Drone Services
Investigative Report

(Casey Dep. Ex. 2)

# NORTH CAROLINA
# BOARD OF EXAMINERS FOR
# ENGINEERS AND SURVEYORS

## INVESTIGATIVE REPORT

Reference:   Case No. V2019-003
                 360 Virtual Drone Services, LLC [Non-licensed]
Report by:   William P. Casey, Board Investigator
Date:         February 8, 2019

## SYNOPSIS

This matter is the result of a Board authorized investigation. At its meeting on December 19, 2018, the Board authorized an investigation to determine if 360 Virtual Drone Services, LLC is in violation of G. S. 89C-24, 57D, and 55B for practicing or offering to practice land surveying in North Carolina without a license. Based upon a review of the firm's web site by the Surveying Committee of the Board and an advertisement on the Droners.io web site, it is alleged that the firm may be practicing or offering to practice land surveying. The services include, but are not limited to, "Surveying & Mapping," and providing orthomosaic maps of construction sites.

Michael Jones, owner of the firm, was notified of the allegations through Board correspondence and he responded by e-mail. He wrote that he is aware the firm is neither licensed nor allowed to offer surveying or engineering. Mr. Jones indicated any such violation was by mistake and not meant to mislead anyone into thinking they are licensed.

There are no previous violations listed on the Board's database for 360 Virtual Drone Services, LLC and the firm is not listed on the NCEES Enforcement Exchange web site.

The following individual was interviewed by Board Investigator William Casey during the investigation:

- Michael Jones – Owner of 360 Virtual Drone Services, LLC (2/7/19)

This matter is pending consideration by the Land Surveying Review Committee of the North Carolina Board of Examiners for Engineers and Surveyors.

**Exhibit**
PI 0002

1

**DETAILS OF INVESTIGATION**

Report of Interview with Michael Jones on February 7, 2019
360 Virtual Drone Services, LLC
Goldsboro, NC 27534
252/360-9021
michael@360vdrone.com

Board Investigator William Casey conducted an interview with Mr. Jones at the Wayne County Public Library in Goldsboro, North Carolina. Mr. Jones indicated he has a Remote Pilot Certificate issued by the Federal Aviation Administration. He added that pursuant to 14 CFR – Part 107, anyone flying an unmanned aircraft system or drone for commercial purposes must carry that certification. Mr. Jones indicated his highest level of education is a high school GED certificate. He added that he obtained a Microsoft certification that allowed him to get into Information Systems Technology. Mr. Jones indicated he worked as a Network Systems Analyst for Branch Banking & Trust for a period of time before leaving the office setting to begin welding. He indicated a welding co-worker brought their drone into work one day, which got him interested in pursuing a career piloting a drone. Mr. Jones went on to say the rest is history.

Mr. Jones stated he operates as 360 Virtual Drone Services, LLC and is 100 percent owner of the company. He indicated he started out offering services in the real estate industry, which is "low hanging fruit" because it is easy work but there is no money in it. Mr. Jones indicated he began taking online mapping courses to help move into different areas of service. He added that he was able to transition into the construction industry providing orthomosaic or orthorectified maps. Mr. Jones indicated he markets his services through his web site (ncdronehome.com), the Droners.io web site, his YouTube channel (Jones Knows Drones) and Facebook (360Vdrone).

Mr. Jones stated his typical construction client is hard to put into one category, but he essentially flies his drone back and forth over the client's site using the Drone Deploy application on his phone. He indicated once he selects the area to be flown, the application guides his drone, which takes a picture about every two seconds while in flight. Mr. Jones added that the images are then uploaded through the Drone Deploy application and get stitched together into one map or photo that he provides to his client. He went on to say the photo can be zoomed in on much the same way Google Maps is able to be zoomed. Mr. Jones indicated the map can be used by the client to keep tabs on their site and to see how construction is progressing. He indicated the package he subscribes to with Drone Deploy allows him access to 2-D, 3-D, heat deviation and plant health life maps. He added that he most often uses the 2-D and 3-D maps.

Mr. Jones stated he has offered his services to Professional Land Surveyors but has not had much luck getting any work from them. He indicated he saw a job posting (evidence #4.1) on the Droners.io web site in November 2018; however, it specifically required a Professional Land Surveyor. He went on to say he replied to the

advertisement asking if he was able to partner with a Professional Land Surveyor or had one on his team would they accept his bid, but he never received a response. Mr. Jones stated he put an advertisement on his business Facebook page (360Vdrone) stating he was looking to partner with a Professional Land Surveyor for the project. He indicated he received a message (evidence #4.2) from James D. Grant, PLS asking for additional information about the job. Mr. Jones indicated he replied to Mr. Grant and they went back and forth a few times but because he never heard back from the client, he and Mr. Grant never worked together. He added that he does not know for sure but he thinks maybe their discussion triggered this investigation.

Mr. Jones stated one of his current clients is Steve Keen, owner of Adair, LLC, a real estate development group. He indicated Mr. Keen wanted an overall view of a current project he is developing in Wayne County, North Carolina. Mr. Jones indicated Mr. Keen did not want multiple photos that he would have to tape together or zoom in on individually; however, because he is limited to a 400 foot altitude, it was not possible to take a photo of 40 acres with one shot. He indicated for that reason he recommended an orthomosaic map (evidence #4.5) using the Drone Deploy application that would look like one photo and could be zoomed in on like one photo. Mr. Jones indicated the incremental photos allow Mr. Keen to keep up with project progression without actually going on-site. He added that his (Jones) map even allowed Mr. Keen to confirm that a truck delivering gravel had backed over and broken a section of curb and gutter.

Mr. Jones stated another function of the Drone Deploy application is the ability to measure area, distance and volume. He indicated he has never offered that service because the people he works for do not have a use for it and he is under the impression you need a license to provide that type of information. Mr. Jones indicated the application only offers one to four meter accuracy, which really could not be used for planning purposes. He acknowledged that at one time he advertised the ability to provide measurements but has since removed that from any marketing materials. Mr. Jones went on to say he has the ability to add his clients as administrators in the application, which would allow them to use the measurement tools if they wanted to, but he has never done so. He added that Drone Deploy has multiple packages to choose from that increase in accuracy as you go up in price.

Mr. Jones stated his disclaimer's (evidence #3 and 4.3) reference to relative accuracy means if he laid out a tape measure on the ground and took a photo showing a driveway is 10 feet wide that using the application's measuring tool it would measure the same driveway to be within an inch or two of 10 feet. He went on to say the application could be used for volumetrics as well; however, he has never looked at it close enough to determine accuracy, mainly because he has no way to verify it.

Mr. Jones stated the Droners.io web site provides free memberships. He indicated Droners.io gets paid a commission on what a member gets paid after completing a project. Mr. Jones indicated that upon signing up on the Droners.io web site there is a checklist whereby you select the types of services you want to offer. He indicated one of the selections combines mapping and surveying. He added that when he selected

that option his thought was that he would only be offering mapping; however, he can see how it would be misconstrued with the word surveying included and has since removed that as an offering on the web site.

Mr. Jones indicated he considers mapping as the stitching together of multiple photos. He reiterated he is unable to get what some clients want photographed in one shot, so he takes multiple shots and stitches them together into a map or one large photo.  He went on to say maybe the term mapping is the wrong word and he should just call it a photograph.

Mr. Jones stated he never has or will produce maps showing property lines or measurements.  He acknowledged that he has taken some real estate videos (evidence #4.6) that include what appears to be property lines.  He indicated his intent with that was to give a general location and shape of the parcel.  Mr. Jones indicated there is never any bearings or distances on any of his maps.  He added that he puts a disclaimer (evidence #4.7) in the notes of his YouTube videos stating, "Property lines are for a visual guide only and are not accurate to county coordinates."

NCBELS 000916

## **EVIDENCE**

1.    Packet of information, received from NC Secretary of State's web site consisting of:

    1.1    NC Secretary of State search results for 360 Virtual Drone Services, LLC.

    1.2    2018 **Limited Liability Company Annual Report** for 360 Virtual Drone Services LLC.

2.    Packet of information, received from Mark Mazanek consisting of:

    2.1    E-mail correspondence from Mark Mazanek to David J. Evans dated 12/12/18, Subject: Case Request.

    2.2    Business advertisement for 360 Virtual Drone Services.

    2.3    www.carolinahomedrone.com web site information.

    2.4    Droners.io web site information.

    2.5    E-mail correspondence from Mike Benton to Mark Mazanek dated November 7, 2018, Subject: 360 Virtual Drone Services.

3.    Updated www.ncdronehome.com web site information, construction services with disclaimer.

4.    Packet of information, received from Michael Jones consisting of:

    4.1    Droners.io solicitation for services.

    4.2    Facebook Messenger transcript between Michael Jones and James D. Grant, PLS.

    4.3    Disclaimer statement.

    4.4    Orthomosaic map of Harbor Freight project site in Dillon, South Carolina.

    4.5    Orthomosaic map of Steve Keen, Adair, LLC project site in Wayne County, North Carolina.

    4.6    Screenshot from YouTube real estate marketing video showing property outline.

    4.7    Screenshot from YouTube real estate marketing video showing disclaimer.

# Plaintiffs' Summary-Judgment Appendix Exhibit 22

## Clyde Alston Deposition Transcript Excerpts

1           IN THE UNITED STATES DISTRICT COURT
         FOR THE EASTERN DISTRICT OF NORTH CAROLINA
2                    WESTERN DIVISION
      - - - - - - - - - - - - - - - - - :
3     360 VIRTUAL DRONE SERVICE      :
      LLC, et al.,                   :
4                                    :
               Plaintiffs,           :   CASE NO.
5                                    :
               vs.                   :   5:21-cv-0137 FL
6                                    :
      ANDREW L. RITTER, in his       :
7     official capacity as Executive:
      Director of the North Carolina:
8     Board of Examiners for         :
      Engineers and Surveyors, et    :
9     al.                            :
                                     :
10             Defendants.           :
      - - - - - - - - - - - - - - - - - :
11
12              DEPOSITION OF CLYDE ALSTON
13
14    DATE:                January 18, 2022
15    TIME:                3:02 p.m.
16    LOCATION:            Via Zoom Videoconference
17
18    REPORTED BY:         Constance H. Rhodes
                           Reporter, Notary
19
20
21              Veritext Legal Solutions
                1250 Eye Street, Northwest
22                 Washington, DC 20005

```
 1              A P P E A R A N C E S
 2
 3      On behalf of Plaintiffs:
 4            JAMES KNIGHT, ESQUIRE
              Institute of Justice
 5            901 North Glebe Road
              Suite 900
 6            Arlington, Virginia 22203
              (703) 682-9320
 7            jknight@ij.org
 8
 9      On behalf of Defendants:
10            DOUGLAS W. HANNA, ESQUIRE
              Graibe Hanna & Sullivan, PLLC
11            4350 Lassiter at North Hills Avenue
              Suite 375
12            Raleigh, North Carolina 27609
              Dhanna@ghslawfirm.com
13
14      ALSO PRESENT:
15            John Logsdon
16                      *  *  *  *  *
17
18
19
20
21
22
```

Page 3

```
 1                  C O N T E N T S
 2    EXAMINATION BY:                         PAGE
 3         Counsel for Plaintiffs               4
 4
 5    ALSTON DEPOSITION EXHIBITS:*
 6    Exhibit 10  Complaint against Firmatek          43
      Exhibit 11  Investigative Report into Firmatek  45
 7    Exhibit 12  Firmatek Evidence Packet            46
      Exhibit 13  Board Letter of Inquiry to Firmatek 50
 8    Exhibit 14  Firmatek's Response to Board        56
      Exhibit 15  Decision Letter re: Firmatek        61
 9    Exhibit 16  Lappert/Smith - Charlotte UAV Complaint  64
      Exhibit 17  Investigative Report for Lappert/Smith  67
10    Exhibit 18  Decision Letter for Lappert/Smith   74
      Exhibit 19  Complaint against NC Drone Pro and Mark
11                Fronrath                            76
      Exhibit 20  Investigative Report on NC Drone    77
12    Exhibit 21  Evidence Packet on NC Drone         87
      Exhibit 22  Letter of Inquiry from Board to Fronrath  90
13    Exhibit 23  Letter of Inquiry from Board to
                  NC Drone                            92
14    Exhibit 24  Complaint against NSight Drone Services  94
      Exhibit 25  Investigative Report NSight Drone   95
15    Exhibit 26  Decision Letter for NSight Drone    102
16
17
18
19
20
21
22    (* Exhibits attached to transcript.)
```

Page 4

1               P R O C E E D I N G S

2     WHEREUPON,

3                      CLYDE ALSTON

4     called as a witness, and having been first duly

5     sworn, was examined and testified as follows:

6               EXAMINATION BY COUNSEL FOR PLAINTIFFS

7     WHEREUPON,

8                      CLYDE ALSTON

9     called as a witness, and having been first duly

10    sworn, was examined and testified as follows:

11              EXAMINATION BY COUNSEL FOR PLAINTIFF.

12    BY MR. KNIGHT:

13        Q    Good afternoon, Mr. Alston.

14        A    Good afternoon.

15        Q    Could you please state your full name

16    for the record?

17        A    Sure.  Clyde Anthony Alston.

18        Q    Thank you.  My name is James knight.  I

19    represent the plaintiffs in 360 Virtual Drone

20    Services versus Ritter.  This deposition is being

21    taken as part of that lawsuit.

22              Have you ever had your deposition taken

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 5:21-cv-00137-FL   Document 38-22   Filed 03/25/22   Page 5 of 15

J.A. 264

Page 87

1    and Stake-out for future reference; is that

2    correct?

3         A    Yes.

4         Q    Why did you give him that policy?

5         A    For future reference of what the Board

6    policy stated regarding 3D modeling for grading

7    and stake-out.

8         Q    Did he have any question about the

9    policy when you handed it to him?

10        A    He didn't at the time of the interview

11   that I recall.

12             (ALSTON Exhibit Number 21 was marked for

13             identification.)

14   BY MR. KNIGHT:

15        Q    I'll introduce an exhibit.  Exhibit 21.

16   Let me know when you see it.

17        A    Yes, I have it.

18        Q    Have you seen this material before?

19        A    Yes.

20        Q    Is this the evidence you collected

21   during Mr. Fronrath's and his company's case?  Is

22   that correct?

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 5:21-cv-00137-FL   Document 38-22   Filed 03/25/22   Page 6 of 15

J.A. 265

Page 88

1          A     We did receive that from for this case,

2     yes.

3          Q     If you could turn to the second-to-last

4     page -- so scrolling all the way down -- marked

5     607.  Let me know when you are there.

6          A     Yes.

7          Q     Can you tell me what this and the

8     following page are?

9          A     Yeah.  It's 3D modeling for grading and

10    stake-out, the Board's policy regarding that.

11         Q     Is this the policy that you gave Mr.

12    Fronrath?

13         A     It is, yes.

14         Q     How often do you give respondents in

15    investigations copies of Board policies like this?

16         A     There are some occasions that I will,

17    particularly if a firm or company is unlicensed

18    and they are doing, for an example, 3D modeling,

19    then I would provide a copy of the Board policy

20    relating to that.

21         Q     Do respondents who you give the policy

22    to tend to have questions about the policy?

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 5:21-cv-00137-FL  Document 38-22  Filed 03/25/22  Page 7 of 15

J.A. 266

Page 89

1        A    I don't recall them having questions

2    after providing that.  And if so, I would refer

3    them for further discussion with David Tuttle, the

4    Board attorney.

5        Q    When you turned in your report --

6    Exhibit 20, if you want to go back to it -- in

7    this case, Mr. Fronrath's case, did you provide

8    any opinion on what the board of review should

9    recommend?

10       A    No.

11       Q    Do you know what the Board did

12   recommend?

13       A    Not with this case.  I do not know.

14       Q    And so I assume you don't know what

15   action the Board ultimately took then?

16       A    I do not.

17       Q    In this, the Board investigated both the

18   drone company, NC Drone Pro, and Mr. Fronrath

19   individually; is that correct?

20       A    Yes.

21       Q    Can you tell me why both the company and

22   the individual were investigated separately here?

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 5:21-cv-00137-FL ~ Document 38-22 ~ Filed 03/25/22 ~ Page 8 of 15

J.A. 267

Page 90

1          A     Well, it appeared that Mark Fronrath was

2     the owner of NC Drone, so they re are two

3     different entities, Mark being one, and NC Drone

4     Pro.  And so the Board charged not only Mark but

5     also the firm, his company, that he owns.

6          Q     During -- is it common to charge the

7     individual and the company that they own

8     separately?

9          A     It has been done before.  I don't know

10    what instances that it was where they just charge

11    one and not both -- the owner of the company as

12    well as his company.  I don't -- I don't recall

13    the specifics behind that.

14         Q     When you turned in your report, did you

15    provide any opinion on what the -- I'm sorry.  I'm

16    going to introduce another exhibit.  Exhibit 22.

17    Let me know when you see it.

18               (ALSTON Exhibit Number 22 was marked for

19               identification.)

20               THE WITNESS:  I have it before me.

21    BY MR. KNIGHT:

22         Q     Have you seen this document before?

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 5:21-cv-00137-FL   Document 88-22   Filed 03/25/22   Page 9 of 15

J.A. 268

Page 91

1        A     I may have.

2        Q     Could you tell me what it is?

3        A     Like the other letters that the Board

4    sent out.  After they conduct this investigation,

5    they will let the respondent know that they have

6    done a thorough investigation and what their

7    response -- what the Board's review committee had

8    determined and then what the Board determined as a

9    result of their meeting.

10       Q     And based on your reading of this

11   letter, what did the Board determine?

12       A     The Board determined that the activities

13   that NC Drone Pro that included but not limited to

14   what was on their website -- mapping and

15   surveying, as well as the manipulation of aerial

16   data for CAD and GIS programs and commercial roof

17   inspections -- was the practice of surveying and

18   engineering.

19       Q     Just to clarify, at the top of this

20   letter it looks to me like this letter is to Mr.

21   Fronrath, not to his company in particular, when

22   it says the case number is Mr. Fronrath.  Is that

Page 92

```
 1   correct?
 2        A    For this particular case, yes.  This is
 3   just 058.
 4        Q    And when you say you may have seen this
 5   before, do you have reason to believe you wouldn't
 6   have seen this or you just don't recall seeing
 7   this?
 8        A    It may have a part of what was sent to
 9   me last Thursday, but I don't -- I don't recall.
10   There was quite a few documents that had to be
11   reviewed, and I don't remember if this was one of
12   them or not.
13        Q    But you don't recall seeing it at the
14   time of the investigation, the time the letter was
15   sent?
16        A    No.  I don't recall that.
17             (ALSTON Exhibit Number 23 was marked for
18             identification.)
19   BY MR. KNIGHT:
20        Q    I'll introduce another exhibit,
21   Exhibit 23.  Tell me when you can see it.
22        A    I have it.
```

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 5:21-cv-00137-FL   Document 38-22   Filed 03/25/22   Page 11 of 15

J.A. 270

Page 106

1                    CERTIFICATE OF NOTARY PUBLIC

2                    I, CONSTANCE HUNT RHODES, the officer

3        before whom the foregoing deposition was taken, do

4        hereby certify that the witness whose testimony

5        appears in the foregoing deposition was duly sworn

6        by me; that the testimony of said witness was

7        taken by me in stenotypy and thereafter reduced to

8        typewriting under my direction; that said

9        deposition is a true record of the testimony given

10       by said witness; that I am neither counsel for,

11       related to, nor employed by any of the parties to

12       the action in which this deposition was taken; and

13       further, that I am not a relative or employee of

14       any attorney or counsel employed by the parties

15       thereto, nor financially or otherwise interested

16       in the outcome of the action.

17                                         *Constance Hunt Rhodes*

18                              _____
                               CONSTANCE HUNT RHODES

19                             Notary Public in and for
                               the District of Columbia

20

         My commission expires:

21       January 14, 2023

22

```
                                              Page 107
 1    Douglas Hanna, Esquire

 2    Dhanna@ghslawfirm.com

 3

 4    RE: 360 Virtual Drone Services v. Andrew L. Ritter, Et Al.

 5        1/18/2022, Clyde Alston (#5024742)

 6        The above-referenced transcript is available for

 7    review.

 8        Within the applicable timeframe, the witness should

 9    read the testimony to verify its accuracy. If there are

10    any changes, the witness should note those with the

11    reason, on the attached Errata Sheet.

12        The witness should sign the Acknowledgment of

13    Deponent and Errata and return to the deposing attorney.

14    Copies should be sent to all counsel, and to Veritext at

15    cs-midatlantic@veritext.com

16

17     Return completed errata within 30 days from

18    receipt of testimony.

19      If the witness fails to do so within the time

20    allotted, the transcript may be used as if signed.

21

22              Yours,

23              Veritext Legal Solutions

24

25
```

```
                                          Page 108
1      360 Virtual Drone Services, LLC v. Andrew L. Ritter, Et Al.

2      Clyde Alston (#5024742)

3                    E R R A T A   S H E E T

4      PAGE  12   LINE  2    CHANGE  working at COP? to working at

5      CPS?

6      REASON: because I did not work for COP?

7      PAGE 29 LINE 18 CHANGE plat where you may need not factual to

8      plat that may not be accurate

9      REASON the statement seems awkward

10     PAGE_____ LINE_____ CHANGE_____

11     _____

12     REASON_____  PAGE_____

13     LINE_____  CHANGE_____

14     _____

15     REASON_____  PAGE_____

16     LINE_____  CHANGE_____

17     _____

18     REASON_____  PAGE_____

19     LINE_____  CHANGE_____

20     _____

21     REASON_____

22

23       Clyde Alst                    2/21/2022

24     Clyde Alston                      Date

25
```

Page 109

```
 1    360 Virtual Drone Services LLC v. Andrew L. Ritter, Et Al.
 2    Clyde Alston (#5024742)
 3              ACKNOWLEDGEMENT OF DEPONENT
 4       I, Clyde Alston, do hereby declare that I
 5    have read the foregoing transcript, I have made any
 6    corrections, additions, or changes I deemed necessary as
 7    noted above to be appended hereto, and that the same is
 8    a true, correct and complete transcript of the testimony
 9    given by me.
10
11    _Clyde Alst_____          __2/21/2022__
12    Clyde Alston                 Date
13    *If notary is required
14                    SUBSCRIBED AND SWORN TO BEFORE ME THIS
15                    _____ DAY OF _____, 20___.
16
17
18                    _____
19                    NOTARY PUBLIC
20
21
22
23
24
25
```

# Plaintiffs' Summary-Judgment Appendix Exhibit 23

Board Expert Report (Schall Dep. Ex. 31)

**Report of Mark S. Schall, CP, PLS, PPS, SP**

Attorney Douglas W. Hanna, representing The North Carolina Board of Examiners for Professional Engineers and Land Surveyors (NCBELS), has retained me to give expert testimony or opinions on the following:

- What is Photogrammetry?
- How does Photogrammetry Work?
- My Experience in Photogrammetry
- Using Unmanned Autonomous Vehicles (UAV's) or Drones as a Tool for Photogrammetry
- My Experience using Drones as a Tool for Photogrammetry
- Why Land Surveying, most specifically Photogrammetry, as the North Carolina Legislature has designated the practice of Land Surveying as a profession, is regulated by NCBELS.
- The Purpose of Regulating Land Surveying and Photogrammetry
- Specific Issues Raised in the Complaint

**About Mark S. Schall**

Currently, I'm the Chief Professional Officer (CPO) and Professional Land Surveyor (PLS) in responsible charge at Spatial Data Consultants, Inc. (SDC), a regional Geospatial Consulting firm specializing in Surveying, Photogrammetry, Remote Sensing and GIS, including Unmanned Autonomous Systems (UAS) surveys. My professional experience spans from 1979 to present, I have approximately 42 years of applied and professional experience and expertise in the fields of Surveying and Photogrammetry.

Prior to founding SDC in February of 1996, I gained approximately 17 years of production and project management experience in Land Surveying and Photogrammetry for regional, national and international consulting firms headquartered in the eastern United States.

My professional credentials also include the following certifications, registrations and affiliations.

- American Society of Photogrammetry and Remote Sensing (ASPRS)
  - Certified Photogrammetrist #950, 1994
- The North Carolina Board of Examiners for Professional Engineers and Land Surveyors
  - Professional Land Surveyor L-4019, 1999
- The South Carolina State Board of Registration for Professional Engineers and Land Surveyors
  - Photogrammetric Surveying #22679, 2003
- Commonwealth of Virginia Board for Architects, Professional Engineers, Land Surveyors, Certified Interior Designers and Landscape Architects
  - Surveyor Photogrammetrist #75, 2010
- Approximately 437.5 hours of Professional Development Hours (PDHs) of education required to maintain professional certifications and registrations.
- North Carolina Society of Surveyors (NCSS), Sustaining Member
- Board of Director, and Past President for the NCSS Education Foundation, served 9 years.
- Instructor, NCSS Institute for Professional Continuing Education, teaching Photogrammetry competency courses.
- Professional Land Surveyor (PLS) in responsible charge for the North Carolina (NC) Statewide Orthoimage Program, from 2012 to present, SDC as a Prime Vendor. This annual reoccurring project is funded by the NC E-911 Board, and facilitated by NC Information Technology Services (ITS) Center for Geographic Information and Analysis (NCCGIA).

**Exhibit
PI 0031**

In preparing this report and my opinions herein, I'm relying on my 42 years of applied and professional experience in Photogrammetry, Land Surveying and other Geospatial disciplines. I reserve the right to amend this report if additional information is revealed during case findings. I have never testified as an expert at trial or by deposition at any time in my career.

In consideration of the health, safety and welfare of the public in the State of North Carolina, I have prepared this report pro bono. In addition, any expert testimony by deposition that may be required of me will also be provided pro bono.

**What is Photogrammetry?**

Photogrammetry is the art, science, and technology of obtaining reliable information about physical objects and the environment through processes of recording, measuring, and interpreting photographic images and patterns of recorded radiant electromagnetic energy and other phenomena (Wolf and Dewitt, 2000; McGlone, 2004).

Photogrammetry is nearly as old as photography itself. Since its development approximately 150 years ago, photogrammetry has moved from a purely analog, optical–mechanical technique to analytical methods based on computer-aided solution of mathematical algorithms and finally to digital or softcopy photogrammetry based on digital imagery and three-dimensional (3D) computer vision, which is devoid of any optical-mechanical hardware.

Photogrammetry is primarily concerned with making precise measurements of three-dimensional (3D) objects and terrain features from two-dimensional (2D) photographs. Applications include the measuring of coordinates; the quantification of distances, heights, areas, and volumes; the preparation of topographic maps; and the generation of digital elevation models and orthophotographs (Aber, Marzolff and Ries, 2010).

*Although similar to each other, following are some definitions of Photogrammetry from other sources…*

Founded in 1934, The American Society for Photogrammetry and Remote Sensing (ASPRS) is an American learned society devoted to photogrammetry and remote sensing. It is the United States member organization of the International Society for Photogrammetry and Remote Sensing (ISPRS).

ASPRS defines Photogrammetry as… "the art, science, and technology of obtaining reliable information about physical objects and the environment, through processes of recording, measuring, and interpreting images and patterns of electromagnetic radiant energy and other phenomena."

Wikipedia, the free online encyclopedia defines Photogrammetry as… "the science and technology of obtaining reliable information about physical objects and the environment through the process of recording, measuring and interpreting photographic images and patterns of electromagnetic radiant imagery and other phenomena."

Merriam-Webster, a Dictionary since 1828, defines Photogrammetry as… "the science of making reliable measurements by the use of photographs and especially aerial photographs (as in surveying)."

*From my own experience and perspective…*

Photogrammetry is a discipline of Professional Land Surveying, Land Surveying or Surveying, regardless of how one wishes to term it. Where in Land Surveying, the Surveyor goes into the field to locate, measure and record accurate survey data or useful information; in Photogrammetry, the Surveyor obtains imagery, aerial or terrestrial, most often aerial, and brings the field into the office environment, then uses Photogrammetric practices and processes to locate, measure and record accurate survey data or useful information from the imagery. This is the simplest explanation or analogy I can offer.

**How does Photogrammetry Work?**

In the context of this report, I can't begin to scratch the surface of how complex and continuously developing a technology Photogrammetry is, with its evolving techniques and high-level mathematical principles. This is the primary reason why Photogrammetry is licensed and regulated under Land Surveying in NC and requires the Licensed Professional to continue his/her education in the form of Professional Development Hours (PDHs) throughout their career, typically on an annual basis.

*Following is a very fundamental description of how Photogrammetry works…*

Photogrammetry is a three-dimensional (3D) coordinate measuring technique that uses photographs or images, most often from an airborne platform, as the essential source for locating, measuring and recording survey data or useful information. Throughout the history of Photogrammetry airborne platforms have ranged from balloons and kites, to fixed wing aircraft, rotor wing aircraft, satellites and unmanned autonomous vehicles (UAV), or more commonly known as drones. The airborne platform used to collect the imagery doesn't matter, the subsequent Photogrammetric workflow to achieve the desired survey data or useful information is exactly the same regardless of how the imagery is acquired.

The fundamental principle used in photogrammetry is triangulation. When using aerial imagery, it's often referred to as aero-triangulation or aerial triangulation. By taking photographs from at least two different locations, lines of sight, also called image rays, can be developed from each camera principal point to points on the object. These image rays, due to their optical nature, are mathematically intersected to produce the three-dimensional (3D) coordinates of the points being measured. Triangulation is also the principle used by theodolites for coordinate measurements in Land Surveying. Triangulation is also how the two human eyes work together to gauge distance which is called depth perception.

Responsible Photogrammetric practice includes the use of metric cameras and sensors that are engineered, designed and manufactured specifically for surveying and mapping applications. A metric camera is very high quality, very expensive, and virtually distortion free. A metric camera utilizes a leaf shutter, has a focal length and internal dimensions which are exactly known through calibration, and can maintain calibration for long periods of time over numerous airborne missions, thus providing accurate, repeatable and dependable results for triangulation and survey data extraction time after time.

A modern metric digital camera may often be called a sensor because they're digital in nature however, another example of a metric sensor used for terrestrial, mobile and airborne surveys is LiDAR, which is an acronym for Light Detection and Ranging. Lidar is a method for determining ranges by targeting an object with a laser and measuring the time for the reflected light to return to the receiver (Wikipedia). LiDAR sensors can vary widely in quality, accuracy and cost, and are utilized in a wide variety of industries including surveying and mapping, manufacturing automation, agriculture, automotive safety and many others.

Over the past 50 years, new metric airborne cameras and sensors for commercial Photogrammetry and Remote Sensing surveying operations have ranged in cost from $300,000.00 to as much as $1,500,000.00. This doesn't include the software and internal infrastructure required for developing or post processing the imagery or other types of sensor data. These cameras and sensors are essentially surveying instruments which were engineered, designed and manufactured specifically for the purpose of producing distortion free imagery and other types of remotely sensed data suitable for Photogrammetric surveying.

**My Experience in Photogrammetry**

I first started my Photogrammetry career in 1979 at the Ralph L. Woolpert Company (now Woolpert, LLP), an international Engineering, Land Surveying and Geospatial consulting firm headquartered in Dayton, Ohio. During my tenure at Woolpert, I was taught the basic principles of Photogrammetry and Land Surveying by highly trained and skilled Photogrammetrists and Surveyors. This was during the Analog development stage of Photogrammetry. Aero-triangulation was a manual process of locating, marking and measuring pass, tie and control points, also known as "bridging" in those days. Planimetric and topographic maps for engineering applications were manually drawn on mylar manuscripts by hand using projection or optical mechanical stereo-plotting devices, the imagery used was captured with analog metric aerial cameras using acetate based aerial film for distortion free imagery. Computers and or software had not yet been developed or integrated into Photogrammetry procedures and or processing.

From 1985 through 1995 I worked for several other regional, national and international Geospatial Consulting firms across the eastern United States. During this period of my career, I widened my experience in Photogrammetry to include project technical planning, production supervision and project management. This was during the Analytical development stage of Photogrammetry. Imagery was still being collected using analog metric aerial cameras using acetate based aerial film for distortion free imagery however, the development of main frame computers allowed for the development of block adjustment software, which greatly improved aero-triangulation, and the analytical stereo-plotter. Analytical stereo-plotters use a mathematical projection based on the co-linearity (two vectors pointing in the same direction) equation model. The mechanical element of the instrument is a very accurate, computer-controlled device that compares two photographs simultaneously (Wikipedia).

In February of 1996, I founded Spatial Data Consultants, Inc. (SDC), a regional Land Surveying and Geospatial consulting firm located in High Point, NC. From 1996 to present, I've witnessed and experienced the transition of Analytical Photogrammetry into Digital Photogrammetry. Film based metric analog aerial cameras have been replace with digital airborne sensors, both active and passive, for imagery, LiDAR or other remote sensing data. Although still used by some Photogrammetrists, analytical stereo plotters have been replaced by PC base Softcopy Photogrammetry software platforms utilizing specialized graphics cards, monitors, emitters and glasses allow for three-dimensional (3D) stereo viewing for Photogrammetric data collection and post processing.

During my 42-year career, Photogrammetry has been a constantly changing and progressive science within Land Surveying, requiring ongoing education and training in order to gain current technical knowledge and expertise. In my experience, Photogrammetry has always been viewed and practiced as a professional vocation under the guise of Land Surveying. I've always practiced Photogrammetry emphasizing professionalism, ethical conduct, compliance with legislated standards of practice; while observing regulatory and professional licensing requirements; in consideration of the health, safety and welfare of the general public.

**Using Drones for Photogrammetry and Surveying**

Modern drones equipped with cameras were first developed in the early 1980's for military applications. Hobbyist drones began to emerge in the early 2000's out of the remote control (RC) model aircraft community. Consumer off the shelf (COTS), or recreational drones became available around 2006, with popularity in the United States beginning to increase around 2015.

UAVs or drones offer an alternative aviation platform or tool for Photogrammetry besides fixed wing or rotor wing aircraft however, this doesn't necessarily mean lower cost for an acquisition system or lower project costs for the client. Drones and payloads engineered, designed and manufactured specifically for Surveying and Photogrammetry can cost upwards of $300,000.00 or more, compared to a COTS drone and payload which typically cost under $500.00, but can range in cost from under $500.00 to $1,500.00. Drones for other professional applications can cost tens of thousands of dollars, prices vary widely.

The availability of COTS drones along with the development of inexpensive, sometimes free, Structure from Motion (SfM) Photogrammetry software which allows for "black-box" processing, unsupervised when using internet cloud-based post processing services, or by unskilled users, has created an overwhelming surge in the popularity of Photogrammetry since 2015.

If it weren't for the introduction of low-cost drones and SfM post processing software the UAS gold rush within the Photogrammetry and Surveying industries we've experienced in recent years wouldn't have taken place. Mainstream surveying equipment manufacturers like Trimble, Leica, Topcon, Javad, Riegl, and many others, all started developing drone surveying systems and software as another surveying and mapping tool to market to their traditional client demographic, which were Surveyors, Engineers and Photogrammetrists, not recreational or hobbyist drone enthusiasts.

From around 2018 to present the development curve of drone sensors and post processing software has flattened. Currently, there are ample UAS systems available that have been engineered, designed and manufactured specifically for Photogrammetric Surveying, that can provide accurate, reliable and repeatable results.

**My Experience Using Drones for Photogrammetry and Surveying**

My experience with using a UAV or drone for Photogrammetry and Surveying began in early 2016 as a reaction to the overwhelming promotion and hype of drone photogrammetry and surveying within our industry. At that time, mainstream survey equipment and drone manufacturers were developing drone surveying systems and software, aggressively marketing them to Professional Surveyors and Engineers in an attempt to add the element of Photogrammetry to their everyday practice.

For myself, as a Professional Photogrammetric Surveyor, the appearance of drones in the industry was simply another airborne platform or tool we could utilize when the physical or technical scope of a project wasn't practical for a fixed wing or rotor wing aircraft however, drones have weight and payload limitations, so the most critical aspect of using a drone as an aviation tool for Photogrammetry and Surveying would be the cameras or sensors being used to collect imagery or other remote sensing data since mainstream metric airborne cameras and sensors for Photogrammetry and Surveying were designed for fixed wing or rotor wing aviation platforms.

During 2016 and 2017, with the assistance of Staff Members, Peers, Manufacturers and Clients, we began testing various COTS drone surveying systems and SfM Photogrammetry software applications to determine if we could achieve accurate, reliable and repeatable results compared to our proven Photogrammetric workflows using airborne imagery collected with metric airborne cameras or sensors from fixed wing or rotor wing aviation platforms, meeting Client expectations, and in compliance with regulated surveying and mapping standards.

The drone surveying systems we initially tested during this period were comprised of COTS drones and cameras, all of which didn't measure up when we compared the drone system survey data to verified field survey data or data derived from our standard photogrammetric procedures, which had also been validated by statistical analysis using surveyed ground control and check points. We attributed the inaccuracy of the SfM processed drone survey data to the following technical or physical limitations.

### *Technical Limitations*
1) The COTS cameras we tested consisted of digital single-lens reflex camera (DSLR) cameras which aren't metric, or in other words, aren't calibrated by the manufacturer. Each time the camera was turned on the calibration changed.
2) The COTS cameras we tested utilized a rolling shutter. A rolling shutter camera scans the pixels of each image, introducing pixel shifts with the movement of the camera over the duration of the scan. Pixel displacement in the images caused feature matching problems and inaccurate camera parameters during SfM Photogrammetry post processing.
3) The COTS cameras we tested didn't have a precise center of exposure pulse for geocoding each image with accurate relative coordinates.
4) The COTS cameras we tested weren't coupled with survey grade GPS for geocoding each image with accurate absolute coordinates.
5) The center of exposure pulse precision and non-survey grade GPS coupled with the COTS cameras we tested didn't produce post processed data within the manufacturers advertised accuracy for direct georeferencing. We tested a number of scenarios introducing surveyed ground control into the post processing, from minimal to saturated configurations until we achieved somewhat accurate results.

### *Physical Limitations*
1) Vegetation caused problems during SfM post processing. Dense brush and tree canopy yielded incomplete triangulation which couldn't be corrected by manual inspection and measuring due to extremely small image footprints and the fact there were no visible locations in the imagery to accurately measure triangulation tie or pass points, also known
2) Vegetation on site caused problems during SfM post processing. Grass and weeds yielded point cloud elevation points which didn't represent bare earth or ground elevation. The SfM Photogrammetry software didn't allow for visual 3D inspection of the point cloud data for manual review and correction by a highly trained and skilled Photogrammetric Technician as our standard 3D Photogrammetric software platform and workflow allows for.
3) Other site conditions such as surface motion, highly reflective surfaces and consistent surface patterns all caused pixel matching problems during SfM post processing. These conditions might include trees moving in the wind, moving or static water, highly reflective surfaces, row crops, new asphalt or concrete.

