No. 23-1472

# In the United States Court of Appeals for the Fourth Circuit

360 VIRTUAL DRONE SERVICES LLC et al., Plaintiffs-Appellants,

*v.*

ANDREW L. RITTER, in his official capacity as Executive Director of the North Carolina Board of Examiners for Engineers and Surveyors, et al., Defendants-Appellees.

On Appeal from the United States District Court
for the Eastern District of North Carolina, Case No. 5:21-cv-00137-FL
(Hon. Louise W. Flanagan)

## CORRECTED JOINT APPENDIX
## VOLUME II OF II
### (Pages J.A. 487 to J.A. 987)

Douglas W. Hanna
FITZGERALD HANNA &
SULLIVAN PLLC
  3737 Glenwood Avenue, Suite 375
  Raleigh, North Carolina 27612
  (919) 863-9091

*Counsel for Appellees*

Samuel B. Gedge
James T. Knight II
INSTITUTE FOR JUSTICE
  901 North Glebe Road, Suite 900
  Arlington, VA 22203
  (703) 682-9320

David G. Guidry
GUIDRY LAW FIRM PLLC
  338 South Sharon Amity Rd., #337
  Charlotte, NC 28211
  (917) 376-6098

*Counsel for Appellants*

# TABLE OF CONTENTS

## VOLUME I

U.S. District Court docket report.................................................................J.A. 1

Complaint (Mar. 22, 2021) (Dist. Ct. Doc. 1)....................................J.A. 8

Defendants' statement of undisputed material facts
    (Mar. 25, 2022) (Dist. Ct. Doc. 32)......................................J.A. 31

Plaintiffs' statement of undisputed material facts
    (Mar. 25, 2022) (Dist. Ct. Doc. 37)......................................J.A. 41

Exhibits to plaintiffs' motion for summary judgment (Mar. 25, 2022):

    Exhibit 1—Declaration of Alex Abatie
        (Dist. Ct. Doc. 38-1).........................................................J.A. 65

    Exhibit 3—Declaration of Michael Jones
        (Dist. Ct. Doc. 38-3)........................................................ J.A. 87

    Exhibit 4—Michael Jones's webpage
        (Dist. Ct. Doc. 38-4)........................................................ J.A. 94

    Exhibit 5—Michael Jones map with scale bar
        (Dist. Ct. Doc. 38-5)........................................................ J.A. 98

    Exhibit 6—Board's December 2018 letter to 360 Virtual Drone
        Services LLC (Dist. Ct. Doc. 38-6).............................J.A. 100

    Exhibit 7—E-mails between Michael Jones and board
        investigator (Dist. Ct. Doc. 38-7).................................J.A. 102

    Exhibit 8—Board's June 2019 letter to 360 Virtual Drone
        Services LLC (Dist. Ct. Doc. 38-8).............................J.A. 109

    Exhibit 9—Michael Jones's e-mail to client
        (Dist. Ct. Doc. 38-9)....................................................J.A. 112

Exhibit 10—Declaratory opinion of the Mississippi Board of Licensure for Professional Engineers and Surveyors (Dist. Ct. Doc. 38-10) .................................................................. J.A. 115

Exhibit 11—Advisory opinion of the Kentucky State Board for Licensure for Professional Engineers & Land Surveyors (Dist. Ct. Doc. 38-11) .................................................................. J.A. 119

Exhibit 12—Board's letter to Air Source One (Dist. Ct. Doc. 38-12) .................................................................. J.A. 123

Exhibit 13—Board's letter to NSight Drone Services, LLC (Dist. Ct. Doc. 38-13) .................................................................. J.A. 126

Exhibit 14—Board's letter to Firmatek, LLC (Dist. Ct. Doc. 38-14) .................................................................. J.A. 129

Exhibit 15—Board's letter to Lappert Smith Industries d/b/a Charlotte UAV (Dist. Ct. Doc. 38-15) ........................................... J.A. 132

Exhibit 16—Board's letter to NC Drone Pro, LLC (Dist. Ct. Doc. 38-16) .................................................................. J.A. 135

Exhibit 17—E-mail from Board's counsel to Roger Armstrong (Dist. Ct. Doc. 38-17) .................................................................. J.A. 138

Exhibit 18—Excerpts of deposition of David Tuttle, Board's counsel (Dist. Ct. Doc. 38-18) .......................................... J.A. 143

Exhibit 19—Board's file on 360 Virtual Drone Services (Dist. Ct. Doc. 38-19) .................................................................. J.A. 169

Exhibit 20—Excerpts of deposition of board investigator William Casey (Dist. Ct. Doc. 38-20) ........................................ J.A. 232

Exhibit 21—Board's investigative report on 360 Virtual Drone Services LLC (Dist. Ct. Doc. 38-21) ........................................ J.A. 253

Exhibit 22—Excerpts of deposition of board investigator Clyde Alston (Dist. Ct. Doc. 38-22) ........................................... J.A. 260

Exhibit 23—Report of Mark Schall, Board's expert witness
(Dist. Ct. Doc. 38-23)........................................................J.A. 275

Exhibit 24—Excerpts of deposition of Board's 30(b)(6) designee
(Dist. Ct. Doc. 38-24)........................................................J.A. 292

Exhibit 25—Excerpts of deposition of Mark Schall, Board's
expert witness (Dist. Ct. Doc. 38-25)............................J.A. 325

Exhibit 26—Excerpts of deposition of Andrew Ritter, Board's
executive director (Dist. Ct. Doc. 38-26)......................J.A. 380

Exhibit 27—Michael Jones's map with no scale bar
(Dist. Ct. Doc. 38-27)........................................................J.A. 417

Exhibit 28—Defendants' response to plaintiffs' interrogatory
number ten (Dist. Ct. Doc. 38-28)..................................J.A. 419

Exhibit 29—Board's investigative report on Firmatek, LLC
(Dist. Ct. Doc. 38-29)........................................................J.A. 428

Exhibit 30—Board's investigative report on Lappert Smith
Industries d/b/a Charlotte UAV (Dist. Ct. Doc. 38-30)............J.A. 438

Exhibit 31—Board's investigative report on Mark Fronrath/
NC Drone Pro, LLC (Dist. Ct. Doc. 38-31)................J.A. 455

Exhibit 32—Board's investigative report on Droners.io
(Dist. Ct. Doc. 38-32)........................................................J.A. 461

Exhibit 33—Board's investigative report on NSight Drone
Services, LLC (Dist. Ct. Doc. 38-33)............................J.A. 469

Exhibit 34—Board's investigative report on Swampfox
Aerial, LLC (Dist. Ct. Doc. 38-34)..............................J.A. 477

Exhibit 35—Board's investigative report on Air Source
One, LLC (Dist. Ct. Doc. 38-35) ....................................J.A. 482

# VOLUME II

Exhibits to defendants' motion for summary judgment (Mar. 28, 2022):

    Exhibit 1—Affidavit of Andrew Ritter, Board's executive
        director (Dist. Ct. Doc. 39-1)..........................................J.A. 487

    Exhibit 2—Transcript of deposition of 360 Virtual Drone
        Services LLC's 30(b)(6) designee (Dist. Ct. Doc. 39-2) ...........J.A. 494

    Exhibit 3—Transcript of deposition of Michael Jones* ................J.A. 582

    Exhibit 4—Plaintiff 360 Virtual Drone Services LLC's
        responses to requests for admission (Dist. Ct. Doc. 39-4).......J.A. 781

    Exhibit 5—Transcript of deposition of Board's Rule 30(b)(6)
        designee (Dist. Ct. Doc. 39-5)......................................J.A. 786

    Exhibit 6—Defendants' disclosure of expert testimony
        (Dist. Ct. Doc. 39-6).................................................J.A. 817

    Exhibit 7—Transcript of deposition of Alex Abatie
        (Dist. Ct. Doc. 39-7).................................................J.A. 837

Defendants' response to plaintiffs' statement of undisputed
    material facts (Apr. 28, 2022) (Dist. Ct. Doc. 43) ................J.A. 926

Plaintiffs' response to defendants' statement of undisputed
    material facts (Apr. 29, 2022) (Dist. Ct. Doc. 45) ................J.A. 933

Order (motions for summary judgment)
    (Mar. 31, 2023) (Dist. Ct. Doc. 50)................................J.A. 959

Judgment (Mar. 31, 2023) (Dist. Ct. Doc. 51) ..........................J.A. 983

---

* The version of this transcript filed in the district court (at docket number 39-3) was a condensed transcript. In accordance with directions from the clerk's office, an uncondensed version has been included in this appendix.

Plaintiffs' notice of appeal (Apr. 25, 2023) (Dist. Ct. Doc. 52) ................J.A. 985

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
CASE NO. 5:21-cv-0137-FL

| | | |
|---|---|---|
| 360 VIRTUAL DRONE SERVICES LLC and MICHAEL JONES, | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) ) | |
| ANDREW L. RITTER, in his official capacity as Executive Director of the North Carolina Board of Examiners for Engineers and Surveyors; and JOHN M. LOGSDON, JONATHAN S. CARE, DENNIS K. HOYLE, RICHARD M. BENTON, CARL M. ELLINGTON, JR, CEDRIC D. FAIRBANKS, BRENDA L. MOORE, CAROL SALLOUM, and ANDREW G. ZOUTWELLE, in their official capacities as members of the North Carolina Board of Examiners for Engineers and Surveyors, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **AFFIDAVIT OF ANDREW RITTER** |
| Defendants. | ) ) ) | |

I, Andrew Ritter, being first duly sworn, depose and say as follows:

1.     I am over the age of 18, have personal knowledge of all matters in this affidavit, and am legally competent to testify.

2.     I am employed by the North Carolina Board of Examiners for Engineers and Surveyors (the "Board") as the Executive Director.

3.     North Carolina regulates land surveying through it Engineering and Land Surveying Act (the "Act"). The Act establishes a State Board of Examiners for

Engineers and Surveyors (the "Board") to administer the provisions of the Act. *See* N.C.G.S. § 89C-4.

4. The Legislature designated the practice of Land Surveying as a profession. *See* N.C.G.S. § 89C-3(7)(a).

5. "Land surveying encompasses a number of disciplines including geodetic surveying, hydrographic surveying, cadastral surveying, engineering surveying, route surveying, photogrammetric (aerial) surveying, and topographic surveying." *See* N.C.G.S. § 89C-13(b).

6. "The Act prohibits any person from practicing or offering to practice land surveying in North Carolina without first being licensed by the Board." [ECF Doc. 1 at ¶ 36; N.C.G.S. §§ 89C-2 and 89C-23].

7. The alleged unlawful practice by an unlicensed person shall be subject to Board investigation. *See* 21 NCAC 56 .1302.

8. In early 2019, the Board mailed to Michael Jones and 360 Virtual Drone a notice that the Board "had initiated an investigation concerning charges that 360 Virtual Drone Services, LLC is practicing or offering to practice surveying without a license as required by F.S. 89C."

9. During the investigation, Plaintiffs Michael Jones and 360 Virtual Drone admitted that it had advertised it had "experience" in providing services for "Mapping and Surveying."

10. During the investigation, Plaintiffs Michael Jones and 360 Virtual Drone reported that it had offered to provide orthomosaic maps (measurable maps).

11.     The Board mailed to Michael Jones a letter dated June 13, 2019, stating that, after conducting an investigation, "the Board's Review Committee has determined that there is sufficient evidence to support the charge that 360 Virtual Drone Services, LLC is practicing, or offering to practice, surveying in North Carolina, as defined in G.S. 89C-3(6) without being licensed with this Board."

12.     Plaintiffs were placed on notice that practicing, or offering to practice, land surveying in North Carolina without being licensed with the Board is a violation of the Act.

13.     At no time has the Board initiated any enforcement proceedings against Plaintiffs Michael Jones and 360 Virtual Drone.

14.     Plaintiff 360 Virtual Drone testified that it never provided the service of orthomosaic maps prior to receiving the notice dated June 19, 2019. However, Plaintiff 360 Virtual Drone testified that it did produce one exemplar of an orthomosaic map in PDF form to a potential customer for marketing purposes. The PDF map did not have any measurable information.

15.     It is the position of the Board that taking aerial photographs for the purpose of producing a PDF picture without measurable information is not the practice of land surveying. As such, the Board disavows any intent to initiate enforcement proceedings against Plaintiffs based on the act of producing a PDF image of a map that does not contain measurable information.

16.    The Board actively updates and publishes policies to include or exclude activities that fall within, or outside, the definition of the practice of land surveying. A copy of the inclusion/exclusion list is attached hereto as Exhibit A.

17.    It is the position of the Board that the act of producing an aerial photograph, without measurable information, that includes lines indicating the approximate position of property lines for marketing purposes is not the practice of land surveying. As such, the Board disavows any intent to initiate enforcement proceedings against Plaintiff based on the act of producing an aerial photograph, without measurable information, that includes lines indicating the approximate position of property lines for marketing purposes.

**FURTHER, THE AFFIANT SAYETH NOT.**

This the 24th day of March, 2022.

Andrew Ritter

Wake County, North Carolina

Sworn to and subscribed before me

this the 24th day of March, 2022.

Cora S. Houston, Notary Public

My Commission Expires: _1 - 1 - 2026_

## GIS Inclusions/Exclusions Guidelines - April 2008, Revised October 2011
### North Carolina Board of Examiners for Engineers and Surveyors

This chart, while not all inclusive, assists in determining items of GIS data that are included or excluded from the definition of Land Surveying in G.S. 89C-3(7).The definition includes all location data that is issued for an authoritative purpose.  Authoritative shall mean presented as trustworthy and competent for reliance upon by the public or if provided to a stated accuracy.

| Board Description | GICC Data Layer Description | Land Surveying Committee Responses |
|---|---|---|
| Orthophotography | Large-scale scanned and rectified aerial photographs | Inclusion |
| Cadastral | County-based private and public property boundaries including easements | Inclusion |
| Roads | Centerlines, including rights-of-way | Inclusion |
| Municipal Boundaries | City/town boundaries | Inclusion |
| County Boundaries | County borders | Inclusion |
| ETJs | Extra-territorial jurisdictions -- areas not in a municipality, but under authority of the city or town | Inclusion |
| Surface Waters | Locations and names of streams, rivers, lakes, ponds, etc., including mean high water marks | Inclusion - Locations and names of streams, rivers, lakes, ponds, etc., including mean high water marks and when the survey is done to determine authoritative location of stream, waterway or location of mean high water. |
| Geodetic Control | Horizontal and vertical survey control locations | Inclusion |
| Elevation | Ground elevations (depicted as contours, X/Y/Z points, elevation models, TINs?) | Inclusion |
| Land Use | Cadastral-based land use | Exclusion |
| Land Cover | Statewide land cover - 1996 | Exclusion |
| Flood Zones | Areas inundated by flood waters (1% annual chance, .2%annual chance, flood ways) | Inclusion |
| Soils | Soil Survey Geographic (SSURGO) database produced by US Dept. of Agriculture, Natural Resources Conservation Service | Inclusion if used to determine authoritative location of soils. Determination of soils to be done by Soil Scientists. |
| Public Lands | Non-taxable lands maintained in county cadastral databases | Inclusion |
| Railroads | Locations of railroad lines including rights-of-way | Inclusion |
| Airports | Airport/airfield property boundaries and easements | Inclusion |
| Schools | Point locations of public and non-public grade schools | Exclusion |
| Colleges/Universities | Point locations of state universities and private colleges and universities | Exclusion |
| Hospitals | Point locations of hospitals | Inclusion |
| Storm Surge Inundation | Estimated coastal areas inundated by hurricane storm surge | Inclusion for PEs and PLSs.  Models are developed by PEs using data collected by PLS. |
| Surface Water Intakes | Point locations where communities draw raw water from a lake, river, or stream, treat it, and distribute treated water to customers | Exclusion |
| NPDES | National Pollutant Discharge Elimination System -locations of individually permitted wastewater discharged into surface waters | Exclusion unless federal, state or local authority requires survey. |
| Police Stations | Point locations of police stations | Exclusion |
| Fire Stations | Point locations of fire stations | Exclusion |
| Landfills | Point locations of municipal/county landfills | Exclusion |
| Watersheds | Water supply watersheds | Inclusion |
| Wetlands | Wetlands areas from the US Fish and Wildlife Service, National Wetlands Inventory | Inclusion |

EXHIBIT A

| Hazardous Disposal Sites | Areas identifying locations of uncontrolled and unregulated, hazardous waste sites (formerly called superfund sites). | Inclusion |
|---|---|---|
| Building Footprints | Perimeter outlines of buildings | Inclusion when authoritative location is required, such as Land Title Surveys, Brownfield Surveys, etc. |
| Future Land Use | Cadastral-based, potential land use based on current zoning | Exclusion |
| Water Lines | Water pipe distribution network and accompanying features | Inclusion |
| Sewer Lines | Sanitary sewer pipe network and accompanying features | Inclusion |
| Stormwater Lines | Stormwater network and accompanying features | Inclusion |
| NC House Districts | Boundaries of NC House Districts | Exclusion |
| NC Senate Districts | Boundaries of NC Senate Districts | Exclusion |
| US Congressional Districts | Boundaries of US Congressional Districts | Exclusion |
| Census Boundaries | 2000 US Census boundaries for tracts, blocks, and block groups | Exclusion |
| Power Transmission Lines | Transmission network and accompanying features | Exclusion for inventory applications. Inclusion where survey is for authoritative location or a stated accuracy. |
| Natural Gas Pipelines | Transmission network and accompanying features | Exclusion for inventory applications. Inclusion where survey is for authoritative location or a stated accuracy. |
| Septic Tanks | Point locations of septic features | Exclusion for inventory applications. Inclusion where survey is for authoritative location or a stated accuracy. |
| Telecommunication Lines | Telephone, cable television, and other communication features such as towers | Exclusion for inventory applications. Inclusion where survey is for authoritative location or a stated accuracy. |
| Wells | Point locations | Exclusion for inventory applications. Inclusion where survey is for authoritative location or a stated accuracy. |
| Mineral Rights Boundaries | | Inclusion if for authoritative location or stated accuracy of the boundary. |
| Mining Resources | | Exclusion |
| Greenways | | Inclusion when the survey is to determine the fee simple or easement corridor of the greenway. |
| Sidewalks | | Exclusion |
| Cemeteries | | Exclusion if general point location for inventory purpose of locating cemetery. Inclusion if the boundaries of the cemeteries are being determined or established. |
| Archaeological Sites | | Exclusion |
| Historic Sites and Structures | | Exclusion |

NCBELS 000078

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this day served a copy of the **AFFIDAVIT OF ANDREW**

**RITTER** upon all parties to this action by email addressed as follows:

David G. Guidry, Mainsail Lawyers, **dguidry@mainsaillawyers.com**
338 South Sharon Amity Rd., #337
Charlotte, NC 28211

Samuel B. Gedge, Institute for Justice, **sgedge@ij.org**
901 North Glebe Road, Suite 900
Arlington, VA 22203

James T. Knight II, Institute for Justice, **jknight@ij.org**
901 North Glebe Road, Suite 900
Arlington, VA 22203

This the 25th day of March 2022.

/s/ Douglas W. Hanna
Douglas W. Hanna, NCSB #18225

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
CASE NO. 5:21-cv-0137-FL

_____

360 VIRTUAL DRONE SERVICES LLC and      )
MICHAEL JONES,                          )
     Plaintiff,      )
v.                                      )
ANDREW L. RITTER, in his official       )
capacity as Executive Director of the   )
North Carolina Board of Examiners for   )
Engineers and Surveyors; and JOHN M.    )
LOGSDON, JONATHAN S.' CARE, DENNIS K.   )
HOYLE, RICHARD M. BENTON, CARL M.       )
ELLINGTON, JR, CEDRIC D. FAIRBANKS,     )
BRENDA L. MOORE, CAROL SALLOUM, and     )
ANDREW G. ZOUTWELLE, in their official  )
capacities as members of the North      )
Carolina Board of Examiners for         )
Engineers and Surveyors,                )
                                        )
     Defendants.     )
_____)

REMOTE DEPOSITION OF
MICHAEL RUDOLPH JONES 30(b)(6)
Zoom Videoconference
02/22/2022
10:01 a.m. (EST)

REPORTED BY:  AMANDA GORRONO, CLR
CLR NO. 052005-01

_____

DIGITAL EVIDENCE GROUP
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202) 232-0646

USCA4 Appeal: 23-1472    Doc: 19-3    Filed: 06/28/2023    Pg: 15 of 211

Page 2

```
 1                         02/22/2022

 2                         10:01 a.m. (EST)

 3

 4      REMOTE DEPOSITION OF MICHAEL RUDOLPH JONES,

 5   held virtually via Zoom Videoconferencing, before

 6   Amanda Gorrono, Certified Live Note Reporter, and

 7   Notary Public of the State of New York.

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22
```

www.DigitalEvidenceGroup.com    Digital Evidence Group C'rt 2022    202-232-0646
Case 5:21-cv-00137-FL    Document 39-2    Filed 03/28/22    Page 2 of 88

J.A. 495

Page 3

```
 1    A P P E A R A N C E S
 2    (Via Zoom Videoconferencing):
 3
 4    ON BEHALF OF PLAINTIFF:
         Samuel B. Gedge, Esquire
 5       Institute for Justice
         901 N. Glebe Road, Suite 900
 6       Arlington, VA 22203
         PHONE:  (703) 682.9320
 7       E-MAIL: Sgedge@ij.org
 8
 9    ON BEHALF OF DEFENDANTS:
         Douglas W. Hanna, Esquire
10       Fitzgerald Hanna & Sullivan, PLLC
         3737 Glenwood Avenue
11       Suite 375
         Raleigh, NC  27612
12       PHONE:  (919) 863-9091
         E-MAIL: Dhanna@ghslawfirm.com
13
14    ALSO PRESENT:
15    Jacqueline Poyle, Assistant - Fitzgerald Hanna &
16    Sullivan, PLLC
17
18
19
20
21
22
```

J.A. 496

```
                                                      Page 4
 1                    I N D E X
 2   WITNESS                EXAMINATION BY           PAGE
     MICHAEL R. JONES      MR. HANNA                    6
 3
 4                  E X H I B I T S
 5   EXHIBIT       DESCRIPTION                        PAGE
 6   Exhibit 1     Re-Notice of Rule 30(b)(6)
                   Deposition of Plaintiff 360
 7                 Virtual Drone Services LLC.......    7
 8   Exhibit 2     Complaint for Declaratory and
                   Injunctive Relief...............    10
 9   Exhibit 3     Deposition of Michael Jones......   14
10   Exhibit 4     North Carolina Board of
                   Examiners for Engineers and
11                 Surveyors Investigative Report
                   Bates NCBELS 000001 - NCBELS
12                 000076..........................    15
13   Exhibit 5     Plaintiff 360 Virtual Drone
                   Services LLC's Responses and
14                 Objections to Defendant's First
                   Set of Interrogatories...........   25
15   Exhibit 6     Plaintiff 360 Virtual Drone
                   Services LLC's Responses and
16                 Objections to Defendant's First
                   Set of Request For Admissions....   82
17   Exhibit 7     Plaintiff 360 Virtual Drone
                   Services LLC's Responses and
18                 Objections to Defendant's First
                   Set of Request For Production
19                 of Documents.....................   30
20   Exhibit 8     Letter dated 2/8/2019............   83
21   Exhibit 9     E-mail Bates Plaintiffs000020....   16
22   Exhibit 10    Certificate of Completion........   84
```

2/22/2022        360 Virtual Drone Services, et al. v. Andrew L. Ritter, et al. Michael Jones 30(b)(6)

```
                                                             Page 5
  1                         R E Q U E S T S

  2     DESCRIPTION                                          PAGE

  3     Request for E-mails...........................       70

  4

  5

  6

  7

  8

  9

 10

 11

 12

 13

 14

 15

 16

 17

 18

 19

 20

 21

 22
```

J.A. 498

Page 6

1    MICHAEL RUDOLPH JONES, called as a witness,

2    having been first duly sworn by a Notary Public

3    of the State of New York, was examined and

4    testified as follows:

5              THE WITNESS:  Yes, ma'am.

6              THE COURT REPORTER:  Thank you.

7              Can you please state your name and

8         address for the record.

9              THE WITNESS:  Michael Rudolph Jones.

10        Address is 4971 Wayne Memorial Drive,

11        Goldsboro 27534.

12   EXAMINATION

13   BY MR. HANNA:

14        Q.    Mr. Jones, good morning.

15        A.    Good morning.

16        Q.    My name is Doug Hanna and I

17   represent the defendants in this case, which I

18   will collectively refer to as the Board.  And

19   it's a lawsuit that was filed by you in the

20   Eastern District of North Carolina.  It was a

21   lawsuit that's entitled Complaint for Declaratory

22   and Injunctive Relief.

J.A. 499

Page 7

```
 1                    Are you familiar with the lawsuit

 2      that I'm talking about?

 3            A.    Yes, sir, I am.

 4            Q.    Okay.  And you're here today on

 5      behalf of 360 Virtual Drone Services LLC?

 6            A.    Yes, sir.

 7            Q.    And just for the record, do you have

 8      a copy of the Complaint in front of you?

 9            A.    Yes, I do.

10            Q.    Okay.  Great.  And I'm going to

11      share my screen with you if I can figure this

12      out.

13            A.    Great.  Thank you.

14                    (Whereupon, Exhibit 1, Re-Notice of

15         Rule 30(b)(6) Deposition of Plaintiff 360

16         Virtual Drone Services LLC, was marked for

17         identification.)

18            Q.    And if that worked, do you see a

19      document called "Re-notice of Rule 30(b)(6)

20      Deposition"?

21            A.    I do, yes, sir.

22            Q.    And we're here today to take the
```

www.DigitalEvidenceGroup.com    Digital Evidence Group C'rt 2022    202-232-0646
Case 5:21-cv-00137-FL    Document 39-2    Filed 03/28/22    Page 7 of 88

J.A. 500

2/22/2022        360 Virtual Drone Services, et al. v. Andrew L. Ritter, et al. Michael Jones 30(b)(6)

Page 8

1    corporate deposition of Virtual Drone Services

2    LLC.

3              Have you seen this Notice of

4    Deposition before?

5         A.    Yes, sir.  I have it right here.

6         Q.    Okay.  And on that notice, you'll

7    see where I have asked "Plaintiff 360 Virtual

8    Drone Services LLC to designate one or more

9    officers, members, managing agents, or other

10   persons to testify on its behalf on each of

11   the" -- on each of the 13 topics listed in this

12   Deposition Notice.

13             Are you the person designated?

14        A.    Yes, sir, I am the only person.

15        Q.    Okay.  All right.  And are you the

16   100 percent owner of 360 Virtual Drone Services?

17        A.    Yes, sir, I am.

18        Q.    And that is a limited liability

19   company formed in North Carolina?