The extensive tests we conducted between 2016 and 2017 validated my decision to delay our implementation of drones into our acquisition and product development workflows. I felt the development of the systems, primarily using COTS components, and the software for post processing, were underdeveloped and being oversold by the Developers. In regards to Photogrammetry, Surveying and Mapping, everyone was jumping on the drone bandwagon prematurely in an attempt to ride the initial wave of commercial opportunities.

In late 2017, I made the decision to seek out a drone manufacturer to assist us in designing and developing a UAV Surveying system that would use components that were engineered, designed and manufactured specifically for Surveying and Mapping applications. We wouldn't try to implement any drone, camera or sensor technology for commercial operations that was meant for the recreational consumer or hobbyist.

In early 2018 I reached out to Microdrones, an international company based in Germany, recently acquired by GE, with support facilities in Toronto, Canada and Atlanta, GA, to inquire about their interest in developing a fully integrated UAV system for Photogrammetry. Microdrones agreed to work with SDC to codevelop such a system which is now known as the mdLiDAR3000.

From February through July of 2018 SDC staff aided in the development of the mdLiDAR3000 hardware, flight control and management system and the data post processing software. SDC took delivery of the first mdLiDAR3000 drone Photogrammetry Mapping System in August of 2018. The basic composition of the system was as follows…
1) Microdrones md4-3000 Heavy Lift Drone
2) Riegl MiniVUX-1UAV LiDAR Sensor (LiDAR manufactured specifically for surveying)
3) Sony RX1RII Digital Camera (affixed lens, mechanical leaf shutter with precise exposure pulse)
4) Trimble APX-20 UAV DG (military and survey grade GNSS-INS for direct georeferencing)

After three years of research, testing and development, and a financial investment of nearly $500,000.00 we were ready and confident to begin offering drone Photogrammetry to our customer demographic. We were the first Geospatial company to commercially operate the Microdrones mdLiDAR3000 drone Photogrammetry system worldwide, and would have the distinction of being the only commercial operator until Microdrones announced the mdLiDAR3000 product release on September 29, 2018.

From August 2018 to present, SDC has successfully accomplished over eight hundred (800) commercial drone missions, in compliance with FAA, NCDOT Aviation, NCBELS and other state or local commercial drone operation and land surveying regulations, without a single reportable or unreportable incident. Being a responsible and professional organization, offering Photogrammetry and Surveying, including commercial drone aviation services, SDC carries the following insurance policies at a total annual expense of $38,113.56 for 2021.

1) Professional Liability Insurance (CNA)
    a. $2,000,000.00 aggregate limit per policy year, annual premium $5,864.00.
2) Commercial General Liability Insurance (Acord)
    a. $2,000,000.00 general aggregate limit per policy year, annual premium $3,130.00.
3) Automotive Liability (Acord)
    a. $1,000,000.00 combined single limit per policy year, annual premium $2,421.66.
4) Umbrella Liability (Acord)
    a. $4,000,000.00 aggregate limit per occurrence, annual premium $1,650.00.

5) Workers Compensation and Employers Liability (Acord)
   a. $1,000,000.00 per accident, per employee, annual premium $3,355.90
6) Aviation Insurance Policy Unmanned Aircraft Systems (Global Aerospace)
   a. $2,000,000.00 personal injury, annual premium $956.00.
   b. $255,000.00 hull coverage, annual premium $20,736.00.

Using a drone as an optional aviation tool for our Photogrammetry and Surveying operations hasn't eliminated our use of fixed wing or rotor wing aviation platforms for airborne imagery and LiDAR data acquisition. We only implement drone imagery and LiDAR acquisition into our project technical plan when it makes practical sense, typically the deciding factors being the location of the project site in relation to regulated or controlled airspace, the area size of the project, the distance we have to mobilize to the project site and the physical conditions of the site.

Photogrammetry is a very complicated and ever evolving science and industry, with challenges and difficulties that require highly trained and skilled staff, most often certified or licensed by a professional organization or regulatory Board. Adding unmanned autonomous vehicles (UAVs), non-metric sensors and Structure from Motion (SfM) Photogrammetry post processing software makes Photogrammetry even more complicated and difficult compared to using manned aviation platforms, metric sensors and traditional Photogrammetry software solutions that include more robust statistical analysis for post processing and 3D stereo viewing for data collection, data validation and quality control.

In our case, implementing a drone into our imagery and LiDAR acquisition workflow is not "cutting edge", or a "technical innovation", it's simply another means, or aviation tool, we use to collect airborne imagery and or LiDAR for our Photogrammetry project technical plans and workflows. Following is an outline for a typical Photogrammetry Project, be it UAS, fixed wing or rotor wing aviation platforms.

1) Project Technical Planning and Consulting (PLS, ASPRS Certified Photogrammetrist)
   a. Assess Client needs and objectives.
   b. Evaluate project technical and product requirements, scope of work (SOW).
   c. Flight and ground control planning.
   d. Cost estimating, technical and cost proposal development.
   e. Client consultations and or negotiation.
   f. Technical and cost proposal acceptance, contract execution.
2) Ground Control Survey (PLS, PLS Intern)
   a. Final control planning, refine project control point distribution and point locations.
   b. Research existing geodetic control, USGS and or State Geodetic Survey Agencies.
   c. Mobilize field crew and equipment to the project site.
   d. Select precise control point locations in the field, monument and pre-mark (target).
   e. Use conventional, Global Positioning Systems (GPS) surveying methods to obtain accurate horizontal and vertical coordinates for each control point.
   f. Select precise check point locations in the field, monument and pre-mark (target) them if they'll be enabled as control points for final post processing.
   g. Use conventional, Global Positioning Systems (GPS) surveying methods to obtain accurate horizontal and vertical coordinates for each check point.
   h. If using a Real Time Network (RTN), Real Time Kinematic (RTK) GPS survey methods, visit each control and or check point a minimum of two times for redundant measurements.

8

J.A. 283

      i. If using conventional survey methods, GPS base station with rover RTK-GPS or static GPS point occupation, post process field data using OPUS and or Manufacturer specific survey post processing software.

      j. Output final ground control and check points in the project designed coordinate system using the appropriate horizontal datum, vertical datum and units.

      k. Prepare Ground Control Surveys Report, signed and sealed by the PLS in responsible charge of field survey operations.

3) Airborne Imagery and LiDAR Acquisition (PLS, FAA Commercial Pilot, Part-107 Certified Remote Pilot, Sensor Operator and or Observer).

      a. Final flight planning, review planned flight lines, forward or side overlap, altitude of operations, all other imagery and or LiDAR collection parameters, ensure regulatory compliance and public safety. For UAS, final flight planning includes selecting the launch and retrieve location for the drone.

      b. Assess airspace for restricted flight zones, submit waiver applications FAA approval, if required.

      c. Pilot safety check, FAA NOTAMs, TFRs and Aircraft Safety Alerts.

      d. Assess weather and wind forecasts and conditions, day of mission.

      e. Mobilize crew and equipment to the project site.

      f. For UAS, assess current site conditions to assure FAA Part-107 compliance and public safety. For some project sites, this requires flying a scout drone and collecting video which is reviewed and assessed in the field.

      g. For UAS, check ground control and or check points to ensure all are pre-marked prior to imagery acquisition, repair or replace targets as necessary.

      h. For UAS, to reduce GPS baseline distances, locate geodetic or local project benchmark for base station GPS occupation, collection of GPS baseline for drone exterior orientation (EO) trajectory data post processing. For some projects, CORS or SmartBase software post processing offer alternate base station options when required. Perform base station setup and begin collecting statice GPS.

      i. For UAS, assess and finalize drone launch and retrieve location, obtain permission if necessary.

      j. For UAS, prepare drone and payload, conduct preflight equipment and safety checks following documented operation and safety procedure checklists.

      k. For UAS, launch the drone, acquire imagery and or LiDAR, maintaining visual line of site with the drone. Land the drone, exchange batteries, launch drone for additional lifts, if required to complete acquisition.

      l. For UAS, review and verify ground control survey data, base station data, imagery and or LiDAR data acquired during the mission before leaving the project site, assuring complete data sets, no corrupted or incomplete files.

      m. Mobilize crew and equipment back to the hangar or office for field data transfer and post processing.

4) Airborne Imagery and LiDAR Post Processing (PLS, PLS Intern, Skilled Photogrammetric or LiDAR Technician)

      a. For large format metric digital airborne image sensors with multiple sensor heads or cameras, raw image data collected by the sensor system must be post processed, outputting exploitation images, typically 3-band (RGB) color, in some cases 4-band (RGBIR) color or false color infrared depending on which bands are used to display the images. The post processed exploitation images, 3 or 4 band, are used for subsequent photogrammetric processing and product development.

b. For UAS, images collected by the sensor system don't require supplementary post processing. Exploitation images, typically 3-band (RGB) color, are ready to use for subsequent photogrammetric processing and product development directly from the sensor data storage device.

c. Submit and post process base station data using OPUS for corrected positioning based on a minimum 2-hour static GPS collection.

d. Post process GPS base station data for exterior orientation (EO) trajectory data.

e. For UAS, post process preliminary orthoimage composite using SfM Photogrammetry. This preliminary orthoimage composite is used to assist LiDAR point cloud classification.

f. Post process raw LiDAR flight line data using EO data.

g. Isolate noise, assess LiDAR returns of the unadjusted LiDAR.

h. Post process LiDAR flight line data for relative orientation (RO), strip and bundle adjustments using ground control, creating a project LiDAR point cloud.

i. Based on terrain type, post process LiDAR point cloud by applying automated ground classification procedures. Output shaded surface, perform manual review and corrections to refine bare earth classification.

j. Post process statistical results for direct geo-referencing accuracy by comparing the bare earth classified LiDAR point cloud to the surveyed ground control points and or check points, generate LiDAR accuracy report.

k. Perform above ground LiDAR classifications based on ASPRS LAS Format 1.4.

l. Perform visual quality control inspection and refinement, assuring absolute classification and accuracy.

m. Post process final project colorized LiDAR point cloud.

n. Prepare LiDAR Post Processing Report, signed and sealed by the PLS in responsible charge of LiDAR field operations and post processing.

5) Aero-Triangulation Post Processing (PLS, PLS-Intern, Skilled Photogrammetric Technician)

a. AT strip and block preparation and project setup, organize and format if necessary: EO trajectory data, surveyed ground control and checkpoint data, exploitation imagery and camera data files.

b. Import all required data into the AT Post Processing software, setting up individual strips and a composite AT block. Identify and enter specific project post processing parameters based on the project technical requirements and SOW.

c. For projects that require a high level of accuracy, manually select and measure 2-ray and 3-ray pass points within individual strips (flight lines). A minimum of six, 3-ray pass points are required within the stereo overlap region of two consecutive exploitation images in a flight line to ensure measurement geometry and relative orientation (RO).

d. For projects that require a high level of accuracy, manually select and measure 4-ray, 5-ray or 6-ray tie points between the side overlap regions between strips (flight lines). A minimum of two, 6-ray pass points are required within the stereo overlap region of two consecutive exploitation images and two adjacent flight lines to ensure measurement geometry and RO.

e. For UAS, or projects that require lower levels of accuracy, conduct automatic or semi-automatic pass and tie point generation, often called auto-correlation, or SfM Photogrammetry. This type of automated process for pass and tie point geometry often requires visual review and supplemental manual measurements to refine the strips and block for successful RO, regardless of accuracy requirements.

f. Manually measure the surveyed ground control in reference to where it appears in the imagery.

10

g.  Post process the AT block for RO applying predetermined weigh factors for the image rays within the defined AT project parameters. Perform statistical analysis, review and remeasure image rays that fall outside tolerances set within the defined AT project parameters, refine the measurement rays util the overall RO sigma is within the defined AT project parameters for image measurement Root Mean Square Error (RMSE).

h.  Post process the AT block for absolute orientation (AO) by enabling the EO trajectory data, surveyed ground control and or check points in the post processing solution, applying predetermined weight factors within the defined AT project parameters. Perform statistical analysis, review and remeasure image rays that fall outside tolerances set within the defined AT project parameters, refine the measurement rays util the overall AO sigma is within the defined AT project parameters for image measurement and ground control Root Mean Square Error (RMSE).

i.  Finalize AT block AO bundle adjustment, densify control, apply bulk orientation to apply final RO, AO and single photo resection parameters to the final EO data and stereo models for 3D stereo feature collection.

j.  Prepare AT Post Processing Report, signed and sealed by the PLS in responsible charge of AT measurement and post processing.

6)  3D Stereo Mapping (PLS, PLS-Intern, Skilled Photogrammetric Technician)

a.  Stereo model and data collection setup, organize and format if necessary: final AT data files and stereo exploitation imagery.

b.  Import all required data into the 3D Stereo Photogrammetric data collection software, setting up stereo models and CAD workspace environment. Identify and enter specific project data collection parameters based on the project technical requirements and SOW. Create project mapping limits and stereo model boundaries within the CAD workspace environment.

c.  Cursory review of all project stereo models, visiting each surveyed control point, taking manual readings at each point to ensure horizontal and vertical accuracy comparing the actual field survey coordinates to the coordinates generated by the final AT AO solution, measured by the Technician within the 3D stereo models prior to feature data collection.

d.  Manually measure and digitize 3D planimetric features based upon the project technical requirements and SOW: structural, transportation, utility, vegetation and hydrographic feature classes, any planimetric or cultural feature visible in the stereo imagery.

e.  LiDAR data quality control, manual review for vertical accuracy in comparison to the 3D stereo model surface. Use automated and manual procedures to remove LiDAR points from conflicting structural and hydrographic features, as well as other 3D planimetric features included in DTM processing.

f.  Manually measure and digitize supplemental 3D digital terrain model (DTM) features based upon the project technical requirements and SOW: supplemental DTM break lines and elevation points where LiDAR points don't adequately define the terrain surface. Use automated and manual procedures to remove LiDAR points from conflicting DTM features.

g.  Generate temporary contours, measure and digitize supplemental spot elevations: tops, bottoms, saddles, areas where contours are spaced apart further than the project parameters allow for.

h.  Detailed 3D stereo quality control review to ensure complete planimetric content, DTM accuracy and contour integrity.

11

J.A. 286

     i.   Create final 3D mapping files for product development: separate 3D planimetric feature and 3D DTM feature files.

     j.   Post process the final DTM file: quality control for duplicate points or crossing break lines, export final contours and required surface files, XML or TIN.

     k.   Combine final 3D mapping files for product delivery: final planimetric and topographic feature file, final DTM feature file and final DTM surface file, in appropriate CAD, GIS, XML or TIN formats.

     l.   Develop digital mapping metadata.

7)  Orthoimage Post Processing (PLS, PLS Intern, Image Analyst, Skilled Photogrammetric Technician)

     a.   Perform global exploitation image radiometry adjustments, correcting the project exploitation images for dynamic range, tone, color, contrast and brightness.

     b.   Orthoimage project and workspace setup, organize and format if necessary: final AT data files, final project DTM or digital elevation model (DEM) surface files and exploitation imagery.

     c.   Post process preliminary exploitation orthoimages for visual quality control review and seam line development.

     d.   Develop seam lines using automatic, semi-automatic or manual seam line digitizing techniques.

     e.   Visual seam line quality control review using image transparency functions and custom MDL utilities to avoid seam line conflicts and DTM or DEM blunder detection.

     f.   Edit seam lines, correct DTM or DEM blunders.

     g.   Post process final exploitation orthoimages for mosaic post processing.

     h.   Import final seamlines and exploitation orthoimages in the project workspace, process seam line polygons and exploitation orthoimage polygon assignments.

     i.   Mosaic post processing, including secondary image color and tone matching adjustment, combining multi-resolution imagery if required, creating a seamless transition and visually consistent result for GeoTIFF output as one composite orthoimage or predetermined orthoimage tiles.

     j.   Internal macro quality review, visual inspection for image artifacts, seam line blunders or other image distortion introduced during the mosaic post processing.

     k.   Perform macro quality review corrections.

     l.   GeoTIFF product development: modify GeoTIFF header if required, output specific orthoimage mosaic or tile formats… TIFF, MrSID, JPG2000, or other image formats.

     m.   Develop orthoimage metadata.

     n.   Prepare Orthoimage Post Processing Report, signed and sealed by the PLS in responsible charge of AT measurement and post processing.

8)  Product Deliver, Project Conclusion (PLS, ASPRS Certified Photogrammetrist)

     a.   Product delivery to the Client via FTP or other electronic data transfer.

     b.   Draft and submit a Project Certification Letter or Airborne Surveys Report detailing the tasks, procedures, equipment, software, technical specifications, survey standards, statistical analysis for horizontal and vertical accuracy, signed and sealed by the PLS in responsible charge, overseeing all project tasks.

The outline above is an example of a typical Photogrammetric Survey Project, the task descriptions are brief and non-technical in nature, true technical documentation of a Photogrammetry, applications, theory and workflows, could take hundreds of pages.

J.A. 287

Photogrammetry text books are extremely technical, outlining the complex and arduous mathematics and principals Photogrammetry is based upon, fundamental changes in photogrammetric theory or practice due to technological changes such as widespread adoption of digital imagery and the emergence of separate fields with strong photogrammetric components, such as geographic information systems (GIS) and remote sensing. These text books are typically for graduate-level courses at the Master's level.

Some Photogrammetry projects can be far more complex than outlined above, some could be less complex than outlined above. Project scope and workflow can vary widely from project to project however, any Photogrammetric project, regardless of complexity, requires extensive expertise, knowledge and skill to ensure survey integrity and accuracy, meeting or exceeding applicable regulatory standards, conducted in a professional and ethical manner.

For the past 25 years SDC has thrived as a Photogrammetry, Surveying and Geospatial firm here in NC, serving a wide variety of private and government Clients. Since licensure in 1999 with NCBELS, for the past 22 years, both myself as a Professional Land Surveyor and SDC as a Professional Corporation, our success in the industry hasn't been impeded in any manner through professional regulatory compliance. If a poll was taken of the other 4,370 licensed Professional Firms, 2,336 licensed Professional Land Surveyors, and 29,585 licensed Professional Engineers in NC, I'm sure all or the majority would agree that regulatory compliance isn't cumbersome or an inconvenience, it's an asset, and ensures the public is protected from malpractice.

Being licensed by NCBELS, both as an individual and a corporation, assures our clients and the public that we've met specific standards for education, expertise and experience. With professional licensure comes obligations for professional conduct and ethics, and the requirement to maintain proper insurances for business liability, aviation operations and professional liability - errors and omissions, which protects the public from malpractice. Licensure with NCBELS and other regulatory agencies has afforded us business opportunities and allowed us to be successful by validating our credentials.

For the past three years, implementing drones and establishing an internal UAS program hasn't increased the number of projects we've been awarded compared to years prior to implementing drones, our gross annual revenue has remained somewhat consistent over the past three years compared to previous years. The only change that has occurred for us is we're using the UAS for projects that we'd have utilized a fixed wing or rotor wing aircraft in the past, which really isn't a change if you consider a drone as just another aviation tool.

The projects we fly using the UAS are typically 150 acres or less, are within a reasonable distance from our office, or have specific requirements for horizontal or vertical survey accuracy that can only be equaled by conventional ground survey methods. In some project cases, the Client's expectation for horizontal and vertical accuracy is 0.05' for clearly defined features and non-vegetated surfaces, 0.1' vertical accuracy for vegetated surfaces.

**Photogrammetry - Aerial Surveying - Topographic Surveying Regulated in North Carolina.**

The North Carolina Legislature designated the practice of Land Surveying as a profession. *See* N.C.G.S. § 89C-3(7)(a).

13

"Land surveying encompasses a number of disciplines including geodetic surveying, hydrographic surveying, cadastral surveying, engineering surveying, route surveying, **photogrammetric (aerial) surveying, and topographic surveying**." *See* N.C.G.S. § 89C-13(b).

The practice of land surveying includes the following. *See* N.C.N.C.G.S. § 89C-3(7):

1) Locating, relocating, establishing, laying out, or retracing any property line, easement, or boundary of any tract of land;
2) Locating, relocating, establishing, or laying out the alignment or elevation of any of the fixed works embraced within the practice of professional engineering;
3) Making any survey for the subdivision of any tract of land, including the topography, alignment and grades of streets and incidental drainage within the subdivision, and the preparation and perpetuation of maps, record plats, field note records, and property descriptions that represent these surveys;
4) Determining, by the use of the principles of land surveying, the position for any survey monument or reference point, or setting, resetting, or replacing any survey monument or reference point;
5) Determining the configuration or **contour** of the earth's surface by measuring lines and angles and applying the principles of mathematics or **photogrammetry**;
6) Providing geodetic surveying which includes surveying for determination of the size and shape of the earth both horizontally and vertically and the precise positioning of points on the earth utilizing angular and linear measurements through spatially oriented spherical geometry; and
7) Creating, preparing, or modifying electronic or computerized data, including land information systems and geographic information systems relative to the performance of the practice of land surveying.

**The purposes of Regulating Land Surveying in North Carolina**

The Act provides that "in order to safeguard life, health, and property, and to promote the public welfare, the practice of engineering and the practice of land surveying in this State are hereby declared to be subject to regulation in the public interest."  *See* NC G.S. § 89C-2.

In my opinion, Land Surveying and Photogrammetry are regulated in the State of NC to protect the public, individuals and businesses, from negligence, incompetence, professional misconduct or any other form of malpractice in the performance of services within the profession.

Furthermore, Land Surveying and Photogrammetry as a profession, is not "artistic impression" protected under the First Amendment. Art or artistic impression is for entertainment purposes, while surveying is providing useful information for a functional use.

Relying on untrained and unskilled amateurs to recognize any of the multiple varieties of problems or deficiencies that can arise from the measurements, computations or use of tools for the survey profession to create useful survey data, could be catastrophic to the outcome of a project and harm the public at large who relies on the accuracy and fidelity of this information.

Through proper education, training and years of practice under the guidance of others, along with regulation for standards of practice, the Professional understands the irregularities that occur within the practice of the profession and has the experience and expertise to avoid them, producing repeatable measurements and useful survey data, capable of being vetted by other Professionals as verification of the results.

14

*Regulation of Land Surveying through the development of an inclusions and exclusions list.*

The Board actively updates and publishes policies to include or exclude activities that fall within, or outside the definition of the practice of land surveying as defined by N.C.G.S. § 89C-3(7).

From April, 2008 until October, 2011, in coordination with the NC Geographic Information Coordinating Council (GICC), the Board codeveloped GIS Inclusions/Exclusions Guidelines, these guidelines assist in determining if features or items of data are included or excluded from the definition of Land Surveying in N.C.G.S. § 89C-3(7).  https://www.ncbels.org/wp-content/uploads/2019/03/gisinc_excl.pdf

While it is true that the guidelines are based upon elements that often show up in GIS databases, it is meant to use those as items representative of what may come into question as to whether it is within the definition of Land Surveying in N.C.G.S. § 89C-3(7), and requires a PLS. The statement at the top of the guidelines describes the authoritative purpose that it is to be relied upon by the public for the location and dimension data or is given to some stated accuracy.  If so, then it is land surveying data.

**Specific Issues Raised in the Complaint**

   A.  *"Capturing aerial images on behalf of paying clients and using orthomosaic software to stich those aerial images together to form orthomosaic maps."*

In my opinion, this could be a gray area because of the use of the word "map" and whether or not the orthomosaic is printed or in a digital format.

The word "map" may imply or be interpreted as a survey, or document that is corrected for distortion, is scalable and can be used for accurate measurements.

If the document was printed, also called "hard-copy", and didn't include a reference grid, scale bar, north arrow, title block, etc., basically just a printed picture, this would not be regulated.

If the orthomosaic is in a digital format such as Adobe PDF and doesn't include georeferencing information in the file header as metadata, in my opinion, this would not be regulated. If the orthomosaic was any other digital format such as TIFF, TIFFJPG, JPG2000, MrSID, etc., and didn't include georeferencing information in the file header as metadata or accompanied by a separate georeferencing metadata file, in my opinion, this also would not be regulated.

If the orthomosaic is in a digital format such as TIFF, TIFFJPG, JPG2000, MrSID, etc., and does include geo-referencing information in the file header as metadata or is accompanied by a georeferencing metadata file, in my opinion, this would be regulated as it falls under the definition of Land Surveying within N.C.G.S. § 89C-3(7).

   B.  *"Creating marketing images of land on behalf of paying clients and drawing on those images lines indicating the approximate position of property boundaries."*

In my opinion, this would not be regulated, as long as the marketing images are printed with no reference grid, scale bar, north arrow, title block, etc., Or, are in a digital format with no georeferencing information in the file header as metadata, or accompanied by a georeferencing metadata file.

A client could just as easily use screen capture software to create the same image with boundaries from a County GIS website although, these types of websites include disclaimers the User must acknowledge and agree to, and the client wouldn't be paying a fee for the image.

**C.** ***"Capturing aerial images of land and structures (along with location data, coordinates, elevation data, and volume data) and making those images and that data available to paying clients."***

In my opinion, this would be regulated as it falls under the definition of Land Surveying within N.C.G.S. § 89C-3(7).

**D.** ***"Capturing aerial images of and data about land and structures; processing those images and data to create 3D digital models of land and structures; and making those 3D digital models available to paying clients."***

In my opinion, this would be regulated as it falls under the definition of Land Surveying within N.C.G.S. § 89C-3(7).

_____

Mark S. Schall, CP, PLS, PPS, SP

November 26, 2021
Date

16

# Plaintiffs' Summary-Judgment Appendix Exhibit 24

## Board 30(b)(6) Deposition Transcript Excerpts

Page 1

```
1              IN THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF NORTH CAROLINA
2                         WESTERN DIVISION
             CIVIL ACTION NO. 5:21-cv-0137-FL
3                                          )
      360 VIRTUAL DRONE SERVICES LLC        )
4     et al.,                               )
                                            )
5                                           )
          Plaintiffs,                       )
6                                           )
      V.                                    )
7                                           )
                                            )
8     ANDREW L. RITTER, in his              )
      official capacity as Executive        )
9     Director of the North Carolina        )
      Board of Examiners for                )
10    Engineers and Surveyors,              )
      et al.,                               )
11                                          )
                                            )
12        Defendants.                       )
13
14
15
16
17      REMOTE VIDEOCONFERENCE 30(b)(6) DEPOSITION
18                         of
19              ANDREW L. RITTER
20           (Taken by Plaintiffs)
21        Thursday, January 20th, 2022
22                  1:52 p.m.
23
24
25     Reported by: Leslie Christian Lentkowski
```

```
                                              Page 2

 1    APPEARANCES:
 2    On Behalf of the Plaintiffs:
 3        Samuel B. Gedge, Esquire (via videoconference)
          James T. Knight II, Esquire (via videoconference)
 4        Institute for Justice
          901 North Glebe Road
 5        Suite 900
          Arlington, Virginia 22203
 6        703-682-9320
          sgedge@ij.org
 7
      On Behalf of the Defendants:
 8
          Douglas W. Hanna, Esquire (via videoconference)
 9        Graebe Hanna & Sullivan, PLLC
          4350 Lassiter at North Hills Avenue
10        Suite 375
          Raleigh, North Carolina 27609
11        919-863-9091
          dhanna@ghslawfirm.com
12
      Also Present:
13
          John M. Logsdon, PLS
14        North Carolina Board of Examiners for Engineers and
      Surveyors
15
16
17
18
19
20
21
22
23
24
25
```

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 5:21-cv-00137-FL   Document 38-24   Filed 03/25/22   Page 3 of 33

J.A. 294

Page 3

```
1              E X A M I N A T I O N S

2    Witness                                    Page

3    Andrew L. Ritter

4        By Mr. Gedge                              4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 5:21-cv-00137-FL   Document 88-24   Filed 03/25/22   Page 4 of 33

J.A. 295

Page 4

1                P R O C E E D I N G S

2    Whereupon,

3                ANDREW L. RITTER, having been previously

4    sworn by declaration under penalty of perjury,

5    testified as follows:

6                         EXAMINATION

7    BY MR. GEDGE:

8         Q.    Mr. Ritter, we will turn over to the entity

9    deposition.  And so do you understand that you're also

10   here today to testify not just about your personal

11   knowledge but also as a representative of the Board of

12   Examiners for Engineers and Surveyors?

13        A.    Yes.

14        Q.    Okay.  I will introduce the notice of

15   30(b)(6) deposition.  All right.  I just posted

16   Exhibit 38, and it's under the folder that says "Andrew

17   Ritter," not deposition of board of engineers.  Let me

18   know if you have any trouble finding it.

19        A.    38?

20        Q.    Yes.

21        A.    I got it.

22        Q.    Have you seen this document before?

23        A.    Yes.

24        Q.    Okay.  This is the notice of 30(b)(6)

25   deposition to the board, right?

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 5:21-cv-00137-PL ~ Document 38-24 ~ Filed 03/25/22 ~ Page 5 of 33

J.A. 296

Page 7

```
 1          A.   I can't guess.  I don't know how much time.
 2          Q.   Did you spend more than five minutes
 3     preparing for this deposition?
 4          A.   I did.  I spent more than five minutes.
 5     It's not hours.
 6          Q.   Okay.  Somewhere between five minutes and
 7     an hour.  Is that fair?
 8          A.   That's fair.
 9          Q.   Okay.  As we discussed earlier, you're the
10     executive director of the board, right?
11          A.   Yes.
12          Q.   And you've worked for the board as
13     executive director since 2001?
14          A.   Correct.
15          Q.   Okay.  And in other capacities since 1993?
16          A.   Correct.
17          Q.   I'm going to post Exhibit 39.  Do you have
18     that in front of you?
19          A.   Yes.
20          Q.   Okay.  Have you seen Exhibit 39 before?
21          A.   Yes.
22          Q.   Okay.  Can you tell me what it is?
23          A.   Can I tell you what it is?  Can I just read
24     the title?  "Defendant's responses to plaintiff's first
25     set of interrogatories."
```

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 5:21-cv-00137-FL  Document 88-24  Filed 03/25/22  Page 6 of 33

J.A. 297

Page 8

1          Q.   And I understand that you signed a document

2    attesting to the truth of these responses; is that

3    right?

4          A.   Yes.

5          Q.   I'll just post that as well.

6               I posted Exhibit 40, which I think is your

7    verification.  If you want to take a look and confirm,

8    I would appreciate it.

9          A.   Yes.  I'm confirming it's a verification.

10         Q.   Turning to Exhibit 39, the interrogatory

11   responses, I would like us to scroll down to

12   Interrogatory 10.  Just a second.  On Page 13, you'll

13   see Interrogatory 10.

14         A.   Page 13, you said?

15         Q.   Yes.

16         A.   Okay.

17         Q.   Let's read it for the transcript.  So

18   Interrogatory 10 asks the defendant to state each

19   governmental interest that you contend is advanced by

20   preventing plaintiffs from creating, processing, and

21   disseminating data about land and structures (including

22   data about distances, coordinates, elevations, and

23   volumes), right?

24         A.   Yes.

25         Q.   So you're welcome to read the response --

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 5:21-cv-00137-FL   Document 38-24   Filed 03/25/22   Page 7 of 33

J.A. 298

Page 9

```
1    kind of the boldface response to that.  It's about

2    three or four pages long.  I'll tell you the part I'm

3    interested in is just toward the very bottom of that

4    first page.  I'm happy for you to read as much of it as

5    you want, and once you've done that, let me know and we

6    can talk about it.

7              A.    You're referring to the bottom of Page 13?

8              Q.    Yeah.

9              A.    I'm ready for your question.

10             Q.    Okay.  Great.  So there's a fair amount of

11   lead-up in here, but the final full sentence on Page 13

12   says, "The purpose of the Act is to 'safeguard life,

13   health, and property, and to promote public welfare.'"

14   Do you see that?

15             A.    Yes.

16             Q.    Am I correct that those are the

17   governmental interests that the defendant contends the

18   act exists to further?

19                        MR. HANNA:  Object to form.

20                        THE WITNESS:  Yeah.  I kind of lost

21   you on the question.

22   BY MR. GEDGE:

23             Q.    Okay.  So the interrogatory asks the

24   defendant to state governmental interests, right, that

25   are advanced by regulating certain kinds of information
```

Page 10

1    under the licensure statute, right?

2         A.   Yes.

3         Q.   And my question for you is if we look at

4    this sentence, it says, "The purpose of the Act is to

5    'safeguard life, health, and property, and to promote

6    the public welfare.'"  My question for you is is

7    safeguarding life, health, and property and promoting

8    the public welfare, are those the governmental

9    interests that are furthered by the act -- by this act?

10        A.   Yes.

11        Q.   Okay.  Can you identify any other interests

12   that the act serves?

13        A.   Yes.

14        Q.   Okay.  What interests?

15        A.   What 89-C does is it -- we have a sentence

16   that reads -- and, again, I'm paraphrasing.  I don't

17   have it in front of me.  Gross negligence,

18   incompetence, and misconduct -- we're telling the

19   public that we may -- we're hiring a licensed surveyor,

20   there's a bar, and the licensed work is going to be

21   above that bar.  It's going to be above incompetence,

22   gross negligence, and misconduct.  And if it's not

23   above the bar, then the board can hold the licensee

24   responsible for his actions.

25                  We're also establishing a minimum level of

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 5:21-cv-00137-PL   Document 38-24   Filed 03/25/22   Page 9 of 33

J.A. 300

Page 11

1    competence via the three E's -- the education, exam,

2    and experience.  When somebody gets licensed, what

3    we're telling the citizens of North Carolina is they

4    have met a minimum level of competence, and the work

5    they're going to receive from that licensee meets that

6    minimum level of competence.  If it doesn't, again,

7    then the board by statute has the ability to remedy the

8    situation.

9         Q.    All of that makes sense to me.  It honestly

10   sounds kind of like that all falls under the broader

11   umbrella of safeguarding life, health, and property and

12   promoting the public welfare.  Is that fair to say?

13        A.    I wouldn't disagree with that.  Yes, I

14   would agree with that.

15        Q.    Beyond what you just described, are there

16   any other governmental interests that are served by the

17   statute?

18        A.    Not that I can think of.

19        Q.    I talked with Mr. Schall about this a

20   little bit yesterday, and I did touch on the board's

21   view too.  I understand the board's position to be that

22   providing a client with a 3D digital model or a

23   measurable orthomosaic map -- providing a client with

24   that kind of information counts as surveying, right?

25        A.    Yes.  As you described it, I think it meets

Page 12

1    the statutory definition of surveying.

2         Q.   My question is would it be surveying for a

3    non-licensee to create a measurable orthomosaic map of

4    their own property for their own personal use?  Does

5    that also fall within the definition of surveying?

6         A.   Oh, boy.  I don't know.  There's -- there

7    is a line of what you can do for yourself that's okay,

8    and you cross it at a certain point where it becomes

9    available for public consumption.  So as you described

10   the question, if I did an orthomosaic map for my

11   property and it wasn't available for public

12   consumption, I don't think that's surveying in

13   North Carolina.  If it becomes available for public

14   consumption, I believe that would cross the line.

15        Q.   Okay.  What do you mean by "public

16   consumption"?  Selling it to somebody else or something

17   else?

18        A.   If you survey your boundary and you record

19   that down at the Register of Deeds Office, your

20   boundary is also somebody else's boundary.  So even

21   though you're surveying your property, if it's out

22   there for public consumption, your boundaries are also

23   somebody else's boundaries.

24        Q.   That makes perfect sense.  I mean, I assume

25   that -- well, maybe you can tell me.  If a non-licensee

Veritext Legal Solutions
215-341-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 5:21-cv-00137-FL  Document 38-24  Filed 03/25/22  Page 11 of 33

J.A. 302

Page 13

```
1    just walks down to the local Register of Deeds with,
2    like, a crayon drawing map of their backyard and tries
3    to register it as a survey, I assume that the Register
4    of Deeds isn't going to accept that, right?
5           A.   No, that's not correct.  The Register of
6    Deeds would accept it.
7           Q.   Good.  So maybe you can explain that.  How
8    does that work?
9           A.   So the Register of Deeds is not my
10   bailiwick, so to speak.  What I understand about the
11   Register of Deeds Office is their job is not to check
12   that crayon drawing.  Their job is to record that
13   drawing.
14          Q.   Is it your understanding that they check to
15   see whether a plat or a survey has been stamped by a
16   surveyor?
17          A.   I do not know.  And, again, we don't -- the
18   Register of Deeds is considered the Secretary of
19   State's Office in North Carolina, and what a Register
20   of Deed does and does not do, I do not know.
21          Q.   That's fair.
22          A.   I did not know if that's a requirement.  I
23   do not know if a map that's attached to a deed has to
24   be -- I don't know if the Register of Deeds requires
25   that to be signed and sealed.
```

Veritext Legal Solutions
215-341-1000    610-434-8588    302-571-0510    202-803-8830
Case 5:21-cv-00137-FL   Document 38-24   Filed 03/25/22   Page 12 of 33

J.A. 303

1          Q.    From the board's perspective, the board

2     would say that that has to be signed and sealed?

3          A.    We would say that map has to be signed and

4     sealed.

5          Q.    Okay.  I think I understand kind of the

6     line we're drawing there between, you know, your

7     personal map down to the courthouse.

8                But am I right that -- I think we're on the

9     same page.  If you're not presenting your orthomosaic

10    map to the world for public consumption in one way or

11    another if you made an orthomosaic map of your own

12    property for your own use on your own land, am I right

13    that that does not fall within the definition of

14    surveying?

15         A.    Following your scenario, that would be

16    correct.

17         Q.    Okay.  I think Mr. Schall had the opposite

18    view yesterday -- maybe not the opposite.  As I

19    understood, he was saying he thought that technically

20    it would qualify, but then he didn't think anyone at

21    the board would care enough to do anything about it.

22                As I understand it, your view seems a

23    little bit different in that you just don't think it

24    qualifies in the first place.  Am I understanding that

25    correctly?

1          A.   Well, that goes back to my original --

2                    MR. HANNA:   Let me interject and just

3     say that I object to the form and the summary of

4     Mr. Schall's testimony.   To the extent that you heard

5     that testimony, you can answer.

6                    THE WITNESS:   Well, it goes back to my

7     original issue.   There's a line there, and I would need

8     some really -- some micro-specifics to tell you where

9     the line is.   We get scenarios here where somebody is

10    building a place of assembly on their own property, and

11    if you bring the public in to that place of assembly,

12    all of a sudden does that take it away from the owner's

13    right to not have to do things according to the law

14    because it's their own property?   So there is a line

15    there.   I do not know where Mr. Schall was drawing the

16    line.   Like I said, I'm going to stick with my answer

17    before.   Sometimes it's okay, but sometimes you cross

18    the line.   I need some micro-specifics.

19    BY MR. GEDGE:

20         Q.   And what kind of specifics would be helpful

21    to you in making that analysis?

22         A.   If you drew an orthomosaic map and nobody

23    knew about it, how would I know about it?   If you drew

24    an orthomosaic map for yourself and I knew about it,

25    how did I know about it?   Those are the micro-specifics

Veritext Legal Solutions
215-341-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 5:21-cv-00137-FL   Document 38-24   Filed 03/25/22   Page 14 of 33

J.A. 305

Page 16

1  this board would look at.  If it ended up in the

2  board's hands, the question is how did it end up in the

3  board's hands?  And usually that means it wasn't just

4  for the owner's use.  Somehow it ended up in the public

5  domain.  If it ended up in the public domain, we would

6  would to take a look at what its use and intent was

7  for.

8        Q.   Okay.  This will probably sound a bit

9  familiar from yesterday, but does the board have

10  evidence that it's more common here in Virginia than in

11  North Carolina for members of the public to be harmed

12  by inaccurate orthomosaic maps?

13        A.   Yeah.  I no information on what happens in

14  Virginia.

15        Q.   Okay.  And, again, you're testifying as the

16  board's representative, right?

17        A.   Correct.

18        Q.   Okay.  Similar question.  Does the board

19  have any evidence that inaccurate orthomosaic maps

20  cause more instances of harm in Virginia than they do

21  in North Carolina?

22        A.   My answer is going to be the same.  I have

23  no information on Virginia.

24        Q.   Okay.  And, likewise, I assume the board

25  does not have any evidence that inaccurate orthomosaic

Veritext Legal Solutions
215-341-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 5:21-cv-00137-FL   Document 38-24   Filed 03/25/22   Page 15 of 33

J.A. 306

1   maps cause more severe harm in Virginia than in

2   North Carolina?

3           A.    I have no information on what transpires in

4   Virginia.

5           Q.    Similar question for the 3D digital models

6   -- does the board have any evidence that it's more

7   common in Virginia than in North Carolina for members

8   of the public to be harmed by inaccurate 3D digital

9   models?

10          A.    I have no information on what goes on in

11  Virginia.

12          Q.    Okay.  Does the board have any evidence

13  that inaccurate 3D digital models cause more instances

14  of harm in Virginia than they do in North Carolina?

15          A.    I have no information on what goes on in

16  Virginia.

17          Q.    Thank you for indulging me.  This will not

18  go on forever.  Just a few more.

19               Does the board have any evidence that

20  inaccurate 3D digital models cause more severe harm in

21  Virginia than they do in North Carolina?

22          A.    I have no information on what goes on in

23  Virginia.

24          Q.    Moving to Kentucky, is your answer the

25  same?

Page 18

```
1          A.    Yes, sir.