20        A.    Yes, sir, it is.

21        Q.    And you're the single managing

22   member of that LLC?

www.DigitalEvidenceGroup.com    Digital Evidence Group C'rt 2022              202-232-0646
Case 5:21-cv-00137-FL   Document 39-2   Filed 03/28/22   Page 8 of 88

J.A. 501

Page 9

1          A.    Yes, sir.

2          Q.    All right.  And you started that

3     company, I believe you formed it on or about

4     October 16, 2017?

5          A.    Yes, sir, that sounds about right.

6          Q.    And just for the judge, just to go

7     through a little bit of a timeline here, but you

8     operated and provided services under that LLC for

9     a couple of years before you received a letter

10    from the North Carolina Board of Examiners for

11    Engineers and Surveyors, correct?

12         A.    Yes, sir.

13         Q.    And then just going through the

14    timeline, it looks like you received a letter

15    dated December 19, 2018 notifying you of an

16    investigation, correct?

17         A.    Yes, sir.

18         Q.    And that you provided -- we'll look

19    through the documents here shortly -- but you

20    provided an E-mail response in January to the

21    Board?

22         A.    Yes, sir.

Page 10

1          Q.    And you were interviewed by the

2     investigator in February of 2019?

3          A.    William Casey, yes, sir.

4          Q.    And in June of 2019, you received a

5     letter from the Board that you attached as an

6     exhibit to the Complaint, correct?

7          A.    Yes, sir.

8          Q.    All right.  So I'm going to share my

9     screen and show you a copy of the Complaint.

10              Do you see that on the screen?

11         A.    Yes, sir, I do.

12         Q.    And is that the same Complaint that

13    you have in front of you?

14         A.    Yes, it is.

15              (Whereupon, Exhibit 2, Complaint for

16         Declaratory and Injunctive Relief, was marked

17         for identification.)

18         Q.    And if I move down to Page 6 of your

19    Complaint, you have a section at the bottom,

20    "Regulation of Land Surveying in North Carolina."

21              Do you see that?

22         A.    Yes, sir, I do.

www.DigitalEvidenceGroup.com    Digital Evidence Group C'rt 2022    202-232-0646
Case 5:21-cv-00137-FL    Document 39-2    Filed 03/28/22    Page 10 of 88

J.A. 503

Page 11

1          Q.    And based on that, you're familiar

2     the, with the Act that's identified as 89C?

3          A.    I'm familiar with, yes, as far as it

4     being on this paper.  I don't have the ins and

5     outs of all of that.

6          Q.    Understood.

7                And your Complaint -- this is your

8     Complaint, right?

9          A.    Okay.  Yes, ma'am -- yes, sir.  I'm

10    sorry.

11         Q.    And your Complaint quotes from the

12    Act and I think in specifically on Paragraph 40

13    which is on Page 8, do you see where your

14    Complaint talks about the "practice of land

15    surveying" and how the Act defines the practice

16    of land surveying?

17         A.    What number does that start on,

18    Mr. Doug?  40?  Right there?

19         Q.    Yes, sir.

20         A.    Yes, sir, I do.  Thank you.

21         Q.    Okay.  And one of the items that is

22    listed here in your Complaint when you look at

Page 12

1    Page 9 --

2         A.    Okay.

3         Q.    -- so it's Paragraph 40,

4    Subparagraph 5, and the definition as you've

5    indicated here from the statute, the definition

6    of land surveying includes, "determining the

7    configuration or contour of the earth's surface

8    or the position of fixed objects on the earth's

9    surface by measuring lines and angles and

10   applying the principles of mathematics or

11   photogrammetry."

12             Do you see that?

13        A.    Yes, sir.

14        Q.    Okay.  And your company, 360 Virtual

15   Drone Services, prior to receiving any type of

16   letter from the Board, had you ever provided any

17   services in the field of photogrammetry?

18        A.    No, not for paying customers.  I

19   tried to pitch it to customers for a future

20   service, but nobody bought into it.

21        Q.    Did you -- do you know what -- what

22   is photogrammetry?

www.DigitalEvidenceGroup.com   Digital Evidence Group C'rt 2022   202-232-0646
Case 5:21-cv-00137-FL   Document 39-2   Filed 03/28/22   Page 12 of 88

J.A. 505

Page 13

```
 1          A.    Photogrammetry is being able to make
 2    orthomaps of the earth by having multiple
 3    pictures stitched together to create one large
 4    picture or map.  That's the way I understand it.
 5          Q.    Okay.  And do you have any education
 6    in the field of photogrammetry?
 7          A.    No, just a couple of online courses
 8    that I took.
 9          Q.    Do you have any experience?  Did you
10    work for any company before you started 360
11    Virtual Drone in the field of photogrammetry?
12          A.    No, sir.
13          Q.    And do you have any certificates or
14    any formal training in photogrammetry?
15          A.    Nothing like -- I have a Udemy
16    course I think I completed online, but it's just
17    an informational course, nothing that certifies
18    anyone.
19          Q.    So the -- a copy of the Notice of
20    Deposition in this case is marked as Exhibit 1.
21                And do you have a paper copy of that
22        in front of you, Mr. Jones?
```

Page 14

 1             A.    What is that again?  What's the name

 2      of it?

 3             Q.    The Re-Notice of the Rule 30(b)(6)

 4      Deposition.

 5             A.    Got it right here, yes, sir.

 6             Q.    And then Exhibit 2 is a copy of the

 7      Complaint.

 8                   Do you have a copy of that in front

 9      of you?

10             A.    Yes.

11             Q.    And Exhibit 3 that I have marked is

12      a copy of your deposition transcript.

13                   Do you have a copy of your

14      deposition, your individual deposition transcript

15      in front of you?

16             A.    I don't have a hard copy, but I do

17      have it online available to look at.

18                   (Whereupon, Exhibit 3, Deposition of

19          Michael Jones, was marked for

20          identification.)

21             Q.    Okay.  And then Exhibit 4 is a set

22      of documents that we produced, the North Carolina

USCA4 Appeal: 23-1472    Doc: 19-3    Filed: 06/28/2023    Pg: 28 of 211

Page 15

1    Board produced.  And I'm going to share my screen

2    with you and show you those documents.

3                    (Whereupon, Exhibit 4, North

4        Carolina Board of Examiners for Engineers and

5        Surveyors Investigative Report Bates NCBELS

6        000001 - NCBELS 000076, was marked for

7        identification.)

8        A.    Okay.  Thank you.

9             MR. HANNA:  And it's, for the

10       record, it's a group of documents marked

11       NCBELS 1 through 76.

12       A.    Okay.

13       Q.    If I scroll down to Page 4, Page 4

14   looks like an E-mail from you to Mr. Casey dated

15   January 2, 2019.

16            Do you see that E-mail?

17       A.    Yes, sir, I do.

18       Q.    All right.  And in that E-mail, you

19   indicate that "First I would like to apologize

20   for any violation on behalf, for I'm aware that

21   we are not licensed surveyors/engineers, nor are

22   we allowed to offer any services in that field

Case 5:21-cv-00137-FL    Document 39-2    Filed 03/28/22    Page 15 of 88

J.A. 508

Page 16

```
 1   claiming such."

 2               Do you see that?

 3         A.    Yes, sir.

 4         Q.    Okay.  And when you wrote that, did

 5   you have a general idea of what a surveyor does?

 6         A.    A general idea, yes, sir.

 7         Q.    And you were indicating that those

 8   were not the kind of services you wanted to or

 9   you were performing?

10         A.    No, not the services I was

11   performing, yes, sir.

12         Q.    Okay.  And I'm going to show you

13   another exhibit.  I may come back to that one

14   but --

15         A.    Okay.

16         Q.    -- I'm going to show you a document

17   which is marked as Exhibit 9.  And it's

18   Plaintiffs No. 20.

19               (Whereupon, Exhibit 9, E-mail Bates

20         Plaintiffs000020, was marked for

21         identification.)

22         Q.    And do you see that on your screen?
```

Page 17

1          A.    Yes, I do.

2          Q.    Okay.  And that, do you recognize

3    that E-mail?

4          A.    I absolutely do.  It's to Paul

5    Aitken from Drone University.

6          Q.    Can you tell me a little bit about

7    the E-mail, who the recipient was, and what the

8    purpose of the E-mail?

9          A.    Sure.  Paul Aitken is one of the I

10   believe owners of Drone U, maybe a partnership

11   with a guy named Rob, and they teach courses on

12   multiple services that drones offer, including

13   mapping.  So I had been following their podcast.

14   They had had prior stories on this subject.

15              So when this letter arrived, I

16   decided to send this letter to Paul Aitken in

17   hope for some support or guidance maybe on, you

18   know, what I should do or just to let them know

19   that this was happening to multiple people with

20   the drone companies in North Carolina.

21         Q.    All right.  And so the letter you're

22   referring to is the December letter from the

J.A. 510

2/22/2022    360 Virtual Drone Services, et al. v. Andrew L. Ritter, et al. Michael Jones 30(b)(6)

Page 18

```
 1    Board just letting you know there was an

 2    investigation?

 3         A.    Yes.  Yes, sir.  Sorry.

 4         Q.    That's all right.

 5               And in the letter to Mr. -- well, in

 6    the letter to Paul, I don't know what his last

 7    name is?

 8         A.    Yeah, Aitken.

 9         Q.    Aitken.  You indicate to Paul, in

10    the third sentence, you say, "And before we

11    begin, I am not an idiot, I am well aware I cant

12    [sic] offer services such as surveying without

13    license."

14               Do you see that?

15         A.    I'm trying to -- where was that?

16    Second paragraph?

17         Q.    I'm sorry.  First paragraph, third

18    sentence.

19         A.    Okay.  Let me see.

20               Yes, I see that.

21         Q.    What did you mean by "I'm not an

22    idiot, I'm well aware I cant [sic] offer services
```

www.DigitalEvidenceGroup.com    Digital Evidence Group C'rt 2022    202-232-0646
Case 5:21-cv-00137-FL    Document 39-2    Filed 03/28/22    Page 18 of 88

J.A. 511

Page 19

1    such as surveying without license"?

2            A.    I had assumed Paul probably gets a

3    lot of notifications of people who are breaking

4    the law and offering surveying without license.

5    I was letting him know I'm not one of those guys.

6    I was aware of the line in the sand as far as

7    being able to make maps or do measurements or

8    anything and turn into a county or Board and try

9    to, you know, legitimately get this passed as a

10    project.

11            Q.    And what services were you referring

12    to, in your mind, when this --

13            A.    There was mapping --

14            Q.    Hold on.  Hold on.  You've got to

15    let me -- the court reporter won't be able to

16    take down what we say if we talk over each other.

17            A.    Okay.

18            Q.    So you need to do the best you can

19    to let me finish my question, pause, and I will

20    let you finish your answer.  I'll pause and then

21    I'll ask the next question.  But if we have a

22    normal conversation and we talk over each other,

Page 20

1    she won't be able to get that down.  Okay?

2        A.    Yes, sir.

3        Q.    So when you wrote this in January of

4    2019, what services were you referring to that

5    you could not do as a, without -- you know, what

6    kind of surveying services were you referring to

7    that you couldn't do without a license?

8        A.    I was referring to the services that

9    you guys were claiming were surveying services.

10   I was referring to making maps, orthomosaic maps

11   for progression projects for construction sites

12   or developers.

13       Q.    And so you're referring, you were

14   indicating to Mr. -- or to Paul, that you're

15   aware that you can't offer services such as maps

16   or orthomosaic maps without a license?

17       A.    I was letting them know that I knew

18   you couldn't do that, create the maps and turn

19   them in for official documents to courts to build

20   any projects or roads or anything like that.

21       Q.    All right.  And you mentioned a few

22   minutes ago in your testimony that you understood

www.DigitalEvidenceGroup.com    Digital Evidence Group C'rt 2022    202-232-0646
Case 5:21-cv-00137-FL    Document 39-2    Filed 03/28/22    Page 20 of 88

J.A. 513

Page 21

1    the line in the sand.

2              What is the line in the sand?

3         A.    Me turning in -- me making

4    orthomosaic maps or measurements.  Just for an

5    example, turning it into Steve Keen and telling

6    him this is official, all measurements are

7    straight, they're accurate.  We can turn them

8    into the courts and any licensed surveyor would

9    take this map and they can go forward with it

10   officially, which I can't do.  So that's what I

11   was letting him know.

12        Q.    So if I understand your testimony,

13   it was your understanding that making maps or

14   orthomosaic maps was, in fact, surveying?

15        A.    No.  Just the part about turning

16   them into the official courts with lines, you

17   know, to do with projects or roads or what have

18   you.

19        Q.    Correct.  So, what, in your mind,

20   what turned that orthomosaic map into surveying

21   was whether it was used for an official purpose?

22        A.    Yes.

2/22/2022    360 Virtual Drone Services, et al. v. Andrew L. Ritter, et al. Michael Jones 30(b)(6)

Page 22

 1          Q.    And when a client hires you, do you

 2    inquire what the purpose is and how they are

 3    going to be using the product?

 4          A.    No, because I never got that far --

 5          Q.    Okay.

 6          A.    -- with clients.

 7          Q.    All right.  And so how were you --

 8    how did, prior to being notified by the Board,

 9    how did you make sure the orthomosaic map that

10    you created for Mr. Keen, how were you -- how did

11    you ensure that it was not used for any official

12    purpose?

13          A.    Okay.  So one, just for the record,

14    he did not ask for this map nor did he order or

15    ask for it.  This was a sales pitch of a service

16    that I wanted to go forward with.  Steve was

17    having me do multiple video products.  So while I

18    was at his house one day, I presented this map to

19    him and said, look, these are things I can do

20    with my drone.  It's not for measurements, but if

21    you want to keep an eye on the progression of

22    your project, I can do this if you'd like.  And

www.DigitalEvidenceGroup.com    Digital Evidence Group C'rt 2022    202-232-0646
Case 5:21-cv-00137-FL    Document 39-2    Filed 03/28/22    Page 22 of 88

J.A. 515

Page 23

1    he had no interest in it.  So he's like, that's

2    cool, let's get back to my video and that was it.

3           Q.    So Mr. Keen did not hire you to

4    produce an orthomosaic map in PDF form?

5           A.    No, sir, he had no clue about it.

6    It was just a sales pitch that I was trying to

7    let him know these are other services that I can

8    possibly perform for you and they may be of need

9    to you.

10          Q.    And had Mr. Keen actually hired you

11   to provide a PDF orthomosaic map, how would you

12   have made sure that it wasn't used for some

13   official purpose?

14          A.    By telling him exactly what I did

15   when I pitched it to him, that this is not a map

16   you can make any kind of measurements off of, you

17   can't turn it into the Board.  It's not accurate

18   for measurements.  You can't build anything off

19   of it, and you can't use it in your development,

20   in this development that you're creating.

21                And I had a written void or, excuse

22   me, a written notice on my website and if I

Page 24

1    delivered that to Steve, it also had that on it

2    as well.

3            Q.    So if you would have created an

4    orthomosaic map for a client, you would have

5    informed the client that you can't use this for

6    measurements?

7            A.    I would inform the client this map

8    is not official, so to speak, but you can't use

9    this with surveyors.  You can't turn this into a

10   surveyor and you say this is perfect, I could use

11   this, no need to hire a surveyor.

12           Q.    All right.  Let me switch gears on

13   you a little bit --

14           A.    Okay.

15           Q.    -- and ask you about the services

16   you actually did provide --

17           A.    Okay.

18           Q.    -- operating under 360 Virtual Drone

19   Services beginning in 2017.

20                 And as I indicated before, I believe

21   you were incorporated in late 2017; is that

22   right?

J.A. 517

2/22/2022        360 Virtual Drone Services, et al. v. Andrew L. Ritter, et al. Michael Jones 30(b)(6)

Page 25

1              A.    That's correct, yes, sir.

2              Q.    All right.  And so would you have

3      started providing services about that time, which

4      I believe was -- yeah, you were -- the

5      corporation was formed on October 16, 2017.

6                    Does that sound right?

7              A.    Yes, sir.

8              Q.    All right.  And when would you have

9      started providing services under the umbrella of

10     360 Virtual Drone --

11             A.    Maybe a little before that, before I

12     saw it was going to turn into a prominent

13     business.  Like as I had mentioned in the other

14     deposition, I was coming from regular photography

15     and then kind of transitioned into the air and

16     the stuff with the droning.

17             Q.    I'm going to show you what's marked

18     as Exhibit No. 5.

19                   (Whereupon, Exhibit 5, Plaintiff 360

20         Virtual Drone Services LLC's Responses and

21         Objections to Defendant's First Set of

22         Interrogatories, was marked for

www.DigitalEvidenceGroup.com    Digital Evidence Group C'rt 2022    202-232-0646
Case 5:21-cv-00137-FL    Document 39-2    Filed 03/28/22    Page 25 of 88

J.A. 518

Page 26

```
 1        identification.)

 2            A.    Okay.

 3            Q.    And Exhibit 5 is a copy of Plaintiff

 4   360 Virtual Drone Services LLC's Responses and

 5   Objections to Defendant's First Set of

 6   Interrogatories.

 7                 Do you see that?

 8            A.    Yes, sir, I do.

 9            Q.    And so essentially, on behalf of the

10   Defendants, we served a list of questions on the

11   company, and it looks like at the very end, you

12   signed on behalf of the company declaring "under

13   penalty of perjury that the answers to the above

14   interrogatories, 1 through 10, are true and

15   correct to the best of" your "information,

16   knowledge, and belief."

17                 Do you see that?

18            A.    Yes, sir.

19            Q.    Okay.  And I'm going to show you

20   your response to No. 2.

21                 Do you see Interrogatory No. 2 on

22   this screen?
```

www.DigitalEvidenceGroup.com    Digital Evidence Group C'rt 2022    202-232-0646
Case 5:21-cv-00137-FL    Document 39-2    Filed 03/28/22    Page 26 of 88

J.A. 519

USCA4 Appeal: 23-1472    Doc: 19-3    Filed: 06/28/2023    Pg: 40 of 211

Page 27

1          A.    Yes, I do.

2          Q.    Okay.  And it says:  "Identify and

3    describe in detail all services provided by 360

4    Virtual Drone Services to customers in 2017,

5    2018, 2019, 2020, and 2021."

6                Do you see that?

7          A.    Yes, sir.

8          Q.    All right.  And what -- can you read

9    your response for the record?

10         A.    Yes, sir.  You ready?

11         Q.    I'm ready.

12         A.    Okay.  "Between 2017 and 2021, 360

13   Virtual Drone Services LLC has provided a range

14   of drone photography-related services, including

15   videography and photography for commercial and

16   real-estate marketing and weddings.  360 Virtual

17   Drone Services LLC has captured visual and

18   thermal images for use in orthomosaic and thermal

19   maps.  360 Virtual Drone Services LLC also

20   provided a completed orthomosaic map before

21   Defendants issued a cease-and-desist letter."

22                Is that good?

www.DigitalEvidenceGroup.com    Digital Evidence Group C'rt 2022    202-232-0646
Case 5:21-cv-00137-FL    Document 39-2    Filed 03/28/22    Page 27 of 88

J.A. 520

Page 28

1          Q.    It is good.  Thank you.

2                So if I break that down, you

3     provided videography services to clients?

4          A.    Yes, sir.

5          Q.    And you provided photography

6     services for clients?

7          A.    Yes, sir.  Yes, sir.

8          Q.    And you provided, you provided

9     one -- or you completed one orthomosaic map

10    before you received that June letter, which I

11    think you called "Cease and Desist Letter,"

12    right?

13         A.    I think so.  I'm not sure if that's

14    accurate, but, yes.

15         Q.    Do you know what I'm talking about,

16    so you received a letter from the Board in

17    December of 2018 talking about a -- notifying you

18    of an investigation, right?

19         A.    Yes, sir.

20         Q.    And then there was an investigation

21    conducted and you cooperated with the

22    investigation, right?

Page 29

1          A.    Yes, sir.

2          Q.    And then there was a letter you

3     received in June, and that's what -- that's the

4     letter June of 2019 that you call a cease and

5     desist letter?

6          A.    Yes, sir.  Or the decision, I guess,

7     the Board had made.

8          Q.    Okay.  And that -- based on the

9     decision that the Board had made, you indicate

10    that prior to that June of 2019 letter, you had

11    completed one orthomosaic map for Mr. Keen?

12         A.    I completed one orthomosaic map to

13    present to Mr. Keen for a possible purchase in

14    the future.

15         Q.    So this was like a marketing ploy

16    for you?

17         A.    Yeah.  I don't want it to be

18    misunderstood that Mr. Keen bought this and this

19    was something he paid for and I delivered this

20    orthomosaic map to him.

21              This is just me trying to get him to

22    understand this is some services I may be able to

Page 30

1    offer if you need it and he was not interested.

2              Matter of fact, he didn't even

3    remember -- when I was talked to him, he said you

4    didn't make me a map, and I had to remind him

5    what it was.  And he was like, oh.

6         Q.    All right.  Let me drop down to --

7    actually, let me switch exhibits.

8         A.    Okay.

9         Q.    So the next exhibit I'm going to

10   show you is Exhibit 7.

11              (Whereupon, Exhibit 7, Plaintiff 360

12      Virtual Drone Services LLC's Responses and

13      Objections to Defendant's First Set of

14      Request For Production of Documents, was

15      marked for identification.)

16        Q.    And Exhibit 7 is Plaintiff 360

17   Virtual Drone Services LLC's Responses and

18   Objections to Defendant's First Set of Request

19   For Production of Documents.

20              Do you see that?

21        A.    Yes, sir, I do.

22        Q.    And I'm going to drop all the way

Page 31

1    down to 21.

2                    And Request No. 21 I -- we ask you

3    to "Produce a copy of all company files on

4    Dropbox, including all work product created by

5    360 Virtual Drone Services as referenced in the

6    testimony of Michael Jones at Page 35 of his

7    deposition."

8                    Do you see that?

9        A.    Yes, sir.

10       Q.    All right.  And just for the record,

11   it was my understanding that when you did work

12   for 360 Virtual Drone that you used Dropbox to

13   communicate with clients?

14       A.    To deliver the products to clients.

15       Q.    Okay.  And did you ever use any

16   other service other than Dropbox to deliver

17   products to clients?

18       A.    Possibly if the file was small

19   enough.  It might have been done under direct

20   E-mail.  But usually my products are so large you

21   have to put them on a Dropbox link.

22       Q.    Okay.  So if it's -- again, I'm just

www.DigitalEvidenceGroup.com    Digital Evidence Group C'rt 2022    202-232-0646
Case 5:21-cv-00137-FL    Document 39-2    Filed 03/28/22    Page 31 of 88

J.A. 524

Page 32

1    trying to get the Court to understand, that if it

2    was like a small, like a photo, you might send it

3    via E-mail, but most of the time you would use

4    Dropbox and provide the images, videos, or

5    whatever services you had provided to the client

6    via Dropbox?

7            A.    Yes, sir, through a shared link that

8    they could access.

9            Q.    Okay.  And the documents when you

10   looked at the file that you produced in response

11   to RFP 21, you provided a real estate video on

12   104 Blue Crest.

13           Do you remember that project?

14           A.    Yes, sir.

15           Q.    And tell me about that.  What was

16   the purpose of that real estate video?

17           A.    Marketing video for a real estate

18   firm here in North Carolina.  They use me for all

19   their videography services for their house to

20   make real estate tours.

21           Q.    And then you also produced a file or

22   set of files on 105 Brian Pool Road which appears

Page 33

1    to be another real estate video file?

2          A.    Yes, sir.

3          Q.    And at least one of those two also

4    had some regular images of what I would call

5    photographs and not videos?

6          A.    In the video?

7          Q.    No.  In the information you

8    produced, it looks like you produced some videos

9    and some photographs?

10          A.    Yes, sir.  That real estate agent

11    also has aerial photos with all of her video

12    packages -- aerial stills.  Yes, sir.

13          Q.    And then the third -- I guess I

14    would call client file -- is a wedding that you

15    call the "Price Wedding."

16                Do you remember providing that

17    information?

18          A.    Yes, sir.

19          Q.    All right.  Were there other files

20    that you -- that you provided to clients on

21    Dropbox that you no longer had or deleted?

22          A.    So when I deliver these to clients,

www.DigitalEvidenceGroup.com    Digital Evidence Group C'rt 2022    202-232-0646
Case 5:21-cv-00137-FL    Document 39-2    Filed 03/28/22    Page 33 of 88

J.A. 526

Page 34

1    the link is normally deleted within 90 days.

2    They have to download the file in 90 days, and

3    then I delete it for space purposes and storage.

4            Q.    Understood.  Okay.

5                  So let me move up.  So there were

6    other deliverables to clients between 2017 and

7    2019, but they would have been deleted by then?

8            A.    Yes, sir.

9            Q.    All right.  And then do you see

10   Request No. 10?

11           A.    Yes.

12           Q.    And then the request ask you to,

13   "Produce an exemplar, including all electronic

14   data for the 'aerial or orthomosaic maps'

15   provided by Plaintiff to its clients as

16   referenced in Paragraph 72 of the Complaint."

17                 And in response you indicate that

18   you couldn't find any, right?

19           A.    Yes, sir.

20           Q.    And you further indicated that, "A

21   PDF of the orthomosaic map provided by 360

22   Virtual Drone Services LLC to client Steve Keen,

www.DigitalEvidenceGroup.com    Digital Evidence Group C'rt 2022    202-232-0646
Case 5:21-cv-00137-FL    Document 39-2    Filed 03/28/22    Page 34 of 88

J.A. 527

Page 35

1    however, is available at NCBELS000072."

2                    Do you see that?

3           A.    Yes, sir.

4           Q.    All right.  And just so I understand

5    your answer here --

6           A.    Okay.

7           Q.    -- No. 1 is you can't -- you don't

8    have any final products or PDFs of orthomosaic

9    maps that you previously produced?

10          A.    Correct.

11          Q.    Okay.  And your recollection is you

12   would have only produced one of them for

13   Mr. Keen, and that was for marketing purposes?

14          A.    Yes, sir.

15          Q.    And that other than the orthomosaic

16   map you turned into a PDF for Mr. Keen, you

17   didn't produce any other orthomosaic maps prior

18   to receiving any type of, what you call, "cease

19   and desist letter" for the Board?

20          A.    I did not create any maps for

21   anyone.  I created them for myself practicing

22   doing surveying or learning how to do it.  But no

Page 36

1    one ever saw them or I delivered them.

2         Q.    Right.

3               And the NCBELS000072 document, that

4    was essentially a photocopy of the PDF that you

5    provided to Mr. Keen that you provided to the

6    Board investigator, right?

7         A.    I'm not sure if it was a photocopy

8    or attachment out of an E-mail.  I'm not positive

9    on what that was.

10        Q.    Well, let's take a look at that.

11        A.    Okay.

12        Q.    Do you see that on your screen right

13   now?

14        A.    Yes, sir.

15        Q.    So it's NCBELS000072, which is part

16   of Exhibit 4.

17        A.    Yes.

18        Q.    Can you explain to me -- well, first

19   of all, to me this looks like just a photo --

20   just a copy of the image that you may have

21   provided to him in PDF form?