2          Q.    Okay.  Mississippi?

3          A.    Yes.

4          Q.    All of the states in the union?

5          A.    Yes.  My answer would be my only

6    information will be for what happens in North Carolina,

7    and I have no information on what goes on outside of

8    our borders.

9          Q.    Does the board -- as I understand it, the

10   board does not have any evidence comparing how common

11   it is for members of the public to be harmed by

12   inaccurate orthomosaic maps in North Carolina versus

13   any other state in the nation?

14         A.    That's correct.

15         Q.    And the board does not have any evidence

16   comparing how common it is for members of the public to

17   be harmed by unlicensed orthomosaic maps in

18   North Carolina versus any other state in the nation?

19         A.    That's correct.

20                  MR. HANNA:  Object to the form.

21   BY MR. GEDGE:

22         Q.    And by "unlicensed orthomosaic maps," I

23   mean they are maps that are created by someone who is

24   not a licensed surveyor.

25                  MR. HANNA:  Object to form.
```

Page 19

1                    THE WITNESS:  I didn't quite

2    understand that one.

3    BY MR. GEDGE:

4         Q.   Oh, sure.  I was just clarifying.

5              I think my question referred to unlicensed

6    orthomosaic maps, and what I meant by that term is a

7    map that's created by somebody who's not a licensed

8    surveyor.  Does that make sense?

9         A.   Maybe you can say the whole question again.

10        Q.   Sure.  Does the board have any evidence

11   comparing how common it is for members of the public to

12   be harmed by unlicensed orthomosaic maps in

13   North Carolina versus any other state?

14                    MR. HANNA:  Object to form.

15                    THE WITNESS:  No.

16   BY MR. GEDGE:

17        Q.   Does the board have any evidence comparing

18   how common it is for members of the public to be harmed

19   by inaccurate 3D digital models in North Carolina

20   versus any other state?

21                    MR. HANNA:  Object to form.

22                    THE WITNESS:  No.

23   BY MR. GEDGE:

24        Q.   Does the board have any evidence comparing

25   the -- how common it is for members of the public to be

Page 20

```
 1   harmed by inaccurate volumetric calculations in
 2   North Carolina versus any other states?
 3           A.   No.
 4                   MR. HANNA:   Same objection to form.
 5   BY MR. GEDGE:
 6           Q.   Are you familiar at all with how other
 7   states define surveying?
 8           A.   Not so much.  Some.  Some.  Not so much.  I
 9   heard Mr. Schall -- I know a little bit about
10   South Carolina, but that's about it.
11           Q.   I think Mr. Schall testified yesterday that
12   -- and I think he said in the past few years something
13   around 33 states license photogrammetry.  Did you
14   remember him testifying to that?
15           A.   Yes.
16           Q.   Do you have any reason to think he's wrong
17   about that?
18           A.   No.
19           Q.   I think he said that 17 states -- I think
20   within the past few years, 17 states did not license
21   photogrammetry, right?
22           A.   Yes.  I heard him say that.  I don't have
23   information whether that's accurate or not.  I have no
24   reason to doubt it.
25           Q.   It's my understanding that some states
```

Veritext Legal Solutions
215-341-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 5:21-cv-00137-FL  Document 38-24  Filed 03/25/22  Page 19 of 33

J.A. 310

Page 21

1    create an exemption from licensure for employees when

2    they're simply performing surveying on their employer's

3    property.  I don't think North Carolina has that

4    exemption, but am I wrong on that?  Does North Carolina

5    have an exemption that resembles that?

6          A.    Yes, we do.  Now -- go ahead.  I'm sorry.

7          Q.    Explain that.

8          A.    Well, the answer is yes, and then the

9    second part is maybe.  The previous question, if you're

10   working for your employer and the work product is for

11   your employer, you don't need to be licensed except if

12   that product is going to be used for public

13   consumption.

14         Q.    I'm sorry.  It's probably my fault, but can

15   you repeat that?

16         A.    So we have what's called the industrial

17   exemption in North Carolina, which says if you're

18   performing this service for your employer, not for the

19   public, you don't need to be licensed.  However, if

20   your work product is to be out in the public for public

21   consumption, then the industrial exemption does not

22   apply.

23               So an example of that is more common in the

24   engineering world where you'll do the engineering for

25   your company, but you can't call that person on the

Veritext Legal Solutions
215-341-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 5:21-cv-00137-FL   Document 38-24   Filed 03/25/22   Page 20 of 33

J.A. 311

Page 22

1    phone and ask him for engineering services.  You see

2    that more on the engineering side.  You don't see it

3    much on the surveying side because there's not much

4    surveying that's not going to be out in the public.  So

5    if you're working for Duke Energy and you're surveying

6    the easement lines, those easements are going to be in

7    the public and the industrial exemption doesn't apply,

8    and that work of surveying has to be signed and sealed.

9           Q.   Okay.  I see.

10               MR. HANNA:  Just for my clarification,

11   Sam, what topic are you under right now from the

12   30(b)(6)?

13               MR. GEDGE:  Let me pull it up.  It's,

14   I think, 6 -- between 6 and 9.  All of them with the

15   notes.

16               MR. HANNA:  6, 7, 8, and 9 seem to be

17   about the basis for each governmental interest that the

18   board contends is advanced by North Carolina's

19   surveying licensing law, but I thought -- you seem to

20   be getting into the industrial exemption or what's in

21   the -- I'm not sure it relates to governmental

22   interests, but go ahead.  I didn't -- this is not a

23   topic that we covered prior to coming here, so go

24   ahead.  You can go a little bit.  I just -- this is

25   getting a little far field.

Veritext Legal Solutions
215-341-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 5:21-cv-00137-FL   Document 38-24   Filed 03/25/22   Page 21 of 33

J.A. 312

Page 23

```
 1                    MR. GEDGE:  That's fine.
 2    BY MR. GEDGE:
 3         Q.   Mr. Ritter, we're talking about the
 4    industrial exemption.  Give your best answer.  It seems
 5    like you're familiar with it.  I lost track a little
 6    bit, but just to make sure I understand how the
 7    industrial exemption works, let's say you have a
 8    company that owns a piece of land and they're planning
 9    to build a private facility for themselves on that
10    piece of land, and as part of that, they construct it
11    themselves.  They are digging a hole, and one of their
12    employees does some volumetric calculations as part of
13    helping his employer build this facility.  Is that --
14    would that be the kind of scenario that would fall
15    within the industrial exemption, or am I not --
16         A.   To my knowledge, that --
17                    MR. HANNA:  I want to object again to
18    that question.  I'm not sure that's covered by the
19    notice of deposition, but you can answer.  Go ahead.
20                    THE WITNESS:  To my knowledge, that
21    would be an activity that would not require a license.
22    If you're establishing the volume of that hole for your
23    employer on his property, it's my belief that that
24    doesn't need a license and that comes under the
25    industrial exemption.
```

Veritext Legal Solutions
215-341-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 5:21-cv-00137-FL   Document 38-24   Filed 03/25/22   Page 22 of 33

J.A. 313

Page 24

```
 1    BY MR. GEDGE:

 2          Q.   Okay.  But if the employer instead were to

 3    hire 360 Virtual Drone Services to do those same

 4    volumetric calculations, am I understanding correctly

 5    that that would not fall within the industrial

 6    exemption?

 7          A.   That is correct.

 8          Q.   As though the person actually performing

 9    the calculations doesn't have a surveyor license?

10          A.   Well, we would require 360 Drone to have a

11    surveyor license to do it.

12          Q.   Exactly.  But just to clarify, in each of

13    those scenarios if the employee is performing those

14    volumetric calculations without a surveyor license,

15    that's okay because he falls within the industrial

16    exemption, right?

17          A.   Yes.  That's in the statute as an

18    exemption.

19          Q.   Okay.  And am I correct that if 360 Virtual

20    Drone performs those same volumetric calculations for

21    the employer, they would be in violation because they

22    are not an employee of the property owner?

23          A.   Correct.  They would not come under the

24    industrial exemption clause.  Therefore, they would

25    need a license to do that.
```

Page 25

1          Q.   Okay.  Thank you.  I think we're getting

2     pretty close, Mr. Ritter.  Why don't we take another

3     five minutes and I can see how much more we have, and

4     we can hopefully wrap it up.  Sound good?

5                    MR. HANNA:  Sounds good.

6                    (A break was taken.)

7     BY MR. GEDGE:

8          Q.   Mr. Ritter, I posted Exhibit 31 in your

9     folder.  It's Mr. Schall's expert report.  As I

10    understand it, you have looked at that before; is that

11    right?

12         A.   Yes.

13         Q.   Just scroll down to pages -- well, Page 15.

14    We can start out -- I'll give you a chance to get

15    there.

16         A.   Okay.

17         Q.   On Page 15, there's a section of the report

18    that's entitled "Specific Issues Raised in the

19    Complaint."  Have you had a chance to read this section

20    specifically?

21         A.   Yes.

22         Q.   Okay.  In this section, Mr. Schall offers

23    opinions on what kinds of services or products do and

24    do not qualify as surveying under the North Carolina

25    statute.  Is that a fair characterization?

```
 1            A.    Yes.

 2            Q.    Okay.  Does the board disagree with any

 3     part of Mr. Schall's opinion in this section?

 4            A.    I don't think so.

 5            Q.    I guess just for clarity, by "this

 6     section," I mean the section starting with "Specific

 7     Issues Raised in the Complaint" and going through to

 8     the end of the report on Page 16.

 9            A.    Okay.  I was on Letter A.

10            Q.    Well, we can go chunk by chunk.  It sounds

11     like you looked over Letter a.  The board doesn't

12     disagree with Ms. Schall's opinion there?

13            A.    Correct.

14            Q.    Okay.  You can march on to Letter B, and

15     once you've had a chance to look at that, I will have

16     the same question.

17            A.    So under Letter B, I think his opinion is

18     correct as well.

19            Q.    Okay.  And Letter C?

20            A.    His opinion is correct as well.

21            Q.    Okay.  And same for D?

22            A.    Yes, sir.

23            Q.    Okay.  Does providing orthomosaic maps to a

24     client for free as opposed to for compensation also

25     fall within the definition of surveying in the board's
```

Page 27

```
 1   view?
 2         A.   89-C is silent on cost.  Whether it's free
 3   or you charge, it doesn't change what the product is.
 4         Q.   Okay.  So the analysis is the same
 5   regardless of whether money changed hands?
 6         A.   That's correct.
 7         Q.   When we were discussing your testimony in
 8   your personal capacity, we talked about disclaimers a
 9   little bit.  Do you remember that?
10         A.   Yes, sir.
11         Q.   So now that you're sitting here as the
12   board or on the board's behalf, is it fair to say that
13   you are not aware of any instance where the board has
14   informed a non-licensee that they can provide
15   orthomosaic maps to a client as long as they include
16   some kind of disclaimer language on their map?
17                  MR. HANNA:  Just for the record, when
18   you say "orthomosaic maps," have we defined that?
19                  MR. GEDGE:  I'm happy to.  So for
20   purposes of these questions, when I'm saying
21   "orthomosaic maps" --
22                  MR. HANNA:  And the reason why I asked
23   that is because initially Mr. Jones testified that he
24   provided orthomosaic maps, but then he testified that
25   he essentially turned it into a PDF and provided it in
```

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 5:21-cv-00137-FL   Document 38-24   Filed 03/25/22   Page 26 of 33

J.A. 317

1    that form.  And so I just think that it's important

2    when these kinds of questions are being asked or

3    hypotheticals are being given that the precise product

4    or data that is being discussed is properly identified.

5    BY MR. GEDGE:

6         Q.   So, Mr. Ritter, for purposes of these

7    questions, I'll use "orthomosaic map" in the shorthand,

8    but what I mean is an orthomosaic map that's qualified

9    as surveying.  So whether that's an orthomosaic map

10   that has coordinate metadata in it or geo-referencing

11   information, it is a map that on its own, you, the

12   board, would say is surveying.  Does that make sense?

13        A.   Yes, sir.

14        Q.   Okay.  So I guess circling back to my

15   question, that is -- as the board's designee, can you

16   point to any instance where the board has informed a

17   non-licensee that they can give an orthomosaic map to a

18   client as long as they include some kind of disclaimer

19   language on that map?

20        A.   I don't recall that happening.

21        Q.   Okay.  I have a similar question for 3D

22   digital models.  As the board's designee, can you point

23   me to any instance where the board has informed a

24   non-licensee that they can provide 3D digital models to

25   a client as long as they include certain disclaimer

Veritext Legal Solutions
215-341-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 5:21-cv-00137-FL   Document 38-24   Filed 03/25/22   Page 27 of 33

J.A. 318

Page 29

1    language with that?

2         A.   Not that I recall.

3         Q.   Just to close the loop on that line of

4    questioning about other states, the board does not have

5    any information about harms caused by unlicensed

6    surveying in other states; is that right?

7                   MR. HANNA:  Object to form.

8                   THE WITNESS:  No.

9    BY MR. GEDGE:

10        Q.   Okay.  It might have been that I asked a

11   bad question, but I still think that -- I'll ask

12   another question.

13             Does the board have any information about

14   harms caused by unlicensed surveying in other states?

15                  MR. HANNA:  Object to form.

16                  THE WITNESS:  I don't think I

17   understand the question.  If I could ask you a question

18   if that's okay -- what do you mean by information

19   presented at the board?

20   BY MR. GEDGE:

21        Q.   Not by the board, but is the board in

22   possession of any evidence about the number of

23   instances of photogrammetry malpractice in different

24   states?

25        A.   No.

Veritext Legal Solutions
215-341-1000    610-434-8588    302-571-0510    202-803-8830
Case 5:21-cv-00137-FL   Document 38-24   Filed 03/25/22   Page 28 of 33

J.A. 319

```
                                                    Page 30
1          Q.   Okay.  Give me one minute.
2               That's all I have for now, Mr. Ritter.
3    I'll let Mr. Hanna ask any questions if he would like.
4                    MR. HANNA:  I have no questions.
5                    MR. GEDGE:  Thank you, Mr. Ritter.  I
6    appreciate it.
7                    (Proceedings concluded at 2:41 p.m.)
8                    (Signature reserved.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 5:21-cv-00137-FL   Document 38-24   Filed 03/25/22   Page 29 of 33

J.A. 320

Page 31

```
1   CERTIFICATE OF REPORTER
2   STATE OF NORTH CAROLINA  )
3   COUNTY OF WAKE           )

4

5        I, Leslie Christian Lentkowski, the officer
6   before whom the foregoing remote videoconference
7   30(b)(6) deposition was taken, do hereby certify that
8   the witness whose testimony appears in the foregoing
9   remote videoconference 30(b)(6) deposition was taken by
10  me to the best of my ability and thereafter reduced to
11  typewriting under my direction; that I am neither
12  counsel for, related to, nor employed by any of the
13  parties to the action in which this remote
14  videoconference 30(b)(6) deposition was taken, and
15  further that I am not a relative or employee of any
16  attorney or counsel employed by the parties thereto,
17  nor financially or otherwise interested in the outcome
18  of the action.
19        4th day of February, 2022.

20

21                           Leslie Christian Lentkowski
22

                        _____
23                      LESLIE CHRISTIAN LENTKOWSKI
                        Notary Public in and for
24                      County of Wake
                        State of North Carolina
25                      Notary Public No. 201221300088
```

J.A. 321

```
                                                    Page 32
 1      Douglas W. Hanna, Esquire

 2      dhanna@ghslawfirm.com

 3                      February 4, 2022

 4      RE: 360 Virtual Drone Services LLC Et Al. v. Andrew L. Ritter,

            Et Al.

 5          1/20/2022, Andrew Ritter (Board of Engineers) (#5024807)

 6          The above-referenced transcript is available for

 7      review.

 8          Within the applicable timeframe, the witness should

 9      read the testimony to verify its accuracy. If there are

10      any changes, the witness should note those with the

11      reason, on the attached Errata Sheet.

12          The witness should sign the Acknowledgment of

13      Deponent and Errata and return to the deposing attorney.

14      Copies should be sent to all counsel, and to Veritext at

15      cs-midatlantic@veritext.com

16

17       Return completed errata within 30 days from

18      receipt of testimony.

19        If the witness fails to do so within the time

20      allotted, the transcript may be used as if signed.

21

22                      Yours,

23                      Veritext Legal Solutions

24

25
```

J.A. 322

```
                                                        Page 33
1      360 Virtual Drone Services LLC Et Al. v. Andrew L. Ritter

2      Andrew Ritter (Board of Engineers) (#5024807)

3                      E R R A T A   S H E E T

4      PAGE_____ LINE_____ CHANGE_____

5      _____

6      REASON_____

7      PAGE_____ LINE_____ CHANGE_____

8      _____

9      REASON_____

10     PAGE_____ LINE_____ CHANGE_____

11     _____

12     REASON_____

13     PAGE_____ LINE_____ CHANGE_____

14     _____

15     REASON_____

16     PAGE_____ LINE_____ CHANGE_____

17     _____

18     REASON_____

19     PAGE_____ LINE_____ CHANGE_____

20     _____

21     REASON_____

22

23     _____  _____

24     Andrew Ritter (Board of Engineers)              Date

25
```

```
                                                            Page 34

 1    360 Virtual Drone Services LLC Et Al. v. Andrew L. Ritter, Et Al.

 2    Andrew Ritter (Board of Engineers) (#5024807)

 3                    ACKNOWLEDGEMENT OF DEPONENT

 4        I, Andrew Ritter, do hereby declare that I

 5    have read the foregoing transcript, I have made any

 6    corrections, additions, or changes I deemed necessary as

 7    noted above to be appended hereto, and that the same is

 8    a true, correct and complete transcript of the testimony

 9    given by me.

10

11    _____              18 Feb 2022

12    Andrew Ritter                          Date

13    *If notary is required

14                    SUBSCRIBED AND SWORN TO BEFORE ME THIS

15    18th DAY OF February, 2022.

16

17

18                    _____

19                    NOTARY PUBLIC

20

21

22

23

24

25
```

# Plaintiffs' Summary-Judgment Appendix Exhibit 25

## Mark Schall Deposition Transcript Excerpts

Page 1

1              IN THE UNITED STATES DISTRICT COURT
2          FOR THE EASTERN DISTRICT OF NORTH CAROLINA
3                       WESTERN DIVISION
4              CIVIL ACTION NO. 5:21-cv-0137-FL
5      360 VIRTUAL DRONE SERVICES, )
       LLC, ET AL.,                )
6                                  )
            Plaintiffs,            )
7                                  )
       vs.                         )
8                                  )
       ANDREW L. RITTER, in his    )
9      official capacity as        )
       Executive Director of the   )
10     North Carolina Board of     )
       Examiners for Engineers and )
11     Surveyors, et al.,          )
12          Defendants.
13     _____
14
15
16
17              DEPOSITION OF MARK SCHALL
18               (TAKEN BY PLAINTIFFS)
19                 Taken via Zoom
20            Wednesday, January 19, 2021
21
22
23
24
                Reported in Stenotype by
25                  Erin Ramsey
        Transcript produced by computer-aide transcription

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 5:21-cv-00137-FL   Document 88-23   Filed 03/25/22   Page 2 of 55

J.A. 326

Page 2

```
 1            APPEARANCES
 2    ON BEHALF OF PLAINTIFFS:
 3                SAMUEL B. GEDGE, ESQUIRE
                  JAMES T. KNIGHT, II, ESQUITE
 4                Institute for Justice
                  901 North Glebe Road
 5                Suite 900
                  Arlington, Virginia 22203
 6                (703) 682-9320
                  Sgedge@ij.org
 7                Jknight@ij.org
 8
      ON BEHALF OF DEFENDANTS:
 9
                  DOUGLAS HANNA, ESQUIRE
10                Graebe Hanna & Sullivan, PLLC
                  4350 Lassiter at North Hills Avenue
11                Suite 325
                  Raleigh, North Carolina 27609
12                (919) 863-9091
                  Dhanna@ghslawfirm.com
13
14
15
16
17
18
19
20
21            DEPOSITION OF MARK SCHALL, a witness called on
22    behalf Plaintiffs, before Erin Ramsey, Notary Public,
23    in and for the Commonwealth of Virginia, taken via
24    Zoom, on Wednesday, January 19, 2021, commencing at
25    2:10 p.m.
```

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 5:21-cv-00137-FL   Document 88-28   Filed 03/25/22   Page 3 of 55

J.A. 327

Page 3

```
1                    INDEX OF EXAMINATIONS

2       BY MR. GEDGE................................ PAGE 4

3

4

5                     INDEX OF EXHIBITS

6       NUMBER          EXHIBIT                    MARKED

7       Exhibit 31  Schall Report.........................6

8       Exhibit 33  CV....................................7

9       Exhibit 34  Picture.............................36

10      Exhibit 35  Picture.............................37

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 5:21-cv-00137-FL   Document 38-23   Filed 03/25/22   Page 4 of 55

J.A. 328

Page 4

```
 1                         MARK SCHALL,
 2      called as a witness by the Plaintiff, was first duly
 3      sworn, as hereinafter certified, examined, and
 4      testified as follows:
 5                         EXAMINATION
 6      BY MR. GEDGE:
 7          Q.  Good afternoon, Mr. Schall.  My name is Sam
 8      Gedge.  How are you?
 9          A.  I'm fine.  How are you?
10          Q.  Very well.  Thank you.  Can you hear me okay?
11          A.  Barely.
12          Q.  All right.  How is that?  Is that a bit better?
13          A.  Yes.
14          Q.  I'll lean forward.
15          A.  Okay.
16          Q.  So I represent the plaintiffs in the case, 360
17      Virtual Drone Services versus Ritter, and I assume you
18      understand that this deposition is being taken as part
19      of that lawsuit, right?
20          A.  That's correct.
21          Q.  I understand that you've been designated as an
22      expert witness for the defendants in that case,
23      correct?
24          A.  Yes, I have.
25          Q.  Have you been deposed before by any chance?
```

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 5:21-cv-00137-FL ~ Document 38-23 ~ Filed 03/25/22 ~ Page 5 of 55

J.A. 329

Page 7

1          A.   Other than continuing education for my
2     professional licenses, no.
3          Q.   Okay.   I'm going to post another exhibit on
4     here which is the resumé we've received for you.   That
5     should be popping up for you in just a sec.   Going to
6     give you a chance to take a quick look.   If you can
7     just confirm that that is, in fact, what appears to be
8     your resumé I'd appreciate it.
9          A.   Yeah, I'm refreshing the page.
10         Q.   Okay.
11         A.   Yes.   Okay.   That is it.
12         Q.   And great.   That's Exhibit 33.   So based on
13    your report and I guess your resumé too I understand
14    that you started your photogrammetry career in 1979;
15    is that right?
16              (Plaintiff's Exhibit 33 was marked for
17              identification.)
18         A.   Correct.   Straight from high school.   I had
19    already worked part time during the summer when I was
20    still in high school for the same company I started
21    with which was Wilbert -- Ralph L. Wilbert (phonetic)
22    Company.
23         Q.   Great.   And that's at Furman, Ohio, right?
24         A.   Correct.
25         Q.   How long did you work at Wilbert for?

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 5:21-cv-00137-FL   Document 88-23   Filed 03/25/22   Page 6 of 55

J.A. 330

Page 8

1          A.   Until approximately I'm going to say around

2     1984 or '85.

3          Q.   And can you just briefly walk me forward in

4     time career wise what places you worked since.

5          A.   Again, started right out of high school with

6     Wilbert, worked in their surveying and photogrammetry

7     division.  Back at that time there were no accredited

8     college programs per se for photogrammetry but it was

9     something that had to be -- it was traditionally

10    taught by military agencies and I particularly -- the

11    first four or five years I was there at corporate I

12    trained and studied under a gentleman who had learned

13    through the Turkish military.  Then from Wilbert and

14    Dayton took up a job back home.  I'm originally from

15    Pennsylvania so I took up a job, again photogrammetry

16    and surveying, with a firm back in Pennsylvania,

17    Talmate, Van Kern, Gerz and Associates (phonetic).

18    Worked there for probably three or four years then

19    ended up taking a position with a larger firm which is

20    now known as Fugro International.

21          Back then it was known as earth data

22    Corporation they were out of Gaithersburg, Maryland.

23    I worked for them until they moved me here to North

24    Carolina to help them resurrect a company that had

25    become bankrupt that they had purchased.  And after

Page 9

1    working here for North Carolina for them for
2    approximately three or four years I separated myself
3    and started Spatial Data Consultants.
4        Q.  And that was in?
5        A.  '96.  1996.  So from '79 to '96 I worked for
6    professional corporations and kind of cut my teeth and
7    learned the business, put in 15 years.  And then
8    started SDC in '96 and been self-employed ever since.
9        Q.  And are you doing the same kind of work at SDC
10   that were doing for --
11       A.  Yep.  Photogrammetry, surveying, all the way
12   through.  43 years going this February.
13       Q.  Okay.  Great.  So you said you founded SDC --
14   is that kind of like a one-man shop or is it a big --
15       A.  At our highest capacity personnel we had
16   approximately 17 employees, currently we have 6.  We
17   have a seventh employee starting at the end of this
18   month.
19       Q.  I guess as the founder have you always been the
20   guy at the top?
21       A.  Yes, yes.
22       Q.  So I see I guess going back to your resumé that
23   you're a certified photogrammetrist with the ASPRS and
24   I guess first off, can you explain what the ASPRS is?
25       A.  It's the American Society of Photogrammetry and

Veritext Legal Solutions
215-341-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 5:21-cv-00137-FL   Document 88-23   Filed 03/25/22   Page 8 of 55

J.A. 332

Page 10

1    Remote Sensing.  The organization was founded in 1934

2    and began of course in the -- immediately began

3    certifying photogrammetrist.  Just to give you an idea

4    I was certified I believe -- I passed their

5    certification process in 1994 and my certification

6    number was 950 so at that time from between 1934 and

7    1996 there had only been 950 individuals certified by

8    the ASPRS as a photogrammetrist.

9         Q.  Interesting.  Can you give a sense as to why

10   that number is really, really low.  Can you explain

11   that?

12        A.  Just to give an example there's 27 --

13   approximately 2700 licensed surveyors just in the

14   state of North Carolina.  Tens of thousands of

15   registered engineers.  So in comparison the ASPRS is a

16   national certification.  So, you know, in comparison

17   to other licensed professions it's a very low number.

18        Q.  Yeah, yeah.  So am I right the ASPRS

19   certification is a voluntary credential; am I

20   understanding that correctly?

21        A.  That's correct.  That's correct.  But it is a

22   voluntarily credential as far as the individual.  But

23   again, if you followed or understood contracting

24   procedures for this type of work over the last 40

25   years typically most requests for proposals and

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 5:21-cv-00137-FL ~ Document 88-29 ~ Filed 03/25/22 ~ Page 9 of 55

J.A. 333

Page 11

1    request for qualifications at the higher levels is

2    through state agencies, you know, utility companies

3    and stuff like that typically require a ASPRS CP.

4        Q.  So even though the state doesn't say you have

5    to have the certification if you want to get decent

6    jobs --

7        A.  Yeah.  It was in a number of project

8    procurements it was a requirement, yes.

9        Q.  Does that continue to be the case, is it still

10   a pretty well regarded credential?

11       A.  Excuse me?

12       Q.  Does that continue to be the case now?

13       A.  I'm sorry, I'm not understanding what you're

14   saying.

15       Q.  Sure.  I can try to rephrase it.  Currently

16   does it continue to be the case that these higher

17   level requests or bids asks for applicants to have the

18   ASPRS certification?

19       A.  It is still sometimes a requirement, yes, along

20   with regulated licenses as well.

21       Q.  Sure.  Sure.  Actually brings me to a question

22   I was curious about as well.  So if I understand the

23   timeline you founded SDC early in 1996 and you got

24   your North Carolina license in '99 and I'm wondering

25   if you can explain the gap there for me.

Veritext Legal Solutions
215-341-1000    610-434-8588    302-571-0510    202-803-8830
Case 5:21-cv-00137-FL   Document 38-25   Filed 03/25/22   Page 10 of 55

J.A. 334

Page 12

```
1        A.   Again, at the time here in North Carolina the
2    language of photogrammetry was not in the North
3    Carolina Survey Act and they passed that into
4    legislation, I believe, in 1998 which, again, then put
5    me in a situation where I had to license myself to be
6    able to continue my profession.
7        Q.   I understand.  Do you have a sense for what
8    prompted North Carolina to change the law in that way?
9        A.   Don't have a clue.
10       Q.   Okay.
11       A.   Don't have a clue.  It was -- I'll be honest at
12   that time it was kind of  -- I mean, I heard of other
13   states, you know, starting to do it.  North Carolina
14   by no way was revolutionary or anything in that
15   aspect.  Other states were already enacting it.  I
16   think they just they possibly just followed suit.
17       Q.   That makes sense.  So how, if at all, was
18   photogrammetry regulated before that 1998 inflection
19   point with the statutory change?
20       A.   Again, when you're not underneath a regulatory
21   board it was pretty much -- it was just -- honestly it
22   was just unregulated.  So where were you guys back
23   then?
24       Q.   Me?  I was a freshman in high school I think.
25   So just kind of working off of the resumé again.  So
```

Page 13

```
 1    it looks like -- I think some of these questions are
 2    going to be a little bit repetitive but it looks like
 3    when you were working in Maryland before you moved to
 4    North Carolina you weren't licensed as a
 5    photogrammetrist in Maryland either, right?
 6         A.   I never applied for my ASPRS certification till
 7    I lived here in North Carolina.  But again, when I
 8    worked at other companies I was not the individual in
 9    direct responsible charge.
10         Q.   Okay.  So that -- you mean you started becoming
11    the individual in direct responsible charge when you
12    founded SDC in '96?
13         A.   Exactly.
14         Q.   Okay.  And it looks like you're also licensed
15    as a professional photogrammetric surveyor in South
16    Carolina too?
17         A.   That's correct.  Shortly after North Carolina,
18    you know, changed their survey act so did the state of
19    South Carolina and the Commonwealth of Virginia did as
20    well.  It's a trend I mean.
21         Q.   Got you.  So I see for South Carolina it looks
22    like you got licensed there in 2003.  Was the impetus
23    -- for getting licensed at the time because South
24    Carolina had adopted a license and requirement for
25    photogrammetrist?
```

Page 31

1    answer other than we don't use those types of

2    softwares.  You know, again, obviously the whole --

3    the key for -- I do know that the structure for motion

4    photogrammetry softwares rely on significant overlap

5    of the imagery that's used for the processing.  Like

6    for instance, when we're flying a project with an

7    aircraft or a drone, doesn't matter we could be using

8    a metric aerial camera or using GPS to fly the flight

9    plan, we can get by with overlapping the pictures 60

10   percent forward overlap, 30 percent side overlap.  And

11   again, I don't expect you to understand what I'm

12   saying.

13        In a situation where you're going to use

14   structure for motion photogrammetry you practically

15   have to overlap the flight lines 80 percent and

16   overlap the forward -- overlap with the photographs by

17   80 percent.  So you have to do significantly more

18   flying acquisition of many, many, many more

19   photographs in order to use structure for motion

20   photogrammetry because it relies on pixels matching of

21   the pixels to do the autocollimation of the data.

22      Q.  I see.  That makes sense.  Does it also rely

23   on, like, georeferenced data in the image; does that

24   help --

25      A.  So the drone system has to have some sort of --

Veritext Legal Solutions
215-341-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 5:21-cv-00137-FL   Document 38-25   Filed 03/25/22   Page 13 of 55

J.A. 337

Page 32

1    some sort of GPS.  You can do it with just GPS and not

2    have an IMU on the drone but the results are much less

3    dependable.  Add the IMU to the whole system and it

4    increases the integrity of your data significantly.

5        Q.  Do you have a sense of -- what are some of the

6    other go-to drones that other surveyors in your area

7    tend to use?

8        A.  Honestly I know Trimble had a system they were

9    starting to develop early on that we tested turned

10   away.  Leica had a system called the Aibotix.  I think

11   I know of a few folks using that.  I know a lot of

12   people on the DJI platform and I do know that DJI has

13   developed a per se -- I think they took it on the chin

14   early on because, again, they were trying to use

15   something for what it wasn't really intended for and

16   since then I do believe they have developed a LiDAR

17   system that they do want -- that they do want to, you

18   know, promote as a true mapping surveying system.  The

19   reason why we never went down the DJI path is because

20   DJI drones are banned from government work because the

21   Chinese were caught spying using them --

22       Q.  Interesting.

23       A.  -- on the U.S.

24       Q.  Is that not kind of a disincentive to your

25   colleagues in using that as well or -- how are they

Veritext Legal Solutions
215-341-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 5:21-cv-00137-FL  Document 38-25  Filed 03/25/22  Page 14 of 55

J.A. 338

Page 33

1    getting away using that if --

2        A.  Obviously not doing work for the government.

3        Q.  Okay.

4        A.  If you're just doing work for the private

5    sector it's a non-issue.  At one time there was a -- I

6    can't remember whether the memo came out or the

7    notification came out of Homeland Security, it was

8    some division of the Department of Defense actually

9    issued a, you know, a mandated, you know, no DJI

10   drones in government work.  I'm sure if you Google it

11   you'd find it.

12       Q.  Turn to page 15 of your report.

13       A.  Sure.

14       Q.  You'll see the section, section A which is

15   titled -- I'll just read it for the record but it's

16   titled capturing aerial images on behalf of paying

17   clients and using orthomosaic software to stitch those

18   aerial images together to form orthomosaic maps.

19       A.  Correct.

20       Q.  Okay.  So I think that's a quote from the

21   complaint in this case; is that right?

22       A.  That's correct, yeah.  These were specifically

23   addressed in the complaint so I just followed that.

24       Q.  Did you read the complaint as a whole?

25       A.  Pretty much.

Page 34

1      Q.  So I think what we're talking about here is

2   basically orthomosaic maps; is that right?

3      A.  Correct.  Right.

4      Q.  Couple of paragraphs, three parahgraphs, we see

5   the report says, if the document was printed, also

6   called hard copy, and didn't include a reference grid,

7   scale bar, north arrow, title block, etc., basically

8   just a printed picture, this would not be regulated,

9   right?

10     A.  In my opinion it would not be regulated.  In my

11   opinion at that point you're just doing a portrait for

12   someone.  You're just doing a portrait photograph for

13   someone.

14     Q.  Got you.

15     A.  There's no harm or liability, you know, in that

16   or potential harm.

17     Q.  Some of which I think I know but I want to make

18   sure I understand it.  So what's a reference grid as

19   you use that term?

20     A.  Again, on most published surveys or platted

21   surveys there's typically a reference grid which on

22   the map itself it can either be solid lines or grid

23   tics.  Typically they're labelled at the edges with

24   the coordinates of the design -- of the project design

25   coordinate system.  It's just something allows you to

Veritext Legal Solutions
215-341-1000  610-434-8588  302-571-0510  202-803-8820
Case 5:21-cv-00137-FL   Document 38-25   Filed 03/25/22   Page 16 of 55

J.A. 340

1    scale on the hard map itself using an engineering

2    scale to measure distances.

3       Q.  Okay.  And how about a scale bar, can you kind

4    give me the -- (simultaneous speakers) -- of what that

5    is?

6       A.  A scale bar is just printed on the map to

7    indicate that if you measure one inch on the printed

8    document would equal X number of feet.  Might be 50

9    feet, might be 100 feet, might be -- again, these are

10   all items that are required under 89C.  If you create

11   a survey plat these items are required to be on the

12   map.

13      Q.  I see.  Okay.  I thought I knew what a scale

14   bar was.  The north arrow, is that when you look at

15   the map and there's the arrow that has the N on it?

16      A.  Yep.

17      Q.  And I do not think I know what a title block

18   is.  So what's that?

19      A.  A title block, again, is typically just a

20   section on the map that will give information about

21   the map.  You know, what date -- maybe date of the

22   imagery was exposed.  It might have the data -- if it

23   has a reference grid on it that means its tied to a --

24   it's a reference -- tied to a survey reference system.

25   So in the title block you would identify what survey

Veritext Legal Solutions
215-341-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 5:21-cv-00137-FL   Document 38-25   Filed 03/25/22   Page 17 of 55

J.A. 341

Page 36

1    data that the map is tied to.  You know, maybe who the

2    survey was -- map was created for, those types of

3    things.  Just basic information about so that when

4    somebody looks at that document they can -- it's

5    printed metadata basically.

6        Q.  I see.  So if I understand what you're saying

7    here we're talking about we fire a drone, we take the

8    pictures, we put them together into an orthomosaic

9    map, we print it out so we have a piece of paper with

10   the map on it, and as long as we don't have any those

11   feature on there you're telling me that that's not a

12   survey?

13       A.  If you have those features on there a person

14   looking at that might have the impression that it is

15   an actual surveyed document.

16       Q.  Pull up another -- I have two screens.

17   Sometimes it looks like I'm staring off into the

18   distance here.  So I'm posting Exhibit 34.  You got

19   it?

20              (Plaintiff's Exhibit 34 was marked for

21              identification.)

22       A.  Right.

23       Q.  It may not be -- it might not be -- it's up on

24   its side but if you can take a look at that.  Based on

25   what we're talking about my understanding of what

Veritext Legal Solutions
215-341-1000   610-434-8588   302-571-0510   202-803-8830
Case 5:21-cv-00137-FL   Document 38-25   Filed 03/25/22   Page 18 of 55

J.A. 342

Page 37

```
 1    you're telling me is that this orthomosaic map would

 2    not -- would not qualify as surveying; is that right?