22        A.    No, I don't think it is.  I don't

www.DigitalEvidenceGroup.com    Digital Evidence Group C'rt 2022    202-232-0646
Case 5:21-cv-00137-FL    Document 39-2    Filed 03/28/22    Page 36 of 88

J.A. 529

Page 37

1    think it's a copy.  This is a print from

2    DroneDeploy.  They have an option for exporting

3    files, how you would like to export them, what

4    file extension you would like to use.  When you

5    choose PDF, they give you a PDF form.  This is

6    it.  And I just hit "print."  It is printed off.

7              That's why it has "Powered By

8    DroneDeploy" at the bottom.

9              Q.   I see what you're saying.  What

10   you've done is you've just printed a copy of the

11   PDF image that you sent, but you didn't -- you no

12   longer have the PDF file is what I guess is the

13   point?

14             A.   Yes, sir.  To explain further,

15   maybe, help you understand a little bit better.

16   I was a -- I had a trial membership with these

17   guys.  They are very expensive.  I had a trial

18   membership with them.  And then once you, you

19   know, are done with your 7-day trial all of these

20   things you've done are unavailable to you unless

21   you continue your monthly subscription, which I

22   wasn't able to do.

Page 38

```
 1              So that's one reason that I don't
 2    have the actual map and just pictures.  I don't
 3    have access to their dashboard anymore.
 4          Q.    All right.  And when you provided
 5    this to the Board investigator, did you tell him
 6    that this was a copy of the orthomosaic map that
 7    you had previously produced?
 8          A.    I'm not sure what terms I used as
 9    far as "copy."  I probably told him this is a
10    picture of the map.  I'm not sure about the copy
11    thing, like how -- why are we determining whether
12    it's a copy or me just printed it.  It's still
13    the picture.
14          Q.    When I say "copy" or "print" I mean
15    the same thing.
16          A.    Okay.  Okay.
17          Q.    Essentially this was just a picture,
18    if you feel better with that word --
19          A.    Yeah.
20          Q.    -- a picture of the map that you
21    previously produced?
22          A.    Yes, sir.
```

Page 39

1          Q.    And you actually specifically told

2     him it's a picture of the orthomosaic map that

3     you previously created?

4          A.    How I explained it to him was, yes,

5     this is 4 or 500 pictures stitched together of

6     your whole entire property.  And we can do this

7     weekly if you want, but he wasn't interested.

8          Q.    Did -- well, I'm actually talking

9     now about the communications that you would have

10    had with the Board investigator.

11         A.    With the Board, okay.

12         Q.    This is a document that's marked

13    NCBELS 000072.  This is actually part of the

14    investigation that was conducted right before you

15    received the June 2019 letter.

16         A.    Yes, sir.

17         Q.    All right.  And in that

18    investigation, you had communicated to the Board

19    that you have -- that you offer orthomosaic maps,

20    you offer to do that to clients?

21         A.    I wanted to, yes.  I was offering,

22    just nobody was interested.

Page 40

1          Q.    All right.  And so -- and then you

2     were giving him an example of what an orthomosaic

3     map would look like that your company would be

4     able to create?

5          A.    Correct.

6          Q.    All right.  And did you explain to

7     him that you, prior to the investigation in early

8     2019, that you had not been hired by any client

9     to produce an orthomosaic map?

10         A.    I'm sure we had discussed that.

11    Yes.  I can't recall the conversation exactly.

12    But I don't know why I wouldn't have expressed to

13    him I don't have clients that order those.  This

14    is a hopeful service I can get into.

15         Q.    All right.  And did you explain to

16    him that the one orthomosaic map that you had

17    created was actually in PDF form?

18         A.    I'm quite certain that I did.

19         Q.    Okay.  Did you provide -- other than

20    the videography services that we talked about

21    earlier, or the photography services that we

22    talked about earlier, did you provide any other

Page 41

1    services for clients between, you know, the date

2    you started in October of 2017 through the date

3    you received that letter from the Board in June

4    of 2019?

5         A.    Just photography, videography.  And

6    that's pretty much my business.  And aerial

7    photography, if you want to separate that.

8         Q.    And aerial photography you're

9    talking about --

10         A.    With the drone.

11         Q.    -- essentially video that you're

12    talking using your drone?

13         A.    Or still pictures.

14         Q.    Okay.  And prior to June of 2019,

15    had you ever been hired to provide any measurable

16    maps to clients?

17         A.    No, sir.

18         Q.    And prior to June of 2019, had you

19    ever been asked to provide maps with location

20    data?

21         A.    No, sir.

22         Q.    And prior to June of 2019, had you

Page 42

1    ever been asked to provide maps with elevation

2    data?

3          A.    No, sir.

4          Q.    And prior to June of 2019, had you

5    ever been asked to provide maps with volume data?

6          A.    No, sir.

7          Q.    And so when you received the, what

8    you call a cease and desist letter in June of

9    2019, how did you change your business, if you

10   changed your business at all?

11         A.    So I left the meeting with the

12   understanding that I could not draw lines on any

13   real estate photos that I was giving to the

14   clients, like property boundary lines; I could

15   not deliver clients any maps, whether they were

16   measurable in PDF form, I was pretty much under

17   the understanding I could not make any maps

18   regardless of anything.  So I quit offering that.

19   And that was -- and you know, that service as far

20   as taking pictures together and mapping has to do

21   with a lot of other service like parking lot

22   pavement inspections, roof inspections, I had to

J.A. 535

Page 43

```
 1    turn all of those possible jobs down that came to

 2    me because that technology is used to create

 3    those things as well.

 4           Q.    So based on the -- just so I

 5    understand -- based on the June 2019 letter that

 6    you received from the Board that you identify as

 7    a cease and desist letter, you no longer would

 8    provide any type of marketing maps with property

 9    boundary lines?

10           A.    Yes, sir.

11           Q.    Okay.  And that was something you

12    did prior to -- was that something you did prior

13    to receiving that letter in June of 2019?

14           A.    Yes, sir, it was.

15           Q.    Okay.  And then other than that, did

16    you stop doing any service that you had

17    previously provided a client?

18           A.    With that one, the lines -- like I

19    had a lot of real estate agents that would hire

20    me to take aerial photos and then in that package

21    they would also, can you put the property around

22    this empty parcel, the property lines, you know,
```

Page 44

```
1    and they would give me a map that they had from

2    Google and I would just, kind of, you know, in

3    Photoshop application would draw the lines.  I

4    had to send E-mails and notification and texts to

5    all my clients I can no longer do that.  I could

6    take the pictures, but I couldn't draw any lines.

7            Q.    So other than not providing pictures

8    with lines for marketing purposes, did you stop

9    doing anything else that you had previously done

10   prior to June of 2019?

11           A.    I had stopped trying to market any

12   kind of maps because I just quit making them

13   altogether.  I wasn't delivering those -- I mean,

14   I had no clientele to get the maps, but that was

15   something I was hoping to get into.  I just put a

16   halt to all of that.

17           Q.    I guess so we're clear, you were

18   hired and you had provided marketing maps to

19   clients where you would draw the property

20   boundaries, right?

21           A.    Not marketing maps.  Aerial photos.

22           Q.    Aerial photos with -- sorry.  Aerial
```

J.A. 537

USCA4 Appeal: 23-1472    Doc: 19-3    Filed: 06/28/2023    Pg: 58 of 211

Page 45

1    photos with approximate property boundaries for

2    marketing purposes?

3            A.    Yes, sir.

4            Q.    Okay.  But other than that service,

5    there was no other service that you previously

6    provided that you had to stop providing, right?

7            A.    I don't think so.  I think that was

8    it.

9            Q.    And then as far as the orthomosaic

10    PDF map, that was the only map that you had tried

11    to do but you only did that for marketing

12    purposes, you weren't hired to do that?

13            A.    Exactly.  And also too, can I say

14    one thing about -- as far as the mapping and

15    stopping everything -- so I've had to turn down a

16    lot of jobs, I guess you can say, I quit offering

17    anything that has to do with mapping because I

18    was told I couldn't collect the data.  Remember

19    that part where companies were hiring me to

20    collect the data, take the pictures.  I would

21    deliver all the pictures to them then they would

22    produce a map.  And I was told by William that

J.A. 538

Page 46

1    you cannot even collect the data for a company

2    who's making the map.

3              So that I had to quit offering

4    altogether.  Someone called me and said, all you

5    got to do is take the pictures, send the manilas,

6    you know, we are doing the map.  I had to again

7    tell them I can't perform that service.

8         Q.    Who hired you to do that?

9         A.    I'm a member of a couple of -- like,

10   Droners, DroneBase they send me jobs daily that I

11   have to turn down.

12        Q.    And you're saying you turned down

13   jobs where you would just take pictures and

14   provide pictures?

15        A.    If they wanted to make a map out of

16   it.  Because there is a certain -- in the

17   instructions they have to tell you, you have to

18   use DroneDeploy, they tell you to overlap,

19   instructions how to make the map.  I'm just

20   collecting the pictures and putting the SD card

21   in the computer, uploading it to their site.

22   They create a map because they own the stitching

J.A. 539

Page 47

1    application.  I would just be collecting the

2    data, which are pictures, sending it to them.

3    They create the map.

4              But I was told by William even

5    though I wasn't doing any processing of the map,

6    I couldn't collect the pictures at all.

7              So if a job came to me and they were

8    like, we need beauty shots and also an

9    orthomosaic picture or map, I had to turn it

10   down.  And still am today.

11        Q.    Just so we're clear, what you're

12   talking about is flying your drone and taking

13   pictures and providing those pictures?

14        A.    Yes, but what I'm talking about

15   turning down is the orthomosaic maps which they

16   are asking me to do.  They are asking me to take

17   pictures, but they are in a separate like, No. 1

18   instruction, we need beauty shots of the front of

19   the building.  No. 2, we need an orthomosaic map

20   over top of the warehouse.  And then they give me

21   a picture of the map and they draw the line over

22   the warehouse where they need an orthomosaic map.

Page 48

1              So I'm not doing a map, but by

2       William's words, I can't even collect those

3       pictures for that company.

4              Is that clear?

5              Q.    It is.  I mean, have you seen that

6       written down where you -- from anybody from the

7       Board that you're not allowed to take pictures

8       and provide clients with aerial photos?

9              A.    Actually, technically, it is.  It's

10      the one paragraph that I can't offer any location

11      services which they have to have that picture in

12      order to make the map.  So yes, it does say I

13      can't collect pictures with location data.

14             Q.    Just so I'm clear, so since June of

15      2019, you no longer -- let me make sure I've got

16      this right.

17             A.    Okay.

18             Q.    You no longer provide aerial images

19      for marketing purposes where you would

20      approximate rough boundaries of the property?

21             A.    No.  So I no longer am providing

22      pictures that is told to me when I'm getting the

Page 49

1    job, we're going to take these pictures, Michael,

2    and we're going to create a map with them.  If

3    they have that in their instruction, I'm saying I

4    can't do it.

5            Q.    No.  I hear you.  But let me back

6    up.

7                 So the first thing you talked about

8    was aerial photos where you would approximate

9    rough boundaries for real estate marketing

10   purposes.  And you're no longer doing that?

11           A.    No, I can't.  No.  I don't draw the

12   lines on the pictures.  All of my clients know

13   that I can't do that.

14           Q.    Okay.  And as I understand, you've

15   said that since you received the cease and desist

16   letter, you've been asked to provide photographs,

17   aerial photographs to other people who would then

18   use them to produce an orthomosaic map?

19           A.    Yes, sir.

20           Q.    Okay.  And you -- and those jobs,

21   those are new jobs since June of 2019 that you

22   have been unable to do?

Page 50

```
 1              A.    Yes, sir.

 2              Q.    Okay.  Are there any other jobs that

 3      you're unable to do?

 4              A.    Not within my realm of what I want

 5      to.  No.  That's it.

 6              Q.    And you've never been asked to

 7      produce a 3D model?

 8              A.    No.

 9              Q.    And you've never produced a 3D

10      model?

11              A.    Just for practicing and learning how

12      to do it for myself.

13              Q.    Have you ever produced a 3D model to

14      a client or a third party?

15              A.    No, because it's very hard and I

16      didn't get far enough in the learning process.

17              Q.    All right.  Let me -- we've been

18      going about quite an hour.  Let me take a

19      five-minute break and I don't think I have that

20      much longer.

21              A.    Okay.  Thank you.

22              Q.    Thanks.
```

www.DigitalEvidenceGroup.com    Digital Evidence Group C'rt 2022    202-232-0646
Case 5:21-cv-00137-FL    Document 39-2    Filed 03/28/22    Page 50 of 88

J.A. 543

Page 51

1              (Recess taken.)

2              THE COURT REPORTER:  Back on the

3       record.

4    BY MR. HANNA:

5              Q.   Mr. Jones, I wanted to turn back to

6    Exhibit 2, which is a copy of the Complaint.

7              A.   Okay.

8              Q.   I put that on my -- I can share my

9    screen with you.

10             A.   Great.  Thank you.

11             Q.   And so you indicate here on

12   Paragraph 72, you said:  "Before the Board issued

13   its June 13, 2019 letter, Plaintiffs offered and

14   provided drone services such as aerial

15   orthomosaic maps, aerial images containing

16   location information, and aerial images of land

17   that include lines indicating the rough position

18   of property lines."

19             Do you see that?

20             A.   Yes, sir.

21             Q.   Okay.  And as far as providing

22   services such as aerial orthomosaic maps, you

Page 52

1    actually never did that prior to June 13, 2019?

2         A.    Correct.  Just hoping, hoping to do.

3         Q.    And as far as aerial images

4    containing location of information, are those

5    just -- are you talking about aerial -- you're

6    talking about just photographs that you took

7    using your drone that you provided to real estate

8    clients and other clients?

9         A.    Yes, sir.

10        Q.    Okay.  And just so we're -- and so

11   it's not anything unusual, but we're talking

12   about using your drone to fly a piece of property

13   and take video and take aerial images on top of

14   the video and provide that to the client?

15        A.    Yes, sir.

16        Q.    Okay.  And as I understand it, you

17   continued to provide aerial images to clients

18   after you got the June 13, 2019 letter, correct?

19        A.    Yes, sir.

20        Q.    And you provided, continued to

21   provide aerial videography to clients?

22        A.    Yes, sir.

J.A. 545

2/22/2022    360 Virtual Drone Services, et al. v. Andrew L. Ritter, et al. Michael Jones 30(b)(6)

Page 53

1          Q.    Okay.  And you no longer provided

2     aerial images of land that include lines

3     indicating the rough position of property lines?

4          A.    Yes, sir, I quit that.

5          Q.    Okay.  And do you understand that

6     the Board's position is that you're allowed to do

7     that if it's for marketing purposes only?

8          A.    No, that's not what I got from Mr.

9     William Casey.

10         Q.    Well, I understand that.  But you're

11    talking about a conversation that you claim to

12    have with Mr. Casey during the investigation,

13    right?

14         A.    Yes, sir, absolutely had.  And I can

15    remember all of it.

16         Q.    But since this lawsuit has

17    started -- so that conversation that you had with

18    Mr. Casey was in early 2019, right?

19         A.    Yes, sir.

20         Q.    And you filed this lawsuit in March

21    of 2021?

22         A.    Yes, sir, I think that is correct.

www.DigitalEvidenceGroup.com    Digital Evidence Group C'rt 2022    202-232-0646
Case 5:21-cv-00137-FL    Document 39-2    Filed 03/28/22    Page 53 of 88

J.A. 546

USCA4 Appeal: 23-1472    Doc: 19-3    Filed: 06/28/2023    Pg: 67 of 211

Page 54

```
 1            Q.     And since the filing of the lawsuit,
 2     do you now understand that the Board takes the
 3     position that you can, in fact, provide aerial
 4     images of land that include lines indicating the
 5     rough position of property lines as long as it's
 6     being used for marketing purposes only?
 7            A.     I did not know that, but that's
 8     great.
 9            Q.     Okay.  And as far as providing a PDF
10     of an orthomosaic map, that's something that you
11     never -- you were never hired to do, but you did,
12     in fact, provide a PDF to one potential client,
13     correct?
14            A.     Yes, sir, Steve Keen.
15            Q.     And do you know if the Board would
16     allow you to actually provide a PDF of an
17     orthomosaic map to a paying client as long as it
18     didn't have measurable information?
19            A.     I was not aware of that, not the
20     impression I was under.
21            Q.     Okay.  But those are two things that
22     you want to do going forward, right?
```

Case 5:21-cv-00137-FL    Document 39-2    Filed 03/28/22    Page 54 of 88

J.A. 547

Page 55

```
 1              A.    Two of the things I want to do, yes,
 2      sir.
 3              Q.    And the other thing is you want to
 4      be able to provide aerial images to other third
 5      parties for them to use in, I guess, creating
 6      orthomosaic maps or using DroneDeploy in some
 7      other way?
 8              A.    Yes, that's another thing I'd like
 9      to do.
10              Q.    Okay.  Why don't those companies
11      just do it themselves?
12              A.    Honestly, I think it's a group of
13      young entrepreneurs and they have locked down as
14      far as like an internet feed to drones nationwide
15      so they can charge the clients thousands of
16      dollars and pay a drone client 70 bucks to go fly
17      it.
18              Q.    And that's something that you've
19      been asked to do since you received this June 13,
20      2019 letter?
21              A.    Yes, sir.  These job boards I have,
22      they basically just send jobs constantly to you
```

J.A. 548

2/22/2022    360 Virtual Drone Services, et al. v. Andrew L. Ritter, et al. Michael Jones 30(b)(6)

Page 56

1    and you have the option to accept or decline, so.

2            Q.    And when was the first time that you

3    declined providing aerial images?

4            A.    That's hard to say.  I would have no

5    idea, I mean.

6            Q.    Like within the last 12 months?

7    Last 18 months?

8            A.    These things come weekly, every day.

9    I mean, they've never stopped.  So as far as me

10   being able to tell you, like, the first one I got

11   after that notice, I'm not sure.  They come

12   frequently.

13           Q.    And so what I hear you saying, just

14   so that I'm clear, you're complaining that you

15   are not able to provide PDF orthomosaic maps to

16   clients, right?

17           A.    That's one of the complaints, yes.

18           Q.    I'm just trying to break it down for

19   the Court.

20           A.    That's fine.

21           Q.    You're complaining that you're not

22   allowed to provide aerial images of land that

www.DigitalEvidenceGroup.com    Digital Evidence Group C'rt 2022    202-232-0646
Case 5:21-cv-00137-FL    Document 39-2    Filed 03/28/22    Page 56 of 88

J.A. 549

Page 57

```
 1    include lines indicating the rough position of

 2    property lines for real estate marketing

 3    purposes, right?

 4              A.    Yes, sir.

 5              Q.    And that you're complaining that

 6    you're not allowed -- since the Board issued its

 7    June 13, 2019 letter, you have not been allowed

 8    to provide aerial images to other third-party

 9    Droners?

10              A.    Yes, for map production.

11              Q.    All right.  Anything else?

12              A.    I would -- I mean, I would like to

13    have the option to give these clients access to

14    DroneDeploy's dashboard to use the tools they

15    have to measure and do volume metrics like

16    construction sites.  I think there's like 48 or

17    47 or 48 other states that have no problem with

18    this.  I would like to do what these other people

19    are doing in other states.

20                   I'm not surveying.  I'm not claiming

21    it's surveying, but I don't understand why I

22    can't give the client these tools.  They are made
```

J.A. 550

Page 58

1    for that and they are being offered nationwide.

2    It's just North Carolina is telling me you can't

3    do it.  And I have trouble understanding why.

4    And I want to be able to do that.

5        Q.    I'm walking through your Complaint

6    and I just want to make sure I understand where

7    in your Complaint you were asking about this.

8            So in Paragraph 72, we've covered --

9    I mean, there's nothing else identified in

10   Paragraph 72 that you're claiming injury, right,

11   other than what we've just talked about?

12       A.    I'm sorry.  I'm not understanding

13   that question now.

14       Q.    Yeah.  In Paragraph 72, this is

15   under a heading called "Injury to Plaintiffs,"

16   right?

17       A.    Okay.

18       Q.    Do you understand that?

19       A.    Yes.

20       Q.    Okay.  And you're saying to the

21   Court since the June 13, 2019 letter has been

22   issued, you've been injured in the following

Page 59

1   ways, right?

2           A.    Yes.

3           Q.    And one of the things you've been

4   injured in and you're no longer able to provide

5   PDF aerial orthomosaic maps?

6           A.    That's one of the things, yes, sir.

7           Q.    Even though you never actually

8   provided it, you just did it one time for

9   marketing purposes, right?

10          A.    Yes, sir.

11          Q.    Okay.  And that you're now going

12  forward, you're not able to provide aerial images

13  containing location information to third-party

14  Droners using your, using your drone and camera?

15          A.    Yes, sir.

16          Q.    Those are the same aerial images

17  that you currently take and provide to paying

18  clients for real estate purposes and other

19  purposes, right?

20          A.    Yes, sir.

21          Q.    Okay.  And so just to make sure,

22  when we say aerial images, you're talking about

www.DigitalEvidenceGroup.com    Digital Evidence Group C'rt 2022    202-232-0646
Case 5:21-cv-00137-FL    Document 39-2    Filed 03/28/22    Page 59 of 88

J.A. 552

Page 60

1    aerial photographs that you took for real estate

2    clients before the letter and you've continued to

3    take for real estate clients since you received

4    the letter?

5          A.    Yes, sir.

6          Q.    And that also this idea of you're

7    claiming injury that you are no longer able to

8    provide aerial images of land that include lines

9    indicating the rough position of property lines

10   for real estate marketing purposes?

11         A.    Yes.

12         Q.    All right.  And anything else, any

13   other way you've been injured?

14         A.    As far as, I mean, like I mentioned

15   the maps.  I have not been able to, that part

16   about the location data and the aerial, that

17   keeps me from being able to make a map.  I would

18   like to be able to do that.

19         Q.    All right.  So let's -- let me break

20   it down this way.

21         A.    Okay.

22         Q.    In Paragraph 72, there's nothing

www.DigitalEvidenceGroup.com    Digital Evidence Group C'rt 2022    202-232-0646
Case 5:21-cv-00137-FL    Document 39-2    Filed 03/28/22    Page 60 of 88

J.A. 553

Page 61

1    else, right?

2              I'm sorry.  Did you get that

3    question?

4         A.    Yeah, I'm sorry.  I was just reading

5    over it.  Sorry about that.

6              When you say there's nothing else, I

7    guess that's the part I'm not understanding.

8         Q.    Well, in Paragraph 72, you have

9    aerial orthomosaic maps, and you're talking about

10   the PDF map that you made, right?

11        A.    Well, I'm talking about the ability

12   to make any orthomosaic map there, actually.

13        Q.    All right.  Prior to, prior to June

14   of 2019, you had never provided any client with

15   an orthomosaic map, right?

16        A.    No.

17        Q.    Okay.  And prior to June of --

18   June 13, 2019, you had never been asked by any

19   Droners to provide aerial images for use in this

20   DroneDeploy software?

21             MR. GEDGE:  Object;

22        mischaracterizing prior testimony.

Page 62

1                    But you can answer, if you can.

2           A.    What was that question again?  Since

3      receiving the Board, plaintiffs have had --

4           Q.    Prior to June of 2019, you had never

5      been asked by a client to provide an orthomosaic

6      map, correct?

7           A.    Oh, no.   Yes, sir.   I'm sorry.   No,

8      I have not.

9           Q.    And prior to June of 2019, you have

10     never been asked by a third-party Droners to

11     provide aerial images, correct?

12               MR. GEDGE:   Objection;

13          mischaracterizing prior testimony.

14               MR. HANNA:   You can object to the

15          form.

16               MR. GEDGE:   Objection to form.

17               MR. HANNA:   I don't -- I don't like

18          your speaking objection at all.

19     BY MR. HANNA:

20          Q.    Do you understand my question,

21     Mr. Jones?

22          A.    Can you ask it one more time,

J.A. 555

Page 63

1    please?

2            Q.    Yeah.

3                  You said, you testified that prior

4    to June of 2019, you had never been asked to

5    provide an aerial orthomosaic map by a client,

6    right?

7            A.    Yes, we've got that one, so, no.

8    The next question.

9            Q.    And prior to June of 2019, you had

10   provided clients with aerial images for marketing

11   purposes or real estate purposes, right?

12           A.    Yes.

13           Q.    And prior to June of 2019, you had

14   provided videos to real estate clients, aerial

15   videos, correct?

16           A.    Yes, yes.

17           Q.    And after June of 2019, you

18   continued to provide aerial images to real estate

19   clients, right?

20           A.    Yes.

21           Q.    And after June of 2019, you

22   provided, continued to provide aerial videography

Page 64

1    to real estate clients, correct?

2            A.    Yes.

3            Q.    All right.  And then we talked about

4    aerial images containing location information.

5    You said -- I understood that prior to June of

6    2019, you had never been asked by a third-party

7    droner to provide that kind of information for

8    use in DroneDeploy, correct?

9            A.    Okay.  So, no, because they wouldn't

10   have asked that.  I guess that's why that's

11   confusing me.  No, they wouldn't have asked that.

12   If they were hiring me for pictures, they would

13   just say I want aerial pictures.  They wouldn't

14   go -- it would be like you saying I want a new

15   car and also want gas and oil in it.  It was

16   just -- I just assume that when they call me to

17   ask for the aerial pictures, I'm not putting

18   locations.

19            Now, to be factual, all of the

20   pictures taken with any modern camera does have

21   location information in it.  The question is kind

22   of bending.

J.A. 557

Page 65

1          Q.    Again, and I'm just going off your

2     testimony, which is why your lawyer objected, but

3     your testimony was that since June of 2019, you

4     have turned down jobs where you were asked by

5     other droners to provide aerial images?

6          A.    Yes, since June '19, I've turned

7     down all jobs that want orthomosaic pictures and

8     they let me know we're going to produce a map

9     with this.  I turned those down.

10          Q.    So what's really important for the

11     Court to understand is prior to June of 2019, had

12     you taken a paying client where you provided

13     aerial images to a third-party droner for use in

14     this DroneDeploy software?

15          A.    Yes, prior to June 13th, that's like

16     the Wilmington mall, the thermal jobs, all of

17     those were me providing the pictures to that

18     company.  They were doing the map or producing

19     the map, which we discussed multiple times in

20     this case.

21          Q.    All right.  Well, let's go back over

22     that because --

www.DigitalEvidenceGroup.com    Digital Evidence Group C'rt 2022    202-232-0646
Case 5:21-cv-00137-FL    Document 39-2    Filed 03/28/22    Page 65 of 88

J.A. 558

Page 66

1           A.    Okay.

2           Q.    -- so what you're saying is before

3     June of 2019, you had been asked to fly a site

4     and take pictures?

5           A.    Yeah, like Harbor Freight.  Is this

6     not all ringing a bell?  Harbor Freight,

7     Wilmington, all of that.  I wasn't making the

8     maps, but I was hired to take the pictures for

9     the map.  Then the Board told me you can't even

10    do that.  So from that point, I quit doing --

11          Q.    Hold on, hold on.  And you were

12    hired to take aerial images by a client in

13    Wilmington, right?

14          A.    By Upland Data from Chicago.

15          Q.    Okay.

16          A.    In Wilmington, yes.

17          Q.    And you took aerial images and you

18    provided it that to that client?