 3       A.  If it was a printed on a piece of paper in my

 4    opinion no it would not be because it doesn't have

 5    anything on it but an image.  At that point it's just

 6    a picture.

 7       Q.  Post an Exhibit 35.  I'll let you take a look

 8    at as well.  Looks like there's an option to rotate

 9    it.  Might be easier.

10             (Plaintiff's Exhibit 35 was marked for

11             identification.)

12       A.  That's fine.  I can see it.

13       Q.  I'm going to rotate it so I can see it.  Okay.

14    So in contrast to the one we were just talking about,

15    Exhibit 34, as I understand what we've been discussing

16    this orthomosaic map would qualify under the

17    definition of survey; is that right?

18       A.  I see a scale bar on there which implies that

19    the map is scaled correctly and measurable so I would

20    have to say yes.

21       Q.  Okay.  Turning back to the report, we're still

22    talking about that -- that same section there on page

23    15 I think it is.  Go to the next paragraph down.

24    I'll just read so Erin can take it down.  It says, if

25    the orthomosaic is in a digital format such as Adobe
```

Veritext Legal Solutions
215-341-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 5:21-cv-00137-FL   Document 38-25   Filed 03/25/22   Page 19 of 55

J.A. 343

Page 38

1    PDF and doesn't include georeferencing information in

2    the file header as metadata, in my opinion, this would

3    not be regulated.  If the orthomosaic was any other

4    digital format such as TIFF, TIFFJPG, JPF2000, MrSID,

5    etc., and didn't include georeferencing information in

6    the file header as metadata or accompanied by a

7    separate georeferencing metadata file, in my opinion,

8    this also would not be regulated.

9        A.  Yes.  That's what I wrote.  At that point you

10   have nothing more than just a digital photograph.

11       Q.  What we were looking on the screen just now,

12   that first one, Exhibit --

13       A.  Exactly.

14       Q.  The first of those two images, correct?

15       A.  It has no intelligence.

16       Q.  Can you tell me what you mean by georeferencing

17   information in that paragraph?

18       A.  In that particular paragraph?

19       Q.  Yeah.

20       A.  Yeah.  In most -- if you process the digital --

21   if you process a digital ortho and you post process it

22   as a geoTIFF which is -- it's just a TIFF image with

23   georeferencing information embedded in the header of

24   the file and in most softwares including the one that

25   you're pointing out that was on that last drawing

Page 39

1      there, the drone deploy, they automatically

2      georeference the digital image and they both -- in a

3      geoTIFF and with an accompanying TFW file, which is

4      also a georeferecning file.  And typically the

5      metadata -- the geoTIFF metadata in there will include

6      the horizontal positioning reference of the image, it

7      will include rotational information, it will also most

8      likely include information about what projection data

9      it's on whether it be North Carolina state plane,

10     NAD83, or U.S. survey feet or possibly meters or

11     whatever the units are and such.  That's what I'm

12     referring to as there as georeferecing metadata.

13        Q.  So if we were to have our orthomosaic map

14     available digitally and we hadn't stripped the

15     metadata out what you're saying, and correct me if I'm

16     wrong, is that you can go on there and based on the

17     georeferecing data in the image you can start taking

18     measurements, correct?

19        A.  If you deliver someone a digital product and

20     there's no means for them to open that product so that

21     it positions itself correctly in any kind of software,

22     doesn't matter if its GIS software, Google Earth, CAD

23     software that a surveyor would use or the design

24     engineer would use, if that information is not there,

25     that image is not going to be useable to do any type

Veritext Legal Solutions
215-341-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 5:21-cv-00137-FL  Document 38-25  Filed 03/25/22  Page 21 of 55

J.A. 345

Page 40

1    of measuring calculations, etc.  But if the

2    information is there and you hand that over to

3    somebody that has the means to use it in that capacity

4    with any type of engineering, surveying, or any type

5    of GIS software they're going to use it in that

6    capacity.

7         Q.  Okay.  That makes sense.  So really the

8    georeferencing information is what triggers the

9    surveying definition, is that what you're saying?

10        A.  That's correct.  That's correct.  You are now

11   taking that image and you're locating it -- you're

12   basically locating it in the real world.  You're

13   telling people where it is and you're guaranteeing

14   that it's scaled to the correct scale and that if you

15   take measurements from it they'll be correct.

16        Q.  So if we go back to the -- go back to the

17   second of those two images obviously that is kind of

18   standing alone is not placeable in the real world;

19   right, we don't where in North or South Carolina that

20   is.

21        A.  Correct.

22        Q.  Right.  But still, because of that scale I

23   think what you're telling me is you can at least

24   determine the relative --

25        A.  Again, in my opinion adding the scale bar there

Veritext Legal Solutions
215-341-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 5:21-cv-00137-FL  Document 38-25  Filed 03/25/22  Page 22 of 55

J.A. 346

Page 41

1    it starts to add -- starts to add liability because
2    now you're telling that that's just not a picture.  If
3    I took a digital picture of you right now on the
4    screen I couldn't guarantee how wide your head is.
5    Unless I orthorectify that image and somehow
6    georeferenced it then I could tell you precisely how
7    wide your head is.  But if I provide a print of that
8    photo with a scale bar on it that somebody can
9    reference the scale bar to something on the -- in the
10   image and try to calculate a distance then, again,
11   you've now created something that's regulated.
12      Q.  I got you.  Am I right that most images that
13   are taken by, you know, drone cameras do they
14   automatically contain the georeferencing information
15   that we're talking about?
16      A.  No.  There is no such thing as a drone camera,
17   first of all.  A camera is a camera, a drone is a
18   drone.  And most cameras -- you know, consumer off the
19   shelf cameras that are used by most of these folks the
20   type of metadata you're going to get by taking a
21   photograph might be the date that you took the
22   photograph.  It might give you how many rows and
23   columns of pixels are in the image.  It might give you
24   the digital format whether it's TIFF, TIFFJPG, that's
25   the type of basic metadata information that's built

Veritext Legal Solutions
215-341-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 5:21-cv-00137-FL   Document 38-25   Filed 03/25/22   Page 23 of 55

J.A. 347

Page 42

1    into an image from a camera.

2         It's the GPS unit and the IMU unit that's added

3    to the system in the baseline GPS that is post

4    processed through trajectory post processing that then

5    adds the positional and rotation attributes to the

6    image.  It's through a post process that that

7    information is added.

8    Q.  So I thought -- and correct me if I'm mistaken

9    by this, I thought that even if you have your iPhone

10   and you take a picture on the iPhone you can kind of

11   go to an app and it will at least purport to tell you

12   the GPS longitude and latitude down to like the --

13   A.  Your phone has a GPS built into it most likely,

14   but the GPS built into your phone is intended for

15   navigation and emergency response purposes, it's not

16   intended for surveying.

17   Q.  Sure.  No, I understand that.  But just to make

18   sure I understand kind of the georeferencing

19   information that we are talking about, is that the

20   same kind of georeferencing information that you'd see

21   that you could get from the metadata on an iPhone

22   camera, the GPS --

23   A.  Correct.  But the key being is that your iPhone

24   has a GPS, not all cameras come with a GPS.  You buy a

25   Sony camera for doing digital photography and you're a

Veritext Legal Solutions
215-341-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 5:21-cv-00137-FL   Document 38-25   Filed 03/25/22   Page 24 of 55

J.A. 348

Page 43

1   wedding photographer and you take a wedding picture do

2   you think the location of that picture is in the

3   wedding photo, no, because there's no GPS in the

4   camera.  And typically the GPS is not in your camera,

5   it's in the iPhone.  The GPS and the camera in your

6   iPhone are two separate devices.

7       Q.  That makes sense.  Do you know if, kind of, the

8   lower tier drones, the 1500 drones for example, do

9   they come with cameras in the off-the-shelf package or

10  do people separately buy them and add them; how does

11  that work?

12      A.  No.  Again, most -- it's any combination that

13  you just mentioned.  You know, a lot of the drone

14  systems come integrated with a camera and integrated

15  with some sort of GPS.  And again, most of those

16  initial GPS systems in those -- integrated into those

17  drones, again, are for -- meant for navigating the

18  drone, not necessarily collecting survey grade GPS.

19  But most people that are taking it seriously and doing

20  what I term as, you know, industry standard survey

21  work with a UAS are using cameras, GPS units, LiDAR

22  units, the sensors, the IMU, are all manufactured and

23  intended for surveying and mapping, not recreational

24  drone operation.

25      Q.  Move on to the second section there on 15.

Veritext Legal Solutions
215-341-1000   610-434-8588   302-571-0510   202-803-8830
Case 5:21-cv-00137-FL   Document 38-25   Filed 03/25/22   Page 25 of 55

J.A. 349

Page 44

1    Where I'll just read it for Section B.  Is creating

2    marketing images of land on behalf of paying clients

3    and drawing on those images lines indicating the

4    approximate position of property boundaries.

5         That, again, is taken from the complaint,

6    right?

7       A.  Right.  Right.

8       Q.  As I understand your view on this those kinds

9    of images with those approximate drawings of lines,

10   that would not qualify as surveying under the statute;

11   is that right?

12      A.  No.  Again, if you're handing someone a piece

13   of paper that has a picture on it with some -- again,

14   anybody can recreate that same document by just going

15   to a GIS website.  I don't know why someone would pay

16   someone to do that, no idea because information is

17   readily available in a public resource at all times.

18   But no, I would not consider that surveying.

19      Q.  It sounds like those kind of pictures just

20   don't seem to raise the public health and welfare

21   concern that you've been talking about?

22      A.  No, no, no.  Although you never know.  You

23   could publish a document like that and two neighbors

24   could get over -- in a squabble over looking at it and

25   saying my property line is here, no mine's there, and

Page 45

1    next thing you know there's some kind of domestic

2    dispute.  People get shot over that stuff.

3        Q.  Yeah, yeah.  Okay.  But regardless -- setting

4    aside kind of the domestic fight there those images

5    aren't covered in your view by the statute?

6        A.  Right.

7        Q.  Got it.  So scroll down there to page 16,

8    Section C.  Capturing aerial images of land and

9    structures (along with location data, coordinates,

10   elevation data, and volume data) and making those

11   images and that data available to paying clients.

12           I think that's from the complaint, right?

13       A.  That's correct.

14       Q.  In your view isn't that kind of information

15   would fall in that definition of surveying?

16       A.  That's absolutely surveying.

17       Q.  And then the final one there D you again I

18   think quoting again from the complaint but correct me

19   if I'm wrong and that says, capturing aerial images

20   and data about land and structures; processing those

21   images and data to create 3D digital models of land

22   and structures; and making those 3D digital models

23   available to paying clients.

24           And I talked about this with one of the board

25   folks earlier today, but that is from the complaint

Veritext Legal Solutions
215-341-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 5:21-cv-00137-FL   Document 38-25   Filed 03/25/22   Page 27 of 55

J.A. 351

Page 46

1       though, right?

2           A.   That's correct.

3           Q.   And your view here is that that also falls

4       under the definition of surveying; is that right?

5           A.   Absolutely yes, it does in my opinion.

6           Q.   So what do you understand the phrase 3D digital

7       models of land and structures, what do you understand

8       that phrase to mean?

9           A.   Again, a 3D digital model is anything that --

10      it can be features collected to wire frame the

11      structure of the ground, it can be a triangulated

12      network that represents the surface of the ground.  It

13      can be contours.  Anything that depicts the shape and

14      elevation of the ground is a 3D model.

15          Q.   Is that the same -- would the same be true of

16      digital models of buildings as well?  Your comments

17      are mainly confined to natural features but can you

18      make 3D digital models of manmade structures too?

19          A.   Well, that goes with the territory.  Anytime we

20      do any kind of digital mapping for a DOT project we

21      don't just model the ground, we model everything.  We

22      model the buildings, we model the utility poles, we

23      model the sidewalks, we model the roads.  It's every

24      discernible feature from the imagery and/or the LiDAR

25      that you collect is modelled.

Veritext Legal Solutions
215-341-1000   610-434-8588   302-571-0510   202-803-8830
Case 5:21-cv-00137-FL   Document 38-25   Filed 03/25/22   Page 28 of 55

J.A. 352

Page 47

1     Q.  Because as I understand it people might want to

2   use that for all sorts of different things.  Can you

3   give me some examples from your experience of what

4   most common needs are for 3D modelling.

5     A.  It's the -- I mean, I won't say there's any one

6   particular primary because it involves everything.

7   Anything that's preconstruction, predevelopment.  You

8   know, highways, sewer, water, you know, housing, you

9   name it.  You need modelling on the front end and you

10  then you need modelling on the back end as an as built

11  of what's finally constructed.  So in some cases you

12  need modelling throughout the entire process.  And

13  basically you take a DOT highway design project before

14  the road is built, you model the surface so the

15  engineer can design the road.

16          Once you hire a grading contractor and a

17  construction company then you might want to

18  intermittently track their progress through grading

19  the roadbed for preparing it for construction.  The

20  grading contractor will probably get paid by the

21  amount of cut and fill their material that they're

22  moving on the site, that's tracked through 3D

23  modelling.  That individual doesn't want to be

24  underpaid, the DOT doesn't want to overpay.  So that's

25  how you figure that kind of stuff out.  The

Veritext Legal Solutions
215-341-1000 — 610-434-8588 — 302-571-0510 — 202-803-8830
Case 5:21-cv-00137-FL   Document 38-25   Filed 03/25/22   Page 29 of 55

J.A. 353

Page 53

1    is that 3D modelling sometimes used for building

2    inspections.  Instead of sending someone up to the top

3    of five story building and having them check out the

4    shingles and possibly fall off; is that --

5       A.  That's typically -- I would have to say you're

6    not building a model.  If you want to do a roof

7    inspection there's no modelling required.  You take a

8    video and use the video for inspection.  But now, if

9    you're talking about surveying a cell tower or

10   something of that nature where you don't want to have

11   somebody climb to the top of a cell tower or we

12   regularly do power line inspections using LiDAR for

13   people like Duke Energy, Dominion Energy.  And

14   depending on the size of the project sometimes we use

15   our UAS, sometimes we use a helicopter, sometimes we

16   use a fixed winged aircraft.

17        But again, the data has an expectation of

18   accuracy and to be able to go in there and provide

19   inspection data to the point where you can look at

20   individual insulators and capacitors on a power line

21   structure you better know what you're doing.

22      Q.  Okay.  Covered roof inspections a minute ago.

23   I take your point that maybe one way to do is running

24   a video over the roof.  If we're talking about a big

25   structure would it make sense to have an orthomosaic

Veritext Legal Solutions
215-341-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 5:21-cv-00137-FL   Document 38-25   Filed 03/25/22   Page 80 of 55

J.A. 354

Page 54

1    map where the owner can pinpoint there's some heat

2    coming out over at this spot and not over there; is

3    that something that's done at all?

4              MR. HANNA:  Object to form.

5        A.  Again, that goes back to the whole

6    georeferecing thing.  Again, if you're asking me if a

7    roof inspection falls under land surveying I'm going

8    to say no because you can easily just fly the roof

9    with a video or with a number of pictures, create a

10   mosaic, and hand it to the roofing contractor.  He

11   really -- he can look at the picture and tell if

12   there's problem.  You're creating an image for visual

13   inspection, you're not creating an image for some type

14   of modelling application.  So yeah --

15       Q.  I think I understand your correctly where if

16   you were to provide the roof inspector not just the

17   different step image of the -- what have you but it's

18   the digital version because you took it with

19   georeferencing camera.  If you provided that map of

20   the roof with the georeference information I assume

21   for the reason we talked about that would fall under

22   the definition of surveying, right?

23       A.  An orthomosaic is a orthomosaic.  If it's

24   georeferenced it doesn't matter if it's of a roof or

25   Davidson County.  It's -- an ortho is an ortho.  The

Veritext Legal Solutions
215-341-1000 ~ 610-434-8888 ~ 302-571-0510 ~ 202-803-8830
Case 5:21-cv-00137-FL  Document 38-25  Filed 03/25/22  Page 31 of 55

J.A. 355

1    subject in the photograph is irrelevant.

2        Q.  Okay.  I just don't know the answer to this.

3    Is it possible to strip the georeferencing metadata

4    out of a 3D digital model?

5        A.  There is no metadata in a 3D digital model.  A

6    3D digital model is all on its own completely

7    georeferenced.  All the features in the 3D model are

8    geographically -- they're all -- a 3D model is all

9    geographically located.  It's a survey.  A ortho

10   photo -- an image can be stripped of its metadata and

11   its positioning data.  A binary CAD file -- a binary

12   file or point cloud of a 3D model contains points,

13   poly lines, shapes, there are already attributed with

14   coordinate data, there's no stripping that data.

15       Q.  Let's turn to page 14 of your report.  Are you

16   there?

17       A.  Yep.

18       Q.  Okay.  So if we go to the second to last

19   paragraph from the bottom I'll just read it in full.

20   I'll read it in full.  Relying on untrained and

21   unskilled amateurs to recognize any of the multiple

22   varieties of problems or deficiencies that can arise

23   from the measurements, computations, or use of tools

24   for the survey profession to create useful survey

25   data, could be catastrophic to the outcome of a

Veritext Legal Solutions
215-341-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 5:21-cv-00137-FL  Document 38-25  Filed 03/25/22  Page 32 of 55

J.A. 356

Page 56

1      project and harm the public at large who relies on the

2      accuracy and fidelity of this information.

3           Did I get that right?

4      A.   Correct.

5      Q.   Okay.  So going back going through that

6      sentence so I'm clear, is your claim here that relying

7      on untrained and unskilled amateurs could be

8      catastrophic or that it factually has been

9      catastrophic?

10     A.   It has been catastrophic, there's no question

11     about that.

12     Q.   Can you tell me about that?

13     A.   Well, again, it's -- you ask any surveying firm

14     if they've ever follow behind somebody who was out

15     there surveying without the proper credentials you're

16     going to run across, you know, projects that you

17     follow behind somebody else and you're going to have

18     to fix something.  It happens all the time.

19     Q.   Go ahead.

20     A.   If I'm going to pull one off the top of my head

21     for years we used to do 3D modelling for a capacity

22     study for the Transylvania North Carolina County

23     Landfill.  Several years ago they did not use us to do

24     the capacity study, they hired a local drone operator

25     who was an unlicensed surveyor.  Two years later they

Page 57

1   had us come back and refly and redo the capacity study

2   ourselves and found that the two previous years of

3   data provided by the drone operator were in error and

4   actually had the landfill at capacity before it was

5   actually at capacity.

6       Q.  Why did they switch over?

7       A.  Because they -- through field surveying and

8   checking the data they learned that it was wrong.

9       Q.  Why did they switch to that drone operator from

10  you in the first place?

11      A.  Somebody local -- somebody at the landfill knew

12  some local guy and came in there and said he could do

13  it -- we could do your landfill topo for $600 so they

14  went for it.

15      Q.  Got it.  What was the name of the drone company

16  if you remember?

17      A.  Don't know.  It was just an individual.  I

18  never met him.  I did get a phone call from him one

19  time because he was asking questions about the ground

20  control.  Don't remember who he was.

21      Q.  Okay.  Did you report him to the board for

22  unlicensed practice?

23      A.  No.  No, I did not.  That was the county's

24  choice to use him.  They ended up paying me in the

25  end.

Veritext Legal Solutions
215-341-1000   610-434-8588   302-571-0510   202-803-8830
Case 5:21-cv-00137-FL   Document 38-25   Filed 03/25/22   Page 34 of 55

J.A. 358

Page 58

1      Q.  Do you have any evidence that it's more common

2   in -- do you have any evidence that it's more common

3   in Virginia than in North Carolina for members of the

4   public to be harmed by inaccurate 3D modelling?

5      A.  Again, you would have to contact the Virginia

6   board and ask them about that.  I'm sure those types

7   of complaints are filed all the time.  I'm not on any

8   regulatory board so I really can't speak to that.

9      Q.  Make sure I have the record clean.  Sounds like

10  you don't have any evidence that the problems

11  associated with unlicensed 3D modelling are worse in

12  Virginia than they are in North Carolina?

13     A.  No, I have no way -- I have no way to quantify

14  that.

15     Q.  Okay.  Do you have any evidence that, you know,

16  the harms associated with unlicensed orthomosaic maps

17  are worse in Virginia than in North Carolina?

18     A.  No, I don't.

19     Q.  Do you have any evidence that the harms

20  associated with unlicensed volumetric calculations are

21  worse in Virginia than in North Carolina?

22     A.  No, I don't.

23     Q.  Do you have any evidence that unlicensed

24  volumetric calculations -- by that I mean volumetric

25  calculations performed by people who are not licensed

Veritext Legal Solutions
215-341-1000   610-434-8588   302-571-0510   202-803-8820
Case 5:21-cv-00137-FL   Document 38-25   Filed 03/25/22   Page 35 of 55

J.A. 359

Page 59

```
1     surveyors, do you have any evidence that unlicensed
2     volumetric calculations cause more instances of harm
3     in Virginia than they do in North Carolina?
4          A.  I have no way to quantify these.
5          Q.  You just don't know?
6          A.  No, no.  I don't track the unlicensed practice
7     of surveyors in Virginia so I have no way of knowing
8     these.
9          Q.  Okay.  So I think your answers to a few of
10    these questions will be similar so if you'll indulge
11    me.  So if we look at Illinois.  I assume you don't
12    have any evidence that it's more common in Illinois
13    than in North Carolina for members of the public to be
14    harmed by inaccurate orthomosaic maps?
15         A.  No.
16         Q.  And you don't have any evidence that inaccurate
17    orthomosaic maps cause more harm in Illinois than they
18    do in North Carolina?
19         A.  No.
20         Q.  What about Kentucky?  Do you have any
21    comparison between the harms between North Carolina?
22         A.  No.
23         Q.  Mississippi?
24         A.  These are all questions for regulatory boards.
25         Q.  Okay.  So I mean it's a lot of states -- I'll
```

Veritext Legal Solutions
215-341-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 5:21-cv-00137-FL   Document 38-25   Filed 03/25/22   Page 36 of 55

J.A. 360

1    streamline it for all of our benefits.  Have you done

2    any comparison between North Carolina and any state

3    comparing how common it is for members of the public

4    to be harmed by inaccurate orthomosaic maps?

5        A.   No.

6        Q.   Have you done any comparison between North

7    Carolina and any other state comparing how common it

8    is for the members of public to be harmed by

9    inaccurate 3D digital models?

10       A.   No.

11       Q.   Have you done any comparison between North

12   Carolina and any other state comparing how common it

13   is for members of the public to be harmed by

14   inaccurate volumetric calculations?

15       A.   No.

16       Q.   Have you done any between North Carolina and

17   any other state comparing how common it is for members

18   of the public to be harmed by the creation of

19   orthomosaic maps by unlicensed persons?

20       A.   No.

21       Q.   And by unlicensed, just to be clear, I mean

22   people who are not licensed as surveyors or

23   photogrammetrists.

24       A.   I was asked to be a photogrammetric expert, not

25   an expert on statistical comparisons between states

Page 61

```
 1    and who may or may not have damage.
 2        Q.  Are you at all familiar with how surveying is
 3    defined in other states?
 4        A.  Yeah.  Approximately 33 states out of the 50
 5    states have regulatory acts that govern surveying
 6    which include 3D modeling and topographic mapping.
 7    17 -- approximately 17 I think that don't.
 8        Q.  Okay.  Where are you getting those numbers
 9    from?  Is there kind of a 50 state collection of --
10        A.  The ASPRS tracks it. They have a state -- they
11    have a committee that tracks state by state surveying
12    act regulations.  Again, before I can venture into it
13    because photogrammetry is technically limitless,
14    you're using an aviation platform to collect your --
15    to bring the field into the office as I mentioned in
16    my report to conduct surveying from geographically
17    there is no limit to where I can practice.  The only
18    thing that can limit where I practice are regulatory
19    statutes.  So we have to become familiar with those in
20    order to be able to make sure that we comply when we
21    venture into other states.
22        Q.  That makes a lot of sense.
23        A.  I have to make that stuff my knowledge.
24        Q.  Sure.  So it sounds around 33 states they
25    require a license?
```

Page 62

1      A.   That was as of, I think, like, 2015 maybe, the

2   last report that I saw.  So there may actually be more

3   by now.  Ironically California is one of them where

4   your expert report came from.

5      Q.   Yeah.  California has a lot of laws.

6      A.   Yeah.

7      Q.   So at least the last time you checked maybe it

8   was a few years ago around 33 states required a

9   license to engage in photogrammetry?

10      A.   The last report that I saw there were

11   approximately 33 states that had some sort of

12   regulatory language that governed not -- in some cases

13   they used the specific word photogrammetry and other

14   words they just described 3D modelling.  They

15   mentioned contours or 3D modelling, anything that

16   depicts or replicates the surface of the earth.

17      Q.   Got you.  The other 17 don't require --

18      A.   The boards don't regulate processes and mean,

19   they just regulate the actual outcome, the data

20   itself.

21      Q.   That makes sense.  And so in the other 17 or so

22   they don't require a surveyor or photogrammetrist

23   license to engage in this type of work; is that right?

24      A.   No.  The other 17 states have regulatory

25   statutes but mainly -- if you read them they're mainly

Veritext Legal Solutions
215-341-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 5:21-cv-00137-FL   Document 38-25   Filed 03/25/22   Page 39 of 55

J.A. 363

Page 63

1    directed to boundary type surveys.

2        Q.  I got you.  I'll ask you a couple of questions

3    that may be a little repetitive but I'll hope you'll

4    indulge.

5        A.  Go ahead.

6        Q.  Do you have any evidence that inaccurate

7    orthomosaic maps cause more instances of harm in those

8    17 or so states that don't require a photogrammetrist

9    license?

10       A.  No, I don't have any evidence.  Again, I was  a

11   photogrammetric expert, not a statistical expert.

12       Q.  And I assume you don't have any evidence that

13   in those 17 states that don't require a

14   photogrammetrist or surveyors license to engage in

15   photogrammetry, you don't have any evidence that 3D

16   digital modelling by unlicensed person has caused more

17   harm there than in North Carolina?

18       A.  No, I don't.

19       Q.  And same for volumetric calculations?

20       A.  Yeah, exactly.  No.

21       Q.  Turning to you license in Virginia so maybe you

22   kind of Virginia's regulatory scheme close to the

23   front of your mind, if not that's fine.  It's my

24   understanding that the surveyor license in Virginia is

25   narrower -- at least as regards to photogrammetry is

Page 64

1    narrower than North Carolina; is that right?

2        A.  Define narrower.

3        Q.  My understanding is that the definition of the

4    kinds of photogrammetry that require a licensure

5    covers --

6        A.  There's only one science of photogrammetry.

7        Q.  Okay.  So you're not familiar with any peculiar

8    definition of what kind of photogrammetry is and is

9    not regulated in Virginia?

10       A.  No.  I do know that South Carolina and Virginia

11   recognize photogrammetry as the separate discipline

12   other than land surveying.  Other than that no, I

13   don't.

14       Q.  Is it regulated by separate board from the

15   surveying board in those states?

16       A.  No, it's the same board just you -- if you were

17   to look at my actual Virginia license it doesn't say

18   professional land surveyor it says professional

19   photogrammetric surveyor.

20       Q.  I see.  Okay.  So you kind of have a smaller

21   mandate than if you have a full surveyor license?

22       A.  My license in Virginia does not allow me to go

23   up there and do boundary surveying.  I can only do

24   photogrammetric surveying or geodetic surveying in

25   relation to my photogrammetric projects.  It's the

Page 65

1       same thing in South Carolina, I'm not permitted to go

2       to South Carolina and do boundary surveying.  Only in

3       relationship to photogrammetry.

4           Q.  Quickly turning back up to page 14.  Might have

5       actually been on 14.  Get yourself over to page 14 of

6       your report I have a couple of questions.  So we're

7       looking at the third paragraph from the bottom.

8       Furthermore, land surveying and photogrammetry as a

9       profession, is not artistic impression protected under

10      the First Amendment.  Art or artistic impression is

11      for entertainment purposes, while surveying is

12      providing useful information for a functional use.

13          A.  Correct.

14          Q.  Is that a fair characterization of your view?

15          A.  Yes.

16          Q.  And this is not meant to sound argumentative by

17      any means, but it is a lawyer question that I feel

18      like I have to ask.  You're not an expert on first

19      amendment; is that right?

20          A.  I mean, no, I'm not a lawyer and I don't go and

21      read the First Amendment to memorize it.  But I do

22      know enough that there was that -- again, the art

23      impression is -- or is viewed as freedom of speech.

24          Q.  Okay.  Scroll back to page 13, the second full

25      paragraph.  For the past 25 years SDC has thrived.  So

Veritext Legal Solutions
215-341-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 5:21-cv-00137-FL   Document 38-25   Filed 03/25/22   Page 42 of 55

J.A. 366

Page 66

```
1     I'm interested in that final sentence which I'll just
2     read for the transcript's benefit.  It says, if a poll
3     was taken of the other 4,370 licensed professional
4     firms, 2,336 licensed professional land surveyors, and
5     29,585 licensed professional engineers in North
6     Carolina, I'm sure all or the majority would agree
7     that regulatory compliance isn't cumbersome or an
8     inconvenience, it's an assets, and ensures the public
9     is protected from malpractice.
10         Is that a fair reading?
11    A.   Yeah.
12    Q.   So you mentioned kind of this theoretical poll
13    of the members of the regulated community in North
14    Carolina.  Just to be clear, you did not conduct any
15    poll of --
16    A.   No, I did not.  I didn't state that I conducted
17    a poll either.
18    Q.   Understood.  I wanted to --
19    A.   If I had taken the poll I would have stated
20    that I had taken the poll.
21    Q.   No poll of professional firms, no poll of land
22    surveyors, and no poll of professional engineers?
23    A.   I have a pretty good hunch of what they would
24    say.
25    Q.   I don't know if you have an opinion on this but
```

Veritext Legal Solutions
215.341.1000   610.434.8588   302.571.0510   202.803.8830
Case 5:21-cv-00137-FL   Document 38-25   Filed 03/25/22   Page 43 of 55

J.A. 367

Page 67

1    if you do I would be interested in hearing it.  A lot

2    of what we've been talking about today involves

3    providing these kinds of services to a client, right,

4    so there's kind of two parties involved in the

5    transaction and we've been talking about some kind of

6    information qualifies as surveying, some doesn't and

7    so on.  I guess let me pause a scenario on it and get

8    your thoughts on it if it qualifies as surveying.

9         So let's say that I just own a big field in

10    North Carolina and I am kind of an amateur drone

11    enthusiast and I want to get a general sense of, you

12    know -- say I want to build a kiddie pool in my field

13    or whatever and I take my drone out and I run it in

14    laps over my field and I take pictures and I process

15    them in one of the lower level platforms like Pix4D

16    and it spits out the black box orthomosaic map that

17    you described and it provides measurements and I take

18    that map has those measurements on it and I use that

19    to kind of figure out build my jungle gym or kiddie

20    pool or fence.

21    A.   Okay.

22    Q.   It's my land, it's my drone for my personal

23    use; does my creation of that measurable map qualify

24    as surveying do you think?

25              MR. HANNA:  Object to the form.  You can

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 5:21-cv-00137-FL   Document 38-25   Filed 03/25/22   Page 44 of 55

J.A. 368

1   answer.

2      A.  Technically yes.  If you're creating -- if

3   you're creating a measurable map or you're using data

4   to do some type of construction design on your own

5   property if you've -- but again, the key thing here is

6   you're doing it for yourself, you're not charging

7   any -- I don't see how this scenario in any way,

8   shape, or form relates to your complaint or your

9   plaintiff's complaint.  There's no money being

10  exchanged, there's no second party, the only person

11  that can be harmed is yourself, there's no -- other

12  than --

13     Q.  Yeah, that's right.  I guess that's what kind

14  of peaks my curiosity.

15     A.  From the fact that you are creating

16  georeference data you are practicing land surveying.

17  From the fact that you're doing it strictly for

18  yourself as a recreation or a hobby then, you know,

19  the board would not regulate you.  I'm positive that

20  if you went to the board and presented and said, hey,

21  I want to do this on my own property for my own

22  purposes they would say knock yourself out.  I'm

23  confident that's what would happen.

24     Q.  You think that but it sounds like you also

25  think that this is a matter of the strict letter of

Page 69

```
 1      the law that would, in fact, be unlicensed surveying.

 2          A.  Under the strict letter of the law, yes, it

 3      would because, again, you are doing what a surveyor

 4      does.  But again, I'm sure that the board would not

 5      regulate that because again, there's no second party.

 6      The board's job is to protect the public.  If the only

 7      person to protect is yourself and the potential harm

 8      is only to yourself then there's no reason why you

 9      shouldn't be able to do it.

10              MR. HANNA:  Object to the last question on

11      strict letter of the law to the form.  Other than that

12      just for the record.

13          Q.  Okay.  So I just have a few questions for you

14      about Google Maps.  Get your thoughts on this too.  So

15      if you know can you explain to me how the Google Maps

16      apparatus is created, who does that, how does that

17      work?

18          A.  I'm not -- I don't work for Google and I'm a

19      photogrammetrist, not an internet expert.

20          Q.  Okay.  That was a big question.  As I was

21      stating it it sounded like we could cover a lot of

22      ground.  So as I understand it and I tried to do this

23      morning anyone can go on Google Maps, right, it's

24      publicly available out in the world.

25          A.  Correct.
```

Veritext Legal Solutions
215-341-1000 — 610-434-8588 — 302-571-0510 — 202-803-8820
Case 5:21-cv-00137-FL   Document 38-25   Filed 03/25/22   Page 46 of 55

J.A. 370

1     Q.   And it has images of land, right?

2     A.   Right.

3     Q.   And if you go to the bottom of the screen

4   there's a scale bar saying one inch is 100 feet or

5   what have you.

6     A.   Right.

7     Q.   And then if you want to -- if you want to you

8   can kind of zoom in on a field or a piece of property

9   and you can click your mouse on point A and drag it to

10   point B and it says that's 12.12573 feet, right?

11     A.   Right.

12     Q.   And then if you want to you can trace the line

13   around the property and it tells you the line then it

14   tells you okay the area is --

15     A.   Right.

16     Q.   -- 35.2573 feet, right?

17     A.   Right.

18     Q.   I think it kind of depends on where you are in

19   the world but there's some parts of Google Maps where

20   it even gives you contours.  If it's a hill I think it

21   will define contour lines; is that right?

22     A.   Correct.

23     Q.   And so --

24     A.   I don't know necessarily if they display

25   contours or not but I do know you can turn on a

Veritext Legal Solutions
215-341-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 5:21-cv-00137-FL   Document 38-25   Filed 03/25/22   Page 47 of 55

J.A. 371

Page 71

1    terrain function and it will show you approximate

2    elevation.

3        Q.  Got you.  And so as I was using it it looks

4    kind of reliable to me, every measurement was down to

5    the ten thousandth of a foot and I mean you can

6    measure people and make those measurements in doing

7    all sorts of decisions about their land based on those

8    measurements, right?

9        A.  Let me look on Google Earth real quick.

10       Q.  One of the benefits of the remote deposition.

11       A.  I don't believe Google Earth will measure to a

12   ten thousandth of a foot.

13       Q.  Well, since we have the benefit of both having

14   computers, one of the few upside of doing depositions

15   remotely so go to Google Maps.  Maybe I misspoke and

16   said Google Maps.

17       A.  Google Earth, they're both pretty much the same

18   thing.

19       Q.  Yeah.  And --

20       A.  They both use the same name source.

21       Q.  Right, right.  So if we do the search thing we

22   can both plug in the North Carolina Board of

23   Examiners.

24       A.  I'm in High Point right now.  The measuring

25   tool there is displaying to a hundredth of a foot, not

Page 72

1    a ten thousandth of a foot.  And I do believe there's

2    settings in here where you can actually change that

3    resolution.

4        Q.  Sorry.  I missed that.  Can you repeat that?

5        A.  Yeah.  The measuring tool that's in there right

6    now currently the way I have is set up is measuring to

7    a hundredth of a foot.

8        Q.  Okay.

9        A.  Which is vastly different than ten thousandth

10   of a foot.  And again, I believe that is in here where

11   you can set the resolution.  You can minimize the

12   decimal places.

13       Q.  Okay.  I see it.  I guess I misspoke on the ten

14   thousandth.  But it looks like, and we don't need to

15   go through the motions, but you can measure at least

16   to the tenth of a foot from point A to point B, right?

17       A.  Right.

18       Q.  And make a square or any shape and it can tell

19   you the area, right?

20       A.  Right.

21       Q.  And I guess the question that I kind of

22   derailed myself on before is it seems like ordinary

23   people who want to make low level decisions about how

24   much picket fence to buy for their house, right, they

25   could easily go on Google Maps and rely on the figures

Page 73

1    that are given?

2         A.   Exactly.  Why would they pay somebody to do it?

3         Q.   I think that's a decent question but I guess my

4    question is, don't we have the same concerns about

5    harm to the public if they're using these maybe not

6    super precise numbers off Google Maps as if they're

7    using potentially not super precise numbers --

8         A.   If they're just using it to get approximate

9    numbers for how much fence to buy how much harm can

10   that do?  When you're talking about 3D models and

11   actual survey data we're talking about actual

12   engineering design projects going wrong, bridges being

13   built incorrectly, roadways being -- sewers being

14   built incorrectly.  You can't obtain information from

15   Google Earth or Google Maps that could ever be used

16   for an engineering or surveying application.

17        This is free public data meant for navigation

18   and for people to locate destinations.  You know, go

19   online and go to Google Earth or Google's actual web

20   page they have paragraphs and paragraphs of

21   disclaimers for this information.

22        Q.   So in your view the existence of those

23   disclaimers reduce some of the concern that you might

24   have with people kind of relying on inaccurate data?

25        A.   Repeat that, please.

Veritext Legal Solutions
215-341-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 5:21-cv-00137-FL   Document 38-25   Filed 03/25/22   Page 50 of 55

J.A. 374

Page 74

```
1        Q.   You mentioned a bunch of disclaimers and I'll

2    take your word for it, I'm sure if you go on Google a

3    bunch of lawyers have written a bunch of disclaimers.