19          A.    Yes, sir.

20          Q.    Do you have a copy of that?  Do you

21    have that information?

22          A.    I'm not sure if it's in the Droners'

J.A. 559

Page 67

1    E-mails.  I know they send you Droners' E-mails

2    from Droners.

3         Q.    Well, I'm just asking for the -- you

4    know, you have a paying client prior to June of

5    2019 where you took aerial images, right?

6         A.    Yes, yes.

7         Q.    And you, do you have those aerial

8    images?

9         A.    No.

10        Q.    Okay.

11        A.    They were delivered.

12        Q.    Hold on, hold on.  What you're

13   saying is the aerial images are nothing different

14   than what you're providing your real estate

15   clients, same photos, same images?

16        A.    No.

17        Q.    No what?

18        A.    No, they are not the same images.

19        Q.    And why not?

20        A.    Because they are not orthomosaic

21   maps.  I'm having such a time understanding why

22   you're not understanding this.

Page 68

1              So pictures taken like -- the real

2       estate agents call me.  They are just pictures.

3       I choose the framing of the house or I put

4       whatever is in the frame.

5              Orthomosaic maps are me collecting

6       data to make a map.  It's flown by an automated

7       mission by the drone.  The drone is taking

8       pictures straight down every two seconds whatever

9       direction they give me to plot the map.  They are

10      nothing like the real estate pictures.  They are

11      pictures, yes, but they are not in any form like

12      those at all.

13              Q.   Okay.  And other than the fact that

14      they are being taken straight down and they are

15      taken every two seconds, is there anything

16      different about those images than the images from

17      a data perspective that you provided your real

18      estate clients?

19              A.   No.

20              Q.   And so it's -- and so if you

21      provided me -- and you don't have an exemplar to

22      provide the Court of what you're talking about?

Page 69

```
 1            A.    No, sir.

 2            Q.    Okay.  But what you're saying is

 3     from a data perspective, the images that you take

 4     every two seconds straight down, for this

 5     Wilmington mall client, it has the same data that

 6     you're providing your real estate clients?

 7            A.    Yes, all the photos have the same

 8     data in it.  Yes, sir.

 9            Q.    Okay.  And so if a client calls you

10     like the Wilmington mall client and says we need

11     you to take aerial images, you're no longer doing

12     that?

13            A.    Aerial images -- I'm making a map.

14     I would know if it's for a map by the way they

15     ask me to take the pictures.  If I know that,

16     then I tell them I can't do it.

17                 I can send you plenty of examples of

18     E-mails where I turned down those jobs.

19            Q.    Yeah.  That would be great.  If you

20     would provide those, I think I asked for those in

21     discovery.  So --

22                 (Cross-talking.)
```

Page 70

1          A.    They probably --

2                (Whereupon, a request for Request

3          for E-mails, was made.)

4    BY MR. HANNA:

5          Q.    So if you get one that would be

6    great.

7                Is there anything else in Paragraph

8    72 that we haven't talked about?

9          A.    No.

10         Q.    And other than not providing aerial

11   images to third parties for use in preparing an

12   orthomosaic map, is there anything that you're

13   not able -- anything else that you're not able to

14   do since you received this June 2019 letter?

15         A.    Well, I can't deal with 3D models.

16   I can't --

17         Q.    Did you ever build a 3D model before

18   June of 2019?

19         A.    I have built several, yes.

20         Q.    For a client?

21         A.    Not for a client.

22         Q.    Is there anything that you were

2/22/2022    360 Virtual Drone Services, et al. v. Andrew L. Ritter, et al. Michael Jones 30(b)(6)

Page 71

1    doing prior to June 2019 other than what we

2    talked about in Paragraph 72 that you're no

3    longer able to do?

4            A.    No.

5            Q.    Okay.  So the lawsuit, as I

6    understand it, your First Amendment lawsuit,

7    you're claiming that the -- you're claiming that

8    the Board is keeping you from doing three things

9    as I understand it.

10           They are keeping you from -- and I'm

11   looking at -- well, let me back up.  Let me

12   strike that.  Let me back up.

13           Do you see your Cause of Action on

14   Page 19?

15           A.    Yes.

16           Q.    Okay.  And this is -- you're filing

17   or making a claim under the First Amendment,

18   right?

19           A.    Yes.

20           Q.    Okay.  And in Paragraph 93, you say

21   "Plaintiff," meaning you and your company --

22   "want to create, process, and communicate

www.DigitalEvidenceGroup.com    Digital Evidence Group C'rt 2022    202-232-0646
Case 5:21-cv-00137-FL    Document 39-2    Filed 03/28/22    Page 71 of 88

J.A. 564

2/22/2022    360 Virtual Drone Services, et al. v. Andrew L. Ritter, et al. Michael Jones 30(b)(6)

Page 72

1    information -- for example, aerial images, 3D

2    digital models, and data about land and

3    structures.  These services consist entirely of

4    speech protected by the First Amendment."

5              Do you see that?

6         A.    Yes, sir.

7         Q.    Okay.  And, again, 3D digital models

8    is something you never did prior to receiving

9    this June 2019 letter, right?

10        A.    Correct.

11        Q.    And aerial images is something that

12   you did prior to receiving the letter and for

13   real estate clients and other clients you've

14   continued to provide aerial images, correct?

15        A.    Correct.

16        Q.    But for clients who you think are

17   going to use it to produce orthomosaic mapping

18   under DroneDeploy you stopped doing it?

19        A.    Yes, sir.  Or any other program.

20        Q.    Okay.  Am I -- do I have that?  Am I

21   being fair to you on that?

22        A.    Yes, I think that's correct.

www.DigitalEvidenceGroup.com    Digital Evidence Group C'rt 2022    202-232-0646
Case 5:21-cv-00137-FL    Document 39-2    Filed 03/28/22    Page 72 of 88

J.A. 565

Page 73

1          Q.    Okay.  And the aerial images that

2    you no longer do for these people you think might

3    be using it for DroneDeploy are the same aerial

4    images that you provide from a data perspective

5    to real estate clients, correct?

6          A.    Somewhat, yes.

7          Q.    Okay.  And I mean they are photos,

8    aerial, they are photos using your drone?

9          A.    Yes.

10          Q.    Okay.  And then the last thing you

11    have in Paragraph 93 is "data about land and

12    structures."  What are you talking about there?

13          A.    As far as the native data in the

14    picture, so height, volume, distance, square

15    footage, area, et cetera, et cetera.

16          Q.    Again, we're be back to aerial

17    images.

18               It's the data that you have in the

19    aerial images is what you're talking about?

20          A.    Yes, sir.

21          Q.    Okay.  And the data in the aerial

22    images whether you take it for real estate client

J.A. 566

Page 74

1    or whether you take it straight down every two

2    seconds for a client you think might be using it

3    for mapping is the same data?

4        A.    Yes.

5        Q.    Okay.  All right.

6        A.    And can I clarify one thing?

7        Q.    Sure.

8        A.    There's no thinking of me knowing or

9    thinking it.  I know for a fact that they are

10   going to use it for the map.  There's no

11   situations where like I'm wondering if they are

12   going to make a map.  I know for a fact if they

13   call me that they are going to make a map.

14       Q.    Right.  But you're not making the

15   map, you're just taking the digital images,

16   right?

17       A.    Right.  I'm just clarifying there's

18   no speculation when they call whether I know if

19   they are going to do a map or not.  I know for a

20   fact they are going to make a map.

21       Q.    Just to clarify, again, for the

22   Court prior to June of 2019 you never made an

www.DigitalEvidenceGroup.com    Digital Evidence Group C'rt 2022    202-232-0646
Case 5:21-cv-00137-FL    Document 39-2    Filed 03/28/22    Page 74 of 88

J.A. 567

Page 75

```
 1    aerial map for a client?

 2           A.    No, sir.

 3           Q.    Okay.  And Paragraph 94, it says

 4    "Creating, processing, and disseminating images

 5    on land and structures is fully protected speech

 6    under the First Amendment."

 7                 Do you see that?

 8           A.    Yes, sir.

 9           Q.    And, again, what we're talking about

10    is the images that you're taking these

11    photographs?

12           A.    Yes, sir.

13           Q.    Okay.  And then Paragraph 95 talks

14    about 3D models, which is not something you've

15    done before, correct?

16           A.    Haven't done before, but I would

17    like to.

18           Q.    Well, there's a lot of things you'd

19    like to do, but I'm just focused right now on

20    stuff you did prior to June of 2019.

21                 That's not something you ever did?

22           A.    No, correct.  Never.
```

J.A. 568

Page 76

1          Q.    And Paragraph 97 [sic], you have

2     "Creating, processing, and disseminating data

3     about land and structures (including data about

4     distances, coordinates, elevations and volumes)

5     is fully protected speech under the First

6     Amendment."

7              What are you talking about there?

8          A.    I don't -- I mean, I'm not a lawyer.

9     I don't know how to tell you what it means as far

10    as the first speech amendment.  That's what it's

11    talking about.

12         Q.    Let's break down the nonlawyer part.

13    You say "creating, processing, and disseminating

14    data about land and structures (including data

15    about distances, coordinates, elevations and

16    volumes)."

17             What are you talking about there?

18         A.    All of the information in the

19    pictures.  The metadata which tells everything

20    you've listed as far as the approximate

21    boundaries, the height, elevation.

22         Q.    Again, the aerial photos that you

Page 77

1    provide to real estate clients is an example?

2            A.    They have metadata in them, yes --

3            Q.    Okay.

4            A.    -- but not for making maps.

5            Q.    And the aerial photos that you're

6    taking for these people who are going to use them

7    to create mapping, it's those photos that you're

8    talking about, those aerial images?

9            A.    Yes.

10           Q.    And from a data -- just so we're

11   clear, I want to make sure we got this

12   100 percent --

13           A.    Sure.

14           Q.    Just so we're clear, the data in the

15   aerial images for these droners or these folks

16   that are going to create mapping, is the same

17   data in the aerial image that you take and

18   provide to your real estate clients?

19           A.    Yes.  Every picture has that

20   metadata and this mapping software using that

21   metadata in every picture.

22           Q.    And other than Mr. -- other than

www.DigitalEvidenceGroup.com    Digital Evidence Group C'rt 2022    202-232-0646
Case 5:21-cv-00137-FL    Document 39-2    Filed 03/28/22    Page 77 of 88

J.A. 570

Page 78

1    your contention that the investigator told you

2    that you couldn't provide these pictures with

3    metadata, do you have any other evidence or

4    information that the Board has said you can't

5    provide these images or these pictures to

6    clients?

7         A.    As far as saying I can't deliver any

8    location data in the pictures, I would take that

9    as them saying -- that's what that says.

10        Q.    And where are you reading from?

11        A.    As far as -- I'm not sure where it

12   was, but the part that says about collecting the

13   metadata in the pictures, like I have to have

14   that in order to do the map.  If I have to strip

15   that out, then I can't do any maps.

16        Q.    Well, again, I'm not talking about

17   maps.  I'm talking about the pictures, the

18   images, right?

19        A.    Uh-huh.

20        Q.    You can point to anything where the

21   Board has said you're not allowed to take images,

22   take pictures and provide them to clients?

J.A. 571

Page 79

```
 1              A.    No, that was with the personal

 2     meeting in the library with Mr. Casey.

 3              Q.    Mr. -- with Will Casey?

 4              A.    With William.  Sorry.

 5              Q.    Okay.  All right.  And then 97 is

 6     the "Creating and disseminating information about

 7     the approximate boundaries of property" for

 8     marketing purpose?

 9              A.    Yes, sir.

10              Q.    Okay.  And then 98 you mention a

11     couple of general statutes here that prohibit you

12     from "creating, processing, and disseminating

13     images of land and structures."

14                   Do you see that?

15              A.    Yes, sir.

16              Q.    And, again, what you're talking

17     about is you feel like you're not able to take

18     these images, these photos, and provide them to a

19     paying client, right?

20              A.    Yes, sir.

21              Q.    Okay.  And it's these images or

22     photos that you contend are speech?
```

Page 80

1            A.    Yes.  Information.

2            Q.    Right.  But you're specifically

3       calling it "speech," right, in your lawsuit?

4                  MR. GEDGE:  Object to form.

5            A.    I mean, I think so.  I'm not an

6       attorney, but that's what I see it as.

7            Q.    Okay.  And then Paragraph 99 says

8       that these statutes are prohibiting plaintiffs,

9       your company, "from creating, processing and

10      disseminating 3D digital models of land and

11      structures."

12                 Do you see that?

13           A.    Yes, sir.

14           Q.    And, again, the 3D digital models is

15      not something you ever did prior to receiving the

16      June 2019 letter, correct?

17           A.    Correct.

18           Q.    Okay.  And then Paragraph 100 says

19      these statutes "...prohibit Plaintiffs,"

20      including your company, "from creating,

21      processing, and disseminating data about land and

22      structures (including data about distances,

www.DigitalEvidenceGroup.com    Digital Evidence Group C'rt 2022    202-232-0646
Case 5:21-cv-00137-FL    Document 39-2    Filed 03/28/22    Page 80 of 88

J.A. 573

Page 81

1    coordinates, elevations and volumes)."

2              And again, that is the images that

3    you're talking about, the aerial images that

4    you're taking?

5              A.    Yes, sir.

6              Q.    Anything else other than the aerial

7    photos?

8              A.    No, sir.

9              Q.    Paragraph 101, these statutes are

10   prohibiting you and your company from "creating

11   and disseminating information about the

12   approximate boundaries of property" -- for

13   marketing purposes.

14             Again, that's the marketing boundary

15   issue.  Anything else other than that in

16   Paragraph 101?

17             A.    No, sir.

18             Q.    Okay.  So -- and it looks like --

19   can you think of anything else that you're

20   complaining about that you're not able to do as a

21   result of the Board's letter in June of 2019?

22             A.    I think we've covered everything.

www.DigitalEvidenceGroup.com    Digital Evidence Group C'rt 2022    202-232-0646
Case 5:21-cv-00137-FL    Document 39-2    Filed 03/28/22    Page 81 of 88

J.A. 574

Page 82

1           Q.    Great.

2                 And are you currently operating 360

3     Virtual Drone Services?

4           A.    Yes, sir.

5           Q.    And what kind of work are you doing?

6           A.    Real estate, weddings, business

7     commercials for their marketing companies,

8     et cetera, et cetera, and event videography.

9           Q.    Let me show you what's been marked

10    as Exhibit 6.

11                (Whereupon, Exhibit 6, Plaintiff 360

12        Virtual Drone Services LLC's Responses and

13        Objections to Defendant's First Set of

14        Request For Admissions, was marked for

15        identification.)

16          A.    Okay.

17          Q.    And Exhibit 6 is just a copy of

18    Plaintiff 360 Virtual Drone Services LLC's

19    Responses and Objections to Defendant's First Set

20    of Request For Admissions.

21                Have you seen this document before?

22          A.    Yes, sir.

www.DigitalEvidenceGroup.com    Digital Evidence Group C'rt 2022    202-232-0646
Case 5:21-cv-00137-FL    Document 39-2    Filed 03/28/22    Page 82 of 88

J.A. 575

Page 83

1          Q.    Okay.  And so these are essentially

2     questions or items that we asked you to admit or

3     deny, and I take it you had a hand in responding

4     to this on behalf of company?

5          A.    Yes, sir.

6          Q.    Okay.  And I'm going to show you

7     what's been marked as Exhibit 8, and ask if you

8     can identify this document for me.

9               (Whereupon, Exhibit 8, Letter dated

10          2/8/2019, was marked for identification.)

11         A.    Of course.  That is a letter to

12    William Casey from me, 2/8/2019.

13         Q.    Do you see and the bottom where it

14    has "Plaintiffs000014"?

15         A.    Yes, I do.

16         Q.    Okay.  And it looks like Plaintiffs

17    14, 15, 16, 17, 18, 19 are essentially copies of

18    the E-mail correspondence between you and

19    Mr. Casey?

20         A.    Yes.

21         Q.    Okay.  All right.  Let me show you

22    what's been marked as Exhibit No. 10.

Page 84

1              (Whereupon, Exhibit 10, Certificate

2         of Completion, was marked for

3         identification.)

4         Q.    I'll represent to you that they

5     were -- so you provided some images of

6     Certificate of Completion.

7         A.    Okay.

8         Q.    Unfortunately, I don't have a better

9     copy, but this says "This is to certify that

10    Michael Jones successfully completed 4 hours of

11    Drones: How to tell aerial stories online course

12    on Aug. 17, 2017."

13              Do you see that?

14        A.    Yes, sir.

15        Q.    Okay.  And what is this Certificate

16    of Completion that you provided us?

17        A.    Exactly what the title is.  It's

18    just a course on how to tell stories with aerial

19    photography and videography from Udemy.  That's

20    an online course.  They have multiple courses.

21        Q.    There is a second certificate that

22    you provided us.  And, in fact, it's the only

www.DigitalEvidenceGroup.com    Digital Evidence Group C'rt 2022    202-232-0646
Case 5:21-cv-00137-FL    Document 39-2    Filed 03/28/22    Page 84 of 88

J.A. 577

USCA4 Appeal: 23-1472    Doc: 19-3    Filed: 06/28/2023    Pg: 98 of 211

Page 85

1    other certificate you provided us.

2                Can you tell me about the second

3    one?

4        A.    Same thing.  This is a course of

5    6 hours of how to take a stunning aerial

6    photography using drones.

7        Q.    Have you taken any other drone

8    courses where you received a Certificate of

9    Completion?

10       A.    I think I have taken several Udemy

11   courses about drones that I've completed and

12   probably got certificates for.

13       Q.    Okay.  And what else -- because you

14   didn't produce those in discovery.  What other

15   courses do you think you took where you got a

16   Certificate of Completion?

17       A.    I'm not sure of the name.  It's been

18   so long.  I don't know the titles of the courses.

19   It had something to do with drones I'm sure.

20   Probably took some mapping courses.  Trying to

21   learn about that.  But I couldn't tell you how

22   many courses I had.

J.A. 578

USCA4 Appeal: 23-1472    Doc: 19-3    Filed: 06/28/2023    Pg: 99 of 211

Page 86

1          Q.    And what's the mapping course that

2     you would have taken?

3          A.    I'm not sure of the title.  I mean,

4     they all have titles to the courses --

5          Q.    What did you -- what did you learn

6     in the mapping course?

7          A.    Mainly stuff I already knew.  You

8     want me to go into that?

9          Q.    Can you be a little more specific?

10    Do you remember anything that you learned from

11    the mapping course?

12         A.    Yeah.  They explained different, you

13    know, how to collect the data correctly; what you

14    can do with ground control points; what you

15    couldn't do ground control point; how accurate

16    you could make the map, if you needed to make the

17    map accurate.  And there were several things

18    about equipment I don't have, so I just finished

19    the course out.

20         Q.    Meaning, you don't have the

21    equipment to actually do the job?

22         A.    Like they got into heavy surveying

www.DigitalEvidenceGroup.com    Digital Evidence Group C'rt 2022    202-232-0646
Case 5:21-cv-00137-FL    Document 39-2    Filed 03/28/22    Page 86 of 88

J.A. 579

2/22/2022    360 Virtual Drone Services, et al. v. Andrew L. Ritter, et al. Michael Jones 30(b)(6)

Page 87

1    stuff where they were putting ground control

2    points and videos and stuff like that which I

3    don't have and could never afford, so...

4          Q.    And what equipment do you have?

5          A.    A drone -- I mean I have several

6    drones -- and various camera and video equipment.

7          Q.    Prior to June of 2019 did you have

8    any different equipment?

9          A.    No, sir.

10         Q.    All right.  I don't have anything

11   further.

12               Thank you.

13               MR. GEDGE:  Why don't we take five

14      to chat here.  We might have a question or

15      two.

16               THE COURT REPORTER:  Off the record.

17               (Recess taken.)

18               MR. GEDGE:  We don't have any

19      questions.

20               (Time Noted:  11:43 a.m. EST)

21

22

www.DigitalEvidenceGroup.com    Digital Evidence Group C'rt 2022    202-232-0646
Case 5:21-cv-00137-FL    Document 39-2    Filed 03/28/22    Page 87 of 88

J.A. 580

2/22/2022     360 Virtual Drone Services, et al. v. Andrew L. Ritter, et al. Michael Jones 30(b)(6)

Page 88

```
 1        CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC

 2

 3              I, Amanda Gorrono, the officer

          before whom the foregoing deposition was

 4        taken, do hereby certify that the foregoing

          transcript is a true and correct record of

 5        the testimony given; that said testimony was

          taken by me stenographically and thereafter

 6        reduced to typewriting under my direction;

          and that I am neither counsel for, related

 7        to, nor employed by any of the parties to

          this case and have no interest, financial or

 8        otherwise, in its outcome.

                IN WITNESS WHEREOF, I have hereunto

 9        set my hand this 22nd day of February, 2022.

10

11

12

13        _____

14

15        AMANDA GORRONO, CLR

16        CLR NO:   052005 - 01

17

18        Notary Public in and for the State of New York

19        County of Suffolk

20        My Commission No.  01G06041701

21        Expires:  01/07/2023

22
```

J.A. 581

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
CASE NO. 5:21-CV-0137-FL

360 VIRTUAL DRONE SERVICES       )
LLC AND MICHAEL JONES,           )
          Plaintiffs,            )
v                                )
ANDREW L. RITTER, IN HIS         )
OFFICIAL CAPACITY AS EXECUTIVE   )
DIRECTOR OF THE NORTH CAROLINA   )
BOARD OF EXAMINERS FOR           )
ENGINEERS AND SURVEYORS; AND     )
JOHN M. LOGSDON, JONATHAN S.     )
CARE, DENNIS K. HOYLE, RICHARD   )
M. BENTON, CARL M. ELLINGTON,    )
JR., CEDRIC D. FAIRBANKS,        )
BRENDA L. MOORE, CAROL           )
SALLOUM, AND ANDREW G.           )
ZOUTWELLE, IN THEIR OFFICIAL     )
CAPACITIES AS MEMBERS OF THE     )
NORTH CAROLINA BOARD OF          )
EXAMINERS FOR ENGINEERS AND      )
SURVEYORS,                       )
          Defendants.            )


DEPOSITION OF MICHAEL JONES


This matter coming on for deposition on July 21, 2021, at Graebe,

Hanna & Sullivan, Raleigh, North Carolina, before Victoria L.

Pittman, BA, FAPR, RDR, CRI, CVR-CM-M, Court Reporter and Notary

Public, the following proceedings were had, to wit:


Reporter:  Victoria L. Pittman, Managing Reporter
           BA, FAPR, RDR, CRI, CVR-CM-M, RCP, NCJT

2

```
 1                        APPEARANCES
 2   For the Plaintiffs:
 3              Samuel B. Gedge
 4              INSTITUTE FOR JUSTICE
 5              901 North Glebe Road
 6              Arlington, Virginia 22203
 7
 8   For the Defendants:
 9              Douglas W. Hanna
10              GRAEBE HANNA & SULLIVAN
11              4350 Lassiter at North Hills Ave., Suite 375
12              Raleigh, North Carolina 27609
13
14
15
16
17   Present:   John M. Logsdon
18
19
20
21
22
23
24
25
```

The Amanuensis, LLC, d/b/a Pittman Stenography
PO Box 47, Wake Forest, NC 27588 * * * pittmanstenography.com
J.A. 583

3

1                           C O N T E N T S

2      THE WITNESS                                          PAGE

3      MICHAEL JONES

4              Examination by Mr. Hanna                       4

5              Examination by Mr. Gedge                     175

6              Examination by Mr. Hanna                     178

7

8

9                             EXHIBITS

10     NUMBER        DESCRIPTION                          MARKED

11     1             Complaint for Declaratory and           46
                     Injunctive Relief
12     2             Exhibit 1 to the Complaint              45
13     3             Rule 26 Initial Disclosures            37
       4             Letter from NC Board of Examiners for   37
13                   Engineers and Surveyors, 12/19/18
14     5             NCGS Chapter 89C                       102
       6             Investigative Report                    20
15     7             DroneDeploy Post Processing Guide      159
       8             DroneDeploy Making Great Maps E-book   167
16

17     **Reporter's Note:  This transcript may contain quoted material.

18         If so, such material is reproduced as read or spoken.**

19

20

21

22

23

24

25

4

1          Wednesday, July 21, 2021 (10:06 a.m.)

2          (Pursuant to the Federal Rules of Civil

3          Procedure:)

4                    * * * * *

5          MICHAEL JONES,

6  having been identified and affirmed by the Notary, was examined

7  and testified as follows on EXAMINATION

8  BY MR. HANNA:

9      Q.   Mr. Jones, good morning.

10     A.   **Good morning.  How are you, sir?**

11     Q.   Good.  I'm Doug Hanna.  I represent the Board of

12  Engineers -- actually, the Board of Examiners for Engineers

13  and Surveyors and all of the individual defendants that have

14  been named in the lawsuit in their official capacity.

15     A.   **Okay.**

16     Q.   I just wanted to introduce myself.

17          Could you, for the record, state your full name.

18     A.   **Yes.  Michael Rudolph Jones.**

19     Q.   Mr. Jones, also, if you could state your address.

20     A.   **4971 Wayne Memorial Drive, Goldsboro, North**

21  **Carolina 27534.**

22     Q.   Mr. Jones, where did you grow up?

23     A.   **Wilson, North Carolina.**

24     Q.   And could you tell the jury about your educational

25  background.

Michael Jones - 7/21/21

5

1      A.    Education -- I went through high school, dropped
2  out in tenth grade, went to get my GED.  That's pretty much
3  it.
4      Q.    In what year would you have received your GED?
5      A.    '92 I think it would be.
6      Q.    And had you not dropped out, what graduation year
7  would you have been?
8      A.    Oh, I'm sorry.  I thought that's what you were
9  asking.  I think '92 would have been the graduation year.
10     Q.    Okay.  Sorry about that.
11     A.    No problem.
12     Q.    And did you get your GED before '92 or after '92?
13     A.    So I dropped out in tenth grade and went right to
14  the community college and got it, like, that next upcoming
15  week.
16     Q.    Okay.
17           So 1990?
18     A.    Probably around that.  Sorry.  Not easy on those
19  dates.
20     Q.    No worries.
21           I'm just going to try to get a little bit of
22  understanding of your background as well.
23     A.    Sure.
24     Q.    So in 1990, you were, you know, 16 years old,
25  about, I would say; right?

1    A.    16, yes.

2    Q.    And did you start taking classes at the community

3    college?

4    A.    I went and just got the GED there and then I went

5    to work.

6    Q.    Okay.

7    And what did you do?

8    A.    Grocery stores.

9    Q.    And if you could, just a broad overview of what

10   was your work experience like in the '90s and then the first

11   decade of the 2000s?

12   A.    In the '90s, I -- of course, 16, I hit the ground,

13   wanted to work 40 hours a week, grocery stores, one from the

14   next, whoever needed stock boys, bag boys.