4    But does the existence of those disclaimers in your

5    view does that reduce the concern that you might have

6    with people relying on these measurements and hurting

7    themselves?

8        A.   I would hope they would do their due diligence

9    and read the disclaimers.  You enter into any GIS

10   website in the state of North Carolina as soon as you

11   enter the GIS website you usually have to agree to a

12   disclaimer.

13       Q.   Okay.

14       A.   But again, you're comparing something that's

15   free to something that your client wants to charge

16   for, there's a difference there.

17       Q.   Sure.  So correct me if I'm wrong but I

18   think --

19       A.   Paying clients don't use this data.

20       Q.   I'm sorry you cut out there.  What was that?

21       A.   I said a paying client would not use this data.

22       Q.   Sure.  I mean, I wonder if there's a disconnect

23   between, kind of, like, your clientele and the

24   clientele of smaller unlicensed drone operators or

25   smaller scale businesses, right, but it makes sense to
```

Veritext Legal Solutions
215-341-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 5:21-cv-00137-FL   Document 38-25   Filed 03/25/22   Page 81 of 55

J.A. 375

Page 75

1   me that no reasonable person would come to SDC with

2   kind of all your --

3      A.  Yeah, there's -- I'm sorry.  Go ahead.

4      Q.  I'll just finish my thought.  It seems unlikely

5   that someone would come to the highest level

6   photogrammetry and surveying firm if they want to

7   figure out, you know, about how much picket fence to

8   buy for their backyard, right?

9      A.  Correct.  Correct.  But that would be senseless

10   for somebody to pay us for something like that.  They

11   can get it right here off of Google Earth or off of

12   the county GIS website.

13      Q.  And for that kind of lower stakes, for lack of

14   a better word, for that kind of lower stakes work it

15   sounds like, kind of, the concerns that you're

16   describing about bridges collapsing and that's --

17         (Simultaneous speakers.)

18         MR. HANNA:  Object to the form.  Lower

19   stakes.

20      Q.  Okay.  I think we might been talking over each

21   other a bit.  Let me try to start from the beginning

22   for the benefit of everyone.  I think what I

23   understood you saying was that for those kind of lower

24   stakes, small time measuring needs that people might

25   need, the kind of concerns that you had expressed

Veritext Legal Solutions
215-341-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 5:21-cv-00137-FL   Document 38-25   Filed 03/25/22   Page 52 of 55

J.A. 376

Page 76

1    about bridges collapsing, for example, and these kind

2    of engineering failures, that those kind of dangers

3    are less present when we're talking about those

4    smaller scale projects; is that fair to say?

5            MR. HANNA:  Object to the form.

6        A.  Yeah.

7        Q.  I understand you're not an expert on Google

8    Maps and I'm not an expert either.  Do we know -- are

9    land surveyors the ones that create Google <aps; do

10   you know?

11       A.  Actually, if you read the disclaimers and such

12   Google will immediately tell you that the data that's

13   on these sites all come from other sources.  Like for

14   instance, the data -- the orthoimage data that we

15   create for the state of North Carolina statewide

16   orthoimage program ends up on Google Earth.  So even

17   though you have -- you're calling these lower tier

18   clients or these lower tier surveyors when actually --

19   the type of data -- the data that does appear in some

20   cases on Google Earth is being prepared through the

21   regulated process of surveying and creating

22   orthoimages.

23       Q.  Do you know is it always created through those

24   type of regulated actors?

25       A.  No, I can't say that.  But I do recognize

Veritext Legal Solutions
215-341-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 5:21-cv-00137-FL   Document 38-25   Filed 03/25/22   Page 53 of 55

J.A. 377

```
                                                        Page 77

1      imagery that we have created here at Spatial Data on

2      Google Maps.

3              MR. GEDGE:  Why -- we've been going for a

4      couple hours, why don't we take a five-minute break,

5      Mr. Schall, and I think we're almost done on my end.

6      Sound good?

7              THE WITNESS:  That's fine.

8                  (A recess was taken.)

9      BY MR. GEDGE:

10       Q.  We have no other questions for Mr. Schall.

11     I'll let Mr. Hanna ask any questions that he might

12     have.

13             MR. HANNA:  We have no questions.  Thank

14     you, Mr. Schall.

15             THE WITNESS:  You're welcome.

16                 (Off the record at 4:11 p.m.)

17                 (Signature was not waived.)

18

19

20

21

22

23

24

25
```

Page 78

1

2                   REPORTER'S CERTIFICATE

3          I, Erin Ramsey, a Notary Public in and for the

4    Commonwealth of Virginia, do hereby certify that there

5    came before me on Wednesday, the 19th day of January,

6    2022, the person hereinbefore name, who was by me duly

7    sworn to testify to the truth and nothing but the

8    truth of his knowledge concerning the matters in

9    controversy in this cause; that the witness was

10   thereupon examined under oath, the examination reduced

11   to typewriting under my direction, and the deposition

12   is a true record of the testimony given by the

13   witness.

14          I further certify that I am neither attorney or

15   counsel for, nor related to or employed by, any

16   attorney or counsel employed by the parties hereto or

17   financially interested in the action.

18          IN WITNESS WHEREOF, I have hereto set my hand,

19   this the 2nd day of February, 2022.

20

21

22   _____

23   Erin Ramsey, Notary Public

     Notary Number: 7941836

24   Expiration Date: August 31, 2025

25

# Plaintiffs' Summary-Judgment Appendix Exhibit 26

Andrew Ritter Deposition
Transcript Excerpts

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF NORTH CAROLINA
 2                      WESTERN DIVISION
            CIVIL ACTION NO. 5:21-cv-0137-FL
 3                                       )
      360 VIRTUAL DRONE SERVICES LLC     )
 4    et al.,                            )
                                         )
 5                                       )
         Plaintiffs,                     )
 6                                       )
      V.                                 )
 7                                       )
                                         )
 8    ANDREW L. RITTER, in his           )
      official capacity as Executive     )
 9    Director of the North Carolina     )
      Board of Examiners for             )
10    Engineers and Surveyors,           )
      et al.,                            )
11                                       )
                                         )
12       Defendants.                     )
13
14
15
16
17          REMOTE VIDEOCONFERENCE DEPOSITION
18                          of
19                  ANDREW L. RITTER
20              (Taken by Plaintiffs)
21          Thursday, January 20th, 2022
22                   12:14 p.m.
23
24
25      Reported by: Leslie Christian Lentkowski
```

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 5:21-cv-00137-FL   Document 88-26   Filed 03/25/22   Page 2 of 37

J.A. 381

```
                                                      Page 2

1    APPEARANCES:
2    On Behalf of the Plaintiffs:
3        Samuel B. Gedge, Esquire (via videoconference)
         James T. Knight II, Esquire (via videoconference)
4        Institute for Justice
         901 North Glebe Road
5        Suite 900
         Arlington, Virginia 22203
6        703-682-9320
         sgedge@ij.org

7
     On Behalf of the Defendants:

8
         Douglas W. Hanna, Esquire (via videoconference)
9        Graebe Hanna & Sullivan, PLLC
         4350 Lassiter at North Hills Avenue
10       Suite 375
         Raleigh, North Carolina 27609
11       919-863-9091
         dhanna@ghslawfirm.com

12
     Also Present:

13
         John M. Logsdon, PLS
14       North Carolina Board of Examiners for Engineers and
     Surveyors

15
16
17
18
19
20
21
22
23
24
25
```

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 5:21-cv-00137-FL   Document 38-28   Filed 03/25/22   Page 3 of 37

J.A. 382

Page 3

1          E X A M I N A T I O N S

2    Witness                                    Page

3    Andrew L. Ritter

4       By Mr. Gedge                                4

5

6            E X H I B I T S (Premarked)

7    Exhibit                                    Page

8    Exhibit 31 - Expert report of Mark Schall

9    Exhibit 36 - Droners

10   Exhibit 37 - Air Source One

11   Exhibit 38 - Notice of 30(b)(6) deposition

12   Exhibit 39 - Defendants' responses

13   Exhibit 40 - Verification-Ritter

14

15

16

17

18

19

20

21

22

23

24

25

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 5:21-cv-00137-PL  Document 88-26  Filed 03/25/22  Page 4 of 37

J.A. 383

Page 4

```
 1              P R O C E E D I N G S
 2              THE REPORTER:  Participating attorneys
 3    recognize that all parties, including the witness and
 4    court reporter, are participating remotely.  In lieu of
 5    an oath administered in person, the witness will
 6    verbally declare that their testimony in this
 7    deposition is under penalty of perjury and will be the
 8    truth, the whole truth, and nothing but the truth.
 9    Counsel stipulate that all objections to the remote
10    participation are waived.  Please state your name and
11    indicate your agreement on the record.
12              MR. HANNA:  Douglas Hanna on behalf of
13    the defendants, and we agree with the stipulation as
14    read.
15              MR. GEDGE:  Sam Gedge, counsel for
16    plaintiffs, and we agree.
17                        EXAMINATION
18    BY MR. GEDGE:
19         Q.   Good morning, Mr. Ritter.  How are you?
20         A.   Good.  How are you?
21         Q.   Good.  I guess before we start, maybe you
22    could just state your full name so we get it for the
23    record.
24         A.   Sure.  It's Andrew; middle initial L;
25    Ritter, R-i-t-t-e-r.
```

Page 23

1    -- even though I wasn't involved with any of the

2    discussions in the '90s, I was not involved with any of

3    -- when the law was enacted in 1998, but I did try to

4    educate myself so I wouldn't look silly in front of

5    some of these meetings.

6            So what happened in the mid-to-late '90s,

7    of course one of the things that happened is all our

8    technology started exploding.  And there's a big

9    transformation in the way all professionals are doing

10   their work when it came to computers but especially

11   engineers and surveyors.  Their equipment dramatically

12   started changing.  And then what happened in the

13   mid-to-late '90s -- and, again, this is a non-technical

14   person repeating this -- is the United States

15   government and the military started releasing satellite

16   information to commercial providers, and that

17   information was not available prior to that.

18           What is important in our surveying law and

19   our rules is the level of accuracy on maps, and

20   horizontal measurements have had that standard for a

21   long time.  Now all of a sudden in the mid-to-late '90s

22   when the government released military grade satellites

23   for commercial use, that level of accuracy was now

24   available to commercial users.  So commercial users now

25   entered into what we would classify as the surveying

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 5:21-cv-00137-FL   Document 88-26   Filed 03/25/22   Page 6 of 37

J.A. 385

Page 24

1   world, and so the laws had to be adopted to the new

2   technologies.

3           I mean, at the time, you could use your

4   Garmin handheld unit and walk through the woods.  You

5   know, it wasn't very accurate, but it was accurate

6   enough to get you back to your car.  Well, now all of a

7   sudden the satellites were giving you data that got you

8   within, you know, a foot of your car, and so companies

9   started selling that product to -- I mean, I don't know

10  who came first, but now it's bought by municipalities,

11  cities, counties, states.  They needed a standard, and

12  once the standard was put in place, then it became

13  regulated and under our licensure law.  A long answer.

14  I'm sorry.

15      Q.   Oh, not at all.  It's useful.

16           This is a bit of a broad question.  I'm

17  happy to try to narrow it a bit.  Was there anything

18  from what you heard Mr. Schall testifying about his

19  opinion on what is and is not covered under the

20  definition of surveying, was there anything in his

21  opinion on that that struck you as incorrect?

22      A.   You know, specifically it is broad, and I

23  don't really -- I would almost rather have a specific.

24  You know, there were times I was listening closely, and

25  there were times that I was not.  So I'm going to go

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 5:21-cv-00137-FL   Document 88-26   Filed 03/25/22   Page 7 of 37

J.A. 386

Page 25

1    safe and say you would have to ask me specifically

2    because I don't recall everything that he said.

3    Nothing popped out that he said was not accurate.

4         Q.    Okay.  So, for example, his opinion -- he

5    expressed the idea that orthomosaic maps -- those meet

6    the definition of surveying, that they include

7    reference grids, scale bars, north arrows, title

8    blocks.  Do you remember him talking --

9         A.    Yeah.  I remember you asking what a title

10   block was.

11        Q.    Was his view on that consistent with the

12   board's view?

13        A.    You know, if you called and asked me on the

14   phone outside this deposition, I would say, "Hey, put

15   that in writing," and I would take that to a technical

16   member of the board because you start crossing the line

17   past where I'm comfortable asking technical questions.

18             I would say just because you put a title

19   block on something doesn't make it surveying, and just

20   because you put a north arrow on a block -- on a piece

21   of paper doesn't make it surveying.  Just because you

22   put a north arrow on a piece of paper, it doesn't make

23   it surveying, but if you start putting three or four of

24   those things together on a piece of paper, you're going

25   to start getting closer.

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 5:21-cv-00137-PL   Document 88-26   Filed 03/25/22   Page 8 of 37

J.A. 387

Page 26

1          Now, when you cross the line, that's the

2    technical member of the board's job to tell me that,

3    but if you just gave me a piece of paper with a title

4    block on it, I'm comfortable saying that's not

5    surveying.  But if you put -- I mean, we have what's

6    called the Standards of Practice for Surveying in

7    North Carolina, and what he uses is what he was

8    describing are the Standards of Practice for Surveying

9    in North Carolina.  There's, I want to say, 16 items on

10   that list that have to be on every map.  As a matter of

11   fact, some surveyors get in trouble for not putting

12   that information on the map.  That's what he was

13   talking about.  But if you're only putting one or two

14   of those things on there, I'm not going to say that's

15   surveying.  On the other side, it could be, but by

16   itself it's not an indicator.  I would need more

17   information.

18        Q.   Well, were you observing the part of the

19   deposition where he had looked at a couple of examples

20   of orthomosaic images?  Does that ring a bell to you?

21        A.   Yeah.  I mean, I didn't see them though,

22   but, yeah, I remember that part.

23        Q.   Okay.  We can circle back then.

24             Just in your experience, has there been an

25   increase in recent years, do you think, of, I guess,

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 5:21-cv-00137-FL   Document 88-26   Filed 03/25/22   Page 9 of 37

J.A. 388

Page 27

1   amateur drone operators buying a drone and starting to

2   offer surveying services?  Is that something that

3   you've seen an increase of?

4         A.   Well, if it's okay with you, I'm going to

5   take that as two different questions.  The first part

6   is yes.  When drones came out, everybody bought a

7   drone.  And the running joke was it wasn't too much

8   longer that they ended up buying their second drone

9   because they drove the first drone into the side of a

10   building.  So, yes, everybody bought a drone.

11         Friends of mine bought drones.  Actually,

12   the North Carolina Department of Transposition has a --

13   and I'm not sure what it's called, but they have a

14   division that actually was created to handle the use of

15   drones in North Carolina.  I actually arranged for them

16   to come up to the board office, and they brought their

17   -- by the way, they don't like calling them "drones."

18   They were sort of offended.  They like calling them

19   "unmanned aircraft."  They had a different term.  And

20   then, of course, we would call them "drones," and then

21   they would get mad at us.

22         But it was new technology, so we brought

23   them in, and they gave a two-hour presentation to the

24   board on UAVs.  That's what it's called -- UAV

25   technology.  They were talking about everybody buying a

Page 28

1    drone, but you couldn't survey with it.  And I heard

2    the question you asked yesterday about does the UAV

3    come with a camera.  You can go to Target and buy a

4    UAV.  It's got a GoPro camera in it.  And what we

5    learned is at the time -- this probably goes back, I'm

6    guessing, five or six years ago, maybe longer, when we

7    brought them up.  They said there's no camera that was

8    being sold then that could provide survey grade images.

9                Anyway, the long answer is yes.  Everybody

10   was buying drones, but nobody was using them at the

11   time to try and survey.  Everybody recognized what DOT

12   said.  The cameras were not taking pictures that could

13   develop survey grade product.  And Mr. Schall talked

14   about it yesterday.  He used a number that I thought

15   was lower.  We had a company up here -- Tacheometry --

16   I want to say in 2000, 2004, or 2005, and they told us

17   flat out their camera was worth a million dollars, and

18   they were taking survey grade pictures.  And so your

19   typical surveyor in North Carolina cannot afford a

20   million-dollar camera.  So, yes, a lot of them in the

21   early part of drones were buying them, but there was

22   not a lot of surveyors using drones for survey type

23   work.  They might be using it for reconnaissance work

24   but not for survey level work.

25                Q.   Okay.  Just based on the number of notices

Veritext Legal Solutions
215-341-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 5:21-cv-00137-FL   Document 38-26   Filed 03/25/22   Page 11 of 37

J.A. 390

Page 29

```
1    of non-compliance that we started seeing in the past
2    four or five years, it seemed like there was a state --
3    maybe not licensed surveyors using drones but a state
4    of unlicensed folks buying drones and operating mapping
5    services.  Is that fair to say?
6            A.   Yes.  I think that's fair to say.
7            Q.   I think just based on the information that
8    we have, it looks like the last of those drone-related
9    investigations wrapped up in 2020, something called Air
10   Source One.  I don't know if that rings a bell for you.
11           A.   No.
12           Q.   Okay.  Do you -- well, I think that would
13   wrap up 2020.  To your knowledge, has the board
14   performed any investigations into drone-related
15   companies since 2020?
16           A.   I can't recall.  Maybe I shouldn't say
17   this.  If I see my attorney shaking his head, I'll
18   know.
19               But I have an opinion on that and it's
20   based on a longstanding practice that the board has,
21   which is we are a license-promotion state.  We are
22   referred to as an independent licensing board.  And
23   I've set my staff up -- and this is based on board
24   directives, and, again, it predates me being here.
25               We're not interested in providing or laying
```

Veritext Legal Solutions
215-341-1000   610-434-8588   302-571-0510   202-803-8830
Case 5:21-cv-00137-FL   Document 38-26   Filed 03/25/22   Page 12 of 37

J.A. 391

Page 30

1    down hurdles.  We're a pro-business state, and we're a

2    pro-business board.  One of the things that is part of

3    my regular -- just a regular part of my job is we're

4    interested in getting people in compliance, and with

5    that comes trying to get the word out.  And so when the

6    drone companies were taking off, we went to

7    professional association trade shows.  We were invited

8    speakers, and we tried to get out as much information

9    as we could as to where the board was on regulating

10   vertical technology.

11           And so in the early 2000s, "Okay.  Here's

12   fresh money.  Here's government money."  We're in it.

13   Anybody can fly a drone, and we didn't view our role

14   as, you know, the drone police.  We don't do that as

15   our job.  We viewed our job as to educate both the

16   public and the profession on where the law stands.  So

17   we spent quite a bit of time -- staffed the board,

18   solicited invitations to all these meetings, and we

19   tried to get the word out, "This is surveying.  This is

20   not surveying.  If you have questions, call us."

21           And so if I'm going to take your word for

22   it, if the drone investigations have dried out, then

23   hopefully that's a result of a lot of our efforts to

24   get the word out.  And part of the word was, "Look,

25   we've got a staff person here who's in charge of

Veritext Legal Solutions
215-341-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 5:21-cv-00137-FL   Document 38-26   Filed 03/25/22   Page 13 of 37

J.A. 392

Page 31

1    getting these set up properly.  If you want to do it,

2    call them, and they'll walk you through what the

3    process is."  We don't say, "Here's the bar.  You can't

4    get in."  We say, "These are the rules.  These are the

5    regulations.  Now we're going to walk you through it

6    and see if we can get you licensed because we want you

7    licensed."

8           Q.   That brings up another question for me.

9    Can you walk me through how one goes about getting

10   licensed as a surveyor in North Carolina?  What are the

11   main hoops you have to jump through?  What are the main

12   qualifications you have to have?

13          A.   We purposely avoid the word "hoops."  So

14   both engineers and surveyors are called the

15   three-legged stool.  It's the three E's -- education,

16   experience, and exam.  On the surveying side, it's a

17   sliding scale.  The more education you have, the less

18   experience you have.  You can be -- you can have a

19   Bachelor's of Science in Surveying in a survey related

20   field, and you only need two years of experience.  If

21   you have an associate's degree -- I don't want to

22   misspeak -- I think it's 10 years of experience.  And a

23   high school degree, you need 16 years of experience.

24   And those are two E's -- education and experience.  And

25   then the third E is exams.  There's two national exams.

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 5:21-cv-00137-FL   Document 38-26   Filed 03/25/22   Page 14 of 37

J.A. 393

Page 40

```
 1    contracts that are out there as a contractual matter
 2    require that applicants for that contract have certain
 3    licenses and certifications?
 4            A.    I don't know because that's not my end, but
 5    if I had to guess on your statement, I would say your
 6    guess is probably accurate.
 7            Q.    At least it sounds like from kind of your
 8    opinion on the GIS folks, in particular 2010, it sounds
 9    like the existence of that licensing requirement in the
10    contracts that they were trying to get might have been
11    one of the motivating forces for why they wanted to end
12    up licensed; is that right?
13            A.    Yes.  I would say yes.
14            Q.    Are you familiar -- and I wasn't until
15    yesterday, but are you familiar with this organization
16    ASPRS that Ms. Schall was talking about?
17            A.    Yes.  I mean, I'm not -- I know who they
18    are.
19            Q.    Okay.  What's your understanding of what
20    that organization is and how it operates?
21            A.    Well, I don't know anything about how they
22    operate.  This is the extent of my knowledge.  So
23    there's professional societies affiliated with
24    surveying and engineers, both on the state level and
25    the national level.  And the surveyors have an
```

Veritext Legal Solutions
215-341-1000 — 610-434-8588 — 302-571-0510 — 202-803-8830
Case 5:21-cv-00137-FL   Document 38-26   Filed 03/25/22   Page 15 of 37

J.A. 394

Page 41

1   organization called NSPS the National Society of

2   Professional Surveyors.  It's a pure professional

3   society for the surveying community.  And traditionally

4   that's -- or historically that's been through the

5   horizontal boundary surveyor.  The ASPRS is the

6   vertical surveying equivalent.  You're almost at the

7   end of my knowledge.

8          Q.   Fair enough.  I've never heard of this

9   event -- I think it's called the NC Drone Summit.  Does

10  that ring any bells for you?

11         A.   I've heard of it.  I don't know anything

12  about it.  I'm on -- and the board is on -- 100 e-mail

13  lists.  We have required continuing education in

14  North Carolina, and we have a -- when you're giving

15  continuing education in North Carolina, they request

16  our e-mails of all our licensees, and then we end up on

17  their e-mail lists.  And so we have -- I get e-mails

18  all the time from organizations I have no idea who they

19  are, and they're not to me.  They're generic e-mails.

20  And, again, that's the extent of how I know who they

21  are.

22              I will tell you, like I mentioned, I have a

23  staff person who is in charge of -- we call it firm

24  compliance.  We want to get everybody licensed.  And

25  sometimes he asks to go to events like that.  Again,

Veritext Legal Solutions
215-341-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 5:21-cv-00137-FL   Document 38-26   Filed 03/25/22   Page 16 of 37

J.A. 395

Page 42

```
 1   it's our public outreach.  I can't tell you if he's
 2   been to that meeting, but if he has, I'm not going to
 3   be surprised.  Again, it's in our outreach to say,
 4   "Hey, if you guys are doing a licensed activity and you
 5   want to get licensed, here's my card.  Call me."
 6              Q.   I may be mispronouncing his name, but
 7   Mr. --
 8              A.   Donovan [sic], yeah.
 9              Q.   All right.  Is it possible that he's
10   participated in that?
11              A.   I can or cannot tell you if he's been, but,
12   yeah.  I had name recognition.  I probably should have
13   left it at that.
14              Q.   So I think if I did my counting correctly,
15   the board produced to us in this case a total of eight
16   notices of non-compliance that have been sent to major
17   drone operators.  Does that sound right to you?
18              A.   I'm going to take your word for it.
19              Q.   We can look at them if you would like.  I
20   have 360 Virtual Drone Services; a gentleman named Mark
21   Fronrath, NC Drone Pro; Droners.io, Permatex, Isight
22   Drone Services, Charlotte UAV, and Air Source One.
23   Recognizing that there's hundreds of investigations, do
24   any of those ring a bell for you?
25              A.   No, sir.
```

Page 43

```
 1        Q.   Okay.  You should be seeing Exhibit 36 in
 2   your folder.
 3        A.   Where do you want me to click?  Maybe we'll
 4   start there.
 5        Q.   Refreshing might do it.  Are you not
 6   getting it?
 7        A.   I got it.
 8        Q.   Great.  So when you have a chance to take a
 9   look at that, I'll just ask you if you recognize it.
10        A.   Well, I recognize the letter.  I mean, if
11   the question is do I remember droners doing business at
12   droners, the answer is no, but, yeah, that's our
13   letter.
14        Q.   Okay.  And if I understand correctly, this
15   is -- kind of the point of the notice is a
16   non-compliance that was set forth.  I'll ask that
17   question again.
18             This is a notice of non-compliance that was
19   sent to Droners, LLC dba Droner.io?
20        A.   Okay.
21        Q.   Is that right?
22        A.   Sounds like it.  Yeah.
23        Q.   And you signed it, right?
24        A.   Yes, sir.
25        Q.   Okay.  All right.  I have a similar
```

Veritext Legal Solutions
215-341-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 5:21-cv-00137-FL   Document 38-26   Filed 03/25/22   Page 18 of 37

J.A. 397

Page 44

1   question about another -- all right.  I've posted

2   Exhibit 37, and similar question -- just let me know

3   when you take a look.

4           A.   Yep.  Air Source One.

5           Q.   Air Source One.  And here, this is a notice

6   of non-compliance the board issued to Air Source One,

7   LLC, right?

8           A.   Yes.  I will -- if I can add, I know you

9   spoke with David Tuttle yesterday.  David Tuttle, as

10  board counsel, he calls them "notice of

11  non-compliance."  That's actually his term.

12          Q.   Do you have a different term, or do you

13  just not have a term?

14          A.   I really don't have a term.  We don't have

15  authority over non-licensees.  I mean, again, you can

16  stop me if you want.  We're a pro-license state, so a

17  company like Air Source One, we want them to get

18  licensed.  So in a letter like this, we're trying to

19  tell them the licensure law says, A, if you want to do

20  A, you need a license, and we prefer to get you

21  licensed.  If you don't agree with us -- and that's

22  when David Tuttle lays out what the avenues are if they

23  don't agree with us.

24          Q.   All right.  And it looks like one of the

25  avenues that you lay out in these letters is if you

Veritext Legal Solutions
215-341-1000    610-434-8588    302-571-0510    202-803-8830
Case 5:21-cv-00137-FL   Document 38-26   Filed 03/25/22   Page 19 of 37

J.A. 398

Page 50

1    or the surveying side, we get some, but I cannot recall

2    us denying somebody -- well, if you have felonies

3    serious enough where there's a concern, we'll bring

4    them in for an interview.  We might ask them to get

5    some additional references.  But, yes, your answer is

6    we can consider that.  It doesn't mean you're banned.

7    The board has to consider it.

8            Q.   After the board sends out one of their

9    notices of compliance like we see here in Exhibit 37,

10   does the board then take any steps to monitor whether

11   the respondent, like, actually listens to you or

12   actually comes into compliance?

13           A.   We might do a little.  We're busy enough.

14   Like I said, we're busy enough as a reactive agency

15   instead of a proactive agency.  But if an investigator

16   is in an area where there was unlicensed practice

17   reported and it's, you know, recent and three months

18   later he's going to be back in that area for something

19   else, yes, he'll probably check.

20           Q.   Okay.  Is that, like, a form of practice,

21   or is it just every once in a while you'll happen on

22   someone that you investigated in the past?

23           A.   Like I said, we're busy enough.  We'll do a

24   cursory check, like I said, within the first quarter of

25   the year after.  But then after that, we are -- what we

Veritext Legal Solutions
215-341-1000   610-434-8588   302-571-0510   202-803-8830
Case 5:21-cv-00137-FL   Document 38-26   Filed 03/25/22   Page 20 of 37

J.A. 399

Page 51

1  rely on is the public and the profession itself, and it

2  doesn't happen.  I'm trying to think of when it

3  happened.  Nobody has ever come back to us and said

4  they're still doing it.  If they did, we would probably

5  -- we might look at things differently, but the short

6  answer is we'll look in the first quarter, and then

7  after that, we're moving on.

8       Q.  Is it your understanding that a

9  non-licensee can give an orthomosaic map to a client if

10 the non-licensee tells the client that the map is not a

11 licensed survey?

12            MR. HANNA:  Object to the form.

13            THE WITNESS:  I'm going to -- I think

14 my answer is going to be I would have to know what

15 you're describing when you say "orthomosaic map."  This

16 almost goes back to your earlier question of just

17 because it has a title block on it doesn't make it a

18 survey.

19 BY MR. GEDGE:

20      Q.  Sure.  I guess it can change a little bit.

21 Based on my conversation with Mr. Schall and other

22 documents, my understanding is that certain types of

23 orthomosaic maps do qualify as surveyed under the

24 definition that North Carolina has.  Is that your

25 understanding too?

Veritext Legal Solutions
215-341-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 5:21-cv-00137-FL   Document 38-26   Filed 03/25/22   Page 21 of 37

J.A. 400

Page 52

1          A.    Yes.

2          Q.    Okay.  So, for example, if you have a

3    digital orthomosaic map where you can make measurements

4    on it, that would be a survey, right?

5          A.    Correct.

6          Q.    So let's talk about one of those.  So a

7    digital orthomosaic map, you make measurements.  If a

8    non-licensee makes that and gives it to a client but

9    tells the client, "Listen, this is not a licensed

10   survey," does that -- is that legal?  Is it your

11   understanding that that's legal?

12                    MR. HANNA:  Object to form.

13                    THE WITNESS:  I'm going to answer it

14   the way you asked it.  It is my understanding that it's

15   not legal.

16   BY MR. GEDGE:

17         Q.    Okay.

18         A.    It's not my call to say whether that's

19   legal or not.  That's not my job.  Again, that's above

20   my pay grade.  But, yeah, what you described, it's my

21   belief that is surveying under our definition.

22         Q.    So can that non-licensee give that same

23   orthomosaic map to a client if the non-licensee puts a

24   disclaimer on the map?

25         A.    No.  It's my understanding you cannot

Veritext Legal Solutions
215-341-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 5:21-cv-00137-FL   Document 38-26   Filed 03/25/22   Page 22 of 37

J.A. 401

Page 53

1  disclaim your way out of complying with the law.

2  That's my understanding.  You cannot disclaim your way

3  out of that.

4          Q.   Okay.  What's the basis for your

5  understanding?

6          A.   You're giving that map to the public.  The

7  public is relying on you.  If you're a licensed

8  surveyor, the public is relying on you as a licensed

9  surveyor.  There's checks and balances with this

10 licensing board with the product they're giving the

11 public.

12          The public is not -- my wife does not

13 understand the standard practices of surveying.  My

14 wife does not understand 47-30.  That's the licensed

15 surveyor's job.  The public can -- when it gets super

16 technical, the public is relying on that surveyor to be

17 telling them accurate information.  And so if a person

18 gives you a map and tries to disclaim his way out of

19 what 89-C says, a member of the public is going to go,

20 "Sure.  Okay.  I believe it," and then he's going to

21 use that map in an improper way.  And it's not the

22 member of the public's fault for using it in an

23 improper way.  It's the person who gave the maps fault

24 for giving them a product that he said, "Hey, you can

25 use this any way you want," when that might not be

Veritext Legal Solutions
215-341-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 5:21-cv-00137-FL   Document 38-26   Filed 03/25/22   Page 23 of 37

J.A. 402

Page 54

1    true.  It may be true, but it might not be true either.

2    The public is not going to know.  It's not the public's

3    job to know.  It's the licensed surveyor's job to know.

4         Q.   Okay.  I want to make sure we're talking

5    about the same thing, and I think we are.  If a

6    non-licensee were to make that map, put the disclaimer

7    on, give it to a member of the public, it's your

8    understanding that that still falls within the practice

9    of surveying; is that right?

10        A.   Yeah.  It's not that he's unlicensed.  It's

11   the product that he's delivering is what we're looking

12   at.

13        Q.   And that still meets the definition of

14   surveying?

15        A.   From how you described it and from my

16   understanding, yes.

17        Q.   Okay.  Makes sense.  Would your answer be

18   different if the disclaimer said that it's a

19   non-licensed survey and should not be viewed as legally

20   authoritative?

21        A.   Yeah.  So that one I would take to the

22   board.  Like I said, it's not my role.  And when that

23   does happen -- because we actually get disclaimer

24   questions all the time, and my first stop is board

25   counsel.  The second stop is it goes to the committee

Veritext Legal Solutions
215-341-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 5:21-cv-00137-FL   Document 38-26   Filed 03/25/22   Page 24 of 37

J.A. 403

Page 55

1    of the board.  I'm not going to be able to answer that.

2          Q.   Okay.  I asked Mr. Tuttle a similar

3    question, and I understand he's the board counsel.  It

4    sounds like he didn't really have an answer to that

5    either.  Who does have the answer?

6          A.   That's the board's job.

7          Q.   Okay.  So I guess when we talk to you in

8    your capacity as the board's representative, we can get

9    back into that?

10          A.   Well, you can, but I'm probably going to

11    give you the same answer.  So the practice we have here

12    is we get questions all the time, and if we get a

13    question that's been asked and answered already, we

14    have all those policies on our website, and we'll point

15    that person to the website or if we have it someplace

16    else.

17               David Tuttle keeps, he said, 30 years'

18    worth of files where questions have been asked, and

19    they're answered on board letterhead.  And so if the

20    question has been asked and answered already, then

21    we're comfortable sending it out.  But if we can't find

22    the answer, we don't know the answer -- if I don't know

23    the answer and David Tuttle doesn't know the answer,

24    then it goes to the respective committee and the board.

25    That's their job to answer it.  If it's technical --

J.A. 404

Page 58

1    all the time when they submit it for bid.  This is not

2    for construction.  This is a bid document.  That, by

3    far, is the most common one.  I would have to pull my

4    book out and read you the others.

5           Q.   Okay.

6           A.   I heard David Tuttle's deposition

7    yesterday.  He can quote the statute by number and

8    paragraph and letter.  I cannot do that.

9           Q.   To your knowledge, has the board ever told

10   a non-licensee that it's okay for them to provide

11   orthomosaic maps to clients as long as they put certain

12   disclaimer language on it?

13          A.   Again, if somebody asked me that question,

14   I would say, "I have to see what you mean by

15   'orthomosaic.'  Tell me what you're actually doing.

16   Just don't label it 'orthomosaic.'  Tell me what you're

17   doing, and then I'll take that to the committee and the

18   board."

19          Q.   Sure.  Yeah.  Just to make sure we're on

20   the same page, I'm not asking you to speculate.  I'm

21   just asking kind of as a matter of historical fact, to

22   your knowledge, has the board ever stated that a

23   non-licensee can provide --

24          A.   Not that I'm aware of.

25          Q.   Okay.  I'm just going to ask the question

Veritext Legal Solutions
215-341-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 5:21-cv-00137-FL  Document 38-26  Filed 03/25/22  Page 26 of 37

J.A. 405

Page 59

1   so that the transcript is --

2           A.    Yeah.  Yeah.

3           Q.    I'm going to circle back.

4                 Are you aware of any instance where the

5   board has told a non-licensee that they can provide an

6   orthomosaic map to a client as long as that map

7   contained a disclaimer?

8           A.    Not that I'm aware of.

9           Q.    Is your answer the same as to 3D digital

10  models?

11          A.    Yes.

12          Q.    So for 3D digital models, you're not aware

13  of any instances where the board has told a

14  non-licensee that they can provide a client with a --

15          A.    Not that I'm aware of.

16                You know, I forgot my instruction at the

17  beginning that I'm supposed to let you finish the

18  question.

19          Q.    That's okay.  I will for Leslie's benefit

20  try to start over again.

21                For 3D digital models, you're likewise not

22  aware of any instance where the board has told a

23  non-licensee that they can provide a client with a 3D

24  digital model as long as they include certain

25  disclaimer language on it; is that correct?

Veritext Legal Solutions
215-341-1000  ~  610-434-8588  ~  302-571-0510  ~  202-803-8830
Case 5:21-cv-00137-FL   Document 38-26   Filed 03/25/22   Page 27 of 37

J.A. 406

Page 60

1          A.   Correct.

2          Q.   Okay.

3          A.   Not to my knowledge.

4          Q.   If that had ever happened, would that

5     likely be something that you would have been aware of?

6          A.   Yes.  But it doesn't mean it happened and I

7     forgot, but I would think I would have remembered.  I

8     don't recall it happening.  I like my answer.

9          Q.   Okay.  You talked about the eight or so

10    notices of non-compliance that had been sent out to

11    drone companies in recent years.  Do you remember

12    talking about those?

13         A.   Yeah.

14         Q.   And we can look at them.  We can look at

15    them directly if you would like.  As I read those

16    notices, in none of those notices did the board nor do

17    you advise the respondent that you can keep making

18    maps, you can keep doing 3D digital models, but you

19    have to include a little disclaimer on it.  None of

20    those letters include that advice to the investigation

21    respondent, did it?

22         A.   Yeah.  No, I would say that's correct.

23         Q.   Do you recall whether an investigation into

24    a drone company has ever been triggered by a complaint

25    from a dissatisfied customer of that company?

Veritext Legal Solutions
215-341-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 5:21-cv-00137-FL   Document 38-26   Filed 03/25/22   Page 28 of 37

J.A. 407

Page 61

1          A.    No.

2          Q.    Do you know that -- that's a cumbersome

3    question.  When you say "no," do you mean you just

4    don't know or that you have reason to believe that no

5    investigation into a company has been triggered by a

6    dissatisfied customer?

7          A.    So the second part, which is I don't recall

8    a complaint coming in against a drone company from a

9    dissatisfied customer.

10         Q.    Okay.  As part of the investigation into

11   360 Virtual Drone Services, do you know whether the

12   investigator interviewed any customers of 360 Virtual

13   Drone Services?

14         A.    I know he did not interview any customers.

15         Q.    As part of that investigation, did the

16   board -- this is a different question.  As part of its

17   investigation, did the board ask any customer of

18   Virtual Drone Services whether they had been

19   dissatisfied with the services they received?

20         A.    Well, the answer is no.  Again, this is

21   three or four years ago.  No.  I'm just going to go

22   with no.

23         Q.    As part of its investigation into

24   360 Virtual Drone Services, I assume that the board did

25   not ask any customer of the company whether they had

J.A. 408

Page 62

1   been harmed by the services provided by the company; is

2   that right?

3           A.   That's correct.

4           Q.   As part of its investigation, did the board

5   ask any customer whether they had been confused about

6   what services 360 Virtual Drone Services did or did not

7   offer?

8           A.   No.

9           Q.   As part of its investigation, did the board

10  ask any customer whether they had thought that

11  360 Virtual Drone Services was licensed by the board?

12          A.   No.

13          Q.   To your knowledge, in any of these

14  investigations that the board has conducted against

15  drone companies, has the board ever interviewed a

16  customer of the company that was under investigation?