15   And then I learned the trade of welding in about

16   '95 maybe -- '94ish, '95, at Murphy Truck Body, they were a

17   national company in Wilson, and I went to work there,

18   welded, and left there, went to Evans Metal Fabrication,

19   which I have stayed off and on through the years doing the

20   same thing -- welder, layout fitter.  And then I got into

21   network support, computers, IT, and went to BB&T, Branch

22   Banking & Trust, worked there as a network support

23   specialist for seven years.

24   Q.    All right.  Let me stop you there.

25   A.    Sure.

Michael Jones - 7/21/21

7

1    Q.   So you're transitioning from employment in the

2  welding field to IT?

3    A.   Yes, sir.

4    Q.   What year did you do that?

5    A.   About '99/2000, that's when I got my first A+

6  certification, CompTIA A+ certification.

7    Q.   So you would have been in your late twenties?

8    A.   Early twenties -- so 23, age 23.  I just know it

9  because my father passed when I was 23; so I was already

10 welding then, and I -- after he passed is when I got into

11 the IT network field.  So it had to be in 2000 -- he passed

12 October 2000.

13   Q.   How old are you right now?

14   A.   44.

15   Q.   All right.

16        And so then you went to work for BB&T, did you

17 say?

18   A.   Yes.

19   Q.   And what year was that?

20   A.   2000, maybe, -3ish.

21   Q.   What did you do for BB&T?

22   A.   Network support specialist.  So we did all of

23 their IT internal support for all of the branches, IT

24 centers -- anything on the map.

25   Q.   So explain that to me because I'm -- I don't know

Michael Jones - 7/21/21

8

1  much about IT.

2     A.   So we -- I -- the department I dealt with, we did

3  not deal with any clients outside; we only dealt with

4  BB&T -- the internal clients at BB&T.  So if there was a

5  loan officer in Mississippi who needed support with their

6  mouse or their network wasn't supporting -- wasn't

7  connecting to the servers, they called us.  We were the

8  first line; so we either resolved the issue on the phone or

9  we dispatched a technician or sent a client server engineer.

10     Q.   All right.

11      And then how long did you work for BB&T?

12     A.   Seven years.  Actually worked there -- they

13  offshored the help desk to India for a couple years.  I left

14  during that time and did some just contract network stuff

15  through a couple different companies.  When they returned

16  back to the States, I was called by my supervisor and asked

17  did I want to return, so I did.

18     Q.   Okay.

19      So you were employed full-time beginning in '03?

20     A.   I think so, around '03.

21     Q.   Okay.

22      And, again, the dates -- the specifics aren't

23  critical by any stretch --

24     A.   Sure.

25     Q.   -- but just approximately 2003.

9

1           How long did you work full-time?

2     A.    So I worked full-time until about 2007, I think,

3  is when they offshored.  And I think they offshored for

4  about two years; so around 2010 maybe, somewhere around the

5  area, is when I was called back by BB&T.  And then I went

6  back to work for them and worked, I'm not sure, maybe

7  another year or two, something like that.

8     Q.    And then what did you do after BB&T?

9     A.    Then went back to welding.

10    Q.    And was that just a matter of welding paid more or

11  did you --

12    A.    Oh, no.  Actually, in 2013, I actually got under

13  some trouble with the law.  And BB&T, due to the FDIC

14  regulations, had to release me.

15    Q.    So you were -- when you say "released," you were

16  terminated by BB&T?

17    A.    Yes.

18    Q.    Okay.

19           What was the reason for the termination?

20    A.    I sold a prescription pill bottle to a guy without

21  a prescription, one of my prescriptions.

22    Q.    And other than that incident, do you have any

23  other -- have you been involved in any other type of charges

24  from law enforcement?

25    A.    No.  Just speeding tickets with cars, but ...

10

1   yeah, that's it.

2       Q.   Have you been involved in any other lawsuits other

3   than the lawsuit that was filed in your name and on behalf

4   of your company's name?

5       A.   No, sir.

6       Q.   So tell me about -- so what happened in 2013?  Who

7   invest -- how did you get caught or turned in on this issue?

8       A.   So I had sold to a hairdresser in Wilson who had a

9   business, and he bought the whole bottle, and then they set

10   up an audio/video recording of him buying it from me.  And

11   then they did the arrest after that, I guess.

12       Q.   All right.

13            And so he was like an undercover informant,

14   basically?

15       A.   I don't think he was undercover.  He just -- I

16   think what I heard, he got pulled, like, driving from the

17   house or something, and I guess they got them to tell.  I'm

18   not sure.  I was never told exactly what happened.

19       Q.   When you say "they," who is "they"?

20       A.   Police officers.

21       Q.   From what --

22       A.   Wilson County.

23            (Stenographer clarification.)

24            (Discussion off the record.)

25       Q.   What was the prescription that you sold the

1    hairdresser?

2        A.    Oxycodone.

3        Q.    And this was a prescription that had been

4    prescribed to you legally?

5        A.    Yes.

6        Q.    Okay.

7              So I take it, then, you were charged by the local

8    district attorney in Wilson County?

9        A.    Yes.

10       Q.    And was it a felony?

11       A.    Yes.

12       Q.    And how was that felony charge resolved?

13       A.    It was resolved -- I hired an attorney in Wilson

14   and they got the charge dropped to a delivery and sale of a

15   narcotic, which was still a felony, but it was a couple

16   charges below.  And then I was released with two years'

17   supervised probation.

18       Q.    And do you remember what class felony you pled

19   guilty to?  Do you remember?  There's a chart -- A, B, C, D?

20       A.    I'm not sure.  I wouldn't be able to tell you.  It

21   wouldn't be honest.

22       Q.    Fair enough.

23             You just know that the felony charge that you pled

24   to, that put you in a lower punishment bracket; is that

25   right?

Michael Jones - 7/21/21

12

1    A.    It was out of the mandatory bracket because what I
2  was in was a mandatory, and it dropped one below that but
3  I'm not sure the letters.
4    Q.    Okay.
5        And then you -- as a punishment, you -- obviously
6  you got a conviction, felony conviction; correct?
7    A.    Yes.
8    Q.    And then you were two years supervised probation?
9    A.    Yes, sir.
10    Q.    And then as a result, unfortunately, I guess, then
11  you were terminated from your job at BB&T?
12    A.    Yes, sir.
13    Q.    And then you went back into the welding field?
14    A.    Yes, sir.
15    Q.    Okay.
16        And how long did you work in welding?
17    A.    Probably another two years, maybe, until I got
18  back on my feet.
19    Q.    And then what did you do next?
20    A.    And then I started my own photography company that
21  turned into photography with drones.
22    Q.    Now, the photography company, what year would you
23  have started that?
24    A.    2016.
25    Q.    And was that something you were doing -- well, let

Michael Jones - 7/21/21

13

1  me back up here.

2          The documents that we produced to you in this

3  case, there is some information about the incorporation of

4  360 Virtual Drone Services LLC with the State of

5  North Carolina.

6          And the documents that I'm looking at show that

7  that company was incorporated by you in October of 2017.

8          Does that sound right?

9     A.    Yes.

10    Q.    Okay.

11          And so when you say "photography company," is that

12  just a business you were operating under your name?

13    A.    So first I started doing photography, started

14  doing, you know, small clients, family portraits, friends --

15  stuff like that.  Then I realized I wanted to -- you know,

16  hey, I want to make this into a business; so that's when I

17  spoke to another friend of mine who invested in the drone

18  equipment, and then I kind of moved from that to the aerial.

19          So yes, the drone business, 2017 would be the

20  date, you know, but I did photography in 2016 kind of

21  leading up to that as a hobby turned, you know, business.

22    Q.    All right.

23          Let me spend a few minutes transitioning and just

24  talk about the timeline of events.

25    A.    Absolutely.

14

1      Q.   So you indicate in 2016 -- is that when you

2  started getting interested in photography?

3      A.   Yes.

4      Q.   And you called it a hobby.  Was that a hobby

5  initially?

6      A.   Yes.

7      Q.   And what equipment were you using in 2016?

8      A.   One Nikon D35 camera, I think, 3500.

9      Q.   Any other equipment?

10      A.   That was it for me.  A couple flashes and lights,

11  you know.

12      Q.   And how did the hobby of photography turn into a

13  side business?

14      A.   So a friend of mine noticed I was doing

15  photography, she was a real estate agent, and she asked did

16  I have a drone.  I told her no.  She wanted to invest in my

17  company by purchasing the drone if I would return the work

18  and the pay through real estate work for her doing the

19  drone -- you know, using the drone.

20          And so we did that, and I started doing, you know,

21  real estate photography and things like that.

22      Q.   When was that?  When did your friend -- well, who

23  is your friend?

24      A.   Lisa.  Oh, you need her last name too?

25      Q.   Yes.

Michael Jones - 7/21/21

15

```
 1        A.    Lisa -- what was her last name?  You'll have to
 2   give me a second on her last name.  I can't think of it.
 3        Q.    Do you remember what company she worked with?
 4        A.    No, because she was starting real estate as well.
 5   I can't believe I'm drawing a blank on her name.  Sorry.
 6        Q.    Well, when you -- if it comes, jumps into your
 7   head, let me know.
 8        A.    Yeah.  I'll think of it in a minute.
 9        Q.    And so Lisa comes to you and says, "I want you
10   to -- I want to partner with you"?
11        A.    Not those exact words.  She asked did I do drone
12   photography.  I told her no.  She said, "Have you ever
13   thought about it?"
14              I said, "I can't afford them.  You know, not in my
15   bank right now."
16              So she said, "Well, how about if I purchase the
17   drone?  You can do your real estate work with it and then
18   you can pay back the money for the drone by doing real
19   estate work for me."
20              So that was the agreement we had.  She bought a
21   drone for me, wrote me a check, I bought a drone, and it
22   started there.
23        Q.    Okay.
24              When did she buy the drone?
25        A.    It was around the 2017ish mark, in between '16 and
```

Michael Jones - 7/21/21

16

1    '17, that transition from regular photography to 360 Virtual

2    Drone Services.  I'm not sure of the month.

3         Q.    So if 360 Virtual is incorporated in October,

4    would you say that was three, six, nine months earlier?

5         A.    I'd hate to give you a definite time.  I'm really

6    not sure.

7         Q.    Would you still have -- did you buy the drone?

8         A.    I bought the drone, yes.

9         Q.    Do you still have the records related to the

10   purchase of the drone?

11        A.    I'm sure I do.  It came through, actually, on

12   eBay; so I would say I can probably obtain it but I'm not

13   positive.

14        Q.    And so do you have e-mails between you and Lisa?

15   Or text messages?

16        A.    No.

17        Q.    And just so the record is clear, prior to Lisa

18   buying the drone for you, there had been no photography

19   business conducted by you?

20        A.    Regular photography; no drone photography.  Like I

21   said, I was doing friends who wanted family portraits and,

22   you know, graduation pictures -- stuff like that, but I

23   hadn't -- I didn't have a drone at that time; so I only did

24   that.

25             So that's when it was more or less kind of a

Michael Jones - 7/21/21

17

 1  hobby, you know, 50 bucks here for a shoot, 60 bucks here

 2  for a shoot.  And then it just kind of progressed from

 3  there.

 4       Q.   All right.  So let me back up.

 5            You buy a camera in -- sometime in 2016, and you

 6  get interested in the hobby of photography; correct?

 7       A.   Yes.

 8       Q.   And at some point, it develops into more of a

 9  hobby by people saying, "I'll give you 50 bucks if you shoot

10  this event"?

11       A.   Sure.  Yes.

12       Q.   All right.

13            When was that?  When would be the first time you

14  had received money in exchange for doing a photography

15  shoot?

16       A.   I couldn't tell you the actual date.

17       Q.   Okay.

18            Was it in 2016 or 2017?

19       A.   2016, probably.

20       Q.   And how many times would you have been paid to

21  shoot photographs at an event before the drone -- before

22  buying a drone?

23       A.   I wouldn't have any way of telling you, here,

24  without seeing any records or anything.

25       Q.   Okay.

Michael Jones - 7/21/21

18

1          More than 10?

2     A.    Maybe 10, a few more than 10 maybe.

3     Q.    And are we talking about the total of, making,

4   like, you know, 500 bucks or something -- or did it -- was

5   it more than that as far as --

6     A.    Oh, it was less than that starting out, yeah.

7     Q.    Okay.  All right.

8          So it really was just doing side deals with

9   friends, like, "I'll do this for $50" or "do this for $75,"

10  whatever?

11    A.    Sure.  Because I was beginning the hobby; so I

12  wasn't feeling, you know, I was that good to do it.  So then

13  the work -- just started turning out more work.

14    Q.    And how did you meet Lisa?

15    A.    She -- I was in a band and the drummer who I had

16  hired had dated her briefly, and that's how she even knew of

17  me.

18    Q.    So did you meet her out, like, at an event where

19  you were playing?

20    A.    To be honest, I never met her during the entire

21  time; everything was communicated through my drummer, like

22  when we would do the events.  He was like, "Hey, the Lisa

23  girl wants to invest in your company," you know or "buy you

24  a drone" or ...

25          So we -- I got the check and purchased the drone

Michael Jones - 7/21/21

19

1    before I met Lisa.

2        Q.    Did you get the check and purchase the drone

3    before you ever spoke to her on the phone?

4        A.    Yes.

5        Q.    And how much was the check?

6        A.    1200.

7        Q.    All right.

8              And so sometime in 2017?  Is that fair?

9        A.    For what?

10       Q.    You bought the drone?

11       A.    Either late 2016 or '17 -- early '17.

12       Q.    And so what kind of drone was it?

13       A.    A DJI Phantom 4.

14       Q.    And so now you have this -- did you say $1200

15   drone?

16       A.    Oh, the drone was actually 900, and I think I

17   bought a camera lens with the remaining for the -- for the

18   regular camera.

19       Q.    So you have the drone and the camera lens, and now

20   what do you do with it?

21       A.    So then I start learning how to work with the

22   drone, you know, taking pictures and incorporating them, who

23   my customers could be -- things like that.

24       Q.    How do you do that?  How do you go about learning

25   how to do that?

Michael Jones - 7/21/21

20

1          A.    Internet.

2          Q.    Where on the internet?

3          A.    YouTube, Google.

4          Q.    Take me back to 2017.  Before you incorporated 360

5    Virtual Drone Services, what are you -- what are you

6    googling, what are you looking at on YouTube?

7                What type of videos?

8          A.    So I'm looking up things -- you know, businesses

9    to start with drones, industries who, you know, are using

10   drones, future of drones -- things like that.  Obviously,

11   real estate was the number one service, you know, for drone

12   people.

13               So then I just started my education.  I mean, I

14   had to get, of course, certified with the Part 107 license

15   to fly.  So all of that, I googled for months, studying all

16   the FAA regulations, the rules, what you've got to have to

17   fly, when you can and cannot fly.

18               So there were courses on Udemy, that's another

19   site I went to, and the drone -- it's called Drone U, the

20   letter U, I guess, for "university."  That's an online site

21   that also does drone education.

22         Q.    I'm going to mark this document as Exhibit 6.

23                    (Exhibit 6 marked.)

24         Q.    I've handed you what has been marked as Exhibit 6.

25   And for the record, it is also identified by Bates numbers

Michael Jones - 7/21/21

21

1   NCBELS 1 through 79.

2          Have you seen those documents before?

3      A.   Of course, this is a huge packet of paper, but

4   yes, a lot of these documents do look familiar.

5      Q.   I'll tell you that these are the documents we

6   produced to your lawyer --

7      A.   Okay.

8      Q.   -- in what's called the initial disclosures.

9      A.   Gotcha.

10     Q.   So there's no trick question here, I was just

11  curious if you'd seen them.

12         And the last document in that packet, 79, is a

13  copy of some sort of certification involving the FAA.

14     A.   Okay.

15     Q.   And it's something that actually we printed off in

16  our office.

17         Do you recognize that document?  Have you seen a

18  document like that before?

19     A.   I'm familiar with all the information on it.  I'm

20  not sure if I've seen this document.  But, I mean, the

21  information is all familiar.

22     Q.   And the information, is that you, Michael Rudolph

23  Jones?

24     A.   Yes, sir.

25     Q.   And your address?

Michael Jones - 7/21/21

22

1          A.    Yes, sir.

2          Q.    And then it says you were -- received a

3    certificate as a remote pilot on January 18, 2017.

4          A.    Yes, sir.

5          Q.    Okay.

6                And that's what you were referring to a few

7    minutes ago when you talked about you researched the FAA

8    rules and ...

9                What did you have to do in order to get the

10   certificate?

11         A.    You have to take an exam at the airport or testing

12   facility.  By the way, it's referred to as a Part 107, if

13   you need that.

14         Q.    And besides taking the exam at the airport, do you

15   take any classes?

16         A.    No classes.

17         Q.    Okay.

18         A.    I mean, online boot camps, I studied, you know,

19   through those but ...

20         Q.    And so does this refresh your memory about when

21   you would have purchased a drone?

22               Or would you -- do you know if you used somebody

23   else's drone to get certified?

24         A.    No, I didn't use anybody else's drone to get

25   certified because you don't have to have a drone to get

Michael Jones - 7/21/21

23

1   certified, technically.

2       Q.   Okay.

3       A.   But as far as refreshing -- 1/18/2017 -- I mean,

4   that sounds in the field of the time that I was

5   transitioning from 2016, you know, hobby photography, to

6   this time.  That was my first one because you have to get

7   them reissued every two years; so this would have been my

8   first.

9       Q.   And so other than taking or getting this

10  certificate, did you take any other classes before you

11  incorporated 360 Virtual Drone Services in October?

12      A.   I'm just looking at the date.

13           Yes.  There's a North Carolina one that they

14  supersede the FAA on, and North Carolina State said you have

15  to have a North Carolina drone -- I guess they're calling it

16  a certificate, because it's completely null in the FAA, but

17  they say you have to have it.  It was $25.  The test wasn't

18  hard; so I took it and got that.

19      Q.   Did you take any classes before you took that

20  test?

21      A.   No.  Just study.

22      Q.   So prior to incorporating 360 Virtual Drone

23  Services LLC in October of 2017, did you take any classes?

24      A.   No.  Besides the online -- you know, if you want

25  to -- as far as the definition of classes, I never went to a

Michael Jones - 7/21/21

24

1    class and attended anyone, like, teaching me things --

2        Q.    Correct.

3        A.    -- but I did watch many a training video, you

4    know, before the test.

5        Q.    So other than watching YouTube videos, did you

6    enroll in any classes?

7        A.    Not if it wasn't online.  I mean, there could have

8    been an online boot camp, if you want to call that

9    enrolling, that I may have signed up for to take their

10   quiz/exam, you know, practice test.  But I couldn't tell you

11   what they were.  I think I may have took -- taken one at

12   Udemy as well.

13       Q.    Have you taken any classes in photography?

14       A.    Just online stuff.

15       Q.    Again, I'm not talking about YouTube videos, but

16   other than watching a YouTube video or doing a google

17   search, have you taken any classes -- any instruction,

18   formal instruction?

19       A.    No.  I have not taken any classes from any

20   photographers.

21       Q.    No formal instruction from photographers?

22       A.    No, not on hand, not person to person.

23       Q.    Have you taken any classes or had any formal

24   instruction involving the use of drones?

25       A.    No.

25

1      Q.    All right.

2            And then, again, going back to the timeline, you

3      incorporated 360 Virtual Drones on or about October 16th,

4      2017.

5            Does that sound right?

6            And let me refer you to documents 14 and 15 of

7      Exhibit 6.

8      A.    4/13/2018?  Is that the date you just gave?

9      Q.    So if you look at Exhibit 14, this was a

10     printout -- again, this was done, I think, by the

11     investigator for the board of examiners and they printed out

12     something on your company that indicates that it was formed

13     on 10/16/2017.

14     A.    Okay.  I see the date formed.

15     Q.    Does that sound right?

16     A.    If that's what the paper says, I'm assuming that's

17     right.  Yes, sir.

18     Q.    Okay.

19           I think what this is indicating is that's what the

20     Secretary of State's office is reporting.

21     A.    Yes, sir.  On their website.

22     Q.    And that sounds to you like about the month and

23     date that you would have incorporated 360 Virtual Drone

24     Services LLC?

25     A.    Yes, sir.

Michael Jones - 7/21/21

26

1    Q.    And you are the registered agent; correct?

2    A.    Yes, sir.

3    Q.    And you are the -- are you the sole owner?

4    A.    Yes.

5    Q.    So you're the only manager?

6    A.    Yes, sir.

7    Q.    And you're the only member?

8    A.    Yes, sir.

9    Q.    And prior to incorporating this, had you done any

10   business, drone business?

11   A.    With the drone?  I mean, it started out probably

12   the same way that photography did, you know, a couple people

13   were hiring me here and there, "Hey, you've got a drone, you

14   know, would you come take pictures of, like, our house?"

15        So yeah, just light hobby work.  But when I saw it

16   was getting to the point it was turning into a business,

17   then that's what I registered.

18   Q.    So you get the drone in late 2016?

19   A.    I think it was around that time, yes.

20   Q.    You were mentioning someone by the name of Lisa.

21   A.    Lisa, yes.

22   Q.    So what did you -- when did you first speak to her

23   or meet her?

24   A.    Datewise, I could not tell you.

25   Q.    How long after purchasing the drone did you first

Michael Jones - 7/21/21

27

```
 1   meet her or first speak with her?
 2        A.    Maybe a month or two.
 3        Q.    Tell me what you spoke about.
 4        A.    I just expressed my gratitude for what she had
 5   done.  She was telling me that she wanted to invest in a
 6   hard worker, somebody who was going to go make something.  I
 7   told her I would, and that, you know, I would pay her back.
 8              So she said, "Okay, let's go."
 9              I think she actually went and got her real estate
10   license around that time to start working, and I was doing
11   this; so we were just kind of like patting each other on the
12   back and, you know, let's go build something.
13        Q.    Okay.
14              And when was that?
15        A.    I'm not sure.  I mean, a couple months after the
16   check, whatever date we talked; but I'm not sure when that
17   was.
18        Q.    Do you know if it was before or after you received
19   your FAA certification?
20        A.    It was before I received that, my FAA
21   certification.
22        Q.    All right.
23              And so you meet her -- or do you meet her?  Or do
24   you talk to her on the phone?
25        A.    I think we may have met for lunch or something.
```

The Amanuensis, LLC, d/b/a Pittman Stenography
PO Box 47, Wake Forest, NC 27588 * * * pittmanstenography.com

1    I'm not positive of the first meet we had.  We may have

2  spoken on the phone, you know, briefly prior to that.  I may

3  have called and told her thank you or something.

4        Q.  Did her boyfriend meet with you as well?

5        A.  No, she didn't have -- they just kind of had a

6  brief relationship; so she had no boyfriend.  It was just me

7  and Lisa.

8        Q.  Okay.  All right.

9        And so when did you first do any work for Lisa?

10       A.  The odd thing is I've never done any work for

11 Lisa.  She never allowed me to pay her back.  She never

12 allowed me to return the work.  She just -- after a while,

13 when I tried and kept asking her, "Are you going to let me

14 do any work for you to return this?" she just said, "You

15 know, you're good.  Don't worry about it."  And that was it.

16       Morris is her last name.  I'm sorry.

17       Q.  Lisa Morris?

18       A.  Morris.

19       Q.  When's the last time you spoke to her or saw her?

20       A.  Maybe a couple of months ago.  She called me when

21 this case came out and just wanted to know what was going

22 on.

23       Q.  Did you ever pay her the $1200 back?

24       A.  No.

25       Q.  And you never did any work for her?

Michael Jones - 7/21/21

1      A.    No.

2      Q.    All right.

3            So you have this drone and you have a camera lens;

4  correct?

5      A.    Yes, sir.

6      Q.    You have -- now, in January of 2017, you have some

7  sort of FAA certificate?

8      A.    Yes, sir.

9      Q.    All right.

10           You've not taken any classes, enrolled in any

11 classes involving photography; correct?

12     A.    No, sir.

13     Q.    Not enrolled in any classes involving the use of

14 drones; correct?

15     A.    No, sir.

16     Q.    You've received no formal instruction regarding

17 photography; correct?

18     A.    No, sir.

19     Q.    No formal instruction regarding the use of drones;

20 correct?

21     A.    No, sir.

22     Q.    And then what do you do next?

23     A.    Then I just started building my business, finding

24 out how -- you know, what industries are cooking with the

25 drones, what are they being used most for, what it looks

Michael Jones - 7/21/21

30

1  like it's going to turn into, you know, the best industry to
2  go with in the drones.
3       And then I go start, you know, pushing my work
4  doing real estate jobs.  I hired on to the Droners.io
5  website, they're kind of like a job -- a contractual job
6  finder, I guess you could say.  They just find jobs for
7  drones and then you sign up under their website and you can
8  bid on the job.  So I did some jobs through that.
9       There was also another site called DroneBase.com
10  that I also did some jobs for.  They were kind of the same
11  thing, very low-hanging fruit, but just to get into the
12  industry and stuff in my portfolio; so I did those jobs.
13      Q.   Did you do your first job before or after you
14  incorporated 360 Virtual Drone?
15      A.   Before.
16      Q.   And what was your first job?
17      A.   I did a job for a real estate agent in Apex.  It
18  was just a real estate marketing video and photos.
19      Q.   So you're going to -- I need to go back to the
20  drone that you bought.
21      So you buy a drone for $900 and you buy a camera
22  lens.  Does that camera lens allow you to take video and
23  take still pictures?
24      A.   Yes.
25      Q.   Okay.

 1            So you're flying your drone.  Are you doing that
 2    manually in Apex?
 3        A.    Yes.
 4        Q.    And you're flying the drone -- manually, meaning
 5    you control the drone?
 6        A.    Yes.
 7        Q.    It's not being controlled by a computer program?
 8        A.    No.
 9        Q.    And you fly the drone in Apex and you take video?
10        A.    Yes, sir.
11        Q.    And you're -- as I understand it, you're flying a
12    piece of property that this real estate agent is trying to
13    sell?
14        A.    Yes.
15        Q.    And was the real estate agent there when you were
16    flying the drone?
17        A.    Yes.
18        Q.    And so how much were you paid for that?
19        A.    I'm sorry.  I'm trying to remember.
20            I want to say how it went was I did a couple of
21    jobs for this same real estate agent and, in return, he
22    bought my first editing computer, which was around $600.  It
23    was kind of a trade-off, pay for the computer for me doing
24    the jobs, him helping me.
25        Q.    When did you buy the editing computer?