17          A.   I'm trying to -- I mean, I'm trying to, in

18  my head, think about your question.  I'm going to stick

19  with no.  I can't -- nothing pops out.

20          Q.   Okay.  So for each investigation --

21          A.   Well, if I could, this is what's in my

22  mind.

23          Q.   Yeah.  Go ahead.

24          A.   So this goes back to the traditional -- not

25  traditional but usual client for an aerial or a

Page 63

1   vertical surveying company is going to be a government

2   organization, and it's not uncommon for the government

3   organization to contact us and say, "We have put out a

4   bid document, an RFQ request for qualification," and

5   their bid document will require licensed activity, and

6   non-licensed firms will bid on that work, and the

7   government entity will contact us.  So it may be a

8   little bit of a nuanced answer to your question.

9          Q.    Go ahead.

10         A.    I'm not sure that fits the meaning of what

11  you were saying as a customer, but -- so we have had

12  government organizations contact us about aerial

13  surveying firms and asking if they are licensed.

14         Q.    Okay.  I think that answers my question.

15  That leads to a follow-up question.  In those

16  circumstances, is the government entity complaining

17  that they've been hoodwinked by the unlicensed company?

18         A.    My apologies.  The answer is no.

19         Q.    Okay.  Just to make sure -- and, again, I'm

20  not trying to be -- I want to make sure I understand

21  it.

22                Those scenarios are ones where the

23  government has a list of bidders and they're -- they

24  have certain criteria that needs to be met for the

25  bidder, and they're going to you just to double-check

Veritext Legal Solutions
215-341-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 5:21-cv-00137-FL  Document 38-26  Filed 03/25/22  Page 31 of 37

J.A. 410

1   that bidder X has the credentials that the government

2   wants; is that right?

3          A.    Almost correct.  Usually the government --

4   we have an online license lookup, and they'll have

5   checked, and they'll only call us about the companies

6   that they know aren't licensed.  They'll say,

7   "Hey, these guys are bidding for work, and they're not

8   licensed."

9          Q.    So it's kind of a heads-up?

10         A.    It's more of a referral than a heads-up.

11         Q.    Okay.  It's done a little bit on casual

12  terms?

13         A.    Yes.

14         Q.    So for the full-blown investigations that

15  we've identified against drone companies, for any one

16  of those if the investigator had interviewed a customer

17  of the company under investigation, am I right that a

18  record of that interview with the customer would have

19  been made part of the investigative report?

20         A.    Yes, 100 percent.

21         Q.    So if we look at the investigative reports

22  for these various investigations into drone companies

23  and there's no record of an interview with any

24  customer, we can say the investigator did not interview

25  any customers as part of the investigation?

Veritext Legal Solutions
215-341-1000    610-434-8588    302-571-0510    202-803-8830
Case 5:21-cv-00137-FL   Document 38-26   Filed 03/25/22   Page 32 of 37

J.A. 411

Page 65

1        A.   Correct.

2        Q.   Okay.  Why don't we take another five

3  minutes or so.  I think that we're almost wrapped up

4  with this part of the depo.  We can come back and wrap

5  it up and move over to the next section.

6        A.   Sound goods.  Thank you.

7                (A break was taken.)

8                MR. GEDGE:  Just for clarity, Doug, I

9  think those are the questions for the personal capacity

10  part of the deposition.

11                MR. HANNA:  We can close it out.  I

12  have no further questions for Mr. Ritter.

13                  (Proceedings concluded at 1:52 p.m.)

14                  (Signature reserved.)

15                  (Exhibits 31, 36-40 premarked.)

16

17

18

19

20

21

22

23

24

25

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830
Case 5:21-cv-00137-FL  Document 38-26  Filed 03/25/22  Page 33 of 37

J.A. 412

Page 66

```
1  CERTIFICATE OF REPORTER
2  STATE OF NORTH CAROLINA  )
3  COUNTY OF WAKE           )
4
5          I, Leslie Christian Lentkowski, the officer
6  before whom the foregoing remote videoconference
7  deposition was taken, do hereby certify that the
8  witness whose testimony appears in the foregoing remote
9  videoconference deposition was taken by me to the best
10 of my ability and thereafter reduced to typewriting
11 under my direction; that I am neither counsel for,
12 related to, nor employed by any of the parties to the
13 action in which this remote videoconference deposition
14 was taken, and further that I am not a relative or
15 employee of any attorney or counsel employed by the
16 parties thereto, nor financially or otherwise
17 interested in the outcome of the action.
18
19          4th day of February, 2022.
20
21
22                                  Leslie Christian Lentkowski
                                    _____
23                                  LESLIE CHRISTIAN LENTKOWSKI
                                    Notary Public in and for
24                                  County of Wake
                                    State of North Carolina
25                                  Notary Public No. 201221300088
```

```
                                                   Page 67
 1      Douglas Hanna, Esquire

 2      dhanna@ghslawfirm.com

 3                   February 4, 2022

 4      RE: 360 Virtual Drone Services LLC Et Al. v. Andrew L. Ritter

 5          1/20/2022, Andrew Ritter (#5024807)

 6          The above-referenced transcript is available for

 7      review.

 8          Within the applicable timeframe, the witness should

 9      read the testimony to verify its accuracy. If there are

10      any changes, the witness should note those with the

11      reason, on the attached Errata Sheet.

12          The witness should sign the Acknowledgment of

13      Deponent and Errata and return to the deposing attorney.

14      Copies should be sent to all counsel, and to Veritext at

15      cs-midatlantic@veritext.com

16

17        Return completed errata within 30 days from

18      receipt of testimony.

19        If the witness fails to do so within the time

20      allotted, the transcript may be used as if signed.

21

22                   Yours,

23                   Veritext Legal Solutions

24

25
```

J.A. 414

```
                                                        Page 68
 1     360 Virtual Drone Services LLC Et Al. v. Andrew L. Ritter

 2     Andrew Ritter (#5024807)

 3                     E R R A T A   S H E E T

 4     PAGE_____ LINE_____ CHANGE_____

 5     _____

 6     REASON_____

 7     PAGE_____ LINE_____ CHANGE_____

 8     _____

 9     REASON_____

10     PAGE_____ LINE_____ CHANGE_____

11     _____

12     REASON_____

13     PAGE_____ LINE_____ CHANGE_____

14     _____

15     REASON_____

16     PAGE_____ LINE_____ CHANGE_____

17     _____

18     REASON_____

19     PAGE_____ LINE_____ CHANGE_____

20     _____

21     REASON_____

22

23     _____     _____

24     Andrew Ritter                          Date

25
```

```
                                              Page 69
1    360 Virtual Drone Services LLC Et Al. v. Andrew L. Ritter
2    Andrew Ritter (#5024807)
3              ACKNOWLEDGEMENT OF DEPONENT
4       I, Andrew Ritter, do hereby declare that I
5    have read the foregoing transcript, I have made any
6    corrections, additions, or changes I deemed necessary as
7    noted above to be appended hereto, and that the same is
8    a true, correct and complete transcript of the testimony
9    given by me.
10
11   _____        18 Feb 2022
12   Andrew Ritter                      Date
13   *If notary is required
14                        SUBSCRIBED AND SWORN TO BEFORE ME THIS
15                        18th DAY OF February , 20 22.
16
17
18
19                        NOTARY PUBLIC
20
21
22
23
24
25
```

CORA S. HOUSTON
NOTARY
My Commission Expires
01-01-2026
PUBLIC
WAKE COUNTY, N.C.

# Plaintiffs' Summary-Judgment Appendix Exhibit 27

Jones Map with No Scale Bar

(Schall Dep. Ex. 34)



HARBOR FREIGHT

**Exhibit**
PI 0034

# Plaintiffs' Summary-Judgment Appendix Exhibit 28

Defendants' Response to Plaintiffs' Interrogatory 10 (with Verification)

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
CASE NO. 5:21-cv-0137-FL

| | | |
|---|---|---|
| 360 VIRTUAL DRONE SERVICES LLC and MICHAEL JONES, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | |
| ANDREW L. RITTER, in his official capacity as Executive Director of the North Carolina Board of Examiners for Engineers and Surveyors; and JOHN M. LOGSDON, JONATHAN S. CARE, DENNIS K. HOYLE, RICHARD M. BENTON, CARL M. ELLINGTON, JR, CEDRIC D. FAIRBANKS, BRENDA L. MOORE, CAROL SALLOUM, and ANDREW G. ZOUTWELLE, in their official capacities as members of the North Carolina Board of Examiners for Engineers and Surveyors, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **DEFENDANTS' RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES** |
| Defendants. | ) | |

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Defendants respond as follows to Plaintiff's First Set of Interrogatories as follows:

## INTERROGATORY 1

Identify the Board investigator who met with Michael Jones in early 2019.

**RESPONSE: William P. Casey.**

1

digital model that has previously been created. [Deposition of Michael Jones at p. 189]. Without more information as to what is involved in "creating, processing, and disseminating 3 D digital models," Defendants cannot provide a response to Interrogatory No. 9 and object to the entirety of Interrogatory No. 9.

## INTERROGATORY 10

State each governmental interest that you contend is advanced by preventing Plaintiffs from creating, processing, and disseminating data about land and structures (including data about distances, coordinates, elevations, and volumes).

RESPONSE: The North Carolina Legislature designated the practice of land surveying as a profession in 1921. *See* Chapter 89C, the Engineering and Land Surveying Act (the "Act"). This is a "practice act." Only persons duly licensed by the Board are authorized to practice land surveying or offer to practice land surveying as defined in the Act or to hold themselves out as a land surveyor. N.C.G.S. § 89C-23. The Act establishes a North Carolina Board of Examiners for Engineers and Surveyors (the "Board") to administer the provisions of the Act. *See* N.C.G.S. § 89C-4. "States have a compelling interest in the practice of professions within their boundaries, and that as part of their power to protect the public health, safety, and other valid interests they have broad power to establish standards for licensing practitioners and regulating the practice of professions." *Goldfarb v. Va. State Bar,* 421 U.S. 773, 792, 95 S. Ct. 2004, 44 L. Ed. 2d 572 (1975).

The Legislature designated the practice of Land Surveying as a profession. *See* N.C.G.S. § 89C-3(7)(a). "Providing professional services" in the field of land surveying requires licensure. The services enumerated by the legislature include "consultation, investigation, testimony, evaluation, planning, mapping, assembling, and interpreting reliable scientific measurements and information relative to the location, size, shape or physical features of the earth, improvements on the earth, the space above the earth, or any part of the earth, whether the gathering of information for the providing of these services is accomplished by conventional ground measurements, by aerial photography, by global positioning via satellites, or by a combination of any of these methods, and the utilization and development of these facts and interpretations into an orderly survey map, plan, report, description, or project." The purpose of the Act is to "*safeguard life, health, and property, and to promote the public welfare.*" N.C.G.S. § 89C-2. The Legislature declared that the practice of land

13

surveying is "subject to regulation in the public interest." *Id.* The Legislature intended its rules on the practice of land surveying to protect property interests in North Carolina. *In re Suttles Surveying, P.A.*, 227 N.C. App. 70, 742 S.E.2d 574 (2013). Indeed, under N.C.G.S. §§ 89C-2 and 89C-3, practitioners in the field of land surveying have a legal duty to safeguard the property of the public when performing their duties. *Associated Indus. Contrs., Inc. v. Fleming Eng'g, Inc.*, 162 N.C. App. 405, 413, 590 S.E.2d 866, 872 (2004).

The practice of land surveying includes the following:

1.  *Locating, relocating, establishing, laying out, or retracing any property line, easement, or boundary of any tract of land;*

2.  *Locating, relocating, establishing, or laying out the alignment or elevation of any of the fixed works embraced within the practice of professional engineering;*

3.  *Making any survey for the subdivision of any tract of land, including the topography, alignment and grades of streets and incidental drainage within the subdivision, and the preparation and perpetuation of maps, record plats, field note records, and property descriptions that represent these surveys;*

4.  *Determining, by the use of the principles of land surveying, the position for any survey monument or reference point, or setting, resetting, or replacing any survey monument or reference point;*

5.  *Determining the configuration or contour of the earth's surface by measuring lines and angles and applying the principles of mathematics or photogrammetry;*

6.  *Providing geodetic surveying which includes surveying for determination of the size and shape of the earth both horizontally and vertically and the precise positioning of points on the earth utilizing angular and linear measurements through spatially oriented spherical geometry; and*

14

> 7. *Creating, preparing, or modifying electronic or computerized data, including land information systems and geographic information systems relative to the performance of the practice of land surveying.*

*See* N.C.G.S. § 89C-3(7).

The Legislature has expressly endowed the Board with the authority to promulgate Rules of Professional Conduct and to discipline licensees that violate those rules. The Board has therefore established standards of practice for land surveyors in order to better regulate the practice of land surveying. *See* 21 N.C.A.C. 56.1601.

Public policy considerations that justify the standards for licensing practitioners and regulating the practice of land surveying include, but are not limited to, promoting the public confidence in the land surveying profession and to safeguard the welfare of the public and persons with interest in real property. Each activity included in the definition of surveying requires the knowledge of measurement science and the expertise of a licensed professional, no matter what area of surveying practice is being performed. The performance of such activities by land surveying professionals protects the public by promoting accurate work product, thereby protecting the legal rights of both the landowner and the public at large.

Moreover, the Act makes it clear that the Legislature's intent in the "representation," "conveying," and "holding out" provisions of the chapter was to protect the public from misrepresentations of professional status or expertise. *North Carolina State Board of Registration for Professional Engineers & Land Surveyors v. International Business Machines Corp.*, 31 N.C. App. 599, 605, 230 S.E.2d 552, 557 (1976).

The profession of land surveying is a regulated profession in North Carolina, as well as in each State in the United States. The purpose of the Act is plainly set forth in N.C.G.S. § 89C-2. "The Supreme Court in *McCullen* recognized that protecting property rights is a legitimate government interest." *People for the Ethical Treatment of Animals, Inc. v. Stein*, 466 F.Supp.3d 547, 577 (M.D.N.C. June 12, 2020); *see also McCullen*, 573 U.S. at 486-87 ("We have, moreover, previously recognized the legitimacy of the government's interest[] in . . . protecting property rights . . . ."). One of the purposes of the Act is to protect property interests in North Carolina. The Legislature intended its rules on the practice of land surveying to protect property interests in North Carolina. *In re Suttles Surveying*, 227 N.C. App. at 76.

In December 2018, the Board authorized an investigation to determine if 360 Virtual Drone Services, LLC is in violation of the Act for practicing or offering to practice land surveying in North Carolina without a license. The report of investigation found that 360 Virtual Drone Services, LLC markets the company as providing Mapping and Surveying services. This was confirmed at the deposition of Michael Jones:

> Q. And in fact, on that Droner.io website, you were advertising the services of, quote, "surveying & mapping," close quote; correct?
> A. Yes.
> Q. And then on that website, were you advertising providing orthomosiac maps?
> A. Yes.

[Deposition of Michael Jones at p. 56]. In order to perform services, 360 Virtual Drone Services, LLC used software called DroneDeploy. By using DroneDeploy, 360 Virtual Drone Services, LLC provided what it called measurable maps:

> Q. I'm trying to understand - - you said "So we of course offer" and then you use the term "orthrectified mapping." What is that?
> A. That is the process of the mapping putting - - put together in an orthomosiac map; so that's multiple pictures being used to create one picture.
> Q. And you say these are measurable maps; correct?
> A. Yes.

[Deposition of Michael Jones at p. 68]. Plaintiffs do not have any formal training in the use of Drone Deploy or the creation of orthomosiac maps. [Deposition of Michael Jones at p. 82].

With respect to the accuracy, Plaintiffs report the following: "These maps do have a relative accuracy of 1 to 3 inches."

> Q. How are you able to make that claim?
> A. That's the claim from the software, Pix4D and DroneDeploy, that creates the orthomosiac maps from the data that I collect.
> Q. And then you go on to tell the client: "This means the measurable points on the map are

16

> within 1 to 3 inches accurate to a ground
> measurement."
>
> A.     Yes.

[Deposition of Michael Jones at p. 61]. Offering mapping and measurements relative to the location, size, shape or physical features of the earth to prospective clients is the practice of land surveying. Offering mapping and measurements to a stated accuracy or for an authoritative purpose to prospective clients is the practice of land surveying. Offering services that fall under the category of land surveying without a license fails to protect the public from unqualified persons.

<u>INTERROGATORY 11</u>

State each governmental interest that you contend is advanced by preventing Plaintiffs from creating and disseminating information about the approximate boundaries of property (including by drawing lines on marketing images to approximate property boundaries).

RESPONSE:   The Legislature designated the practice of Land Surveying as a profession.   *See* N.C.G.S. § 89C-3(7)(a).  "Providing professional services" in the field of land surveying requires licensure. The services enumerated by the legislature include "consultation, investigation, testimony, evaluation, planning, mapping, assembling, and interpreting reliable scientific measurements and information relative to the location, size, shape or physical features of the earth, improvements on the earth, the space above the earth, or any part of the earth, whether the gathering of information for the providing of these services is accomplished by conventional ground measurements, by aerial photography, by global positioning via satellites, or by a combination of any of these methods, and the utilization and development of these facts and interpretations into an orderly survey map, plan, report, description, or project." The purpose of the Act is to "*safeguard life, health, and property, and to promote the public welfare.*"  N.C.G.S. § 89C-2.  The Legislature declared that the practice of land surveying is "subject to regulation in the public interest."  *Id.*  The Legislature intended its rules on the practice of land surveying to protect property interests in North Carolina. *In re Suttles Surveying, P.A.*, 227 N.C. App. 70, 742 S.E.2d 574 (2013).  Indeed, under N.C.G.S. §§ 89C-2 and 89C-3, practitioners in the field of land surveying have a legal duty to safeguard the property of the public when performing their duties. *Associated Indus.*

17

Services LLC) to clients, including real-estate developers, property managers, realtors, entertainment companies, retail stores, and individuals." [ECF Doc. 1 at ¶ 24].

The subsequent investigation conducted by the Board involves 360 Virtual Drone Services, LLC. There is no case or controversy involving Michael Jones. There was no investigation or letter issued to Michael Jones individually.

## INTERROGATORY 13

State all facts supporting the Board's determination in 2019 that 360 Virtual

Drone Services LLC had engaged in the unlicensed practice of land surveying.

RESPONSE: Defendants respond that, pursuant to Rule 33(c) of the Federal Rules of Civil Procedure, please see all documents produced by Defendants in the mandatory initial disclosures that involve the investigation of 360 Virtual Drone Services, LLC and are identified as NCBELS 000001 to NCBELS 000074. The answer to this interrogatory may be derived or ascertained from the records produced in this case by Defendants and the burden of deriving or ascertaining the answer is substantially the same for Plaintiffs as for Defendants. See also Exhibit 1 to the Complaint. Finally, see Response to Interrogatory Number 10.

This the 23rd day of August, 2021.

GRAEBE HANNA & SULLIVAN, PLLC

/s/ Douglas W. Hanna
Douglas W. Hanna, NCSB #18225
4350 Lassiter at North Hills Ave., Suite 375
Raleigh, NC 27609
Telephone: (919) 863-9091
Facsimile: (919) 424-6409
*Attorneys for Defendants*

20

## **VERIFICATION**

Andrew Ritter, being first duly sworn, deposes and says that he is the Executive Director of the North Carolina Board of Examiners for Engineers and Surveyors and has read **DEFENDANTS' RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES** served on August 23, 2021 and knows the contents thereof, and that the responses to the interrogatories are true to the best of his personal knowledge, and as to those matters as to which he has no personal knowledge, he believes them to be true.

_____
Andrew Ritter

Wake County, North Carolina

Sworn to and subscribed before me
on this the 22ⁿᵈ day of December, 2021.

_____
Notary Public

My Commission Expires: _1-1-2026_

# Plaintiffs' Summary-Judgment Appendix Exhibit 29

## Firmatek Investigative Report

**NORTH CAROLINA
BOARD OF EXAMINERS FOR
ENGINEERS AND SURVEYORS**

**INVESTIGATIVE REPORT**

Reference:  Case No. V2016-041
            Firmatek, LLC [Non-licensed]
Report by:  Clyde A. Alston, Board Investigator
Date:       May 16, 2017

## SYNOPSIS

This matter is the result of sworn to and notarized charges filed with the Board by Donald E. "Gene" Fine, Jr., PLS [L-3697] of Raleigh, NC.  It is alleged that Firmatek, LLC may be in violation for practicing or offering to practice land surveying in North Carolina without a license as required [G.S. 89C-24, 57D, and 55B].  It is also alleged that an employee of the company, Hayes Wilkinson, is using the title "Survey Technician" on a North Carolina project in violation of licensing required by G.S. 89C-23.  Additionally, based upon a review of the firm's web site (www.firmatek.com) it appears that the company offers services that may fall within the definition of land surveying [G.S. 89C-3(7)] to include but not limited to Stockpile Measurement and 3D Mapping.  The complainant contends that Mr. Wilkinson provided him a business card and advised that the company was measuring open pits and slurry piles in the region.

Ms. Lauren Elmore, President of Firmatek, LLC, was notified of the charges through certified Board correspondence.  She responded to the charges in writing.  Then on September 13, 2016, attorney Brian R. Brown notified this investigator by e-mail (evidence #4) that Firmatek, LLC had retained his services to provide further assistance regarding the charges against the firm.

On January 18, 2017, Mr. Brown provided a supplemental response.  He wrote, "Firmatek's activities include measuring and documenting inventory stockpiles within the mining, construction and solid waste industries.  These measurements are used by Firmatek's clients to assist with their inventory management in the ordinary course of their business and do not serve as the basis for financing or sale transactions on which the public relies."  Therefore, the activities do not fall within the definition of the practice of land surveying.  As for Mr. Hayes Wilkinson using "Survey Technician" on business cards, it is their belief this was not a violation, but nevertheless, Mr. Wilkinson will cease using any of his business cards with the title.  On May 4, 2017, during the interview, Ms. Elmore indicated that Mr. Hayes was no longer an employee of Firmatek, LLC.

Board Investigator Clyde Alston interviewed the following individuals during the investigation:

1

- Donald E. "Gene" Fine, Jr., PLS [L-3697]  – complainant, interviewed on September 1, 2016.
- Thomas J. Fields, PLS [L-2906] – witness, interviewed on September 20, 2016.
- Lauren Elmore – President of Firmatek, LLC, respondent, interviewed on May 4, 2017.

There are no violations listed on the Board's database or NCEES Enforcement Exchange web site against Firmatek, LLC.

This matter is pending consideration by the Land Surveying Review Committee of the North Carolina Board of Examiners for Engineers and Surveyors.

## DETAILS OF INVESTIGATION

Report of Interview with Donald E. "Gene" Fine, Jr., PLS [L-3697] on September 1, 2016
24661 NC Highway 8 (Primary)
Denton, NC 27239

5451 Markridge Road, A8121 (Secondary)
Raleigh, NC 27607
336/250-9632 – mobile
finede@yahoo.com – e-mail

Board Investigator Clyde Alston conducted an interview with Mr. Fine at the rental office at Post Parkside at Wade where he resides.  Mr. Fine said Monday through Thursday he lives in Raleigh and the rest of the week he is in Denton, NC.  For the past two years Mr. Fine has worked for Wake Technical Community College as its Lead Geomatics Instructor.  Prior to his current job Mr. Fine worked for the United States Army as a hospital administrator.  He said he served three combat tours in Iraq and Bosnia.  As for doing land surveying, Mr. Fine said occasionally he works for his friend, James L. Strome, PLS [L-3682] at A Strome Land Surveying Company [F-0647].  He said Mr. Strome is a one-man operation and calls him whenever he needs an extra field crewman.  Mr. Fine said he does this to "be in the woods" more than anything else.

Mr. Fine said that for several months he noticed a Firmatek, LLC truck parked where he lives.  Attached to the truck was some sort of digital scanner apparatus that telescoped up to look down on a site.  He was curious about the company so he did a Google search of Firmatek, LLC and noticed mapping services in North Carolina on the search page.  He said when he noticed they did mapping in North Carolina he checked to see if they were licensed with the Board and discovered they weren't, so his plan was to file a complaint against the company.

Mr. Fine said just before he filed his complaint he observed a man, later identified as Hayes Wilkinson, walking away from this particular truck.  Mr. Fine directed his conversation towards the apparatus on the truck, as well as, the type of work Mr. Wilkinson did.  Mr. Wilkinson told him the apparatus holds a digital scanner that travels all over the region measuring open pits and slurry piles.  When asked whether he was a Professional Land Surveyor, Mr. Wilkinson responded that he was not a surveyor and did not have to be one for the type of work he does in the field.  Mr. Wilkinson gave Mr. Fine one of his business cards (evidence #1).

Mr. Fine said that the following day he talked with Byron J. Latil, PLS [L-3571], his department head, about the conversation he had with Mr. Wilkinson.  Mr. Fine wanted a second opinion as to whether Firmatek, LLC was offering surveying in North Carolina without a license.  Together they looked at the company's web site and noticed stockpile measurement and mapping prominent on each of the web pages.  Comparing their services with the Board Rules, and the North Carolina General Statutes, both agreed the services fell within the purview of practicing land surveying.  What appeared

most egregious was Mr. Wilkinson handing out business cards (evidence #1) to the public identifying himself as a survey technician. He said neither Mr. Wilkinson nor Firmatek, LLC are licensed to practice land surveying in North Carolina, which was why he eventually reported the matter to the Board.

Mr. Fine said in addition to offering land surveying, Firmatek, LLC's web site also appears to offer engineering services because they have an office in Raleigh. He said from the information contained on its web site they have a Professional Engineer on staff, Caleb Cass, Director of Engineering, who does their engineering work. According to their web site, under the "Our Team" page (evidence #2.7), Mr. Cass is licensed as a Professional Engineer in Texas. His background (evidence #2.7) describes he *spent the last five years performing engineering, mapping and consulting work primarily for mining, solid waste and engineering clients*. Mr. Fine said there is nothing on their web site indicating they don't offer engineering in North Carolina, so to him it looks like they provide engineering. In addition, its two key members (evidence #2.7), Dustin Dudley, Director of Business Development, and Jeremy Wilson, Senior Operations Manager, both live in North Carolina.

Mr. Fine said if Firmatek, LLC's defense is they aren't doing engineering here, well if they are providing any engineering product and operating in North Carolina then they are. The cut and fill volumes they advertise is what engineers and surveyors do. The surveyors usually map the area and the engineers compute the cut and fill calculations. He said the experience for this is straight up engineering. Also, the drainage studies Firmatek, LLC offers is both civil and environmental engineering. He said there are a lot of regulatory demands that are required for conducting drainage studies.

As for measuring volume above or below ground, this requires having a surveyor on staff and is within the purview of land surveying. He said he has a friend, Thomas J. Fields, PLS [L-2906] that does volume calculations at landfills. He suggested this investigator contact Mr. Fields to get more information regarding measuring stockpiles at landfills.

In closing, Mr. Fine said Firmatek, LLC is probably doing a lot of work in North Carolina. Based on what he saw on Firmatek, LLC's web site he was obligated to file a complaint against the company for not being licensed with the Board.

<u>Report of Interview with Thomas "Tommy" J. Fields, PLS [L-2906] on September 20, 2016</u>
Wright & Fields Land Surveying [F-1055]
P.O. Box 933 (mailing address)
Troy, NC 27371

1340 Albemarle Road (physical)
Troy, NC 27371
910-572-2449 – office
tfields1256@embarqmail.com – e-mail

Board Investigator Clyde Alston conducted an interview with Mr. Fields at his office.  Mr. Fields said he earned an Associate of Science in Surveying Technology and Civil Engineering Technology from Sandhills Community College in 1983.  He worked in the surveying profession for three years before receiving his North Carolina Professional Land Surveyor's license in 1984.  He is not licensed in any other states and does not have any other professional licenses.  He said he worked for his father-in-law, James L. Wright, PLS [L-1418 – Retired] before Mr. Wright retired in 2005.  He bought Wright & Fields Land Surveying and is the sole proprietor of the company.  He operates one crew.  He uses a Nikon total station with data collector and Trimble robotic instrument.  He said he does boundary, loan, location, as-built, and cell construction surveys, which involves measuring stockpiles at landfills.  He does one or two cell construction projects a year, which take four to six months to complete.

Mr. Fields said he's done stockpile measurements at solid waste landfills since the 1990s.  He's worked at the following landfill sites: Uwharrie Environmental; Foothills Environmental; Upper Piedmont Environmental; Republic Services Upper Piedmont Environmental; and East Carolina Environmental.  He said if Firmatek, LLC is doing cell construction surveys, which is a certification process, then they have to be licensed with the Board.

Mr. Fields explained the process he goes through doing volume calculations at these sites.  First, the engineering firm gives him their pre-design data, which shows the cell areas to be developed.  The information he gets contains contour lines with elevation data, key reference points, grid coordinates, etc.  He said he takes the data and does his own horizontal and vertical computations.  Afterwards, he prepares a pre-grid topographic survey and gives that to the engineering firm for their review and approval.  Once approved, the grading contractor uses his (Fields) survey to excavate the cell. After the excavation is done an expansive clay liner is placed and covered with a high-density polyethylene 60-mil geomembrane plastic.  A layer of protective gravel is added and waste begins to be placed into the new cell.  At each phase they measure the volume of what's added to the site.  He said the process has many steps and takes several months before it's completed.  He went on to say if Firmatek, LLC is doing cell construction then they're doing land surveying because their drawings have to be signed and sealed.

<u>Report of Telephone Interview with Lauren Elmore on May 4, 2017</u>
Firmatek, LLC
9360 Corporate Drive, Suite 103
Selma, TX 78154
650/678-0219 – mobile
210/651-4990 – office
lauren.elmore@firmatek.com – email

Brian R. Brown and Susan K. Hackney, Attorneys at Law
K&L Gates LLP
430 Davis Drive, Suite 400
Morrisville, NC 27560
919/466-1109 – office
919/831-7040 – fax
brian.brown@klgates.com – email

Board Investigator Clyde Alston conducted a telephone interview with Ms. Elmore. Ms. Elmore was at her office in Texas.  Mr. Brown and Ms. Hackney were also present during the interview but at their office in Morrisville, NC.

Ms. Elmore is president and part owner of Firmatek, LLC.  She said she was part of an investment team that acquired Firmatek, LLC in October 2014.  Ms. Elmore has a Bachelor of Administration in Economics from Stanford University, and a Juris Doctorate and Master of Business Administration from Indiana University.  She said she works on the overall general strategies of the company.  Her job is to improve company profits.  She said sometimes she makes presentations that relate to inventory management.  Her presentations are given to those within the aggregate industry.  She went on to say none of her speaking engagements have been in North Carolina.

**INVESTIGATOR'S NOTE**:  According to the North Carolina Department of the Secretary of State's web site (evidence #3), Firmatek, LLC filed its application for a Certificate of Authority on June 29, 2016, which was after receiving the Board's case-opening letter.

Ms. Elmore confirmed they have seven offices throughout the United States including one in Raleigh, NC.  Ms. Elmore confirmed its office address was 3816 Sincerity Street, Suite 100, Raleigh, NC but it has since moved.  She said she doesn't know the address of their new office.

Ms. Elmore said the company provides stockpile measurements, drone solutions, mine mapping, landfill mapping, 3D underground scanning, and engineering services as indicated on its web site; however, stockpile management was the only service offered in North Carolina.  With the exception of making presentations and its web site, they advertise through word of mouth and purchasing agents.

6

Ms. Elmore said Firmatek, LLC is an inventory management company. Their services involve providing volumetric information to clients about their inventory. Their field technicians measure and document inventory stockpiles within the mining, construction and solid waste industries using mobile laser scanners and drones for data collection. She adds the Federal Aviation Administration has given Firmatek, LLC an exemption to fly drones to capture aerial data and imaging.

Ms. Elmore said for the most part their technicians have bachelor's degrees and some basic computer knowledge. The training they go through requires shadowing one of their senior technicians. This helps them know their equipment and the software they'll be using before working alone. The company uses Riegl laser scanners and small drones to take measurements of the land. She said once the data is collected it is uploaded to Firmatek, LLC's 3D point cloud where it is processed by one of their team members. Subsequent measurements allow the client to compare previous measurements of their inventory. In that regard, the client is able to determine if there are leakages, washouts or inefficient practices that could damage their inventory.

Ms. Elmore stated the technology and equipment they use provides a high degree of accuracy in measuring stockpiles. She said the data accuracy is +/- four inches. She said the equipment manufacturer describes the level of accuracy on its own equipment, which is what they go by. As for certifying their reports, Ms. Elmore said they don't certify any of their reports. Ms. Elmore said she doesn't think they are doing any work in North Carolina at this time and does not recall their last project in the state.

Ms. Elmore reiterated the 3D mapping, landfill mapping, underground scanning, and engineering are not done in North Carolina. Ms. Elmore confirmed that Caleb Cass is the Director of Engineering for Firmatek, LLC and is their only Professional Engineer. He performs engineering, mapping and consulting work primarily for mining, solid waste, and engineering clients. She said Mr. Cass has one client in Texas he stamps work for but other than that he doesn't certify anything.

On May 10, 2017, this investigator received a follow-up call from Mr. Brian Brown and Susan Hackney regarding several questions Ms. Elmore didn't know the answer to. Mr. Brown indicated Ms. Elmore didn't have a lot of the information at her fingertips during the interview. He said they would provide a follow-up letter addressing those specific questions and any others the Board may have. He would respond by May 22, 2017. Additionally, with regard to Firmatek, LLC's web site, Mr. Brown said they would extract some of the information as to what services are and are not offered in North Carolina. He said the web site is not tailored to individual states; instead, it refers to a national operation. He said he would send to David Tuttle for review and approval any modifications regarding the firm's web site.

**INVESTIGATOR'S NOTE**: This investigator sent Mr. Brown an e-mail (evidence #5) on "Volume Computation Surveys Policy" and "GIS Inclusions/Exclusions Guidelines" to refer to if he had questions.

## EVIDENCE

1.    Hayes Wilkinson's business card, Firmatek, LLC, with the title, SURVEY TECHNICIAN, received on June 6, 2016 from the complainant.

2.    Packet of information obtained by Clyde Alston from Firmatek, LLC's web site, consisting of the following:

    2.1    "**Home Page**" contained the following: Stockpile Measurement and 3D Mapping for the Mining, Construction & Solid Waste Industries; Stockpile Measurement; 3D Mine Mapping; Topographic Mapping for Landfills; Drones for the Mining Industry; As-Builts, Overburden Removal, Density Testing, and More; and Giving Companies that Build the World Supreme Confidence.

    2.2    "**Stockpile Measurement**" page includes the following: LIDAR 3D Mapping Technology; Stockpile Reports; and Stockpile Management Consulting.

    2.3    "**3D Mapping**" page, *Other 3D Mapping Solutions* includes information on Cut & Fill Volumes' Drainage Studies; Changes in Topography; Overburden Removal Calculations; Roadway Scans; and As-Built Scans.

    2.4    "**3D Mapping**" page, *Mine Mapping* includes information on 3D Mine Mapping; Engineering Services; Track Your Operation; Core Reserve Calculations and Mineable Modeling; and Underground Mine Mapping.

    2.5    "**3D Mapping**" page, Landfill Mapping includes information on Landfill Mapping Services; Landfill Operational Calculations; and Additional Landfill Services.

    2.6    "**Drone Solutions**" page includes Drone Data Processing Solutions; Drone Leasing Program; and Drone Service Solutions.

    2.7    "**About Us**" page includes Our Purpose; Our Values; Our Story; Why Partner with Us?; and Our Team.

3.    A copy of the Firmatek, LLC "**APPLICATION FOR THE CERTIFICATE OF AUTHORITY,**" filing date June 29, 2016, received from the North Carolina Secretary of State's web site by Clyde Alston.

4.    E-mail correspondence dated September 20, 2016 through April 21, 2017 between Clyde Alston and Brian R. Brown, RE: Case No. V2016-041 – Firmatek, LLC.

5.    E-mail dated May 10, 2017 from Clyde Alston to Brian Brown with the following attachments: "Volume Computation Surveys Policy" and "GIS Inclusions/Exclusions Guidelines."

9

J.A. 437

# Plaintiffs' Summary-Judgment Appendix Exhibit 30

Lappert Smith/Charlotte UAV Investigative Report

## NORTH CAROLINA
## BOARD OF EXAMINERS FOR
## ENGINEERS AND SURVEYORS

## INVESTIGATIVE REPORT

Reference:    Case No. V2017-025
              Lappert Smith Industries, LLC, d/b/a Charlotte UAV [Non-licensed]
Report by:    Clyde A. Alston, Board Investigator
Date:         December 4, 2017

### SYNOPSIS

This matter is the result of sworn to and notarized charges filed with the Board by Jonathan T. King, PLS [L-4780] of Wilmington, NC. It is alleged that Lappert Smith Industries, LLC may be in violation of G.S. 89C-24, 55B and 57D for practicing or offering to practice surveying and engineering without being licensed with this Board. The allegations pertain to the offering of surveying services on the firm's web site (charlotteuav.com), including the services offered on the Aerial Mapping page.

In addition, the firm's proposal to Mecklenburg County GIS dated February 6, 2017, Re: Requests for Quotes Unmanned Aerial Vehicle Collection Efforts Services - #487-MN-036, indicates the company has performed engineering and surveying services in North Carolina. For example, in Section 2.3, Past Projects, the firm has reportedly provided: accurate aerial maps; creation of break lines, reference points, digital elevation models, contour lines, and calculations; and analysis of volume stockpiles. Further, in Section 3, References, it appears the company has provided aerial mapping, photogrammetry and engineering services according to client testimonials.

Lappert Smith Industries, LLC was notified of the complaint through certified Board correspondence. Douglas J. Brocker, of The Brocker Law Firm, P.A., responded on its behalf. Mr. Brocker wrote that Lappert Smith Industries, LLC uses unmanned technology to collect data for others. Often, they work with licensed surveyors by collecting certain data at the direction of and use by the surveyor. The company does not individually analyze any of the aerial imagery data it collects, nor determines any property lines or similar assessments and calculations.

With respect to its web site and proposal, Mr. Brocker wrote that much of the work described was done or is expected to be done at the direction of a licensed surveyor, although, this distinction may not have been clear in Lappert Smith Industries, LLC's bid proposal's Past Projects or Reference section or on the company's web site. He writes that Lappert Smith Industries, LLC is receptive to changes the Board recommends to its operation, public statements, and information contained on its web site.

On December 1, 2017, Mr. Brocker e-mailed (evidence #22) this investigator stating that revisions have been made to Charlotte UAV's web site. The revisions included changing the section title to "Data Collection" and clarifying that many of the services are provided under the supervision of a licensed surveyor.