Michael Jones - 7/21/21

32

```
1        A.    I don't know what the date is.

2        Q.    Did you do that before or after you incorporated

3   360 Virtual Drones?

4        A.    Before.

5        Q.    So walk me through the -- or walk the jury through

6   the job in Apex, where you go out there, you bring your

7   drone out there, the drone has a camera.

8              Is the camera part of the drone?

9        A.    Yes, sir.

10       Q.    Okay.

11             And can you explain to the jury how you went about

12  taking the video and creating this project.

13       A.    So I first check the airspace location to make

14  sure it wasn't any kind of airspace that was locked down

15  or -- you know, from flying.

16             Everything was clear so we then go out to the job.

17  He meets me out there.  We -- I get the drone out, we check

18  everything out around -- make sure there's no towers, power

19  lines, and then we launch the drone.  He stands behind me,

20  kind of guides me on what angle he wants, you know, which

21  way he wants to feature the property from, we fly that, we

22  take the pictures in the same manner, we get finished, we

23  come back down, land it.  I pack up, I go home, deliver --

24  after I edit the video, I then deliver it to him via Dropbox

25  link.
```

Michael Jones - 7/21/21

33

1    Q.    So do the -- when you put the drone in the air, is
2    the drone taking pictures every few seconds --
3    A.    Uh-huh.
4    Q.    -- or is it taking pictures when you manually take
5    the pictures?
6    A.    All manual.
7    Q.    Okay.
8          And so you get home, and in order -- and you
9    essentially now have a camera with data in it; right?
10   A.    Sure.  Yes.
11   Q.    And what was your deliverable to this real estate
12   agent?
13   A.    I can't remember the number exactly, maybe 20 to
14   30 photos, still aerial photos, and then the video was
15   probably under 3 minutes of just orbiting flights, straight
16   pass-bys of the property, which also had details and
17   information that I added in the postproduction that he
18   supplied me with.
19   Q.    And so this was the work product that he hired you
20   to do?
21   A.    Yes.
22   Q.    And this work product, you did this a couple of
23   times for him in exchange for him buying an editing
24   computer?
25   A.    I think that's how it went.

Michael Jones - 7/21/21

34

```
 1        Q.    Okay.

 2              Who is the real estate agent?

 3        A.    I figured you were going to ask me.  Do you mind

 4    if I look at my phone?

 5        Q.    Sure.

 6                   MR. HANNA:  Why don't we go off the record.

 7                   (Discussion off the record.)

 8        Q.    We're back on the record.

 9              What was the name of the real estate agent that

10    you worked for in 2017?

11        A.    In Apex?

12        Q.    Yes.

13        A.    Billy Mills.

14        Q.    And if you could explain to the jury, when you get

15    back home, how exactly do you process the data that you

16    called the work product, the 20 to 30 still photos and the

17    3-minute video, how do you do that?

18        A.    So that's on an SD card which is in the drone.

19    All the data is recorded onto the SD card.  I then load the

20    SD card into my computer, upload the photos and video.

21    Photos get taken into an editing program for still

22    photography; videos get loaded into a program called Final

23    Cut Pro, which is a film editing program.  And that's where

24    I edit the video into short clips, 10- or 12-second clips,

25    multiple clips, to create kind of a highlight reel of the
```

Michael Jones - 7/21/21

35

1   property.

2        Q.   And then you -- do you e-mail him this work

3   product?

4        A.   It was either Dropbox link or I may have given him

5   a thumb drive.  It's been so long ago, I can't remember

6   exactly how we did the deliverable.  But that's the two

7   primary ways I deliver products anyway.

8        Q.   Either Dropbox or a thumb drive?

9        A.   Mostly Dropbox, but the occasional person wants a

10  thumb drive.

11       Q.   Do you still have the same Dropbox account?

12       A.   Yes.

13       Q.   And so after you -- I take it you do a couple of

14  projects for Mr. Mills?

15       A.   Yes.

16       Q.   And then you -- why did you need the editing

17  computer if you already were using certain software?

18       A.   Because -- okay.  So the editing software which is

19  on the Apple, it's called Final Cut Pro, you have to have

20  pretty substantial hardware set up to run that program

21  fluently, and I just didn't have a computer -- I had a

22  computer, but I didn't have an editing machine, you know,

23  with the RAM memory and the space to actually use.

24            So he was just discussing wanting, you know,

25  writing on the screen that popped up and told details.  So I

Michael Jones - 7/21/21

36

1  just expressed to him, "Hey, I'm saving up for a computer

2  that will allow me to do that," and that's when he kind of

3  offered, like, "Hey, you know, I'll get that for you if you

4  want to trade out this work for it and then that's how I'll

5  pay you." So ...

6      Q.   So when you did the first work product of 20 to 30

7  photos, you're just uploading photos, going through, making

8  sure that you're picking 20 or 30 that are the best photos,

9  I take it?

10     A.   Yes.

11     Q.   And then the 3-minute video is something you

12 just -- did you have to edit that at all?

13     A.   Yes.

14     Q.   Okay.

15          And so other than editing it, you're just sending

16 him information; you're not drawing lines or pictures or

17 putting words or anything on it?

18     A.   Not on this one -- yes, I am doing words of the

19 details that I mentioned earlier that he supplied me with.

20     Q.   Okay.

21     A.   It's like the acreage.  You know, it's close to

22 401, you know, proximity, it's close to -- you know, details

23 like that, just kind of traditional real estate stuff.

24     Q.   And so -- but you're providing him with photos and

25 video?

1       **A.    Photos and videos for this, yeah.**

2       Q.    And do you still do that today?  Do you still

3    provide customers photos and videos?

4       **A.    Yes.**

5       Q.    And then as I understand the timeline, between --

6    your lawsuit alleges that "Between 2017 and 2019, Michael

7    offered drone photography services through a single-member

8    LLC, 360 Virtual Drone Services LLC, to clients."

9            Is that true?  Did you offer drone photography

10   services between 2017 and 2019 to clients?

11      **A.    Yes.**

12      Q.    And then in December of 2018, you received a

13   letter from the Board of Examiners for Engineers and

14   Surveyors; correct?

15      **A.    Yes.**

16               (Exhibit 3 marked.)

17      Q.    Mr. Jones, I'm going to hand you what's been

18   marked as Exhibit 3.

19            Exhibit 3 is a document that was produced by your

20   lawyer in this lawsuit, and it's just called "Plaintiff's

21   Rule 26 Initial Disclosures."

22            Have you seen that before?

23      **A.    Yes, I think so.**

24               (Exhibit 4 marked.)

25      Q.    And then related to your initial disclosures is

38

1  Exhibit 4.

2          And Exhibit 4 is a copy of the documents that you

3  produced in this lawsuit during the initial disclosures.

4      A.   I'm sorry.  Could you repeat that?

5      Q.   Sure.

6          So Exhibit 4 is related to Exhibit 3.  It's a copy

7  of the documents that were produced by you during the

8  initial disclosure phase.

9      A.   Okay.

10     Q.   And those documents are -- they're marked

11  Plaintiffs' 1 through 13.

12     A.   Okay.

13     Q.   Have you seen those documents before?

14     A.   Yes.

15     Q.   And the board investigation letter that we

16  mentioned a few minutes ago that was received by you in

17  December of 2018, that is the first document in that

18  Exhibit 4, right, Plaintiffs' 01?

19     A.   Yes, sir.

20     Q.   And then in response to that, did you send the

21  board an e-mail on January 2, 2019?

22     A.   I think I did.  I'm not sure the date, but I

23  definitely replied through e-mail.

24     Q.   And did you produce -- strike that.

25          How did you go about creating the set of documents

39

1  that were produced during your initial disclosures?

2      A.   Which documents are you referring to?  I'm sorry.

3      Q.   Exhibit Number 4.

4      A.   So this packet?

5      Q.   Yes.

6      A.   So all of this?

7      Q.   Correct.

8           MR. GEDGE:  I'll just object to the extent it

9  requires disclosing attorney-client communication or work

10  product.

11           MR. HANNA:  Fair enough.

12           MR. GEDGE:  To the extent you can answer ...

13      Q.   Yeah, because I don't want to get into -- to make

14  the record clear, I don't want to get into anything you've

15  talked to your lawyer about or any advice you received or

16  assistance about, "Hey, this is how you answer these

17  questions."

18          But I do want to -- if you go back to Exhibit 3,

19  Exhibit 3 is a copy of the initial disclosures that were

20  served on your behalf and also on behalf of your company.

21      A.   Okay.

22      Q.   And the lawsuit that was filed, you filed a

23  lawsuit on behalf of your company and on behalf of yourself

24  individually; correct?

25      A.   Yes, sir.

Michael Jones - 7/21/21

40

1        Q.    Okay.

2              And then the initial disclosures, question

3    number 1 is a question that says:  "Individuals likely to

4    have discoverable information that plaintiffs may use to

5    support their claims."

6              Do you see that?

7        A.    Yes, I see that.

8        Q.    Okay.

9              And so you've made a claim in this case -- a First

10   Amendment freedom of speech claim; correct?

11       A.    Yes, sir.

12       Q.    Okay.

13             And you've identified certain individuals that you

14   believe may have discoverable information that you will use

15   to support your claims; correct?

16       A.    Can you repeat that.  I'm not quite sure --

17       Q.    You have identified some individuals here --

18       A.    Okay.  The listed ones in bold?

19       Q.    Yes.

20       A.    Okay.

21       Q.    And those are the individuals that you believe to

22   have discoverable information that plaintiffs may use to

23   support their claims?

24       A.    I'm not sure about these names, maybe just because

25   I'm unfamiliar with it or it's been a while.

Michael Jones - 7/21/21

41

```
 1        Q.   Well, let me help you out.
 2        A.   Sure.
 3        Q.   So the first name on the list is you, right, the
 4   plaintiff?
 5        A.   Right.
 6        Q.   And you're the owner of the company?
 7        A.   Yes, sir.
 8        Q.   100 percent owner; correct?
 9        A.   Yes, sir.
10        Q.   The second group of names are the defendants in
11   the lawsuit --
12        A.   Okay.
13        Q.   -- that were all named in their official capacity?
14        A.   Okay.  Thank you.
15        Q.   Yes, sir.
16             And then the third name on the list -- who is
17   Chris Alexander?
18        A.   I'm not -- Chris Alexander, I don't know.
19        Q.   Okay.
20             Are there any other witnesses, sitting here today,
21   that you think you would use to support your claims?  And,
22   again, I don't want to get into anything you talked to your
23   lawyer about about strategy, but just -- you understand the
24   case; right?
25        A.   I understand the case, yes.
```

Michael Jones - 7/21/21

42

1    Q.   You read the complaint before it was filed;
2    correct?
3    A.   Yes, sir.
4    Q.   It's your lawsuit; correct?
5    A.   Yes, sir.
6    Q.   It's not your lawyer's lawsuit; right?
7    A.   No, sir.
8    Q.   All right.
9         And can you think of any other witnesses that
10   you're going to use to support your claims other than these
11   people you've identified?
12   A.   I'm not aware of any, no.
13   Q.   Okay.
14        And then question number 2, do you see that one,
15   where it says" Documents, electronically -- documents,
16   electronically stored information, and tangible things in a
17   plaintiffs' possession, custody, or control that plaintiffs
18   may use to support their claims"?
19   A.   I suppose we do have documents that back up our
20   claims, yes.
21   Q.   Okay.
22        And you've produced those?
23   A.   I produced what you have here in this packet, yes.
24   Q.   Right.
25        You produced 13 documents?

Michael Jones - 7/21/21

43

1     A.    Okay.

2     Q.    13 pages; correct?

3     A.    Yes.

4     Q.    All right.

5           And this is something where you're producing

6 information that you may use, not that you will use, but

7 that you may use to support your claims.

8           Do you understand that?

9     A.    Yes.

10    Q.    All right.

11          And are you aware of any other documents that you

12 have in your possession or electronically stored information

13 or tangible things that you may use to support your claims?

14    A.    I'm not sure about that.

15    Q.    What does that mean, "not sure"?

16    A.    I have documents at the house.  I'm not sure what

17 is going to be applicable to the case that we may use.  So

18 to be honest answering you, I'm not sure if those documents

19 are going to be used.  I mean, I keep records of everything.

20 So yes, I have documents; whether they're used in this, I'm

21 not sure; I've not been told.

22    Q.    Okay.

23          And sitting here, what documents are you thinking

24 of?

25    A.    Records of certifications or job timelines,

1  conversations with clients ...

2       Q.   Let me flip back to the timeline.

3       A.   Okay.

4       Q.   So there was a -- do you recall giving an

5  interview to the board investigator on about February 7,

6  2019?

7       A.   If that was that meeting at the library in

8  Goldsboro, yes.

9       Q.   Okay.

10           Let me turn your attention back to Exhibit 6, this

11  packet.

12      A.   Okay.

13      Q.   If you look at -- if you turn to document

14  number 9, NCBELS 9 of Exhibit 6.

15      A.   Yes, sir.

16      Q.   Okay.

17           And there is a three-page document that appears to

18  have been generated by the board investigator that states

19  "Report of Interview with Michael Jones on February 7,

20  2019."

21           Do you see that?

22      A.   Yes, sir.

23      Q.   Okay.

24           And have you seen this document before?

25      A.   Yes, sir.

45

1     **Q.**   Do you recall giving an interview to --

2     **A.**   **William.**

3     **Q.**   -- yeah, Mr. Casey --

4     **A.**   **Yes, I do.**

5     **Q.**   -- on February 7?

6     **A.**   **I do.**

7     **Q.**   And then earlier I'd asked you about an e-mail.

8  If you flip back a few pages, there appears to be an e-mail

9  from you to Mr. Casey dated January 2, 2019.

10     And that's on document number 4.

11     **A.**   **4?  Right here?  Yes, I do see that.**

12     **Q.**   Okay.

13     And do you recall sending him an e-mail on the 2nd

14  of January?

15     **A.**   **I do.**

16        (Exhibit 2 marked.)

17     **Q.**   Okay.

18     And then it looks like there was -- after the

19  interview, Exhibit 2, Deposition Exhibit 2, which is also

20  identified as Exhibit 1 to your complaint, is that the

21  letter that you received from the Board of Examiners for

22  Engineers and Surveyors in June of 2019?

23     **A.**   **Yes.  This was, like, the second letter after the**

24  **meeting.**

25     **Q.**   Okay.

46

1                   MR. GEDGE:  Do you have a copy of that?

2                   MR. HANNA:  Oh, I'm sorry.  Yeah.

3                   MR. GEDGE:  Could we take a break when you

4    get to a natural stopping point?

5                   MR. HANNA:  Yeah, let me just get a couple of

6    housekeeping and we'll take a break.

7                   (Exhibit 1 marked.)

8        Q.    Mr. Jones, I keep referring to the lawsuit.  I'm

9    going to hand you what's been marked as Exhibit 1.

10            Do you recognize that lawsuit that was filed?

11       A.    Yes.

12       Q.    And then going back to the timeline real briefly,

13   you received the letter in June of 2019, and based on that

14   letter, you stopped performing certain services; correct?

15       A.    Yes.  Yes, sir.

16       Q.    And then the next thing I have on my timeline is

17   March of 2021 when you filed the lawsuit.

18            So not quite two years later, you're filing a

19   First Amendment lawsuit; correct?

20       A.    Yes, sir.

21                  MR. HANNA:  Let's take a break.

22            (Recess taken, 11:01 to 11:18 a.m.)

23       Q.    Back on the record.

24            I think I had handed you Exhibit 1, the complaint.

25       A.    This?

Michael Jones - 7/21/21

47

1      **Q.**    Yes.  And if you could turn to paragraph 77.

2             In paragraph 77 -- first of all, let me move up a

3   little earlier.

4             Do you see the top of the page it says "Injury to

5   Plaintiffs"?

6      **A.**    **Yes, sir.**

7      **Q.**    Okay.

8             And then paragraph 72 says:  "Before the Board

9   issued its June 13, 2019, letter, plaintiffs offered and

10  provided drone services such as aerial orthomosaic maps,

11  aerial images containing location information, and aerial

12  images of land that include lines indicating the rough

13  position of property lines."

14            Do you see that?

15     **A.**    **Yes, sir.**

16     **Q.**    All right.

17            And is that true, what was alleged in

18  paragraph 72?

19     **A.**    **Yes.**

20     **Q.**    All right.

21            And then paragraph 73 is basically saying, "Hey,

22  following the board's June 13 letter, we no longer offer

23  aerial orthomosaic maps"; correct?

24     **A.**    **Yes.**

25     **Q.**    "We no longer offer aerial images containing

1   location information"; correct?

2        A.    Yes.

3        Q.    And "We no longer offer aerial images of land that

4   includes lines indicating the rough position of property

5   lines."

6        A.    Yes.

7        Q.    And when you say you no longer offer this, it's

8   your company; right?  360 Virtual Services -- 360 Virtual

9   Drone Services?

10       A.    Yes, sir, which is me.

11       Q.    Right.

12             You don't yourself individually offer any services

13   in your name; correct?

14       A.    No.

15       Q.    And you don't transact any business, drone

16   business or photography business under your name?

17       A.    No.

18       Q.    And then if I drop down to 76 -- and we talked

19   about this earlier, but you still use your drone to -- for

20   certain projects; right?

21       A.    Yes, I still do.

22       Q.    You're still hired to perform a work product in

23   the form of images or video, something of that sort;

24   correct?

25       A.    Yes, sir.

Michael Jones - 7/21/21

49

1    **Q.**    And then paragraph 77, as I read it, is sort of

2    the heart of the lawsuit, and it says to the Court that your

3    company -- when you say "plaintiffs," you mean your company;

4    right?   360 Virtual Drone Services?

5    **A.**    **Plaintiffs, me and the company, 360 Virtual Drone**

6    **Services.**

7    **Q.**    But you through your company; correct?

8    **A.**    **Yes, sir.**

9    **Q.**    That you wish "to offer and provide drone services

10   that include the following" -- and I'm going to say

11   number 1, "capturing aerial images on behalf of paying

12   clients and using orthomosaic software to stitch those

13   aerial images together to form orthomosaic maps."

14   **A.**    **Yes.**

15   **Q.**    That's what you want to be able to do?

16   **A.**    **Yes, sir.**

17   **Q.**    And you're not doing that because of the June 13,

18   2019, letter; correct?

19   **A.**    **Because of the warning letter, yes, sir.**

20   **Q.**    Okay.

21            And then number 2, you want to create "marketing

22   images of land on behalf of paying clients and drawing those

23   images lines indicating the approximate position of property

24   boundaries."

25   **A.**    **Yes, sir.**

50

1     **Q.**    Number 3, going to 77 -- paragraph 77.c, the third

2    item is "capturing aerial images of land and structures

3    (along with location data, coordinates, elevation data, and

4    volume data) and making those images and that data available

5    to bank paying clients"; correct?

6    **A.**    Yes, sir.

7    **Q.**    That's what you want to do but you can't do that

8    based on June 13, 2019, letter?

9    **A.**    Yes, sir.

10    **Q.**    And then number 4, "capturing aerial images of --

11    and data about land and structures; processing those images

12    and data to create 3D digital models of land structures; and

13    making those 3D digital models available to paying clients."

14    That's what you want to do; correct?

15    **A.**    Yes, sir.

16    **Q.**    Okay.

17    Is there anything else that you're complaining

18    about that you're not able to do because of the board's

19    June 13 letter?

20    **A.**    Yes.  There's other stuff.

21    **Q.**    Okay.

22    What else?

23    **A.**    Parking lot paving inspections, which involves

24    stitching; cemetery plot availability for cemeteries that

25    also involves stitching pictures of the orthomosaic map.  If

Michael Jones - 7/21/21

51

 1   I haven't said roof inspections yet.  Agriculture, farm,

 2   there's software to get the health of the crops.  That's

 3   also included in the orthomosaic.

 4          So by -- according to the letter, I can't do any

 5   of that.  So those are also things in addition to what's

 6   listed that I would like to be able to do.

 7      Q.   And the items or the projects that you mentioned

 8   seem to fall under item 1, which is capturing aerial images

 9   on behalf of paying clients and using orthomosaic software

10   to stitch those aerial images together to form orthomosaic

11   maps.

12      A.   Yes.  And orthomosaic maps would be the definition

13   of the end product of that.

14      Q.   All right.

15      A.   I just want to make sure everyone knew that those

16   extra items I mentioned also, you know, were developed from

17   the orthomosaic map.

18      Q.   As I understand, your testimony is if you're able

19   to do this, to use this, use your drone in connection with

20   certain software to take images, stitch the images together,

21   and create orthomosaic maps, then you can do the type of

22   projects that you just mentioned a few minutes ago; correct?

23      A.   Yes, sir.

24      Q.   All right.

25          And so other than the four items there listed

1  under paragraph 77, are you complaining about anything else

2  that you're not able to do as a result of action taken by my

3  client, the Board of Examiners for Engineers and Surveyors?

4       A.   So, yes, there is another one that I don't think

5  is covered under the orthomosaic which requires stitching of

6  the pictures, but it doesn't produce an orthomosaic map; it

7  produces a navigable 360 image that is on a picture where

8  they can move with the cursor or mouse on their device and

9  move the picture around.  Those are created by stitching

10  pictures together, but it's not considered an orthomosaic

11  map.  I would also like to do that.

12       Q.   Have you ever done that?

13       A.   Yes.

14       Q.   And who did you do that for?

15       A.   National Land Realty.

16       Q.   Do you have an example of that work product?  Do

17  you still have that work product?

18       A.   Yes, I do have some examples of that.

19       Q.   Anything else?

20       A.   I think that is it.

21       Q.   And so just so I'm clear -- and the reason why I'm

22  asking this is in paragraph 77, these four items are

23  identified by you and your company as plaintiffs in the

24  lawsuit, and then when you get into the First Amendment

25  claim starting on page 19 of the lawsuit, you see those

 1   paragraph 77 items being repeated -- they're sort of broken
 2   down one by one.
 3           And so I was just curious if there were any more
 4   examples of drone services that you want to provide that
 5   you're not being able to provide.
 6           And you've identified an example of creating a 360
 7   image.  Anything else other than the 360 image?
 8       A.   Okay.  So I'm going to answer that by saying no,
 9   but the possibilities are endless to what these things could
10   do.
11           So in a week from now, there may be another option
12   that I'd like to do with drones that they've come up with.
13   But as of right this second, I would say no, I can't think
14   of any other services that I would like to offer.
15       Q.   And the reason why I ask this is because the Court
16   at some point -- the judge, Judge Flanagan, is going to try
17   to understand the facts, what you're complaining about.
18       A.   Okay.
19       Q.   And so the idea that, you know, the possibilities
20   are endless, that's not something that we're able to judge.
21   We need to judge what it is that you're not able to do that
22   you say you've done before or that you want to do.
23           Do you understand?
24       A.   Yes.
25       Q.   Okay.

Michael Jones - 7/21/21

54

1    A.    So yes, my answer would be that is it, what I have

2    listed.

3    Q.    Okay.

4          And just so you understand, one of the purposes of

5    this deposition is for me to discover what your lawsuit is

6    about; so I'm just trying to make sure I understand --

7    A.    Sure.

8    Q.    -- what's in your lawsuit.  Okay?

9    A.    Yes, sir.

10   Q.    If you look at paragraph 77.d, 77.d talks about

11   capturing aerial images of and data about land and

12   structures, processing those images and data to create 3D

13   digital models of land and structures, and making those 3D

14   digital models available to paying clients.

15         Do you see that?

16   A.    Yes, I do see that.

17   Q.    And does this 360 image that you're talking about,

18   is that covered under paragraph 77.d?

19   A.    No.  It doesn't.

20   Q.    All right.

21         I want to switch gears and ask you a little bit

22   about the December letter that you received from the board.

23   And when I say "board," do you understand I'm talking about

24   my client, the Board of Examiners for Engineers and

25   Surveyors?

```
 1        A.    Yes, sir.

 2        Q.    Okay.

 3              So the board sent you a letter dated December 19,

 4   2018.  And in the letter -- and that's the first document of

 5   Exhibit 4.

 6              In that letter, they say:  "Based upon a review of

 7   the firm's website (carolinadronehome.com) by the surveying

 8   committee of the board and an advertisement on the

 9   Droners.io website, it is alleged that the firm may be

10   practicing or offering to practice land surveying."

11              Do you see that?

12        A.    I do see that.

13        Q.    All right.

14              Is that your website, carolinadronehome.com?

15        A.    That is my website.

16        Q.    Okay.

17              Is that still your website today?

18        A.    Yes, sir.

19        Q.    And you indicated earlier, I think, in the

20   deposition, that you did advertise on Droners.io website;

21   correct?

22        A.    Yes, sir.

23        Q.    And then the board's letter goes on to say:  "The

24   services include, but are not limited to, quote, 'surveying

25   & mapping,' unquote, and providing orthomosaic maps of
```

56

1  construction sites."

2        Do you see that?

3    A.   I do see that.

4    Q.   All right.

5        And in fact, on that Droners.io website, you were

6  advertising the services of, quote, "surveying & mapping,"

7  close quote; correct?

8    A.   Yes.

9    Q.   And then on that website, were you advertising

10 providing orthomosaic maps?

11   A.   Yes.

12   Q.   Now, I mentioned earlier -- and I'm going to force

13 you to switch to Exhibit 6 here, but I mentioned earlier the

14 e-mail that you sent, which is document 4, I think.

15   A.   Okay.

16   Q.   So how did you get ahold of Mr. Casey?

17   A.   Mr. Casey, William Casey, okay, he sent the -- he

18 contacted me through the e-mail, the initial letter.  I

19 contacted him back.  I'm not sure if we talked on the phone

20 or in this e-mail, somewhere, we arranged a meeting at the

21 library in the city of Goldsboro.  We made that date.  We

22 both met person-to-person.  We had a, I guess, maybe an hour

23 meeting and that was it.

24   Q.   All right.

25        Let me ask you about your e-mail.

Michael Jones - 7/21/21

57

1        A.    Okay.

2        Q.    And it looks like there's one, two, three, four,

3    five -- are these just -- is this just sort of a formatting

4    error?

5        A.    Yeah.   That looks weird.   I'm not sure what

6    happened there.

7        Q.    All right.

8              And then you -- do you see, next to number 2, it

9    was "we"?

10       A.    Yes.

11       Q.    All right.

12             And then it says:   "We added this to the company's

13   website.   And to any of the videos that offer any services

14   for construction industry.   Also any videos that have

15   property lines added to them in post video production, we

16   also addressed those videos as well stating that the lines

17   are for visual purposes ONLY and are NOT accurate nor do

18   they represent any city or county documentation for that

19   property."

20             Do you see that?

21       A.    Yes.

22       Q.    All right.

23             So what are you talking about there?

24       A.    So the part, number 2 where I say we've added this

25   to the company website and any videos of service to

1    construction was my disclaimer to state that I wasn't a

2    surveyor and that this was being offered for visual

3    representation only and no valid measurements could be used

4    and turned in to any kind of official office.

5         Q.    And how do you do that?  How do you add property

6    lines in post video production?

7         A.    In video?  Is that all -- you want to know about

8    video?

9              Videos use what the post -- it's an editing

10   program, Final Cut Pro.  There's many; that's the one I use.

11   There's a plug-in on that that you can track items in the

12   video.

13        Q.    But how do you do it?  How do you know where to

14   put -- add property lines?

15        A.    When I do it, I use the GIS county map that the

16   Realtor -- when I go with the Realtor or whoever is hiring

17   me, most of the time they already have the map with the

18   lines already drawn on it and that they have been using to

19   advertise.  Then they come to me because they want an

20   updated version; so then I just basically replicate what

21   they've given me.  But it's with updated pictures.  So I'll

22   update the picture -- take the picture in real time, then I

23   take it into Photoshop or, if it's video, it's Final Cut

24   Pro, and then by looking at the lines from GIS, I add the

25   lines to that from the GIS map.