During the interview Mr. Smith said Lappert Smith Industries, LLC, a Nevada Limited Liability Company, was converted to Lappert Smith Industries, LLC, a North Carolina Limited Liability Company, on January 27, 2017. Charlotte UAV is a d/b/a. He said they changed the name to Lappert Smith Industries, LLC because Charlotte UAV, LLC was "narrowly focused." Charlotte UAV, LLC changed its name to Lappert Technologies, LLC on May 3, 2016. The company was dissolved by Articles of Dissolution of Limited Liability Company, filed on January 18, 2017, with an effective date of January 1, 2017.

There are no violations on the Board's database or NCEES Enforcement Exchange against Lappert Smith Industries, LLC or Charlotte UAV, LLC.

Board Investigator Clyde Alston interviewed the following individuals during the investigation:

- Jonathan T. King, PLS [L-4780] – complainant, interviewed on September 6, 2017.
- Joseph R. "Joe" Bruno, Jr., PLS [L-3315] – witness, interviewed on September 11, 2017.
- Andy Goretti – witness, interviewed on October 31, 2017. Mr. Goretti wrote the proposal for the Unmanned Aerial Vehicle Collection Efforts Services for Mecklenburg County GIS department.
- Jimmy N. Faires, PLS [L-4311] – witness, interviewed on October 31, 2017. Mr. Faires' firm, Geomatic Concepts, PLLC [P-1031], was purportedly responsible for providing the surveying services for Lappert Smith Industries, LLC.
- Bretten "Brett" Smith of Lappert Smith Industries, LLC – respondent, interviewed on November 20, 2017.

This matter is pending consideration by the Land Surveying Review Committee of the North Carolina Board of Examiners for Engineers and Surveyors.

## DETAILS OF INVESTIGATION

<u>Report of Interview with Jonathan T. King, PLS [L-4780] on September 6, 2017</u>
619 Orange Street (residence)
Wilmington, NC 28401
910/540-1915 – mobile
910/343-1048 – office
tking@mckimcreed.com – e-mail

Board Investigator Clyde Alston conducted an interview with Mr. King at McKim & Creed, Inc.'s Raleigh office located at 1730 Varsity Drive. Mr. King said he did not want his employer's name associated with his complaint. Any correspondence from the Board should be mailed to his home address.

Mr. King stated he graduated from Appalachian State University in 1990 with a Bachelor of Science in Applied Mathematics, not 1996 as the Board's records indicate. Mr. King received his North Carolina Professional Land Surveyor's license in 2008. He is not licensed in any other states. He has a LEED AP (Leadership in Energy and Environmental Design Accredited Professional) certification, BMP (Best Management Practices) certification in inspections and maintenance, and has a remote pilot's certification for small unmanned aircraft systems. He said his next goal is to obtain his private pilot's license.

**INVESTIGATOR'S NOTE**: Board staff will review Mr. King's application, confirm the date of his Bachelor of Science, and update his record accordingly.

Mr. King works as a Business Developer for McKim & Creed, Inc [F-1222] at their Wilmington, NC office. He said he does very limited surveying work. His responsibilities are to establish working relationships with other engineering and surveying firms, municipalities and governmental agencies. He has served in this capacity for the past two and a half years. With regard to providing unmanned aerial vehicles (UAV) services, Mr. King said McKim & Creed, Inc. uses drones a lot in North Carolina and in its 16 other office locations. Its usage is in-house for their mapping and engineering departments. They also provide similar support for other consulting firms.

Mr. King said McKim & Creed, Inc. has existing governmental contracts with Mecklenburg County. With regard to the complaint, he said Mecklenburg County solicited unmanned aerial vehicle collection services for its Geographic Information Services department. McKim & Creed, Inc. submitted its response and was placed on the shortlist, but was not awarded the contract. Instead, Charlotte UAV was selected as the vendor.

Mr. King said that before final interviews there was a question and answer session about Mecklenburg County's unmanned aerial vehicle collection services. One of the questions he recalls was whether the vendor had to be a Professional Land Surveyor, or could this requirement be fulfilled by subcontract. The county said it was okay to

subcontract the work to a Professional Land Surveyor, however, the original solicitation did not say that. Mr. King said the prime was to be all-inclusive, providing the surveying and mapping services.

Mr. King said Charlotte UAV being awarded the contract would have been fine with him had they been licensed with the Board. He said the company has an office in North Carolina and does its work here yet no one in the industry knew who they were. To him this was a red flag. He started doing his due diligence by reviewing their web site. He noticed they were advertising surveying without being licensed with the Board, which precipitated his complaint.

Mr. King said there is a *we can survey* statement on Charlotte UAV's web site under "**AERIAL MAPPING**." It further states they can survey hazardous areas with minimal ground access and they save time surveying large areas, up to 50 times faster than ground-based land surveying. He said not only are they offering land surveying services, they are getting projects without licensure with the Board, which is more troubling and disappointing. He said winning the contract wasn't his biggest concern as long as it was done fairly, and based on qualifications and quality of work, but that's not what happened.

Another issue Mr. King noted on Charlotte UAV's web site was the offering of volumetric measuring. This is a service offered by licensed surveyors. He said it's comparing two surfaces, creating a digital terrain model (DTM) and certifying to its accuracy. Further, providing topography data, which is another name for contour data or mapped surfaces, is the practice of land surveying too.

Mr. King reviewed Mecklenburg County, Geographic Information Services, Request for Quotes (evidence #1) and Charlotte UAV's "DIGITAL SUBMITTAL" (evidence #7). With regard to the Request for Quotes, he said the "**SELECTION CRITERIA**," says the vendor, *Must be registered as a Professional Land Surveyor….* He said this is self-explanatory and Charlotte UAV would not have been selected if this wasn't changed. As a result of the change, Charlotte UAV was allowed to subcontract any surveying work to a licensed surveying firm. Section 5.1 of the criteria refers to, *photogrammetric* interpretation, which means a photogrammetrist licensed with the Board that also carry a national certification with the American Society for Photogrammetry & Remote Sensing.

As for Charlotte UAV's "DIGITAL SUBMITTAL" (evidence #7), Mr. King indicated it was their "PAST PROJECTS," Section 2.3, that was most concerning. If area surveys; topographic surveys, including DTMs; volume calculations of stockpiles; 3D mapping; etc. are part of their service portfolio, and they're getting paid for it, then they are committing a habitual violation that needs to be addressed.

4

<u>Report of Interview with Joseph R. Bruno, Jr., PLS [L-3315] on September 11, 2017</u>
E.S.P. Associates, P.A. [C-0587]
3475 Lakemont Blvd. (Main office)
Fort Mill, SC 29708
803/802-2440 – office
704/363-2964 – mobile
803/835-0939 – direct
jbruno@espassociates.com – e-mail

<u>Mailing Address</u>
P.O. Box 7030
Charlotte, NC 28241

Board Investigator Clyde Alston conducted an interview with Mr. Bruno at E.S.P. Associates, P.A.'s Raleigh office.    Mr. Bruno said he took mining engineering courses while attending West Virginia University but he lacks 14 hours to receive his Bachelor of Science degree.  He also attended Fairmont State University and Northern Virginia Community College.  Mr. Bruno received his North Carolina Professional Land Surveyor's license in 1990.  He is not licensed in any other states and does not have any other professional licenses.  He is Executive Vice President of E.S.P. Associates, P.A.  He provides executive oversight for public sector surveying.  His specialties include LIDAR, GPS, GNSS, Terrestrial LIDAR, and mobile and floodplain mapping.

E.S.P. Associates, P.A. is a multi-disciplined consulting firm that serves all phases of project development and public safety.  They offer a large array of services, including but not limited to, civil engineering, surveying and mapping, planning, earth and material science, and water resource management.  Their surveying division provides mobile LIDAR scanning, 3D scanning, conventional and GPS surveying, aerial mapping, and UAS (unmanned aircraft system) services.  He said they began providing unmanned aircraft services in September 2016 to perform inspections, show progress in areas under construction, and for emergency response operations.  He said he's familiar with its limitations, so its primary focus is to provide engineering and surveying support.

Mr. Bruno said they worked and tested the UAS software for three years before developing their own software for aerial close-range photography and LIDAR.  He said UAS has been offered for about a year now.  He said any type of support offered to their surveying division always begins with an area previously surveyed the conventional way.  He said this helps them determine absolute accuracy and precision with the software they're using.

Mr. Bruno said he contact David Tuttle, Board Counsel, expressing his concerns about Charlotte UAV responding to Mecklenburg County's RFQ for unmanned aerial vehicle collection services.  The solicitation specified having a Professional Land Surveyor as part of its requirements.  Andy J. Goretti, the contact person for the RFQ, told him the project was not supposed to be an engineering project.  Most of the work was supposed

to be either promotional videos or pictures.  Taking photos in a public park and making videos was the way it was to be advertised.  He went on to say Mr. Goretti told him that he did not like the way the solicitation was advertised.

Mr. Bruno said what caught his eye was Charlotte UAV's marketing material.  Its web site and submittal indicates they provide a professional service that fits within the definition of the practice of land surveying.  He said their work requires oversight of a Professional Land Surveyor, which they don't have, which is why he contacted Mr. Tuttle for assistance.

Mr. Bruno reviewed Charlotte UAV's web site (evidence #5) during the interview.  He said the word "survey" is used several times in the "Benefits" section under "AERIAL MAPPING."  The company mentions it can survey >100 Ha (1km2) in a day; in large areas up to 50 times faster than ground-based land surveying; and survey hazardous areas.  The word accuracy is also mentioned frequently.  He said in the profession anytime you start talking about accuracy you're talking about surveying.  Additionally, the digital terrain modeling and volumetric analysis are professional services that bleed into both engineering and surveying work.  He said at E.S.P Associates, P.A. their surveyor would survey the area first.  In the process they draw a map to be handed over to one of their engineers to do the calculations.

Mr. Bruno reviewed Mecklenburg County's Geographic Information Services Request of Quotes (evidence #1) and said under the "**SELECTION CRITERIA**," Section 5.6, the vendor, *Must be registered as a Professional Land Surveyor in the State of North Carolina....*  This is problematic as Charlotte UAV is not licensed with the Board and there is nothing in the "**PROCUREMENT PROCESS**," Section 6, saying this can be waived.  Additionally, the vendor must have relevant experience and expertise with similar projects with emphasis on aerial capabilities, such as, photogrammetric, interpretation, compilation and rectification.  Mr. Bruno said these are surveying disciplines.  As for the "**SPECIFIC REQUIREMENTS**," Section 4.3, he said the vendor must be qualified to, *Extract features for environmental, engineering, and mapping purposes*… which again is the practice of land surveying.

Mr. Bruno reviewed Charlotte UAV's "DIGITAL SUBMITAL" (evidence #7) and said Charlotte UAV's "PROJECT TEAM" (page 7 of 46) includes Geomatic Concepts, PLLC [P-1031] but the company is not part of its "ORGANIZATIONAL STRUCTURE" (see page 8 of 46).  He said if Geomatic Concepts, PLLC is one of the key players then they should be shown on this chart.  He went on to say that Geomatic Concepts, PLLC should be the prime contractor while Charlotte UAV should be the support.

Mr. Bruno commented that Walter Lappert's "**Specializations**" include "3D Mapping and Aerial Photography Professional" (page 10 of 46).  He said Mr. Lappert probably doesn't understand but a photogrammetrist must be licensed as a surveyor in North Carolina.

Regarding Charlotte UAV's "PAST PROJECTS," Mr. Bruno said the problem with this is the "service deliverables." Based on their project experience they seem to be capable of doing aerial surveys, topographic surveys, mapping, volume calculations, the creation of break lines, contour lines, 3D modeling and DTMs. He said he can't believe they are doing all this without having a professional license. He suggests the Board call some of these past clients to find out what services Charlotte UAV actually provided. For example, Charlotte UAV reports having done a project for Sloan Construction and according to some of its services listed, they provided, *Creation of break lines, reference points, digital elevation models, contour lines calculation and analysis of volumes and stockpiles, etc.* If they provided these services there should be a certified map somewhere with Charlotte UAV's name in the title block as evidence of carrying out this type of work.

As for section "3. REFERENCES" (pages 20 through 22 of 46), Mr. Bruno reiterated their scope of services included aerial mapping, photogrammetry, creation of break lines, etc., which again are all surveying activities. Even the descriptions used in sections "4.1 CHARLOTTE UAV SERVICES" and "4.1.1 SURVEY, MONITORING AND MAPPING APPLICATIONS" are additional proof of wrongdoing. He said if Charlotte UAV is providing engineering monitoring, infrastructure analysis and inspections, then they are doing engineering. Any type of judgment call they make regarding infrastructure analysis enters into the practice of engineering, which presents another problem for them. He went on to say Charlotte UAV needs to be made aware of the North Carolina General Statutes, Chapter 89C, which allows the Board to regulate the engineering and surveying profession as well as those that are not licensed.

Mr. Bruno reiterated that Charlotte UAV's mapping applications, to include 3-D Volumetric Analysis, 3-D Point Cloud, 2-D Distance Measurement, contour line maps, digital surface models, and orthomosaic overlays, is the practice of land surveying. He said they might be doing this out of ignorance but if they don't know it's wrong then they need to be made aware of it.

In closing, Mr. Bruno mentioned that Mr. Tuttle advised him that Charlotte UAV has been warned by the Board before about its web site. He said he hopes the other engineering and surveying firms that participated in Mecklenburg County's RFQ will do likewise and contact the Board about their concerns. He said they all have a professional responsibility that if they see a violation, they are obligated to report it.

<u>Report of Interview with Andy J. Goretti on October 31, 2017</u>
Mecklenburg County Government, GIS Department
2145 Suttle Avenue
Charlotte, NC 28208
980/314-4645 – office
704/621-7987 – cell
<u>Andy.goretti@mecklenburgcountync.gov</u> – e-mail

Board Investigator Clyde Alston conducted an interview with Mr. Goretti at his office in Charlotte.  Mr. Goretti is Mecklenburg County's Geospatial Information Services (GIS) Division Manager.  He manages the mapping, land use and environmental services divisions.  Mr. Goretti has worked for the GIS department for 25 years.  He said his department provides data services for all of Mecklenburg County, including 911, the district attorney's office, police and fire departments, and the Board of Elections.

Mr. Goretti explained that Mecklenburg County's RFQ announcement (evidence #1) was the first UAV type of service technology agreement, to his knowledge, ever posted.  He said they searched other state service contracts for a template to go by but could not find one.  So, he put this one (evidence #1) together, gave it to their attorney and procurement department to look at, and they gave it their blessing.  In retrospect, he said wishes he had reviewed it more with and left out Section 5.6, which states, *Must be registered as a Professional Land Surveyor in the State of North Carolina….*  He said this should have been taken out before it went out on the street, or at least modified to say something differently.

Mr. Goretti said Mecklenburg County wanted imagery and promotional videos from unmanned aerial vehicles capturing people walking while waving their hands, and playing in parks.  They wanted videos of greenways and recreational centers throughout the city.  Different departments would benefit for this technology.  He said the district attorney's office is one example.  Videos of crime scenes could help them with their investigations.

Mr. Goretti explained the request was not to have multiple sources involved because that would be more difficult to work with.  The intent was to have one vendor with multiple abilities to perform unmanned vehicle services.  The county had six engineering or surveying firms, and six video companies that responded to the bid.  Each respondent was told they didn't have to be a licensed surveyor, however, one would be needed when a project called for it.  This was more about aerial photography and promotional videos.  He said a Professional Land Surveyor would not be required for that.  However, if the county was interested in capturing imagery for their Solid Waste Landfill department, then a Professional Land Surveyor would be required for signed and sealed drawings.

Mr. Goretti said he let vendors know this was an unmanned aerial vehicle project, not a surveying or engineering project.  He said there were people he knew that were aware of Charlotte UAV's abilities.  They had done work on other projects for the City of Charlotte to include two ceremonial type videos, a video of a local stream channel and a project involving before and after pictures of a prescribed fire.  He said their Natural Resources Section occasionally does controlled burns and they use drones to take pictures of the fires.  These are before and after photos that helps see what improvements they can make with the next ones they do.  He said county leaders have discussed getting their own drones for this, but their attorney has said no to it.

In closing, Mr. Goretti said they chose Charlotte UAV because they were local, and unlike some of the other firms, they were able to respond to an immediate need. He said the engineering/surveying firms said it would take longer plus the other firms wanted to bill them for services they really did not need.

Report of Interview with Jimmy N. Faires, PLS [L-4311] on October 31, 2017
Geomatic Concepts, PLLC [P-1031]
North Broad Street
Mooresville, NC 28117
704/664-1994 – Business
704/361-0412 – Cellular
jfaires@geomaticconcepts.com – e-mail

Information in italics was taken from Case V2016-046:

Board Investigator Clyde Alston conducted an interview with Jimmy N. Faires, PLS at his office in Mooresville, North Carolina. *Mr. Faires became licensed as a Professional Land Surveyor in North Carolina in 2001. He is also licensed in South Carolina and Virginia. He does not have any other professional licenses. He received an associate's degree in Civil Engineering and Surveying Technology from Central Piedmont Community College in 1997. He operates as Geomatic Concepts, PLLC and he owns 100 percent of the firm. Mr. Faires states that he offers most types of surveys, including but not limited to, boundary and easement surveys, construction staking, quality control and topographic surveys. He works on both residential and commercial projects.* He said a lot of his work is done for Duke Energy. He said some of the calls they get are from his web site but most are through word of mouth. He said people want references and prior customers help him with that. Mr. Faires said he operates with two, two-man crews. He added that none of the crewmembers are licensed.

Mr. Faires said Brett Smith of Charlotte UAV contacted him early this year to see if he would be interested in teaming on a Mecklenburg County project. He said a couple of years prior, he, Joel H. Patterson, III, PLS [L-3717], and Mike Rempe, who is a pilot, believed drones were a valid tool to acquire imagery or survey data. To find out more they attended a drone conference in Las Vegas. While there they bought a $40,000 drone and camera and in 2015 started Epic Aerial Imaging, LLC. He said the company has since been dissolved.

Mr. Faires said at the start of Epic Aerial Imaging, LLC he bought a Pix4D one-year software subscription. As he started analyzing the data and what could be done with it, he became concerned about its accuracy. He said if you had a nice even surface, freshly excavated dirt, paved sidewalks with no obstruction between the camera lens and the ground, then it works pretty well. However, when you have grass, foliage, trees, or a steep slope, these are "inaccuracy triggers" and it becomes more challenging to filter through the images. So, in his opinion, you have to make assumptions using it.

Mr. Faires said they decided to close Epic Aerial Imaging, LLC.  He said they were having too many issues with the drone.  He said eventually they got their money back, but found out about Charlotte UAV in the process.  He said they were looking for Charlotte UAV to potentially design or build them another drone or to team on projects where they had the expertise on the technical side and vice versa when a project called for surveying.  However, the relationship never got started.   Mr. Faires went on to say Mr. Rempe had direct contact with Charlotte UAV when there was any communication between them.

Mr. Faires said Charlotte UAV approached him directly in January 2017 asking if he would be interested in working with them on a Mecklenburg County project.  He said Charlotte UAV sent him two sheets from the RFQ (evidence #1) and asked for his resume.  It was Mr. Faires understanding that Mecklenburg County didn't know the type or size of the project but was looking for a firm that could provide imagery with the ability to perform other mapping features from drone acquisitions.   Mr. Faires said he would provide the quality control for Charlotte UAV's work.  He would take Charlotte UAV's data, look at it in the field and office, and make sure the data was accurate.

Mr. Faires said his concern all along with drone software is its accuracy.  He said Charlotte UAV gave him examples of some of their previous work.  Their (Charlotte UAV) assumption was it was accurate.  Mr. Faires said he did not think that way.  He said there was no external source checking the data.  A surveyor would have to analyze the data and it's been his experience through trial and error on some sample projects they did using Pix4D software that accuracy cannot be relied upon unless the conditions are good, meaning without obstructions.  He said some people rely only on the software to provide the quality control, but someone has to provide quality control behind the software to make sure it's accurate.

Mr. Faires said the Mecklenburg County project was the first time Charlotte UAV approached Geomatic Concepts, PLLC.  He said he hasn't heard anything since submitting his resume, so he doesn't know if there is any work going on.  He went on to say Mr. Smith did ask him for a price quote for his services and he provided it.  He looked at Charlotte UAV's proposal and acknowledged this was the cost for his services.

Mr. Faires reviewed Charlotte UAV's proposal, specifically, "PAST PROJECTS" and references to accurate aerial maps and imagery, and questioned who would provide the quality control and sign off on their maps.   He said the route, grade and volumes would require certification by a surveyor.  He adds much of Charlotte UAV's past projects would require the oversight of a Professional Land Surveyor.

<u>Report of Interview with Bretten "Brett" Smith on November 20, 2017</u>
Lappert Smith Industries, LLC, d/b/a Charlotte UAV
3440-B Saint Vardell Lane
Charlotte, NC 28217
704/620-7659 – Office
<u>brett@charlotteuav.com</u> – e-mail

Douglas J. Brocker, Attorney at Law
The Brocker Law Firm, P.A.
5540 Centerview Drive, Suite 200
Raleigh, NC 27606
919/424-6334 – main office
919/854-2460 – direct
206/350-1802 – facsimile

Board Investigator Clyde Alston conducted an interview with Mr. Smith at his attorney's office.

Mr. Smith confirmed that Lappert Smith Industries, LLC, a Nevada Limited Liability Company, was converted to Lappert Smith Industries, LLC, a North Carolina Limited Liability Company, on January 27, 2017. Charlotte UAV is a d/b/a. He said they changed the name to Lappert Smith Industries, LLC because Charlotte UAV, LLC was "narrowly focused."

Mr. Smith said their unmanned aerial vehicle business was founded in 2014. He said he did not really jump into working in the business full-time until this year. Mr. Smith indicated Lappert Smith Industries, LLC is a fully integrated drone company that provides industrial-grade software and hardware solutions including ground rovers and airborne vehicles for drone-based applications. They provide consulting services related to innovative information systems that integrate drone operations with business management processes for its customers. They have military aircraft and unmanned technology experience, with emphasis in industrial data collection solutions. They have their Federal Aviation Administration (FAA) remote pilot's certification, Section 333 Exemption, and Certificate of Authorization for commercial Unmanned Aerial Vehicle (UAV) operations throughout the United States.

Mr. Smith said he has a Bachelor of Science in Tactical Management and a Master of Business Administration with a focus in project management. He said he has worked in the information technology field since 2008. He specializes in government contracts, strategic consulting and technology integration.

Mr. Smith said they have experience in all facets of drone data collection. Their web site, which he manages, explains much of what the company is about. He said rarely does he make changes to it. He said the last time he recalls updating it was when the Board sent them a letter (evidence #12) with concerns about its services. He said he responded by making the appropriate changes and figured the matter had been resolved.

Using his laptop, Mr. Brocker pulled up Charlotte UAV's web site. With regard to the allegations pertaining to its "AERIAL MAPPING" page, Mr. Smith admits that "survey" is used loosely. He said they don't survey property lines as it might imply. It's the surveyors they work with that deliver this service. He said he would change the word "survey" to "fly" to avoid any further confusion. He said aerial mapping is a service they provide to companies with their own "in-house surveying team." Mr. Smith did not know if these were licensed surveyors, only that they were "in-house surveyors." Mr. Smith said Charlotte UAV doesn't have total stations, can't establish ground control points, and does not have the ability to say the raw data they collect is accurate. He said it's up to the surveyor to verify the accuracy of the data they give them.

As for "surveying hazardous areas," Mr. Smith said hazardous could mean a nuclear power plant. If an accident occurs at the plant site, the owner may want to scan it for radiation. Typically, a person is suited up, goes into the affected area, and may be exposed to the radiation. He said Charlotte UAV can put a drone in place to reduce the risk of harming someone in a situation like that.

As for Charlotte UAV's proposal and its references to past projects, Mr. Smith said the project with CK Contracting happened a while ago, so he wasn't sure of their total scope, but believes he worked with CK Contracting's groundcrew or a surveyor employed by them on this particular job. The drone they used was a data collector.

With regard to Turner Construction, he said they did a virtual reality video for marketing purposes. The aerial survey and 3D model was data they collected under the direction of Turner Construction's in-house surveying team. The Go Unmanned – Benchmark Tool & Supply, Inc. project was one where they designed and developed an unmanned ground vehicle. He said the company did not want a "drone off the shelf" so they built them one. The Real Time Kinematic (RKT) GPS for precision was a piece of the hardware they put on the drone for accuracy.

As for Sloan Construction, he said they worked with their surveying crew like the others. He said Sloan Construction's "in-house surveying team" gave them ground control points and pointed out areas on the construction site where they wanted data collected. With the use of drones, they would take as many as 500 photos. Those aerial photos are given to the surveyor, who uploads the data for their intended purposes. He said the data is capable of producing as many as eight different deliverables including contour lines, creation of break lines, orthomosaic images, digital elevation models, 3D

models, etc.    Mr. Smith went on to say Charlotte UAV does not provide these deliverables, rather, the company they collect the data for does.

Mr. Smith said he should have clarified that their "services and deliverables" were provided under the direction of the surveyor they worked for.  Each company identified in this proposal (evidence #7) had its own "in-house surveying team," who they worked directly with.    In that regard, he understands that their "Project description" and "Services and deliverables…" should have been made clearer.

Regarding the "REFERENCES" section, and references to photogrammetry and engineering, Mr. Smith said the software itself processes the aerial images.    The engineering is what Charlotte UAV does when customizing and building drones.

Regarding the "ORGANIZATIONAL STRUCTURE," Mr. Smith said this pertains to Charlotte UAV's project management team members.  He said if surveying was the primary scope, then Lappert Smith Industries, LLC would work under the direction of Geomatic Concepts, PLLC.  The "Cost Breakdown" for the surveying was given to them by Mr. Jimmy N. Faires, PLS [L-4311].

In closing, Mr. Smith said, although Charlotte UAV was awarded the contract, everything is at a standstill because of the Board's investigation.  He said that in March 2017, they did a promotional video of an event; however, they are supposed to be doing a lot more.  He hopes whenever this matter is resolved that he can get more work finished.  He said he wants to figure out how to make this work.  He said he's open to change and does not want to qualify their work as survey grade.  He said he understands the confusion and will make the changes as recommended.

**INVESTIGATOR'S NOTE:**  Mr. Smith was given copies of the following Board Policies: 3D Modeling for Grading and Stake-out (evidence #18), Oblique Aerial Imaging (evidence #19) and Volume Computation Surveys Policy (evidence #20).

## EVIDENCE

1.   Copy of Mecklenburg County, North Carolina Geographic Information Services – Request for Quotes #487-MN-036, Issued on January 13, 2017, "**UNMANNED AERIAL VEHICLE COLLECTION EFFORTS SERVICES**," received from Jonathan T. King, PLS on March 9, 2017.

2.   E-mail correspondence dated March 6, 2017 from Mark Mazanek, RE: Charlotte UAV, LLC changed to Lappert Smith Technologies, LLC.  Attached is a copy of North Carolina Department of the Secretary of State – **ARTICLES OF ORGANIZATION INCLUDING ARTICLES OF CONVERSION** form.  Signed on January 10, 2017 by Bretten Smith.  Date of filing is January 27, 2017 [SOSID: 1569316].

3.   North Carolina DEPARTMENT OF THE SECRETARY OF STATE – Corporate Names: **Prev Legal**: Charlotte UAV, LLC, **Legal**: Lappert Smith Technologies, LLC; **Status**: Dissolved, **Date formed**: 8/26/2015, received from David J. Evans on March 10, 2017.

4.   North Carolina DEPARTMENT OF THE SECRETARY OF STATE – Corporate Names: **Legal**: Lappert Smith Industries LLC; **Status**: Current-Active, **Date formed**: 1/27/2017, received from David J. Evans on March 10, 2017.

5.   Copy of Charlotte UAV's web site "**ABOUT US**" and "**AERIAL MAPPING**" pages, received from David J. Evans on March 10, 2017.

6.   E-mail correspondence dated March 13, 2017 between David S. Tuttle, David J. Evans and Joe Bruno, Subject: RE: Mecklenburg UAV services.

7.   E-mails dated March 10 and 15, 2017 between Andy Goretti and David J. Evans, RE: Request for Information.  Attached is a copy of Charlotte UAV - "**DIGITAL SUBMITTAL**" **RE: Requests for Quotes Unmanned Aerial Vehicle Collection Efforts Services - #487-MN-036,** dated February 6, 2017 (46 pages).

8.   E-mail correspondence dated March 13 and 15, 2017 between David J. Evans and jbruno@espassociates.com Fw: Mecklenburg UAV services.

9.   E-mail correspondence dated March 13 and 15, 2017 between Joe Bruno and David J. Evans and David S. Tuttle, RE: Mecklenburg UAV services.  Attached is the **CERTIFICATE OF ASSUMED NAME FOR A LIMITED LIABILITY**

**COMPANY (LLC)** – Charlotte UAV is proposing to engage is business in Mecklenburg County [date of filing with Mecklenburg County Register of Deeds is July 21, 2015].

10.   E-mail correspondence dated March 15 and 16, 2017 between Todd King and David J. Evans, Re: Complaint (Case No. V2017-025).

11.   E-mail correspondence dated March 13 and 15, 2017 between David S. Tuttle, David J. Evans and Joe Bruno, Fwd: Mecklenburg UAV services.

12.   E-mail correspondence dated May 13, 2016 between David J. Evans and Andrew Ritter et al, Subject: Drone Seminar.  Included is a letter dated October 26, 2015 to Charlotte UAV, LLC, Attn: Walter Lappert, Co-Owner – Re: Surveying Services from the **NORTH CAROLINA BOARD OF EXAMINERS FOR ENGINEERS AND SURVEYORS**.

13.   E-mail correspondence dated April 23 and 24, 2017 between David S. Tuttle, Clyde Alston and Joe Bruno Subject: FW: Charlotte UAV, with news article entitled "First in flight: North Carolina aims to lead the drone game," by Carolina Curran, charlotte.crains.com, dated April 10, 2017.

14.   Copy of Charlotte UAV, LLC, "ARTICLES OF ORGANIZATION," AMENDMENT OF ARTICLES OF ORGANIZATION," and "ARTICLES OF DISSOLUTION OF LIMITED LIABILITY COMPANY," filed with the State of North Carolina Department of the Secretary of State, received by Clyde Alston on September 11, 2017.

15.   Copy of Lappert Smith Industries, LLC "ARTICLES OF ORGANIZATION, INCLUDING ARTICLES OF CONVERSION" date of filing with the State of North Carolina Department of the Secretary of State is January 27, 2017, received by Clyde Alston on September 11, 2017.

16.   Web pages from Charlotte UAV's web site, consisting of: Aerial Mapping, Drone Repair, Hazardous Inspections, Custom UAVs, and Flight Services, received by Clyde Alston on March 30, 2017.

17.   E-mail dated October 31, 2017 forwarded to Clyde Alston from Andy Goretti, Subject: FW: RFQ #487-MN-036 Questions.

18.   Copy of North Carolina Board of Examiners for Engineers and Surveyors, POLICY, "3D MODELING FOR GRADING AND STAKE-OUT," received by Clyde Alston on November 13, 2017.

19.   Copy of North Carolina Board of Examiners for Engineers and Surveyors, POLICY, "OBLIQUE AERIAL MAPPING," received by Clyde Alston on November 13, 2017.

20.     Copy of North Carolina Board of Examiners for Engineers and Surveyors, <u>POLICY</u>, "Volume Computation Surveys Policy," received by Clyde Alston on November 13, 2017.

21.     Internet news article from the Charlotte Observer entitled "Hear a buzz? Look up: Charlotte drone company is using them for more than just photos," by Ely Portillo, dated July 24, 2017, received by David J. Evans on September 15, 2017.

22.     E-mail dated December 1, 2017 from Doug Brocker to Clyde Alston, RE: Supplemental information and response (Lappert – Smith: COMM – BOARD).

23.     Copy of Charlotte UAV's web site with UPDATES (6 pages), received by Clyde Alston on December 1, 2017.

# Plaintiffs' Summary-Judgment Appendix Exhibit 31

## Fronrath/NC Drone Pro, LLC Investigative Report

# NORTH CAROLINA
# BOARD OF EXAMINERS FOR
# ENGINEERS AND SURVEYORS

## INVESTIGATIVE REPORT

Reference:    Case No. V2017-058 – Mark Fronrath [Non-licensed]
                Case No. V2017-059 – NC Drone Pro, LLC [Non-licensed]
Report by:   Clyde A. Alston, Board Investigator
Date:         December 4, 2017

## SYNOPSIS

These matters are the result of sworn to and notarized charges filed with the Board by Timothy S. Guisewhite, PLS [L-4912] of Charlotte, NC.  It's alleged that Mr. Fronrath and NC Drone Pro, LLC may be practicing or offering to practice land surveying without a license as required.  The allegation is that the firm offers surveying services through its web site (www.ncdronepro.com).  The services in question include, but are not limited to, "Mapping & Surveying" as well as the manipulation of aerial data for CAD and GIS programs.

Mr. Fronrath, the owner of NC Drone Pro, LLC, was notified of the complaint through certified Board correspondence.  Mr. Fronrath responded in writing that the wording on his company's web site was intended to illustrate that he could assist professional surveying companies in the gathering of aerial data.  He has since removed any wording related to surveying services, and manipulation of aerial data for CAD or GIS programs from his company's web site.

There are no violations listed on the Board's database or NCEES Enforcement Exchange web site against Mark Fronrath or NC Drone Pro, LLC.

The following individuals were interviewed by Board Investigator Clyde Alston during the investigation.

- Timothy S. Guisewhite, PLS [L-4912] – complainant, interviewed on November 15, 2017.
- Mark Fronrath – respondent, interviewed on November 15, 2017.

These matters are pending consideration by the Land Surveying Review Committee of the North Carolina Board of Examiners for Engineers and Surveyors.

NCBEELS 000586

J.A. 456

## DETAILS OF INVESTIGATION

<u>Report of Interview with Timothy S. Guisewhite, PLS [L-4912] on November 15, 2017</u>
Guisewhite Professional Land Surveying, P.C. [C-4411]
5229 Mt. Holly Huntersville Road (home office)
Charlotte, NC 28216
704/530-1700 – office
tguisewhite@hensonfoley.com – e-mail

Board Investigator Clyde Alston conducted an interview with Mr. Guisewhite at his home office.  Mr. Guisewhite received a degree in Civil Engineering Technology from Trident Technical College in 1999.  He became licensed in South Carolina as a Professional Land Surveyor in 2001.  He became licensed in North Carolina in 2010 and is also licensed in Virginia and Pennsylvania. Guisewhite Professional Land Surveying, P.C. offers boundary, subdivision, physical, recombination, and ALTA-NSPS Land Title surveys, topographic mapping, construction layout and 3D machine control data preparation.  He has one employee. He uses a robotic instrument, Trimble data collector and GPS.  He said they perform about 150 surveys each year.

Mr. Guisewhite explained that one day while stuck in traffic on I-77 South he noticed on the back of an SUV, NC Drone Pro, LLC, and mapping listed as one of its services.  Mr. Guisewhite said mapping and surveying are tag words surveyors look out for.  He said since traffic wasn't moving he typed NC Drone Pro, LLC into his phone and saw the word surveying and mapping on its web site.  Later that evening he looked at their web site again and didn't see any credentials indicating the company was licensed with the Board, which prompted his complaint.  He said as a Professional Land Surveyor it's his obligation to protect the public from companies that say they can offer surveying services when they aren't supposed to.

Mr. Guisewhite said that prior to today's interview he went back to NC Drone Pro, LLC's web site and noticed some minor changes to its homepage, however, there were still some issues he took notice of.  Regarding aerial photography, he acknowledges that anyone can do aerial photography, but as soon as you start mentioning photogrammetry it becomes a surveying activity.  As for the statement, "transforming aerial data," Mr. Guisewhite said the company needs to make sure the Board doesn't define this as photogrammetry.  The reference to 3D models for analysis, should be removed altogether because this is the same as topography, which is surveying.  Also, the statement "owned and operated by a licensed professional," can be misleading to the public.  He said if he was looking for someone to do photogrammetry, based on its web site, it appears the company is licensed with the Board to perform this work.

In closing, Mr. Guisewhite said his complaint was not personal.  He said he hopes for nothing but the best for NC Drone Pro, LLC.  However, with drone technology in North Carolina, as it is today, if it's not regulated by the Board then it can potentially threaten the surveying profession.

<u>Report of Interview with Mark Fronrath on November 15, 2017</u>
NC Drone Pro, LLC
18937 Southport Drive
Cornelius, NC 28031
704/307-7251 – mobile
mark@ncdronepro.com – e-mail

Board Investigator Clyde Alston conducted an interview with Mr. Fronrath at the Starbucks located at 19722 One Norman Drive, Suite #200, Cornelius, NC. Mr. Fronrath is the owner of NC Drone Pro, LLC. He said he operates as a 1099 contractor. He said he has over 35 years of aviation experience. He has his Federal Aviation Administration (FAA), Part 107, remote pilot for small unmanned aircraft system (sUAS) license; he carries a North Carolina Commercial Operator's Permit; he's licensed as a private pilot; and is certified as a flight instructor at DARTdrones Flight School. For training he uses the DJI Inspire1 and Phantom UAV flight systems. Those interested in their flight school include fire and police departments, commercial users, and drone hobbyist. In addition to providing training, a big part of his revenue is from aerial videography and aerial imaging.

Mr. Fronrath said when drone technology came out he enrolled in every training he could to build his knowledge of the industry. After obtaining his Federal Aviation Administration certification and his North Carolina Commercial UAS Operator's Permit, he pursued his own business. In 2016, he formed NC Drone Pro, LLC. Mr. Fronrath admits his web site was a rush job when he put it together. The verbiage came from another drone company's web site, which he doesn't remember the name of. He said he was trying to "throw a big blanket to cover everything" he could. He said he never connected the dots that he doesn't provide all of the services he listed on his web site. It wasn't until he received the certified letter from the Board saying he was under investigation for practicing or offering to practice land surveying without a license that he considered this was a problem. He went on to say he never thought what he was advertising was surveying.

Mr. Fronrath said he hasn't received any traffic from his web site and has not worked for a user, construction company, or a surveying or engineering firm. His core business involves subcontracting his aerial services to other drone companies. Mr. Fronrath said Charlotte UAV, LLC has used his services before. In that particular case, he was hired to provide images of a highway overpass.

Mr. Fronrath said as a drone instructor he is very familiar with federal and state regulations. As an instructor he helps prepare anyone considering taking the Part 107 license exam offered by the FAA. He said with the training he offers he makes sure students aren't crossing the line when it comes to using unmanned aerial vehicles. He went on to say he's very careful teaching what drones can and cannot do.

Mr. Fronrath explained that all he does is capture JPEG images. He said he doesn't do any processing of aerial images, photogrammetry, or georeferencing to any of the

existing orthomosaic photos he takes.  Again, the wording he chose to use on his web site came from another source he found on the Internet.