Michael Jones - 7/21/21

59

1    Q.    So you're somehow interfacing with the GIS map to

2    get lines?

3    A.    "Interfacing" as in just using it as a visual

4    reference.  Like, if this was the map, then I would just

5    look at this and copy this line from this onto my picture or

6    video.

7    Q.    How do you do that?

8    A.    Through the software Final Cut Pro.  So I would go

9    in, you open the plug-in up, you drag it on top of the video

10   footage.  You take your mouse and you draw a line pointing

11   around the property to each point, and then you hit track.

12   It tracks every scene, every frame, all the way down.  So

13   the lines -- if the picture's moving, it tracks with the

14   lines, and then that's it once I, you know, render the file

15   out; it is all in one file then.

16   Q.    All right.

17         And just so I understand, because it is a little

18   confusing to me --

19   A.    Sorry.

20   Q.    -- you have a map, a GIS map with lines on it that

21   the Realtor -- or the client gives you.

22   A.    To be clear, it may not be a GIS map, but it's

23   some kind of a map that they have, most likely from Google

24   Earth or something like that, that they've given me and

25   said, "I need you to take a picture of this property and --

Michael Jones - 7/21/21

60

1    for an advertisement, and here's the lines on it."

2        Q.    Okay.

3              And so you have a map and you're not exactly sure

4    where it comes from?

5        A.    No.

6        Q.    And it has -- there's a map of a property with

7    lines on it?

8        A.    Yes, sir.

9        Q.    And then you go ahead and you take pictures and

10   video of the site?

11       A.    Yes, sir.

12       Q.    And are you doing this manually or are you doing

13   this through some sort of computer program?

14       A.    Manually.

15       Q.    All right.

16             And then you upload the data on your computer from

17   the drone?

18       A.    Yes, sir.

19       Q.    And then you're able to access the picture of the

20   site or pictures of the site, and at some point, you use

21   software to actually draw the lines yourself?

22       A.    Yes.

23       Q.    And essentially what you're doing, if I understand

24   it, is you're using this picture that was given to you by a

25   client with lines on it and you're just trying to replicate

Michael Jones - 7/21/21

61

1   that yourself using the software?

2       A.   Yes.

3       Q.   And you're doing that manually yourself?

4       A.   Yes.

5       Q.   Okay.

6            And then you -- on top of putting the lines on

7   this finished work product, you were putting in this

8   disclaimer?

9       A.   Yes.  I was, but they told me that it didn't

10  matter; so ...

11      Q.   In your disclaimer, you say "These maps do have a

12  relative accuracy of 1 to 3 inches."

13           How are you able to make that claim?

14      A.   That's the claim from the software, Pix4D and

15  DroneDeploy, that creates the orthomosaic maps from the data

16  that I collect.

17      Q.   And then you go on to tell the client:  "This

18  means the measurable points on the map are within 1 to 3

19  inches accurate to a ground measurement."

20      A.   Yes.

21      Q.   Where do you get that information?

22      A.   As far as the information, I could replicate it.

23      Q.   I mean, how are you able to make that

24  representation to the client?

25      A.   I could measure on the ground with a tape measure

62

1    and then actually replicate that with the picture of the

2    orthomosaic map and then confirm through the tape and the

3    picture.  They have a tool in the DroneDeploy and Pix4D that

4    you can draw, to click here, to click here, to get that

5    measurement.  So that's provided in the software.

6            So using that, that maps what I would replicate on

7    the ground with a tape measure.

8        Q.    Did you ever do that?  Did you ever double-check

9    to see -- when you used DroneDeploy and you inserted your

10   points to get distance, did you ever go onto the ground and

11   measure to see if that was accurate?

12       A.    Yes.

13       Q.    Okay.

14            And what was -- what were your results?

15       A.    It was dead on.

16       Q.    What is DroneDeploy?

17       A.    DroneDeploy is a company who offers mapping

18   software, among other things.  They have other things, but

19   that is their claim to fame, so to speak.

20       Q.    When did you first start using the mapping

21   software offered by DroneDeploy?

22       A.    I would guess 2017 at some point.

23       Q.    And did you do this -- did you subscribe to buy a

24   license or how did you -- did you have to buy the software?

25   How did you go about doing this?

Michael Jones - 7/21/21

63

1        A.    So different software companies offer different

2    packages as far as the availability of it.  DroneDeploy at

3    the time offered a "free up to a certain point of data" that

4    you could enter that would create the map.  So I just used

5    the free version.  And I think for a month, maybe, I

6    subscribed.

7        Q.    So when you were creating orthomosaic maps, were

8    you doing that using the free service?

9        A.    Yes.

10        Q.    Do you still use DroneDeploy today?

11        A.    No.

12        Q.    Did you stop using DroneDeploy in June of 2019?

13        A.    Yes.

14        Q.    Did you ever subscribe to any paid service through

15    DroneDeploy?

16        A.    Yes.

17        Q.    And how long?  Is that that one month?

18        A.    Yes.  Like a month or two.  It wasn't long at all

19    because it's very expensive and there was no work and

20    turnaround for it; so ...

21        Q.    Okay.

22              So do you know if you ever did any -- did you ever

23    create any work product for a client using the paid

24    subscription?

25        A.    I would not be being honest if I tried to answer

Michael Jones - 7/21/21

64

1    that.  I would guess maybe I did once, but it would be hard
2    to tell when in that timeline I actually produced the
3    orthomosaic map and if my subscription was valid at that
4    point.
5         Q.    Going back to that e-mail on the second page,
6    which would be I think page 5 --
7         A.    Okay.
8         Q.    -- if you see under number 2, it says:  "We also
9    address the Droners.io website profile."
10            Do you see that?
11        A.    Yes, sir.
12        Q.    And then you wrote to the board, quote:  "On this
13   website, there are categories that you are opted to select
14   from.  The title of one I had added to my, quote, 'area of
15   expertise,' unquote, was, quote, 'mapping and surveying,'"
16   unquote.
17            Do you see that?
18        A.    Yes, sir.
19        Q.    And so you were advertising expertise in mapping
20   and surveying on Droners.io website; correct?
21        A.    No, I wouldn't say correct.
22        Q.    Okay.
23            On the Droners.io website, you -- you had a
24   profile for your company, 360 Virtual Drone Services;
25   correct?

Michael Jones - 7/21/21

65

1       A.    Yes, sir.

2       Q.    And did you pay for that?

3       A.    No.  That works off of, I guess you could call, a

4   commission basis.

5       Q.    And so you advertised on Droners.io website,

6   advertised drone services; correct?

7       A.    They have a profile page and, yes, I filled out a

8   profile page.

9       Q.    And under the profile page, there's a part of that

10  that says "area of expertise"; correct?

11      A.    Not sure it's stated just like that, but yes, it

12  gives you options to choose your selected services.

13      Q.    All right.

14            You wrote in this e-mail:  "The title of one I had

15  added to my, quote, 'area of expertise,'" unquote.

16            Do you know why you were putting that in

17  quotations?

18      A.    Just because I generally didn't know how it was

19  listed on Droners; so "areas of expertise" was just a title

20  I picked out, I guess.

21      Q.    Okay.

22            And what is that meant to explain to the board?

23      A.    Okay.  What are you asking, "what's meant to

24  explain"?

25      Q.    Yeah.  Why did you use the words "area of

Michael Jones - 7/21/21

66

1   expertise" to explain --

2        A.    So on Droners.io, they have a spot where you can

3   select your services of what you want to participate in in

4   offering your clients, okay.

5             So I'm not sure if they have the words "area of

6   expertise" on the site.  It may have "specialties."  It may

7   have "areas you would like to participate."

8             So as far as the writing, I'm not positive on

9   that; it's just an option on the site where you can choose.

10  And they already have them prefilled-in boxes; so you don't

11  get to write out, you have to choose the options they

12  already have.

13       Q.    And your -- one of the options that you chose to

14  advertise on Droners.io website was "mapping and surveying"?

15       A.    Yes, sir.

16       Q.    Okay.

17             And that's what the board saw and sent you the

18  letter in December; correct?

19       A.    I'm not positive.  Maybe.

20       Q.    Okay.

21             Well, go back to Exhibit 4, the letter in

22  December.

23       A.    Okay.

24       Q.    And when I read the letter, it says -- they've

25  referenced specifically the Droners.io website in the second

Michael Jones - 7/21/21

67

1  paragraph; correct?

2      A.   Yes.

3      Q.   And it goes on to say the services that were

4  advertised by you "include, but are not limited to,

5  surveying and mapping."

6           Do you see that?

7      A.   Yes, sir.

8      Q.   Okay.

9           And then you provided them a link to your profile

10  in this e-mail; correct?

11     A.   Yes, sir.

12     Q.   Do you still advertise there?

13     A.   No, sir.  My account is not active there.

14     Q.   And then you have a few questions that you want to

15  ask the board; right -- in your e-mail?

16     A.   Yes.

17     Q.   And then you write:  "So we of course offer

18  orthrectified mapping," and then you put in parens,

19  (orthomosaic maps) (measurable maps)."

20           What are you talking about there?

21     A.   So I guess you're asking for the definition of

22  orthomosaic map?  Is that what you're looking for?

23     Q.   I'm trying to understand -- you said "So we of

24  course offer" and then you use the term "orthrectified

25  mapping."

Michael Jones - 7/21/21

1          What is that?

2     A.   That is the process of the mapping putting -- put

3  together in an orthomosaic map; so that's multiple pictures

4  being used to create one picture.

5     Q.   And you say these are measurable maps; correct?

6     A.   Yes.

7     Q.   And this one picture that is processed by the

8  software, you said they do that with "RTK and Ground Control

9  Points."

10    A.   Uh-huh.

11    Q.   What is RTK?

12    A.   RTK and Ground Control Points are GPS modules you

13 use in capturing when you're making orthomosaic maps or in

14 surveying, I guess.  I don't know what they're -- they're a

15 module you have to buy.  They're very expensive.  Those are

16 used to establish certain ground control points on the

17 ground so when you're doing your map, you can make sure the

18 cloud points are accurate to those ground control points.

19    Q.   All right.

20         So when you say:  "So we of course offer

21 orthrectified mapping (orthomosaic maps) (measurable maps),"

22 did you mean to have a period there before you start with

23 "with RTK"?

24    A.   Maybe.

25    Q.   Okay.

Michael Jones - 7/21/21

69

1           "With RTK," was that the beginning of another

2   sentence or was that part of the first sentence?

3       A.   I'm not sure.

4       Q.   You say:  "With RTK and Ground Control Points we

5   have the ability to offer global accurate maps and relative

6   accurate maps."

7           Do you see that?

8       A.   Yes, sir.

9       Q.   All right.

10          And so are you telling the board that you're

11  creating orthomosaic maps with RTK and control points?

12      A.   No, I'm not telling the board that.

13      Q.   Okay.  All right.

14          Did you -- were you doing that?  Were you creating

15  orthomosaic maps with RTK and ground control points?

16      A.   No.

17      Q.   All right.

18          What is this sentence that says -- or this

19  information that says:  "With RTK and Ground Control Points

20  we have the ability" -- are you saying what you could do --

21      A.   Yes.

22      Q.   -- or what you have done?

23      A.   I'm saying what the technology is capable of.

24      Q.   All right.

25          And did you ever do that?

Michael Jones - 7/21/21

70

1       A.    No.  I couldn't.  Those -- the equipment for that

2  is so expensive, I alone could not ever afford that.

3       Q.    Okay.

4             And then you say:  "We do however have to work

5  with a licensed surveyor to sign off on and work with us

6  capturing this data and with processing."

7             What did you mean by that?

8       A.    I mean, so as far as a drone company, you cannot

9  go out and collect this data for any kind of construction

10 site or any other client and then turn it in to a state or

11 city or any kind of official department that, you know,

12 turns in any land surveying or lines or anything for the

13 county.  So you have to have a licensed surveyor to sign off

14 on it, and I was interested in working with surveyors who

15 were implementing drones into their company.

16      Q.    Did you have any success?

17      A.    No, sir.

18      Q.    All right.

19            Then you -- at the bottom, it talks about "we

20 offer to the construction industry" -- or "What we offer to

21 the construction industry is generally used for the

22 following purposes."

23            Do you see there where it says:  "Monitoring" --

24      A.    Yes.

25      Q.    -- "the site/property, flying it every week or

1  biweekly"?

2      A.   Yes, sir.

3      Q.   And do you do that by video?

4      A.   It would depend.  You could do it by video or

5  pictures really.  But I think in this case, most people were

6  looking to orthomosaic map.

7      Q.   Why is that?  Why are they looking for orthomosaic

8  map instead of pictures and a video?

9      A.   The orthomosaic map would be way more efficient if

10  you're looking at a site that's, you know, a thousand acres

11  or a construction site that's very large.

12      Q.   The next one:  "Investors can see the site as it

13  constructs."

14      A.   Yes.

15      Q.   Do you see that?

16           Was that by video?

17      A.   That is also by orthomosaic map.

18      Q.   Can you do it by video?

19      A.   You could, yes, sir.

20      Q.   And then you have "quality control."

21           Do you see that?

22      A.   Yes, sir.

23      Q.   What is that?

24      A.   It's a quality control on your -- I'll use

25  construction, for example.

Michael Jones - 7/21/21

72

1          So quality control on the site -- equipment being

2    left out unattended, stockpiles being in the wrong spot, I

3    mean, it could -- uncountable things could be wrong.  So

4    managers or site managers use that for quality control.

5          Q.    And do you do that by video?

6          A.    The clients I was going to was wanting the

7    orthomosaic map but you could accomplish it with video, I

8    suppose.  It wouldn't be the most efficient.

9          Q.    Safety control monitoring?  What is that?

10         A.    So safety control would follow kind of under the

11   same thing as quality control.  They're just able to see

12   every aspect of their site.  The maps, they can zoom all the

13   way in to it from all the -- you know, the full map all the

14   way in to one part to monitor, you know, like I said, parts,

15   equipment ...

16         Q.    And is that by video?

17         A.    No.  All of these are under orthomosaic maps is

18   what these clients wanted.  You could accomplish it all by

19   video, but nobody wanted that.

20         Q.    All right.

21              And so the items that you have listed here under

22   what you offer, all of these items could be -- you could

23   accomplish the projects by providing video but the clients

24   preferred orthomosaic maps.

25              Is that what I hear you saying?

Michael Jones - 7/21/21

73

 1      A.   I mean, that was never anything that came up.  But
 2  just answering you here, I mean, I suppose -- it's a visual
 3  concept so they could see it by video.
 4          Did clients ever want video?  No.  They always
 5  wanted an orthomosaic map.
 6      Q.   Is there a difference in price between a video and
 7  an orthomosaic map?
 8      A.   Yes.
 9      Q.   And what's the difference in price?
10      A.   It would be impossible to tell you.  I mean, it's
11  just according to what the client wants, you know, on the
12  screen.  A video could run anywhere to $10,000 or could be a
13  thousand, or -- an orthomosaic map, you know, would be a
14  different fee.  Video production is a whole lot more
15  expensive than an orthomosaic map.  Significantly.
16      Q.   Okay.
17          Video is more expensive than creating an
18  orthomosaic map?
19      A.   Yes.
20      Q.   And why is that?
21      A.   It's more work.
22      Q.   Can you explain that to the Court?
23          What's -- what is the work involved in creating a
24  video of a project to determine quality control or monitor
25  safety or provide investors updates on construction?

Michael Jones - 7/21/21

74

1      A.    Okay.  What was the question again on top of that?

2      Q.    Yeah.

3            If you could explain to the Court the process for

4      providing a video work product.

5      A.    Okay.  So the video work product, you would go out

6      to the site, you would have to schedule that.  You would

7      collect all the data, which is the content you're capturing

8      for the day.  And then you would have to go back home, you

9      would have to upload all of this data onto your computer.

10     Then you'd have to upload all this data into your post

11     editing software.

12           And then, according to the client's demands and

13     requests, you'd have to create the video to their

14     specifications, which could have text on the screen, arrows

15     on the screen -- they may suggest, you know, me bringing in

16     graphics.  I mean, it's -- anything in post production, I

17     mean, it could go on and on, versus making an orthomosaic

18     map is taking pictures, you know, with a computer program,

19     which is much quicker.

20     Q.    All right.

21           And you use -- or did -- before June of '19, you

22     used the DroneDeploy software; correct?

23     A.    DroneDeploy software, yes.

24     Q.    Okay.

25           And so can you explain that process?  So if I

1  hired you to come to my site and I provided you a map that

2  has a map of an aerial photo of the site with some lines

3  drawn on it and I asked you to provide me with an

4  orthomosaic map of my site, how would you go about doing

5  that?

6      A.    Let's use DroneDeploy since that's on the table

7  that we're familiar with.  That's one of the many mapping

8  softwares.

9          So you would load that software onto your device.

10 You would then enter the map site as far as the location

11 visually into the software, that's by using your mouse to

12 click lines.  The software would then generate a map as far

13 as direction of how the drone will fly.

14         You have control of adjusting all of that, which

15 is altitude, how many passes it makes, how much overlap it

16 has, front and back, side to side.  The drone then flies

17 this pattern automated while we're monitoring it.  We have

18 complete control of the drone.  We can stop it at any time

19 or cancel the mission.

20         And then once that map is completed as far as the

21 computer program, the drone would then automatically return

22 home.  It will land.  That software -- or the data off the

23 SD card would then be loaded into DroneDeploy via the

24 internet.  According to how many pictures, they produce the

25 map in a certain amount of time, and then they send it back

Michael Jones - 7/21/21

76

1  to you via a link on their website.

2      Q.   Anything else?

3      A.   That's about it.

4      Q.   Okay.

5           And so just so we're on the same page, when you

6  looked at paragraph 77 of the complaint, the first item on

7  that that you want to do that you claim you're not able to

8  do because of the letter is you want to be able to capture

9  aerial images on behalf of paying clients and use

10 orthomosaic map software to stitch those aerial images

11 together to perform orthomosaic maps?

12     A.   What page was that on?  I'm so sorry.

13     Q.   So that's Exhibit 1, on the left.

14     A.   Oh, gotcha.  I'm sorry.

15     Q.   And then that's paragraph 77.a.

16     A.   Okay.  And I'm sorry.  Could you repeat the

17 question?

18     Q.   Yes.

19          So in your lawsuit, you identify four services

20 that you want to provide that you claim you can't provide

21 because of the board's letter in June; correct?

22     A.   Yes.

23     Q.   And what you just explained to the Court on how

24 you create an orthomosaic map, that's 77 -- paragraph 77.a,

25 right, where it says "capturing aerial images on behalf of

Michael Jones - 7/21/21

77

1    paying clients and using orthomosaic software to stitch
2    those aerial images together to form orthomosaic maps."
3         A.    Yes.
4         Q.    Okay.
5              So let me drill down on that a little more just so
6    we all understand what you're talking about.
7              You go on-site and you have your drone; correct?
8         A.    Yes.
9         Q.    And the software that you're talking about, the
10   DroneDeploy software, is loaded into your telephone?
11        A.    Yes, sir.  Your iPad.  Whatever device you're
12   using with the drone.
13        Q.    Okay.
14             So some sort of smartphone or iPad device?
15        A.    Yes, sir.
16        Q.    Okay.
17             And what did you use?
18        A.    Either iPad or iPhone.
19        Q.    And then you used the software on your phone to
20   locate the piece of property that we're talking about;
21   right?
22        A.    No.  I wouldn't say that.
23        Q.    Okay.
24        A.    So the software, you can either create the map
25   from home, the prework on the internet on the desktop, or

1  you can do it when you get to the job site.  If it was a

2  site that I was flying frequently, I did it at home on the

3  desktop, as far as planning the site.

4         So then when I got to the site, opened to the

5  drone, it would already be planned.  Everything was already

6  planned out on the phone.  So all I had to do was connect

7  the drone, pull that certain map program in, and it would

8  fly.

9     Q.   Okay.

10         And so what we're talking about is using the

11  software to draw lines that would essentially sketch out the

12  flight pattern or flight project for the drone?

13     A.   Yes, sir.

14     Q.   It's the mission that you're programming the drone

15  to fly?

16     A.   Yes, sir.

17     Q.   All right.

18         And lines -- you're essentially drawing lines

19  around the property that you want to survey?

20     A.   The perimeter, yes, sir.

21     Q.   Okay.

22         And it might be the entire perimeter of the

23  property owned by your client or it could be a smaller

24  portion; right?

25     A.   Yeah.  I mean, it could be any -- any job, yes,

Michael Jones - 7/21/21

79

1   sir.

2        Q.    Okay.

3              And do you do that manually using a mouse?

4        A.    As far as creating the plan, yes, you do it

5   manually with the mouse.

6        Q.    All right.

7              And once that plan is -- the area is drawn, does

8   it give you -- the program itself, does it tell you how much

9   acreage is involved?

10       A.    Yes.

11       Q.    And the mission, so to speak, programs the drone

12  to fly in a pattern like you're mowing your lawn; right?

13       A.    Perfect.  Yes.

14       Q.    Okay.

15             And as the drone flies in that pattern like you're

16  mowing your lawn, it's taking pictures every so often?

17       A.    You set the parameter on how often you want to

18  take the pictures; so yes.

19       Q.    Okay.

20             And so that's sort of another key question, which

21  is:  You have the software, and the work product that you're

22  doing, right, is you yourself are controlling the area that

23  is being -- that the mission is flying; right?

24       A.    Yes, sir.

25       Q.    What else do you control before the drone goes up

Michael Jones - 7/21/21

80

1    in the air?

2           In other words, what kind of decisions are you

3    making as to what type of mission is being flown and what

4    kind of data is being generated?

5        A.    You always have to check the air space as far as

6    preparing -- any flight you do, you always have to check the

7    air space.  That's only controlled by the FAA.  We have

8    maps -- VFR maps that we go to and different software

9    programs that we check that.

10          So once you've established that the site, the

11   project site that you're working is clear from the FAA, then

12   you -- basically, you have to go and just check, you know,

13   for towers, power lines, all the hazards before you take

14   off, and then you take off from there.

15       Q.    But there are other items on the software that

16   you're selecting -- other boxes you're checking and --

17       A.    Like I mentioned earlier, you do have a

18   customization option to select a parameter of that.  So the

19   flight altitude you can adjust, the overlap front and back

20   of the pictures you can adjust, and the speed I think you

21   can adjust.  And different software programs offer different

22   options that you have access to.

23       Q.    All right.

24          And when is the first time you used DroneDeploy

25   software to create an orthomosaic map?

```
1        A.    I couldn't tell you.

2        Q.    Was it in 2017?

3        A.    It was between 2016 and 2017.

4        Q.    And you stopped doing it in June of 2019?

5        A.    Yes.  If that's -- after the letter came, the

6   second letter claim, I quit after that.

7        Q.    Yeah.

8              And the -- how many orthomosaic maps did you

9   generate for paying clients?

10       A.    I couldn't answer.  I couldn't tell you.

11       Q.    Is it more than five?

12       A.    Yes, more than five.

13       Q.    Less than 100?

14       A.    Absolutely, yes.

15       Q.    Less than 25?

16       A.    Less than 25, yes.

17       Q.    Less than 15?

18       A.    Probably.

19       Q.    All right.

20             Can you narrow it down any more than 5 to 15 or is

21   that --

22       A.    Yeah, that's about the pocket I'm comfortable

23   talking to you in --

24       Q.    That's fair enough.

25       A.    -- because I'm really not sure.
```

Michael Jones - 7/21/21

82

1    **Q.**    Thank you.

2    What type of training did you receive in

3  generating these orthomosaic maps using this DroneDeploy

4  software?

5    **A.**    **Just all self-education online.  The Drone**

6  **University is heavy into mapping and creating orthomosaic**

7  **maps.  So I followed those guys a lot.  And then the rest of**

8  **the education was just on YouTube, Google.**

9    **Q.**    Did you take classes through DroneDeploy?  Did you

10  receive any type of formal training in how to use

11  DroneDeploy?

12    **A.**    **No, sir.**

13    **Q.**    And you said you were using -- primarily for that

14  year and a half, you were primarily using the free version

15  of DroneDeploy?

16    **A.**    **Yes, sir.**

17    **Q.**    All except for about a month?

18    **A.**    **Yes, about a month or two when I had to pay.**

19    **Q.**    And the -- how did you learn how to use the free

20  version first to select altitude, to select overlap, or

21  determine how many passes or determine the speed of the

22  drone or how to create the property lines or mission lines

23  that were going to be followed?

24    How did you learn how to do all that?

25    **A.**    **Self-education online, YouTube, Google.**

Michael Jones - 7/21/21

83

1    Q.    And do you understand the importance of selecting

2  the right altitude?

3    A.    Yes.

4    Q.    Okay.

5          And what is that?

6    A.    Basically it's according to the job.

7    Q.    Okay.

8    A.    Are you asking the limits of the FAA?

9    Q.    No, not the limits of the -- but is the altitude

10  important for --

11    A.    Yes.

12    Q.    -- creating a final work product?

13    A.    Yes, it is.  So the altitude, you know -- if it's

14  a very large lot, you know, the altitude may be 400 feet.

15  So it would be according to what the client ordered, how

16  close they wanted it to the ground, how many passes they

17  want to, you know, have the drone go.  It's kind of hard to

18  give it a block answer on that.

19    Q.    All right.

20          Can you give me some ideas or some issues that you

21  were concerned about when you selected altitude or factors

22  that you considered when you selected altitude?

23    A.    So when you can get to the job site, you have to

24  pretty much find the lowest obstacle.  So if it's a tower,

25  that's always the check.  You look around, you find that.

Michael Jones - 7/21/21

84

1              The jobs that I was doing for the orthomosaic

2     maps, the majority of them, they had on the order what the

3     altitude was; so they wanted it flown -- and a lot of the

4     times, the jobs or the client hiring for the job, they would

5     already have all of the directions and what to make the

6     altitude, the front lap, back lap -- everything like that in

7     the order sheet, and then I would just adjust accordingly.

8         Q.   Did the client also have the parameter drawn for

9     what they wanted flown for the mission?

10        A.   Yes.

11        Q.   All right.

12             And so as I understand it, you had the software on

13    your phone, the client would provide you the perimeter map

14    that would be flown; correct?

15        A.   Yes.

16        Q.   And the client would provide you the altitude that

17    would be flown; correct?

18        A.   Yes.

19        Q.   And they would provide you with instructions as to

20    how many passes to do?

21        A.   Yes.  Which is determined by the overlap.

22        Q.   And so they would provide you the overlap?

23        A.   Yes.

24        Q.   Did they provide you the speed?

25        A.   No.  Speed is determined by a couple more

Michael Jones - 7/21/21

85

1  equations -- overlap height, and that could vary.

2      Q.    So once you follow the instructions provided by

3  the client on overlap and altitude, then the speed is

4  automatically generated by the program?

5      A.    I believe in DroneDeploy it is.  Like I mentioned

6  earlier, the softwares have differences.  Some have the

7  options to adjust the speed directly.  Some of the speeds

8  are adjusted by parameters -- height, altitude, front

9  overlap, rear overlap.