With regard to the wording "3D models for analysis," Mr. Fronrath said after he captures the aerial data, the images are uploaded to a DroneDeploy account, which then creates the 3D model that's given to the customer.  As for the statement, "owned and operated by a licensed professional," Mr. Fronrath said this statement refers to being a commercial drone professional.   He said he thought he could use "licensed professional" because that's what he is.

In closing, Mr. Fronrath said using the words surveying, photogrammetry, and mapping on his web site was done inadvertently.  He said he did not understand the implications of using these terms before now.   He wants the Board to know he wants to be compliant with its rules and guidelines.  He said there is just too much for him to lose otherwise.  He indicated that he wants to portray the drone industry in the highest level of professionalism and it behooves him not to push limits.

**INVESTIGATOR'S NOTE**: Mr. Fronrath was given a copy of the Board's Policy (evidence #3) regarding 3D MODELING FOR GRADING AND STAKE-OUT for future reference.

## **EVIDENCE**

1.    Copies of NC Drone Pro, LLC homepage, "About Us" page, "Photos/Videos" page, and "Contact Us" page, received by David J. Evans on July 6, 2017.

2.    Revised copies of NC Drone Pro, LLC homepage, "About Us" page, and "Contact Us" page, received by Clyde Alston on November 20, 2017.

3.    Copy of the Board's Policy, "3D MODELING FOR GRADING AND STAKE-OUT," received by Clyde Alston on November 14, 2017.

# Plaintiffs' Summary-Judgment Appendix Exhibit 32

Droners.io Investigative Report

**NORTH CAROLINA
BOARD OF EXAMINERS FOR
ENGINEERS AND SURVEYORS**

**INVESTIGATIVE REPORT**

Reference:    Case No. V2017-062
              Droners.io [Non-licensed]
Report by:    William P. Casey, Board Investigator
Date:         September 12, 2017

## SYNOPSIS

This matter is the result of a Board authorized investigation.  At its meeting on July 19, 2017, the Board authorized an investigation to determine if Droners.io is in violation of G.S. 89C-24 and 55B for practicing or offering to practice land surveying without a license.  Information obtained by the Board indicates the firm may be in violation by offering aerial surveying and mapping services on its web site.

David J. Brown was notified of the charges through Board correspondence and he responded by e-mail.  He wrote that this issue had been brought up by Mark Mazanek roughly a year ago at which time he made changes to the web site Mr. Mazanek felt could be misleading.  He added that he would like to go over in detail the specific issues so he can do his best to promptly address them.

There are no previous violations listed on the Board's database for Droners.io and they are not listed on the NCEES Enforcement Exchange web site.

The following individuals were interviewed by Board Investigator William Casey during the investigation:

- Gary W. Thompson, PLS – witness employed NC Geodetic Survey. (8/30/17)
- David J. Brown – owner of Droners.io. (9/11/17)

This matter is pending consideration by the Land Surveying Review Committee of the North Carolina Board of Examiners for Engineers and Surveyors.

## DETAILS OF INVESTIGATION

Report of Interview with Gary W. Thompson, PLS No. L-2694 on August 30, 2017
NC Geodetic Survey
4105 Reedy Creek Rd.
Raleigh, NC 27607
919/948-7844

Board Investigator William Casey conducted an interview with Mr. Thompson at his office in Raleigh, North Carolina. Mr. Thompson has been licensed as a Professional Land Surveyor in North Carolina since 1980. He is not licensed in any other states and does not have any other professional licenses. Mr. Thompson is the Chief of the North Carolina Geodetic Survey. He graduated from UNC-Charlotte in 1977 with a Bachelor's degree in Engineering Technology. Mr. Thompson served as a Board member on the North Carolina Board of Examiners for Engineers and Surveyors from 2004 until 2013.

Upon review of the Drioners.io web site materials (evidence #1.3) from April 2016, Mr. Thompson stated the site gives the perception they are licensed in North Carolina to offer surveying and mapping by use of the words "professional" and "legal." He indicated the material also talks about photography, which does not bother him as long as they do not refer to it as photogrammetry. Mr. Thompson further indicated all the pilot bios he has seen offer surveying and mapping services, which they cannot do if not properly licensed. He went on to say there is not a lot of detail in the information he reviewed to describe exactly what Droners.io is doing. Mr. Thompson added that it appears as if Droners.io is serving a broker where the client contacts them and they line up a pilot.

Mr. Thompson stated their attempt to change the web site materials (evidence #1.6 and 1.7) in April 2016 only creates additional problems. He indicated the description says they offer UAV LIDAR mapping. Mr. Thompson further indicated LIDAR mapping involves measuring the height of points on the ground, which constitutes the practice of surveying. He went on to say they also advertise UAV photogrammetry services, which again constitutes the practice of surveying.

Mr. Thompson stated that in July 2017 he came across the Droners.io web site (evidence #1.9 and 1.10) and felt they may be in violation for offering engineering and surveying services. He indicated when compared to earlier versions of the web site they have removed the references to legal and professional, but continue to use surveying and mapping, which gives the perception they require a professional license. Mr. Thompson went on to say they continue to offer photogrammetry and 3D/LIDAR mapping, which is included in the definition of surveying. He added that they offer flood surveying, which could be surveying or engineering. Mr. Thompson went on to say each of their pilots list hourly rates for surveying and mapping.

Mr. Thompson indicated he is curious about what types of deliverables they provide and are they to a stated accuracy. He added that he would also like to know what their

photogrammetry products are being used for and do they know the difference between photography and photogrammetry. Mr. Thompson questions whether they are analyzing any of the data. He indicated some UAVs have built-in GPS and some of the vendors feel it can be used without ground control; however, his office is testing that because there is a lot of room for error. Mr. Thompson indicated he would like to know what kind of deliverables they provide for flood surveys and if they are providing analysis to determine flood risk or flood boundaries.

Report of Interview with David J. Brown on September 11, 2017
Droners.io (Non-licensed)
774 Ministerial Rd.
South Kingstown, RI 02879
720/220-6718

Board Investigator William Casey conducted an interview with Mr. Brown by telephone. He does not have any professional licenses and is not a UAV pilot. Mr. Brown indicated he is a software engineer and lifetime entrepreneur. He indicated the legal name of his company is Droners, LLC, which he acknowledged currently has a revoked Certificate of Authority in the State of Rhode Island. Mr. Brown indicated somehow the letter from the Rhode Island Secretary of State's office reminding him to file an Annual Report got lost subsequently prompting the revocation. He added that he is in the final stages of updating his records in order to reactivate the Certificate of Authority.

Mr. Brown acknowledged that he owns and operates the Droners.io web site. He indicated the ".io" domain is a technology domain name and stands for input/output. Mr. Brown stated Droners.io is a matchmaking web site for clients looking for unmanned aerial vehicle (UAV), commonly known as drone, services. He went on to say the client posts a job description and budget, which gets sent to drone pilots in their area for review. He added that if the pilots are interested and capable of doing the work they submit bids to the client. Mr. Brown indicated once the project has been completed the client pays through Droners.io's secure web site wherein Droners.io gets a 10 percent commission.

Mr. Brown stated at first he had to recruit pilots, but since the drone industry has blown up the pilots are coming to him unsolicited. He indicated they upload their profile including their UAV pilot license information that gets verified.

Mr. Brown stated when Mark Mazanek contacted him roughly a year ago one big issue was that his web site language gave the appearance Droners.io was providing surveying services. He indicated they use search landing pages that are created to attract the user to their services. He added that most of their web pages were created generically, containing basically the same text except for the individual services. Mr. Brown indicated that after speaking with Mr. Mazanek and the Board's attorney, he changed the wording in the surveying and mapping section as well as both terms of service sections (evidence #2.1 and 2.3) so it is clear that Droners.io is not providing the services.

Mr. Brown stated another area of concern when speaking with Mr. Mazanek was whether the pilots advertising on the web site are licensed to provide surveying in North Carolina. He indicated he explained if there were some way for him to identify pilots with surveying licenses he would be open to it, but it seemed like a slippery slope trying to do it for every state and guarantee accuracy 100 percent of the time. He indicated at that time he added text to the pilot profile form asking that they only offer services in which they are licensed. Mr. Brown added that he has also since added text to the *PILOT TERMS OF SERVICE ("Agreement")* (evidence #2.1) in the fifth paragraph of section 6 that states "Pilot shall not enter into any Job Agreement to provide services that require licenses that the pilot has not obtained, as required by applicable laws or regulations to which they may be subject in the jurisdiction(s) in which they offer services." He indicated none of the services the pilots can check when creating their profiles are selected by default so he relies upon the pilots to only select what they can legally offer. Mr. Brown stated he regularly reviews comments between the pilots and clients to ensure the pilots are staying professional and by the book regarding the terms of service.

Mr. Brown stated he does not remember much discussion with Mr. Mazanek about the use of the words "surveying and mapping" on his web site. He indicated there are pilots who are also licensed surveyors, so he does not want to go too far in eliminating words and/or services from the site. Mr. Brown further indicated he feels like it has been made clear that Droners.io is not providing the services advertised on his web site. He went on to say Droners.io is a common model used by lots of sites, i.e., thumbtack.com, that connect clients with service providers.

Mr. Brown stated he does not get into verifying licenses outside of UAV pilot licenses. He indicated he does not have the means to keep surveying licensing data in sync. He reiterated that he relies on the pilot to be as clear as possible in their profiles about what services they are capable of legally performing. Mr. Brown indicated drones are fairly controversial right now so the pilots are walking on egg shells to keep themselves within legal limits. He acknowledged it may be a good idea to add verbiage to his web site stating surveying is a professional service requiring a license in North Carolina that should be verified by the client. He went on to say it would probably be a good idea to add that verbiage to every state's page on his site.

Mr. Brown stated that a year and a half ago the surveying and mapping section of his web site was referred to as "photogrammetry," but he changed it to surveying and mapping since they are more generic terms. He acknowledged that photogrammetry is included in the definition of surveying, but reiterated he believes it is clear Droners.io is not providing the service. He further reiterated it would be a good idea to add verbiage stating surveying is a professional service requiring licensure and should be verified by the client before choosing their pilot. Mr. Brown stated Droners.io does not handle the data collected by pilots.

Mr. Brown stated the types of deliverables provided by the pilots ranges from high-quality aerial photos to aid in land clearing, photographs of dye placed in a river to aid in showing how it mixes downstream, photos of hail damage on a large-scale area, to high-altitude aerial photos to aid in landscape design.

Mr. Brown acknowledged that the FAQ (evidence #2.2) response regarding "Are your pilots legal and licensed?" may need to be changed to say they only verify pilot's license and that any other professional licenses need to be verified by the client.

In closing, Mr. Brown stated he is more than happy to work with the North Carolina Board of Examiners for Engineers and Surveyors and make changes to his web site it deems necessary.  He indicated he will be making the changes already discussed and will notify this Investigator once they are completed.

## **EVIDENCE**

1.   Packet of information, received from Mark Mazanek consisting of:

    1.1   E-mail dated July 7, 2017 between Mark Mazanek and David J. Evans (Droners.io).

    1.2   E-mail dated March 9, 2016 between Stacey Smith and Mark Mazanek (Subject: Professional North Carolina, United States Surveying & Mapping Drone Pilots for Aerial Videography & Photography: Droners.io).

    1.3   Droners.io webpage "How Droners Works" information.

    1.4   North Carolina Board of Examiners for Engineers and Surveyors correspondence dated April 6, 2016 from Mark Mazanek to David J. Brown (RE: Unlicensed Practice of Land Surveying).

    1.5   E-mail dated April 14, 2016 between Dave Brown and Mark Mazanek (Subject: Re: Unlicensed Practice of Land Surveying).

    1.6   UAV 3D Mapping information.

    1.7   E-mail dated May 26, 2016 between Dave Brown and Mark Mazanek (Subject: Re: Unlicensed Practice of Land Surveying).

    1.8   E-mail dated July 5, 2017 between Gary Thompson and Mark Mazanek (Subject: Re: UAV Company).

    1.9   Droners.io webpage "About Flyover Services" page information.

    1.10   Droners.io webpage "Flyover Services" Drone Pilot portfolio information.

2.   Packet of information, received from Droners.io web site consisting of:

    2.1   Droners.io Pilot Terms of Service ("Agreement") web page.

    2.2   Droners.io FAQ web page.

    2.3   Droners.io Client Terms of Services ("Agreement") web page.

3.   Packet of information, received from Rhode Island Office of the Secretary of State web site consisting of:

    3.1   State of Rhode Island and Providence Plantations Articles of Organization for Droners LLC, dated July 25, 2015.

3.2     Rhode Island Office of the Secretary of State correspondence dated April 6, 2017 from Nellie M. Gorbea to David J. Brown (R: Entity ID #1339304 Droners l.l.c.).

3.3     Certificate of Revocation of Certificate of Organization/Registration of Droners l.l.c., dated June 27, 2017.

4.     E-mail dated August 9, 2017 between David Evans and Cathy Nicholson, et al (Subject: Fw: Question Regarding Drone Surveying), received from David Evans.

7

NCBELS 000715

J.A. 468

# Plaintiffs' Summary-Judgment Appendix Exhibit 33

## NSight Drone Services, LLC Investigative Report

**NORTH CAROLINA**
**BOARD OF EXAMINERS FOR**
**ENGINEERS AND SURVEYORS**

**INVESTIGATIVE REPORT**

Reference:   Case No. V2018-069
             NSight Drone Services, LLC [Non-licensed]
Report by:   Clyde A. Alston, Board Investigator
Date:        December 19, 2018

## SYNOPSIS

This matter is the result of sworn to and notarized charges filed with the Board by Kristian D. Forslin, PLS [L-5116] of Garner, NC.   It's alleged that NSight Drone Services, LLC may be in violation of G. S. 89C-24, 55B and 57D for practicing or offering to practice land surveying without a license. A vehicle with a North Carolina license plate (PFD-6602) was discovered advertising "Mapping" and "Surveying" services. In addition, NSight Drone Services, LLC's web site indicates that the company offers such services as drone based aerial mapping, inspection services and property line referencing.

Mr. Tracy Terrell, owner of NSight Drone Services, LLC, was notified of the charges via e-mail.  The letter the Board sent by Certified Mail was returned as unclaimed.  In his response he wrote that his advertisement was not meant to be misleading, and if taken that way, then he apologizes for it.  He said his web site clearly states "...we collect data. Whether by means of photography, or using drone based sensors." Nevertheless, removing "surveying" from his vehicle and web site was necessary to avoid any further confusion.  During the interview Mr. Terrell said he went ahead and removed "Mapping" from his web site too.

On December 17, 2018, Mr. Terrell called this investigator to say he has taken down NSight Drone Services, LLC's web site (evidence #6) and wasn't going to solicit any future work under the company name.

The following individuals were interviewed by Board Investigator Clyde Alston during the investigation.

- Kristian D. Forslin, PLS – complainant, interviewed on November 28, 2018.
- Tracy Terrell of NSight Drone Services, LLC – respondent, interviewed on December 5, 2018 and December 17, 2018.

There are no previous violations against NSight Drone Services, LLC in the Board's database or on the NCEES Enforcement Exchange web site.

1

This matter is pending consideration by the Land Surveying Review Committee of the North Carolina Board of Examiners for Engineers and Surveyors.

2

NCBELS 000836

J.A. 471

## DETAILS OF INVESTIGATION

Report of Interview with Kristian D. Forslin, PLS [L-5116] on November 28, 2018
57 Portsmouth Island (residence)
Garner, NC 27529
919/423-5095
kkcreek@gmail.com – email

Board Investigator Clyde Alston conducted an interview with Mr. Forslin at his office in Raleigh, NC. Mr. Forslin said he received a Bachelor of Arts in Geography from the University of North Carolina Wilmington and has a GIS Certificate in Geospatial Technology from Haywood Community College. Mr. Forslin was approved for licensure to become a North Carolina Professional Land Surveyor under the grandfathering provision of House Bill 301. He is not licensed in any other states. Mr. Forslin works as a GIS and Survey Manager for the North Carolina Railroad Company. He said he doesn't do any surveying. He said he is heavily involved in outreach by educating surveyors and local governments on mapping and surveying issues. Mr. Forslin said he was contemplating on getting his remote pilot's certification for work, which would allow him to take photographs during their inspections and pictures for marketing materials.

Mr. Forslin said he was in traffic one day when he noticed a truck (evidence #2) with NSight Drone Services, LLC advertised on it. At first, he didn't think much of it. He said his initial interest was to get their phone number and call them, possibly to use their drone services, but the more he began looking into the company he began to realize their services ran afoul with the Board's licensing requirements.

Mr. Forslin said NSight Drone Services, LLC's web site was not as descriptive as the truck. The truck indicated that the company was offering "Mapping" and "Surveying." He reviewed NSight Drone Services, LLC's web site and to him aerial photography seems to be a professional service. Mr. Forslin said it is his understanding that in order to do aerial photography one must be a licensed photogrammetrist. Further, only a PLS or photogrammetrist can offer and provide digital elevation models. Mr. Forslin said there was no disclaimer on the company's web site that says the owner is not a Professional Land Surveyor, which was in part why he filed a complaint.

As for some of the other language on NSight Drone Services, LLC's web site, he said "Inspections" has a broad definition that doesn't necessarily relate to surveying or mapping. He said he wasn't sure of the Board's stance on this and preferred not to comment. He noted the words "Property line referencing" and the statement, "Google maps and other online maps can be out of date. We can make sure you are always viewing the most up-to-date property state." He said if NSight Drone Services, LLC is talking about imagery only, meaning taking photos, then that's okay. However, if he is talking about producing a property map, to him that's offering a surveying product that should not be given to the public unless they are licensed by the Board.

Mr. Forslin said he would imagine NSight Drone Services, LLC should have a disclaimer somewhere on its web site to say they aren't surveyors and that their work should not be a substitute for that of a PLS, but it doesn't show that. In closing, Mr. Forslin suggests NSight Drone Services, LLC add a disclaimer saying they are not licensed surveyors and remove some of the gray areas, like aerial photography that a layperson may not understand is offering the practice land surveying. He said that would be a step in the right direction to resolve some of their web site issues.

Report of Interview with Tracy Terrell on December 5, 2018 and December 17, 2018
NSight Drone Services, LLC
283 Old Barbour Road
Benson, NC 27504
919/714-9048 - mobile
nsightdrones@gmail.com – e-mail

Board Investigator Clyde Alston conducted an interview with Mr. Terrell at the McDonald's restaurant at 3810 Lake Boone Trail, Raleigh, NC 27607. Mr. Terrell said he received a diploma in Computer Science from North Carolina State University. His specialty is computer programming and network support. He said he works full-time for Perspecta USPS as an implementation specialist. He said he works on the information technology side, testing technology software for federal government use.

With regard to his use of drones, Mr. Terrell said he got involved with them in 2016. He said that in August 2017, he received a Federal Aviation Administration, Part 107, remote pilot for small unmanned aircraft systems (sUAS) license. He said his commercial pilot's license gives him the right to fly and capture data under the aviation rule for small and large unmanned aircraft. He said he uses DroneDeploy software for mapping and creating 3D models.

Mr. Terrell said he has two drones. One he uses for recreational purposes, and the other, a DJI commercial drone, he uses for business. He admits that he doesn't fly much. During the interview Mr. Terrell looked over his flight logs and said he's only flown 24 hours since receiving his pilot's license. He went on to say business is not as profitable as first thought. His prior contracts were through Droners.io or DroneBase.

**INVESTIGATOR'S NOTE**: The Board investigated Droners, LLC, d/b/a Droners.io (V2017-062) for practicing or offering to practice land surveying without a license as required by G.S. 89C-24, 57D and 55B. The Board issued the company a notice of noncompliance for offering aerial surveying and mapping services resulting in a map, a drawing, or a 3D model of an object or land mass; aerial photogrammetry; and LIDAR mapping.

Mr. Terrell said Droners.io and DroneBase send him e-mail notifications when there are jobs posted. He said DroneBase also uses a mobile app for smartphone usage. He said both companies send him, and other commercial pilots, jobs to bid on. These jobs describe the type of services the client needs. He said a lot of times it includes

surveying and mapping, which he admits was a category he said he offered (evidence #7). Nevertheless, he hasn't done any mapping or surveying work since starting his business. He said all he's done is aerial photography. He said his last job was for an insurance company. A homeowner filed a claim to have their roof repaired due to storm damage. The insurance company asked him to take pictures of the damage and send them back, so all he does is collect the data, the pictures.

Mr. Terrell said the mobile app he uses allows him to accept or decline job offers. In the case of an insurance company, if he accepts the work, the app sends him a list with the areas he would need to shoot. These are JPEG images the client wants captured. He said the drone captures images depicting what the property looks like in its current state. He said the pictures are high-definition geotagged photographs. He said he doesn't manipulate any metadata that he collects. Once he captures enough images, he sends them to the client, who extracts the data using their own computer software.

In reference to "Aerial Land Survey (NON-Regulatory), Land Use, Land Mapping and Site Selection" (evidence #1.1), Mr. Terrell said he reworded this to Aerial Land Photography. It is also called an orthophoto. He said its multiple images stitched together as one large picture. As for "Farms/Ranches and Livestock Survey," Mr. Terrell said he should have called this a census survey. He said some farmers want to know how many cattle or other livestock they have on their farm. Using a drone to flyover the property helps the farmer know exactly how many cattle he has. Mr. Terrell said if called for a job like this, he would take pictures and send them to the farmer. He said he didn't know what else to call it.

Mr. Terrell said neither he nor the drone makes the prediction noted on the "Inspection" page (evidence #1.3) and the statement, "The high-resolution data can then be inspected to make accurate predictions on possible repairs." It's the building inspector or claims adjuster that does. He said he only takes the photographs. He said drones have the capability of getting to a higher elevation and can capture more data than someone on scaffolding would. He said the drones are cheaper and safer, and more and more companies are using them to help with inspections.

As for the "Construction" page (evidence #1.4), and some of the "…benefits to our clients," particularly, "Multiple Perspective and Varying Elevations," he said a drone can capture multiple angles at different altitudes. A 30-day timeline with photographs taken at different angles at a construction site was an example Mr. Terrell used. As to what is meant by "Google overlay and GIS Data Overlay," Mr. Terrell said this is when someone wants to know what a property looks like, its current state versus its past condition. He said he uses the drone for that by taking the images he captures and laying them on top of the Google map to see the difference.

**INVESTIGATOR'S NOTE:** Mr. Terrell was given a copy of the Board's Policy (evidence #4) on 3D MODELING FOR GRADING AND STAKE-OUT for future reference.

5

Regarding "Mapping and Surveying" (evidence #1.4), Mr. Terrell said this has been removed from his web site. He said he believed this was a service he was capable of doing before the Board told him otherwise. He said many drone companies are using "Surveying" and "Mapping" in their marketing materials as he did.

Mr. Terrell stated that he created his own web site. He said he took information from other drone web sites to create his own. He said he added only what he could do. He uses a drone to take pictures and that's all he does. He said he knows the difference between what is supposed to be regulated and what isn't.

In closing, Mr. Terrell said that when the investigation began his wife told him to look at the allegations from the Board's standpoint to see if he could understand why using "surveying" and "mapping" without being licensed was an issue for the Board. He said looking at it that way he understood and because he's had a chance to see things differently, he's removed both words from his web site and from his truck. He said he will keep photography because he can do this without it presumably being a problem. He went on to say that since the investigation started he was seriously considering removing his web site altogether. He said he has too many other things he needs to be working on for this to be a distraction.

On December 17, 2018 Mr. Terrell called this investigator to say he has taken down NSight Drone Services, LLC's web site (evidence #6) and wasn't going to solicit any future work under the company name. However, he was going to keep his business registered with the North Carolina Secretary of State because his name was attached to it.

6

NCBELS 000840

J.A. 475

## EVIDENCE

1.  The following web site pages were obtained by Clyde Alston on August 21, 2018, from NSight Drones Services, LLC's web site:

    1.1   NSight Drones Services "Home" page.

    1.2   NSight Drones "Real Estate Services" page.

    1.3   NSight Drones "Inspections" page.

    1.4   NSight Drones "Construction" page.

    1.5   NSight Drones "Communications Audits" page.

2.  Photograph of a black Jeep 4X4, with a North Carolina license plate (PFD-6602) advertising "Mapping" and "Surveying" services and a copy from NSight Drones web site advertising "Mapping And Surveying" services, received from the Kristian D. Forslin, PLS on August 15, 2018.

3.  A copy of NSight Drone Service, LLC, Limited Liability Company, Articles of Organization, from the North Carolina Secretary of State web site, obtained by David J. Evans on August 20, 2018.

4.  North Carolina Board of Examiners for Engineers and Surveyors, Policy for 3D MODELING FOR GRADING AND STAKE-OUT, obtained by Clyde Alston on December 5, 2018.

5.  A copy of http://nsightdrones.com/ web site unavailable obtained from the Internet by Clyde Alston on December 17, 2018.

6.  Google "Error 404 (Not Found)!!1" page using the NSight Drone Services, LLC web site (https://sites.google.com/view/nsightdrones/home), obtained by Clyde Alston on December 17, 2018.

7.  E-mail dated December 10, 2018 forwarded from NSight Drone Services to Clyde Alston, Subject: Fwd: Droners.io Lead (Surveying & Mapping): PrecisionHawk Enterprise – Mapping 940 Acres – Wilkinson, received from Tracy Terrell on December 10, 2018.

# Plaintiffs' Summary-Judgment Appendix Exhibit 34

Swampfox Investigative Report

# NORTH CAROLINA
# BOARD OF EXAMINERS FOR
# ENGINEERS AND SURVEYORS

## INVESTIGATIVE REPORT

Reference:   Case No. V2019-072
             Swampfox Aerial, LLC [Non-licensed]
Report by:   William P. Casey, Board Investigator
Date:        August 19, 2019

## <u>SYNOPSIS</u>

This matter is the result of a Board authorized investigation.  At its meeting on July 17, 2019, the Board authorized an investigation to determine if Swampfox Aerial, LLC is in violation of G. S. 89C-24, 55B and 57D for practicing or offering to practice land surveying in North Carolina without a license.  The allegations stem from an e-mail (evidence #1) dated April 23, 2019, from Dillon Flanagan of Swampfox Aerial, LLC, to Stacey A. Smith, PE, in which the firm offers to provide aerial LiDAR services to include volumetric and topographical aerial surveys.

Thomas J. Ihrke of Swampfox Aerial, LLC was notified of the charges through Board correspondence and he responded in writing.  He wrote that Swampfox Aerial, LLC in no way meant to violate any North Carolina laws.  Mr. Ihrke indicated that Mr. Flanagan's e-mail incorrectly represented that Swampfox Aerial, LLC provides aerial surveys.  He added that any work performed in North Carolina will be under a licensed surveyor's responsible charge.

There are no previous violations listed on the Board's database for Swampfox Aerial, LLC and the company is not listed on the NCEES Enforcement Exchange web site.

The following individual was interviewed by Board Investigator William Casey during the investigation:

- Thomas J. Ihrke – President of Swampfox Aerial, LLC (8/15/19)

This matter is pending consideration by the Land Surveying Review Committee of the North Carolina Board of Examiners for Engineers and Surveyors.

## DETAILS OF INVESTIGATION

Report of Interview with Thomas J. Ihrke on August 15, 2019
Swampfox Aerial, LLC [Non-licensed]
38 Krier Ct.
Mt. Pleasant, SC 29464
843/952-3764

Board Investigator William Casey conducted an interview with Mr. Ihrke by telephone. Mr. Ihrke is the President and part owner of Swampfox Aerial, LLC. He indicated the other owners are Frank Boccia, CGJCW, LLC, and Eusebi Inspired, LLC. Mr. Ihrke further indicated they own close to equal shares; however, he probably has majority ownership. He advised that there is one pilot, a Chief of Operations, and two owners who work for the company as 1099 employees. Mr. Ihrke indicated the company was founded in 2016 but was not active until September 2018 when they first obtained equipment.

Mr. Ihrke stated they have five drones or UAVs and three cameras/sensors used for LiDAR, RTK, and thermal imaging. He indicated he and their pilot have the Part 107 remote pilot certification required by the Federal Aviation Administration to operate a UAV or drone commercially. Mr. Ihrke indicated he obtained an undergraduate degree in Political Science and Marketing from Texas Christian University in 1989 and a Master of Business Administration from the University of Tennessee in 1993.

Mr. Ihrke stated Swampfox Aerial, LLC offers aerial data gathering services and their typical clients are surveyors. He indicated he cannot recall Swampfox Aerial, LLC having done any work in North Carolina. He added that the majority of their work has been in Florida and Georgia where they work with a network of builders and surveyors. Mr. Ihrke went on to say the end client always works directly with the surveyor. He indicated if Swampfox Aerial, LLC is contacted first regarding their services they advise the client that they will need a surveyor and if they do not have one, Swampfox Aerial, LLC can make a referral. Mr. Ihrke indicated Swampfox Aerial, LLC provides data to surveyors who use it to create a final map.

Mr. Ihrke stated in addition to LiDAR services, Swampfox Aerial, LLC also offers orthomosaic mapping services. He indicated their LiDAR scanner will get under trees and orthomosaic mapping allows for the stitching together of photos. Mr. Ihrke indicated they gather the data and photos that get sent to the surveyor who stitches it together. He added that those types of images can be used to gather volumetric data but reiterated that Swampfox Aerial, LLC only collects the data and any volumetric calculations are done by a surveyor. Mr. Ihrke indicated if they learn of a landfill owner in need of determining how much usable area they have remaining, they will reach out to them and offer to fly the site and send the data to a surveyor who can process it and produce a map.

Mr. Ihrke stated Swampfox Aerial, LLC also offers coastline erosion studies. He indicated they have not actually done any studies; however, the hope is that they will be asked to

take time-series photos to aid in determining if coastal erosion is occurring. Mr. Ihrke indicated there is no surveying involved in those studies.

Mr. Ihrke stated the e-mail (evidence #1) that prompted this investigation was sent by Dillon Flannagan, a former pilot for Swampfox Aerial, LLC. He indicated Mr. Flannagan used a bad term when describing the services the company can offer. He went on to say no one at Swampfox Aerial, LLC is a surveyor and it would take less than five minutes speaking with them to figure that out. Mr. Ihrke indicated their intent was to provide LiDAR services to the firm they had reached out to. He indicated Swampfox Aerial, LLC believes they can legally work in North Carolina and can be hired as a consultant to gather LiDAR data, which would be used by a licensed surveyor to create a map. Mr. Ihrke went on to say they never provide the data they collect to the end user. He added that Swampfox Aerial, LLC's employees do not know what to do with the data after it is collected, which is why they partner with a licensed photogrammetrist for processing and quality control before it gets sent to a surveyor.

Mr. Ihrke stated Swampfox Aerial, LLC partners with 5280 Geospatial Solutions, LLC, a licensed photogrammetry firm located in Colorado, to process their data and perform quality control checks to ensure it is what a surveyor will need to do their job. He indicated the only deliverable they provide is to surveyors in the form of 3D cloud data that can be loaded into CAD software for the creation of a map. Mr. Ihrke stated that before they begin flying a job, ground control is established by a licensed surveyor.

Mr. Ihrke acknowledged that the Swampfox Aerial, LLC web site (evidence #2.2) reads as if they directly provide the services they market. He indicated their web site reads like it does because they can get those services done. Mr. Ihrke added that how they get the deliverable to the end user may vary by state. He indicated any work they may eventually do in North Carolina will be under the supervision of a surveyor. He indicated it is a national web site and Swampfox Aerial, LLC is willing to make changes to clarify how work is done in North Carolina if necessary. Mr. Ihrke indicated he is not a technical person but imagines a "geofence" could be used so that if someone from North Carolina goes to their web site they would be redirected to a North Carolina specific web site wherein their services would be described differently. He reiterated that he does not recall having any clients in North Carolina and that Swampfox Aerials, LLC is willing to do anything not to be in trouble.

In closing, Mr. Ihrke stated Swampfox Aerial, LLC respects the North Carolina Board of Examiners for Engineers and Surveyors and went on to say this investigation has been a horrifying experience. He indicated if they continue to market their services in North Carolina they want to do it correctly and will not be argumentative at all.

## <u>EVIDENCE</u>

1.    E-mail correspondence with attached marketing materials between Stacey A. Smith, PE, David Evans, and Mark Mazanek dated April 23, 2019, Subject: Aerial LiDAR.

2.    Packet of information, received from David Tuttle consisting of:

    2.1    E-mail correspondence between Richard Bullock, PLS, David Tuttle, David Evans, and Mark Mazanek dated May 8, 2019 and May 9, 2019, Re: Drone LiDar Subcontract Question.

    2.2    Web site materials for swampfoxaerial.com.

3.    E-mail correspondence between Mike Benton, PLS, David Evans, Mark Mazanek, and Mark Schall dated June 20, 2019 to July 11, 2019, RE: Compliance Question.

4.    South Carolina Secretary of State entity profile for Swampfox Aerial, LLC.

# Plaintiffs' Summary-Judgment Appendix Exhibit 35

Air Source One, LLC Investigative Report

**NORTH CAROLINA
BOARD OF EXAMINERS FOR
ENGINEERS AND SURVEYORS**

**INVESTIGATIVE REPORT**

Reference:    Case No. V2019-091
              Air Source One, LLC
Report by:    Cathy Nicholson, Board Investigator
Date:         April 7, 2020

## SYNOPSIS

This matter is the result of sworn to and notarized charges filed with the Board by David H. Snider, PLS.  He alleged that Air Source One, LLC may be in violation of G. S. 89C-24, 57D and 55B for practicing or offering to practice surveying without a license.  A review of the firm's web site indicated the firm's services include mapping property contours and existing conditions [Evidence #2.1].  These services were also advertised on the company vehicle [Evidence #1].

Brian Reeves, owner of Air Source One, LLC, was notified of the charges through certified Board correspondence.  Mr. Reeves provided a written response saying they have reviewed their web site and agree there is terminology that would indicate they're offering surveying services such as mapping property contours.  He wrote that they have revised the web site to prevent any future confusion to the public [Evidence #4].  During the telephone interview Mr. Reeves stated that they are not offering land surveying services.  In follow-up e-mail correspondence dated April 6, 2020, he wrote that he removed the misleading lettering from the company vehicle.  He e-mailed photos to document the corrective action taken.  He stated that he is willing to make any other changes the Board deems necessary.

There are no violations on the Board's database or NCEES Enforcement Exchange against Brian Reeves or Air Source One, LLC.

The following person was interviewed during the course of this investigation:

- Brian Reeves of Air Source One, LLC – respondent – Interviewed on April 3, 2020.

This matter is pending consideration by the Land Surveying Review Committee of the North Carolina Board of Examiners for Engineers and Surveyors.

1

NCBELS 001129

J.A. 483

## <u>DETAILS OF INVESTIGATION</u>

<u>Report of Interview with Brian Reeves on April 3, 2020</u>
Air Source One, LLC
222 N. Main Street
Mooresville, NC  28115
844-247-7721 Ext. 1
info@airsourceone.us

Board Investigator Cathy Nicholson conducted a telephone interview with Brian Reeves. Mr. Reeves stated that he is 100 percent owner of Air Source One, LLC.  He indicated that he earned a degree in Photography from the New York Institute of Photography. He stated that he has over 20 years of experience in action photography to include shooting NFL and NASCAR events.  He also has 25 years of experience as a project superintendent at Crowder Construction in Charlotte doing heavy civil construction projects involving infrastructure.

Mr. Reeves stated that he formed Air Source One, LLC three years ago as an aerial drone photography service in the Lake Norman, Charlotte and Piedmont areas.  He and employee Travis Weddington are both certified as FAA drone pilots. They offer services such as photographing crops for the agricultural community; aerial inspections of clock towers, churches, and infrastructure; roof inspections; photographing real estate; and cinematography of events.  He stated that they oftentimes work with structural and forensic engineers.  He added that their biggest client is SKA Consulting Engineers, Inc. [F-0508].

Mr. Reeves stated that after receiving the Board's case-opening letter they contacted Rufus J. Love, PLS [L-2844] of Pyramid Land Surveying, PA [C-1341] and asked him to review their web site and suggest edits, if needed.  Mr. Reeves stated that he also showed Mr. Love the Board's letter and Mr. Love agreed that *mapping property contours and existing conditions* [Evidence #2.1, #3] is a service Professional Land Surveyors provide.  Mr. Reeves stated that he revised his web site and now that page indicates, "Aerial Reconnaissance / Property Modeling / Present Conditions / Planning" [Evidence #4].  He stated that he also removed a reference to using photogrammetry software, and mapping.  Mr. Reeves explained that Mr. Weddington worked for Mr. Love for eight years as an apprentice before coming to work at Air Source One, LLC. He further explained that Mr. Love has been surveying over 35 years and they knew he would be a good source to provide a third opinion.

Mr. Reeves stated that his web site has one reference to agriculture surveys, but that's in reference to crop counts and has nothing to do with land surveying.  Mr. Reeves stated that they have not been providing surveying services and they didn't intend to offer surveying services. He stated that they have never worked from control monuments set by a Professional Land Surveyor.  He stated that for the company's 10-year plan, he hopes to merge the company with a Professional Land Surveyor and add LIDAR and topographic services, but that's a long way down the road.

Mr. Reeves stated that he removed misleading lettering from the back of their company van, which said, "3D Imaging & Contour Mapping." He stated that he is willing to make any changes the Board deems necessary because he wants to operate his company in compliance.

**INVESTIGATOR'S NOTE**: This investigator telephoned complainant David Snider, PLS on April 3, 2020, and left a message informing him that Air Source One, LLC has made changes to its web site and is going to make changes to the advertising on their company vehicle. He was also informed that the matter would be reviewed at an upcoming Land Surveying Review Committee meeting and he could contact this investigator if he had anything further to add. Mr. Snider didn't return the call.

## **EVIDENCE**

1. Color photo of Air Source One, LLC's company vehicle (van) advertising services, received from David H. Snider, PLS on October 7, 2019.

2. Packet of documents obtained by David Evans on October 8, 2019, containing the following:

   2.1 Web pages (5 pages) from Air Source One, LLC's web site at https://airsourceone.us/missions/ [page 3 advertises "Mapping Property Contours / Existing Conditions / Planning"].

   2.2 North Carolina Secretary of State search results for Air Source One, LLC [Status: Current-Active] and Annual Report for 2018 [Nature of Business: UAV Aerial Imaging, UAV Aerial Inspections].

3. Packet of documents from web pages of http://airsourceone, obtained by Cathy Nicholson on December 2, 2019 [**Inv. Note**: This investigator placed sticky-back markers beside possible references to surveying. These pages predate the written response].

4. Packet of documents from web pages of http://airsourceone, obtained by Cathy Nicholson on January 3, 2020 [**Inv. Note**: This investigator placed sticky-back markers beside revisions].

## CERTIFICATE OF SERVICE

I hereby certify that on June 28, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ Samuel B. Gedge
Samuel B. Gedge

*Counsel for Appellants*