10     Q.    And so your company, then, is -- you have this

11  free software loaded onto your system; correct?

12     A.    Yes, on one of my devices.

13     Q.    And you are following the instructions of the

14  client on the location to be flown or the mission perimeter

15  to be flown?

16     A.    Yes.

17     Q.    And you are entering that into the software that

18  you have along with the altitude provided by the client;

19  right?

20     A.    Yes, sir.  Into DroneDeploy.

21     Q.    And you're entering the overlap provided by the

22  client; correct?

23     A.    Yes, sir.

24     Q.    And you're entering -- and the speed is generated

25  automatically by the software; right?

Michael Jones - 7/21/21

86

1      A.    Could be determined according to which software
2  you're using.
3      Q.    And so is there any discretion you have in what I
4  would call the preflight planning for the mission?
5      A.    Discretion?  I'm not really sure what you mean.
6      Q.    Maybe that's not a good word.  It sounds to me
7  like ...
8            Is there any of your own work product that goes
9  into the preflight planning that's not provided to you by
10  the client or generated automatically by the software?
11     A.    Other than the internet access to access the
12  software, but that would be it if I'm understanding the
13  question correctly.
14     Q.    I think so.  So -- I hope.
15           Is there any of your company's work product that
16  goes into the preflight planning that's not provided by your
17  client or generated automatically by the DroneDeploy
18  software?
19     A.    No.
20     Q.    And then once you get to the site, you have this
21  preflight mission loaded and ready to go; right?
22     A.    Most of the time, yes, sir.
23     Q.    And if you don't have it loaded and ready to go,
24  you're working on it with your client at the site --
25     A.    You can draw it out on-site.

Michael Jones - 7/21/21

87

1      Q.   And they're telling you, "Here is the perimeter I
2  want you to use"; right?
3      A.   Yes.
4      Q.   And "Here are the other instructions that you have
5  to enter into the program."
6      A.   Yes.
7      Q.   And you're just following their instructions.
8           And then what do you do?  Push a button to create
9  the mission?
10     A.   So after the all perimeters and everything are
11 entered, you hit "create flight."  The software
12 automatically goes through and does a number of safety
13 checks, makes sure everything's right.  If everything's not
14 right, the software will not allow you to continue to the
15 take-off point.  It will hold up and tell you what's wrong
16 or what you need to adjust.
17          But if everything is okay and the software checks
18 out, then it's a go, the button turns green and you hit
19 "fly," and the drone takes off and then it flies the
20 automated pattern.
21     Q.   And so what I hear you explaining to the Court is
22 that in order to generate a flight plan, you have to input
23 certain data into the software and you push a button called
24 "create flight"?
25     A.   Yeah.  I mean, as far as the title, it may be

Michael Jones - 7/21/21

88

1  "create flight," but something along those lines, yes.

2       Q.    And the data that you're inputting is nothing

3  that -- it's data that's either given to you by the client

4  or it's just automatically generated by the software?

5       A.    Correct.

6       Q.    All right.

7             And then you create flight, and then the drone is

8  being controlled by the software?

9       A.    Yes.  It follows the mission that's programmed

10 into the software.

11      Q.    And as I understand it, then, the drone is flying

12 this lawnmower-type pattern, taking pictures, and then it

13 completes its flight?

14      A.    Yes.

15      Q.    And you're on-site with it?

16      A.    Have to be on-site with it.

17      Q.    And then once the drone completes its mission,

18 what happens next?

19      A.    Then it returns back -- back home, it lands

20 automatically.  The software will see you captured all the

21 data.  It will let you know that it was captured

22 successfully or if there were any problems.

23            At that point, close down, pack up, take that

24 information home, as I mentioned, and load it into

25 DroneDeploy application on your desktop.  And, you know, it

Michael Jones - 7/21/21

89

1    could be an hour or two, three, according to how big of a

2    map you have created, and then they send you a notification

3    via e-mail that your map's ready.

4         Q.    All right.

5               And that's my next question, which is:  Explain to

6    the Court how the information or data from the drone is then

7    loaded to DroneDeploy.

8         A.    So it's on an SD card like I mentioned earlier.

9    So the SD card just comes out of the drone into my computer,

10   you open it as a drive, copy those photos to your drive, and

11   then load that via the internet, DroneDeploy.com on your

12   account, you load that into that map because it already has

13   the map, you know, prefilled out from when you panned it.

14              So once you enter the data, it kind of connects

15   everything, processes the map, and as I mentioned, you have

16   to wait a couple of hours or however big the map is.  At

17   that point, you'll get an e-mail your map is ready and then

18   you have to use their site to go back to it to see it.

19        Q.    So other than manually inserting the SD card into

20   your computer and clicking a few buttons, are you -- is

21   there any work product that's being generated by your

22   company?

23        A.    No.

24        Q.    And once the drone data from the card is loaded

25   into the computer, it's then loaded onto the DroneDeploy

Michael Jones - 7/21/21

90

```
 1    site.
 2              And then what do you do?  Push a button that says
 3    "orthomosaic map"?
 4         A.    So when you go back into the profile, as I
 5    mentioned, it will already have your plan that you made --
 6    let's just say on Main Street.  So it will have the Main
 7    Street job programmed.  It's waiting for you to load the
 8    data you acquired.
 9              So once you load that data, that software
10    automatically completes it and gives you a message similar
11    to, you know, "Your data is being uploaded.  Your map will
12    be processed shortly."  And then you just wait and you get
13    the e-mail that it's back.
14              And then once you open that up, you go to that map
15    project, click on it, it will open up.  That site has
16    different options that you can use on that map, but you see
17    the map, basically, and have access to it.
18         Q.    All right.
19              And so you are -- it takes some time, right, to
20    process this data?
21         A.    Yes.
22         Q.    And the processing is being done by DroneDeploy?
23         A.    By DroneDeploy, yes, sir.
24         Q.    And they send you an e-mail to your company, 360
25    Virtual Drone Services, that your project is ready?
```

Michael Jones - 7/21/21

91

1      A.    Yes, sir.  Or through their DroneDeploy app, they
2 just send a notification because I have it on my phone.
3      Q.    What does the notification say?
4      A.    Roughly, it just says "Your map's ready" or "Your
5 map's finished processing."
6      Q.    Okay.
7            And then do you have a link or do you actually
8 have an image?
9      A.    If I were to go through the e-mail, there would be
10 a link.  But if I were to open the actual software, it would
11 just be all integrated into that -- you know, that
12 particular app on your phone.
13      Q.    And what do you provide your client?
14      A.    It's according to what they want.  Most of the
15 time, I would deliver a simple PDF of the orthomosaic map.
16      Q.    All right.
17            And so you have a link or you have a -- strike
18 that.  Let me start over.
19            You get an e-mail with a link; correct?
20      A.    Yes.
21      Q.    But if you log in to your account on DroneDeploy,
22 you actually just have what?  What do you see at that point?
23      A.    So you open it up to your profile.  You know, it
24 may have "360 Virtual Drones," and then it would have a list
25 to the left of all of the projects you've created and then

1  you're able to click on each one.  So once you click on the

2  left menu, it opens up on the right, you know, your

3  projects.

4           So let's say we did the one on Main Street.  We

5  click on Main Street.  It opens up, you know, for you to

6  view the map.  And as I mentioned, it has countless tools

7  that you can use for whatever purposes.  What I was using it

8  for was just to create the map.

9           Then I would take that map -- I'm not sure, they

10 may have an option to just export it into a PDF and that's

11 how I got it, so PDF to my computer and then ever what

12 deliverable the client wanted, whether it was on a thumb

13 drive or a Dropbox link or e-mail.  Different clients use

14 different methods.

15     Q.   And so from the point in time when you're hired to

16 provide the client an orthomosaic map, the client is

17 providing you with certain information that you enter into

18 the software, and then the software is automatically

19 generating the remainder of the information necessary to

20 complete the preflight mission; correct?

21     A.   Yes.

22     Q.   And then once you get the drone back in your

23 hands, then you're just taking the data that was generated

24 from that flight and you're loading that data into your

25 computer?

Michael Jones - 7/21/21

93

1      A.    Yes sir.

2      Q.    And then you are load -- you're transferring that

3   data to DroneDeploy software -- DroneDeploy account, I

4   guess.

5      A.    Yes.

6      Q.    And you're not doing -- you're not analyzing

7   anything, you're not changing anything, you're not deleting

8   pictures or changing pictures.  You're just transferring the

9   data; correct?

10     A.    Yes, sir.

11     Q.    And then once you transfer the data, then the

12  DroneDeploy software is processing the data to create this

13  orthomosaic map; correct?

14     A.    Yes, sir.

15     Q.    And then when you get the link back or

16  notification that it's ready, you go onto the site, you

17  click a button, and the map's ready?

18     A.    Pretty much, yes, sir.

19     Q.    And that map is -- you don't analyze it, you don't

20  edit it, you don't do anything to it.  You just take that

21  map and you click another button and turn it into a PDF?

22     A.    Yes.

23     Q.    And that's your deliverable to your client?

24     A.    Most of the time, yes.

25     Q.    And that's what you're saying to the Court that

Michael Jones - 7/21/21

94

1  you should be able to do that work in order to -- let me

2  read here.

3          You're saying that you want to offer and provide

4  those services where you capture these aerial images on

5  behalf of paying clients and using orthomosaic software to

6  stitch those aerial images together to form orthomosaic

7  maps.

8      A.   Yes, sir.

9      Q.   Okay.

10         And when you're saying "stitching these aerial

11  images together to form orthomosaic maps," it's really

12  simply sending the data to DroneDeploy and hitting a button

13  and they process it for you?

14     A.   Yes, sir.

15     Q.   Okay.

16         And you're saying that your inability to be able

17  to go through that process and provide that orthomosaic map

18  is a violation of your First Amendment freedom of speech?

19     A.   I think so, yes.

20     Q.   Okay.

21         How so?

22     A.   Selling data, information to clients, which is

23  free speech.  I'm not turning any of this work to have

24  anything certified by any land organization, city, county,

25  anything.

The Amanuensis, LLC, d/b/a Pittman Stenography
PO Box 47, Wake Forest, NC 27588 * * * pittmanstenography.com

Michael Jones - 7/21/21

95

1        And on top of that, my clients were also aware of
2    that, that this is not what it's being offered for.
3        Q.    And that's the first item in paragraph 77, right,
4    orthomosaic maps?
5        A.    Orthomosaic maps, the first item, "a" that's under
6    77.
7        Q.    And I just want to make sure we're clear for the
8    judge.
9            Is there anything else about the process of how
10   you go about performing that work or those services that we
11   haven't touched on that you think is important?
12       A.    I can't think of anything else, sir.
13       Q.    And when you talk about the other three items
14   under paragraph 77, item 2, "creating marketing images of
15   land on behalf of paying clients and drawing on those images
16   lines indicating the approximate position of property
17   boundaries," is that -- do you do that using DroneDeploy or
18   some other software?
19       A.    So that item specifically, DroneDeploy is not
20   involved because there's no stitching of pictures or any
21   processing of maps.
22            This is just kind of standard photography items
23   that come out of the drone.
24       Q.    And what do you use to draw the lines?
25       A.    In still photos, it would be Adobe Photoshop.  In

Michael Jones - 7/21/21

96

1    videography, it would be Final Cut Pro.

2        Q.    And then the third item is "capturing aerial

3    images of land and structures (along with location data,

4    coordinates, elevation data, and volume data) and making

5    images and that data available to paying clients."

6            What -- is this DroneDeploy?

7        A.    You could use DroneDeploy in that process, but it

8    is not solely just DroneDeploy in that.  I mean, you could

9    use -- yeah, because all photos and any digital thing

10   past -- I mean, since smartphones have began, every camera

11   device that takes pictures, it's going to have metadata in

12   it, which I was told I could not deliver metadata -- I could

13   not deliver a photo with metadata in it.

14           So that, "c," would knock out anything with me

15   delivering to -- I would like to be able to do "c," because

16   that's delivering the picture as it comes out of

17   DroneDeploy -- or, excuse me, not DroneDeploy, out of my

18   drone.  So when I take a picture with my drone and it comes

19   out, it has metadata in it.

20           I was told I could not monetarily sell this item

21   to a client if it's got metadata in it.  I would have to

22   strip the metadata out of the picture, which everybody in

23   the United States is using an item that creates metadata.

24           So "c," that item specifically, I would like to

25   not have to strip all the metadata out of every picture I

Michael Jones - 7/21/21

97

1   give to a client because no photographer does that.

2       Q.    All right.  Let's go about it this way.

3             Number 1, the orthomosaic software creating

4   orthomosaic maps -- we talked about that.

5       A.    Yes, sir.

6       Q.    And that's something you did from paying clients

7   prior to June of 2019; right?

8       A.    Yes, sir.

9       Q.    And then number 2, creating marketing images of

10  land on behalf of paying clients and drawing on those images

11  lines indicating the approximate position of property

12  boundaries, that's also something that we talked about, and

13  you did that prior to June of 2019; right?

14      A.    Yes.

15      Q.    And you're saying you -- if it was a still photo,

16  you're using Adobe to draw the line that the client wants to

17  draw.  And if you're -- and all you're doing is looking at a

18  picture that's provided to you by the client; right?

19      A.    Yes, sir.

20      Q.    And you don't even know where that picture came

21  from?

22      A.    Lots -- I mean, I can tell if it came from GIS or

23  I can tell if it was printed off Google.  But as far as,

24  like, a standard practice, no one client has a standard

25  practice for it.

98

1    Q.    And you're -- if you're doing it on video, you're

2    using some sort of -- what did you say --

3    A.    Final Cut Pro.

4    Q.    Final Cut Pro.

5          All right.  And then that number 3 is "capturing

6    aerial images of land and structures (along with location

7    data, coordinates, elevation data, and volume data) and

8    making those images and that data available to paying

9    clients."

10         Were you doing that prior to June of 2019?

11   A.    Yes, sir.

12   Q.    And is that -- how were you doing that?  Give me

13   an example of one project that you did that.

14   A.    A real estate agent calls me and says, "I want

15   marketing pictures for this house on 100 East Main Street."

16   I go take those pictures from my drone or my phone or my

17   camera.  I deliver those to the client.  That's it.

18   Q.    Okay.

19         And so what software are you using?

20   A.    Adobe Photoshop or Adobe Lightroom for the photos.

21   Q.    And so you're -- we're back to -- I think we're

22   back to the beginning, right, where you buy the drone and

23   you buy a camera lens and you use the drone -- you manually

24   control the drone and just take photos?

25   A.    Yes.

Michael Jones - 7/21/21

99

1    Q.    And you're providing those photos to the client

2  in an -- I guess is it a JPEG?  Is it a -- do you know

3  what --

4    A.    Oftentimes JPEG is the deliverable file extension.

5    Q.    And you use Adobe --

6    A.    -- Lightroom --

7    Q.    -- to just download the data from the camera and

8  then put it on the thumb drive in JPEG?

9    A.    Yeah.  I just move the photo from my SD drive that

10  came out of the camera or drone into my computer and then I

11  edit in Photoshop or Lightroom.  Once I'm finished with it,

12  it's still a JPEG, and I deliver that JPEG to the client.

13    Q.    All right.

14        But you're still doing that, taking pictures and

15  providing it to clients today?

16    A.    Yes.

17    Q.    Okay.

18        And so why is it that you need permission to do

19  that?

20    A.    Because I was told I could not deliver a photo to

21  a client with any metadata in it.

22    Q.    Who told you that?

23    A.    William Casey.

24    Q.    Did you receive anything in writing on that?

25    A.    I'm not sure.  I would have to go back and look to

Michael Jones - 7/21/21

100

1   be sure.

2        Q.   So even though you were told that you can't

3   deliver photos that may have metadata, you're still

4   delivering photos with metadata?

5        A.   Yeah, you actually -- I mean, it would be hard to

6   not do that, yeah.

7        Q.   Right.

8             But number 3 is something you did before and you

9   still continue to do?

10       A.   Yes.  C.

11       Q.   C, 3 -- it's the third item under 77; right?

12       A.   Yes, sir.

13       Q.   Why do you add in here in parens "along with

14   location data, coordinates, elevation data, and volume

15   data"?

16       A.   So according to what I'm understanding from

17   William, he's telling me the accurate way to do this is I'm

18   a photographer.  A client hires me.  I go in with my iPhone

19   or a digital professional camera or a drone.  I take a

20   picture.  That picture, post 1980 probably, has metadata in

21   it.

22            The correct workflow they told me is I had to take

23   those pictures, then take those pictures to my computer,

24   upload them, strip all of the information and data out of

25   the picture before I could deliver it to the client.

Michael Jones - 7/21/21

101

 1      Q.   And where -- again, this is not in writing
 2   anywhere?
 3      A.   I'm not sure.  I would have to go back and look if
 4   they told me that.  But that was discussed at the second
 5   meeting, the meeting where they made their decision
 6   basically.
 7      Q.   All right.
 8           Do you remember talking about the initial
 9   disclosures where you're producing all documents that has
10   evidence that you may use at trial?
11      A.   Yes, I do remember that.
12      Q.   Okay.
13           If you look at the documents you produced, the 13
14   pages, is it in the 13 pages?
15      A.   So here's my difficulty with that, is that these
16   items with the codes, the GS 89C, things like that, I do not
17   know the details of all of those.  So I'm not sure if one of
18   those stands for what he said about removing the metadata in
19   it.  It may.
20      Q.   And you're talking about the letter dated June --
21   that cites the general statutes?
22      A.   June 13, 2019.
23      Q.   All right.
24           And you cite some of these general statutes in
25   your complaint, do you not?

102

```
 1        A.   Yes.

 2        Q.   And some of these statutes that you're talking

 3   about are from Chapter 89C, Engineering and Land Surveying?

 4        A.   Yes.  GS 89C-24, 55B, 57D.

 5        Q.   All right.

 6             Let me hand you what's been marked as Exhibit 5.

 7             Are these the statutes that you're referring to,

 8   the Chapter 89C?

 9                  (Exhibit 5 marked.)

10        A.   Yes, sir.  It does look like it.

11        Q.   And so other than the June letter, is there any

12   other evidence that you can point to in writing where there

13   is some instruction or warning given to you about producing

14   photographs and stripping metadata from photographs?

15        A.   Give me just a second to read it.

16                  (Discussion off the record.)

17                  (Recess taken, 12:33 to 1:12 p.m.)

18                  (Record read.)

19        A.   No, I don't think there is anything in here.

20        Q.   Let me ask you about number 3 under paragraph

21   77 -- or 77.c, as you would refer to it.

22             Are you looking to capture aerial images of land

23   and structures that include location data and provide those

24   to clients?

25        A.   Yes.
```

Michael Jones - 7/21/21

103

1    Q.    And what does that mean, "location data"?

2    A.    The metadata in it; so it records the GPS location

3    inside the picture of where it's taken at -- location where

4    the photo's taken.

5    Q.    That's it?

6    A.    It could have -- okay.  Location data.  It could

7    also have information about the photo; so whether it's a

8    JPEG, the file, the size -- typical information of, you

9    know, any file in a PC.

10   Q.    Okay.

11         And are you looking to take aerial images of land

12   and structures that include coordinates and provide them to

13   paying clients?

14   A.    Yes.

15   Q.    What does that mean, "coordinates"?

16   A.    Coordinates is the same as the location, I would

17   say -- the GPS coordinates.  Also the altitude would tell

18   that in the metadata as well if it's a drone flight.

19   Q.    Why is that?  Why do clients want photos that have

20   location data to include GPS location and coordinates data?

21   A.    So they may not want it specifically, but the

22   software for doing any kind of stitching, the 360 pictures,

23   any stitching is involved, the metadata is what the software

24   uses to stitch those pictures.

25   Q.    So it's the 360 images and the orthomosaic maps

The Amanuensis, LLC, d/b/a Pittman Stenography
PO Box 47, Wake Forest, NC 27588 * * * pittmanstenography.com

J.A. 684

Michael Jones - 7/21/21

104

1  that you're speaking of --

2      A.    Yes.

3      Q.    -- when you're talking about location --

4      A.    Yes.

5      Q.    -- and coordinates?

6      A.    Yes, sir.

7      Q.    How about elevation data?  Same thing?

8      A.    Yes.  Elevation is used for that.

9      Q.    And so if I take a photo with my drone and it

10  generates a JPEG that I load onto my computer and I e-mail

11  it to my client, that's not going to give them any elevation

12  data?

13      A.    If they know how to find it, it will be -- it will

14  be in the photo.

15      Q.    How so?

16      A.    Just by the nature of IT, it will be in there.  I

17  mean, if -- not a lot of clients know how to get into the

18  information, you know, details of the photo or video; so

19  yes, it is -- you can find it.  It is there.  A client -- I

20  don't know if they would -- every client would traditionally

21  not open the file and find all of the data in it, but it is

22  in there.

23      Q.    But the elevation data you're speaking of has to

24  do with these 360 images or orthomosaic maps?

25      A.    As far as the -- being used to stitch -- as far as

Michael Jones - 7/21/21

105

1    the metadata being used to stitch the photos together, yes,

2    that is what the altitude in the orthomosaic maps or 360

3    photos ...

4         Q.    In other words, to be able to use this data,

5    stitch it together so that the client can use it, right, so

6    that it's in useable form?

7         A.    So they can receive, yeah, the exact product that

8    they wanted.  So if they wanted the orthomosaic map, then

9    that would allow me or the software to stitch it to give

10   them the end product.

11        Q.    But if I say to you, "Listen, I want you to create

12   a product that has elevation data," how would you go about

13   doing that?

14        A.    I'm not -- the question is not quite clear to me.

15        Q.    Yeah.

16              So you specifically identified four things that

17   you want to be able to do.

18        A.    Uh-huh.

19        Q.    You want to be able to capture aerial images of

20   land and structures that include elevation data.

21              Why would a client want elevation data?

22        A.    No, the client may not want elevation data.

23        Q.    Okay.

24        A.    I want to keep from having to using my work time

25   to strip all the data out to give to the client according to

Michael Jones - 7/21/21

106

1   what Mr. Casey told me.

2       Q.   All right.

3            The --

4       A.   As far as not being able to deliver with the

5   metadata in it.

6       Q.   So you're not looking to provide aerial images of

7   land and on structures with location data?

8       A.   No.  I am looking to do that.

9       Q.   Okay.

10           You are looking -- people do want location data or

11  the ability to generate, right, locations, distances from

12  Point A to Point B; right?

13      A.   They could be using it for that purpose.

14           To answer the question do the clients want that?

15  Some may; some may not.

16           The part that I'm speaking of is I was told that I

17  couldn't deliver the photo to the client with metadata in

18  it.  Therefore, my workflow would have an additional step

19  when I got home; I would have to go and strip all the

20  metadata out in order to deliver to the client under the

21  directions I've been told.

22      Q.   But you're not doing that now.  You're just

23  sending out -- you're taking photos and sending it to the

24  clients?

25      A.   Yes.

Michael Jones - 7/21/21

107

1      Q.    Okay.

2            What I'm asking you specifically, prior to June of

3      2019, were you ever asked to produce an aerial image with

4      location data?

5      A.    All right.  So asked -- the client never asks me

6      "Can you give me the picture with the location data in it?"

7      The product they wanted, if it was the orthomosaic map,

8      required the metadata to be in the picture to produce the

9      product that they were then ordering; so yes.

10           But to answer the question did they ask, did they

11     say, "I want a picture and here's the information that I

12     want in it," no.

13     Q.    Okay.

14           So outside of creation of an orthomosaic map for a

15     client, did any client ever ask you to take an aerial image

16     of land and structures for the purpose of having location

17     data in there?

18     A.    No.

19     Q.    No?

20           Could you provide that to a client in able form

21     without creating an orthomosaic map?

22     A.    Yes, you actually would, by taking any picture

23     with any current device.

24     Q.    So if you took a picture, if I said, "Hey, I want

25     location data" -- well, first of all, what am I asking for?

Michael Jones - 7/21/21

108

1    What does that mean to you?

2        A.    You want the metadata in it.  If you're asking for

3    location data, I mean, that's part of the metadata.

4    Metadata is all the data in the photo.  Part of that data is

5    information on the location, the GPS coordinates -- you

6    actually have a north and south and everything.

7        Q.    So when you use the terms "location data" and

8    "coordinates," you're really referring to metadata?

9        A.    The GPS part of the metadata.

10       Q.    And prior to June 2019, no client ever asked you

11   for images with location data; correct?

12       A.    No, sir.

13       Q.    And prior to June of 2019, no client ever asked

14   you for aerial images with coordinates?

15       A.    No.

16       Q.    And prior to June of '19, did any client ever hire

17   you to provide elevation data or do any analysis regarding

18   elevation data?

19       A.    No.

20       Q.    Prior to June of 2019, did any client ever hire

21   you to provide volume data or do an analysis of volume data?

22       A.    No.

23       Q.    All right.

24            So these are all things that are things that you'd

25   like to do in the future but you've never been -- you've

Michael Jones - 7/21/21

109

1    never done in the past and you're not -- I think that's my

2    question.


4         A.   Okay.

5         Q.   These four items that you have in paragraph 77.c

6    are things that you've never been hired to do, never been

7    asked to perform any of these services, but these are

8    services you want to have the option of performing in the

9    future?

10        A.   Yes.  To make sure I'm clear, let me restate that.

11             So I've never been asked specifically in the way

12   you're asking the question, did the client specifically say,

13   "I want a picture with the metadata."

14             Yes, they did order products that require the

15   metadata to be in the picture.

16             But to answer your question specifically, I was

17   never asked verbally, "Hey, Michael, can you deliver this

18   picture?  And I want elevation data in it, GPS

19   coordinates -- things like that."

20        Q.   Yeah.  That's my question.  My question has

21   nothing to do with metadata because that's -- metadata is

22   not in this paragraph.

23        A.   Okay.

24        Q.   What's in the paragraph that -- your complaint

25   that you filed is you want to be able -- you wish to offer

Michael Jones - 7/21/21

110

1    and provide drone services that include the following:  And

2    you want to be able to capture aerial images of land and

3    structures that include location data, one; coordinates,

4    two; elevation data, three; volume data, four; right?

5         A.    Yes, which could all be compiled under the

6    umbrella of metadata.  That would be the definition of all

7    of the things you just mentioned in the photo.

8         Q.    Okay.

9               But, again, you don't put metadata in here; you

10   don't define metadata as these items in your lawsuit, do

11   you?

12        A.    I'm not if they worded that in that way.

13        Q.    Okay.

14              But, again, the question really is:  Did anybody

15   ever ask you to provide location data specifically?

16        A.    No.

17        Q.    Did anyone ever ask you to provide or hire you to

18   provide coordinates?

19        A.    Again, I feel that's a little -- I feel it's

20   answered in two different sections:  No, they did not ask

21   me -- verbally, pronounce the words "I need location data";

22   but if they said, "I want an orthomosaic map or a 360

23   photo," then they are asking for the data without verbally

24   asking.  They're saying, "I want this product, the 360

25   navigable photo."  That has the metadata of the things you