1  just mentioned it.

2          So yes, they were asking for that without asking

3  for it specifically, list by list.

4      Q.    All right.

5          And no one has ever asked you -- or has anyone

6  ever hired you to give them elevation data?

7      A.    Not specifically, not verbally asked for that, no.

8      Q.    And no one ever hired you to give them volume

9  data?

10     A.    No.

11     Q.    All right.

12         But, again, going back to the orthomosaic maps

13 that are generated, if you generate an orthomosaic map, you

14 can analyze that and provide location data to a client?

15     A.    So the metadata is in it, yes; I can read it.  I

16 can't do anything to manipulate it.  I can strip it out of

17 the photo.

18     Q.    No, I'm talking about the orthomosaic map.

19     A.    Oh, the orthomosaic map?

20     Q.    Yes.

21     A.    So the orthomosaic maps, each individual photo has

22 the GPS data in it.  I can see that.  I can't do anything

23 with it besides take it out or -- I mean, that's it, I can

24 remove it.

25         Then the process is they use the metadata in the

Michael Jones - 7/21/21

112

 1   final map.  The final map does not have any metadata

 2   attached to it because it's multiple pictures in one

 3   location.

 4        Q.    And, again, you're using these terms

 5   interchangeably with "metadata," and I'm not talking about

 6   metadata.  If you want to talk about it, you can --

 7        A.    Yeah.

 8        Q.    -- but I'm asking about the word "location data"

 9   or "location."

10             If you take -- you, your company -- you can open

11   up the orthomosaic map, can you not, and you can analyze it

12   and perform certain location calculations if you want?

13        A.    Not calculations.  You can look at -- for what the

14   data is.  If it says you're 300 feet and north 38 and 72

15   longitude, that's where it's at and I can't do anything to

16   it.  I can read it, if that's what you're referring to as

17   far as analyzing it.

18        Q.    But you can draw -- you can put in a pin -- a

19   point on the photo or on the orthomosaic map and another pin

20   and you can draw distances showing the location of the

21   building to the perimeter or the building to another object;

22   right?

23        A.    So DroneDeploy -- I'll speak about that one;

24   that's the one that's been kind of famous in the story.

25             DroneDeploy has tools inside their software that

Michael Jones - 7/21/21

113

1    the client can use to do the operations you just

2    mentioned -- measuring, volume data, stuff like that.

3            So to give you an example to make sure you

4    understand everything, if me and Steve over here were -- he

5    had the company, he was the landowner and then we had the

6    project manager, and then I'm the drone pilot, I would go to

7    DroneDeploy, create this map, and I would add these users to

8    this map where they can view it.  Then they would have the

9    options of pulling measurements, volume data.  I can't do

10   anything like that to the picture.

11       Q.   No, but you --

12       A.   Is that good or --

13       Q.   -- could do those measurements?

14       A.   I mean, I could.

15       Q.   Because you're the one that actually has the

16   experience in using DroneDeploy; right?

17       A.   For collecting the data, yes.

18       Q.   Right.

19            It's your license; right?

20       A.   Under my profile, if you want to say that.

21       Q.   When I say "you," your company.

22       A.   Yes.

23       Q.   And your company has the ability to open this up

24   and do distances; right?

25       A.   We do, as anyone else would have.  We don't have

Michael Jones - 7/21/21

114

1    any special club membership to read that or anything like --
2    anybody with access to this map could do what you're talking
3    about.  So yes, I do, as you do.
4        Q.    I don't have access.
5        A.    Yeah.  I'm just saying if I signed you on a map,
6    if I gave you access to be a user, you could then go in,
7    pull measurements, volume data, anything like that,
8    yourself.
9        Q.    Okay.
10           Did you ever -- on behalf of a client, were you
11   ever asked to do any measurements?
12       A.    No.
13       Q.    Were you ever asked to do any elevation data?
14       A.    No.
15       Q.    Were you ever asked to analyze any data at all?
16       A.    No.
17       Q.    Did you ever explain to the clients how they could
18   perform those functions?
19       A.    No.
20       Q.    So all you're doing is -- what you're saying is
21   you're doing no analysis?
22       A.    No analysis.
23       Q.    You are -- you are providing them a copy of the
24   orthomosaic map; correct?
25       A.    In a PDF form, yes, sir.

1    Q.    And you're giving them access to the program?

2    A.    No.

3    Q.    Do you give them your log-in information?

4    A.    I don't give them access.  That's just an option

5    of what you can do.  I never had a client do that or would

6    even be interested in or even would know how to.

7    Q.    All right.

8          So the idea that a client would access the

9    DroneDeploy software to secure certain location data,

10   elevation data, volume data -- that never happened?

11   A.    That never happened.  It's just a possibility of

12   what the software can do.

13   Q.    Okay.

14         If you sent me this PDF, am I able to manipulate

15   the PDF and look at locations and get distances and that

16   sort of something?

17   A.    No, sir.  It's just -- it's -- when it's a PDF

18   form, in that deliverable form, it is nothing more than a

19   picture.  Only thing great about this picture is if it's a

20   thousand acres, you can zoom in to, say, one building.

21   That's the only advantage it has to it.

22   Q.    And then number 4 is capturing -- or 77.d is

23   "capturing aerial images and data about land and

24   structures."

25   A.    Okay.

116

1   **Q.** "Processing those images and data to create 3D

2 digital models of land and structures and making those 3D

3 digital models available to paying clients."

4     And as I understand it, the DroneDeploy software

5 allows you to create a 3D digital model; correct?

6   **A.** **That's another option on their package, so to**

7 **speak.**

8   **Q.** Did anyone ever hire you to do that?

9   **A.** No.

10   **Q.** Okay.

11     So, again, that's another example of something

12 that you never did previously, but your reading of the

13 letter and the action taken by the board from your viewpoint

14 is that that's something that you can't do that you would

15 like to do?

16   **A.** **Yes, sir.**

17   **Q.** Okay.  All right.

18     Let me ask you about Exhibit Number 6,

19 specifically pages 9 to 11, which is the report of interview

20 with you on February 7.

21     And this "Report of Interview with Michael Jones

22 on February 7," and this is on page 9, the first paragraph

23 says:  "Board Investigator William Casey conducted an

24 interview with Mr. Jones at the Wayne County Public Library

25 in Goldsboro, North Carolina."

1              Is that true?

2         A.    Yes, sir.

3         Q.    "Mr. Jones indicated he has a remote pilot

4    certificate issued by the Federal Aviation Administration."

5              Did you tell him that?

6         A.    Yes, sir.

7         Q.    "He added that pursuant to 14 CFR - Part 107,

8    anyone flying an unmanned aircraft system or drone for

9    commercial purposes must carry that certification."

10             Is that accurate, what you told him?

11        A.    That's accurate, yes, sir.

12        Q.    And it goes on to say:  "Mr. Jones indicated his

13   highest level of education is a high school GED certificate.

14   He added that he obtained a Microsoft certification that

15   allowed him to get into information systems technology.

16   Mr. Jones indicated he worked as a network systems analyst

17   for Branch Banking & Trust for a period of time before

18   leaving the office setting to begin welding.  He indicated a

19   welding coworker brought their drone in to work one day,

20   which got him interested in pursuing a career piloting a

21   drone.  Mr. Jones went on to say that the rest is history."

22             Is that -- all that accurate about your interview?

23        A.    Yes, sir, it is.

24        Q.    All right.

25             And then the next paragraph states that "Mr. Jones

Michael Jones - 7/21/21

118

1  stated he operates as 360 Virtual Drone Services LLC and is

2  100 percent owner of the company.  He indicated he started

3  out offering services in the real estate industry, which is,

4  quote, 'low-hanging fruit,' unquote, because it is easy to

5  work but there is no money in it.  Mr. Jones indicated he

6  began taking online mapping courses to help move into

7  different areas of service.  He added that he was able to

8  transition into the construction industry providing

9  orthomosaic or orthorectified maps.  Mr. Jones indicated he

10 markets his services through his website (ncdronehome.com),

11 the Droners.io website, his YouTube channel (Jones Knows

12 Drones), and Facebook (360VDrone.)"

13         Is all that accurate?

14     A.   Yes, sir.

15     Q.   And what is an orthrectified map?

16     A.   Orthorectified is a measurable map; so it's

17 actually -- let's see.  So it doesn't have to be clarified

18 to be complete accurate mapping, but it -- the picture is in

19 a scaled map to what you're photographing.

20     Q.   How is it different from orthomosaic?

21     A.   I am actually not sure the difference between the

22 two words.

23     Q.   And have you provided both, orthorectified and

24 orthomosaic to clients?

25     A.   Orthomosaic, like I said, I'm not really sure the

Michael Jones - 7/21/21

119

1  difference between orthorectified and orthomosaic.  I would

2  just kind of say they're the same thing.

3      Q.  So when you use these, you used them

4  interchangeably these words, orthomosaic and orthorectified?

5      A.  Yes, sir, I guess.

6      Q.  And orthorectified, you said, allows you to -- it

7  is measurements?  Or what is it?  What did you say?

8      A.  It's, like, scaled to what you're taking.  So

9  everything would be in scale to the size of, say, if you

10  were in a field with a building on it, and this building --

11 everything is in scale to what it actually would be.

12     Q.  And how does it do that?

13     A.  With the metadata.

14     Q.  Of what?

15     A.  The GPS location metadata from the pictures.

16     Q.  So it takes the pictures and it processes them or

17 stitches them together?

18     A.  Yes.

19     Q.  It's the software that does that?

20     A.  It is the software that does that via the

21 metadata.

22     Q.  Okay.

23         And then if you look at the third paragraph -- and

24 I'll just try to simplify for time -- is there anything in

25 there that you would dispute that you told him, or that is

120

1    an accurate report of your interview?

2         A.   Yes, it is accurate.

3         Q.   And then the fourth paragraph starts with:

4    "Mr. Jones stated he has offered services to professional

5    land surveyors but has not had much luck getting any work

6    from them."

7         A.   Yes.

8         Q.   Is there anything -- if you're reading that fourth

9    paragraph, is there anything in there that is -- misstates

10   what you said or is inaccurate about the interview?

11        A.   Yes.  That's accurate.

12        Q.   All right.

13             The next paragraph starts with:  "Mr. Jones stated

14   one of his current clients is Steve Keen, owner of Adair,

15   LLC, a real estate development group."

16             Do you see that?

17        A.   Yes, sir.

18        Q.   He stated that "Mr. Keen wanted an overall view of

19   the current project he is developing in Wayne County,

20   North Carolina.  Mr. Jones indicated Mr. Keen did not want

21   multiple photos that he would have to tape together or zoom

22   in on individually; however, because he is limited to a

23   400-foot altitude, it was not possible to take a photo of

24   40 acres with one shot.  He indicated for that reason he

25   recommended an orthomosaic map (evidence 4.5) using the

Michael Jones - 7/21/21

121

1   DroneDeploy application that would like -- that would look

2   like one photo and could be zoomed in on like one photo.

3   Mr. Jones indicated the incremental photos allow Mr. Keen to

4   keep up with the project progression without actually going

5   out on-site.  He added that his (Jones) map even allowed

6   Mr. Keen to confirm that a truck delivering gravel had

7   backed over and broken a section of curb and gutter."

8           Is that paragraph accurate?

9       A.  Yes, sir.

10      Q.  And then the next paragraph starts with:

11  "Mr. Jones stated another function of the DroneDeploy

12  application is the ability to measure area, distance, and

13  volume."

14          Do you see that?

15      A.  Yes, sir.

16      Q.  "He indicated he has never offered that service

17  because the people he works for do not have a use for it and

18  he is under the impression that you need a license to

19  provide that type of information."

20          Do you see that?

21      A.  Yes, sir.

22      Q.  Is there anything in that paragraph that

23  inaccurately states what you told him?

24      A.  Yes, that's accurate.

25      Q.  And then the next paragraph, starting with

Michael Jones - 7/21/21

1  "Mr. Jones stated his disclaimers" -- is that paragraph

2  accurate?  Or does that paragraph accurately reflect what

3  you told the investigator?

4       A.   Yes, that's accurate.

5       Q.   The next paragraph states that "Mr. Jones stated

6  the Droners.io website provides free memberships.  He

7  indicated Droners.io gets paid a commission on what a member

8  gets paid after completing a project.  Mr. Jones indicated

9  that upon signing up on the Droners.io website there is a

10  checklist whereby you select the types of services you want

11  to offer.  He indicated one of the selections combines

12  mapping and surveying.  He added that when he selected that

13  option he thought that he would only be offering mapping;

14  however, he can see how it would be misconstrued with the

15  word surveying included and has since removed that as an

16  offering on the website."

17       Is that accurate?  Or does that accurately reflect

18  what you told the investigator?

19       A.   That's accurate, yes, sir.

20       Q.   Next paragraph:  "Mr. Jones indicated he considers

21  mapping as the stitching together of multiple photos.  He

22  has reiterated that he is unable to get what some clients

23  want photographed in one shot so he takes multiple shots and

24  stitches them together into a map or one large photo.  He

25  went on to say maybe the term mapping is the wrong word and

1    he should just call it a photograph."

2          Does that accurately reflect what you told the

3    investigator?

4          A.    That's accurate, yes.

5          Q.    Next, final paragraph:  "Mr. Jones stated he never

6    has or will produce maps showing property lines or

7    measurements.  He acknowledged that he has taken some real

8    estate videos (evidence 4.6) that include what appears to be

9    property lines.  He indicated his intent with that was to

10   give a general location and shape of the parcel.  Mr. Jones

11   indicated there is never any bearings or distances on any of

12   his maps.  He added that he puts a disclaimer (evidence

13   number 4.7) in the notes of his YouTube videos stating,

14   'Property lines are for a visual guide only and are not

15   accurate to county coordinates.'"

16         Is that accurate?

17         A.    That is accurate.

18         Q.    And then if I flip to page 18, is that a copy of

19   your -- well, what is that document, if you know?

20         A.    That is the right one?

21         It looks like a header I had on my website, maybe,

22   or some website?  Business card?

23         Q.    Could be business card?  Is that your business

24   card?

25         A.    Yeah.  I think so, yeah.

124

1      Q.    And does your business card have a "Professional

2   Aerial Data & Media Drone Service Company"?

3      A.    Yes.   That's what's on there.

4      Q.    And then one of the items that you offer is aerial

5   mapping?

6      A.    Yes, sir.

7      Q.    What is your definition of aerial mapping?

8      A.    Stitching of two photos or multiple photos

9   together to create a large photo in one photo.

10      Q.    And you do that, as you indicated -- you do that

11   by taking your drone out to a location and setting up a

12   preflight program using DroneDeploy; correct?

13      A.    Yes, sir.

14      Q.    And that -- and then you have the ability to input

15   certain calculations like speed and altitude and the area

16   that you want to fly in the preflight program?

17      A.    Yes, sir.

18      Q.    And then once all that's selected, you're taking

19   the data that's generated, the photos that are taken, and

20   then you run them through the DroneDeploy processing and

21   they generate this orthomosaic map?

22      A.    Yes, sir.

23      Q.    And it's that orthomosaic map that's generated by

24   DroneDeploy that's then sent back to you that you're calling

25   aerial mapping?

Michael Jones - 7/21/21

125

 1      A.    Yes, sir.

 2      Q.    Okay.

 3            And then on -- let's see here.  Let me find the

 4  page -- page 44, it says:  "We offer video, pictures and

 5  orthomosaic maps (measurable maps) of the sites."

 6            What do you mean by that?  What is a "measurable

 7  map"?

 8      A.    So the measurable maps means that it is relevant

 9  to the same measurements in real life on-site.

10      Q.    Let me turn to Exhibit 1, which is a copy of the

11  complaint.

12      A.    Okay.

13      Q.    This is a copy of the complaint that you filed on

14  behalf of yourself individually and 360 Virtual Drone

15  Services LLC on March 22, 2021; correct?

16      A.    Yes.

17      Q.    And in the first paragraph, you see the

18  introductions paragraph on page 1?

19      A.    Yes, sir.

20      Q.    It says:  "This is a First Amendment lawsuit to

21  vindicate the rights of plaintiffs 360 Virtual Drone

22  Services LLC and Michael Jones to create useful information

23  (aerial images and related data) and disseminate that

24  information to willing customers."

25            Do you see that?

Michael Jones - 7/21/21

126

1     A.   Yes, sir.

2     Q.   All right.

3          And what do you mean by "useful information"?

4     A.   Useful information.  Useful information -- that

5  would just be data the clients need or are ordering.

6     Q.   And the next sentence says:  "In 2017, Michael

7  Jones' business, 360 Virtual Drone Services LLC, began

8  harnessing cutting-edge drone technology to capture aerial

9  images and data about land and property - including

10 orthomosaic aerial pictures, thermal maps, and other

11 visualizations of information about land."

12         Do you see that?

13    A.   Yes, sir.

14    Q.   Is that true?

15    A.   Yes, sir.

16    Q.   And did you provide thermal maps?

17    A.   Yes, sir.

18    Q.   And who did you do that for?

19    A.   It was a company out of Chicago but I cannot

20 remember the name, it's been so long ago.

21    Q.   What is a thermal map?

22    A.   A thermal map is taken with a thermal imaging

23 sensor on the drone that actually doesn't take pictures;

24 it's measuring thermal heat.

25    Q.   And is this something that you -- do you need to

1  run through software or is that --

2      A.    Same process as far as the mapping software for

3  the thermal mapping of roof inspections that I did, they get

4  ran through.  But in this situation, I only delivered the

5  data to the client and they did all the processing.

6      Q.    In one case -- you mean that you were hired?

7      A.    Yes, sir.

8      Q.    Any were there any other clients that asked for

9  this thermal mapping?

10     A.    No, sir.

11     Q.    So on the thermal mapping, what were you asked to

12  do?

13     A.    To capture the roof of I think four Walmart

14  distribution centers and basically get orthomosaic map --

15  thermal map of the roof.

16     Q.    And so how did you do that for that client?

17     A.    Same exact scenario.  I arrived with the drone and

18  a preprogrammed flight pattern, checked the air space,

19  arrived, took the drone out and flew patterns over the

20  entire roof with, like, an overlay of 70 percent, and then

21  delivered that data to the client.

22          They then took that data, because I'm not sure

23  about how -- DroneDeploy, they did not do thermal imaging;

24  so you had to through Pix4D.  Pix4D, I think they sent it to

25  their -- I had nothing to do with the processing on that

Michael Jones - 7/21/21

128

1  job.  I just collected the data, delivered it to the client,

2  and they did the processing with some other company and

3  delivered it to their end client.

4      Q.   So explain to me the data that you're talking

5  about.

6           When you say "deliver the data," what are you --

7      A.   The thermal imaging photos -- well, they're not

8  really photos, but thermal imaging photos that I collected

9  from that drone.

10     Q.   And so they're multiple photos, right, taken?

11     A.   Yes.  In TIFF images.

12     Q.   So you're providing them with the photo images?

13     A.   Yes, sir.

14     Q.   Okay.

15          Anything else that you're doing?

16     A.   In that job, they have -- they actually had a

17  video and photo of thermal.  So they did the orthomosaic

18  map, I collected the data for the orthomosaic map, then I

19  also did the same type pattern manually with the video over

20  the whole entire roof.

21     Q.   Okay.

22     A.   So that was just what I delivered.  I didn't

23  process that data.

24     Q.   And so with that client, you provided them with

25  the thermal imaging photos?

Michael Jones - 7/21/21

129

1     A.    Photos -- imaging photos and imaging video.

2     Q.    You provided them with a video?

3     A.    Yes, sir.

4     Q.    And did you provide them with an orthomosaic map?

5     A.    No.

6     Q.    Okay.

7           On paragraph 3 on page 2 -- this is Exhibit 1.

8     We're going to be on that for a little while.

9     A.    Page 2?

10    Q.    Page 2, paragraph 3.  In the middle of the

11    paragraph, it says:  "Simply, the projects the board -

12    aerial photos, data, 3D digital models and the like - are

13    speech that is fully protected by the First Amendment."

14          Do you see that?

15    A.    Yes, sir.

16    Q.    Okay.

17          And the aerial photos -- what aerial photos are

18    you talking about that the board is targeting?

19    A.    Okay.  So the ones they're targeting are,

20    according to them -- or William Casey -- was orthomosaic

21    maps would be included, any photo at all with any metadata,

22    I can't deliver for any monetary trade or value, and 360

23    pictures would be included because I was also told that any

24    stitching of any pictures in North Carolina was surveying --

25    practicing promotional surveying.

130

1              Yeah, I guess that's it.  Those are things I was

2    told that I can't do.

3         Q.    And 3D digital models?

4         A.    3D digital models, yes.

5         Q.    And are you using 3D digital models

6    interchangeably with 360 pictures?

7         A.    No.

8         Q.    Okay.

9              3D digital models, as I understand it, so the

10   record is clear, is very similar to orthomosaic maps and how

11   that project is generated?

12        A.    Yes, sir.  Just the flight pattern and the capture

13   process is a little different.

14        Q.    Is the 360 -- 360 picture or 360-degree picture --

15   I don't know how you refer to it -- is that the same process

16   as well?

17        A.    No, sir.

18        Q.    And what is that process?

19        A.    That is just stitching together the pictures in

20   a -- it's in another format, but it's still stitching

21   pictures together.

22        Q.    And what format or what software are you using?

23        A.    That -- it's actually three different softwares.

24   So it's Photoshop, Adobe Lightroom, and then a program

25   called RICOH, R-I-C-O-H.

Michael Jones - 7/21/21

131

 1      Q.    And you're taking photos, images that are JPEG

 2  images?

 3      A.    Yes.

 4      Q.    And you're taking those and you're running it

 5  through some sort of software to create a 360-degree --

 6      A.    -- navigable picture.

 7      Q.    Okay.

 8            And, likewise, are you doing any analysis?

 9      A.    No, sir.

10      Q.    Do you have any commentary for the client?

11      A.    No, sir.

12      Q.    Do you provide any -- any input on the data?

13      A.    No, sir.

14      Q.    Other than gathering -- you know, putting the

15  drone up, taking the pictures, is your company adding any

16  other work product to this so-called project?

17      A.    Color correction, that's it, you know, to the

18  photos.  And that's only if they pay.

19      Q.    In paragraph 8 on page 3, 360 Virtual Drone

20  Services LLC is a North Carolina limited liability company

21  wholly owned by you; correct?

22      A.    Yes, sir.

23      Q.    And the next page, paragraph 14:  "Using cameras,

24  drones can take photographs of - and collect data about -

25  buildings, land, construction sites, and other property."

132

```
 1            Is there anything that we haven't already
 2   discussed that explains that allegation?
 3        A.   I don't think so.
 4        Q.   And then metadata is mentioned in paragraph 17.
 5   Do you see that?
 6        A.   Yes, sir.
 7        Q.   Okay.
 8            So in your complaint, you say:  "Metadata are
 9   secondary data about an image (for example, the time and
10   date an image was captured or the GPS coordinates for where
11   it was captured).  Virtually any picture taken with a modern
12   smartphone contains metadata.  Similarly, drone-captured
13   images can include metadata as well, including data about
14   ground elevation, heat, locations, and distances."
15            Do you see that?
16        A.   Yes, sir.
17        Q.   Okay.
18            And what is the -- give me an example of an image
19   that is taking a picture that includes metadata about ground
20   elevation.
21        A.   An example of a photo?
22        Q.   Yeah.  I'm trying to understand what you're
23   referring to here.
24        A.   And where was that?  Which?
25        Q.   17, at the end of 17.  Because you're talking
```

Michael Jones - 7/21/21

133

 1   about an image.  When you say "image," you mean like a JPEG
 2   image; right?
 3        A.    A photo, yes.
 4        Q.    Okay.
 5              And give me an example of what you're referring to
 6   where you allege that drone-captured images can include
 7   metadata, including data about ground elevation.
 8        A.    Okay.  You just want an example of that?
 9        Q.    Yes.
10        A.    Any photo I take with my drone has that in it.
11        Q.    Okay.
12              How so?  I'm trying to get you to explain it to me
13   because I don't know what that means.
14        A.    Let's see.  So photos have information in them.
15   So you can go to a photo and click on -- if you're in Apple,
16   right-click into info and it will bring up information about
17   this photo as listed in your GPS coordinates, the time it
18   was taken, the elevation it was taken, and there's probably
19   a few more pieces of information it has that I can't think
20   of now.
21              But any photo I would take with my drone has this
22   in the photo.
23        Q.    Right.
24              But you're saying -- when you say "ground
25   elevation" --

Michael Jones - 7/21/21

134

1      A.    Altitude.

2      Q.    -- you mean the height that the picture was taken

3  from?

4      A.    Yes, sir.

5      Q.    Oh, okay.

6            But nothing about the elevation of the ground.

7      A.    Oh, I see what you're saying.  So elevation to the

8  ground versus altitude.  No.

9            This -- in the picture, the metadata would be the

10 altitude of the picture.

11     Q.    Okay.

12     A.    Yeah.  Sorry.  I didn't see what you were saying

13 with elevation.  But, yeah.

14     Q.    And then what do you mean by "heat"?

15     A.    If it's a thermal picture, that's how it -- the

16 heat sensor actually collects the image and creates it by a

17 thermal imaging sensor which is not actually a photo; it's

18 actually a sensor, heat.

19     Q.    And then when you say "location data," are you

20 talking about where on the earth this picture was taken?

21     A.    GPS coordinates, yes, sir.

22     Q.    Okay.

23            And "distances," what do you mean by that?

24     A.    Distances would just be in the GPS data from

25 where, like, the coordinates where that picture is at.

Michael Jones - 7/21/21

135

1      Q.    Okay.

2            So all of this can be summarized as GPS data and

3      altitude other than the heat?

4      A.    Yes.  I would just put it all under the umbrella

5      of metadata.

6      Q.    Okay.

7            And have you received any warning or notice from

8      the board that you're not allowed to take pictures that show

9      the elevation of the picture -- or the altitude of the

10     picture?

11     A.    Say that one more time, make sure I understand.

12     I'm sorry.

13     Q.    Bad question.

14           Have you received any warning or notice from the

15     board that you're not allowed to take and sell pictures that

16     tell a user at what altitude the picture was taken from?

17     A.    Yes.  I was told I couldn't take it with any

18     metadata.  So I could deliver the client a picture -- if

19     there was a monetary value trade, which is what I do, I

20     could not charge a client and then give them a picture if it

21     had metadata.  When I asked William Casey what I had to do,

22     his answer was I had to strip the metadata out of the photo,

23     then deliver it to the client.

24     Q.    And so other than your conversation with the

25     investigator -- and the entirety of that conversation is

1    William Casey allegedly told you you've got to strip

2    metadata from pictures?

3         A.   Yes, sir.

4         Q.   Okay.

5              Other than that, have you been provided any type

6    of warning or notice that you're not allowed to sell

7    pictures that show the altitude that the picture was taken

8    from?

9         A.   Just this warning letter here.  This is the one I

10   got.

11        Q.   The June letter?

12        A.   Yes, sir.

13        Q.   Okay.

14             And have you received any warnings or notices that

15   you're not allowed to sell pictures, JPEG pictures, that

16   show the -- that have GPS coordinate information in it?

17        A.   Not written on any paper, no, sir.

18        Q.   Okay.

19             And then the next paragraph says:  "Using this

20   metadata" -- the one we just talked about in 17 --

21        A.   Yes, sir.

22        Q.   -- "computer software can use drone-captured

23   images to calculate the distance from Point A to Point B."

24             Can you explain that to me?

25        A.   Just as we went over earlier, in the DroneDeploy

Michael Jones - 7/21/21

137

1  software, they have tools in there where you can measure the
2  distances.  I couldn't explain the intelligence behind the
3  software or how it works, but that's inside of their
4  platform.

5      Q.    Yeah.

6           So what you're saying is that these JPEGs that are
7  taken, these pictures are taken and they're run through a
8  program or they're processed by DroneDeploy?

9      A.    Yes, sir.

10     Q.    And DroneDeploy creates for you an orthomosaic
11  map, and that data or that work product that's generated,
12  you could pull that up and you could plot points on the map
13  and you could -- if you wanted to, and you could figure out
14  certain circumstances?

15     A.    Yes.  DroneDeploy has that as one of their tools.

16     Q.    Okay.

17           And it's not really the metadata itself that
18  they're using, but it's -- they're taking all these photos
19  and stitching them together and they're creating this map.
20  And based on this map, you're able to plot points and you
21  could, if you wanted to, create distances?

22     A.    So that is using the metadata to do that.  They
23  are using the metadata to perform those functions inside of
24  their application.  So -- but yes, that is what they're
25  doing.  They're using the metadata in order to distinguish

1  distances and measurements and volumes, and they have other

2  stuff you can pull from there as well.

3      Q.    They're actually doing more than that, though;

4  right?  They're actually taking the photos, including

5  whatever this metadata is that you contend is there?

6      A.    Yes, sir.

7      Q.    And they're processing and creating an orthomosaic

8  map that then would allow them to do the measure or

9  calculate distance from Point A to Point B?

10      A.    Yes, sir.  In other words, that metadata is also

11  being used to create a tool where you can measure.

12      Q.    Did you ever use that tool?

13      A.    I used it for my fun, just to see, like, "Wow, I

14  can't believe this technology can do this," but that's it.

15      Q.    Were you ever asked to perform that calculation

16  for a client?

17      A.    No.

18      Q.    Have you ever performed that calculation for a

19  client?

20      A.    No.

21      Q.    You said the software can calculate the size of

22  objects as well.  Were you ever asked to do that?

23      A.    No.

24      Q.    Did you ever perform or calculate the size of

25  objects using that software?

Michael Jones - 7/21/21

139

1    A.    No.

2    Q.    And then you go on and you give an example.  You

3    say:  "For example, a drone can photograph a stockpile of

4    building materials.  In doing so, the drone can capture

5    metadata on materials' location and elevation.  That data,

6    in turn, can be used quickly to calculate the approximate

7    volume of the stockpile as a whole, often called 'volumetric

8    calculation.'"

9          Do you see that?

10    A.    Yes, sir.

11    Q.    Did you ever do this?

12    A.    No, sir.

13    Q.    Were you ever asked to do this?

14    A.    No, sir.

15    Q.    And there's probably -- if we're on paragraph 18,

16    if you go to DroneDeploy software, you could probably create

17    hundreds of examples, could you not --

18    A.    Absolutely.

19    Q.    -- and put those in as paragraphs in this

20    complaint?

21    A.    Yes, sir.

22    Q.    Okay.

23          You go on to say another example is

24    "Drone-captured images and data can also be used," I guess

25    by DroneDeploy, right, "to create 3D digital models of land

Michael Jones - 7/21/21

140

1   and structures."

2        A.    Yes, sir.

3        Q.    And that's another capability of the software, but

4   that's not something you were ever asked to do?

5        A.    No, sir.

6        Q.    And it's not something you've ever done?

7        A.    No, sir.  I wish.

8        Q.    And then another example, in 20, is:  "Drones can

9   use heat sensor imaging to identify thermal leaks in large

10  buildings and storage units"; right?

11       A.    Yes, sir.

12       Q.    And those are JPEGs or photos with this type of

13  capability?

14       A.    Yes.  Thermal imaging.

15       Q.    And you don't analyze anything?

16       A.    No, sir.

17       Q.    You don't editorialize?

18       A.    I don't.  On thermals, I do absolutely nothing to

19  them.  Matter of fact, I don't even have a thermal camera.

20  The company actually flies me a thermal camera to clip on my

21  drone.

22       Q.    You provide no input, commentary?

23       A.    Just the deliverable of that data.

24       Q.    You take the -- you use your drones, you take the

25  photos, and you send them the photos?

Michael Jones - 7/21/21

141

1        A.    Yeah.

2        Q.    Okay.

3              I mean, that sounds like -- other than the

4  orthomosaic maps that you're generating from DroneDeploy, it

5  sounds like you're hired to take photos and video and you

6  just send them the photos and video?

7        A.    A lot of times, yes.

8        Q.    And other than sending a client a photo or video

9  that was taken -- again, without analysis, without

10 commentary, without editorializing, without any input --

11 you're just sending them photos that you were taking?

12       A.    I mean, unless they hire the option of me color

13 correcting and editing the photo.  But yes, on these jobs,

14 we're talking about how these orthomosaic captures, the heat

15 imaging systems, that was all me delivering the data for the

16 client to them.  They did all of the processing and they did

17 the delivery to the client.  I was not even ever aware of

18 who the client was.

19       Q.    And then as I understand it, the scope of the

20 modifications you made to your business after receiving the

21 June 13th, 2019, letter is that you no longer generated

22 orthomosaic images from drones --

23       A.    I just, like, turn down if they call now.

24       Q.    Other than that, though, your business model is

25 the same?

Michael Jones - 7/21/21

142

1    A.    Yeah.  I still do video and photos and stuff like
2    that for marketing.
3    Q.    Do you still do -- have you done any heat sensor
4    images?
5    A.    No, sir.
6    Q.    Have you been asked to do it?
7    A.    No, sir.  I wish that would take off but it hasn't
8    yet.
9    Q.    If you're asked to do that, would you feel
10   comfortable doing that?
11   A.    As long as it wasn't an orthomosaic map, I would.
12   Q.    Okay.
13         And so essentially -- and I don't want to try to
14   oversimplify this whole lawsuit factually, but factually,
15   you're -- the thing that you're not able to do that you did
16   before is the orthomosaic maps?
17   A.    Yes.  And then, like I said, the 360 stitching
18   pictures, the terminable, mappable 360 photo.
19   Q.    But that's not in your lawsuit.
20   A.    It would be if you are considering the stitching.
21   Q.    Okay.
22         I guess, paragraph 28, another example of work
23   that you did previously was taking aerial photographs, not
24   orthomosaic maps, and adding rough boundaries for the
25   property that you were asked to photo; correct?

1     A.   Yes.

2     Q.   And that's something you did prior that you don't

3 do anymore?

4     A.   No.  I just take pictures.  I let the Realtors

5 know if they want the lines on, they'll have to do it, which

6 they are fine in doing.

7     Q.   And you're not licensed as a land surveyor in

8 North Carolina; correct?

9     A.   No.  No.  Nor do I want to be.

10     Q.   Just so I'm clear on what you've done to make

11 changes to your business model, you no longer use

12 DroneDeploy to generate orthomosaic maps?

13     A.   No, sir.

14     Q.   And you no longer draw lines on photos?

15     A.   No, sir.

16     Q.   Other than that, you're operating the same as you

17 were before?

18     A.   Yes, sir.

19     Q.   And one other thing -- I guess the third thing is,

20 you no longer do the 360-degree or do you still do that?

21     A.   The 360 navigable photos?  No.

22     Q.   360 navigable?

23     A.   Yeah, that's the best way to describe it, I guess,

24 because you can turn to navigate in them.  But no, due to

25 the stitching.

Michael Jones - 7/21/21

144

1    Q.    And why do you not do that?  Who told you you

2    couldn't do that?

3    A.    Mr. William Casey.

4    Q.    Okay.

5    Other than Mr. Casey, did anyone say you can't do

6    that?

7    A.    Nope.  He's the only one I talked to.

8    Q.    And if you were successful in your lawsuit, what

9    would you -- how would you change your business going

10   forward?

11   A.    I would start advertising and looking to get some

12   of these things I mentioned I wanted to do, like the parking

13   lot paving inspections; I still get calls for those.

14   Roofing inspections; I still get calls for those.  And

15   progress -- progression maps for, you know, developers or

16   real estate people who develop in neighborhoods and property

17   managers who have, like, shopping centers; I get calls for

18   that.

19   Q.    And when you --

20   A.    So I would try to advertise and point back to

21   those people to let them know that now I'm clear from the

22   State and I'm available to do these maps if you still want

23   them.

24   Q.    And so essentially you would advertise that you

25   are cleared or available to do orthomosaic maps?

145

```
 1        A.    Orthomosaic mapping, yes, sir.
 2        Q.    And in order to do that mapping -- and just so
 3   that we're clear, that would be something where you would
 4   take certain information from the client and you would input
 5   it into the computer program?
 6        A.    Yes, sir.
 7        Q.    And you would make selections on altitude and
 8   speed and maybe some other items and essentially push a
 9   button and fly the drone -- it would create a flight plan
10   and then you'd fly the drone?
11        A.    Yes, sir.
12        Q.    And then you would fly the drone, collect the
13   data, you would take the data, transfer it to your computer,
14   and then you would run it through DroneDeploy software, and
15   that software would generate an orthomosaic map, and then
16   you'd just take that work product by -- that was generated
17   by DroneDeploy and you'd send it to the client?
18        A.    In PDF.
19        Q.    In PDF?
20        A.    Or JPEG, could do either.
21        Q.    And that information that you're providing to the
22   client doesn't have any work product of your own in the form
23   of analysis or commentary or any type of data.  You're not
24   providing them with distances or --
25        A.    No.  No, sir.
```

Michael Jones - 7/21/21

146

1     **Q.**  Let me ask you to turn to page 19.  Paragraph 93

2  says:  "Plaintiffs want to create, process, and communicate

3  information - for example, aerial images, 3D digital models,

4  and data about land and structures."

5         Do you see that?

6     **A.**  **Yes, sir.**

7     **Q.**  All right.

8         And when you say "create, process, and

9  communicate," is it the same example that we talked about

10  with using DroneDeploy software?

11     **A.**  **Yes, sir.**

12     **Q.**  Okay.

13         And on top of the DroneDeploy software, you're

14  talking about just taking regular old JPEGs or aerial

15  images?

16         **MR. GEDGE:**  Object to form.

17     **Q.**  Okay.

18     **A.**  **I'm sorry.  I didn't get the question.**

19     **Q.**  Yeah.

20         So on top of the example of creating an

21  orthomosaic map using DroneDeploy, are you also talking

22  about just generating aerial images in the form of JPEGs?

23     **A.**  **Yes.  I would continue to do what I'm doing now as**

24  **far as my workflow now on top of this.**

25     **Q.**  And it's your contention to the Court that the

147

1  creation, processing, and dissemination of orthomosaic maps

2  is speech?

3      A.   Yes.

4      Q.   And you're talking about speech on your behalf,

5  right, 360 degrees -- 360 Virtual Drone Services LLC and/or

6  Michael Jones?

7      A.   Yes, sir.

8      Q.   Okay.

9           And tell me about your speech.  What is -- what

10  part of that process in generating orthomosaic maps are we

11  talking about your personal speech?

12      A.   I'm not sure how to answer.

13      Q.   Okay.

14           Because I've asked if you -- you know, do you --

15  what input do you have into it, what type of commentary do

16  you have, what type of analysis do you have, how do you

17  affect or alter the map that is created by DroneDeploy.

18           And I've essentially received, "I don't do

19  anything except take the inputs from the client and

20  create -- run the drone, process the data, and DroneDeploy

21  sends it to me and I just send it to the client."

22      A.   Uh-huh.

23      Q.   Is that true?

24      A.   Yeah.  But I don't get the question you're asking

25  after that.  I don't -- I'm sorry.

Michael Jones - 7/21/21

148

1    Q.    Yeah.  That's the predicate for the question.

2         Is that all true, how I explained it?  And if it's

3    not, if it's not accurate, let me know.

4    A.    Say it one more time, if you don't mind, so that

5    I'm clear.

6    Q.    I'll do my best.

7         So you're taking inputs from the client; right?

8    A.    Uh-huh.

9    Q.    You are using DroneDeploy software; correct?

10   A.    Okay.  Yes.

11   Q.    You're inputting certain information from the

12   client on altitude, the software is generating certain

13   automatic things for you like speed?

14   A.    Yes, sir.

15   Q.    The client is telling you how they want the

16   overlay and what distance they want you to complete --

17   they're giving you that information; right?

18   A.    Yes, sir.

19   Q.    And you're feeding that into the program to create

20   this flight plan?

21   A.    Yes.

22   Q.    You push a button, the flight plan is done; right?

23   A.    Yes, sir.

24   Q.    And then the drone flies the flight plan?

25   A.    Yes, sir.

1    **Q.**    And collects data.  You take the data, you run it

2    through DroneDeploy software, and they spit out this

3    orthomosaic map and you send it to the client?

4    **A.**    Yes.

5    **Q.**    Where is your personal speech in all that that

6    you're saying is being violated?

7    **A.**    I don't know if I feel comfortable answering

8    because I don't know laws that well.  I would hate to

9    misword something and it not be accurate.  So I would -- I

10   don't know how to answer that.

11   **Q.**    Well, it's your lawsuit; right?

12   **A.**    Mine and 360, the same.

13   **Q.**    Okay.

14        And you're saying that by not being able to

15   create, process, and disseminate this orthomosaic map, it's

16   violating your First Amendment rights?  That's what your

17   lawsuit says; right?

18   **A.**    Yes, sir.

19   **Q.**    Okay.

20        And I'm just trying to -- as best you can do,

21   explain to me how that is.  What speech are you personally

22   worried about that you're trying to protect?

23   **A.**    That's -- to me, that's too deep into the law.  I

24   mean, I wouldn't feel comfortable even starting to give you

25   any answer on that.

150

1       **Q.**   Yeah.  I'm not asking you to give me a legal

2  analysis on the First Amendment.

3       **A.**   **Yeah.**

4       **Q.**   I'm just asking for your own -- what speech are

5  you worried about that you're saying to Judge Flanagan, "I

6  need you to protect this speech that's subject to First

7  Amendment protections" from your viewpoint?

8       **A.**   **Again, I don't know how to answer it.  Sorry.**

9       **Q.**   Okay.

10       So you don't have to -- can you identify any

11  speech for me that you're worried about?

12       **A.**   **Again, that's getting into the law thing.  I would**

13  **rather him take care of that part, as far as that.**

14       **Q.**   Right.

15       And I can't -- unfortunately, I can't depose him.

16       **A.**   **Sure.**

17       **Q.**   I would love to do that but I'm not allowed to.

18       **A.**   **I understand.**

19       **Q.**   It's your lawsuit, and if you can't identify

20  speech, that's fine --

21       **A.**   **Yeah.**

22       **Q.**   -- but I just want you to do the best you can to

23  tell me, "This is what I'm concerned about, this is what I'm

24  trying to protect, this is the speech I'm identifying," if

25  you can.  If you're not able to do that, then you just

Michael Jones - 7/21/21

151

 1    say --

 2        A.    I'm not comfortable doing it.  That's my best

 3    answer.  Yeah.

 4        Q.    Okay.

 5              Do you know if the board ever asked you for any

 6    examples of your work product?

 7        A.    They never asked me.  When I met with William

 8    Casey, I could clearly see all the data he had of mine;

 9    so -- but I never asked for it, but they did have it.

10        Q.    What data did they have?

11        A.    Stuff off my work site, stuff I sent in,

12    screenshots of different screens from my website or the

13    Droners.io.  Everything I see in here, I mean, I could see

14    that in his folder as he was working.  So -- but I was never

15    asked for it; he had it prior to getting there.

16        Q.    Did you ever provide an example of an orthomosaic

17    map?

18        A.    No.

19        Q.    Did it matter from -- as best you understand it,

20    from the board's perspective as to whether or not the map

21    was of an industrial site, of a commercial site, of a farm,

22    of a home?  Did any of that matter?  In other words, the

23    specific content of the thing?

24        A.    Not that I'm aware of, they didn't specify that

25    any of it made any difference.

Michael Jones - 7/21/21

152

 1      Q.    Okay.

 2            So the type of information specifically that was

 3      being produced, it didn't -- do you know if -- whether the

 4      board ever communicated to you that it mattered what type of

 5      project you were working on?

 6      A.    No, sir.

 7                 (Recess taken, 2:24 to 2:35 p.m.)

 8      Q.    Mr. Jones, I just want to make sure I'm clear on

 9      your lawsuit.

10            But you're seeking the ability, are you not, under

11      paragraph 77, to provide orthomosaic maps to paying clients?

12      A.    Yes.

13      Q.    Okay.

14            And you would do that using DroneDeploy?

15      A.    Honestly, I'd use something else.  DroneDeploy is

16      not a leading division in that field.  Pix4D is the top one.

17      Q.    And prior to receiving the June 2019 letter, you

18      were using DroneDeploy?

19      A.    I was using DroneDeploy, yes, sir.

20      Q.    And you were -- as I understand it, you were

21      inputting certain information into the software in order to

22      generate this preflight plan; right?

23      A.    Yes.

24      Q.    And at the end of the day when you got the data

25      from them and they did the -- they process this orthomosaic

Michael Jones - 7/21/21

153

1   map, you turned it into a PDF and you sent that to the

2   client?

3        A.   Yes, sir.

4        Q.   And do you know -- when they get that PDF, do you

5   know what they can do with the PDF -- the client?

6        A.   I'm thinking they could do many things with it,

7   but monitor progress is one, you know -- like we went

8   through the list earlier, safety, quality control -- those

9   are just several things they can do with it.

10       Q.   And you mentioned the -- one option would be,

11  although you never did this, but you could send them the

12  link with the log-in information and they could access

13  DroneDeploy and do all kinds of calculations; right?

14       A.   Kind of like a Google Share Map or if you ever had

15  a DocuShare.  So it's not really -- they don't log in to

16  your account, but you make them kind of an admin user on

17  this profile.  Then they have access to do it.  And you can

18  see -- everyone can see all of their actions, every note as

19  they go in.  For example, they may go in and put a note in

20  that says, "Here on this map, this pile needs to be moved by

21  Friday."  The site manager would see it, I would see it,

22  everybody involved with it -- that's kind of how it works.

23       Q.   And in that hypothetical -- that's a hypothetical;

24  right?

25       A.   Yes.

154

1      Q.    You never did that?

2      A.    Yeah, I never did get that far.

3      Q.    In that hypothetical, you would provide the client

4  information or data that they could then access to perform

5  all kinds of surveying calculations; right?

6      A.    Different tools.  I'm not sure what you're

7  considering surveying.  On the DroneDeploy site, they have

8  many tools that the user or I could use.

9      Q.    Right.

10          To do all kinds of calculations?

11     A.    Elevations.

12     Q.    Distances?

13     A.    Volumetrics.

14     Q.    Correct.

15     A.    Yes, sir.

16     Q.    Things that would, even in your view, right, when

17  you reviewed the statute, would fall under what the

18  North Carolina legislature has defined as "land surveying"?

19     A.    Let me try and make sure I understand the

20  question.

21          You are asking me do I think the board is saying

22  all this is classified under surveying and I can't do it?

23     Q.    No.

24          I'm not saying that.  With -- your hypothetical,

25  providing --

Michael Jones - 7/21/21

155

```
 1        A.    Okay.
 2        Q.    Not providing the PDF, but providing the link and
 3   access to DroneDeploy --
 4        A.    Okay.
 5        Q.    -- and the ability to perform all kinds of
 6   measurements and calculations, would you agree that you're
 7   giving the client the ability to perform surveying?
 8        A.    I'm not sure I want to define what surveying is
 9   because I don't see it as surveying, but the board may have
10   a definition of surveying that they say ...
11        Q.    Well, the legislature defined it; right?
12        A.    I'm not sure who.
13        Q.    Okay.
14              Well, there's the Exhibit 5 -- do you have that in
15   front of you?  Chapter 89C?
16        A.    This one?
17        Q.    Yes.
18              Do you understand that this is a general statute
19   that was enacted by the North Carolina legislature?
20        A.    Yes.
21        Q.    Okay.
22              And if you flip to the second page, under 89C-3,
23   do you see where it has:  "7, Practice of land surveying"?
24        A.    Yes.
25        Q.    Okay.
```

1              And the legislature indicated that "providing

2     professional services such as consultation, investigation,

3     testimony, evaluation, planning, mapping, assembling, and

4     interpreting reliable scientific measurements and

5     information relative to the location, size, shape, or

6     physical features of the earth" -- do you think the data

7     you're providing the client would allow someone to perform

8     these type of measurements and information relative to the

9     location, size, shape, or physical features of the earth?

10         A.    Well, again, I can read this document.  I can see

11    what this document's saying, what they're saying is this;

12    but no, I don't agree that what I was providing -- to

13    provide the client the option to go into DroneSurvey [sic]

14    and pull a measurement is not, you know, giving them access

15    to perform a surveying task.

16         Q.    Are you providing the client data with the ability

17    or someone else the ability to perform these measurements,

18    if you know?

19         A.    With the -- am I providing them with the ability

20    to perform the measurements?  I'm providing them with the

21    software that you have the option to do that in.

22         Q.    Correct.

23         A.    Yes.

24         Q.    All right.

25              And do you know that the information you're

157

1  providing them is reliable or contains reliable scientific
2  measurements?
3      A.   Do I know if the measurements are scientific?  Is
4  that --
5      Q.   Yeah.
6           Do you know if the map, the orthomosaic map that
7  you're providing in the hypothetical with the ability to
8  access the DroneDeploy software, do you know if you're
9  providing them with reliable scientific data?
10     A.   Some of it, yes.
11     Q.   Okay.
12          And how do you know that?  How have you been able
13 to confirm that?
14     A.   Just with the measurement that I mentioned
15 earlier, by pulling the tape on the ground and then
16 confirming with the measurement from the photos captured.
17     Q.   So you took a -- one orthomosaic map that was --
18     A.   I measured -- sorry.
19     Q.   You took one photo or one orthomosaic map, you
20 plotted two points on that orthomosaic map, created a
21 distance, and then you went out and measured it.  And
22 because that one time was accurate, you're saying that
23 that's confirmed that this is an accurate scientific
24 measurement that you can provide to your clients?
25     A.   No.  I would not provide a measurable map to the

Michael Jones - 7/21/21

158

1  clients with any data telling them they could measure it or

2  it could be used for measurement.  I would make that clear

3  from the get-go, which I have always done.

4          So yeah, it -- that does provide them with the

5  option to measure.  Do I think it's stepping on the

6  surveying?  I don't.  I mean, to answer you question, yes, I

7  measured my driveway, I measured several orthomosaic maps

8  that I did with the tape and confirmed it.

9          Do I know that's scientific from doing those

10 measurements?  I mean, those -- that data informs me that

11 that is correct, yes.  As far as delivering it to the

12 client, I don't think I have a place to deliver it to the

13 client with saying you can measure off of it or anything.

14         So they're kind of two separate questions.  You're

15 asking me is the software capable of being able to do what

16 they're saying?  Yes, it is.

17         Do I break the surveying law by giving a client

18 something they could possibly go measure with?  I don't see

19 that at all.

20    Q.   When you say "they" are saying, it's --

21    A.   The board.

22    Q.   Okay.

23    A.   Sorry.

24    Q.   But are you not relying on DroneDeploy or whatever

25 software you would use to determine whether all of this is

Michael Jones - 7/21/21

159

1  scientifically reliable?

2      A.   The DroneDeploy is using that metadata in the

3  photos so I trust the metadata in the photos 150 percent.

4  That can't be incorrect; it's metadata in the photos.

5      Q.   Are you -- under paragraph 77, are you seeking to

6  provide clients with anything other than a PDF copy of the

7  orthomosaic map?

8      A.   No.  I'm just -- want to continue what I was

9  doing, which was delivering the PDF of an orthomosaic map.

10     Q.   As part of your lawsuit, are you trying to collect

11 data, provide that data to the client with the ability to

12 perform all of these calculations that we're talking about

13 for location, size, shape, and physical features of the

14 earth?

15     A.   No.

16              (Exhibit 7 marked.)

17     Q.   And quickly I'm going to show you what has been

18 marked as Exhibit Number 7.  And this is a document that was

19 generated -- or that we located on the internet that was

20 generated, a PDF document by DroneDeploy.

21     A.   Uh-huh.

22     Q.   And it says this -- and I know you can't identify

23 it, but I want to walk through it to see if this is

24 consistent with your experience with DroneDeploy.

25     A.   Yes, sir.

Michael Jones - 7/21/21

160

1      Q.    "This document is designed to serve as a

2  beginners' guideline to providing [sic] raw imagery in

3  DroneDeploy.  It covers flight planning, flight execution,

4  image processing, image export, and use in ArcGIS."

5           Do you see that?

6      A.    Yes, sir.

7      Q.    Okay.

8           And then the first topic, they talk about flight

9  planning.  And you and I have talked about that throughout

10  this deposition.  And that's something you did using the

11  software; correct?

12      A.    Yes, sir.

13      Q.    And it looks like they have a dashboard.

14           Does that dashboard -- is that similar to the

15  dashboard you were using?

16      A.    Yes, sir.  It looks familiar.

17      Q.    Okay.

18      A.    Unless they upgraded or something, pretty close.

19      Q.    And then the first thing you talked about is

20  selecting the area of the flight; right?

21      A.    Yes, sir.

22      Q.    Okay.

23           And it says on page 2:  "Once you create this

24  area, the flight path of the drone will be automatically

25  created, with the ability to change its direction under

Michael Jones - 7/21/21

161

 1   advanced settings"; right?

 2        A.   Yes, sir.

 3        Q.   Okay.

 4             Did you use the advanced settings?

 5        A.   Some jobs required the advanced settings; some

 6   didn't.

 7        Q.   And it says here:  "You can alter more settings

 8   for your flight plan, such as: slidelap."

 9             Do you know what sidelap is?

10        A.   That's what I mentioned earlier in the

11   overlapping -- the front, back, and sidelaps -- there's

12   front, back, and side overlaps on each photo.

13        Q.   And that's something that you had to -- you either

14   went with what was standard or you made changes to it;

15   correct?

16        A.   Yes, sir.  If it wasn't -- if the client suggested

17   anything different than what was default in the program, I

18   entered what the client wanted.

19        Q.   How about frontlap?

20        A.   Same.

21        Q.   So frontlap, you would go with what was the

22   recommended setting or you would ask the client what they

23   wanted to do?

24        A.   Yeah.  Just to be clear, so it has a default in

25   there; I'm not sure what the default is.  But if the client

Michael Jones - 7/21/21

162

1    had -- normally a client did have, "We want 70 percent front

2    overlap, 60 percent side overlap, and that's it," and if it

3    was different than what was default, then I changed it.

4        Q.    Flight speed is another calculation that you would

5    either go with the default --

6        A.    If I'm not mistaken, the DroneDeploy -- I don't

7    think you control specifically the flight speed.  I think

8    that is determined by a couple of other aspects, that that

9    determines the flight speed.  I think Pix4D you can adjust

10   the flight speed.  I could possibly be wrong on that.

11       Q.    DroneDeploy, this document on page 2 at the

12   bottom, does say:  "Flight speed: recommended flight speed

13   is 15 miles per hour or less."

14       A.    There you go.

15       Q.    Okay.

16             So it's something -- does that jog your memory as

17   to whether flight speed was something you would have to

18   input?

19       A.    I would have to open the program and look at it to

20   remember which one it is that you can adjust or the other

21   settings actually determine the flight speed.

22       Q.    Fair enough.

23       A.    I want say the overlapping and the how many passes

24   you made determined the flight speed, but ...

25       Q.    And then the next page, it has multiple camera

Michael Jones - 7/21/21

163

1    settings.

2             Do you know what that input is?

3        A.    Where are we at now?

4        Q.    On page 3, under -- the top is "starting

5    waypoint."

6        A.    "Manual camera settings"?

7        Q.    Yeah.

8        A.    Okay.

9        Q.    Do you know what that is?

10       A.    So this is that you could basically -- in

11   photography, you have manual and you have automatic.

12   Automatic, the computer decides everything; manual, I decide

13   everything -- the aperture, the F-stops, the shutter speed.

14   And that's basically what that is; you can either let

15   DroneDeploy use the autocamera or you can set it and

16   determine all those things manually yourself.

17       Q.    And what did you do?

18       A.    Manually.  Always manually on photos.

19       Q.    And then the second area or topic under this paper

20   is "Flight Execution."

21       A.    Okay.

22       Q.    Do you see that?

23       A.    Yes, sir.

24       Q.    It says:  "Once at the site, power on the drone,

25   acquire the GPS, and calibrate the compass."

Michael Jones - 7/21/21

164

1    A.    Yes, sir.

2    Q.    And as best I understand it, the drone is flying

3    the program that was set by you and it's being controlled by

4    the software?

5    A.    Yes, sir.

6    Q.    Okay.

7    A.    But I do have control of it at all times if

8    anything happens.

9    Q.    And then the next page, do you see number 3,

10    "Image Processing"?

11    A.    Yes, sir.

12    Q.    All right.

13    And this sounds like what you were describing

14    earlier, where you upload the images from an SD card to your

15    computer; correct?

16    A.    Yes, sir.

17    Q.    "For best quality maps, manually review the photos

18    and delete any that are not nadir," n-a-d-i-r, "(looking

19    straight down), as well as any that are blurry, show part of

20    the horizon, or have lighting issues."

21    Did you do that?

22    A.    Yeah.  You have to click over your photos to make

23    sure, you know, the photo turned out okay.

24    Q.    And did you delete photos that didn't turn out

25    okay?

Michael Jones - 7/21/21

165

1    A.    I mean, occasionally there was one that, you know,

2    maybe took with the shutter door half open.  Usually it was

3    pretty head on, though.

4         Q.    And then you would select the photos that you

5    wanted to upload into DroneDeploy?

6         A.    Yes.

7         Q.    Okay.

8               And then it says:  "Continue on to processing.

9    Specify the map type as 'terrain' or 'structures.'"

10              What would you typically select?

11        A.    Terrain.

12        Q.    And why would you select terrain?

13        A.    Structures are for if you're going for the 3D

14   models.  Remember I was telling you earlier it was kind of

15   flowing and captured in a different pattern, that makes it

16   a -- capture more of a 3D kind of cloud.

17        Q.    And the next page says:  "When you are ready,

18   begin processing.  This will take several hours."

19              Is that your experience, it takes several hours?

20        A.    Yes, sir.

21        Q.    And then under 4, "Export Image," it says:  "Once

22   processing is complete, you will see the final, stitched

23   area -- stitched image of the area.  This can be viewed as a

24   2D map (pictured), a 3D model, NDVI imagery as an indicator

25   of plant health or, elevation model."

Michael Jones - 7/21/21

166

1           Is that true?

2       A.    Yes, sir.

3       Q.    And then do I understand your testimony to say

4   that you would take the 2D map and turn it into a PDF?

5       A.    Yes.

6       Q.    Okay.

7           Next page, it says:  "You have the choice of

8   exporting it as a GeoTIFF, JPEG, or PDF, depending on what

9   you need as a final product."

10          And it sounds like you selected PDF?

11      A.    Yes, sir.

12      Q.    And that's what you're looking to do going

13   forward?

14      A.    JPEG or PDF.  The client probably is not even

15   knowledgeable of the difference; so PDF are probably the

16   choice just standard across the board.

17      Q.    And then the next -- number 5 is "Use in ArcGIS:

18   Once the image is exported, you will receive an e-mail with

19   a link to download.  Once downloaded, unzip the folder in

20   your desired location.  Create a new project in ArcMap or

21   ArcPro and add the image."

22          Do you know what they're talking about here?

23      A.    Yes, I do.

24      Q.    Okay.

25          What is this?

Michael Jones - 7/21/21

167

1      A.   I never had to do that.

2          That's if you wanted to put, like, a KML-type

3 extension and it would create -- you could look at this map

4 project on, say, Google Earth.  It would actually overlay

5 your map product over the standard image it had if you had

6 the metadata to put it there.

7      Q.   And that's not something you used?

8      A.   No, I never used it.

9      Q.   Okay.

10          (Exhibit 8 marked.)

11      Q.   I want to show you what has been marked as Exhibit

12 Number 8.  Exhibit Number 8 is an e-book that is put out by

13 DroneDeploy on making great maps.

14          And it is -- it says:  "We start this e-book by

15 describing the basic process behind Map Engine."

16          Is that what you use, Map Engine?

17      A.   I'm assuming Map Engine is just what they call

18 their processing software.

19      Q.   And then if you flip to page 5 --

20      A.   Yes, sir.

21      Q.   -- it says:  "It is important to first understand

22 the basic concept between drone photogrammetry."

23          Do you know what drone photogrammetry is?

24      A.   Yes.

25      Q.   Okay.

Michael Jones - 7/21/21

168

1              What is that?

2         A.    The stitching together of multiple photos -- well,

3    using a drone obviously.

4         Q.    Do you know how it works?

5         A.    For the most part, I mean ...

6         Q.    When they talk about here -- can you explain what

7    your knowledge is about how this process works?

8         A.    The stitching, like building a map?

9         Q.    Drone photogrammetry.

10        A.    Yeah.  It's pretty much what we described several

11   times, that you go, collect the photos with the drone, you

12   come back, put it in a software that stitches the photos

13   together via the metadata, creates an orthomosaic map, and

14   export that multiple types of files to deliver to your

15   client.

16        Q.    Do you understand how the software works?  Because

17   they explain --

18        A.    Okay.

19        Q.    What's your understanding of how the software

20   works?

21        A.    It stitches everything together in a cloud-based

22   structure from where it's actually located in space, like if

23   you're doing 3D structures, then it takes -- it has point

24   clouds of whatever you're doing, the map building,

25   structures, terrain, and then it inputs that together in a

1  navigable whole image.

2      Q.   And then DroneDeploy talks about key points.

3          Do you know what that means when they're using key

4  points to do this process?

5      A.   I mean, I'm assuming key points are just things

6  you need to know, like certain parts of the process.  I

7  don't know what they're referring to as key points.

8      Q.   Do you know anything about key points?

9      A.   No, sir.

10     Q.   Have you ever been trained in key points as it

11 relates to drone photogrammetry?

12     A.   No, sir.

13     Q.   This talks about choose the correct flight

14 planning modes, and it has nonstructures, flight mode,

15 structures mode -- is that something we just talked about a

16 minute ago?

17     A.   Yes.  Terrain and structure, yes, sir.

18     Q.   And then if we go to page 9, there's a section on

19 POI, point of interest.

20         Do you know what they're referring to here?

21     A.   Yes, sir.

22     Q.   Okay.

23         What are they referring to?

24     A.   Point of interest -- if you were taking, say, a

25 5-acre field with a building in the middle of it and you

1  were doing an orbit around it to capture the data, the point

2  of interest would be the building, the part that you stay

3  focused on.

4      Q.  Have you seen this e-book before?

5      A.  No, sir.

6      Q.  When you said you studied or looked on, you know,

7  Google or went to YouTube on learning about DroneDeploy, do

8  you remember anything specific that you watched or read?

9      A.  Like, I studied most of the mapping stuff through

10  Drone U, which is Drone University, but they're called

11  Drone U, and they have just, you know, courses you can take

12  on mapping, on creating maps, photogrammetry.  I just went

13  through those and took all those courses and am still in the

14  process of learning it all.

15      Q.  If you would flip to page 17, this is the advanced

16  panel section of the e-book.

17      A.  Okay.

18      Q.  Have we talked about that before already, the

19  advanced panel and some of the inputs that you would have to

20  make in order to get the flight plan ready?

21      A.  We mentioned advanced planning a while ago, yes.

22      Q.  Okay.

23          How about resolution?  Was there any way to alter

24  resolution or do you know how resolution worked within

25  DroneDeploy software?

171

```
 1        A.    Not in the DroneDeploy software, no.
 2        Q.    How about within the equipment that you used for
 3   the clients?
 4              Did you know how to alter or make any changes to
 5   resolution or generate a work product that had a certain
 6   resolution?
 7        A.    Yeah.  I mean, the resolution is going to be
 8   whatever the resolution of the camera is in the drone; so I
 9   don't know how you could alter that.
10        Q.    Okay.
11              Does resolution have anything to do with altitude?
12        A.    No.
13        Q.    And then after creating the flight plan,
14   there's -- Chapter 8 on page 40 is "Processing."
15        A.    Okay.
16        Q.    On page 42, "Processing Modes" -- I think we
17   talked about this earlier, but they have two main processing
18   modes that you can choose to process your data in, terrain
19   mode and structures mode.
20        A.    Yes.
21        Q.    Okay.
22              And you generally pick terrain mode?
23        A.    Terrain, yes.
24        Q.    And then page 44, chapter 9, "Quality Check Your
25   Data and Map."  It says:  "Once your map completes
```

Michael Jones - 7/21/21

172

1  processing, there are steps you can take each and every time
2  to help you understand how accurate your data is and the
3  reasons behind its accuracy.  These steps are the basic
4  troubleshooting steps that DroneDeploy support uses when you
5  reach out with a question regarding the quality of your
6  map."
7          Did you ever take any steps to check your data and
8  map or troubleshoot the data and map?
9      A.    After the map was processed, I never did because
10  my -- those maps I was creating were never that -- the
11  accuracy was never that important because I was -- it was
12  just for visual purposes.  So whatever the process was when
13  I got finished was always good enough for me.
14      Q.    Why do you say that?  Why do you say the accuracy
15  was never important?
16      A.    Because the clients I was delivering the products
17  weren't using anything that accuracy would be required for.
18  They wouldn't need the accuracy to see the picture.  The guy
19  just wants to see, like, hey, did my cement pile
20  get delivered, did they set that building like they wanted.
21  Like, there's no accuracy in that.  It's just the building's
22  there visibly or it's not.
23      Q.    And when you are hired, do you have engagement
24  letters with your clients?
25      A.    Define "engagement letters."  What do you mean?

Michael Jones - 7/21/21

173

1      Q.    A contract?

2      A.    Contracts?  Yes, sir.

3      Q.    Okay.

4            And do you still have copies of those contracts?

5      A.    No, probably not.  I probably wasn't hard on

6    contracts that early in the business as far as, you know,

7    locking down stuff.  I do it more now since I've grown

8    but --

9      Q.    How about e-mails?  Did you have e-mails with your

10   clients talking about, "Hey, I need you to do this"?

11     A.    Maybe that Steve guy, Steve Adair, possibly.  But

12   me and him talked a lot on the phone.

13     Q.    Did any client ever hire you to provide any type

14   of data other than they would use for, what you say,

15   visualization?

16     A.    No.

17     Q.    Do you know if the data you provided them was

18   accurate?

19     A.    To what?

20     Q.    To --

21     A.    It was an accurate picture, yes.

22     Q.    Okay.

23           Do you know if it was accurate enough to do other

24   types of calculations other than just using it for

25   visualization?

Michael Jones - 7/21/21

174

1      A.   I wouldn't use it for anything or suggest them use

2  it for anything except visualization.

3      Q.   And why is that?  Why wouldn't you do that --

4  suggest that?

5      A.   Because that's not the intent of the product.

6      Q.   What was the intent of the product?

7      A.   A visual representation.

8             (Recess taken, 3:03 to 3:05 p.m.)

9      Q.   Mr. Jones, I appreciate your time today.

10     A.   Thank you.

11     Q.   And really appreciate you staying patient with me.

12     A.   Yes, sir.

13     Q.   There's a lot of technical stuff that I don't have

14  a background in, and so I appreciate you --

15     A.   Same here.

16     Q.   -- sitting through and listening to my questions

17  and answering my questions.

18             Is there anything -- are there any of those

19  questions that you answered that you would like to either

20  change your testimony or say, "Hey, I'm not sure I

21  understood that question," that you can think of?

22     A.   Not off the top of my head.  I was pretty honest,

23  I think, in the questioning.  If I didn't understand it, I

24  told you.

25     Q.   And is there anything that you weren't asked about

1  that you think is important related to the lawsuit that you

2  filed against the board?

3      A.   Not that I can think of.

4      Q.   Thank you.

5              MR. HANNA:  I don't have anything further.

6              MR. GEDGE:  I may just have a few questions.

7              (Recess taken, 3:06 to 3:13 p.m.)

8                       EXAMINATION

9  BY MR. GEDGE:

10     Q.   All right, Michael.  Just to clarify a couple of

11 points.

12          You want to be able to take photographs using your

13 drone; is that right?

14     A.   Yes.

15     Q.   You want to be able to use those photographs to

16 create orthomosaic maps; is that right?

17     A.   Yes, sir.

18     Q.   You want to be able to provide those orthomosaic

19 maps to paying customers?

20     A.   Yes, sir.

21     Q.   Would those orthomosaic maps communicate

22 information?

23     A.   Yes, sir, I think so.

24     Q.   You want to use photos taken with your drone to

25 create 3D digital models; is that right?

Michael Jones - 7/21/21

176

1      A.   I would like to, yes.

2      Q.   Would you like to provide those 3D digital models

3 to paying customers?

4      A.   I would.

5      Q.   In your view, do those 3D digital models

6 communicate information?

7      A.   They do.

8      Q.   Last question on this point, but you would also,

9 as I understand it, like to use the photos taken with your

10 drone to create images on which you will draw lines roughly

11 approximating the boundaries of property; is that right?

12     A.   Yes.

13     Q.   You want to provide those to willing clients?

14     A.   Yes.

15     Q.   For example, real estate agents?

16     A.   Yes.

17     Q.   Would those images, in your view, communicate

18 information?

19     A.   Yes, they would.

20     Q.   Now, as I understand it from your conversation

21 with Mr. Hanna, the orthomosaic maps on DroneDeploy's actual

22 program that you have an account on, those maps contain

23 certain tools that let you -- for example, that let you

24 calculate the volume of a stockpile; is that right?

25     A.   Yes, sir.

Michael Jones - 7/21/21

177

1    Q.    Okay.

2          And another tool would let you identify the

3    elevation of a point of land --

4    A.    Yes, sir.

5    Q.    -- on a map?

6    A.    Yes, sir.

7    Q.    Okay.

8          And another tool, as I understand it, would let

9    you calculate the distance between Point A and Point B on

10   that map?

11   A.    Yes, sir.

12   Q.    All using the DroneDeploy program?

13   A.    Tools, yes.

14   Q.    All right.

15         Now, as I understand it, you testified that

16   between 2017 and 2019, none of your clients asked you to

17   provide them that information; is that right?

18   A.    No.

19   Q.    None of your clients asked you to give them access

20   to that information?

21   A.    No.

22   Q.    Okay.

23         If in the future a client were to want access to

24   that information, would you like to have the ability to

25   provide that client access to that kind of information?

Michael Jones - 7/21/21

178

1      A.    I would like to, yes.

2      Q.    You might recall a part of your conversation with

3   Mr. Hanna where you were discussing, like, a subprovision or

4   a sub subprovision of the North Carolina General Statutes.

5            Do you remember that?

6      A.    Yeah, I think so.

7      Q.    Okay.

8            I believe the subprovision had to do with the

9   definition of surveying.

10     A.    Oh, okay.

11     Q.    Is that right?

12     A.    Yes.

13     Q.    Okay.

14           Are you -- you're not a lawyer; is that right?

15     A.    No.

16     Q.    Okay.

17           Are you an expert in parsing complex statutory

18  language?

19     A.    No, sir.

20              MR. GEDGE:   Okay.  I think that's all I have.

21                          EXAMINATION

22  BY MR. HANNA:  (3:17 p.m.)

23     Q.    Just a quick follow-up.

24           You were asked about would orthomosaic maps convey

25  information to the client.

The Amanuensis, LLC, d/b/a Pittman Stenography
PO Box 47, Wake Forest, NC 27588 * * * pittmanstenography.com

J.A. 759

Michael Jones - 7/21/21

179

1       A.    I was asked that, yes.

2       Q.    And you said yes?

3       A.    Yes, I think it does.

4       Q.    And what type of information does it convey to the

5  client?

6       A.    Again, the same list we went over:  Quality

7  control, quality -- management control of the progress,

8  progression of the site -- any of those things is

9  information to the client.  If the client wanted to, you

10 know, find out if this is being done on the site, that's

11 information to the client, I think, under my definition.

12      Q.    Does the orthomosaic map create information?

13      A.    Create information?  It provides information; it

14 doesn't create information.

15      Q.    Does it communicate information?

16      A.    It communicates information, yes.

17      Q.    Does it matter if the map is conveyed to the

18 client in PDF form or whether you provide a link with log-in

19 instructions?

20      A.    Does it matter?  Is that what you said?

21      Q.    Yes.  Does it make a difference?

22      A.    No.  Not to -- the actual product itself, does it

23 change?  Is that what you're asking?

24      Q.    No.

25            Does it change the type of information that's

Michael Jones - 7/21/21

180

1   communicated.  In other words --

2       A.   Oh, no, no, no.  That's just a format.  But it

3   does not change any information communicated.  PDF is the

4   same as a JPEG.

5       Q.   Does it change what the client can do with the

6   information or what you can do with the information?

7       A.   No.

8       Q.   All right.

9            So the JPEG can be used -- I can use all the same

10  tools on the JPEG that I can use by getting the link and

11  logging in to the program?

12      A.   No.

13      Q.   Okay.

14           So it does make a difference?

15      A.   No.

16      Q.   All right.  I'm confused.

17      A.   Yeah, the question -- the question that you asked

18  is confusing, but it's partly incorrect.

19           So if you're asking does it change or make a

20  difference in the format -- so if I have a JPEG and a PDF

21  and I was going to give this to that young man there, what

22  he could do with it wouldn't make any difference.

23           Then the second question you asked was does it

24  take away the tools.  So now we're talking about two

25  completely separate things.  We're talking about a file here

 1  and you're asking me does it change whether it's a JPEG

 2  format.  No, it would not change it.

 3       When you take that and go into DroneDeploy, now

 4  you're working on their platform.  You're not working on a

 5  file anymore; you're working on their platform and how that

 6  platform interacts with the files I'm giving it.

 7       Is that clear?

 8    Q.   Yes.

 9    A.   Okay.

10    Q.   And what you've done historically is you've

11  communicated information to them, to the clients, by

12  providing them a PDF copy of the orthomosaic map?

13    A.   Yes, sir.

14    Q.   Okay.

15       And that information that you're communicating to

16  them in the PDF document, are they able to use tools to do

17  all these calculations on volume and distance?

18    A.   No, sir.

19    Q.   Okay.

20       But if you were able to give them access to the

21  program, they could then go in, right, and they could

22  perform all kinds of calculations?

23    A.   If I gave them -- added them as a user to the

24  profile, yes, sir.

25    Q.   You could do that as a user.  You could use those

Michael Jones - 7/21/21

182

 1  tools to provide -- perform calculations on volume,

 2  distance, all that; right?

 3       A.   Yeah.  Anyone with access to a DroneDeploy account

 4  could do those -- use those tools.

 5       Q.   And, historically, you've been hired to provide

 6  these orthomosaic maps in PDF form?

 7       A.   Yes.

 8       Q.   And in response to your attorney's question, you

 9  said, "I would like to provide client access to tools to

10  perform calculations on volume and distance."

11            Why would you like to do that?

12       A.   Because, I mean, from a business standpoint, it

13  would be a lot of work if they -- if I could get

14  construction sites to sign on monthly to a subscription to

15  have me do progression flights of their job sites and the

16  tool, as far as volumetrics, they could use that to measure

17  stockpiles, dirt, rock, make sure they've been delivered,

18  how -- what has been delivered.  I mean, on and on as far as

19  information.

20            I would like to be able to deliver that to a

21  client, clearing you guys saying it's okay.  In the future,

22  I would like to be able to do that and to deliver the link

23  and make them users on the drone profile where they could

24  use these tools.

25       Q.   What uses could be -- strike that.

Michael Jones - 7/21/21

183

1        How would potential clients be able to utilize

2   those tools?  Give me some examples.

3        A.   Well, I just gave you one, for the volumetrics.

4        Say there's a stockpile of two tons of crush --

5   two tons of crush-and-run dirt that's supposed to be

6   delivered on the north corner of this job site.  I fly it on

7   Friday.  The job manager checks Saturday.  There's no dirt

8   there.  Or there's a half a pile and he checks it and says,

9   "That's not two tons; it's supposed to be two tons."  That's

10  one.

11       Two, they could lay out a concrete pad for a

12  building and it could be 40 by 35 and they could go in and

13  measure and it could be 40 by 40 and they could say, you

14  know, "You guys built this 5 foot over measurement."

15       That's just a couple of examples.  You could go on

16  for days with things they could do with this.

17       Q.   Could they use it to actually design a concrete

18  pad, say, "Here's an area big enough and we could design a

19  40 by 30 concrete pad"?

20       A.   You'd have to get to the definition of the word

21  "design."  Could they plot out, like, "Hey, I want a cement

22  pad here" --

23       Q.   Right.

24       A.   -- and draw some kind of block to point to that

25  spot.

Michael Jones - 7/21/21

184

1      Q.    Right.

2      A.    Yes, they could do that.

3      Q.    Using the tools?

4      A.    As far as, like, planning to the point where, you

5  know, the concrete workers could go out and, using

6  DroneDeploy, they could tell all the dimensions and all

7  that, I don't think you could do that.

8      Q.    I'm just saying could they take the software --

9  the tools and the orthomosaic map and plot out, yeah, I'd

10  like to put a building here, I'd like to put a concrete pad

11  here, and actually map it out?

12      A.    No.  They couldn't do that anymore than you could

13  with a regular photo if I slid this over and said, "Map out

14  a couple of garages on it for me."  That's the ability --

15  they would be able to do it digitally, you know, where you

16  could take a pencil and draw a square and say, "I want a

17  building here."  They could go in DroneDeploy with a mouse

18  and draw a square and say, "I want the building here."

19          But as far as, like, putting up any kind of

20  details, "Hey, this pad needs to be 4-foot thick, and this

21  here" -- you can't do that.

22      Q.    So the difference, though, using the software,

23  they can go in and plot points, and they would be able to

24  plot a point here and that would show you a concrete pad

25  would be this measurement, this size by plotting points on

Michael Jones - 7/21/21

185

1  the DroneDeploy tools?

2      A.    I'm uncomfortable with the definition you're using

3  "plotting," because it -- you couldn't do any more plotting

4  in the digital representation as you could if I said, "Plot

5  me something" with a pencil here.

6      Q.    Okay.

7          How about if I go in and say, "I want to measure

8  the distance between two points on the orthomosaic photo"?

9  With the PDF, they can't do that?

10     A.    With PDF, they couldn't.  If they had access to

11  DroneDeploy, they could.

12     Q.    And how would they do that?

13     A.    They would use what's called the measuring tool

14  inside that program.

15     Q.    Could they use the measuring tool to measure a

16  location for a concrete pad?

17     A.    You can measure anything on the map with the

18  measuring tool.

19     Q.    Could you measure it -- use that tool to measure a

20  location for a second building?

21     A.    To measure, did you say?

22     Q.    Yeah.  Measure it, like, the space to place a

23  second building.

24     A.    Yes.

25     Q.    Okay.

Michael Jones - 7/21/21

186

1          So there's all kinds of usages that could be

2     undertaken by the client in order to -- or you or anyone who

3     has access, they could do all kinds of calculations on

4     volume and surface area --

5          A.    Yes.

6          Q.    -- and measured distances.

7          A.    Yes.

8          Q.    And you want the ability to do that?

9          A.    I would like to be able to provide the map for

10    them, you know, and then sell, you know, the map and the

11    access to the tools so -- in the future so they could use

12    the tools on the map that I created.

13         Q.    Okay.

14              So they could perform all kinds of calculations;

15    correct?

16         A.    Yes, sir.

17         Q.    All right.

18              It would allow you or the clients to perform

19    certain measurements on the site?

20         A.    You could measure distance with the tool, yes,

21    sir.

22         Q.    Size, shape, or physical features of the earth you

23    could measure?

24         A.    I'm not sure about shape as far as

25    three-dimensional stuff.

1      Q.    Location, size, or physical features of the

2 project -- meaning the dirt pile that you referenced, right,

3 you could perform those calculations?

4      A.    Yes.  With the tools in DroneDeploy, you could do

5 the volumetrics, the distance -- those are the few tools I

6 think they have.  Volumetrics, distance, and area I think

7 you can perform.

8      Q.    And you can perform conventional ground

9 measurements?

10      A.    Yes.

11      Q.    You could locate property lines, could you not?

12      A.    No.

13      Q.    You could not?

14      A.    Not in this map, no.

15      Q.    Okay.

16            Could you perform any type of elevation

17 calculations?

18      A.    Yes.

19      Q.    Could they take the data and modify it to --

20 essentially to create a -- chart a location where they might

21 want to put a concrete pad in and then actually take that

22 data, the tools, and generate yet another map showing where

23 that would be?

24            When I say "they," the client or yourself?

25      A.    It couldn't generate another orthomosaic map off

Michael Jones - 7/21/21

188

 1  that map, if that's you're asking.

 2       Q.    Okay.

 3             Could they create a PDF of where -- of the

 4  plotting of the points or the distances that were generated?

 5       A.    If they had access to DroneDeploy tools, then they

 6  could do the same as I could.  They could export the map in

 7  a PDF or JPEG or TIFF form.

 8       Q.    And that's something you would like them to be

 9  able to do?

10       A.    I would like, yes.

11       Q.    And you want to be able to take photos and lay out

12  the property lines in the photos?

13       A.    I would like to, because real estate agents, you

14  know, they do it and have been doing it for years.  So when

15  they hire somebody, usually what they say to them is, you

16  know, "This is the house and we'd like the property lines

17  around it."

18             So at this point, I'm just telling them, you know,

19  I can't do that.  But they do it anyway after I give them

20  the pictures.

21       Q.    And you want to be able to have the ability --

22       A.    I would like to be able to do it for them.

23       Q.    Yeah, I know.  Right.

24             You want to be able to set up the boundary of the

25  property line on the photos that you take?

Michael Jones - 7/21/21

189

1     A.   Yes.

2          And just for visual purposes, you know.  If they

3     have a neighborhood with 60 houses in it and I fly over it

4     with the drone, they need some kind of representation of,

5     "Hey, I'm talking about this house."  So, you know, it may

6     be a square red -- a red square around that property.

7     Q.   Do you have an example of a 3D digital model that

8     you've created --

9     A.   No.

10    Q.   -- from DroneDeploy?

11    A.   No, sir.

12    Q.   Do you know what -- you testified in response to

13    your lawyer's question that it would -- that type of 3D

14    digital model would communicate information.

15    A.   Yes.

16    Q.   Do you know what type of information it would

17    communicate?

18    A.   Measurements, height.  You know, as far as, like,

19    being able to look at a structure from the side of it, you

20    can rotate around it so you can look at the face of

21    buildings.  I never got that much into 3D modeling.  I

22    thought it was a fantastic thing that technology could

23    provide, you know, the tools to do, but I just never found

24    any work for it.

25    Q.   Anything other than -- that you can think of --

Michael Jones - 7/21/21

190

1   does it communicate any other information other than

2   measurements and height?

3       A.    Visual representation, of course.  I mean, you can

4   turn the entire thing around, look at it from different

5   views inside the software -- you know, rotate it like a

6   model, flip it upside down.

7       Q.    And this is the kind of data that you want to be

8   able to produce and send to clients?

9       A.    I would like to, yes, sir.

10      Q.    Okay.

11            And would you -- would that 3D modeling that you

12  provide them, would that -- do you know what kind of a

13  format that's provided in?  You know, what kind of file?

14      A.    They're different, 3D -- in OBJ files, there's a

15  few different ones.  I'm not diverse enough into it to

16  know -- I know OBJ was one of the file extensions.  Any 3D

17  model-type extension, and then you have a 3D model viewer to

18  view those.

19      Q.    And so --

20      A.    I haven't got that far down the road yet to figure

21  out what I would deliver it as.

22      Q.    So your lawsuit seeks to have the ability to fly

23  your drone, collect the data, and create 3D digital models

24  in a file format that you would send to a client?

25      A.    Yes, sir.

Michael Jones - 7/21/21

191

1    Q.   And that would have measurements and -- height

2    measurements.  Would it have volume measurements?

3    A.   On 3D models?  I wouldn't be comfortable answering

4    because I don't know.  I never got -- I don't think they

5    have volumetrics in it but, to be honest, I don't know if

6    they do or not.

7    Q.   Do you have any background or training in

8    producing 3D models?

9    A.   No, other than what I -- you know, self-taught

10   online.  It's very hard work, very tedious stuff.

11   Q.   Well, sounds like it's just a matter of signing up

12   for a software program and pushing a button.

13   A.   Oh, no.  Not the 3D models.

14   Q.   Okay.

15       Tell me about that.  What program would you use to

16   generate 3D models?

17   A.   I would probably use Pix4D.  It's the standard

18   right now.  I mean, that's canon for doing that for people

19   who create 3D models.

20   Q.   Do you have training in it?

21   A.   No.

22   Q.   So how would you do it?

23   A.   I would learn like I did everything else.  I can

24   learn anything.

25   Q.   Sitting here today testifying, do you know what

Michael Jones - 7/21/21

192

1  type of information other than measurements and height would

2  be communicated in the 3D model?

3      A.    Just a visual representation.  You know, the

4  ability to navigate the model around and turn it and shift

5  it, move it.

6      Q.    Would you want to be able to -- would that be

7  linked to any type of software program?

8      A.    Well, the 3D models are created through apps like

9  DroneDeploy or Pix4D.  So, I mean, as I said just a minute

10 ago, if I were to proceed in this, I would probably use

11 Pix4D to create the 3D models.

12     Q.    So if you sent me a file of a 3D model, would I

13 have the ability to use tools to do certain measurements?

14     A.    Inside of DroneDeploy, maybe; I'm not positive.

15 Again, I did not delve that much into the 3D model.  I mean,

16 I did a little.  I could never find any clients that were

17 interested in it.

18          So I'm not positive of all of -- of all the tools

19 in DroneDeploy for the 3D models.  Because in that window

20 when you open up the dashboard, that's a different view; so

21 you click orthomosaic, then you switch to the 3D model, the

22 whole screen changes, and I don't think you have those tools

23 available.  But I would have to open the website up and look

24 now to give you an accurate answer.

25     Q.    And so the way it was phrased, you want to be able

Michael Jones - 7/21/21

193

1    to -- the goal of your lawsuit, what you're asking the Court

2    to do is give you the ability to create orthomosaic maps and

3    communicate that information to a client?

4         A.    Yes.

5         Q.    A paying client?

6         A.    Yes.

7         Q.    And you also want to be able to give the clients

8    the ability to access tools in whatever program you're using

9    to perform whatever calculations they would want to perform?

10        A.    Yes.

11        Q.    And then the second thing is you want to be able

12   to have the ability, through this lawsuit, to create images

13   of land on behalf of paying clients with lines drawn showing

14   boundaries --

15        A.    Yes, sir.

16        Q.    -- of the property?

17        A.    Yes, sir.

18        Q.    Showing the property lines of the property?

19        A.    Yes, sir.

20        Q.    Okay.

21        A.    And if I could just, like, highlight on that, what

22   I want to do on that is I want to be able to provide the

23   clients with some sort of representation to pinpoint what

24   they're marketing.

25             I mean, just -- in this picture of this house, if

Michael Jones - 7/21/21

194

1  she wants that, I want to be able to put a line around it

2  without the board saying, "Hey, you're drawing property

3  lines," because I'm not drawing property lines because the

4  line is this wide, it would be 25 feet wide in real life.

5  You understand what I'm saying?

6          So I'm just looking to have the right to be able

7  to give the client something visually, to show, "Hey, I'm

8  selling this house."  And right now, the board's saying,

9  "You can't draw lines on the paper because you're doing

10  property lines."

11          And it isn't so much I want to do property lines;

12  I just want to have the ability to put a mark around this

13  property and say, "This square is what we're selling."

14      Q.    Your lawsuit is asking the Court to allow you to

15  create images, digital images; right?

16      A.    Yes.

17      Q.    For paying clients; correct?

18      A.    Yes.

19      Q.    Drawing on those images lines indicating the

20  approximate position of property boundaries?

21      A.    Yes, sir.

22      Q.    Okay.

23          And how would you do that?  How would you

24  determine the approximate property boundary?

25      A.    I would look through GIS on that property in that

Michael Jones - 7/21/21

195

1  county.

2      Q.   Do you have any training in this?

3      A.   No formal training, but it's -- there's nothing to

4  use.  I mean, you just type in the address and go to it and

5  all of the information is given there.

6      Q.   Do you have any training in using GIS?

7      A.   No.

8      Q.   And then the third thing you're asking the Court

9  to do is allow you to capture aerial images of land and

10 structures along with location data, coordinates, elevation

11 data, and volume data and making those images available to

12 paying clients?

13     A.   Yes, sir.

14     Q.   And as we talked about earlier, you're talking

15 about -- you're still doing that today, you're taking

16 pictures and you're providing the images to the pictures

17 [sic]?

18     A.   Yes, sir.

19     Q.   You're concerned that if the image contains any

20 type of metadata, you don't want to get in trouble for that?

21     A.   Yes, sir.

22     Q.   Okay.

23          And then the fourth thing you have is the 3D

24 digital models.

25     A.   Yes.

Michael Jones - 7/21/21

196

```
 1       Q.    Okay.

 2             Anything else?

 3       A.    That's it.

 4       Q.    All right.

 5             And you want to be able to not only give them the

 6  files for those four, let me say items 1 and 4, which is the

 7  orthomosaic maps and the 3D digital models, but you want to

 8  be able to give them access to any tools so they can perform

 9  whatever calculations --

10       A.    Yes.

11       Q.    -- they would want to do?

12       A.    That DroneDeploy would offer them, yes, sir.

13       Q.    All right.

14             MR. HANNA:  I don't have anything further.

15             MR. GEDGE:  I'm all set.

16             We will read and sign.

17             THE STENOGRAPHER:  If you would like to order

18  a transcript, a verbal recognition of that, and then when I

19  have it ready, I'll send it to you.

20             MR. GEDGE:  I would like to order a

21  transcript.

22             THE STENOGRAPHER:  Thank you very much.

23             (Deposition concluded, 3:38 p.m.)

24             (Signature reserved.)

25
```

WITNESS'S SIGNATURE PAGE

1

2

3        I have read the foregoing pages, which contain a correct

4   transcription of answers made by me to the questions therein

5   recorded, with the exception(s) and/or addition(s) reflected on

6   the correction sheet attached hereto, if any.

7            Signed, this the _____ day of _____, 2021.

8

9                    _____

10

11

12                    * * * * * *

13

14   STATE OF: _____

15   COUNTY OF: _____

16

17            Subscribed and sworn to me this, the ___ day of _____,

18   2021.

19

20                    _____

21                    Notary Public

22

23   My Commission expires:         _____
     (seal)

24

25

Michael Jones - 7/21/21

198

E R R A T A   S H E E T

Case:                    360 Virtual Drone Services LLC/Michael Jones
                         v Ritter et al.

Deposition of:           Michael Jones

    Please read this deposition transcript with care, and if you
find any corrections or changes you wish made, list them by
page/line number below.  Return the errata sheet to this office as
soon as executed as the Rules only allow a limited time to make
changes.
    To assist you in making any corrections, please use the form
below.  If supplemental or additional pages are necessary, please
furnish same and attach to this errata sheet.

Page/Line              Reads        Change to              Reason

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

7.21.21/vlp

STATE OF NORTH CAROLINA         )
                                )
COUNTY OF WAKE                  )

CERTIFICATE

I, Victoria L. Pittman, BA, FAPR, RDR, CRI, CVR-CM-M, do hereby certify that the foregoing testimony was duly sworn to; that I reported in voice shorthand the foregoing pages of the above-styled cause, and that they were prepared by computer-assisted transcription under my personal supervision and constitute a true and accurate record of the proceedings;

I further certify that the Witness requests to review the transcript;

I further certify that I am not an attorney or counsel of any parties, nor a relative or employee of any attorney or counsel connected with the action, nor financially interested in the action;

WITNESS my hand in the Town of Wake Forest, County of Wake, North Carolina.

_____
Victoria L. Pittman, Freelance Court Reporter
and Notary Public (No. 19972060075) in and for Wake
County, North Carolina and the State at large.
My Notarial commission expires:  7/31/22.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
CASE NO. 5:21-cv-0137-FL

| | | |
|---|---|---|
| 360 VIRTUAL DRONE SERVICES LLC and MICHAEL JONES, | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| ANDREW L. RITTER, in his official capacity as Executive Director of the North Carolina Board of Examiners for Engineers and Surveyors; and JOHN M. LOGSDON, JONATHAN S. CARE, DENNIS K. HOYLE, RICHARD M. BENTON, CARL M. ELLINGTON, JR, CEDRIC D. FAIRBANKS, BRENDA L. MOORE, CAROL SALLOUM, and ANDREW G. ZOUTWELLE, in their official capacities as members of the North Carolina Board of Examiners for Engineers and Surveyors, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **PLAINTIFF 360 VIRTUAL DRONE SERVICES LLC'S RESPONSES AND OBJECTIONS TO DEFENDANTS' FIRST SET OF REQUESTS FOR ADMISSIONS** |
| Defendants. | ) ) | |

**RESPONSES TO REQUESTS FOR ADMISSION**

1.     Admit that you had no communication with the North Carolina Board of Examiners for Engineers and Surveyors following the receipt of the June 13, 2019 letter identified as Exhibit 1 to the Complaint.

**RESPONSE: Admitted that 360 Virtual Drone Services LLC had no communication with the North Carolina Board of Examiners for Engineers and Surveyors after the July 16, 2019 e-mail exchange concerning receipt of the Board's June 13, 2019 notice.**

2.     Admit that you did not seek a declaratory ruling from the North Carolina Board of Examiners for Engineers and Surveyors for any of the services identified in paragraph 77 of the Complaint.

**RESPONSE: Admitted.**

J.A. 781

3.     Admit that you were advertising services for surveying and mapping.

**RESPONSE: Admitted that 360 Virtual Drone Services advertised services for mapping. Admitted that 360 Virtual Drone Services LLC advertised services that the North Carolina Board of Examiners for Engineers and Surveyors considers surveying.**

4.     Admit that you were advertising services for orthomosaic maps.

**RESPONSE: Admitted.**

5.     Admit that you were advertising services for orthorectified maps.

**RESPONSE: Denied that 360 Virtual Drone Services LLC used the phrase "orthorectified maps" in advertising. Admitted that 360 Virtual Drone Services LLC advertised orthomosaic maps and that in communications with the Board, Plaintiff Michael Jones referred to orthomosaic maps as "orthorectified" maps.**

6.     Admit that you provided clients with a statement that maps do have a relative accuracy of 1 to 3 inches.

**RESPONSE: Admitted.**

7.     Admit that you advertised the ability to provide measurable maps.

**RESPONSE: Admitted.**

8.     Admit that no client, or potential client, asked you to produce aerial images with location data.

**RESPONSE: Denied.**

9.     Admit that no client, or potential client, asked you to produce aerial images with coordinates.

**RESPONSE: Admitted that no client or potential client specifically asked 360 Virtual Drone Services LLC to produce aerial images with "coordinates." Services provided by 360 Virtual Drone Services LLC, however, included providing images with location data.**

10.     Admit that no client, or potential client, asked you to produce aerial images with elevation data.

**RESPONSE: Admitted that no client or potential client specifically asked 360 Virtual Drone Services LLC to produce aerial images with "elevation data." Services**

provided by 360 Virtual Drone Services LLC, however, included providing images that included locational data from which elevations could be determined.

11.    Admit that no client, or potential client, asked you to produce aerial images with volume data.

**RESPONSE: Admitted that no client or potential client specifically asked 360 Virtual Drone Services LLC to produce aerial images with "volume data." Services provided by 360 Virtual Drone Services LLC, however, included providing images that included locational data from which volume data could be calculated.**

Dated: October 19, 2021.

Samuel B. Gedge (VA Bar No. 80387)*
James T. Knight II (DC Bar No. 1671382)*
INSTITUTE FOR JUSTICE
901 North Glebe Road, Suite 900
Arlington, VA 22203
Phone: (703) 682-9320
Fax: (703) 682-9321
E-mail: sgedge@ij.org
       jknight@ij.org
*Special Appearance pursuant to Local Rule
83.1(e)

David G. Guidry
MAINSAIL LAWYERS
338 South Sharon Amity Rd., #337
Charlotte, NC 28211
Phone: (917) 376-6098
Fax: (888) 501-9309
E-mail: dguidry@mainsaillawyers.com
State Bar No.: 38675
*Local Civil Rule 83.1(d) Counsel for Plaintiffs*

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 19, 2021, a true and correct copy of the foregoing

**PLAINTIFF 360 VIRTUAL DRONE SERVICES LLC'S RESPONSES AND**

**OBJECTIONS TO DEFENDANTS' FIRST SET OF REQUESTS FOR ADMISSIONS** was

served via e-mail and U.S. Mail, postage prepaid, on the following counsel:

Douglas W. Hanna (NC Bar No. 18225)
M. Todd Sullivan (NC Bar No. 24554)
GRAEBE HANNA & SULLIVAN, PLLC
4350 Lassiter at North Hills Ave., Suite 375
Raleigh, NC 27609
Telephone: (919) 863-9091
Facsimile: (919) 424-6409
Email: dhanna@ghslawfirm.com
        tsullivan@ghslawfirm.com

*Attorneys for Defendants*

Samuel B. Gedge (VA Bar No. 80387)*
INSTITUTE FOR JUSTICE
901 North Glebe Road, Suite 900
Arlington, VA 22203
Phone: (703) 682-9320
Fax: (703) 682-9321
E-mail: sgedge@ij.org

*\* Special Appearance pursuant to Local Rule 83.1(e)*

Page 1

```
1              IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF NORTH CAROLINA
2                        WESTERN DIVISION
               CIVIL ACTION NO. 5:21-cv-0137-FL
3                                         )
   360 VIRTUAL DRONE SERVICES LLC         )
4   et al.,                               )
                                          )
5                                         )
                                          )
      Plaintiffs,                         )
6                                         )
   V.                                     )
7                                         )
                                          )
8   ANDREW L. RITTER, in his              )
    official capacity as Executive        )
9   Director of the North Carolina        )
    Board of Examiners for                )
10  Engineers and Surveyors,              )
    et al.,                               )
11                                        )
                                          )
12      Defendants.                       )
13
14
15
16
17       REMOTE VIDEOCONFERENCE 30(b)(6) DEPOSITION
18                          of
19                  ANDREW L. RITTER
20              (Taken by Plaintiffs)
21           Thursday, January 20th, 2022
22                    1:52 p.m.
23
24
25      Reported by: Leslie Christian Lentkowski
```

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

EXHIBIT 5

J.A. 786

```
                                              Page 2
 1    APPEARANCES:
 2    On Behalf of the Plaintiffs:
 3        Samuel B. Gedge, Esquire (via videoconference)
          James T. Knight II, Esquire (via videoconference)
 4        Institute for Justice
          901 North Glebe Road
 5        Suite 900
          Arlington, Virginia 22203
 6        703-682-9320
          sgedge@ij.org
 7
      On Behalf of the Defendants:
 8
          Douglas W. Hanna, Esquire (via videoconference)
 9        Graebe Hanna & Sullivan, PLLC
          4350 Lassiter at North Hills Avenue
10        Suite 375
          Raleigh, North Carolina 27609
11        919-863-9091
          dhanna@ghslawfirm.com
12
      Also Present:
13
          John M. Logsdon, PLS
14        North Carolina Board of Examiners for Engineers and
      Surveyors
15
16
17
18
19
20
21
22
23
24
25
```

```
                                              Page 3
1                    E X A M I N A T I O N S
2    Witness                                          Page
3    Andrew L. Ritter
4       By Mr. Gedge                                     4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

1                    P R O C E E D I N G S

2    Whereupon,

3                    ANDREW L. RITTER, having been previously

4    sworn by declaration under penalty of perjury,

5    testified as follows:

6                         EXAMINATION

7    BY MR. GEDGE:

8         Q.    Mr. Ritter, we will turn over to the entity

9    deposition.  And so do you understand that you're also

10   here today to testify not just about your personal

11   knowledge but also as a representative of the Board of

12   Examiners for Engineers and Surveyors?

13        A.    Yes.

14        Q.    Okay.  I will introduce the notice of

15   30(b)(6) deposition.  All right.  I just posted

16   Exhibit 38, and it's under the folder that says "Andrew

17   Ritter," not deposition of board of engineers.  Let me

18   know if you have any trouble finding it.

19        A.    38?

20        Q.    Yes.

21        A.    I got it.

22        Q.    Have you seen this document before?

23        A.    Yes.

24        Q.    Okay.  This is the notice of 30(b)(6)

25   deposition to the board, right?

Page 5

```
 1          A.   Yes.
 2          Q.   Do you understand that you have been
 3    designated as the representative of the board to
 4    testify on the board's behalf as to Topics 1, 2, 3, 4,
 5    5, 6, 7, 8, 9, 10, 12, 13, and 14?
 6          A.   Yes.
 7          Q.   And are you prepared to testify as the
 8    board's representative on those topics?
 9          A.   Yes.
10          Q.   Can you tell me briefly what steps you've
11    taken to prepare to testify on the board's behalf
12    today?
13              MR. HANNA:  Object to the question if
14    it at all covers any discussions he may have had with
15    his attorney.
16    BY MR. GEDGE:
17          Q.   And to the extent you can answer that
18    without telling me about your conversations with
19    Mr. Hanna.
20          A.   Okay.  I've -- the preparation I did was
21    read the materials that are in front of me.
22          Q.   And by that, do you mean the notice of
23    deposition itself?
24          A.   If that's what this is, yes.
25          Q.   Right.  Exhibit 38?
```

Page 6

1          A.    Yes.

2          Q.    Okay.  Did you review any other materials

3    in preparation to testify as the board's designee?

4          A.    I'm not sure what you mean, but I read the

5    360 drone report.  That may be the extent of it.  I

6    read some of the materials that have been sent to me.

7    I mean, there's been so much sent, so I've read

8    materials that have been sent to me.

9          Q.    Okay.  And when you said "the 360 drone

10   report," was that Mr. Schall's expert report?

11         A.    No.  But I did read Schall's expert report.

12         Q.    Okay.  Sorry.  When you referred to the 360

13   drone report, was that the investigative report or --

14         A.    Yes, our investigative report.

15         Q.    Gotcha.  Okay.  How long did you take to

16   prepare for the entity part of the deposition?

17               MR. HANNA:  Objection to form.

18   BY MR. GEDGE:

19         Q.    I'll do it again.  How much time did you

20   spend preparing for this part of the deposition that we

21   just started?

22               MR. HANNA:  Object to form.

23   BY MR. GEDGE:

24         Q.    You can answer it if you understand what I

25   said.

Page 7

```
 1          A.   I can't guess.  I don't know how much time.
 2          Q.   Did you spend more than five minutes
 3     preparing for this deposition?
 4          A.   I did.  I spent more than five minutes.
 5     It's not hours.
 6          Q.   Okay.  Somewhere between five minutes and
 7     an hour.  Is that fair?
 8          A.   That's fair.
 9          Q.   Okay.  As we discussed earlier, you're the
10     executive director of the board, right?
11          A.   Yes.
12          Q.   And you've worked for the board as
13     executive director since 2001?
14          A.   Correct.
15          Q.   Okay.  And in other capacities since 1993?
16          A.   Correct.
17          Q.   I'm going to post Exhibit 39.  Do you have
18     that in front of you?
19          A.   Yes.
20          Q.   Okay.  Have you seen Exhibit 39 before?
21          A.   Yes.
22          Q.   Okay.  Can you tell me what it is?
23          A.   Can I tell you what it is?  Can I just read
24     the title?  "Defendant's responses to plaintiff's first
25     set of interrogatories."
```

Page 8

```
 1         Q.   And I understand that you signed a document
 2    attesting to the truth of these responses; is that
 3    right?
 4         A.   Yes.
 5         Q.   I'll just post that as well.
 6              I posted Exhibit 40, which I think is your
 7    verification.  If you want to take a look and confirm,
 8    I would appreciate it.
 9         A.   Yes.  I'm confirming it's a verification.
10         Q.   Turning to Exhibit 39, the interrogatory
11    responses, I would like us to scroll down to
12    Interrogatory 10.  Just a second.  On Page 13, you'll
13    see Interrogatory 10.
14         A.   Page 13, you said?
15         Q.   Yes.
16         A.   Okay.
17         Q.   Let's read it for the transcript.  So
18    Interrogatory 10 asks the defendant to state each
19    governmental interest that you contend is advanced by
20    preventing plaintiffs from creating, processing, and
21    disseminating data about land and structures (including
22    data about distances, coordinates, elevations, and
23    volumes), right?
24         A.   Yes.
25         Q.   So you're welcome to read the response --
```

Page 9

1    kind of the boldface response to that.  It's about

2    three or four pages long.  I'll tell you the part I'm

3    interested in is just toward the very bottom of that

4    first page.  I'm happy for you to read as much of it as

5    you want, and once you've done that, let me know and we

6    can talk about it.

7         A.    You're referring to the bottom of Page 13?

8         Q.    Yeah.

9         A.    I'm ready for your question.

10         Q.    Okay.  Great.  So there's a fair amount of

11    lead-up in here, but the final full sentence on Page 13

12    says, "The purpose of the Act is to 'safeguard life,

13    health, and property, and to promote public welfare.'"

14    Do you see that?

15         A.    Yes.

16         Q.    Am I correct that those are the

17    governmental interests that the defendant contends the

18    act exists to further?

19              MR. HANNA:  Object to form.

20              THE WITNESS:  Yeah.  I kind of lost

21    you on the question.

22    BY MR. GEDGE:

23         Q.    Okay.  So the interrogatory asks the

24    defendant to state governmental interests, right, that

25    are advanced by regulating certain kinds of information

1  under the licensure statute, right?

2      A.   Yes.

3      Q.   And my question for you is if we look at

4  this sentence, it says, "The purpose of the Act is to

5  'safeguard life, health, and property, and to promote

6  the public welfare.'"  My question for you is is

7  safeguarding life, health, and property and promoting

8  the public welfare, are those the governmental

9  interests that are furthered by the act -- by this act?

10     A.   Yes.

11     Q.   Okay.  Can you identify any other interests

12 that the act serves?

13     A.   Yes.

14     Q.   Okay.  What interests?

15     A.   What 89-C does is it -- we have a sentence

16 that reads -- and, again, I'm paraphrasing.  I don't

17 have it in front of me.  Gross negligence,

18 incompetence, and misconduct -- we're telling the

19 public that we may -- we're hiring a licensed surveyor,

20 there's a bar, and the licensed work is going to be

21 above that bar.  It's going to be above incompetence,

22 gross negligence, and misconduct.  And if it's not

23 above the bar, then the board can hold the licensee

24 responsible for his actions.

25          We're also establishing a minimum level of

Page 11

1   competence via the three E's -- the education, exam,

2   and experience.  When somebody gets licensed, what

3   we're telling the citizens of North Carolina is they

4   have met a minimum level of competence, and the work

5   they're going to receive from that licensee meets that

6   minimum level of competence.  If it doesn't, again,

7   then the board by statute has the ability to remedy the

8   situation.

9        Q.   All of that makes sense to me.  It honestly

10  sounds kind of like that all falls under the broader

11  umbrella of safeguarding life, health, and property and

12  promoting the public welfare.  Is that fair to say?

13       A.   I wouldn't disagree with that.  Yes, I

14  would agree with that.

15       Q.   Beyond what you just described, are there

16  any other governmental interests that are served by the

17  statute?

18       A.   Not that I can think of.

19       Q.   I talked with Mr. Schall about this a

20  little bit yesterday, and I did touch on the board's

21  view too.  I understand the board's position to be that

22  providing a client with a 3D digital model or a

23  measurable orthomosaic map -- providing a client with

24  that kind of information counts as surveying, right?

25       A.   Yes.  As you described it, I think it meets

Page 12

1　the statutory definition of surveying.

2　　　　Q.　My question is would it be surveying for a

3　non-licensee to create a measurable orthomosaic map of

4　their own property for their own personal use?  Does

5　that also fall within the definition of surveying?

6　　　　A.　Oh, boy.  I don't know.  There's -- there

7　is a line of what you can do for yourself that's okay,

8　and you cross it at a certain point where it becomes

9　available for public consumption.  So as you described

10　the question, if I did an orthomosaic map for my

11　property and it wasn't available for public

12　consumption, I don't think that's surveying in

13　North Carolina.  If it becomes available for public

14　consumption, I believe that would cross the line.

15　　　　Q.　Okay.  What do you mean by "public

16　consumption"?  Selling it to somebody else or something

17　else?

18　　　　A.　If you survey your boundary and you record

19　that down at the Register of Deeds Office, your

20　boundary is also somebody else's boundary.  So even

21　though you're surveying your property, if it's out

22　there for public consumption, your boundaries are also

23　somebody else's boundaries.

24　　　　Q.　That makes perfect sense.  I mean, I assume

25　that -- well, maybe you can tell me.  If a non-licensee

Page 13

1   just walks down to the local Register of Deeds with,
2   like, a crayon drawing map of their backyard and tries
3   to register it as a survey, I assume that the Register
4   of Deeds isn't going to accept that, right?
5          A.   No, that's not correct.  The Register of
6   Deeds would accept it.
7          Q.   Good.  So maybe you can explain that.  How
8   does that work?
9          A.   So the Register of Deeds is not my
10  bailiwick, so to speak.  What I understand about the
11  Register of Deeds Office is their job is not to check
12  that crayon drawing.  Their job is to record that
13  drawing.
14         Q.   Is it your understanding that they check to
15  see whether a plat or a survey has been stamped by a
16  surveyor?
17         A.   I do not know.  And, again, we don't -- the
18  Register of Deeds is considered the Secretary of
19  State's Office in North Carolina, and what a Register
20  of Deed does and does not do, I do not know.
21         Q.   That's fair.
22         A.   I did not know if that's a requirement.  I
23  do not know if a map that's attached to a deed has to
24  be -- I don't know if the Register of Deeds requires
25  that to be signed and sealed.

Page 14

1          Q.    From the board's perspective, the board

2     would say that that has to be signed and sealed?

3          A.    We would say that map has to be signed and

4     sealed.

5          Q.    Okay.  I think I understand kind of the

6     line we're drawing there between, you know, your

7     personal map down to the courthouse.

8               But am I right that -- I think we're on the

9     same page.  If you're not presenting your orthomosaic

10    map to the world for public consumption in one way or

11    another if you made an orthomosaic map of your own

12    property for your own use on your own land, am I right

13    that that does not fall within the definition of

14    surveying?

15         A.    Following your scenario, that would be

16    correct.

17         Q.    Okay.  I think Mr. Schall had the opposite

18    view yesterday -- maybe not the opposite.  As I

19    understood, he was saying he thought that technically

20    it would qualify, but then he didn't think anyone at

21    the board would care enough to do anything about it.

22              As I understand it, your view seems a

23    little bit different in that you just don't think it

24    qualifies in the first place.  Am I understanding that

25    correctly?

J.A. 799

Page 15

```
 1          A.   Well, that goes back to my original --
 2                    MR. HANNA:   Let me interject and just
 3     say that I object to the form and the summary of
 4     Mr. Schall's testimony.   To the extent that you heard
 5     that testimony, you can answer.
 6                    THE WITNESS:   Well, it goes back to my
 7     original issue.   There's a line there, and I would need
 8     some really -- some micro-specifics to tell you where
 9     the line is.   We get scenarios here where somebody is
10     building a place of assembly on their own property, and
11     if you bring the public in to that place of assembly,
12     all of a sudden does that take it away from the owner's
13     right to not have to do things according to the law
14     because it's their own property?   So there is a line
15     there.   I do not know where Mr. Schall was drawing the
16     line.   Like I said, I'm going to stick with my answer
17     before.   Sometimes it's okay, but sometimes you cross
18     the line.   I need some micro-specifics.
19     BY MR. GEDGE:
20          Q.   And what kind of specifics would be helpful
21     to you in making that analysis?
22          A.   If you drew an orthomosaic map and nobody
23     knew about it, how would I know about it?   If you drew
24     an orthomosaic map for yourself and I knew about it,
25     how did I know about it?   Those are the micro-specifics
```

1   this board would look at.  If it ended up in the

2   board's hands, the question is how did it end up in the

3   board's hands?  And usually that means it wasn't just

4   for the owner's use.  Somehow it ended up in the public

5   domain.  If it ended up in the public domain, we would

6   would to take a look at what its use and intent was

7   for.

8        Q.   Okay.  This will probably sound a bit

9   familiar from yesterday, but does the board have

10  evidence that it's more common here in Virginia than in

11  North Carolina for members of the public to be harmed

12  by inaccurate orthomosaic maps?

13       A.   Yeah.  I no information on what happens in

14  Virginia.

15       Q.   Okay.  And, again, you're testifying as the

16  board's representative, right?

17       A.   Correct.

18       Q.   Okay.  Similar question.  Does the board

19  have any evidence that inaccurate orthomosaic maps

20  cause more instances of harm in Virginia than they do

21  in North Carolina?

22       A.   My answer is going to be the same.  I have

23  no information on Virginia.

24       Q.   Okay.  And, likewise, I assume the board

25  does not have any evidence that inaccurate orthomosaic

Page 17

1    maps cause more severe harm in Virginia than in

2    North Carolina?

3         A.    I have no information on what transpires in

4    Virginia.

5         Q.    Similar question for the 3D digital models

6    -- does the board have any evidence that it's more

7    common in Virginia than in North Carolina for members

8    of the public to be harmed by inaccurate 3D digital

9    models?

10        A.    I have no information on what goes on in

11   Virginia.

12        Q.    Okay.  Does the board have any evidence

13   that inaccurate 3D digital models cause more instances

14   of harm in Virginia than they do in North Carolina?

15        A.    I have no information on what goes on in

16   Virginia.

17        Q.    Thank you for indulging me.  This will not

18   go on forever.  Just a few more.

19             Does the board have any evidence that

20   inaccurate 3D digital models cause more severe harm in

21   Virginia than they do in North Carolina?

22        A.    I have no information on what goes on in

23   Virginia.

24        Q.    Moving to Kentucky, is your answer the

25   same?

Page 18

1          A.   Yes, sir.

2          Q.   Okay.  Mississippi?

3          A.   Yes.

4          Q.   All of the states in the union?

5          A.   Yes.  My answer would be my only

6    information will be for what happens in North Carolina,

7    and I have no information on what goes on outside of

8    our borders.

9          Q.   Does the board -- as I understand it, the

10   board does not have any evidence comparing how common

11   it is for members of the public to be harmed by

12   inaccurate orthomosaic maps in North Carolina versus

13   any other state in the nation?

14         A.   That's correct.

15         Q.   And the board does not have any evidence

16   comparing how common it is for members of the public to

17   be harmed by unlicensed orthomosaic maps in

18   North Carolina versus any other state in the nation?

19         A.   That's correct.

20              MR. HANNA:  Object to the form.

21   BY MR. GEDGE:

22         Q.   And by "unlicensed orthomosaic maps," I

23   mean they are maps that are created by someone who is

24   not a licensed surveyor.

25              MR. HANNA:  Object to form.

```
 1                    THE WITNESS:  I didn't quite
 2    understand that one.
 3    BY MR. GEDGE:
 4         Q.   Oh, sure.  I was just clarifying.
 5              I think my question referred to unlicensed
 6    orthomosaic maps, and what I meant by that term is a
 7    map that's created by somebody who's not a licensed
 8    surveyor.  Does that make sense?
 9         A.   Maybe you can say the whole question again.
10         Q.   Sure.  Does the board have any evidence
11    comparing how common it is for members of the public to
12    be harmed by unlicensed orthomosaic maps in
13    North Carolina versus any other state?
14                    MR. HANNA:  Object to form.
15                    THE WITNESS:  No.
16    BY MR. GEDGE:
17         Q.   Does the board have any evidence comparing
18    how common it is for members of the public to be harmed
19    by inaccurate 3D digital models in North Carolina
20    versus any other state?
21                    MR. HANNA:  Object to form.
22                    THE WITNESS:  No.
23    BY MR. GEDGE:
24         Q.   Does the board have any evidence comparing
25    the -- how common it is for members of the public to be
```

```
                                          Page 20
 1   harmed by inaccurate volumetric calculations in

 2   North Carolina versus any other states?

 3        A.   No.

 4              MR. HANNA:  Same objection to form.

 5   BY MR. GEDGE:

 6        Q.   Are you familiar at all with how other

 7   states define surveying?

 8        A.   Not so much.  Some.  Some.  Not so much.  I

 9   heard Mr. Schall -- I know a little bit about

10   South Carolina, but that's about it.

11        Q.   I think Mr. Schall testified yesterday that

12   -- and I think he said in the past few years something

13   around 33 states license photogrammetry.  Did you

14   remember him testifying to that?

15        A.   Yes.

16        Q.   Do you have any reason to think he's wrong

17   about that?

18        A.   No.

19        Q.   I think he said that 17 states -- I think

20   within the past few years, 17 states did not license

21   photogrammetry, right?

22        A.   Yes.  I heard him say that.  I don't have

23   information whether that's accurate or not.  I have no

24   reason to doubt it.

25        Q.   It's my understanding that some states
```

Page 21

1  create an exemption from licensure for employees when

2  they're simply performing surveying on their employer's

3  property.  I don't think North Carolina has that

4  exemption, but am I wrong on that?  Does North Carolina

5  have an exemption that resembles that?

6        A.  Yes, we do.  Now -- go ahead.  I'm sorry.

7        Q.  Explain that.

8        A.  Well, the answer is yes, and then the

9  second part is maybe.  The previous question, if you're

10  working for your employer and the work product is for

11  your employer, you don't need to be licensed except if

12  that product is going to be used for public

13  consumption.

14        Q.  I'm sorry.  It's probably my fault, but can

15  you repeat that?

16        A.  So we have what's called the industrial

17  exemption in North Carolina, which says if you're

18  performing this service for your employer, not for the

19  public, you don't need to be licensed.  However, if

20  your work product is to be out in the public for public

21  consumption, then the industrial exemption does not

22  apply.

23           So an example of that is more common in the

24  engineering world where you'll do the engineering for

25  your company, but you can't call that person on the

Page 22

1  phone and ask him for engineering services.  You see

2  that more on the engineering side.  You don't see it

3  much on the surveying side because there's not much

4  surveying that's not going to be out in the public.  So

5  if you're working for Duke Energy and you're surveying

6  the easement lines, those easements are going to be in

7  the public and the industrial exemption doesn't apply,

8  and that work of surveying has to be signed and sealed.

9          Q.    Okay.  I see.

10                MR. HANNA:  Just for my clarification,

11  Sam, what topic are you under right now from the

12  30(b)(6)?

13                MR. GEDGE:  Let me pull it up.  It's,

14  I think, 6 -- between 6 and 9.  All of them with the

15  notes.

16                MR. HANNA:  6, 7, 8, and 9 seem to be

17  about the basis for each governmental interest that the

18  board contends is advanced by North Carolina's

19  surveying licensing law, but I thought -- you seem to

20  be getting into the industrial exemption or what's in

21  the -- I'm not sure it relates to governmental

22  interests, but go ahead.  I didn't -- this is not a

23  topic that we covered prior to coming here, so go

24  ahead.  You can go a little bit.  I just -- this is

25  getting a little far field.

Page 23

1              MR. GEDGE:  That's fine.

2    BY MR. GEDGE:

3         Q.   Mr. Ritter, we're talking about the

4    industrial exemption.  Give your best answer.  It seems

5    like you're familiar with it.  I lost track a little

6    bit, but just to make sure I understand how the

7    industrial exemption works, let's say you have a

8    company that owns a piece of land and they're planning

9    to build a private facility for themselves on that

10   piece of land, and as part of that, they construct it

11   themselves.  They are digging a hole, and one of their

12   employees does some volumetric calculations as part of

13   helping his employer build this facility.  Is that --

14   would that be the kind of scenario that would fall

15   within the industrial exemption, or am I not --

16        A.   To my knowledge, that --

17             MR. HANNA:  I want to object again to

18   that question.  I'm not sure that's covered by the

19   notice of deposition, but you can answer.  Go ahead.

20             THE WITNESS:  To my knowledge, that

21   would be an activity that would not require a license.

22   If you're establishing the volume of that hole for your

23   employer on his property, it's my belief that that

24   doesn't need a license and that comes under the

25   industrial exemption.

Page 24

1   BY MR. GEDGE:

2        Q.   Okay.  But if the employer instead were to

3   hire 360 Virtual Drone Services to do those same

4   volumetric calculations, am I understanding correctly

5   that that would not fall within the industrial

6   exemption?

7        A.   That is correct.

8        Q.   As though the person actually performing

9   the calculations doesn't have a surveyor license?

10       A.   Well, we would require 360 Drone to have a

11  surveyor license to do it.

12       Q.   Exactly.  But just to clarify, in each of

13  those scenarios if the employee is performing those

14  volumetric calculations without a surveyor license,

15  that's okay because he falls within the industrial

16  exemption, right?

17       A.   Yes.  That's in the statute as an

18  exemption.

19       Q.   Okay.  And am I correct that if 360 Virtual

20  Drone performs those same volumetric calculations for

21  the employer, they would be in violation because they

22  are not an employee of the property owner?

23       A.   Correct.  They would not come under the

24  industrial exemption clause.  Therefore, they would

25  need a license to do that.

1      Q.   Okay.  Thank you.  I think we're getting

2  pretty close, Mr. Ritter.  Why don't we take another

3  five minutes and I can see how much more we have, and

4  we can hopefully wrap it up.  Sound good?

5                    MR. HANNA:  Sounds good.

6                    (A break was taken.)

7  BY MR. GEDGE:

8      Q.   Mr. Ritter, I posted Exhibit 31 in your

9  folder.  It's Mr. Schall's expert report.  As I

10  understand it, you have looked at that before; is that

11  right?

12      A.   Yes.

13      Q.   Just scroll down to pages -- well, Page 15.

14  We can start out -- I'll give you a chance to get

15  there.

16      A.   Okay.

17      Q.   On Page 15, there's a section of the report

18  that's entitled "Specific Issues Raised in the

19  Complaint."  Have you had a chance to read this section

20  specifically?

21      A.   Yes.

22      Q.   Okay.  In this section, Mr. Schall offers

23  opinions on what kinds of services or products do and

24  do not qualify as surveying under the North Carolina

25  statute.  Is that a fair characterization?

Page 26

1          A.   Yes.

2          Q.   Okay.  Does the board disagree with any

3     part of Mr. Schall's opinion in this section?

4          A.   I don't think so.

5          Q.   I guess just for clarity, by "this

6     section," I mean the section starting with "Specific

7     Issues Raised in the Complaint" and going through to

8     the end of the report on Page 16.

9          A.   Okay.  I was on Letter A.

10         Q.   Well, we can go chunk by chunk.  It sounds

11    like you looked over Letter a.  The board doesn't

12    disagree with Ms. Schall's opinion there?

13         A.   Correct.

14         Q.   Okay.  You can march on to Letter B, and

15    once you've had a chance to look at that, I will have

16    the same question.

17         A.   So under Letter B, I think his opinion is

18    correct as well.

19         Q.   Okay.  And Letter C?

20         A.   His opinion is correct as well.

21         Q.   Okay.  And same for D?

22         A.   Yes, sir.

23         Q.   Okay.  Does providing orthomosaic maps to a

24    client for free as opposed to for compensation also

25    fall within the definition of surveying in the board's

Page 27

1   view?

2           A.    89-C is silent on cost.  Whether it's free

3   or you charge, it doesn't change what the product is.

4           Q.    Okay.  So the analysis is the same

5   regardless of whether money changed hands?

6           A.    That's correct.

7           Q.    When we were discussing your testimony in

8   your personal capacity, we talked about disclaimers a

9   little bit.  Do you remember that?

10          A.    Yes, sir.

11          Q.    So now that you're sitting here as the

12  board or on the board's behalf, is it fair to say that

13  you are not aware of any instance where the board has

14  informed a non-licensee that they can provide

15  orthomosaic maps to a client as long as they include

16  some kind of disclaimer language on their map?

17                MR. HANNA:  Just for the record, when

18  you say "orthomosaic maps," have we defined that?

19                MR. GEDGE:  I'm happy to.  So for

20  purposes of these questions, when I'm saying

21  "orthomosaic maps" --

22                MR. HANNA:  And the reason why I asked

23  that is because initially Mr. Jones testified that he

24  provided orthomosaic maps, but then he testified that

25  he essentially turned it into a PDF and provided it in

1    that form.  And so I just think that it's important

2    when these kinds of questions are being asked or

3    hypotheticals are being given that the precise product

4    or data that is being discussed is properly identified.

5    BY MR. GEDGE:

6         Q.   So, Mr. Ritter, for purposes of these

7    questions, I'll use "orthomosaic map" in the shorthand,

8    but what I mean is an orthomosaic map that's qualified

9    as surveying.  So whether that's an orthomosaic map

10   that has coordinate metadata in it or geo-referencing

11   information, it is a map that on its own, you, the

12   board, would say is surveying.  Does that make sense?

13        A.   Yes, sir.

14        Q.   Okay.  So I guess circling back to my

15   question, that is -- as the board's designee, can you

16   point to any instance where the board has informed a

17   non-licensee that they can give an orthomosaic map to a

18   client as long as they include some kind of disclaimer

19   language on that map?

20        A.   I don't recall that happening.

21        Q.   Okay.  I have a similar question for 3D

22   digital models.  As the board's designee, can you point

23   me to any instance where the board has informed a

24   non-licensee that they can provide 3D digital models to

25   a client as long as they include certain disclaimer

1  language with that?

2          A.    Not that I recall.

3          Q.    Just to close the loop on that line of

4  questioning about other states, the board does not have

5  any information about harms caused by unlicensed

6  surveying in other states; is that right?

7                      MR. HANNA:  Object to form.

8                      THE WITNESS:  No.

9  BY MR. GEDGE:

10         Q.    Okay.  It might have been that I asked a

11 bad question, but I still think that -- I'll ask

12 another question.

13                 Does the board have any information about

14 harms caused by unlicensed surveying in other states?

15                      MR. HANNA:  Object to form.

16                      THE WITNESS:  I don't think I

17 understand the question.  If I could ask you a question

18 if that's okay -- what do you mean by information

19 presented at the board?

20 BY MR. GEDGE:

21         Q.    Not by the board, but is the board in

22 possession of any evidence about the number of

23 instances of photogrammetry malpractice in different

24 states?

25         A.    No.

Page 30

1          Q.    Okay.  Give me one minute.

2                That's all I have for now, Mr. Ritter.

3     I'll let Mr. Hanna ask any questions if he would like.

4                     MR. HANNA:   I have no questions.

5                     MR. GEDGE:   Thank you, Mr. Ritter.   I

6     appreciate it.

7                     (Proceedings concluded at 2:41 p.m.)

8                     (Signature reserved.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 31

1   CERTIFICATE OF REPORTER

2   STATE OF NORTH CAROLINA  )

3   COUNTY OF WAKE          )

4

5          I, Leslie Christian Lentkowski, the officer

6   before whom the foregoing remote videoconference

7   30(b)(6) deposition was taken, do hereby certify that

8   the witness whose testimony appears in the foregoing

9   remote videoconference 30(b)(6) deposition was taken by

10   me to the best of my ability and thereafter reduced to

11   typewriting under my direction; that I am neither

12   counsel for, related to, nor employed by any of the

13   parties to the action in which this remote

14   videoconference 30(b)(6) deposition was taken, and

15   further that I am not a relative or employee of any

16   attorney or counsel employed by the parties thereto,

17   nor financially or otherwise interested in the outcome

18   of the action.

19          4th day of February, 2022.

20

21                  *Leslie Christian Lentkowski*

22

                 _____

23                  LESLIE CHRISTIAN LENTKOWSKI

                 Notary Public in and for

24                  County of Wake

                 State of North Carolina

25                  Notary Public No. 201221300088

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
CASE NO. 5:21-cv-0137-FL

| | | |
|---|---|---|
| 360 VIRTUAL DRONE SERVICES LLC and MICHAEL JONES, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | |
| ANDREW L. RITTER, in his official capacity as Executive Director of the North Carolina Board of Examiners for Engineers and Surveyors; and JOHN M. LOGSDON, JONATHAN S. CARE, DENNIS K. HOYLE, RICHARD M. BENTON, CARL M. ELLINGTON, JR, CEDRIC D. FAIRBANKS, BRENDA L. MOORE, CAROL SALLOUM, and ANDREW G. ZOUTWELLE, in their official capacities as members of the North Carolina Board of Examiners for Engineers and Surveyors, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **DEFENDANTS' DISCLOSURE OF EXPERT TESTIMONY (Rule 26(a)(2))** |
| Defendants. | ) ) | |

Pursuant to Rule 26(a)(2) of the Federal Rules of Civil Procedure and pursuant to the Case Management Order, Defendants hereby disclose the identity of the expert witness they may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705.

    1.    Mark S. Schall, CP, PLS, PPS, SP
            Spatial Data Consultants, Inc.
            1008 Hutton Lane, Suite 109
            High Point, North Carolina 27262

Mr. Schall was specially retained for purpose of this litigation.  The report of

Mark S. Schall, CP, PLS, PPS, SP is produced herewith.  Further, produced herewith is a copy of Mr. Schall's Curriculum Vitae, a list of all cases in which, during the previous 4 years, Mr. Schall testified as an expert at trial or by deposition, and a statement of the compensation to be paid for the study and testimony in the case.

This the 30th day of November, 2021.

GRAEBE HANNA & SULLIVAN, PLLC

/s/ Douglas W. Hanna
Douglas W. Hanna, NCSB #18225
4350 Lassiter at North Hills Ave., Suite 375
Raleigh, NC 27609
Telephone: (919) 863-9091
Facsimile: (919) 424-6409
*Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this day served a copy of the **DEFENDANTS'**

**DISCLOSURE OF EXPERT TESTIMONY (Rule 26(a)(2))** upon all parties to this

action by email addressed as follows:

David G. Guidry, Mainsail Lawyers, **dguidry@mainsaillawyers.com**
338 South Sharon Amity Rd., #337
Charlotte, NC 28211

Samuel B. Gedge, Institute for Justice, **sgedge@ij.org**
901 North Glebe Road, Suite 900
Arlington, VA 22203

James T. Knight II, Institute for Justice, **jknight@ij.org**
901 North Glebe Road, Suite 900
Arlington, VA 22203

This the 30th day of November, 2021.

/s/ Douglas W. Hanna
Douglas W. Hanna, NCSB #18225

**Report of Mark S. Schall, CP, PLS, PPS, SP**

Attorney Douglas W. Hanna, representing The North Carolina Board of Examiners for Professional Engineers and Land Surveyors (NCBELS), has retained me to give expert testimony or opinions on the following:

- What is Photogrammetry?
- How does Photogrammetry Work?
- My Experience in Photogrammetry
- Using Unmanned Autonomous Vehicles (UAV's) or Drones as a Tool for Photogrammetry
- My Experience using Drones as a Tool for Photogrammetry
- Why Land Surveying, most specifically Photogrammetry, as the North Carolina Legislature has designated the practice of Land Surveying as a profession, is regulated by NCBELS.
- The Purpose of Regulating Land Surveying and Photogrammetry
- Specific Issues Raised in the Complaint

**About Mark S. Schall**

Currently, I'm the Chief Professional Officer (CPO) and Professional Land Surveyor (PLS) in responsible charge at Spatial Data Consultants, Inc. (SDC), a regional Geospatial Consulting firm specializing in Surveying, Photogrammetry, Remote Sensing and GIS, including Unmanned Autonomous Systems (UAS) surveys. My professional experience spans from 1979 to present, I have approximately 42 years of applied and professional experience and expertise in the fields of Surveying and Photogrammetry.

Prior to founding SDC in February of 1996, I gained approximately 17 years of production and project management experience in Land Surveying and Photogrammetry for regional, national and international consulting firms headquartered in the eastern United States.

My professional credentials also include the following certifications, registrations and affiliations.

- American Society of Photogrammetry and Remote Sensing (ASPRS)
  - Certified Photogrammetrist #950, 1994
- The North Carolina Board of Examiners for Professional Engineers and Land Surveyors
  - Professional Land Surveyor L-4019, 1999
- The South Carolina State Board of Registration for Professional Engineers and Land Surveyors
  - Photogrammetric Surveying #22679, 2003
- Commonwealth of Virginia Board for Architects, Professional Engineers, Land Surveyors, Certified Interior Designers and Landscape Architects
  - Surveyor Photogrammetrist #75, 2010
- Approximately 437.5 hours of Professional Development Hours (PDHs) of education required to maintain professional certifications and registrations.
- North Carolina Society of Surveyors (NCSS), Sustaining Member
- Board of Director, and Past President for the NCSS Education Foundation, served 9 years.
- Instructor, NCSS Institute for Professional Continuing Education, teaching Photogrammetry competency courses.
- Professional Land Surveyor (PLS) in responsible charge for the North Carolina (NC) Statewide Orthoimage Program, from 2012 to present, SDC as a Prime Vendor. This annual reoccurring project is funded by the NC E-911 Board, and facilitated by NC Information Technology Services (ITS) Center for Geographic Information and Analysis (NCCGIA).

1

In preparing this report and my opinions herein, I'm relying on my 42 years of applied and professional experience in Photogrammetry, Land Surveying and other Geospatial disciplines. I reserve the right to amend this report if additional information is revealed during case findings. I have never testified as an expert at trial or by deposition at any time in my career.

In consideration of the health, safety and welfare of the public in the State of North Carolina, I have prepared this report pro bono. In addition, any expert testimony by deposition that may be required of me will also be provided pro bono.

**What is Photogrammetry?**

Photogrammetry is the art, science, and technology of obtaining reliable information about physical objects and the environment through processes of recording, measuring, and interpreting photographic images and patterns of recorded radiant electromagnetic energy and other phenomena (Wolf and Dewitt, 2000; McGlone, 2004).

Photogrammetry is nearly as old as photography itself. Since its development approximately 150 years ago, photogrammetry has moved from a purely analog, optical–mechanical technique to analytical methods based on computer-aided solution of mathematical algorithms and finally to digital or softcopy photogrammetry based on digital imagery and three-dimensional (3D) computer vision, which is devoid of any optical-mechanical hardware.

Photogrammetry is primarily concerned with making precise measurements of three-dimensional (3D) objects and terrain features from two-dimensional (2D) photographs. Applications include the measuring of coordinates; the quantification of distances, heights, areas, and volumes; the preparation of topographic maps; and the generation of digital elevation models and orthophotographs (Aber, Marzolff and Ries, 2010).

*Although similar to each other, following are some definitions of Photogrammetry from other sources…*

Founded in 1934, The American Society for Photogrammetry and Remote Sensing (ASPRS) is an American learned society devoted to photogrammetry and remote sensing. It is the United States member organization of the International Society for Photogrammetry and Remote Sensing (ISPRS).

ASPRS defines Photogrammetry as… "the art, science, and technology of obtaining reliable information about physical objects and the environment, through processes of recording, measuring, and interpreting images and patterns of electromagnetic radiant energy and other phenomena."

Wikipedia, the free online encyclopedia defines Photogrammetry as… "the science and technology of obtaining reliable information about physical objects and the environment through the process of recording, measuring and interpreting photographic images and patterns of electromagnetic radiant imagery and other phenomena."

Merriam-Webster, a Dictionary since 1828, defines Photogrammetry as… "the science of making reliable measurements by the use of photographs and especially aerial photographs (as in surveying)."

*From my own experience and perspective…*

Photogrammetry is a discipline of Professional Land Surveying, Land Surveying or Surveying, regardless of how one wishes to term it. Where in Land Surveying, the Surveyor goes into the field to locate, measure and record accurate survey data or useful information; in Photogrammetry, the Surveyor obtains imagery, aerial or terrestrial, most often aerial, and brings the field into the office environment, then uses Photogrammetric practices and processes to locate, measure and record accurate survey data or useful information from the imagery. This is the simplest explanation or analogy I can offer.

**How does Photogrammetry Work?**

In the context of this report, I can't begin to scratch the surface of how complex and continuously developing a technology Photogrammetry is, with its evolving techniques and high-level mathematical principles. This is the primary reason why Photogrammetry is licensed and regulated under Land Surveying in NC and requires the Licensed Professional to continue his/her education in the form of Professional Development Hours (PDHs) throughout their career, typically on an annual basis.

*Following is a very fundamental description of how Photogrammetry works…*

Photogrammetry is a three-dimensional (3D) coordinate measuring technique that uses photographs or images, most often from an airborne platform, as the essential source for locating, measuring and recording survey data or useful information. Throughout the history of Photogrammetry airborne platforms have ranged from balloons and kites, to fixed wing aircraft, rotor wing aircraft, satellites and unmanned autonomous vehicles (UAV), or more commonly known as drones. The airborne platform used to collect the imagery doesn't matter, the subsequent Photogrammetric workflow to achieve the desired survey data or useful information is exactly the same regardless of how the imagery is acquired.

The fundamental principle used in photogrammetry is triangulation. When using aerial imagery, it's often referred to as aero-triangulation or aerial triangulation. By taking photographs from at least two different locations, lines of sight, also called image rays, can be developed from each camera principal point to points on the object. These image rays, due to their optical nature, are mathematically intersected to produce the three-dimensional (3D) coordinates of the points being measured. Triangulation is also the principle used by theodolites for coordinate measurements in Land Surveying. Triangulation is also how the two human eyes work together to gauge distance which is called depth perception.

Responsible Photogrammetric practice includes the use of metric cameras and sensors that are engineered, designed and manufactured specifically for surveying and mapping applications. A metric camera is very high quality, very expensive, and virtually distortion free. A metric camera utilizes a leaf shutter, has a focal length and internal dimensions which are exactly known through calibration, and can maintain calibration for long periods of time over numerous airborne missions, thus providing accurate, repeatable and dependable results for triangulation and survey data extraction time after time.

A modern metric digital camera may often be called a sensor because they're digital in nature however, another example of a metric sensor used for terrestrial, mobile and airborne surveys is LiDAR, which is an acronym for Light Detection and Ranging. Lidar is a method for determining ranges by targeting an object with a laser and measuring the time for the reflected light to return to the receiver (Wikipedia). LiDAR sensors can vary widely in quality, accuracy and cost, and are utilized in a wide variety of industries including surveying and mapping, manufacturing automation, agriculture, automotive safety and many others.

3

Over the past 50 years, new metric airborne cameras and sensors for commercial Photogrammetry and Remote Sensing surveying operations have ranged in cost from $300,000.00 to as much as $1,500,000.00. This doesn't include the software and internal infrastructure required for developing or post processing the imagery or other types of sensor data. These cameras and sensors are essentially surveying instruments which were engineered, designed and manufactured specifically for the purpose of producing distortion free imagery and other types of remotely sensed data suitable for Photogrammetric surveying.

**My Experience in Photogrammetry**

I first started my Photogrammetry career in 1979 at the Ralph L. Woolpert Company (now Woolpert, LLP), an international Engineering, Land Surveying and Geospatial consulting firm headquartered in Dayton, Ohio. During my tenure at Woolpert, I was taught the basic principles of Photogrammetry and Land Surveying by highly trained and skilled Photogrammetrists and Surveyors. This was during the Analog development stage of Photogrammetry. Aero-triangulation was a manual process of locating, marking and measuring pass, tie and control points, also known as "bridging" in those days. Planimetric and topographic maps for engineering applications were manually drawn on mylar manuscripts by hand using projection or optical mechanical stereo-plotting devices, the imagery used was captured with analog metric aerial cameras using acetate based aerial film for distortion free imagery. Computers and or software had not yet been developed or integrated into Photogrammetry procedures and or processing.

From 1985 through 1995 I worked for several other regional, national and international Geospatial Consulting firms across the eastern United States. During this period of my career, I widened my experience in Photogrammetry to include project technical planning, production supervision and project management. This was during the Analytical development stage of Photogrammetry. Imagery was still being collected using analog metric aerial cameras using acetate based aerial film for distortion free imagery however, the development of main frame computers allowed for the development of block adjustment software, which greatly improved aero-triangulation, and the analytical stereo-plotter. Analytical stereo-plotters use a mathematical projection based on the co-linearity (two vectors pointing in the same direction) equation model. The mechanical element of the instrument is a very accurate, computer-controlled device that compares two photographs simultaneously (Wikipedia).

In February of 1996, I founded Spatial Data Consultants, Inc. (SDC), a regional Land Surveying and Geospatial consulting firm located in High Point, NC. From 1996 to present, I've witnessed and experienced the transition of Analytical Photogrammetry into Digital Photogrammetry. Film based metric analog aerial cameras have been replace with digital airborne sensors, both active and passive, for imagery, LiDAR or other remote sensing data. Although still used by some Photogrammetrists, analytical stereo plotters have been replaced by PC base Softcopy Photogrammetry software platforms utilizing specialized graphics cards, monitors, emitters and glasses allow for three-dimensional (3D) stereo viewing for Photogrammetric data collection and post processing.

During my 42-year career, Photogrammetry has been a constantly changing and progressive science within Land Surveying, requiring ongoing education and training in order to gain current technical knowledge and expertise. In my experience, Photogrammetry has always been viewed and practiced as a professional vocation under the guise of Land Surveying. I've always practiced Photogrammetry emphasizing professionalism, ethical conduct, compliance with legislated standards of practice; while observing regulatory and professional licensing requirements; in consideration of the health, safety and welfare of the general public.

**Using Drones for Photogrammetry and Surveying**

Modern drones equipped with cameras were first developed in the early 1980's for military applications. Hobbyist drones began to emerge in the early 2000's out of the remote control (RC) model aircraft community. Consumer off the shelf (COTS), or recreational drones became available around 2006, with popularity in the United States beginning to increase around 2015.

UAVs or drones offer an alternative aviation platform or tool for Photogrammetry besides fixed wing or rotor wing aircraft however, this doesn't necessarily mean lower cost for an acquisition system or lower project costs for the client. Drones and payloads engineered, designed and manufactured specifically for Surveying and Photogrammetry can cost upwards of $300,000.00 or more, compared to a COTS drone and payload which typically cost under $500.00, but can range in cost from under $500.00 to $1,500.00. Drones for other professional applications can cost tens of thousands of dollars, prices vary widely.

The availability of COTS drones along with the development of inexpensive, sometimes free, Structure from Motion (SfM) Photogrammetry software which allows for "black-box" processing, unsupervised when using internet cloud-based post processing services, or by unskilled users, has created an overwhelming surge in the popularity of Photogrammetry since 2015.

If it weren't for the introduction of low-cost drones and SfM post processing software the UAS gold rush within the Photogrammetry and Surveying industries we've experienced in recent years wouldn't have taken place. Mainstream surveying equipment manufacturers like Trimble, Leica, Topcon, Javad, Riegl, and many others, all started developing drone surveying systems and software as another surveying and mapping tool to market to their traditional client demographic, which were Surveyors, Engineers and Photogrammetrists, not recreational or hobbyist drone enthusiasts.

From around 2018 to present the development curve of drone sensors and post processing software has flattened. Currently, there are ample UAS systems available that have been engineered, designed and manufactured specifically for Photogrammetric Surveying, that can provide accurate, reliable and repeatable results.

**My Experience Using Drones for Photogrammetry and Surveying**

My experience with using a UAV or drone for Photogrammetry and Surveying began in early 2016 as a reaction to the overwhelming promotion and hype of drone photogrammetry and surveying within our industry. At that time, mainstream survey equipment and drone manufacturers were developing drone surveying systems and software, aggressively marketing them to Professional Surveyors and Engineers in an attempt to add the element of Photogrammetry to their everyday practice.

For myself, as a Professional Photogrammetric Surveyor, the appearance of drones in the industry was simply another airborne platform or tool we could utilize when the physical or technical scope of a project wasn't practical for a fixed wing or rotor wing aircraft however, drones have weight and payload limitations, so the most critical aspect of using a drone as an aviation tool for Photogrammetry and Surveying would be the cameras or sensors being used to collect imagery or other remote sensing data since mainstream metric airborne cameras and sensors for Photogrammetry and Surveying were designed for fixed wing or rotor wing aviation platforms.

5

During 2016 and 2017, with the assistance of Staff Members, Peers, Manufacturers and Clients, we began testing various COTS drone surveying systems and SfM Photogrammetry software applications to determine if we could achieve accurate, reliable and repeatable results compared to our proven Photogrammetric workflows using airborne imagery collected with metric airborne cameras or sensors from fixed wing or rotor wing aviation platforms, meeting Client expectations, and in compliance with regulated surveying and mapping standards.

The drone surveying systems we initially tested during this period were comprised of COTS drones and cameras, all of which didn't measure up when we compared the drone system survey data to verified field survey data or data derived from our standard photogrammetric procedures, which had also been validated by statistical analysis using surveyed ground control and check points. We attributed the inaccuracy of the SfM processed drone survey data to the following technical or physical limitations.

***Technical Limitations***
1) The COTS cameras we tested consisted of digital single-lens reflex camera (DSLR) cameras which aren't metric, or in other words, aren't calibrated by the manufacturer. Each time the camera was turned on the calibration changed.
2) The COTS cameras we tested utilized a rolling shutter. A rolling shutter camera scans the pixels of each image, introducing pixel shifts with the movement of the camera over the duration of the scan. Pixel displacement in the images caused feature matching problems and inaccurate camera parameters during SfM Photogrammetry post processing.
3) The COTS cameras we tested didn't have a precise center of exposure pulse for geocoding each image with accurate relative coordinates.
4) The COTS cameras we tested weren't coupled with survey grade GPS for geocoding each image with accurate absolute coordinates.
5) The center of exposure pulse precision and non-survey grade GPS coupled with the COTS cameras we tested didn't produce post processed data within the manufacturers advertised accuracy for direct georeferencing. We tested a number of scenarios introducing surveyed ground control into the post processing, from minimal to saturated configurations until we achieved somewhat accurate results.

***Physical Limitations***
1) Vegetation caused problems during SfM post processing. Dense brush and tree canopy yielded incomplete triangulation which couldn't be corrected by manual inspection and measuring due to extremely small image footprints and the fact there were no visible locations in the imagery to accurately measure triangulation tie or pass points, also known
2) Vegetation on site caused problems during SfM post processing. Grass and weeds yielded point cloud elevation points which didn't represent bare earth or ground elevation. The SfM Photogrammetry software didn't allow for visual 3D inspection of the point cloud data for manual review and correction by a highly trained and skilled Photogrammetric Technician as our standard 3D Photogrammetric software platform and workflow allows for.
3) Other site conditions such as surface motion, highly reflective surfaces and consistent surface patterns all caused pixel matching problems during SfM post processing. These conditions might include trees moving in the wind, moving or static water, highly reflective surfaces, row crops, new asphalt or concrete.

The extensive tests we conducted between 2016 and 2017 validated my decision to delay our implementation of drones into our acquisition and product development workflows. I felt the development of the systems, primarily using COTS components, and the software for post processing, were underdeveloped and being oversold by the Developers. In regards to Photogrammetry, Surveying and Mapping, everyone was jumping on the drone bandwagon prematurely in an attempt to ride the initial wave of commercial opportunities.

In late 2017, I made the decision to seek out a drone manufacturer to assist us in designing and developing a UAV Surveying system that would use components that were engineered, designed and manufactured specifically for Surveying and Mapping applications. We wouldn't try to implement any drone, camera or sensor technology for commercial operations thats was meant for the recreational consumer or hobbyist.

In early 2018 I reached out to Microdrones, an international company based in Germany, recently acquired by GE, with support facilities in Toronto, Canada and Atlanta, GA, to inquire about their interest in developing a fully integrated UAV system for Photogrammetry. Microdrones agreed to work with SDC to codevelop such a system which is now known as the mdLiDAR3000.

From February through July of 2018 SDC staff aided in the development of the mdLiDAR3000 hardware, flight control and management system and the data post processing software. SDC took delivery of the first mdLiDAR3000 drone Photogrammetry Mapping System in August of 2018. The basic composition of the system was as follows…
1) Microdrones md4-3000 Heavy Lift Drone
2) Riegl MiniVUX-1UAV LiDAR Sensor (LiDAR manufactured specifically for surveying)
3) Sony RX1RII Digital Camera (affixed lens, mechanical leaf shutter with precise exposure pulse)
4) Trimble APX-20 UAV DG (military and survey grade GNSS-INS for direct georeferencing)

After three years of research, testing and development, and a financial investment of nearly $500,000.00 we were ready and confident to begin offering drone Photogrammetry to our customer demographic. We were the first Geospatial company to commercially operate the Microdrones mdLiDAR3000 drone Photogrammetry system worldwide, and would have the distinction of being the only commercial operator until Microdrones announced the mdLiDAR3000 product release on September 29, 2018.

From August 2018 to present, SDC has successfully accomplished over eight hundred (800) commercial drone missions, in compliance with FAA, NCDOT Aviation, NCBELS and other state or local commercial drone operation and land surveying regulations, without a single reportable or unreportable incident. Being a responsible and professional organization, offering Photogrammetry and Surveying, including commercial drone aviation services, SDC carries the following insurance policies at a total annual expense of $38,113.56 for 2021.

1) Professional Liability Insurance (CNA)
   a. $2,000,000.00 aggregate limit per policy year, annual premium $5,864.00.
2) Commercial General Liability Insurance (Acord)
   a. $2,000,000.00 general aggregate limit per policy year, annual premium $3,130.00.
3) Automotive Liability (Acord)
   a. $1,000,000.00 combined single limit per policy year, annual premium $2,421.66.
4) Umbrella Liability (Acord)
   a. $4,000,000.00 aggregate limit per occurrence, annual premium $1,650.00.

7

5) Workers Compensation and Employers Liability (Acord)
   a. $1,000,000.00 per accident, per employee, annual premium $3,355.90
6) Aviation Insurance Policy Unmanned Aircraft Systems (Global Aerospace)
   a. $2,000,000.00 personal injury, annual premium $956.00.
   b. $255,000.00 hull coverage, annual premium $20,736.00.

Using a drone as an optional aviation tool for our Photogrammetry and Surveying operations hasn't eliminated our use of fixed wing or rotor wing aviation platforms for airborne imagery and LiDAR data acquisition. We only implement drone imagery and LiDAR acquisition into our project technical plan when it makes practical sense, typically the deciding factors being the location of the project site in relation to regulated or controlled airspace, the area size of the project, the distance we have to mobilize to the project site and the physical conditions of the site.

Photogrammetry is a very complicated and ever evolving science and industry, with challenges and difficulties that require highly trained and skilled staff, most often certified or licensed by a professional organization or regulatory Board. Adding unmanned autonomous vehicles (UAVs), non-metric sensors and Structure from Motion (SfM) Photogrammetry post processing software makes Photogrammetry even more complicated and difficult compared to using manned aviation platforms, metric sensors and traditional Photogrammetry software solutions that include more robust statistical analysis for post processing and 3D stereo viewing for data collection, data validation and quality control.

In our case, implementing a drone into our imagery and LiDAR acquisition workflow is not "cutting edge", or a "technical innovation", it's simply another means, or aviation tool, we use to collect airborne imagery and or LiDAR for our Photogrammetry project technical plans and workflows. Following is an outline for a typical Photogrammetry Project, be it UAS, fixed wing or rotor wing aviation platforms.

1) Project Technical Planning and Consulting (PLS, ASPRS Certified Photogrammetrist)
   a. Assess Client needs and objectives.
   b. Evaluate project technical and product requirements, scope of work (SOW).
   c. Flight and ground control planning.
   d. Cost estimating, technical and cost proposal development.
   e. Client consultations and or negotiation.
   f. Technical and cost proposal acceptance, contract execution.
2) Ground Control Survey (PLS, PLS Intern)
   a. Final control planning, refine project control point distribution and point locations.
   b. Research existing geodetic control, USGS and or State Geodetic Survey Agencies.
   c. Mobilize field crew and equipment to the project site.
   d. Select precise control point locations in the field, monument and pre-mark (target).
   e. Use conventional, Global Positioning Systems (GPS) surveying methods to obtain accurate horizontal and vertical coordinates for each control point.
   f. Select precise check point locations in the field, monument and pre-mark (target) them if they'll be enabled as control points for final post processing.
   g. Use conventional, Global Positioning Systems (GPS) surveying methods to obtain accurate horizontal and vertical coordinates for each check point.
   h. If using a Real Time Network (RTN), Real Time Kinematic (RTK) GPS survey methods, visit each control and or check point a minimum of two times for redundant measurements.

8

      i. If using conventional survey methods, GPS base station with rover RTK-GPS or static GPS point occupation, post process field data using OPUS and or Manufacturer specific survey post processing software.

      j. Output final ground control and check points in the project designed coordinate system using the appropriate horizontal datum, vertical datum and units.

      k. Prepare Ground Control Surveys Report, signed and sealed by the PLS in responsible charge of field survey operations.

3) Airborne Imagery and LiDAR Acquisition (PLS, FAA Commercial Pilot, Part-107 Certified Remote Pilot, Sensor Operator and or Observer).

      a. Final flight planning, review planned flight lines, forward or side overlap, altitude of operations, all other imagery and or LiDAR collection parameters, ensure regulatory compliance and public safety. For UAS, final flight planning includes selecting the launch and retrieve location for the drone.

      b. Assess airspace for restricted flight zones, submit waiver applications FAA approval, if required.

      c. Pilot safety check, FAA NOTAMs, TFRs and Aircraft Safety Alerts.

      d. Assess weather and wind forecasts and conditions, day of mission.

      e. Mobilize crew and equipment to the project site.

      f. For UAS, assess current site conditions to assure FAA Part-107 compliance and public safety. For some project sites, this requires flying a scout drone and collecting video which is reviewed and assessed in the field.

      g. For UAS, check ground control and or check points to ensure all are pre-marked prior to imagery acquisition, repair or replace targets as necessary.

      h. For UAS, to reduce GPS baseline distances, locate geodetic or local project benchmark for base station GPS occupation, collection of GPS baseline for drone exterior orientation (EO) trajectory data post processing. For some projects, CORS or SmartBase software post processing offer alternate base station options when required. Perform base station setup and begin collecting statice GPS.

      i. For UAS, assess and finalize drone launch and retrieve location, obtain permission if necessary.

      j. For UAS, prepare drone and payload, conduct preflight equipment and safety checks following documented operation and safety procedure checklists.

      k. For UAS, launch the drone, acquire imagery and or LiDAR, maintaining visual line of site with the drone. Land the drone, exchange batteries, launch drone for additional lifts, if required to complete acquisition.

      l. For UAS, review and verify ground control survey data, base station data, imagery and or LiDAR data acquired during the mission before leaving the project site, assuring complete data sets, no corrupted or incomplete files.

      m. Mobilize crew and equipment back to the hangar or office for field data transfer and post processing.

4) Airborne Imagery and LiDAR Post Processing (PLS, PLS Intern, Skilled Photogrammetric or LiDAR Technician)

      a. For large format metric digital airborne image sensors with multiple sensor heads or cameras, raw image data collected by the sensor system must be post processed, outputting exploitation images, typically 3-band (RGB) color, in some cases 4-band (RGBIR) color or false color infrared depending on which bands are used to display the images. The post processed exploitation images, 3 or 4 band, are used for subsequent photogrammetric processing and product development.

9

b. For UAS, images collected by the sensor system don't require supplementary post processing. Exploitation images, typically 3-band (RGB) color, are ready to use for subsequent photogrammetric processing and product development directly from the sensor data storage device.

c. Submit and post process base station data using OPUS for corrected positioning based on a minimum 2-hour static GPS collection.

d. Post process GPS base station data for exterior orientation (EO) trajectory data.

e. For UAS, post process preliminary orthoimage composite using SfM Photogrammetry. This preliminary orthoimage composite is used to assist LiDAR point cloud classification.

f. Post process raw LiDAR flight line data using EO data.

g. Isolate noise, assess LiDAR returns of the unadjusted LiDAR.

h. Post process LiDAR flight line data for relative orientation (RO), strip and bundle adjustments using ground control, creating a project LiDAR point cloud.

i. Based on terrain type, post process LiDAR point cloud by applying automated ground classification procedures. Output shaded surface, perform manual review and corrections to refine bare earth classification.

j. Post process statistical results for direct geo-referencing accuracy by comparing the bare earth classified LiDAR point cloud to the surveyed ground control points and or check points, generate LiDAR accuracy report.

k. Perform above ground LiDAR classifications based on ASPRS LAS Format 1.4.

l. Perform visual quality control inspection and refinement, assuring absolute classification and accuracy.

m. Post process final project colorized LiDAR point cloud.

n. Prepare LiDAR Post Processing Report, signed and sealed by the PLS in responsible charge of LiDAR field operations and post processing.

5) Aero-Triangulation Post Processing (PLS, PLS-Intern, Skilled Photogrammetric Technician)

a. AT strip and block preparation and project setup, organize and format if necessary: EO trajectory data, surveyed ground control and checkpoint data, exploitation imagery and camera data files.

b. Import all required data into the AT Post Processing software, setting up individual strips and a composite AT block. Identify and enter specific project post processing parameters based on the project technical requirements and SOW.

c. For projects that require a high level of accuracy, manually select and measure 2-ray and 3-ray pass points within individual strips (flight lines). A minimum of six, 3-ray pass points are required within the stereo overlap region of two consecutive exploitation images in a flight line to ensure measurement geometry and relative orientation (RO).

d. For projects that require a high level of accuracy, manually select and measure 4-ray, 5-ray or 6-ray tie points between the side overlap regions between strips (flight lines). A minimum of two, 6-ray pass points are required within the stereo overlap region of two consecutive exploitation images and two adjacent flight lines to ensure measurement geometry and RO.

e. For UAS, or projects that require lower levels of accuracy, conduct automatic or semi-automatic pass and tie point generation, often called auto-correlation, or SfM Photogrammetry. This type of automated process for pass and tie point geometry often requires visual review and supplemental manual measurements to refine the strips and block for successful RO, regardless of accuracy requirements.

f. Manually measure the surveyed ground control in reference to where it appears in the imagery.

10

J.A. 829

g. Post process the AT block for RO applying predetermined weigh factors for the image rays within the defined AT project parameters. Perform statistical analysis, review and remeasure image rays that fall outside tolerances set within the defined AT project parameters, refine the measurement rays util the overall RO sigma is within the defined AT project parameters for image measurement Root Mean Square Error (RMSE).

h. Post process the AT block for absolute orientation (AO) by enabling the EO trajectory data, surveyed ground control and or check points in the post processing solution, applying predetermined weight factors within the defined AT project parameters. Perform statistical analysis, review and remeasure image rays that fall outside tolerances set within the defined AT project parameters, refine the measurement rays util the overall AO sigma is within the defined AT project parameters for image measurement and ground control Root Mean Square Error (RMSE).

i. Finalize AT block AO bundle adjustment, densify control, apply bulk orientation to apply final RO, AO and single photo resection parameters to the final EO data and stereo models for 3D stereo feature collection.

j. Prepare AT Post Processing Report, signed and sealed by the PLS in responsible charge of AT measurement and post processing.

6) 3D Stereo Mapping (PLS, PLS-Intern, Skilled Photogrammetric Technician)

a. Stereo model and data collection setup, organize and format if necessary: final AT data files and stereo exploitation imagery.

b. Import all required data into the 3D Stereo Photogrammetric data collection software, setting up stereo models and CAD workspace environment. Identify and enter specific project data collection parameters based on the project technical requirements and SOW. Create project mapping limits and stereo model boundaries within the CAD workspace environment.

c. Cursory review of all project stereo models, visiting each surveyed control point, taking manual readings at each point to ensure horizontal and vertical accuracy comparing the actual field survey coordinates to the coordinates generated by the final AT AO solution, measured by the Technician within the 3D stereo models prior to feature data collection.

d. Manually measure and digitize 3D planimetric features based upon the project technical requirements and SOW: structural, transportation, utility, vegetation and hydrographic feature classes, any planimetric or cultural feature visible in the stereo imagery.

e. LiDAR data quality control, manual review for vertical accuracy in comparison to the 3D stereo model surface. Use automated and manual procedures to remove LiDAR points from conflicting structural and hydrographic features, as well as other 3D planimetric features included in DTM processing.

f. Manually measure and digitize supplemental 3D digital terrain model (DTM) features based upon the project technical requirements and SOW: supplemental DTM break lines and elevation points where LiDAR points don't adequately define the terrain surface. Use automated and manual procedures to remove LiDAR points from conflicting DTM features.

g. Generate temporary contours, measure and digitize supplemental spot elevations: tops, bottoms, saddles, areas where contours are spaced apart further than the project parameters allow for.

h. Detailed 3D stereo quality control review to ensure complete planimetric content, DTM accuracy and contour integrity.

11

J.A. 830

      i. Create final 3D mapping files for product development: separate 3D planimetric feature and 3D DTM feature files.

      j. Post process the final DTM file: quality control for duplicate points or crossing break lines, export final contours and required surface files, XML or TIN.

      k. Combine final 3D mapping files for product delivery: final planimetric and topographic feature file, final DTM feature file and final DTM surface file, in appropriate CAD, GIS, XML or TIN formats.

      l. Develop digital mapping metadata.

7) Orthoimage Post Processing (PLS, PLS Intern, Image Analyst, Skilled Photogrammetric Technician)

      a. Perform global exploitation image radiometry adjustments, correcting the project exploitation images for dynamic range, tone, color, contrast and brightness.

      b. Orthoimage project and workspace setup, organize and format if necessary: final AT data files, final project DTM or digital elevation model (DEM) surface files and exploitation imagery.

      c. Post process preliminary exploitation orthoimages for visual quality control review and seam line development.

      d. Develop seam lines using automatic, semi-automatic or manual seam line digitizing techniques.

      e. Visual seam line quality control review using image transparency functions and custom MDL utilities to avoid seam line conflicts and DTM or DEM blunder detection.

      f. Edit seam lines, correct DTM or DEM blunders.

      g. Post process final exploitation orthoimages for mosaic post processing.

      h. Import final seamlines and exploitation orthoimages in the project workspace, process seam line polygons and exploitation orthoimage polygon assignments.

      i. Mosaic post processing, including secondary image color and tone matching adjustment, combining multi-resolution imagery if required, creating a seamless transition and visually consistent result for GeoTIFF output as one composite orthoimage or predetermined orthoimage tiles.

      j. Internal macro quality review, visual inspection for image artifacts, seam line blunders or other image distortion introduced during the mosaic post processing.

      k. Perform macro quality review corrections.

      l. GeoTIFF product development: modify GeoTIFF header if required, output specific orthoimage mosaic or tile formats… TIFF, MrSID, JPG2000, or other image formats.

      m. Develop orthoimage metadata.

      n. Prepare Orthoimage Post Processing Report, signed and sealed by the PLS in responsible charge of AT measurement and post processing.

8) Product Deliver, Project Conclusion (PLS, ASPRS Certified Photogrammetrist)

      a. Product delivery to the Client via FTP or other electronic data transfer.

      b. Draft and submit a Project Certification Letter or Airborne Surveys Report detailing the tasks, procedures, equipment, software, technical specifications, survey standards, statistical analysis for horizontal and vertical accuracy, signed and sealed by the PLS in responsible charge, overseeing all project tasks.

The outline above is an example of a typical Photogrammetric Survey Project, the task descriptions are brief and non-technical in nature, true technical documentation of a Photogrammetry, applications, theory and workflows, could take hundreds of pages.

12

Photogrammetry text books are extremely technical, outlining the complex and arduous mathematics and principals Photogrammetry is based upon, fundamental changes in photogrammetric theory or practice due to technological changes such as widespread adoption of digital imagery and the emergence of separate fields with strong photogrammetric components, such as geographic information systems (GIS) and remote sensing. These text books are typically for graduate-level courses at the Master's level.

Some Photogrammetry projects can be far more complex than outlined above, some could be less complex than outlined above. Project scope and workflow can vary widely from project to project however, any Photogrammetric project, regardless of complexity, requires extensive expertise, knowledge and skill to ensure survey integrity and accuracy, meeting or exceeding applicable regulatory standards, conducted in a professional and ethical manner.

For the past 25 years SDC has thrived as a Photogrammetry, Surveying and Geospatial firm here in NC, serving a wide variety of private and government Clients. Since licensure in 1999 with NCBELS, for the past 22 years, both myself as a Professional Land Surveyor and SDC as a Professional Corporation, our success in the industry hasn't been impeded in any manner through professional regulatory compliance. If a poll was taken of the other 4,370 licensed Professional Firms, 2,336 licensed Professional Land Surveyors, and 29,585 licensed Professional Engineers in NC, I'm sure all or the majority would agree that regulatory compliance isn't cumbersome or an inconvenience, it's an asset, and ensures the public is protected from malpractice.

Being licensed by NCBELS, both as an individual and a corporation, assures our clients and the public that we've met specific standards for education, expertise and experience. With professional licensure comes obligations for professional conduct and ethics, and the requirement to maintain proper insurances for business liability, aviation operations and professional liability - errors and omissions, which protects the public from malpractice. Licensure with NCBELS and other regulatory agencies has afforded us business opportunities and allowed us to be successful by validating our credentials.

For the past three years, implementing drones and establishing an internal UAS program hasn't increased the number of projects we've been awarded compared to years prior to implementing drones, our gross annual revenue has remained somewhat consistent over the past three years compared to previous years. The only change that has occurred for us is we're using the UAS for projects that we'd have utilized a fixed wing or rotor wing aircraft in the past, which really isn't a change if you consider a drone as just another aviation tool.

The projects we fly using the UAS are typically 150 acres or less, are within a reasonable distance from our office, or have specific requirements for horizontal or vertical survey accuracy that can only be equaled by conventional ground survey methods. In some project cases, the Client's expectation for horizontal and vertical accuracy is 0.05' for clearly defined features and non-vegetated surfaces, 0.1' vertical accuracy for vegetated surfaces.

**Photogrammetry - Aerial Surveying - Topographic Surveying Regulated in North Carolina.**

The North Carolina Legislature designated the practice of Land Surveying as a profession. *See* N.C.G.S. § 89C-3(7)(a).

13

"Land surveying encompasses a number of disciplines including geodetic surveying, hydrographic surveying, cadastral surveying, engineering surveying, route surveying, **photogrammetric (aerial) surveying, and topographic surveying**." *See* N.C.G.S. § 89C-13(b).

The practice of land surveying includes the following. *See* N.C.N.C.G.S. § 89C-3(7):
1) Locating, relocating, establishing, laying out, or retracing any property line, easement, or boundary of any tract of land;
2) Locating, relocating, establishing, or laying out the alignment or elevation of any of the fixed works embraced within the practice of professional engineering;
3) Making any survey for the subdivision of any tract of land, including the topography, alignment and grades of streets and incidental drainage within the subdivision, and the preparation and perpetuation of maps, record plats, field note records, and property descriptions that represent these surveys;
4) Determining, by the use of the principles of land surveying, the position for any survey monument or reference point, or setting, resetting, or replacing any survey monument or reference point;
5) Determining the configuration or **contour** of the earth's surface by measuring lines and angles and applying the principles of mathematics or **photogrammetry**;
6) Providing geodetic surveying which includes surveying for determination of the size and shape of the earth both horizontally and vertically and the precise positioning of points on the earth utilizing angular and linear measurements through spatially oriented spherical geometry; and
7) Creating, preparing, or modifying electronic or computerized data, including land information systems and geographic information systems relative to the performance of the practice of land surveying.

**The purposes of Regulating Land Surveying in North Carolina**

The Act provides that "in order to safeguard life, health, and property, and to promote the public welfare, the practice of engineering and the practice of land surveying in this State are hereby declared to be subject to regulation in the public interest." *See* NC G.S. § 89C-2.

In my opinion, Land Surveying and Photogrammetry are regulated in the State of NC to protect the public, individuals and businesses, from negligence, incompetence, professional misconduct or any other form of malpractice in the performance of services within the profession.

Furthermore, Land Surveying and Photogrammetry as a profession, is not "artistic impression" protected under the First Amendment. Art or artistic impression is for entertainment purposes, while surveying is providing useful information for a functional use.

Relying on untrained and unskilled amateurs to recognize any of the multiple varieties of problems or deficiencies that can arise from the measurements, computations or use of tools for the survey profession to create useful survey data, could be catastrophic to the outcome of a project and harm the public at large who relies on the accuracy and fidelity of this information.

Through proper education, training and years of practice under the guidance of others, along with regulation for standards of practice, the Professional understands the irregularities that occur within the practice of the profession and has the experience and expertise to avoid them, producing repeatable measurements and useful survey data, capable of being vetted by other Professionals as verification of the results.

14

*Regulation of Land Surveying through the development of an inclusions and exclusions list.*

The Board actively updates and publishes policies to include or exclude activities that fall within, or outside the definition of the practice of land surveying as defined by N.C.G.S. § 89C-3(7).

From April, 2008 until October, 2011, in coordination with the NC Geographic Information Coordinating Council (GICC), the Board codeveloped GIS Inclusions/Exclusions Guidelines, these guidelines assist in determining if features or items of data are included or excluded from the definition of Land Surveying in N.C.G.S. § 89C-3(7). https://www.ncbels.org/wp-content/uploads/2019/03/gisinc_excl.pdf

While it is true that the guidelines are based upon elements that often show up in GIS databases, it is meant to use those as items representative of what may come into question as to whether it is within the definition of Land Surveying in N.C.G.S. § 89C-3(7), and requires a PLS. The statement at the top of the guidelines describes the authoritative purpose that it is to be relied upon by the public for the location and dimension data or is given to some stated accuracy.  If so, then it is land surveying data.

### Specific Issues Raised in the Complaint

**A.   *"Capturing aerial images on behalf of paying clients and using orthomosaic software to stich those aerial images together to form orthomosaic maps."***

In my opinion, this could be a gray area because of the use of the word "map" and whether or not the orthomosaic is printed or in a digital format.

The word "map" may imply or be interpreted as a survey, or document that is corrected for distortion, is scalable and can be used for accurate measurements.

If the document was printed, also called "hard-copy", and didn't include a reference grid, scale bar, north arrow, title block, etc., basically just a printed picture, this would not be regulated.

If the orthomosaic is in a digital format such as Adobe PDF and doesn't include georeferencing information in the file header as metadata, in my opinion, this would not be regulated. If the orthomosaic was any other digital format such as TIFF, TIFFJPG, JPG2000, MrSID, etc., and didn't include georeferencing information in the file header as metadata or accompanied by a separate georeferencing metadata file, in my opinion, this also would not be regulated.

If the orthomosaic is in a digital format such as TIFF, TIFFJPG, JPG2000, MrSID, etc., and does include geo-referencing information in the file header as metadata or is accompanied by a georeferencing metadata file, in my opinion, this would be regulated as it falls under the definition of Land Surveying within N.C.G.S. § 89C-3(7).

**B.   *"Creating marketing images of land on behalf of paying clients and drawing on those images lines indicating the approximate position of property boundaries."***

In my opinion, this would not be regulated, as long as the marketing images are printed with no reference grid, scale bar, north arrow, title block, etc., Or, are in a digital format with no georeferencing information in the file header as metadata, or accompanied by a georeferencing metadata file.

15

J.A. 834

A client could just as easily use screen capture software to create the same image with boundaries from a County GIS website although, these types of websites include disclaimers the User must acknowledge and agree to, and the client wouldn't be paying a fee for the image.

**C.** ***"Capturing aerial images of land and structures (along with location data, coordinates, elevation data, and volume data) and making those images and that data available to paying clients."***

In my opinion, this would be regulated as it falls under the definition of Land Surveying within N.C.G.S. § 89C-3(7).

**D.** ***"Capturing aerial images of and data about land and structures; processing those images and data to create 3D digital models of land and structures; and making those 3D digital models available to paying clients."***

In my opinion, this would be regulated as it falls under the definition of Land Surveying within N.C.G.S. § 89C-3(7).

Mark S. Schall, CP, PLS, PPS, SP

November 26, 2021
Date

16

 **SDC RESUME**

**Name & Title:** Mark S. Schall        Chief Professional Officer

**Years of Experience:** With This Firm: 25    With Other Firms: 17

**Education:**
- High School Diploma: Northmont Senior High School, Clayton, OH
- 437.5 Hours of Continued Education required for Professional Registrations

**Active Registrations & Affiliations:**
- 1994 / Certified Photogrammetrist (CP# 950) ASPRS
- 1999 / North Carolina Professional Land Surveyor (L-4019)
- 2003 / South Carolina Professional Photogrammetric Surveyor (22679)
- 2010 / Virginia Surveyor Photogrammetrist (#75)
- North Carolina Society of Surveyors (NCSS)

**Experience and Qualifications:**
- 42 years of experience in Photogrammetry, Land Surveying, Remote Sensing and GIS.
- 33 years of project management and coordination experience.
- 33 years of production management experience.
- 22 years specialized experience as the Professional Land Surveyor (PLS) in responsible charge of projects awarded under contracts with North Carolina state agencies, most specifically NCDOT, CGIA, NCWRC & NCRC.

**Project Experience and Qualifications:**
- Project Manager and PLS in responsible charge for the 2016-2017 NCDOT 00157-Photogrammetric Services, Photogrammetry Limited Services Agreement, (LSA) 70000016554.
- Project Manager and PLS in responsible charge for the 2016-2017 NCDOT 00002-Aerial Imagery Services Limited Services Agreement, (LSA) 70000016550.
- Project Manager and PLS in responsible charge for the 2018-2020 NCDOT 00157-Photogrammetric Services, Photogrammetry Limited Services Agreement, (LSA) 70000018520.
- Project Manager and PLS in responsible charge for the 2018-2020 NCDOT 00002-Aerial Imagery Services Limited Services Agreement, (LSA) 70000018526.
- Project Manager and PLS in responsible charge for the 2021-2023 NCDOT Aerial Surveying Services Limited Services Contract, (LSC) 70000020804.
- Project Manager and PLS in responsible charge for the NC Coastal Orthoimagery 2016 Project, CO16.
- Project Manager and PLS in responsible charge for the NC Eastern Piedmont Orthoimagery 2017 Project, EP17.
- Project Manager and PLS in responsible charge for the NC Northern Piedmont and Mountains Orthoimagery 2018 Project, NPM18.
- Project Manager and PLS in responsible charge for the NC Southern Piedmont and Mountains Orthoimagery 2019 Project, SPM19.
- Project Manager and PLS in responsible charge for the NC Coastal Orthoimagery 2020 Project, CO20.
- Project Manager and PLS in responsible charge for the NC Eastern Piedmont Orthoimagery 2021 Project, EP21.

USCA4 Appeal: 23-1472    Doc: 19-4    Filed: 06/28/2023    Pg: 146 of 297

11/17/2021    360 Virtual Drone Services, et al. v. Andrew L. Ritter, et al.    Alex Abatie

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF NORTH CAROLINA

_____

360 VIRTUAL DRONE SERVICES, et    )

al.,                              )

                                  )

              Plaintiffs,         )

    vs.                           )    Case No.

                                  )    5:2021cv00137

ANDREW L. RITTER, et al.,         )

                                  )

              Defendants.         )

_____)

Videoconference deposition of ALEX ABATIE, taken
remotely in the above-captioned cause, before
Rachel F. Gard, CSR, RPR, CLR, CRR, commencing at
the hour of 3:03 p.m. Eastern Standard Time on
Wednesday, November 17, 2021.

_____

DIGITAL EVIDENCE GROUP

1730 M Street, NW, Suite 812

Washington, D.C. 20036

(202) 232-0646

11/17/2021      360 Virtual Drone Services, et al. v. Andrew L. Ritter, et al.      Alex Abatie

```
                                                     Page 2
 1    A P P E A R A N C E S (Via Videoconference):

 2

 3        INSTITUTE FOR JUSTICE
          Attorneys for Plaintiffs
 4            901 North Glebe Road
              Suite 900
 5            Arlington, Virginia 22203
              Phone:   703.682.9320
 6            Email:   sgedge@ij.org
                       jknight@ij.org
 7        BY: SAMUEL B. GEDGE, ESQ.
 8            JAMES KNIGHT, ESQ.
 9

10        GRAEBE HANNA & SULLIVAN, PLLC
          Attorneys for Defendants
11            4350 Lassiter at North Hills Avenue
              Suite 375
12            Raleigh, North Carolina 27609
              Phone:  919.863.9091
13            Email:  dhanna@ghslawfirm.com
14        BY: DOUGLAS W. HANNA, ESQ.
15

16    ALSO PRESENT:
17    JOHN M. LOGSDON, Logsdon & Neece, PLLC
18

19

20

21

22
```

www.DigitalEvidenceGroup.com Digital Evidence Group C'rt 2021      202-232-0646
Case 5:21-cv-00137-FL   Document 39-7   Filed 03/28/22   Page 2 of 89

J.A. 838

                                                        Page 3

 1                          I N D E X

 2    WITNESS                                    PAGE

 3    ALEX ABATIE

 4         Examination by Mr. Hanna                 4

 5

 6                       E X H I B I T S

 7    DEPOSITION EXHIBIT                          PAGE

 8     Exhibit 1     Report of Alex Abatie         6

 9     Exhibit 2     DARTDrones webpage           26

10     Exhibit 3     DARTDrones workshop          29

11                   brochure

12     Exhibit 4     Workshop Overview            31

13

14

15

16

17

18

19

20

21

22

                              J.A. 839

USCA4 Appeal: 23-1472    Doc: 19-4        Filed: 06/28/2023    Pg: 149 of 297

Page 4

 1                              (Witness sworn.)

 2    WHEREUPON:

 3                        ALEX ABATIE,

 4    called as a witness herein, having been first duly

 5    sworn, was examined and testified as follows:

 6                        EXAMINATION

 7    BY MR.HANNA:

 8        Q.   Can you state your name for the record,

 9    spelling your last name.

10        A.   Alex Abatie.   A B, as in boy, A T, as in

11    Tom, I E, as in echo.

12        Q.   Is it pronounced Abatie?

13        A.   Correct, Abatie.

14        Q.   Mr. Abatie, my name is Doug Hannah.   I

15    represent the defendants in a lawsuit filed by

16    plaintiffs 360 Virtual Drone Services, LLC, and

17    Michael Jones in Case No. 5:21cv0137 that is pending

18    in the Eastern District of North Carolina.

19              Are you familiar with that case?

20        A.   No.

21        Q.   Okay.   Are you -- do you know anything

22    about the lawsuit?

www.DigitalEvidenceGroup.com Digital Evidence Group C'rt 2021              202-232-0646
Case 5:21-cv-00137-FL   Document 39-7   Filed 03/28/22   Page 4 of 89

J.A. 840

Page 5

```
 1        A.   I know that I was asked to provide some

 2   information about mapping with drones and I had

 3   got some information, but I didn't know the court,

 4   the case, who the defendants and plaintiffs were.

 5        Q.   Okay.  Do you know anything about 360

 6   Virtual Drone Services?

 7        A.   I do not.

 8        Q.   Do you know -- do you know Michael Jones?

 9        A.   I do not.

10        Q.   And who contacted you to be an expert

11   witness?

12        A.   The lawyers, Sam and James.

13        Q.   And do you understand that you're being

14   designated as an expert witness in the lawsuit

15   that's pending in federal court in the Eastern

16   District of North Carolina?

17        A.   Yes, I do.

18        Q.   Okay.  We represent the defendants in this

19   case.  Do you know anything about the claims that

20   were made?

21        A.   I do not.

22        Q.   I'm going to try to use the screen sharing
```

Page 6

1    tool to show you an exhibit.  Let me get my exhibit

2    up first.  And the first exhibit that I wanted to

3    show you.

4                         (Deposition Exhibit Number 1

5                         marked for identification.)

6        Q.   And do you see a copy of your report on

7    the screen share?

8        A.   I do.

9        Q.   Okay.  And there was -- the PDF that I had

10   sent out to the court reporter and to opposing

11   counsel is 14 pages.  Does that sound right, your

12   report was 14 pages in length?

13       A.   I believe that's correct, yes.

14       Q.   All right.  And I'm going to mark your

15   report as Exhibit 1 and refer to it throughout the

16   deposition as Exhibit 1 or your report.  Okay?

17       A.   Yes.

18       Q.   Do you have a copy of that report in front

19   of you?

20       A.   I do.  I have it on another computer here

21   on the side.

22       Q.   All right.  And so from time to time

www.DigitalEvidenceGroup.com Digital Evidence Group C'rt 2021        202-232-0646
Case 5:21-cv-00137-FL   Document 39-7   Filed 03/28/22   Page 6 of 89

J.A. 842

Page 7

1    throughout the deposition, I'm going to ask you some

2    questions about it.

3            So just sort of to begin I think as an

4    overview, you were asked to give certain opinions in

5    this case, correct?

6        A.    Correct.

7        Q.    What opinions are you referring in this

8    lawsuit?

9        A.    From my understanding, what I am offering

10   is how drones can be used for mapping and 3D

11   modeling and to offer some examples on how that's

12   done.

13       Q.    So you're -- as I understand it, your

14   opinions would be essentially you're offering

15   information as to the use of drones in mapping?

16       A.    Correct.

17       Q.    Okay.  And when you used the term

18   "mapping," what do you mean?

19       A.    Using drones to create certain products

20   that clients can use in their business ventures.

21       Q.    All right.  What kind of products?

22       A.    Things like 3D models, point clouds,

www.DigitalEvidenceGroup.com Digital Evidence Group C'rt 2021          202-232-0646
Case 5:21-cv-00137-FL   Document 39-7   Filed 03/28/22   Page 7 of 89

J.A. 843

USCA4 Appeal: 23-1472    Doc: 19-4    Filed: 06/28/2023    Pg: 153 of 297

Page 8

1    images, photographic images, orthographic maps.

2        Q.    Orthographic maps?

3        A.    Yes.

4        Q.    Okay.  And so earlier you said the first

5    area of, I guess, the first opinion you would offer

6    is how drones can be used for mapping and 3D

7    modeling.  Is there a difference between mapping and

8    3D modeling?

9        A.    I'm not quite sure I understand the

10   question.  They're different products, I guess.

11       Q.    Well, I'm actually just going on your

12   testimony.  Your testimony was that you were asked

13   to give an opinion as to how drones can be used for

14   mapping and 3D modeling; is that correct?

15       A.    Correct.

16       Q.    Okay.  And so I wanted to kind of break

17   that down so that the judge or the jury could

18   understand, what is the difference between mapping

19   and 3D modeling?

20       A.    The difference is in what the final

21   result of the data collection is, and a 3D model

22   is really just a different digital file, a

www.DigitalEvidenceGroup.com Digital Evidence Group C'rt 2021        202-232-0646
Case 5:21-cv-00137-FL   Document 39-7   Filed 03/28/22   Page 8 of 89

J.A. 844

USCA4 Appeal: 23-1472    Doc: 19-4    Filed: 06/28/2023    Pg: 154 of 297

11/17/2021    360 Virtual Drone Services, et al. v. Andrew L. Ritter, et al.    Alex Abatie

Page 9

1    different way to look at the image, the

2    information that's been collected.

3         Q.   And so can you use those two terms

4    interchangeably?

5         A.   No, they're different -- they're

6    different products.

7         Q.   Okay.  And so when I asked you to define

8    "mapping," you said using drones to create certain

9    products.  Is that the full definition of mapping?

10        A.   I would think so.  I don't know what the

11   full definition would be.

12        Q.   All right.  And I'm just trying to educate

13   myself and the judge and hopefully the jury as to

14   when you're going to offer an opinion about how

15   drones can be used for mapping, what is mapping?

16        A.   It's using drones to collect information

17   that can then be output as a file that -- and

18   information that can be used to orient things in

19   space, give an overview of a site that's not

20   possible in a single photograph.

21        Q.   Anything else?

22        A.   I don't think so.

www.DigitalEvidenceGroup.com Digital Evidence Group C'rt 2021    202-232-0646
Case 5:21-cv-00137-FL    Document 39-7    Filed 03/28/22    Page 9 of 89

J.A. 845

11/17/2021    360 Virtual Drone Services, et al. v. Andrew L. Ritter, et al.    Alex Abatie

Page 10

1        Q.    Okay.  And what qualifies you to give an

2    opinion about mapping?

3        A.    Well, I have done this work in my

4    business.  And I work for a company as an

5    instructor, and we offer classes in how to do this

6    kind of work.

7        Q.    All right.  And so your work experience?

8        A.    Okay.  Yeah.

9        Q.    Okay.  Anything else besides your work

10    experience?

11        A.    No, I don't think so.

12        Q.    And do you have any specific education in

13    mapping?

14        A.    I have some education with a company that

15    does this kind of, you know, has created software

16    to take images from drones and create some of

17    these products.

18        Q.    Which company is that?

19        A.    I have some training with PIX4D.

20        Q.    And the company that you work for

21    currently, what's the name of that company?

22        A.    That I do instruction with?

www.DigitalEvidenceGroup.com Digital Evidence Group C'rt 2021    202-232-0646
Case 5:21-cv-00137-FL    Document 39-7    Filed 03/28/22    Page 10 of 89

J.A. 846

USCA4 Appeal: 23-1472    Doc: 19-4    Filed: 06/28/2023    Pg: 156 of 297

Page 11

```
1        Q.   Yes, that you were -- I think you

2   reference it in your expert report that you prepared

3   this report through DARTDrones.  Is that the company

4   you're referencing?

5        A.   Correct, yes.

6        Q.   Okay.  All right.  So how about education?

7   Where did you go to school?

8        A.   For my bachelor's degree I went to UCSB,

9   University of California --

10       Q.   University of California, Santa Barbara?

11       A.   Correct.

12       Q.   And you have a BA in photography?

13       A.   Correct.

14       Q.   And do you have any other degrees?

15       A.   No.

16       Q.   And you graduated in 1997?

17       A.   Correct.

18       Q.   Where did you go to work after you

19   graduated in 1997?

20       A.   I went to work -- well, I was already

21   working at the Santa Barbara Independent.

22       Q.   Is that a newspaper?
```

www.DigitalEvidenceGroup.com Digital Evidence Group C'rt 2021    202-232-0646
Case 5:21-cv-00137-FL   Document 39-7   Filed 03/28/22   Page 11 of 89

J.A. 847

Page 12

1        A.    That is, yes, a newspaper.

2        Q.    And what was your role there?

3        A.    At the time my role there was process

4    camera operator.

5        Q.    And what does a process camera operator

6    do?

7        A.    I took photographs and sized them

8    properly and turned them into half tones,

9    basically dots, so they could be reproduced on the

10   press.

11       Q.    Okay.  And how long did you work at the

12   Santa Barbara Independent?

13       A.    I worked off and on at the Santa Barbara

14   Independent from 1995 until 2006.

15       Q.    Did you have -- was that a full-time job

16   in that period of time?

17       A.    Yes.  Not the whole time, but yes, near

18   the end for sure.

19       Q.    Okay.  And did you -- were you a process

20   camera operator during this period of time from 1995

21   to 2006?

22       A.    No.

www.DigitalEvidenceGroup.com Digital Evidence Group C'rt 2021    202-232-0646
Case 5:21-cv-00137-FL    Document 39-7    Filed 03/28/22    Page 12 of 89

J.A. 848

11/17/2021    360 Virtual Drone Services, et al. v. Andrew L. Ritter, et al.    Alex Abatie

Page 13

1     Q.   What did you do -- trying to get an

2   understanding of your experience.

3     A.   Okay.

4     Q.   When you graduated in '97, you were

5   working at Santa Barbara Independent as a process

6   camera operator.  How long did you work as a process

7   camera operator for the Santa Barbara Independent?

8     A.   I don't remember the exact dates, but I

9   think it was maybe a year and a half, 2 years.

10     Q.   All right.  Which would take us to about

11   '99.  And then what did you do at that time?

12     A.   I became a -- no, it would not be '99.  I

13   started in '95, so this was maybe '97.  I became a

14   designer, graphic designer.

15     Q.   So when you graduated from UCSB, you

16   became a graphic designer at the Santa Barbara

17   Independent?

18     A.   Yeah.  Eventually, yes.

19     Q.   And what does a graphic designer do?

20     A.   The job that I did was to lay out the

21   paper.

22     Q.   And how long were you a graphic designer

www.DigitalEvidenceGroup.com Digital Evidence Group C'rt 2021         202-232-0646
Case 5:21-cv-00137-FL   Document 39-7   Filed 03/28/22   Page 13 of 89

J.A. 849

USCA4 Appeal: 23-1472    Doc: 19-4    Filed: 06/28/2023    Pg: 159 of 297

Page 14

1    at the newspaper?

2        A.    Again, I don't remember the exact dates.

3    I think maybe 3 or 4 years.

4        Q.    Okay.  And so that would take us to about

5    2001/2002; is that true?

6        A.    Somewhere around there.

7        Q.    And then what did you do?  Did you switch

8    jobs?

9        A.    No, I was promoted to art director.

10        Q.    Art director at the newspaper?

11        A.    Correct.

12        Q.    And what does an art director do?

13        A.    As the art director, I managed a design

14    staff.  I commissioned artwork from photographers

15    and illustrators, and I managed the budget.

16        Q.    And how long were you the art director at

17    the Santa Barbara Independent?

18        A.    Again, until 2004.  Maybe.  My memory is

19    not -- I hadn't expected to give a full work

20    accounting.

21        Q.    The reason why I'm asking is in your

22    expert report, I think you identify the basis --

www.DigitalEvidenceGroup.com Digital Evidence Group C'rt 2021    202-232-0646
Case 5:21-cv-00137-FL   Document 39-7   Filed 03/28/22   Page 14 of 89
J.A. 850

11/17/2021    360 Virtual Drone Services, et al. v. Andrew L. Ritter, et al.    Alex Abatie

Page 15

1    your basis of your opinion.  Let me see if I can

2    find that.  You say on page 1:  In preparing this

3    report, in forming the opinions expressed in it, I

4    relied on my knowledge of drones, photography,

5    mapping, and image processing, as well as the

6    materials cited in this report.

7              And your report cites your degree and

8    obviously your current job.  So I'm just trying to

9    get an understanding of your work history, just so I

10   understand your experience, the scope of your

11   experience.  So anyway, we're at 2004.  And, again,

12   just approximate times, but where did you go next in

13   your work life?

14        A.   I believe at that point I moved jobs to a

15   catalog company.

16        Q.   What's the name of that company?

17        A.   Territory Ahead.

18        Q.   And what was your job there?

19        A.   I was a catalog designer, and I managed

20   photo shoots.

21        Q.   How long did you work for Territory Ahead?

22        A.   I believe I was there for a couple years.

www.DigitalEvidenceGroup.com Digital Evidence Group C'rt 2021          202-232-0646
Case 5:21-cv-00137-FL    Document 39-7    Filed 03/28/22    Page 15 of 89

J.A. 851

11/17/2021    360 Virtual Drone Services, et al. v. Andrew L. Ritter, et al.    Alex Abatie

Page 16

1        Q.   So would that be about the 2006 time

2   frame?

3        A.   Correct.

4        Q.   Okay.  And where did you go next?

5        A.   I went back to the Santa Barbara

6   Independent.

7        Q.   And what was your job when you went back

8   to the Santa Barbara Independent?

9        A.   Design director.

10        Q.   And how long were you the design director

11   after you went back in 2006?

12        A.   I did that for another 3 years, I

13   believe.

14        Q.   So now we're up to 2009.  What did you do

15   in 2009?

16        A.   2009, I believe at that point I was

17   freelancing as graphic designer.

18        Q.   What does that mean, freelancing?  Were

19   you like an independent contractor working for

20   different people?

21        A.   Correct.

22        Q.   And how long were you freelancing as a

www.DigitalEvidenceGroup.com Digital Evidence Group C'rt 2021          202-232-0646
Case 5:21-cv-00137-FL   Document 39-7   Filed 03/28/22   Page 16 of 89

J.A. 852

11/17/2021    360 Virtual Drone Services, et al. v. Andrew L. Ritter, et al.    Alex Abatie

Page 17

1    graphic designer?

2         A.    I did that for I believe 3 or 4 years.

3         Q.    So would that take us to about 2012 or

4    '13?

5         A.    Probably somewhere close to that.

6         Q.    And up until this point in 2012 or 2013,

7    it doesn't sound like you've done any work in

8    mapping or 3D modeling; is that fair?

9         A.    That is fair.

10        Q.    What did you do in 2012/2013?

11        A.    I took a job at a for-profit university

12   as a graphic artist.

13        Q.    And which school is that?

14        A.    Fielding Graduate.

15        Q.    Where is that?

16        A.    Santa Barbara, California.

17        Q.    And how long did you work at Fielding

18   Graduate University?

19        A.    Until 2015.

20        Q.    And, again, your job was -- what was the

21   job at Fielding, a graphic artist?

22        A.    A graphic artist, yeah.

www.DigitalEvidenceGroup.com Digital Evidence Group C'rt 2021    202-232-0646
Case 5:21-cv-00137-FL    Document 39-7    Filed 03/28/22    Page 17 of 89

J.A. 853

11/17/2021　　　360 Virtual Drone Services, et al. v. Andrew L. Ritter, et al.　　　Alex Abatie

Page 18

1　　Q.　Okay.　And then what did you do in 2015?

2　　A.　I started a drone business.

3　　Q.　What was the name of the business?

4　　A.　Hawkeye Workshop.

5　　Q.　And is that an active business?

6　　A.　Yes.

7　　Q.　And what did you do beginning in 2015?

8　　A.　I started my business as a drone

9　operator, and I started doing promotional videos

10　and real estate.

11　　Q.　And how long did you operate at your

12　company doing promotional videos and real estate?

13　　A.　Well, I still do some of that work.

14　　Q.　And at any point in time, did you add any

15　services to those two, promotional videos or real

16　estate?

17　　A.　Yes.

18　　Q.　And when did you do that?

19　　A.　2016.

20　　Q.　What did you add?

21　　A.　I added mapping and 3D modeling and

22　instruction with DARTDrones.

www.DigitalEvidenceGroup.com Digital Evidence Group C'rt 2021　　　　202-232-0646
Case 5:21-cv-00137-FL　　Document 39-7　　Filed 03/28/22　　Page 18 of 89

J.A. 854

11/17/2021      360 Virtual Drone Services, et al. v. Andrew L. Ritter, et al.      Alex Abatie

Page 19

1     Q.   And how were you -- how were you able to

2  add mapping and 3D modeling to your business

3  activities at Hawkeye, what's the name of the

4  company, Hawkeye what?

5     A.   Hawkeye Workshop.

6     Q.   Hawkeye Workshop.  Did you go to school?

7  Did you take any classes?  How were you able to --

8  how did you have the experience to offer mapping

9  services to clients?

10    A.   Well, I started doing it and figuring out

11  how to make it work, and I don't exactly remember

12  the whole process.

13    Q.   Well, did you take any -- did you go back

14  to school and take any classes in mapping?

15    A.   No.

16    Q.   And did you get any -- did you take any

17  classes, whether it be through university or through

18  private companies on mapping?

19    A.   Only the PIX4D that I talked about

20  earlier.

21    Q.   PIX4D is a software company?

22    A.   Correct.

www.DigitalEvidenceGroup.com Digital Evidence Group C'rt 2021                202-232-0646
Case 5:21-cv-00137-FL   Document 39-7   Filed 03/28/22   Page 19 of 89

J.A. 855

11/17/2021    360 Virtual Drone Services, et al. v. Andrew L. Ritter, et al.    Alex Abatie

Page 20

1      Q.   And so they offered -- what kind of class

2  or information did they offer you?

3      A.   It was a -- I believe a 3-day class in

4  collection methods and proper use of their

5  software.

6      Q.   And so other than the 3-day class offered

7  by PIX4D, when did you take that class?

8      A.   Boy, I don't remember exactly.  I would

9  have to look it up.  I think it was 2017.

10     Q.   And so was that the first instruction you

11 received on mapping?

12     A.   First formal instruction, yes.

13     Q.   All right.  So in 2016, you start offering

14 mapping services to clients.  You haven't taken any

15 classes or anything up to that point.  And then in

16 2017, you take a 3-day class with PIX4D; is that

17 right?

18     A.   Correct.

19     Q.   Okay.  And prior to offering mapping

20 services for your company, you had never worked for

21 another company offering these services, correct?

22     A.   Correct.

www.DigitalEvidenceGroup.com Digital Evidence Group C'rt 2021          202-232-0646
Case 5:21-cv-00137-FL   Document 39-7   Filed 03/28/22   Page 20 of 89

J.A. 856

USCA4 Appeal: 23-1472     Doc: 19-4          Filed: 06/28/2023     Pg: 166 of 297

Page 21

1        Q.    And you never worked under the instruction

2    of anybody with mapping experience, correct?

3        A.    Not formally, no.

4        Q.    Never worked under the charge of anybody

5    with this kind of formal experience or training,

6    correct?

7        A.    Correct.

8        Q.    And are you a -- have you ever taken any

9    classes in survey?

10       A.    No, I have not.

11       Q.    Are you a licensed surveyor in any state

12   in the country?

13       A.    I am not.

14       Q.    Do you offer any services in the field of

15   land surveying?

16       A.    I do not.

17       Q.    Have you ever been -- have you ever

18   contacted any licensing board in any state regarding

19   land surveying and whether your activities fall

20   under the umbrella of the regulation of land survey?

21       A.    No, I have not.

22       Q.    Have you ever been contacted by any

Case 5:21-cv-00137-FL   Document 39-7   Filed 03/28/22   Page 21 of 89

J.A. 857

11/17/2021    360 Virtual Drone Services, et al. v. Andrew L. Ritter, et al.    Alex Abatie

Page 22

1    licensing board?

2        A.    No.

3        Q.    So in 2017, you take this class from

4    PIX4D.  And then do you continue -- do you add any

5    other services besides mapping and 3D after 2016?

6        A.    Yes.

7        Q.    And what services?

8        A.    Utility inspection.

9        Q.    Anything else?

10       A.    No.

11       Q.    And tell me how you got involved with this

12   company called DARTDrones that you're -- that you're

13   testifying on behalf of today.

14       A.    Yeah, I found an advertisement where they

15   were looking for instructors, and I applied and

16   was accepted.

17       Q.    What kind of an instructor were they

18   looking for?

19       A.    They were looking for manned pilots who

20   had drone experience in order to teach

21   open-enrollment classes in the rules and

22   regulations for Part 107 and basic flight.

www.DigitalEvidenceGroup.com Digital Evidence Group C'rt 2021    202-232-0646
Case 5:21-cv-00137-FL   Document 39-7   Filed 03/28/22   Page 22 of 89

J.A. 858

USCA4 Appeal: 23-1472    Doc: 19-4    Filed: 06/28/2023    Pg: 168 of 297

Page 23

1      Q.   When did you begin work for DARTDrones?

2      A.   I believe it was -- let's see.  I believe

3   it was 2017, but I would have to look.  It's been

4   4 or 5 years.

5      Q.   And so you were able -- you run your

6   business -- Hawkeye Workshop offers services and

7   then on the side, you do work for DARTDrones as an

8   instructor?

9      A.   Correct.

10      Q.   And then I think if you look at your -- do

11   you have your expert report there?

12      A.   I do.

13      Q.   Okay.  It looks like if you look at the

14   second paragraph, second sentence, it says:  Since

15   2016, I have also taught mapping, utility

16   inspection, and FAA certification courses for

17   DARTDrones, a national Unmanned Aerial System (UAS)

18   training and development company.

19           Do you see that?

20      A.   I do.  I might have had the date off.

21      Q.   Is the correct date 2016, or is the actual

22   correct date 2017 when you started working there?

www.DigitalEvidenceGroup.com Digital Evidence Group C'rt 2021          202-232-0646
Case 5:21-cv-00137-FL   Document 39-7   Filed 03/28/22   Page 23 of 89

J.A. 859

11/17/2021    360 Virtual Drone Services, et al. v. Andrew L. Ritter, et al.    Alex Abatie

Page 24

1         A.    I initially contacted them in October or

2    had my evaluation in October 2016, and that's when

3    I started with them and really began teaching I

4    think in 2017.

5         Q.    When I asked you about what they were

6    advertising for, you said essentially operating a

7    drone as a pilot?

8         A.    Uh-huh.

9         Q.    Were they also advertising for instructors

10   to teach mapping?

11        A.    At the time when I applied?

12        Q.    Yes.

13        A.    No.

14        Q.    And your expert report said since 2016, I

15   have also taught mapping.  Did you start teaching

16   mapping courses right away?

17        A.    I did not.

18        Q.    If I understand the timeline, you first

19   began offering mapping services for Hawkeye Workshop

20   in 2016, correct?

21        A.    Correct.

22        Q.    Then in 2017 you took a PIX4D software

www.DigitalEvidenceGroup.com Digital Evidence Group C'rt 2021                202-232-0646
Case 5:21-cv-00137-FL    Document 39-7    Filed 03/28/22    Page 24 of 89

J.A. 860

USCA4 Appeal: 23-1472    Doc: 19-4    Filed: 06/28/2023    Pg: 170 of 297

Page 25

1    class on mapping, 3-day class, correct?

2        A.    Correct.

3        Q.    Did you offer -- were you a mapping

4    instructor for DARTDrones prior to taking that PIX4D

5    class?

6        A.    I don't remember the exact timeline.

7        Q.    When did you first act as an instructor

8    for a class in mapping for DARTDrones?

9        A.    I don't remember the exact date.

10        Q.    Would it be before 2020?

11        A.    Yes.

12        Q.    Okay.  So it would be sometime around the

13    2017/2018 time frame?

14        A.    Possibly.  Like I said, I really don't

15    remember when that first class was.

16        Q.    Okay.  You currently teach an aerial

17    mapping and modeling class with DroneDeploy for

18    DARTDrones?

19        A.    Correct.

20        Q.    And before I move to that, I do want to

21    ask you some questions about that.  In your expert

22    report, you say you prepared this report through

www.DigitalEvidenceGroup.com Digital Evidence Group C'rt 2021            202-232-0646
Case 5:21-cv-00137-FL    Document 39-7    Filed 03/28/22    Page 25 of 89

J.A. 861

11/17/2021      360 Virtual Drone Services, et al. v. Andrew L. Ritter, et al.      Alex Abatie

Page 26

1    DARTDrones, which has been paid $7500 for the

2    preparation of this report.  Is that true?

3         A.    Yes.

4         Q.    And how were you paid?

5         A.    I was paid through DARTDrones.

6                    (Deposition Exhibit Number 2

7                     marked for identification.)

8         Q.    All right.  Exhibit 2 -- we talked about

9    Exhibit 1.  So Exhibit 2 is a copy of a webpage that

10   I captured, I think, last name.  Aerial mapping and

11   modeling with DroneDeploy workshop.

12              Do you see that on the screen?

13        A.    I do.

14        Q.    Okay.  And the exhibit that I sent in the

15   PDF is hard to read.  I think it's easier on the

16   screen.  This appears to be a 2-day class that's

17   offered by DARTDrones; is that right?

18        A.    That's correct.

19        Q.    Okay.  And then I'm scrolling down.  Do

20   you see where it says workshop overview?

21        A.    I do.

22        Q.    And I'll come back to that, but it looks

www.DigitalEvidenceGroup.com Digital Evidence Group C'rt 2021          202-232-0646
Case 5:21-cv-00137-FL    Document 39-7    Filed 03/28/22    Page 26 of 89

J.A. 862

USCA4 Appeal: 23-1472    Doc: 19-4    Filed: 06/28/2023    Pg: 172 of 297

Page 27

1    like you have ten lessons in your workshop; is that

2    right?

3        A.   I believe that's correct.

4        Q.   And then for some reason the pictures

5    didn't come out, but you're one of the two

6    instructors.  Is that true?

7        A.   That's correct.

8        Q.   Okay.  And did you -- that exhibit that I

9    just showed you, do you recognize that webpage from

10   the DARTDrones website?

11       A.   I haven't been on the DARTDrones website

12   in a while.  It's not something I regularly check.

13       Q.   All right.  Let me share the screen with

14   you one more time here.  Do you see Exhibit 2?

15       A.   Yes.

16       Q.   Okay.  And have you seen that brochure

17   before or that advertisement before?

18       A.   A few years ago.  Like I said, it's not

19   something that I spend a lot of time on on the

20   DARTDrones website.

21       Q.   Okay.  It says Upcoming.  Is there an

22   upcoming class, December 13-14 in Houston, Texas?

www.DigitalEvidenceGroup.com Digital Evidence Group C'rt 2021    202-232-0646
Case 5:21-cv-00137-FL    Document 39-7    Filed 03/28/22    Page 27 of 89

J.A. 863

USCA4 Appeal: 23-1472    Doc: 19-4    Filed: 06/28/2023    Pg: 173 of 297

Page 28

1        A.    Possibly.  I'm not teaching that class.

2        Q.    Okay.  When is the last time you taught

3    one of these classes, aerial mapping and modeling

4    with DroneDeploy workshop?

5        A.    The last time was in September.

6        Q.    Of 2021?

7        A.    Of 2021.

8        Q.    And where did you teach the class?

9        A.    In Dubai.

10       Q.    And when was the time before that that you

11   taught it?

12       A.    I don't know the exact date.  It was

13   online in spring, I believe.

14       Q.    This is -- about how often are you

15   teaching these classes?  Like, once every 6 months

16   or more often than that?

17       A.    Well, COVID has thrown a wrench in a lot

18   of these things.  So prior to COVID, I would have

19   to look at my records, but I believe I was doing

20   three to four classes a year.

21       Q.    Okay.  Since 2017/2018?

22       A.    Yes.

www.DigitalEvidenceGroup.com Digital Evidence Group C'rt 2021        202-232-0646
Case 5:21-cv-00137-FL   Document 39-7   Filed 03/28/22   Page 28 of 89

J.A. 864

11/17/2021        360 Virtual Drone Services, et al. v. Andrew L. Ritter, et al.        Alex Abatie

Page 29

 1                    (Deposition Exhibit Number 3

 2                    marked for identification.)

 3        Q.    All right.  And then I'm going to screen

 4    share here and show you Exhibit 3, which is also off

 5    the Internet, a PDF document, DARTDrones.  And it

 6    looks more like a formal brochure for this class.

 7    Do you see Exhibit 3 on your screen?

 8        A.    I do.

 9        Q.    And it says:  Elevate your career in

10    aerial mapping and modeling.  Develop the skills you

11    need to effectively gather, analyze, and export

12    mapping data.

13            Have you seen this brochure before?

14        A.    I haven't seen the brochure.

15        Q.    It looks like ten lessons that are

16    identified on this brochure is consistent with the

17    same ten lessons that are advertised on your

18    website.  Does that sound right?

19        A.    That sounds right.

20        Q.    And then the class you taught in Dubai,

21    did you teach ten lessons as well over 2 days?

22        A.    This was a little bit different class

www.DigitalEvidenceGroup.com Digital Evidence Group C'rt 2021                202-232-0646
Case 5:21-cv-00137-FL    Document 39-7    Filed 03/28/22    Page 29 of 89

J.A. 865

USCA4 Appeal: 23-1472    Doc: 19-4    Filed: 06/28/2023    Pg: 175 of 297

Page 30

1    setup, so we covered most of this information.

2          Q.    And did you -- when you have these

3    classes, do you have like a textbook or a binder of

4    materials that you're handing out that cover all

5    these ten lessons?

6          A.    Yes, we do have a handout.

7          Q.    And how long is the handout?  How many

8    pages?

9          A.    I don't remember.  I -- you know ...

10         Q.    Is it more than a hundred or less than a

11   hundred?

12         A.    Gosh, I don't remember.  It's

13   substantial.

14         Q.    Okay.  Now I'm going to show you what's

15   marked as Exhibit -- do you have a copy of your

16   binder of materials that you offer?

17         A.    I don't have one here.

18         Q.    But, I mean, you have access to it or you

19   have it on your computer or something like that?

20         A.    I have some of the handouts in a storage

21   locker.

22         Q.    Okay.

www.DigitalEvidenceGroup.com Digital Evidence Group C'rt 2021          202-232-0646
Case 5:21-cv-00137-FL    Document 39-7    Filed 03/28/22    Page 30 of 89

J.A. 866

USCA4 Appeal: 23-1472    Doc: 19-4      Filed: 06/28/2023    Pg: 176 of 297

Page 31

1          A.    At the moment.

2                      (Deposition Exhibit Number 4

3                      marked for identification.)

4          Q.    I'm going to show you what's been marked

5    as Exhibit No. 4, which is just a better copy of the

6    aerial mapping and modeling with DroneDeploy

7    workshop or workshop overview.  Do you see that on

8    the screen?

9          A.    I do.

10         Q.    Okay.  And then lesson No. 2, aerial

11   photogrammetry?

12         A.    Yes.

13         Q.    And what is aerial photogrammetry?

14         A.    Well, are you asking what we cover in

15   Lesson 2.

16         Q.    No.  Lesson 2, the title is Aerial

17   Photogrammetry.  Do you see that?

18         A.    I do.

19         Q.    And I'm just asking you, what is aerial

20   photogrammetry?  What does that mean?

21         A.    Well, photogrammetry is the process

22   that's used with the images that you collect with

www.DigitalEvidenceGroup.com Digital Evidence Group C'rt 2021          202-232-0646
Case 5:21-cv-00137-FL    Document 39-7    Filed 03/28/22    Page 31 of 89

J.A. 867

USCA4 Appeal: 23-1472    Doc: 19-4    Filed: 06/28/2023    Pg: 177 of 297

Page 32

1    the drone in order to create these products that I

2    mentioned earlier.

3        Q.   And you say "the process."  How does --

4    can you explain to the judge how this works?  How

5    does aerial photogrammetry work?

6        A.   Well, in a nutshell, images that have

7    been geotagged and collected in a specific manner

8    are processed through some software that basically

9    puts these images together in a fashion that makes

10   them usable in certain ways.  There's some

11   processes that the software does in order to tie

12   these images together.

13       Q.   And you said images that have been

14   geotagged.  What does that mean, geotagged?

15       A.   When a drone, a commercial drone takes an

16   image in the metadata, latitude, longitude, and

17   altitude are recorded, and that's geotagged.

18       Q.   And then you say, you explain to the Court

19   that these images that have been geotagged are

20   processed through software.  How does that work?

21   How does photogrammetry work?

22       A.   The software looks for identical points

Case 5:21-cv-00137-FL    Document 39-7    Filed 03/28/22    Page 32 of 89

J.A. 868

11/17/2021    360 Virtual Drone Services, et al. v. Andrew L. Ritter, et al.    Alex Abatie

Page 33

1    present in multiple photographs.  And given that

2    the software can read the geotags and it knows the

3    position of the camera, it can triangulate these

4    points and orient them left, right, and altitude

5    based on their geotag.

6         Q.   And then under aerial photogrammetry, you

7    have under less than two -- well, first, have you

8    taken any classes in photogrammetry?

9         A.   I have not.

10        Q.   Okay.  And have you -- do you have any

11   experience working in the field of photogrammetry?

12        A.   Other than either using the software that

13   really does all the work, you know, I understand

14   how to use the software.

15        Q.   DroneDeploy?

16        A.   Yeah, I can use DroneDeploy.  I prefer

17   PIX4D.

18        Q.   But this workshop you're instructing in is

19   actually a workshop for DroneDeploy, correct?

20        A.   Correct.

21        Q.   And you're saying the DroneDeploy or PIX4D

22   does all the work?

USCA4 Appeal: 23-1472    Doc: 19-4    Filed: 06/28/2023    Pg: 179 of 297

Page 34

 1        A.    It does the triangulation and the

 2    stitching of images, yes.

 3        Q.    And then under principles of

 4    photogrammetry, what are you teaching there?

 5        A.    Just the basic ideas of how the software

 6    uses the images and just kind of a basic overview

 7    of what photogrammetry is.

 8        Q.    And what is that?  What do you tell the

 9    student?  How does the software use the images, and

10    what is photogrammetry?

11        A.    Well, photogrammetry is using images in

12    order to make measurements.

13        Q.    Aerial photogrammetry, would you agree, is

14    the science of deducing the physical dimensions of

15    objects on or above the surface of the earth from

16    measurements on actual photographs of the objects?

17        A.    I haven't heard that definition, but that

18    sounds consistent with photogrammetry.

19        Q.    What is photogrammetric geometry?

20        A.    I'm not exactly sure what they mean on

21    that.  I haven't seen this handout.  I believe

22    what they're referencing is just how the

Page 35

1   triangulation process works.

2       Q.   Triangulation is an important part of

3   photogrammetry?

4       A.   Yes.

5       Q.   And earlier you talked about geotag.  When

6   you're instructing in the area of photogrammetry,

7   you're -- the process I guess is you're taking

8   pictures from the air; is that right?

9       A.   That's correct.

10      Q.   Okay.  And those pictures are determining

11  the size and shape of the earth below?

12      A.   The photographs themselves are not.

13      Q.   Okay.  What allows you, the person who's

14  acting as a photogrammetrist, what allows you to

15  determine the size and shape of the earth both

16  horizontally and vertically?

17      A.   I don't think I understand your question.

18      Q.   Okay.  When you offer -- do you offer

19  services in Hawkeye Workshop in photogrammetry?

20      A.   Not directly.

21      Q.   Okay.  Have you ever offered services to a

22  client in the area of photogrammetry?

11/17/2021        360 Virtual Drone Services, et al. v. Andrew L. Ritter, et al.        Alex Abatie

Page 36

1        A.    I don't -- I don't understand the

2    question because that's not a service that I'm

3    offering.

4        Q.    All right.  I guess I'm just trying to

5    understand it from your perspective.  You're

6    designated as an expert witness in this current

7    case, correct?

8        A.    Yes.

9        Q.    Okay.  And you're designated to talk about

10   how you use drones in order to provide mapping

11   products, correct?

12       A.    Correct.

13       Q.    And you actually have experience in

14   acting -- providing these kind of services for your

15   company, Hawkeye Workshop, correct?

16       A.    Yes.

17       Q.    And you have -- and you have experience in

18   acting as an instructor in the -- in the area of

19   aerial mapping using drone deployment, correct?

20       A.    Yes.

21       Q.    All right.  And so looking at your

22   workshop overview, and Lesson 2 is Aerial

www.DigitalEvidenceGroup.com Digital Evidence Group C'rt 2021        202-232-0646
Case 5:21-cv-00137-FL    Document 39-7    Filed 03/28/22    Page 36 of 89

J.A. 872

Page 37

1    Photogrammetry, I'm trying to understand when you're

2    teaching, you're teaching Lesson 2, correct, as an

3    instructor?

4         A.   Correct.

5         Q.   Okay.  And I'm asking, have you provided

6    photogrammetry services to any client?

7         A.   I guess I don't -- it's not offered that

8    way to my clients.

9         Q.   And I'm not asking how you advertise it

10   because I guess what I'm hearing you say is "I don't

11   advertise that I offer photogrammetry services,"

12   correct?

13        A.   Correct.

14        Q.   Some of the services that clients hire you

15   to do, do involve the area of -- the idea of aerial

16   photogrammetry, correct?

17        A.   It's part of the process.

18        Q.   Okay.  And it's part of the process that

19   you and the work product that you provide to some of

20   your clients, correct?

21        A.   Correct.

22        Q.   Okay.  And so when we talk about the

www.DigitalEvidenceGroup.com Digital Evidence Group C'rt 2021      202-232-0646
Case 5:21-cv-00137-FL   Document 39-7   Filed 03/28/22   Page 37 of 89

J.A. 873

USCA4 Appeal: 23-1472    Doc: 19-4    Filed: 06/28/2023    Pg: 183 of 297

Page 38

1    services that you've provided in the area of

2    photogrammetry, how do you determine the size and

3    shape of the earth, both horizontally and

4    vertically, when you provide these services?

5        A.    I -- there are -- it feels like there are

6    a few ways to answer this question.  The question

7    sounds very broad to me.  That's why I'm not

8    understanding what you're asking me exactly.

9        Q.    Well, would you agree that photogrammetry,

10   among other things, includes the determination of

11   the size and shape of the earth, both horizontally

12   and vertically?

13       A.    That's one part of it.

14       Q.    Okay.  And another part is the positioning

15   of certain points on the earth that you use as

16   either key points or tie points to be able to do

17   this triangulation, correct?

18       A.    Yes.

19       Q.    Okay.  And then you, using this data,

20   right, these photos, trying to determine the size

21   and shape of certain objects on the earth using tie

22   points or key points to ultimately conduct certain

J.A. 874

11/17/2021    360 Virtual Drone Services, et al. v. Andrew L. Ritter, et al.    Alex Abatie

Page 39

1    measurements and offer a product to the clients,

2    correct?

3        A.    Measurements are not always part of the

4    product offered.

5        Q.    I'm just going by your testimony earlier,

6    I thought, was photogrammetry is using images to

7    make measurements?

8        A.    That's the definition of photogrammetry.

9        Q.    Okay.  And the images that you're using

10    that you're taking via a drone, the drone is the

11    tool you use to get the images, right?

12        A.    Correct.

13        Q.    And you use the drone and there might be

14    certain technology that you attach to the drone?

15        A.    Okay.

16        Q.    Is that true?

17        A.    Yes.

18        Q.    And so you have a drone, you have a

19    camera, and then you use some software, and you're

20    collecting images that determines the size and shape

21    of the earth, right?

22        A.    I'm generally not concerned with the

www.DigitalEvidenceGroup.com Digital Evidence Group C'rt 2021    202-232-0646
Case 5:21-cv-00137-FL   Document 39-7   Filed 03/28/22   Page 39 of 89

J.A. 875

Page 40

1    products that I produce on the size and shape of

2    the earth, per se.

3        Q.    Okay.  So how do you use the images to

4    make measurements?  I guess if photogrammetry is

5    using images to make measurements, how do you do

6    that as a photogrammetrist?

7        A.    Well, there's a number of ways to do

8    that.  I use the software that I know how to use

9    in order to make those measurements.

10        Q.    And so take the judge through this.  So if

11    I hire you, my law firm hires you and I want you to

12    perform aerial mapping, I'm going to build a new law

13    office and I need to be able to design it, put it

14    down on the piece of property, and I want you to

15    provide services and aerial map photogrammetry

16    services, how do you do it?  How do you actually go

17    to the property that I want to buy, and how do you

18    perform those services for me?

19        A.    Are you asking me to do a complete

20    run-through of my workflow?

21        Q.    Correct.  I'm saying, I -- my law firm and

22    an engineering company I work with, a construction

Page 41

1    company, let's say, I'm hiring you to perform

2    certain services.  And how do you do that?  How do

3    you provide me those services or the work product?

4    In other words, how do you use images to make

5    measurements is ultimately what I want to know.

6         A.   It's completely dependent on what the

7    deliverable that you require is, so the workflow

8    partly is based on what I'm delivering to you.

9         Q.   Okay.  Let me make it -- instead of using

10   a hypothetical that's not in your report, why don't

11   we use an example that's in your report.  And then

12   you can kind of educate me how you perform

13   photogrammetry services.

14        So one example that you use is on page 5

15   of your report, at the top, and I'm going to read

16   the last couple sentences of that paragraph at the

17   top of page 5.  And you say in your report as

18   follows:  For example, consider a construction

19   company that wants to place a fence around a job

20   site.  The company could hire a drone pilot to take

21   aerial photos of the site and then use software to

22   measure the perimeter of the site.  If the company

Page 42

 1   wants to know how much fencing to purchase, relative

 2   accuracy is more important than absolute accuracy.

 3   It matters how long the perimeter is, not where it

 4   is on the earth.  By contrast, if the company wants

 5   to know precisely where to place the fence so that

 6   it does not trespass on a neighbor's property,

 7   absolute accuracy may be essential.  In that

 8   scenario, it matters where the boundary is on the

 9   planet, not how long it is.  Do you see that on your

10   report?

11        A.   Yeah, yeah.

12        Q.   Okay.  So let's use the example of a

13   company that wants to hire you to perform, I guess,

14   a deliverable so that they know how much fencing to

15   order and where to place fencing on the boundary.

16   How would you go about performing those services?

17        A.   Well, I would go out to the property and

18   fly the property, collect the needed images, put

19   those images, process those images through the

20   software, and use the software in order to measure

21   a perimeter of their area and obtain GPS points

22   from the software if they wanted to know where to

www.DigitalEvidenceGroup.com Digital Evidence Group C'rt 2021                202-232-0646
Case 5:21-cv-00137-FL    Document 39-7    Filed 03/28/22    Page 42 of 89

J.A. 878

Page 43

1    put the fence.

2         Q.    What software would you use?

3         A.    Personally I would use PIX4D.

4         Q.    And so you would use -- you have a drone,

5    correct?  That's a tool that you use, right?

6         A.    Right.

7         Q.    And what other tool?  Do you have

8    something attached to the drone to take the

9    pictures?

10         A.    Yeah, it's -- I use a Phantom 4, and it

11    has an attached camera on it.

12         Q.    So you have a camera; that's another tool

13    you use, correct?

14         A.    Correct.

15         Q.    And then you use the PIX4D software or you

16    could use DroneDeploy software?  That's another tool

17    you use?

18         A.    Correct.

19         Q.    And you indicate when you get back, after

20    you go and fly the site, take the pictures, then you

21    go back and then you process the pictures using the

22    software?

www.DigitalEvidenceGroup.com Digital Evidence Group C'rt 2021    202-232-0646
Case 5:21-cv-00137-FL    Document 39-7    Filed 03/28/22    Page 43 of 89

J.A. 879

Page 44

1       A.    Correct.

2       Q.    Okay.  And then how do you -- how do you

3   conduct measurements so that they know how much

4   fencing they're going to need to order?

5       A.    Well, the software helps you with that.

6       Q.    And how do you do it, though?  Explain to

7   the judge how that's done.  So up to this point, it

8   sounds like even though I'm a lawyer, I could go buy

9   a drone, I could go to the site, I could go buy a

10  camera, I could down some software, I could fly the

11  drone, go back to my law office, download the

12  pictures, log in to DroneDeploy, push a button, and

13  all the work would be done for me; is that right?

14      A.    Yes, to a degree.

15      Q.    Okay.  And so now I've generated -- when I

16  pushed the button and I took all my photos, what

17  kind of work product have I just generated on my

18  computer?

19      A.    Well, you know, it depends on how you

20  have the software set up, what you generate.  The

21  first thing that's created is a point cloud.

22      Q.    And what is a point cloud?

11/17/2021    360 Virtual Drone Services, et al. v. Andrew L. Ritter, et al.    Alex Abatie

Page 45

1       A.   A point cloud is all of these key points

2    and high points that the software has found that

3    are represented as a file that is

4    three-dimensional and orients these points in

5    space.

6       Q.   When you say -- when you go on to the site

7    or if I went on to the site, do you find any of

8    these key points or high points yourself?

9       A.   No.

10       Q.   So that's -- do you do anything for the

11    software to actually find these points, or is it

12    just sort of automatic after you push the button?

13       A.   Well, with PIX4D, it goes through and

14    finds key points and high points for you.  You do

15    also have the option of selecting manual tie

16    points.

17       Q.   But in this case, this company that hires

18    you to take the photos using your drone and then

19    generate a work product of doing a measurement of

20    the -- of the property so that they can order

21    fencing, you would just download the pictures into

22    the PIX4D and you would push a button and it would

www.DigitalEvidenceGroup.com Digital Evidence Group C'rt 2021            202-232-0646
Case 5:21-cv-00137-FL    Document 39-7    Filed 03/28/22    Page 45 of 89

J.A. 881

USCA4 Appeal: 23-1472    Doc: 19-4    Filed: 06/28/2023    Pg: 191 of 297

Page 46

1    generate this work product for you, correct?

2         A.    Yeah.  I would use the software to

3    generate the point cloud.  There are, you know,

4    settings that are more appropriate than others, so

5    there is some knowing how to work the software

6    properly.

7         Q.    It might --

8               [Simultaneous crosstalk]

9         A.    -- bit of software -- having the right

10   coordinates, telling the software the proper

11   camera that's being used.  There are a bunch of

12   parameters that can be set prior to processing.

13        Q.    And do you normally manually change those

14   parameters, or do you go with the default?

15        A.    It depends entirely on the job.

16        Q.    Okay.  What would you do in this job if

17   you went to the fencing site company and flew your

18   drone and went back and ultimately they wanted you

19   to produce a work product that fit your hypothetical

20   or your example on page 5, would you modify the

21   settings or would you use the default settings?

22        A.    Personally I always modify a little bit,

www.DigitalEvidenceGroup.com Digital Evidence Group C'rt 2021    202-232-0646
Case 5:21-cv-00137-FL    Document 39-7    Filed 03/28/22    Page 46 of 89

J.A. 882

USCA4 Appeal: 23-1472    Doc: 19-4    Filed: 06/28/2023    Pg: 192 of 297

11/17/2021      360 Virtual Drone Services, et al. v. Andrew L. Ritter, et al.      Alex Abatie

Page 47

1    but that's up to the user, really.

2        Q.   And how do you modify it?

3        A.   It depends on the project.  I just

4    like -- personally like to monitor.  There are

5    several steps in order for the software to do its

6    processing, and so I do those generally one at a

7    time and check that things are accurate.  If the

8    first pass isn't, you know, as accurate as I would

9    like it to be, I can come back and tweak it a

10   little bit before I do the additional steps.

11       Q.   And so take me through that.  How do you

12   determine, these steps that you're talking about,

13   what steps are they that you're modifying or you're

14   manually, I guess, controlling and how do you

15   determine the accuracy?

16       A.   PIX4D generates an accuracy report in its

17   process and so it looks at how images are

18   calibrated and how they are meshing and the number

19   of key points found.  It's pretty processor

20   intensive to do this kind of work, so there are

21   resolution changes that you can make to have it

22   find more or less key points.  It will run a

www.DigitalEvidenceGroup.com Digital Evidence Group C'rt 2021       202-232-0646
Case 5:21-cv-00137-FL   Document 39-7   Filed 03/28/22   Page 47 of 89

J.A. 883

Page 48

1    little bit faster looking for less key points than

2    more key points but won't be as accurate, things

3    like that.

4         Q.   And so as far as accuracy goes, you're

5    relying on the software?

6         A.   I look at the accuracy report, yes.

7         Q.   Generated by the software?

8         A.   Generated by the software.

9         Q.   Okay.  And do you do anything else to

10   confirm the accuracy of this photogrammetry project?

11        A.   For something -- for a project like this

12   where the accuracy is close enough for determining

13   fencing, it's a good enough check.

14        Q.   I'm sorry.  So is the answer no, you don't

15   do anything else other than use the software?

16        A.   For our example, yes.

17        Q.   All right.  You say because it's good

18   enough to give a rough estimate of how much fencing

19   they need to order?

20        A.   Correct.

21        Q.   Okay.  And what does "good enough" mean?

22   What kind of level of accuracy do you need to

USCA4 Appeal: 23-1472    Doc: 19-4    Filed: 06/28/2023    Pg: 194 of 297

Page 49

1    provide the client that hires you for this project?

2        A.    Well, again, that goes back to, you know,

3    knowing what the client wants, and that's a

4    discussion that you have before you process your

5    images, before you do the work.  But the accuracy

6    of PIX4D is generally within inches.  And for

7    something like a fence, you're dealing in, you

8    know, feet of fence.  So the accuracy is more than

9    enough.

10       Q.    Okay.  So as long as it's within a couple

11   of feet, it's accurate enough?

12       A.    No.

13       Q.    Okay.

14       A.    That would not be -- that would not be

15   accurate enough.  But my point -- my point is that

16   the accuracy is more than enough for determining

17   the amount of fence, fencing material because --

18       Q.    The accuracy from the, in essence, pushing

19   the button and letting the software do its thing,

20   correct?

21       A.    Sure.

22       Q.    Okay.  And in this hypothetical or this

Case 5:21-cv-00137-FL   Document 39-7   Filed 03/28/22   Page 49 of 89

11/17/2021    360 Virtual Drone Services, et al. v. Andrew L. Ritter, et al.    Alex Abatie

Page 50

1    example that you have in your expert report, the

2    company wants to know how much fencing to purchase.

3    And in that situation, what I hear you saying is

4    that you can rely on the tools that you use in the

5    area of photogrammetry to take the pictures and run

6    the software; is that right?

7         A.    Yeah.

8         Q.    Okay.  And then the company also wants to

9    know precisely where to place the fence on its

10   property so it does not trespass on a neighbor's

11   property, right?

12        A.    Potentially.  I would like to say that

13   this example was more about the different types of

14   accuracy that are available and relative versus

15   absolute, and it's just an example.  The

16   information provided to give them the distance of

17   fence is different.  It's a different -- requires

18   some different -- different process to get

19   absolute accuracy.

20        Q.    And I want to -- I'm sorry.  I didn't mean

21   to cut you off.  I'm sorry.

22        A.    No, go ahead.  I was done.

www.DigitalEvidenceGroup.com Digital Evidence Group C'rt 2021          202-232-0646
Case 5:21-cv-00137-FL   Document 39-7   Filed 03/28/22   Page 50 of 89

J.A. 886

USCA4 Appeal: 23-1472    Doc: 19-4       Filed: 06/28/2023    Pg: 196 of 297

Page 51

1        Q.   So I want to use your example.  So now a

2   company hires you, Hawkeye Workshop, to produce a

3   work product so that they know on their piece of

4   property where to place the fence so that they do

5   not trespass on a neighbor's property.  What do you

6   do?  How do you generate that work product?

7        A.   In order to do that, I would have to

8   place some ground control points in order to get a

9   better absolute accuracy.

10       Q.   All right.  And what training have you

11  done in placing or do you have in placing ground

12  control points?

13       A.   Just work experience.

14       Q.   Okay.  So the answer is none?  Do you have

15  any training or education in placing ground control

16  points?

17       A.   No.

18       Q.   All right.  And you're not a licensed

19  surveyor, correct?

20       A.   No.

21       Q.   Okay.  And so how do you do this?  How did

22  you teach yourself how to place ground control

Page 52

1  points?

2     A.   There are ground control points offered

3  by a company in Australia that I've used in the

4  past.

5     Q.   So tell the judge or the jury, how do you

6  do this?  How do you go out and place the ground

7  control points so you can provide a work product to

8  let the company know where exactly to place its

9  fence on the property?

10     A.   The ground control points have GPS

11  receivers in them, and they're placed throughout

12  the area and left there in order to get their

13  position and that position is then sent to the

14  company that creates the ground control points,

15  and they give back information on the ground

16  control points that I then input into PIX4D.

17     Q.   So you're using -- are you flying your

18  drone?

19     A.   Yes.

20     Q.   Okay.  And you're taking pictures of the

21  site?

22     A.   Yes.

11/17/2021    360 Virtual Drone Services, et al. v. Andrew L. Ritter, et al.    Alex Abatie

Page 53

1    Q.    And you're using ground control points or

2    data from ground control points that you personally

3    installed on the site?

4    A.    If that's what the job requires.

5    Q.    Well, and I'm just -- you're saying it

6    would, that's how you would do, correct?

7    A.    Correct.

8    Q.    And then you're using a company out of

9    Australia to create this data on the ground control

10   points?

11   A.    Yeah, they offer that service.

12   Q.    What's the name of the company?

13   A.    AeroPoints, I believe.  I don't know if

14   that's the product or the company.  Oh, I believe

15   the company is called Propeller.

16   Q.    Propeller?

17   A.    Yeah.  I don't remember off the top of my

18   head.

19   Q.    And then you're -- what do you get from

20   them?  Do you get like a file or data or set of data

21   in your file?

22   A.    Yes.

www.DigitalEvidenceGroup.com Digital Evidence Group C'rt 2021    202-232-0646
Case 5:21-cv-00137-FL    Document 39-7    Filed 03/28/22    Page 53 of 89

J.A. 889

11/17/2021    360 Virtual Drone Services, et al. v. Andrew L. Ritter, et al.    Alex Abatie

Page 54

1          Q.    And then you take that file and you, what

2     do you do?  Download it into either DroneDeploy or

3     this PIX4D?

4          A.    Correct.

5          Q.    And then what do you do at that point?

6     You also push a button to create some sort of data

7     file?

8          A.    No.  You have to manually go through some

9     images and identify these ground control points in

10    images.  So you're telling the software this is

11    ground control point No. 1, and you do that over a

12    series of images.  So the software knows where

13    that ground control point is.

14         Q.    Okay.  And then what happens next?

15         A.    That is worked into the algorithm of the

16    software and the software -- helps the software do

17    its work.

18         Q.    All right.  Then what happens?  What work

19    does the software do?

20         A.    Well, it's the ground control points tell

21    the software what these very specific points are,

22    so it helps the software then tie this into a

www.DigitalEvidenceGroup.com Digital Evidence Group C'rt 2021          202-232-0646
Case 5:21-cv-00137-FL    Document 39-7    Filed 03/28/22    Page 54 of 89

J.A. 890

11/17/2021　　360 Virtual Drone Services, et al. v. Andrew L. Ritter, et al.　　Alex Abatie

Page 55

1　coordinate system.

2　　　　Q.　And then what are you producing for the

3　client so that they know where to put their fence?

4　　　　A.　Depends upon the client and what they

5　want.

6　　　　Q.　Okay.　This client wants to know where

7　precisely to place the fence so it does not trespass

8　on a neighbor's property.

9　　　　A.　Yeah.　I could give them GPS points.　I

10　could show them on an image where that should go.

11　　　　Q.　And you would use -- and how would you do

12　that?　Do you then pull an image down?　Is this

13　something you're doing yourself, or is this

14　something software is going to help you do?

15　　　　A.　Yeah, it's something software would help

16　you do.

17　　　　Q.　Okay.　And are you actually drawing a line

18　on the image all the way around, or are you just

19　putting in certain points and then connecting the

20　points?

21　　　　A.　It would depend.　I'm not quite really

22　sure how to answer that question.

USCA4 Appeal: 23-1472    Doc: 19-4    Filed: 06/28/2023    Pg: 201 of 297

Page 56

1       Q.    Okay.  I guess the question is:  So this

2   client came to you and asked you to do these

3   photogrammetry services.  And you went out, you flew

4   the site.  You said you put in your own ground

5   control points.  You took some data from Propeller.

6   You installed it into PIX4D.  And so now how do you

7   give the client a work product that will help them

8   know where to put their fence?

9       A.    Well, it depends on -- again, it depends

10  on the client.  Some clients are technologically

11  savvy.  Some are not.  It entirely depends on who

12  you're working with.

13      Q.    Okay.  Assume the client is not

14  technologically savvy and they just want to know

15  where on their property they put the fence so they

16  don't trespass on a neighbor's property.  What work

17  product are you giving them?  Are you giving them a

18  map?

19      A.    I would give them a map, yes.

20      Q.    Okay.  And that's consistent with your --

21  I guess this course in mapping that you offer,

22  right, you would provide them a map and the map

J.A. 892

11/17/2021        360 Virtual Drone Services, et al. v. Andrew L. Ritter, et al.        Alex Abatie

Page 57

1    would show them what?

2        A.    Potential points.

3        Q.    And potential points, that would show them

4    where to put their fence on the edge of their

5    property, correct?

6        A.    If that's what they were looking for,

7    yeah.

8        Q.    Okay.  And what happens if you're -- if

9    your work product contains an error or is not

10   accurate, what's the result of that?

11       A.    Well, the result I suppose could be a

12   misplaced point.

13       Q.    A misplaced fence, correct, in your

14   example?

15       A.    Potentially.

16       Q.    And that would impact the client that

17   hired you, right?

18       A.    Uh-huh.

19       Q.    Yes?

20       A.    Yes.

21       Q.    Okay.  And it would adversely impact not

22   only the client, but it could adversely impact the

www.DigitalEvidenceGroup.com Digital Evidence Group C'rt 2021                202-232-0646
Case 5:21-cv-00137-FL    Document 39-7    Filed 03/28/22    Page 57 of 89

J.A. 893

USCA4 Appeal: 23-1472    Doc: 19-4    Filed: 06/28/2023    Pg: 203 of 297

Page 58

1   neighbor if the fence was placed on the neighbor's

2   property, correct?

3        A.    Correct.

4        Q.    Okay.  We've been going for about an hour

5   and 20 minutes.  Do you want to take a break, or are

6   you good to continue?

7        A.    I could take a break.

8        MR. HANNA:  Okay.  Let's take a 5-minute

9   break.

10        THE WITNESS:  Thank you.

11                    (A short break was taken.)

12        Q.    So I want to go back to Exhibit 4, which

13   is the workshop overview and Lesson 2 that you teach

14   as an instructor at your company, DARTDrones.  And

15   we talked a little bit about the first couple of

16   bullet points, and I think we talked about aerial

17   triangulation.  And again, just briefly explain to

18   the Court, what is aerial triangulation?

19        A.    It's orienting a point in space from

20   various viewpoints in order to determine its

21   position.

22        Q.    And then photogrammetric procedures, I

www.DigitalEvidenceGroup.com Digital Evidence Group C'rt 2021          202-232-0646
Case 5:21-cv-00137-FL   Document 39-7   Filed 03/28/22   Page 58 of 89

J.A. 894

11/17/2021    360 Virtual Drone Services, et al. v. Andrew L. Ritter, et al.    Alex Abatie

Page 59

1    don't know if I'm pronouncing that correctly, what

2    do you cover there when you're teaching a class?

3        A.    Basically it's a short explanation of

4    what the software is doing in order to do its

5    work.

6        Q.    And other than the software, do you teach

7    any other procedures in photogrammetry?

8        A.    No.

9        Q.    Other than the software, do you have any

10   experience in other procedures in photogrammetry?

11       A.    No.

12       Q.    And when you talk about the next bullet

13   point, Common Coverage Errors, what are you

14   referring to there?

15       A.    Common coverage errors have to do with

16   explaining some ways that you might not collect

17   the proper number of images for a given situation

18   in order for the software to do its work.

19       Q.    And how would you protect against that?

20   So if I was flying my drone, I took pictures and I

21   was trying to produce a work product for the company

22   that wanted to know how much fencing to put in and

Page 60

1   where to put the fencing in, how would I know I

2   didn't take enough pictures or the right pictures?

3        A.    There would probably be a number of

4   things.  You might get that information from the

5   error report that PIX4D creates.  Your products

6   might not look right.  There may be issues with

7   the outputs from PIX4D, so there's a number of

8   ways to go.

9        Q.    So assuming that the software processed

10  the image and there was no error message, what I

11  hear you saying is then it really kind of comes back

12  onto the operator to make sure that they review the

13  work product to make sure its still accurate or

14  doesn't have any obvious errors?

15       A.    Well, yeah.  Yes.  Yeah.

16       Q.    And so, again, it comes back to having

17  some level of experience or training in this area of

18  photogrammetry, correct?

19       A.    Suddenly to read a report or look at an

20  image, it's clear that there's a problem.

21       Q.    And if that person doesn't have any

22  training or experience and produces a report with

www.DigitalEvidenceGroup.com Digital Evidence Group C'rt 2021         202-232-0646
Case 5:21-cv-00137-FL   Document 39-7   Filed 03/28/22   Page 60 of 89

J.A. 896

Page 61

1    errors, it's going to adversely affect the client,

2    correct?

3         A.   Potentially.

4         Q.   And it could adversely affect the

5    adjoining property owner, correct?

6         A.   Potentially.

7         Q.   Okay.  And what is -- when you say

8    "potentially," how so?  How would it adversely

9    affect them?

10        A.   That's entirely dependent on the

11   situation and what the client is asking for and

12   what the error is.  There's no way to give you an

13   answer.

14        Q.   There's many possibilities, correct, how

15   they could be adversely affected?

16        A.   Okay.  Yes.

17        Q.   Is that true?  Okay.  What is

18   georeferencing?

19        A.   Georeferencing has to do with absolute

20   accuracy.  So in order for there to be absolute

21   accuracy, you need to use a coordinate system and

22   reference the product to some kind of coordinate

www.DigitalEvidenceGroup.com Digital Evidence Group C'rt 2021                202-232-0646
Case 5:21-cv-00137-FL    Document 39-7    Filed 03/28/22    Page 61 of 89

J.A. 897

11/17/2021    360 Virtual Drone Services, et al. v. Andrew L. Ritter, et al.    Alex Abatie

Page 62

1    system.

2         Q.    Are we back to the manual tie points or

3    manual key points that you would install yourself?

4         A.    No.

5         Q.    Okay.  So when you say "referencing

6    points," that's something that the software can do

7    for you?

8         A.    I don't understand your question.

9         Q.    Maybe I don't understand what

10   georeferencing means.  When we talk about

11   georeferencing, is that something that the software

12   is going to be able to do for you?

13        A.    Yes.  It's -- given the proper

14   information, the software will do its work, yes.

15        Q.    Okay.  And then spatial reference systems,

16   what is that?

17        A.    That just covers different coordinate

18   systems.

19        Q.    Give me an example.

20        A.    Well, probably the most common coordinate

21   system that people are familiar with is just GPS,

22   which is a latitude and longitude and an altitude.

www.DigitalEvidenceGroup.com Digital Evidence Group C'rt 2021          202-232-0646
Case 5:21-cv-00137-FL   Document 39-7   Filed 03/28/22   Page 62 of 89

J.A. 898

Page 63

1   But there are other ways to reference this

2   information to a coordinate system or the

3   coordinate systems that you can use.

4        Q.   And then Lesson 3 is getting started with

5   DroneDeploy.  As I understand it, you don't even

6   need to have a paid subscription to use a certain

7   level of DroneDeploy; is that true?

8        A.   I believe that's correct.  There are --

9   they do give you some ability to try out the

10  software, but it's feature limited.

11       Q.   Do you need to go through any classes in

12  order to be able to use the software or all I need

13  to do is go to the website and download it?

14       A.   DroneDeploy isn't anything that you

15  download.  It's a cloud service.

16       Q.   Okay.  So I just go to the website?

17       A.   Correct.

18       Q.   And so if I wanted to provide photo -- or

19  services in photo geometry, photogrammetry, I'm

20  sorry, I'm pronouncing it wrong, to a client, this

21  construction client and they called me and they

22  wanted me to do this, all I need to do is I need to

J.A. 899

11/17/2021    360 Virtual Drone Services, et al. v. Andrew L. Ritter, et al.    Alex Abatie

Page 64

1    first buy a drone, right?

2        A.    Yeah.

3        Q.    And I need to buy a camera that goes on

4    the drone, correct?

5        A.    If it's not already equipped with one,

6    yes.

7        Q.    Okay.  And then with that, with those

8    tools, I can then go to the site, fly the site, take

9    the pictures, and I can log in to DroneDeploy myself

10   using the Internet, correct?

11       A.    Correct.

12       Q.    And then I can download the data from my

13   camera on my drone and then -- and if I just want to

14   go with the default settings, I can ask DroneDeploy

15   to process the data, right?

16       A.    Correct.

17       Q.    And then that would allow me to provide

18   the work product to the client on your -- at least

19   as to the amount of fencing they might need,

20   correct?

21       A.    Correct.

22       Q.    Okay.  And so it sounds like I can do all

www.DigitalEvidenceGroup.com Digital Evidence Group C'rt 2021    202-232-0646
Case 5:21-cv-00137-FL    Document 39-7    Filed 03/28/22    Page 64 of 89

J.A. 900

USCA4 Appeal: 23-1472    Doc: 19-4        Filed: 06/28/2023    Pg: 210 of 297

Page 65

1    that without having any degree, taking any classes,

2    having any training, or having any work experience.

3    Would you agree with that?

4        A.    Yes.

5        Q.    And then obviously there's some risks

6    because we talked about errors.  And the risks are

7    that I really don't know what I'm doing and I

8    provide a faulty work product to this client who's

9    relying on me to provide accurate information,

10   right?

11       A.    There's the potential for that.

12       Q.    And that potential could not only impact

13   my client but it could impact others, meaning their

14   neighbors, if it's an issue involving boundaries or

15   real estate, correct?

16       A.    Potentially, yes.

17       Q.    Okay.  And then Lesson 4 you have on 3D

18   modeling.  Well, let me go back.  So how do you

19   protect against that?  How do you protect against

20   somebody going to buy a drone, buying a camera,

21   offering services, and pushing a button on

22   DroneDeploy when they really don't know what they're

www.DigitalEvidenceGroup.com Digital Evidence Group C'rt 2021          202-232-0646
Case 5:21-cv-00137-FL    Document 39-7    Filed 03/28/22    Page 65 of 89

J.A. 901

11/17/2021    360 Virtual Drone Services, et al. v. Andrew L. Ritter, et al.    Alex Abatie

Page 66

1    doing?

2        A.    Are you asking me how I would do that or

3    a person?

4        Q.    Well, how does one do that?  How is the

5    client -- how is the client protected in that

6    scenario against somebody who really doesn't know

7    what they are doing but is often the client services

8    in the field of photogrammetry?

9        A.    That's up to the client.

10        Q.    Okay.  So buyer beware?

11        A.    Okay.

12        Q.    Is that true?

13        A.    Yes.

14        Q.    Okay.  Now, you teach Lesson 4, 3D

15    modeling?

16        A.    Uh-huh.

17        Q.    And you say:  Collecting oblique imaging

18    for 3D modeling.  What does that mean?

19        A.    Well, in order to create the best

20    possible 3D model, you need to collect imagery in

21    a certain way that's different than if you're

22    essentially going to provide a flat map.

www.DigitalEvidenceGroup.com Digital Evidence Group C'rt 2021          202-232-0646
Case 5:21-cv-00137-FL    Document 39-7    Filed 03/28/22    Page 66 of 89

J.A. 902

USCA4 Appeal: 23-1472    Doc: 19-4    Filed: 06/28/2023    Pg: 212 of 297

Page 67

1    Q.   It's more complicated, correct?

2    A.   It requires some additional capture.

3    Q.   Okay.  And then I think maybe the best

4    thing to do is kind of go back to your report.  And

5    your report talks about, if you have that in front

6    of you, on page 3, do you see where it has mapping

7    modeling?

8    A.   At the bottom?

9    Q.   Yes.

10    A.   Yes, I see that.

11    Q.   And I think we talked about this before,

12    but reading from your report, it's stated a little

13    differently.  It says:  Aerial mapping and modeling

14    involved the process from making references from

15    georeferenced photographs.  Do you see that?

16    A.   I do.

17    Q.   That's photogrammetry, correct?

18    A.   Yeah.

19    Q.   All right.  And then the next page says --

20    I'm skipping a sentence.  But there's a sentence

21    that reads:  By combining multiple overlapping

22    images into one composite image, however, points

www.DigitalEvidenceGroup.com Digital Evidence Group C'rt 2021                    202-232-0646
Case 5:21-cv-00137-FL    Document 39-7    Filed 03/28/22    Page 67 of 89

J.A. 903

USCA4 Appeal: 23-1472   Doc: 19-4   Filed: 06/28/2023   Pg: 213 of 297

Page 68

1  that appear in multiple images can be triangulated

2  and measurements become possible.

3          Do you see that?

4      A.   I do.

5      Q.   So the triangulation is one thing that

6  allows you to take proper measurements?

7      A.   Yes.

8      Q.   And then you go on in your expert report

9  to say:  The software finds objects or geographical

10  points that repeat in multiple photos called key

11  points and uses those objects and the georeference

12  locations where the photos were taken to orient the

13  key points in three-dimensional space.

14          Do you see that?

15      A.   I see that.

16      Q.   Okay.  And the key points that we were

17  talking about, or tie point, is what allows you to

18  conduct this triangulation and allow the user to

19  take proper measurements?

20      A.   That's correct.

21      Q.   And then you go on to say:  The composite

22  image is the result, and it can take various forms

www.DigitalEvidenceGroup.com Digital Evidence Group C'rt 2021          202-232-0646
Case 5:21-cv-00137-FL   Document 39-7   Filed 03/28/22   Page 68 of 89

J.A. 904

USCA4 Appeal: 23-1472    Doc: 19-4    Filed: 06/28/2023    Pg: 214 of 297

Page 69

1    such as georeferenced composite image, called

2    orthomosaic, or 3D model.  Do you see that?

3         A.   I see that.

4         Q.   And these images, these orthomosaic image

5    or the 3D model, is the work product of

6    photogrammetry, correct?

7         A.   It's one of the outputs that's available.

8         Q.   There's -- I think this is what you were

9    mentioning a minute ago.  But orthomosaic map is

10   different than a 3D model, correct?

11        A.   Correct.

12        Q.   And it sounds to me like reading your

13   report that it's easier to create an orthomosaic

14   than it is a 3D model?

15        A.   A 3D model requires some additional

16   images in order to obtain a good model.

17        Q.   Skipping to -- so if I skip to page 7, you

18   start talking about the products.  Do you see where

19   it says orthomosaic maps on page 7?

20        A.   Uh-huh.

21        Q.   And you say:  Orthomosaic maps are

22   top-down images of large areas and are georeferenced

www.DigitalEvidenceGroup.com Digital Evidence Group C'rt 2021          202-232-0646
Case 5:21-cv-00137-FL   Document 39-7   Filed 03/28/22   Page 69 of 89

J.A. 905

11/17/2021    360 Virtual Drone Services, et al. v. Andrew L. Ritter, et al.    Alex Abatie

Page 70

1    and measurable.  Do you see that?

2        A.    I do.

3        Q.    You say:  Ortho maps are useful for a

4    number of different applications.  Can you explain

5    to the Court what the different applications are for

6    the use of these orthomosaic maps?

7        A.    Well, they have a lot of applications

8    from just being able to accurately represent a

9    large area, which is probably their most basic

10   function, to being able to georeference points on

11   an image.

12       Q.    Georeference points would allow you to do

13   what?  Take measurements?

14       A.    That would be one use, yes.

15       Q.    And draw property boundaries?

16       A.    That -- that would be up to what the

17   client wants.

18       Q.    Well, I'm asking you, though, if the

19   client wanted that, you could provide that using

20   this orthomosaic map?

21       A.    Potentially.

22       Q.    What else could you do with this data?

www.DigitalEvidenceGroup.com Digital Evidence Group C'rt 2021         202-232-0646
Case 5:21-cv-00137-FL    Document 39-7    Filed 03/28/22    Page 70 of 89

J.A. 906

USCA4 Appeal: 23-1472    Doc: 19-4       Filed: 06/28/2023    Pg: 216 of 297

Page 71

```
 1        A.   You can do volumetrics with this

 2   information.

 3        Q.   And what is volumetrics?

 4        A.   Volumetrics is determining the volume of

 5   perhaps a pile of gravel or determining how much

 6   material you might remove in order to do a certain

 7   function.

 8        Q.   It sounds like when certain clients would

 9   need that information to be accurate in order for

10   them to be able to make use of the information,

11   correct?

12        A.   It would depend on what they're using

13   that information for.

14        Q.   And what do -- in your experience, what do

15   clients use volumetrics or this volumetric data for?

16        A.   My experience has been they want to make

17   sure that they don't perhaps not have enough

18   trucks to move a certain amount of material or

19   spend too much money for too many trucks,

20   something like that.  They're wanting a good

21   measure of what the material is so they know how

22   to manage its removal or sale.
```

www.DigitalEvidenceGroup.com Digital Evidence Group C'rt 2021          202-232-0646
Case 5:21-cv-00137-FL   Document 39-7   Filed 03/28/22   Page 71 of 89

J.A. 907

USCA4 Appeal: 23-1472    Doc: 19-4    Filed: 06/28/2023    Pg: 217 of 297

Page 72

1      Q.    All right.  And then on the orthomosaic

2    map, again, that's something that it sounds like --

3    it sounds like the operator can take pictures using

4    his drone or her drone, take the data, the pictures,

5    data, download it into DroneDeploy, push a button,

6    and it creates an orthomosaic map?

7      A.    That's part of the DroneDeploy process,

8    yes.  It creates an orthographic map.

9      Q.    And the 3D modeling has a little more

10    detail, right?  It's not just like I'm taking

11    photos, any old photos, and then downloading that

12    data into DroneDeploy and pushing a button?  There

13    are some additional steps, right?

14      A.    What it amounts to is there needs to be

15    some additional coverage in terms of images.

16      Q.    And how do you go about?  How do you make

17    sure you provide the additional coverage and take

18    the photos that are necessary to allow the software

19    to create a 3D model?

20      A.    Well, part of that is -- partly is

21    experience and knowing what the software needs,

22    and some of it is a very basic process, just in

Case 5:21-cv-00137-FL    Document 39-7    Filed 03/28/22    Page 72 of 89

J.A. 908

USCA4 Appeal: 23-1472    Doc: 19-4    Filed: 06/28/2023    Pg: 218 of 297

Page 73

1  terms of there are things that a top-only/top-down

2  image misses so you're supplementing some

3  potential holes in information by some additional

4  images.

5      Q.   And so if I -- if I need to, as a client

6  need to hire you to produce 3D model, how do I know

7  you have enough experience and knowledge to

8  provide -- take the necessary pictures to create an

9  accurate 3D model?

10     A.   There isn't any way, I guess, right now

11  to determine that other than past work.

12     Q.   And in this case, that might create a

13  problem, right, if the client hires somebody that

14  doesn't know what they're doing on 3D modeling?

15     A.   Again, it depends entirely what they're

16  using it for.

17     Q.   You say in your expert report on page 8:

18  Unlike an ortho map, which requires only nadir or

19  top-down photographs that can be taken autonomously

20  by the drone, the 3D model requires taking oblique

21  images or images from multiple angles and altitudes.

22          Can you unpack that and explain it to me?

www.DigitalEvidenceGroup.com Digital Evidence Group C'rt 2021    202-232-0646
Case 5:21-cv-00137-FL    Document 39-7    Filed 03/28/22    Page 73 of 89

J.A. 909

Page 74

1    A.    In a top-down nadir image, often the

2    sides of things are missed a little bit.  And to

3    create a good 3D model of something that has

4    detail on its sides, like a building, something

5    like that, you need to take images essentially of

6    more detailed images of the side surfaces of

7    structures in order to get good resolution.

8    Q.    And how do you know how to do that?

9    Again, is that just experience?

10    A.    Are you asking me personally?

11    Q.    Yes.  Well, you're the designated expert

12    on the use of drones to create 3D models, so yes.

13    A.    Yes, that's part of, you know, being --

14    creating good 3D models how to properly capture

15    the images, and for me personally that's been

16    through experience.

17    Q.    And is there any way to get -- take

18    classes on this?

19    A.    Well, that's one of the things that we

20    talk about in the DARTDrones mapping and modeling

21    class is we talk about how to properly capture

22    these images.

www.DigitalEvidenceGroup.com Digital Evidence Group C'rt 2021                202-232-0646
Case 5:21-cv-00137-FL    Document 39-7    Filed 03/28/22    Page 74 of 89

J.A. 910

Page 75

1        Q.   And so if I don't take the DARTDrones

2   class and I don't have any experience under the

3   charge of somebody who's got expertise in creating

4   3D models, what's the downside?  What kind of errors

5   can I -- can I create?

6        A.   Well, one of the great things about 3D

7   models is if you get it wrong, you really know

8   that you've gotten it wrong.  It just looks wrong.

9   So if you don't have the proper information,

10  you'll know, so -- and no client would be happy

11  with a poorly modeled 3D structure.  It would be

12  very evident that there was a problem.

13       Q.   There must be cases where it's not clearly

14  evident and yet the model itself is defective in

15  some way.  Is that true?

16       A.   That's possible.  That's the thing about

17  3D models, you can really tell a good 3D model

18  versus a bad 3D model.  It's pretty obvious.

19       Q.   And what are the uses of 3D models?  Why

20  would somebody hire you to generate a 3D model?

21       A.   There's a lot of reasons.  Visualization

22  might be one of them.  So they want a digital file

J.A. 911

USCA4 Appeal: 23-1472    Doc: 19-4    Filed: 06/28/2023    Pg: 221 of 297

Page 76

1    of something so that they can use it for marketing

2    materials.  They can use it for showing clients.

3    State of a current situation, what's great about a

4    3D model is you can move around it in space so

5    it's not a static image.  So you can look at it

6    from multiple sides, right there looking at the

7    model.  So visualization definitely is one use of

8    that.  3D models are, depending on their accuracy,

9    measurable also.  It's just an easy way to move

10   around an object and look at it more detailed than

11   a series of images.  Just easier to navigate.

12        Q.   So let me, I guess, go back to the

13   beginning.  I asked you what opinions you were going

14   to offer.  And as I understand it, your job is to --

15   is to, I guess, educate the Court as to how unmanned

16   aerial systems collect and process information about

17   land and structures, correct?

18        A.   I guess you could put it that way.

19        Q.   I'm actually reading from your report.

20             So are you -- and then you're also giving

21   opinion on the different ways which drone-captured

22   data can provide useful information to clients,

Case 5:21-cv-00137-FL   Document 39-7   Filed 03/28/22   Page 76 of 89

J.A. 912

Page 77

1    correct?

2        A.    Uh-huh, yes.

3        Q.    So I want to kind of go through the use

4    case that you put in here, which again, as I

5    understand it, you're saying you're here to give an

6    opinion on certain tools that can be used in

7    mapping, photogrammetry, 3D imaging, correct?

8        A.    Yes.

9        Q.    Okay.  And so you're the guy to explain to

10   the Court how the tool works, right?

11       A.    Yes.

12       Q.    And then how the tool -- either the drone

13   itself, the camera on the drone, or the software can

14   produce certain data for the clients, correct?

15       A.    Correct.

16       Q.    Okay.  And so you have on your report, on

17   page 9, you have some use cases and I guess you're

18   probably just giving -- you're trying to give the

19   Court some examples, but it's certainly not

20   exhaustive of how this data can be used, right?

21       A.    Correct.

22       Q.    And then the first area that you have is

J.A. 913

Page 78

1    bidding, planning, and design on page 9.  Do you see

2    that?

3         A.   Yes.

4         Q.   And so walk me through that.  What are you

5    talking about there?  I know you're talking about

6    the construction process for developers.  But what

7    are you talking about bidding, planning, and design?

8         A.   I believe the point of that was along the

9    lines of this information can be used before the

10   project starts, during the project, and once the

11   project is completed.  And these are some of the

12   uses that a company might use before their project

13   starts.  Visualization, like I mentioned in the

14   report, drainage point, elevations, things like

15   that, ways for companies to assess before a job

16   starts.

17        Q.   Okay.  And so when we talk about the data

18   that's produced by the software using drones, it

19   sounds like what I hear you saying is, to the Court,

20   is that you have expertise in how to use these

21   tools, correct?

22        A.   Correct.

11/17/2021      360 Virtual Drone Services, et al. v. Andrew L. Ritter, et al.      Alex Abatie

Page 79

1        Q.   Okay.  And you're not an expert on land

2    surveying, right?

3        A.   Correct.

4        Q.   Okay.  And you're not licensed as a land

5    surveyor?

6        A.   Correct.

7        Q.   Okay.  And you're not an expert in the

8    area of photogrammetry?

9        A.   Correct.

10       Q.   Okay.  And then you have comparison over

11   time.  What is that?

12       A.   Well, this is one of those -- it's a use

13   for this kind of information.  Because using a

14   drone is very efficient and cost effective, you

15   can use it repeatedly over a period of time to

16   document changes on a worksite, how the site is

17   progressing, progress that's being made or not

18   being made.  It's a very good visual record of the

19   state of a job site, for example, at a given time.

20       Q.   And then the next section you have is easy

21   and repeated progress reports.  And what are we

22   talking about there?  Is that similar to comparison

www.DigitalEvidenceGroup.com Digital Evidence Group C'rt 2021          202-232-0646
Case 5:21-cv-00137-FL   Document 39-7   Filed 03/28/22   Page 79 of 89

J.A. 915

Page 80

1    over time?

2         A.   Yes, that is similar.

3         Q.   And then you have some pictures on

4    page 10.  So give the client an idea of essentially

5    taking images or pictures and here's what the

6    project, their job site looks like on day 1, day 5,

7    day 10, day 15, something along those lines?

8         A.   Correct.

9         Q.   Okay.  And inventory management is another

10   section where you have stockpile measurements of

11   construction materials and aggregates can be

12   conducted safely, quickly, and accurately with

13   unmanned aircraft?

14        A.   Yes.

15        Q.   This is going back to the volumetrics

16   issue?

17        A.   Correct, this is about volumetrics.

18        Q.   Then on page 11, you have visualizing

19   property, which I guess is somewhat similar to easy

20   and repeated progress reports, getting an idea what

21   the project looks like from above?

22        A.   Yeah.  I guess that's fair.

www.DigitalEvidenceGroup.com Digital Evidence Group C'rt 2021    202-232-0646
Case 5:21-cv-00137-FL   Document 39-7   Filed 03/28/22   Page 80 of 89

J.A. 916

USCA4 Appeal: 23-1472    Doc: 19-4    Filed: 06/28/2023    Pg: 226 of 297

Page 81

1    Q.   Okay.  And what are you -- when you wrote

2    this section, visualizing property, what did you

3    want to convey to the reader?

4    A.   Well, this is slightly different than --

5    I think the distinction was using in preplanning

6    versus this is really more about 3D visualization,

7    more specifically ways that areas, properties,

8    things like that can be visualized in three

9    dimension always.

10   Q.   And then the next section is safety and

11   accuracy.

12   A.   Uh-huh.

13   Q.   And you get into an example of a cell

14   tower, and you have a picture of that on page 12,

15   right?

16   A.   Correct.

17   Q.   Okay.  And you're given an example of how

18   a company, whether it be an owner of a cell tower,

19   it could be a tower engineering company, why they

20   might hire you to provide certain data?

21   A.   Correct.

22   Q.   Right?  Okay.  And why would that be?  Why

www.DigitalEvidenceGroup.com Digital Evidence Group C'rt 2021    202-232-0646
Case 5:21-cv-00137-FL    Document 39-7    Filed 03/28/22    Page 81 of 89

J.A. 917

Page 82

1    would a cell tower engineering company, for

2    instance, why would they hire you to provide data?

3    What are they -- what's one example that you

4    reference in your report?

5        A.    I referenced a tower that was deemed

6    unclimbable and that was very costly to inspect

7    with a crane or some other method, and the drone

8    was a very cost effective way to inspect something

9    that was difficult to inspect.

10       Q.    So it's a -- you're saying that you can

11   use drones and cameras and software to create data

12   so that these companies can do safety inspections of

13   cell towers?

14       A.    Not that they necessarily are doing

15   safety inspections, but that it's safer to fly a

16   drone to collect these images than to send a

17   person up and climb a tower to collect this

18   information because of the potential of them

19   falling.

20       Q.    And they're using this to inspect their

21   tower, right?

22       A.    They're using this to get information on

www.DigitalEvidenceGroup.com Digital Evidence Group C'rt 2021    202-232-0646
Case 5:21-cv-00137-FL   Document 39-7   Filed 03/28/22   Page 82 of 89

J.A. 918

USCA4 Appeal: 23-1472    Doc: 19-4    Filed: 06/28/2023    Pg: 228 of 297

Page 83

1    their tower.  It can be inspection.  It can be

2    where to put a -- there's a number of ways to use

3    the information.

4         Q.   And what -- just as though there were a

5    number of ways to use the information, there are a

6    number of ways that erroneous information could

7    adversely impact the client, meaning a cell tower

8    engineering company or the owner of a cell tower,

9    right?

10        A.   That's possible.

11        Q.   Okay.  And so what would happen if the

12   cell tower got bad -- cell tower company got bad

13   data that they're using to inspect their cell tower,

14   what are some concerns that you might have?

15        A.   Well, it would depend on what the bad

16   data was and what they were looking for, but can

17   you give me a more specific question?

18        Q.   Well, I'm using your example.  So your

19   hypothetical or your example to the Court is

20   inspection, you said:  How can you inspect a cell

21   tower when it can't be climbed?  And you're talking

22   about, hey, we could use this data to provide cell

www.DigitalEvidenceGroup.com Digital Evidence Group C'rt 2021          202-232-0646
Case 5:21-cv-00137-FL    Document 39-7    Filed 03/28/22    Page 83 of 89

J.A. 919

USCA4 Appeal: 23-1472    Doc: 19-4      Filed: 06/28/2023    Pg: 229 of 297

Page 84

1   tower companies information on doing a cell tower

2   inspection.

3            And my concern is, I'm asking it through a

4   question, but the concern would be what happens if

5   you're not really qualified to provide them this

6   sort of data and you provide bad data?  You know, do

7   you see some -- do you have concerns?  Or is that

8   something that's really outside of your area as an

9   expert and using certain tools in the field of

10  mapping and photogrammetry and surveying, et cetera?

11       A.   Well, using my -- the tools at my

12  disposal and relying on the accuracy report of

13  PIX4D and my experience, I would hope that the

14  information would be as accurate as possible.  If

15  it wasn't, it depends on what they're actually

16  looking for, if it's something structural, if it's

17  something -- bad data in any field is a problem.

18       Q.   I guess the question is:  How do you guard

19  against giving a client bad data?  You as a drone

20  operator, how do you guard against that?

21       A.   Like I said, I rely on my experience and

22  my tools, and I personally would not give

www.DigitalEvidenceGroup.com Digital Evidence Group C'rt 2021            202-232-0646
Case 5:21-cv-00137-FL   Document 39-7   Filed 03/28/22   Page 84 of 89

J.A. 920

11/17/2021      360 Virtual Drone Services, et al. v. Andrew L. Ritter, et al.      Alex Abatie

Page 85

1    information I didn't feel comfortable that I could

2    provide what they wanted.  For example, on the

3    fence example, if I was unable to use ground

4    control points, I would tell you I can't tell you

5    where to put your fence.

6        Q.   Who would you tell them to hire?

7        A.   You know, I would tell them -- it's not

8    something that I could do is what I would tell

9    them.

10       Q.   Would it make sense for them to hire a

11   land surveyor to figure out where to put their

12   fence?

13       A.   That's a possibility.

14       Q.   Then you have law enforcement.  What were

15   you trying to convey to the reader when you wrote

16   your law enforcement section?

17       A.   Largely that public safety is also using

18   this information, and it's just another use for

19   that.

20       Q.   How many uses are there -- other than what

21   you noted for the Court in your report, how many

22   other uses are there for this kind of data that

www.DigitalEvidenceGroup.com Digital Evidence Group C'rt 2021                202-232-0646
Case 5:21-cv-00137-FL   Document 39-7   Filed 03/28/22   Page 85 of 89

J.A. 921

USCA4 Appeal: 23-1472    Doc: 19-4    Filed: 06/28/2023    Pg: 231 of 297

11/17/2021    360 Virtual Drone Services, et al. v. Andrew L. Ritter, et al.    Alex Abatie

Page 86

1    would be generated by DroneDeploy or PIX4D?

2        A.   It seems like people are finding

3    applications for this all the time.  So I can't

4    tell you a number, but people are using this

5    technology in a number of ways, and I outlined a

6    few in my report.

7        Q.   It would be difficult, right, or almost

8    impossible for you to identify all the uses for this

9    kind of information generated by DroneDeploy or

10   PIX4D; is that fair?

11       A.   There are a lot of uses for this, and I

12   did not include all of them in my report and I

13   don't know that I personally know of all the uses

14   for this technology.

15       Q.   All right.  And so just sort of to close

16   the loop here, you were asked to provide information

17   to the Court on the use of drones, correct?

18       A.   Correct.

19       Q.   All right.  And using a drone to take

20   pictures, right?

21       A.   Correct.

22       Q.   And the way you put it in your report,

www.DigitalEvidenceGroup.com Digital Evidence Group C'rt 2021          202-232-0646
Case 5:21-cv-00137-FL   Document 39-7   Filed 03/28/22   Page 86 of 89

J.A. 922

11/17/2021      360 Virtual Drone Services, et al. v. Andrew L. Ritter, et al.      Alex Abatie

Page 87

1    using a drone and a related camera to collect data

2    by taking pictures, correct?

3          A.    Correct.

4          Q.    And then using -- you're also here to

5    educate the Court on using certain software to

6    generate data files known as orthomosaic maps or 3D

7    models?

8          A.    Correct.

9          Q.    Is that the scope of your report?  Are

10   there any other information that we haven't

11   discussed?

12         A.    No, I believe that's the scope of the

13   report.

14         MR. HANNA:  Okay.  I appreciate your time.

15   Thank you.  I don't have any further questions.

16         MR. GEDGE:  Great.  We may have a couple.

17   Maybe we can take 5 and circle back and we may

18   have a few.

19         MR. HANNA:  That would be fine.

20                  (A short break was taken.)

21         MR. GEDGE:  We can go back on the record.

22                  Plaintiffs don't have any questions for

www.DigitalEvidenceGroup.com Digital Evidence Group C'rt 2021          202-232-0646
Case 5:21-cv-00137-FL   Document 39-7   Filed 03/28/22   Page 87 of 89

J.A. 923

USCA4 Appeal: 23-1472     Doc: 19-4     Filed: 06/28/2023     Pg: 233 of 297

Page 88

1    Alex at this time.

2              So I guess we can quickly just run

3    through ordering the transcript.  We will take a

4    copy, electronic.  I think Alex will read and sign

5    as well.  So if we can facilitate that, that would

6    be great.

7                        (Witness excused, 5:19 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

J.A. 924

Page 89

1    STATE OF ILLINOIS )

2                     )  SS:

3    COUNTY OF COOK   )

4        I, RACHEL F. GARD, RPR, CLR, CRR, CSR No.
     084-3324, a Certified Shorthand Reporter in and for

5    the State of Illinois, at large, do hereby certify
     that ALEX ABATIE, the deponent herein, was

6    previously duly sworn to tell the truth, the whole
     truth, and nothing but the truth in the

7    aforementioned matter;

         That the foregoing deposition was taken on

8    behalf of the Defendants remotely via Zoom, on the
     11th day of November, 2021, at 3:00 p.m., pursuant

9    to the applicable rules;

         That said deposition was taken down in

10   stenograph notes and afterwards reduced to
     typewriting under my direction, and that the

11   typewritten transcript is a true record of the
     testimony given by the said deponent; and that

12   signature was requested by the deponent and all
     parties present;

13       That the parties were represented by their
     counsel as aforementioned.

14       I do further certify that I am a disinterested
     person in this cause of action, that I am not a

15   relative or attorney of either party or otherwise
     interested in the event of this action, and that I

16   am not in the employ of the attorneys for any party.

         IN WITNESS WHEREOF, I have hereunto set my

17   hand and affixed my seal on this 2nd
     day of December, 2021.

18

19

20                   *Rachel F. Gard*

21   _____

22                   COURT REPORTER

J.A. 925

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
CASE NO. 5:21-cv-0137-FL

360 VIRTUAL DRONE SERVICES LLC and MICHAEL JONES, )
)
)
Plaintiffs, )
)
v. )
)
ANDREW L. RITTER, in his official capacity as Executive Director of the North Carolina Board of Examiners for Engineers and Surveyors; and JOHN M. LOGSDON, JONATHAN S. CARE, DENNIS K. HOYLE, RICHARD M. BENTON, CARL M. ELLINGTON, JR, CEDRIC D. FAIRBANKS, BRENDA L. MOORE, CAROL SALLOUM, and ANDREW G. ZOUTWELLE, in their official capacities as members of the North Carolina Board of Examiners for Engineers and Surveyors, )
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
Defendants. )

**DEFENDANTS' RESPONSE TO PLAINTIFFS' LR 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS**

NOW COMES Defendants, through counsel, and provides the following

Response to Plaintiffs' LR 56.1 Statement of Undisputed Material Facts:

1.    Not disputed.

2.    Not disputed.

3.    Not disputed.

4.    Not disputed.

5.    Not disputed.

6.     Not disputed as to Michael Jones.  However, Plaintiff 360 Virtual Drone Services, LLC ("Virtual Drone") was not organized until October 2017.  [Rule 30(b)(6) Deposition of Virtual Drone ("Virtual Drone Depo") p. 25 (Appendix Exhibit 2)].

7.     Not disputed.

8.     Not disputed.

9.     Not disputed.

10.    Not disputed.

11.    Not disputed.

12.    Not disputed.

13.    Not disputed.

14.    Not disputed.

15.    Not disputed.

16.    Not disputed.

17.    Not disputed, the referenced letter speaks for itself.

18.    Disputed.  The Board does not issue "cease and desist letters" to individuals or companies suspected of practicing land surveying without a license. The Board did issue various letters to individuals and companies placing them on notice that practicing, or offering to practice, land surveying in North Carolina without being licensed with the Board is a violation of the Act.  However, the Board does not have the jurisdiction over non-licensees.

19.    Disputed as to the characterization of a "cease and desist letter." Otherwise, not disputed as the referenced letter speaks for itself.

20.    Disputed as to the characterization of a "cease and desist letter." Otherwise, not disputed as the referenced letter speaks for itself.

21.    Not disputed, the referenced email speaks for itself.

22.    Not disputed.

23.    Not disputed.

24.    Not disputed.

25.    Not disputed.

26.    Not disputed.

27.    Not disputed.

28.    Disputed.   The Board investigator denied ever making the alleged statement set forth in paragraph 28.

29.    Disputed.   The Board investigator denied ever making the alleged statement set forth in paragraph 29.

30.    Disputed.   The Board investigator denied ever making the alleged statement set forth in paragraph 30.

31.    Not disputed.

32.    Not disputed.

33.    Not disputed.

34.    Not disputed.

35.    Not disputed, the referenced letter speaks for itself.

36.    Not disputed.

37.    Not disputed.

38.    Disputed.    The Board does not issue "cease and desist letters" to individuals or companies suspected of practicing land surveying without a license or enforce laws against non-licensees.    The Board did issue various letters to individuals and companies placing them on notice that practicing, or offering to practice, land surveying in North Carolina without being licensed with the Board is a violation of the Act.    However, the Board does not have the jurisdiction over non-licensees.

39.    Not disputed.

40.    Not disputed, the expert report speaks for itself.

41.    Not disputed, the referenced deposition testimony speaks for itself.

42.    Not disputed, the referenced deposition testimony speaks for itself.

43.    Not disputed, the referenced deposition testimony speaks for itself.

44.    Not disputed, the referenced deposition testimony speaks for itself.

45.    Not disputed, the referenced deposition testimony speaks for itself.

46.    Not disputed.

47.    Not disputed, the referenced deposition testimony speaks for itself.

48.    Not disputed, the expert report speaks for itself.

49.    Not disputed, the referenced deposition testimony speaks for itself.

50.    Not disputed, the referenced deposition testimony speaks for itself.

51.    Not disputed, the referenced deposition testimony speaks for itself.

52.    Not disputed.

53.    Not disputed, the referenced deposition testimony speaks for itself.

54.    Not disputed, the expert report speaks for itself.

55.     Not disputed.

56.     Not disputed, the referenced deposition testimony speaks for itself.

57.     Disputed as to limiting the governmental interests to those identified in paragraph 57.  Land Surveying is regulated in North Carolina "in order to safeguard life, health, and property, and to promote the public welfare" and is "subject to regulation in the public interest."  [N.C.G.S. § 89C-2; Rule 30(b)(6) Deposition of the Board at p. 10 (Appendix Exhibit 5); Defendants' Disclosure of Expert Testimony at p. 14].  The regulation and licensing of land surveying in North Carolina works to establish a minimum level of competence (education, exam, and experience) and the Act works to protect the public from negligence, incompetence, and professional misconduct in the profession of land surveying.  [Defendants' Disclosure of Expert Testimony at p. 14; Rule 30(b)(6) Deposition of the Board at pp. 10-11].  The Act also protects the public from misrepresentations as to professional status or expertise. Additionally, the Act provides a system of accountability, providing the Board with the ability to hold licensees accountable for incompetence or unethical work. [Defendants' Disclosure of Expert Testimony p. 14].

58.     Not disputed.

59.     Not disputed.

60.     Not disputed.

61.     Not disputed.

62.     Disputed.  Errors in land surveying could have significant adverse consequences on the public, including the client who hired the surveyor and who

relies on the accuracy of the work product. [Defendants' Disclosure of Expert Testimony at p. 14; Alex Abate Deposition at pp. 57-58 and 65-66 (Appendix Exhibit 7)]. Errors in land surveying would include mapping and modeling as set forth in the definition of the practice of land surveying.

63.    Not disputed.

64.    Not disputed.

65.    Not disputed, the referenced deposition testimony speaks for itself.

66.    Not disputed, the referenced deposition testimony speaks for itself.

67.    Not disputed.

68.    Not disputed.

69.    Not disputed.

70.    Not disputed, the referenced deposition testimony speaks for itself.

71.    Not disputed, the referenced deposition testimony speaks for itself.

72.    Not disputed, the referenced deposition testimony speaks for itself.

73.    Not disputed, the referenced deposition testimony speaks for itself.

74.    Not disputed, the referenced deposition testimony speaks for itself.

Respectfully submitted this the 28th day of April, 2022.

FITZGERALD HANNA & SULLIVAN, PLLC

/s/ Douglas W. Hanna
Douglas W. Hanna, NCSB #18225
3737 Glenwood Avenue, Suite 375
Raleigh, NC 27612
Telephone: (919) 863-9091
Facsimile: (919) 424-6409
*Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this day filed the foregoing **DEFENDANTS'
RESPONSE TO PLAINTIFFS' LR 56.1 STATEMENT OF UNDISPUTED MATERIAL
FACTS** with the Clerk of the Court using the CM/ECF system which will send
notification of such filing to the following:

David G. Guidry, Mainsail Lawyers, dguidry@mainsaillawyers.com

Samuel B. Gedge, Institute for Justice, sgedge@ij.org

James T. Knight II, Institute for Justice, jknight@ij.org

This the 28th day of April, 2022.

/s/ Douglas W. Hanna
Douglas W. Hanna, NCSB #18225

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
### WESTERN DIVISION

| | | |
|---|---|---|
| 360 VIRTUAL DRONE SERVICES LLC et al., | ) ) ) | |
|     Plaintiffs, | ) ) | |
| v. | ) ) | |
| ANDREW L. RITTER, in his official capacity as Executive Director of the North Carolina Board of Examiners for Engineers and Surveyors, et al., | ) ) ) ) ) | Case No.: 5:21-cv-0137-FL |
|     Defendants. | ) ) ) | |

---

## PLAINTIFFS' RESPONSE TO
## DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS (ECF 32)

---

David G. Guidry
MAINSAIL LAWYERS
338 South Sharon Amity Rd., #337
Charlotte, NC 28211
Phone: (917) 376-6098
Fax: (888) 501-9309
E-mail: dguidry@mainsaillawyers.com
State Bar No.: 38675
*Local Civil Rule 83.1(d) Counsel for Plaintiffs*

Samuel B. Gedge (VA Bar No. 80387)*
James T. Knight II (DC Bar No. 1671382)*
INSTITUTE FOR JUSTICE
901 North Glebe Road, Suite 900
Arlington, VA 22203
Phone: (703) 682-9320
Fax: (703) 682-9321
E-mail: sgedge@ij.org
    jknight@ij.org
*\* Special Appearance pursuant to Local Rule 83.1(e)*

*Attorneys for Plaintiffs*

This counterstatement responds to Defendants' Statement of Undisputed Material Facts

(ECF 32) that it submitted in conjunction with its Motion for Summary Judgment.

**1.      North Carolina regulates land surveying through it Engineering and Land Surveying Act. [ECF Doc. 1, Complaint at ¶ 34; N.C.G.S. §§ 89C-1, *et seq.*].**

**Response:** Although Statement 1 is more one of law than fact, Plaintiffs do not dispute its accuracy.

**2.      The Act establishes a State Board of Examiners for Engineers and Surveyors (the "Board") to administer the provisions of the Act. [N.C.G.S. § 89C-4; Ritter Affidavit ¶ 3 (Appendix Exhibit 1)].**

**Response:** Although Statement 2 is more one of law than fact, Plaintiffs do not dispute its accuracy.

**3.      The Legislature designated the practice of Land Surveying as a profession. [N.C.G.S. § 89C-3(7)(a); Ritter Affidavit ¶ 4].**

**Response:** Although Statement 3 is more one of law than fact, Plaintiffs do not dispute its accuracy.

**4.      "Land surveying encompasses a number of disciplines including geodetic surveying, hydrographic surveying, cadastral surveying, engineering surveying, route surveying, photogrammetric (aerial) surveying, and topographic surveying." [N.C.G.S. § 89C-13(b); Ritter Affidavit ¶ 5].**

**Response:** Statement 4 is a verbatim quote of a portion of N.C. Gen. Stat. § 89C-13(b), and Plaintiffs do not dispute that Statement 4 accurately quotes a portion of N.C. Gen. Stat. § 89C-13(b).

**5.      "The Act prohibits any person from practicing or offering to practice land surveying in North Carolina without first being licensed by the Board." [ECF Doc. 1 at ¶ 36; N.C.G.S. §§ 89C-2 and 89C-23; Ritter Affidavit ¶ 6].**

**Response:** Statement 5 is a verbatim quote from Plaintiffs' complaint, and Plaintiffs continue to stand by its accuracy.

**6.      The alleged unlawful practice by an unlicensed person shall be subject to Board investigation. [21 NCAC 56 .1302; Ritter Affidavit ¶ 7].**

**Response:** On the understanding that the term "unlawful practice by an unlicensed person" means the practice of land surveying by an unlicensed person, Statement 6 is undisputed.

7.　　Plaintiff Michael Jones incorporated 360 Virtual Drone Services, LLC ("Virtual Drone") in October 2017. [Rule 30(b)(6) Deposition of Virtual Drone ("Virtual Drone Depo") p. 25 (Appendix Exhibit 2)].

**Response:** Undisputed.

8.　　Virtual Drone is wholly owned by Michael Jones. [ECF Doc. 1 at ¶ 8].

**Response:** Undisputed.

9.　　Michael Jones does not individually offer any services or transact any business under his name. [Michael Jones Depo p. 48 (Appendix Exhibit 3)].

**Response:** Undisputed.

10.　　Between 2017 and 2021, Virtual Drone has provided drone photography-related services, including videography and photography for commercial and real-estate marketing and weddings. [Virtual Drone Depo p. 27].

**Response:** Undisputed.

11.　　Virtual Drone uses a drone and a camera to perform its services. [Virtual Drone Depo p. 87].

**Response:** Undisputed.

12.　　Between October 2017 and June 2019, Virtual Drone provided drone-related photography and videography services to clients. [Virtual Drone Depo p. 41].

**Response:** Undisputed.

13.　　Michael Jones received no formal instruction regarding photography. [Michael Jones Depo p. 29].

**Response:** On the understanding that "formal instruction regarding photography" means in-person classes from photographers, Statement 13 is undisputed. Michael Jones has received online instruction in photography. *See* Defs.' MSJ App'x Ex. 3 (Jones Dep. 23:22-24:22) (ECF 39-3).

14.　　Michael Jones received no formal instruction regarding the use of drones. [Michael Jones Dep. P. 29].

**Response:** On the understanding that "formal instruction regarding the use of drones" means in-person classes, Statement 14 is undisputed. Michael Jones has received online instruction in the use of drones. *See* Defs.' MSJ App'x Ex. 3 (Jones Dep. 22:5-24:25) (ECF 39-3).

15.    **Michael Jones has no experience in the field of photogrammetry. [Virtual Drone Depo p. 13].**

**Response:** With the understanding that "experience in the field of photogrammetry" means working for a company employer that practiced photogrammetry prior to Michael Jones's founding 360 Virtual Drone Services, Statement 15 is undisputed. Defs.' MSJ App'x Ex. 3 (360 Virtual Drone Services 30(b)(6) Dep. 13:9-13:12) (ECF 39-2) ("Q. Do you have any experience? Did you work for any company before you started 360 Virtual Drone in the field of photogrammetry? A. No, sir."). Michael Jones did, however, create a completed orthomosaic map to pitch a repeat client on incorporating maps into their existing business arrangement. Jones MSJ Decl. ¶ 21 (ECF 38-3). The Board's designated expert opined that that orthomosaic map qualified as "surveying" under North Carolina's surveying law. Pls.' MSJ App'x Ex. 25 (Schall Dep. 37:10-37:20) (ECF 38-25) ("Q. . . . [A]s I understand what we've been discussing this orthomosaic map would qualify under the definition of survey; is that right? A. I see a scale bar on there which implies that the map is scaled correctly and measurable so I would have to say yes."). Plaintiffs also provided paying customers with the aerial images needed to create thermal and aerial maps. Jones MSJ Decl. ¶¶ 17-18 (ECF 38-3).

Jones also practiced making 3D digital models, which the Board maintains qualifies as surveying (or photogrammetry). Defs.' MSJ App'x Ex. 2 (360 Virtual Drone Services 30(b)(6) Dep. 50:9-50:12, 70:17-70:19) (ECF 39-2); *see also* Pls.' MSJ App'x Ex. 23 at 16 (Board expert's report) (ECF 38-23); Defs.' MSJ App'x Ex. 5 (Board 30(b)(6) Dep. 25:8-26:22) (ECF 39-5).

16.    **Virtual Drone has never provided photogrammetry services to paying customers. [Virtual Drone Depo p. 12].**

**Response:** It is undisputed that 360 Virtual Drone Services LLC never provided a measurable orthomosaic map or 3D digital model to a paying customer. Michael Jones did, however, create a completed orthomosaic map to pitch a repeat client on incorporating maps into their existing business arrangement. Jones MSJ Decl. ¶ 21 (ECF 38-3). The Board's designated expert opined that that orthomosaic map qualified as "surveying" (or photogrammetry) under North Carolina's surveying law. Pls.' MSJ App'x Ex. 25 (Schall Dep. 37:10-37:20) (ECF 38-25) ("Q. . . . [A]s I understand what we've been discussing this orthomosaic map would qualify under the definition of survey; is that right? A. I see a scale bar on there which implies that the map is scaled correctly and measurable so I would have to say yes."). Plaintiffs also provided paying customers with the aerial images needed to create thermal and aerial maps. Jones MSJ Decl. ¶¶ 17-18 (ECF 38-3).

17.    **Michael Jones is not a licensed land surveyor in North Carolina or anywhere else. [ECF Doc. 1 at ¶ 29].**

**Response:** Undisputed.

18.    **Virtual Drone is not licensed as a land surveying business in North Carolina or anywhere else. [ECF Doc. 1 at ¶ 30; Michael Jones Depo p. 143]. Michael Jones does not want to be a licensed land surveyor. [Michael Jones Depo p. 143].**

**Response:** Undisputed.

**19.    In early 2019, the Board mailed Michael Jones and Virtual Drone a notice that the Board "had initiated an investigation concerning charges that 360 Virtual Drone Services, LLC is practicing or offering to practice surveying without a license as required by F.S. 89C." [ECF Doc. 1 at ¶ 60; Ritter Affidavit ¶ 8].**

**Response:** Disputed, though the errors in this statement appear to be largely immaterial. For example, the quoted material (subject to minor transcriptional errors) appears to be taken from the June 2019 letter issued by the Board. And the "notice" to which Statement 19 appears to refer was sent in late 2018, not early 2019. Pls.' MSJ App'x Ex. 6 at 1 (ECF 38-6).

**20.    Prior to receiving notice from the Board, Virtual Drone advertised that it offered "surveying" and "mapping" services. [Michael Jones Dep. pp. 56 and 66; Ritter Affidavit ¶ 9].**

**Response:** It is undisputed that 360 Virtual Drone Services LLC advertised mapping services. Jones MSJ Decl. ¶¶ 11, 13-14 (ECF 38-3). It is also undisputed that Michael Jones created a profile on Droner.io, a popular commercial-drone website, and selected "Surveying & Mapping" as one of his project categories. (Droners.io did not offer a standalone "Mapping" project category.) *Id.* ¶¶ 12-13.

**21.    Michael Jones told the Board that Virtual Drone offered orthomosiac maps or measurable maps. [Michael Jones Depo p. 67; Ritter Affidavit ¶ 10].**

**Response:** Undisputed.

**22.    Prior to June 2019, Virtual Drone never provided measurable maps to clients. [Virtual Drone Depo p. 41].**

**Response:** Disputed. It is undisputed that prior to June 2019, 360 Virtual Drone Services LLC never provided a completed, measurable orthomosaic map to a client in exchange for compensation. Michael Jones did, however, create a completed orthomosaic map to pitch a repeat client on incorporating maps into their existing business arrangement. Jones MSJ Decl. ¶ 21 (ECF 38-3). The Board's designated expert opined that that orthomosaic map qualified as "surveying" under North Carolina law. Pls.' MSJ App'x Ex. 25 (Schall Dep. 37:10-37-20) ("Q. . . . [A]s I understand what we've been discussing this orthomosaic map would qualify under the definition of survey; is that right? A. I see a scale bar on there which implies that the map is scaled correctly and measurable so I would have to say yes.") (ECF 38-25). Plaintiffs also provided paying customers with the aerial images needed to create thermal and aerial maps. Jones MSJ Decl. ¶¶ 17-18 (ECF 38-3).

**23.    Prior to June 2019, Virtual Drone was never hired to provide an orthomosaic map. [Virtual Drone Depo pp. 51-52].**

**Response:** It is undisputed that prior to June 2019, 360 Virtual Drone Services LLC was never hired to provide an orthomosaic map. Michael Jones did, however, create a completed orthomosaic map to pitch a repeat client on incorporating maps into their existing business arrangement. Jones MSJ Decl. ¶ 21 (ECF 38-3). The Board's designated expert opined that that orthomosaic map qualified as "surveying" under North Carolina law. Pls.' MSJ App'x Ex. 25 (Schall Dep. 37:10-37:20) (ECF 38-25) ("Q. . . . [A]s I understand what we've been discussing this orthomosaic map would qualify under the definition of survey; is that right? A. I see a scale bar on there which implies that the map is scaled correctly and measurable so I would have to say yes."). Plaintiffs also provided paying customers with the aerial images needed to create thermal and aerial orthomosaic maps. Jones MSJ Decl. ¶¶ 17-18 (ECF 38-3).

24. **Prior to June 2019, Virtual Drone was never hired to provide maps with location data. [Virtual Drone Depo p. 41; Michael Jones Depo p. 108].**

**Response:** It is undisputed that prior to June 2019, 360 Virtual Drone Services LLC was never hired to provide maps with location data. Michael Jones did, however, create a completed orthomosaic map to pitch a repeat client on incorporating maps into their existing business arrangement. Jones MSJ Decl. ¶ 21 (ECF 38-3). The Board's designated expert opined that that orthomosaic map qualified as "surveying" under North Carolina law. Pls.' MSJ App'x Ex. 25 (Schall Dep. 37:10-37:20) (ECF 38-25) ("Q. . . . [A]s I understand what we've been discussing this orthomosaic map would qualify under the definition of survey; is that right? A. I see a scale bar on there which implies that the map is scaled correctly and measurable so I would have to say yes."). Plaintiffs also provided paying customers with the aerial images needed to create aerial orthomosaic maps. Jones MSJ Decl. ¶¶ 17-18 (ECF 38-3).

25. **Prior to June 2019, Virtual Drone was never hired to provide maps with coordinates. [Michael Jones Depo p. 108].**

**Response:** It is undisputed that prior to June 2019, 360 Virtual Drone Services LLC was never hired to provide maps with coordinates. Plaintiffs were, however, hired to capture aerial images and associated location data (including coordinates) needed to create aerial orthomosaic maps. Jones MSJ Decl. ¶¶ 17-18 (ECF 38-3).

26. **Prior to June 2019, Virtual Drone was never hired to provide maps with elevation data. [Virtual Drone Depo p. 42; Michael Jones Depo p. 108].**

**Response:** It is undisputed that prior to June 2019, 360 Virtual Drone Services LLC was never hired to provide maps with elevation data. Plaintiffs were, however, hired to capture aerial images and associated location data (including elevation data) needed to create aerial orthomosaic maps. Jones MSJ Decl. ¶¶ 17-18 (ECF 38-3).

27. **Prior to June 2019, Virtual Drone was never hired to provide maps with volume data. [Virtual Drone Depo p. 42; Michael Jones Depo p. 108].**

**Response:** It is undisputed that prior to June 2019, 360 Virtual Drone Services LLC was never hired to provide maps with volume data. Plaintiffs were, however, hired to capture aerial images

and associated location data (from which volume data can be calculated) needed to create aerial orthomosaic maps. Jones MSJ Decl. ¶¶ 17-18 (ECF 38-3).

28. **Virtual Drone was never hired by a client to do measurements. [Michael Jones Depo p. 114].**

**Response:** It is undisputed that 360 Virtual Drone Services LLC was never hired by a client to "do measurements." Michael Jones did, however, create a completed orthomosaic map with a scale bar to pitch a repeat client on incorporating maps into their existing business arrangement. Jones MSJ Decl. ¶ 21 (ECF 38-3). The Board's designated expert opined that that orthomosaic map qualified as "surveying" under North Carolina law. Pls.' MSJ App'x Ex. 25 (Schall Dep. 37:10-37:20) (ECF 38-25) ("Q. . . . [A]s I understand what we've been discussing this orthomosaic map would qualify under the definition of survey; is that right? A. I see a scale bar on there which implies that the map is scaled correctly and measurable so I would have to say yes."). Plaintiffs also provided paying customers with the aerial images and associated location data (from which measurements can be calculated) needed to create aerial orthomosaic maps. Jones MSJ Decl. ¶¶ 17-18 (ECF 38-3).

29. **Prior to June 2019, Virtual Drone was never hired to provide a 3D model. [Virtual Drone Dep. p. 50; Michael Jones Depo p. 116].**

**Response:** Undisputed.

30. **Prior to June 2019, Virtual Drone "didn't get far enough in the learning process" to produce a 3D model. [Virtual Drone Depo p. 50]. Michael Jones has no experience or training in 3D modeling. [Michael Jones Depo p. 191].**

**Response:** Disputed in part.

> First sentence of Statement 30: It is undisputed that Michael Jones did not get far enough in the learning process to produce a 3D model for a client or a third party. Defs.' MSJ App'x Ex. 2 (360 Virtual Drone Services 30(b)(6) Dep. 50:13-50:15) (ECF 39-2) ("Q. Have you ever produced a 3D model to a client or a third party? A. No, because it's very hard and I didn't get far enough in the learning process."). Michael Jones did, however, produce 3D models for personal use. Defs.' MSJ App'x Ex. 2 (360 Virtual Drone Services 30(b)(6) Dep. 50:9-50:12) (ECF 39-2) ("Q. And you've never produced a 3D model? A. Just for practicing and learning how to do it for myself.").

> Second sentence of Statement 30: On the understanding that "experience or training in 3D modeling" is limited to prior work experience or in-person classes in 3D modeling, the second sentence of Statement 30 is undisputed. Michael Jones testified to having engaged in "self-taught online" studies. Defs.' MSJ App'x Ex. 3 (Jones Dep. 191:7-191:10) (ECF 39-3).

31. **The Board mailed Michael Jones a letter dated June 13, 2019 that, after conducting an investigation, "the Board's Review Committee has determined that there is**

sufficient evidence to support the charge that 360 Virtual Drone Services, LLC is practicing, or offering to practice, surveying in North Carolina, as defined in G.S. 89C-3(6) without being licensed with this Board." [ECF Doc. 1 at ¶ 67; Exhibit 1; Ritter Affidavit ¶ 11].

**Response:** Undisputed that the Board mailed Michael Jones a letter dated June 13, 2019. Undisputed that the quoted language in Statement 31 accurately quotes a portion of the Board letter dated June 13, 2019.

32.    Plaintiffs were placed on notice that practicing, or offering to practice, land surveying in North Carolina without being licensed with the Board is a violation of the Act. [ECF Doc. 1 at ¶ 68; Exhibit 1; Ritter Affidavit ¶ 12].

**Response:** Undisputed.

33.    The following notice was provided to Plaintiff Jones in Exhibit 1 [ECF Doc. 1-1]:

You are hereby notified that the opinion expressed herein is not a final legal determination. An occupational licensing board does not have the authority to order discontinuance of current practices. Only a court may determine that the law has been violated or is being violated and, if appropriate, impose a remedy or penalty for the violation. Further, pursuant to G.S. 150B-4, and per Board Rule 21 NCAC 56 .1205, you may have the right, prior to initiation of any court action by the occupational licensing board, to request a declaratory ruling regarding whether your particular conduct is lawful.

**Response:** Undisputed that the quoted language in Statement 33 accurately quotes a portion of the letter attached to Plaintiffs' complaint as Exhibit 1.

34.    At no time has the Board initiated any enforcement proceedings against Plaintiffs Michael Jones and 360 Virtual Drone. [Ritter Affidavit ¶ 13].

**Response:** While the Board's use of the term "enforcement proceedings" is undefined, it is undisputed that the Board has not applied to the court for an injunction or pursued criminal prosecution against Plaintiffs.

35.    Plaintiffs did not seek a declaratory ruling from the Board for any of the services identified in Paragraph 77 of the Complaint. [Plaintiff's Response to Request for Admission No. 2 (Appendix Exhibit 4)].

**Response:** Undisputed.

36.    In 2019, Plaintiff Virtual Drone created one PDF image of an orthomosaic map for marketing purposes, but no client hired him to perform this service. [Virtual Drone Dep. pp. 23, 29, 35 and 45].

**Response:** The evidence cited in support of Statement 36 does not refer to the year in which the "PDF image of an orthomosaic map" was created. It is undisputed, however, that Michael Jones created a completed orthomosaic map with a scale bar to pitch a repeat client on incorporating maps into their existing business arrangement. Jones MSJ Decl. ¶ 21 (ECF 38-3); Pls.' MSJ App'x Ex. 5 (Jones Map With Scale Bar) (ECF 38-5). It is also undisputed that no client hired him to create a PDF image of an orthomosaic map.

37.     **A PDF copy of an orthomosaic map does not provide clients the ability to perform calculations or measurements on volume or distance. [Michael Jones Depo pp. 181 and 185].**

**Response:** Disputed. The deposition testimony cited in this statement does not support the Board's statement. Michael Jones confirmed that a PDF copy of an orthomosaic map does not give access to electronic "tools to do all these calculations on volume and distance[.]" Defs.' MSJ App'x Ex. 3 (Jones Dep. 181:15-181:18) (ECF 39-3); *see also* Defs.' MSJ App'x Ex. 3 (Jones Dep. 184:22-185:18) (ECF 39-3) (similar). But even without those electronic tools, testimony from Board witnesses confirms that PDF copies of orthomosaic maps can provide clients the ability to perform calculations or measurements (at least as to distance), which in turn triggers the surveying law. For example:

Pls.' MSJ App'x Ex. 23 at 15 (Board expert's report) (ECF 38-23):

> ***A. "Capturing aerial images on behalf of paying clients and using orthomosaic software to stich those aerial images together to form orthomosaic maps."***
>
> In my opinion, this could be a gray area because of the use of the word "map" and whether or not the orthomosaic is printed or in a digital format.
>
> The word "map" may imply or be interpreted as a survey, or document that is corrected for distortion, is scalable and can be used for accurate measurements.
>
> If the document was printed, also called "hard-copy", and didn't include a reference grid, scale bar, north arrow, title block, etc., basically just a printed picture, this would not be regulated.
>
> If the orthomosaic is in a digital format such as Adobe PDF and doesn't include georeferencing information in the file header as metadata, in my opinion, this would not be regulated. If the orthomosaic was any other digital format such as TIFF, TIFFJPG, JPG2000, MrSID, etc., and didn't include georeferencing information in the file header as metadata or accompanied by a separate georeferencing metadata file, in my opinion, this also would not be regulated.
>
> If the orthomosaic is in a digital format such as TIFF, TIFFJPG, JPG2000, MrSID, etc., and does include geo-referencing information in the file header as metadata or is accompanied by a georeferencing metadata file, in my opinion, this

would be regulated as it falls under the definition of Land Surveying within N.C.G.S. § 89C-3(7).

### B. "Creating marketing images of land on behalf of paying clients and drawing on those images lines indicating the approximate position of property boundaries."

In my opinion, this would not be regulated, as long as the marketing images are printed with no reference grid, scale bar, north arrow, title block, etc., Or, are in a digital format with no georeferencing information in the file header as metadata, or accompanied by a georeferencing metadata file. . . . .

Pls.' MSJ App'x Ex. 25 (Schall Dep. 37:10-37:20) (ECF 38-25):

Q. Post an Exhibit 35. I'll let you take a look at as well. Looks like there's an option to rotate it. Might be easier. (Plaintiff's Exhibit 35 was marked for identification.)

A. That's fine. I can see it.

Q. I'm going to rotate it so I can see it. Okay. So in contrast to the one we were just talking about, Exhibit 34, as I understand what we've been discussing this orthomosaic map would qualify under the definition of survey; is that right?

A. I see a scale bar on there which implies that the map is scaled correctly and measurable so I would have to say yes.

Defs.' MSJ App'x Ex. 5 (Board 30(b)(6) Dep. 25:8-26:22) (ECF 39-5):

Q. Mr. Ritter, I posted Exhibit 31 in your folder. It's Mr. Schall's expert report. As I understand it, you have looked at that before; is that right?

A. Yes.

Q. Just scroll down to pages -- well, Page 15. We can start out -- I'll give you a chance to get there.

A. Okay.

Q. On Page 15, there's a section of the report that's entitled "Specific Issues Raised in the Complaint." Have you had a chance to read this section specifically?

A. Yes.

Q. Okay. In this section, Mr. Schall offers opinions on what kinds of services or products do and do not qualify as surveying under the North Carolina statute. Is that a fair characterization?

A. Yes.

Q. Okay. Does the board disagree with any part of Mr. Schall's opinion in this section?

A. I don't think so.

Q. I guess just for clarity, by "this section," I mean the section starting with "Specific Issues Raised in the Complaint" and going through to the end of the report on Page 16.

A. Okay. I was on Letter A.

Q. Well, we can go chunk by chunk. It sounds like you looked over Letter a. The board doesn't disagree with Ms. Schall's opinion there?

A. Correct.

Q. Okay. You can march on to Letter B, and once you've had a chance to look at that, I will have the same question.

A. So under Letter B, I think his opinion is correct as well.

Q. Okay. And Letter C?

A. His opinion is correct as well.

Q. Okay. And same for D?

A. Yes, sir.

Defs.' MSJ App'x Ex. 1 (Ritter Aff. ¶ 15) (ECF 39-1):

15. It is the position of the Board that taking aerial photographs for the purpose of producing a PDF picture without measurable information is not the practice of land surveying. As such, the Board disavows any intent to initiate enforcement proceedings against Plaintiffs based on the act of producing a PDF image of a map that does not contain measurable information.

**38.     Plaintiffs have no intent to offer clients any type of mapping other than a PDF copy of the orthomosaic map. [Michael Jones Depo p. 159].**

**Response:** Disputed. It is undisputed that Plaintiffs would like to offer clients PDF copies of orthomosaic maps. It is disputed, however, that a PDF copy of an orthomosaic map is the only type of mapping they would like to offer to clients. Both at his personal deposition and at his company's entity deposition, Michael Jones testified that he would like to provide numerous mapping services, including providing measurable aerial maps and 3D digital models. For example:

Defs.' MSJ App'x Ex. 2 (360 Virtual Drone Services 30(b)(6) Dep. 61:8-61:12) (ECF 39-2):

> Q. Well, in Paragraph 72, you have aerial orthomosaic maps, and you're talking about the PDF map that you made, right?
>
> A. Well, I'm talking about the ability to make any orthomosaic map there, actually.

Defs.' MSJ App'x Ex. 2 (360 Virtual Drone Services 30(b)(6) Dep. 57:12-58:4) (ECF 39-2):

> I would like to have the option to give these clients access to DroneDeploy's dashboard to use the tools they have to measure and do volume metrics like construction sites. . . . I'm not claiming it's surveying, but I don't understand why I can't give the client these tools. They are made for that and they are being offered nationwide. It's just North Carolina is telling me you can't do it. And I have trouble understanding why. And I want to be able to do that.

Defs.' MSJ App'x Ex. 3 (Jones Dep. 182:8-182:24) (ECF 39-3):

> Q. And in response to your attorney's question, you said, 'I would like to provide client access to tools to perform calculations on volume and distance.' Why would you like to do that?
>
> A. Because, I mean, from a business standpoint, it would be a lot of work if they -- if I could get construction sites to sign on monthly to a subscription to have me do progression flights of their job sites and the tool, as far as volumetrics, they could use that to measure stockpiles, dirt, rock, make sure they've been delivered, how -- what has been delivered. I mean, on and on as far as information. I would like to be able to deliver that to a client, clearing you guys saying it's okay. In the future, I would like to be able to do that and to deliver the link and make them users on the drone profile where they could use these tools.

Defs.' MSJ App'x Ex. 3 (Jones Dep. 185:25-187:18) (ECF 39-3):

> Q. Okay. So there's all kinds of usages that could be undertaken by the client in orderto [sic] -- or you or anyone who has access, they could do all kinds of calculations on volume and surface area –

A. Yes.

Q -- and measured distances.

A. Yes.

Q And you want the ability to do that?

A. I would like to be able to provide the map for them, you know, and then sell, you know, the map and the access to the tools so -- in the future so they could use the tools on the map that I created.

Q. Okay. So they could perform all kinds of calculations; correct?

A. Yes, sir.

Q. All right. It would allow you or the clients to perform certain measurements on the site?

A. You could measure distance with the tool, yes, sir.

Q. Size, shape, or physical features of the earth you could measure?

A. I'm not sure about shape as far as three-dimensional stuff.

Q. Location, size, or physical features of the project -- meaning the dirt pile that you referenced, right, you could perform those calculations?

A. Yes. With the tools in DroneDeploy, you could do the volumetrics, the distance -- those are the few tools I think they have. Volumetrics, distance, and area I think you can perform.

Q. And you can perform conventional ground measurements?

A. Yes.

\*\*\*

Q. Could you perform any type of elevation calculations?

A. Yes.

Defs.' MSJ App'x Ex. 3 (Jones Dep. 188:2-188:10) (ECF 39-3):

-12-

Q. Okay. Could they create a PDF of where -- of the plotting of the points or the distances that were generated?

A. If they had access to DroneDeploy tools, then they could do the same as I could. They could export the map in a PDF or JPEG or TIFF form.

Q. And that's something you would like them to be able to do?

A. I would like, yes.

Jones MSJ Decl. (ECF 38-3):

34.     Because of the Board's June 2019 letter and the investigator's warnings, I stopped trying to develop my mapping business. I stopped offering aerial orthomosaic maps. I also stopped taking jobs to capture images for other people to use for aerial orthomosaic maps. In addition, I've refrained from branching out into other mapping-related projects as well (for example, using aerial images to make 3D digital models). Given the investigator's warning, I also stopped adding lines on real-estate marketing images to indicate the rough position of property boundaries. In short, I'm not comfortable doing these kinds of projects or trying to develop my business into these areas while it is the Board's position that doing so will put me in violation of the surveying laws.

***

36.     If the Board could no longer go after me for doing these kinds of projects, I would start offering aerial orthomosaic maps again.

37.     Without disclosing any privileged communications with my lawyers, I can state that I am aware that representatives of the Board have testified in this case that the Board's current view is that some of the work I'd like to do is not covered by the surveying law. For example, it's my understanding that the Board now says that providing real-estate marketing photos with approximate boundary lines to clients is not "surveying." It's also my understanding that the Board now says that aerial orthomosaic maps are okay for me to make as long as I take out any geospatial metadata and as long as I don't give my customers access to the mapping software I'm using and as long as I don't include anything else on my maps that might let someone make any measurements (even a scale bar or possibly even a north arrow).

38.     I was aware of the Board witnesses' testimony roughly contemporaneously with their depositions, but I'm still not sure what to believe about the Board's actual policy. After all, the Board's investigator told me almost the direct opposite of all these things. So it's not entirely clear to me what I can safely do. But I do understand that at least some of the work I previously advertised and that I'd like to offer again is still off-limits. For example, I would like to resume offering orthomosaic maps that *do* include metadata or that do let my customers annotate them and use mapping software to make basic

-13-

measurements on the maps. It's my understanding that the Board still says I can't do any of that. Even for hard copy aerial maps, I also want to have the flexibility to include basic things like a scale bar like I've done in the past. It's my understanding that the Board says I can't do even that.

39.    I would also still like to have the freedom to develop my business with 3D digital modeling. Early on when I was starting up my business, I started practicing making 3D models for myself. But it's my understanding that the Board still says that unlicensed people can't legally offer 3D models to anyone. I'm not going to expose myself to having the Board come after me again, so I'm not going to develop a 3D model side of my business while it's illegal. But if I could do it without the Board coming after me, I would start building up my skills with 3D modeling and start developing a 3D modeling side of my mapping business too.

**39.    After receiving the June 2019 notice from the Board, Plaintiff Virtual Drone continued to provide aerial images to clients. [Virtual Drone Depo pp. 52 63].**

**Response:** Undisputed. (As detailed elsewhere, Plaintiffs continued to provide certain aerial images to clients after receiving the June 2019 notice from the Board. Plaintiffs stopped, however, offering aerial orthomosaic maps, aerial images for other people to use for aerial orthomosaic maps, and real-estate marketing images that include lines on the images indicating the rough position of property boundaries. Jones Decl. ¶¶ 34-39 (ECF 38-3); Defs.' MSJ App'x Ex. 3 (Jones Dep. 143:10-143:15) (ECF 39-3) ("Q. Just so I'm clear on what you've done to make changes to your business model, you no longer use DroneDeploy to generate orthomosaic maps? A. No, sir. Q. And you no longer draw lines on photos? A. No, Sir.").).

**40.    After receiving the June 2019 notice from the Board, Plaintiff Virtual Drone continued to provide aerial videography to clients. [Virtual Drone pp. 52 and 63-64].**

**Response:** Undisputed.

**41.    As part of the lawsuit, Plaintiffs are not trying to provide data to allow clients the ability to perform calculations for location, size, shape, and physical features of the earth. [Michael Jones Depo p. 159].**

**Response:** Disputed. The record makes clear that Plaintiffs wish to provide certain services that the Board maintains would allow clients to perform calculations about "the location, size, shape, or physical features of the earth" within the statutory definition of "practice of land surveying." N.C. Gen. Stat. § 89C-3(7)(a). Moreover, Defendants' opposition to Plaintiffs' summary-judgment motion concedes as much, acknowledging that "Plaintiffs want to create and sell orthomosaic maps (measurable maps that allow users to measure distances, elevations and area)." Defs.' MSJ Opp. 3 (ECF 42).

*Evidence concerning services Plaintiffs wish to provide:*

Defs.' MSJ App'x Ex. 3 (Jones Dep. 185:25-187:18) (ECF 39-3):

Q.  Okay. So there's all kinds of usages that could be undertaken by the client in orderto [sic] -- or you or anyone who has access, they could do all kinds of calculations on volume and surface area --

A.  Yes.

Q.  -- and measured distances.

A.  Yes.

Q   And you want the ability to do that?

A.  I would like to be able to provide the map for them, you know, and then sell, you know, the map and the access to the tools so -- in the future so they could use the tools on the map that I created.

Q.  Okay. So they could perform all kinds of calculations; correct?

A.  Yes, sir.

Q.  All right. It would allow you or the clients to perform certain measurements on the site?

A.  You could measure distance with the tool, yes, sir.

Q.  Size, shape, or physical features of the earth you could measure?

A.  I'm not sure about shape as far as three-dimensional stuff.

Q.  Location, size, or physical features of the project -- meaning the dirt pile that you referenced, right, you could perform those calculations?

A.  Yes. With the tools in DroneDeploy, you could do the volumetrics, the distance -- those are the few tools I think they have. Volumetrics, distance, and area I think you can perform.

Q.  And you can perform conventional ground measurements?

A.  Yes.

Q.  You could locate property lines, could you not?

A.  No.

Q.  You could not?

A.  Not in this map, no.

Q.  Okay. Could you perform any type of elevation calculations?

-15-

A.  Yes.

Defs.' MSJ App'x Ex. 3 (Jones Dep. 182:8-182:24) (ECF 39-3):

Q.  And in response to your attorney's question, you said, "I would like to provide client access to tools to perform calculations on volume and distance." Why would you like to do that?

A.  Because, I mean, from a business standpoint, it would be a lot of work if they -- if I could get construction sites to sign on monthly to a subscription to have me do progression flights of their job sites and the tool, as far as volumetrics, they could use that to measure stockpiles, dirt, rock, make sure they've been delivered, how -- what has been delivered. I mean, on and on as far as information. I would like to be able to deliver that to a client, clearing you guys saying it's okay. In the future, I would like to be able to do that and to deliver the link and make them users on the drone profile where they could use these tools.

Defs.' MSJ App'x Ex. 2 (360 Virtual Drone Services 30(b)(6) Dep. 61:8-61:12) (ECF 39-2):

Q.  Well, in Paragraph 72, you have aerial orthomosaic maps, and you're talking about the PDF map that you made, right?

A.  Well, I'm talking about the ability to make any orthomosaic map there, actually.

Defs.' MSJ App'x Ex. 2 (360 Virtual Drone Services 30(b)(6) Dep. 57:12-58:4) (ECF 39-2):

A.  . . . I would like to have the option to give these clients access to DroneDeploy's dashboard to use the tools they have to measure and do volume metrics like construction sites. I think there's like 48 or 47 or 48 other states that have no problem with this. I would like to do what these other people are doing in other states. I'm not surveying. I'm not claiming it's surveying, but I don't understand why I can't give the client these tools. They are made for that and they are being offered nationwide. It's just North Carolina is telling me you can't do it. And I have trouble understanding why. And I want to be able to do that.

Defs.' MSJ App'x Ex. 3 (Jones Dep. 188:2-188:10) (ECF 39-3):

Q.  Okay. Could they create a PDF of where -- of the plotting of the points or the distances that were generated?

A.  If they had access to DroneDeploy tools, then they could do the same as I could. They could export the map in a PDF or JPEG or TIFF form.

Q.  And that's something you would like them to be able to do?

A.  I would like, yes.

Jones MSJ Decl. (ECF 38-3):

34.    Because of the Board's June 2019 letter and the investigator's warnings, I stopped trying to develop my mapping business. I stopped offering aerial orthomosaic maps. I also stopped taking jobs to capture images for other people to use for aerial orthomosaic maps. In addition, I've refrained from branching out into other mapping-related projects as well (for example, using aerial images to make 3D digital models). Given the investigator's warning, I also stopped adding lines on real-estate marketing images to indicate the rough position of property boundaries. In short, I'm not comfortable doing these kinds of projects or trying to develop my business into these areas while it is the Board's position that doing so will put me in violation of the surveying laws.

***

36.    If the Board could no longer go after me for doing these kinds of projects, I would start offering aerial orthomosaic maps again.

37.    Without disclosing any privileged communications with my lawyers, I can state that I am aware that representatives of the Board have testified in this case that the Board's current view is that some of the work I'd like to do is not covered by the surveying law. For example, it's my understanding that the Board now says that providing real-estate marketing photos with approximate boundary lines to clients is not "surveying." It's also my understanding that the Board now says that aerial orthomosaic maps are okay for me to make as long as I take out any geospatial metadata and as long as I don't give my customers access to the mapping software I'm using and as long as I don't include anything else on my maps that might let someone make any measurements (even a scale bar or possibly even a north arrow).

38.    I was aware of the Board witnesses' testimony roughly contemporaneously with their depositions, but I'm still not sure what to believe about the Board's actual policy. After all, the Board's investigator told me almost the direct opposite of all these things. So it's not entirely clear to me what I can safely do. But I do understand that at least some of the work I previously advertised and that I'd like to offer again is still off-limits. For example, I would like to resume offering orthomosaic maps that *do* include metadata or that do let my customers annotate them and use mapping software to make basic measurements on the maps. It's my understanding that the Board still says I can't do any of that. Even for hard copy aerial maps, I also want to have the flexibility to include basic things like a scale bar like I've done in the past. It's my understanding that the Board says I can't do even that.

39.    I would also still like to have the freedom to develop my business with 3D digital modeling. Early on when I was starting up my business, I started practicing

-17-

making 3D models for myself. But it's my understanding that the Board still says that unlicensed people can't legally offer 3D models to anyone. I'm not going to expose myself to having the Board come after me again, so I'm not going to develop a 3D model side of my business while it's illegal. But if I could do it without the Board coming after me, I would start building up my skills with 3D modeling and start developing a 3D modeling side of my mapping business too.

***Evidence concerning the Board's position on these services:***

Pls.' MSJ App'x Ex. 26 (Ritter Dep. 52:2-52:5) (ECF 38-26):

> Q.  Okay. So, for example, if you have a digital orthomosaic map where you can make measurements on it, that would be a survey right?
>
> A.  Correct.

Pls.' MSJ App'x Ex. 25 (Schall Dep. 40:7-40:15) (ECF 38-25):

> Q.  Okay. That makes sense. So really the georeferencing information is what triggers the surveying definition, is that what you're saying?
>
> A.  That's correct. That's correct. You are now taking that image and you're locating it -- you're basically locating it in the real world. You're telling people where it is and you're guaranteeing that it's scaled to the correct scale and that if you take measurements from it they'll be correct.

Pls.' MSJ App'x Ex. 17 (Tuttle Dep. Ex. 28) (ECF 38-17):

> As to your questions:
> 1. I take aerial photographs of land for a developer and use software to stitch the images together. I sell him the individual photographs without any geological references.
> If there is no meta data or other information about coordinates, distances, property boundaries or anything that falls within the definition of land surveying in GS 89C-3(7) then simple taking and providing the photographs does not require a land surveying license.
>
> 2. I take the same photographs and process them into a topographic contour map to show elevation so the developer can determine if too much grading would be needed before buying the land and paying for a surveyor.
> No, this would be within the definition of land surveying.
>
> 3. There is a structure on this land, so I take the same photographs and process them into a 3D model so the developer can get a sense of its appearance from all sides and from top to bottom.
> No, this would be within the definition of land surveying.

4. The developer wants to know the relative size of the land, so I process the same photographs so the developer can go online and do rough order of magnitude measurements using a distance tool.
No, this would be within the definition of land surveying.

5. The developer also wants to get a feel for the area and volume of a large stock pile of stone left on the property, so I process the same photographs so the developer can go online and draw a polygon around the stock pile and use a software tool to tell him area and cubic yards contained in the stock pile.
No, this would be within the definition of land surveying, as further explained in the Board's Volume Computation Surveys Policy.

Would it make a difference I delivered the photographs to the developer stating that the images are not a licensed survey?
No, it would still be within the definition of land surveying.

<u>Pls.' MSJ App'x Ex. 23 at 15-16 (ECF 38-23) (Board expert's report):</u>

*A. "Capturing aerial images on behalf of paying clients and using orthomosaic software to stich those aerial images together to form orthomosaic maps."*

In my opinion, this could be a gray area because of the use of the word "map" and whether or not the orthomosaic is printed or in a digital format.

The word "map" may imply or be interpreted as a survey, or document that is corrected for distortion, is scalable and can be used for accurate measurements.

If the document was printed, also called "hard-copy", and didn't include a reference grid, scale bar, north arrow, title block, etc., basically just a printed picture, this would not be regulated.

If the orthomosaic is in a digital format such as Adobe PDF and doesn't include georeferencing information in the file header as metadata, in my opinion, this would not be regulated. If the orthomosaic was any other digital format such as TIFF, TIFFJPG, JPG2000, MrSID, etc., and didn't include georeferencing information in the file header as metadata or accompanied by a separate georeferencing metadata file, in my opinion, this also would not be regulated.

If the orthomosaic is in a digital format such as TIFF, TIFFJPG, JPG2000, MrSID, etc., and does include geo-referencing information in the file header as metadata or is accompanied by a georeferencing metadata file,

in my opinion, this would be regulated as it falls under the definition of Land Surveying within N.C.G.S. § 89C-3(7).

***

**C. "Capturing aerial images of land and structures (along with location data, coordinates, elevation data, and volume data) and making those images and that data available to paying clients."**

In my opinion, this would be regulated as it falls under the definition of Land Surveying within N.C.G.S. § 89C-3(7).

**D. "Capturing aerial images of and data about land and structures; processing those images and data to create 3D digital models of land and structures; and making those 3D digital models available to paying clients."**

In my opinion, this would be regulated as it falls under the definition of Land Surveying within N.C.G.S. § 89C-3(7).

Defs.' MSJ App'x Ex. 5 (Board 30(b)(6) Dep. 25:8-26:22) (ECF 39-5):

Q. Mr. Ritter, I posted Exhibit 31 in your folder. It's Mr. Schall's expert report. As I understand it, you have looked at that before; is that right?

A. Yes.

Q. Just scroll down to pages -- well, Page 15. We can start out -- I'll give you a chance to get there.

A. Okay.

Q. On Page 15, there's a section of the report that's entitled "Specific Issues Raised in the Complaint." Have you had a chance to read this section specifically?

A. Yes.

Q. Okay. In this section, Mr. Schall offers opinions on what kinds of services or products do and do not qualify as surveying under the North Carolina statute. Is that a fair characterization?

A. Yes.

Q. Okay. Does the board disagree with any part of Mr. Schall's opinion in this section?

A. I don't think so.

Q. I guess just for clarity, by "this section," I mean the section starting with "Specific Issues Raised in the Complaint" and going through to the end of the report on Page 16.

A. Okay. I was on Letter A.

Q. Well, we can go chunk by chunk. It sounds like you looked over Letter a. The board doesn't disagree with Ms. Schall's opinion there?

A. Correct.

Q. Okay. You can march on to Letter B, and once you've had a chance to look at that, I will have the same question.

A. So under Letter B, I think his opinion is correct as well.

Q. Okay. And Letter C?

A. His opinion is correct as well.

Q. Okay. And same for D?

A. Yes, sir.

**42.    All photographs taken by Plaintiffs, whether for weddings, real estate marketing or some other purpose, all have the same date in the digital image. [Virtual Drone Depo p. 69].**

**Response:** On the understanding that the word "date" is intended to read "data," Statement 42 is undisputed.

**43.    Following receipt of the June 2019 notice from the Board, Plaintiff Virtual Drone stopped providing aerial images of land that included approximate boundary lines for marketing purposes. [Virtual Drone Depo p. 53].**

**Response:** Undisputed.

**44.    It is the position of the Board that taking aerial photographs for the purpose of producing a PDF picture without measurable information is not the practice of land surveying. As such, the Board disavows any intent to initiate enforcement proceedings against Plaintiffs based on the act of producing a PDF image of a map that does not contain measurable information. [Ritter Affidavit ¶ 15].**

**Response:** It is undisputed that Statement 44 accurately quotes the Board's representations to this Court.

**45.     The Board actively updates and publishes policies to include or exclude activities that fall within, or outside, the definition of the practice of land surveying. A copy of the inclusion/exclusion list is attached hereto as Exhibit A. [Ritter Affidavit ¶ 16].**

**Response:** Undisputed (on the understanding that the "Exhibit A" referenced in Statement 45 is Exhibit A to the Ritter Affidavit docketed at ECF 39-1).

**46.     It is the position of the Board that the act of producing an aerial photograph that includes lines indicating the approximate position of property lines for marketing purposes is not the practice of land surveying. As such, the Board disavows any intent to initiate enforcement proceedings against Plaintiff based on the act of producing an aerial photograph that includes lines indicating the approximate position of property lines for marketing purposes. [Ritter Affidavit ¶ 17].**

**Response:** It is undisputed that Statement 46 accurately quotes the Board's representations to this Court.

**47.     The definition of land surveying includes photogrammetry. [N.C.G.S. § 89C-13(b); Ritter Affidavit ¶ 5].**

**Response:** Although Statement 47 is more one of law than fact, Plaintiffs do not dispute that the definition of "land surveying" in North Carolina's surveying statute includes photogrammetry.

**48. Photogrammetry is the art, science, and technology of obtaining reliable information about physical objects and the environment through processes of recording, measuring, and interpreting photographic images and patterns of recorded radiant electromagnetic energy and other phenomena. Photogrammetry is primarily concerned with making precise measurements of three-dimensional (3D) objects and terrain features from two-dimensional (2D) photographs. Applications include the measuring of coordinates; the quantification of distances, heights, areas, and volumes; the preparation of topographic maps; and the generation of digital elevation models and orthophotographs. [Defendants' Disclosure of Expert Testimony at p. 2 (Appendix Exhibit 6)].**

**Response:** Undisputed that Statement 48 is an accurate (if inexhaustive) summary of the concept of photogrammetry.

**49.     Land Surveying is regulated in North Carolina "in order to safeguard life, health, and property, and to promote the public welfare" and is "subject to regulation in the public interest." [N.C.G.S. § 89C-2; Rule 30(b)(6) Deposition of the Board at p. 10 (Appendix Exhibit 5); Defendants' Disclosure of Expert Testimony at p. 14].**

**Response:** It is undisputed that Statement 49 accurately quotes the North Carolina Engineering and Land Surveying Act and that "safeguard[ing] life, health, and property" and "promot[ing]

-22-

the public welfare" are the state interests claimed to support the Act. (As detailed elsewhere, however, the Board has no evidence that the Act achieves these interests more effectively than the far less restrictive laws that are in force in other states. *See, e.g.*, Pls.' MSJ App'x Ex. 25 (Schall Dep. 58:1-63:20) (ECF 38-25); Defs.' MSJ App'x Ex. 5 (Board 30(b)(6) Dep. 16:8-20:24) (ECF 39-5).)

**50.     The regulation and licensing of land surveying in North Carolina works to establish a minimum level of competence (education, exam, and experience) and the Act works to protect the public from negligence, incompetence, and professional misconduct in the profession of land surveying. [Defendants' Disclosure of Expert Testimony at p. 14; Rule 30(b)(6) Deposition of the Board at pp. 10-11].**

**Response:** On the understanding that the phrase "works to" signifies that the goal of regulating and licensing land surveying in North Carolina is to "establish a minimum level of competence (education, exam, and experience)" and to "protect the public from negligence, incompetence, and professional misconduct in the profession of land surveying," Statement 50 is undisputed. (As detailed elsewhere, however, the Board has no evidence that these goals are achieved less effectively in the many states whose restrictions on mapping and modeling are less restrictive than North Carolina's. Pls.' MSJ App'x Ex. 25 (Schall Dep. 58:1-63:20) (ECF 38-25); Defs.' MSJ App'x Ex. 5 (Board 30(b)(6) Dep. 16.8-20:24) (ECF 39-5).)

**51.     Errors in land surveying could have significant adverse consequences on the public, including the client who hired the surveyor and who relies on the accuracy of the work product. [Defendants' Disclosure of Expert Testimony at p. 14; Alex Abate Deposition at pp. 57-58 and 65-66 (Appendix Exhibit 7)].**

**Response:** It is undisputed that some "[e]rrors in land surveying" conceivably "could" have adverse consequences—though the Board has no evidence that "adverse consequences" caused by mapping and modeling specifically are any more prevalent or severe in the states whose restrictions on mapping and modeling are less restrictive than North Carolina's. Pls.' MSJ App'x Ex. 25 (Schall Dep. 58:1-63:20) (ECF 38-25); Defs.' MSJ App'x Ex. 5 (Board 30(b)(6) Dep. 16.8-20:24) (ECF 39-5).

Dated: April 29, 2022.                    Respectfully submitted,

                                          /s/ Samuel B. Gedge
                                          Samuel B. Gedge (VA Bar No. 80387)*
                                          James T. Knight II (DC Bar No. 1671382)*
                                          INSTITUTE FOR JUSTICE
                                          901 North Glebe Road, Suite 900
                                          Arlington, VA 22203
                                          Phone: (703) 682-9320
                                          Fax: (703) 682-9321
                                          E-mail: sgedge@ij.org
                                                  jknight@ij.org
                                          *Special Appearance pursuant to Local Rule
                                          83.1(e)

                                          /s/ David. G. Guidry
                                          David G. Guidry
                                          MAINSAIL LAWYERS
                                          338 South Sharon Amity Rd., #337
                                          Charlotte, NC 28211
                                          Phone: (917) 376-6098
                                          Fax: (888) 501-9309
                                          E-mail: dguidry@mainsaillawyers.com
                                          State Bar No.: 38675
                                          *Local Civil Rule 83.1(d) Counsel for Plaintiffs*

                                          *Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 29th day of April, 2022, a true and correct copy of the

foregoing was electronically filed with the Clerk of Court using the CM/ECF system, which will

send notification of such filing and, pursuant to Local Civil Rule 5.1(e), shall constitute service

upon, the following:

Douglas W. Hanna (NC Bar No. 18225)
FITZGERALD HANNA & SULLIVAN, PLLC
3737 Glenwood Avenue, Suite 375
Raleigh, NC 27612
Telephone: (919) 863-9091
Facsimile: (919) 424-6409
Email: dhanna@fhslitigation.com

*Attorney for Defendants*

/s/ Samuel B. Gedge
Samuel B. Gedge (VA Bar No. 80387)

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:21-CV-137-FL

| | | |
|---|---|---|
| 360 VIRTUAL DRONE SERVICES LLC and MICHAEL JONES, | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) ) | |
| ANDREW L. RITTER, in his official capacity as member of the North Carolina Board of Examiners for Engineers and Surveyors; JOHN M. LOGSDON, in his official capacity as member of the North Carolina Board of Examiners for Engineers and Surveyors; JONATHAN S. CARE, in his official capacity as member of the North Carolina Board of Examiners for Engineers and Surveyors; DENNIS K. HOYLE, in his official capacity as member of the North Carolina Board of Examiners for Engineers and Surveyors; RICHARD M. BENTON, in his official capacity as member of the North Carolina Board of Examiners for Engineers and Surveyors; CARL M. ELLINGTON, JR., in his official capacity as member of the North Carolina Board of Examiners for Engineers and Surveyors; CEDRIC D. FAIRBANKS, in his official capacity as member of the North Carolina Board of Examiners for Engineers and Surveyors; BRENDA L. MOORE, in her official capacity as a member of the North Carolina Board of Examiners for Engineers; CAROL SOLLOUM, in her official capacity as a member of the North Carolina Board of Examiners for Engineers; and ANDREW G. ZOUTWELLE, in his official capacity as a member of the North Carolina Board of Examiners for Engineers, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | ORDER |
| Defendants. | ) ) | |

J.A. 959

This matter comes before the court on cross-motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  (DE 31, 35).  For the reasons that follow, defendants' motion is granted and plaintiffs' motion is denied.

## STATEMENT OF THE CASE

Plaintiffs, a drone-photography company and its single member, commenced this action March 22, 2021, alleging provisions of the North Carolina Engineering and Land Surveying Act, N.C. Gen. Stat. §§ 89C-1, *et seq.*  (the "Act") prohibit them and others similarly situated from creating, processing, and disseminating images of land and structures, in violation of the First Amendment.  See N.C. Gen. Stat. §§ 89C-2, 89C-3(7), 89C-23, and 89C-24. Plaintiffs sue defendants in their official capacities as executive director and members of the North Carolina Board of Examiners for Engineers and Surveyors (the "Board"), the agency responsible for enforcing the Act.  Plaintiffs seek declaratory and injunctive relief pursuant to the First and Fourteenth Amendments to the United States Constitution; the Civil Rights Act of 1871, 42 U.S.C. § 1983; and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202.

Defendants' motion for summary judgment challenges the court's subject matter jurisdiction.  Alternatively, defendants seek judgment in their favor with reliance upon: 1) testimony by Andrew L. Ritter ("Ritter"), in his capacity as executive director of the Board and as Rule 30(b)(6) deponent for the Board;  plaintiff Michael Jones ("Jones") in his personal capacity and as Rule 30(b)(6) deponent for plaintiff 360 Virtual Drone Services, LLC ("360 Virtual Drone"); and Alex Abatie ("Abatie"), plaintiffs' designated expert witness on drones and mapping; 2) discovery responses; and 3) defendants' disclosure of expert testimony by Mark S. Schall ("Schall").

2

In support of its motion, plaintiffs introduce: 1) plaintiff Jones's declaration; 2) plaintiffs' webpage; 3) a map created by plaintiff Jones with and without a scale bar; 4) the Board's 2018 and 2019 letters to plaintiffs; 5) an email by plaintiff Jones to a potential client; 6) letters from the Board to other drone companies; 7) deposition testimony of David S. Tuttle ("Tuttle"), in-house counsel to the Board; 8) email correspondence between Tuttle and a drone operator regarding application of the Act; 9) testimony by William Casey ("Casey"), the Board's assigned investigator; Clyde Anthony Alston ("Alston"), another Board investigator; and Schall; 10) the Board's investigative report of plaintiffs and other drone companies; 11) defendants' response in discovery; and 12) a declaratory and advisory opinion from Mississippi and Kentucky, respectively, exempting activities from the definition of the practice of land surveying.

## STATEMENT OF UNDISPUTED FACTS

North Carolina regulates land surveying through the Act.[1]  (Pl. Resp. Stmt. Facts (DE 45) ¶ 1 (citing N.C.G.S. §§ 89C-1, et seq.)).  The Act establishes the Board to administer its provisions and forbids "any person from practicing or offering to practice land surveying in North Carolina without first being licensed by the Board."  (Id. ¶¶ 2, 5).  Land surveying is designated as a "profession," and encompasses "a number of disciplines including geodetic surveying, hydrographic surveying, cadastral surveying, engineering surveying, route surveying, photogrammetric (aerial) surveying, and topographic surveying."  (Id. ¶ 4).  The Board also "publishes policies to include or exclude activities that fall within, or outside, the definition of the practice of land surveying."  (Id. ¶ 45).  Pursuant to the Act, those who practice land surveyance without a license are subject to investigation by the Board.  (Id. ¶ 6).

---

[1]    Where a fact asserted in the movants' statement of material facts is undisputed, the court cites to the opposing parties' responsive statement of facts, where it indicates the fact is admitted, undisputed, or without opposing fact.

Abutting this regulatory scheme is the recent "rise of a thriving commercial-drone industry" in which drones "take photographs of—and collect data about—buildings, land, construction sites and other property." (Def. Resp. Stmt. Facts (DE 43) ¶ 1). Operators then are able to create a map of properties over which they fly by combining the photographs captured into a single, high-resolution photograph, called an "orthomosaic" map, which is a type of map described by the parties as a "measurable" map. (Id. ¶ 2). The photographs can include embedded "geo-referenced" information, and the orthomosaic maps resulting then are capable of conveying to the user "information about the land" mapped. (Id. ¶ 3). For instance, users can measure the distance from one point to another, or estimate the area or elevation of a piece of land. (Id.). Images captured by drones also can be used to create "photorealistic 3D models of land and structures." (Id. ¶ 5). These three-dimensional models too can include "geotagged" information for the purpose of measurement. (Id.).

Jones began providing photography and videography services in North Carolina in 2016, and eventually incorporated "drone-based aerial photography" into his business. (Id. ¶¶ 6, 8). In October 2017, Jones founded 360 Virtual Drone as a single-member company. (Id. ¶ 8). Through his newly founded company, Jones branched out into drone-based, "aerial mapping services," creating a profile on a "popular commercial-drone website, Droners.io, and selected 'Surveying & Mapping' as one of his project categories." (Id. ¶ 9). On this website he advertised "video, pictures and orthomosaic maps (Measurable Maps) of [construction] sites," writing "[w]ith this information, construction companies can monitor the elevation changes, volumetrics for gravel/dirt/rock, and watch the changes and progression of the site as it forms over time." (Id. ¶ 10).

Over the course of the following year Jones was hired to fly his drone over a Walmart distribution center and capture images, then used by a drone data company "to create a thermal

4

map of the roof." (Id. ¶ 11). He also was hired to capture aerial images of a shopping-mall parking lot, which images "likewise could be used to create an aerial map." (Id.). At some point during this time, Jones began making orthomosaic maps himself, in one instance processing images taken periodically for a repeat customer into an aerial map and pitching the product to the client. (Id. ¶ 12). The client chose not to make use of the maps, but Jones continued to advertise mapping as one of 360 Virtual Drone's offerings. (Id.).

Jones is not a licensed land surveyor and 360 Virtual Drone is not licensed as a surveying business. (Id. ¶¶ 13-14). In December 2018, Jones received a letter from the State Board of Examiners stating that it had "authorized an investigation" of 360 Virtual Drone to determine whether it was in violation of the Act by "practicing or offering to practice land surveying in North Carolina without a license." (Id. ¶ 17). Between 2016 to 2020, the Board issued at least half a dozen comparable letters to other drone operators, similarly placing them on notice that practicing, or offering to practice, land surveying in North Carolina without being licensed is a violation of the Act, (Id. ¶¶ 18-20), along lines:

> If the company fails to come into compliance, further action may be pursued by the Board as authorized in G.S. 89C-10(c) and 89C-23 to apply to the court for an injunction. The activities include, but are not limited to: collection of survey data; aerial surveying and mapping services; any resulting map or drawing; 3D models; and aerial photogrammetry.

(Id. ¶ 19). One drone operator submitted questions in response, and the Board's in-house counsel provided the following answers by email, appearing below in blue:

5

Mr. Armstrong,

As to your questions:
1. I take aerial photographs of land for a developer and use software to stitch the images together. I sell him the individual photographs without any geological references.
If there is no meta data or other information about coordinates, distances, property boundaries or anything that falls within the definition of land surveying in GS 89C-3(7) then simple taking and providing the photographs does not require a land surveying license.

2. I take the same photographs and process them into a topographic contour map to show elevation so the developer can determine if too much grading would be needed before buying the land and paying for a surveyor.
No, this would be within the definition of land surveying.

3. There is a structure on this land, so I take the same photographs and process them into a 3D model so the developer can get a sense of its appearance from all sides and from top to bottom.
No, this would be within the definition of land surveying.

4. The developer wants to know the relative size of the land, so I process the same photographs so the developer can go online and do rough order of magnitude measurements using a distance tool.
No, this would be within the definition of land surveying.

5. The developer also wants to get a feel for the area and volume of a large stock pile of stone left on the property, so I process the same photographs so the developer can go online and draw a polygon around the stock pile and use a software tool to tell him area and cubic yards contained in the stock pile.
No, this would be within the definition of land surveying, as further explained in the Board's Volume Computation Surveys Policy.

Would it make a difference I delivered the photographs to the developer stating that the images are not a licensed survey?
No, it would still be within the definition of land surveying.

(Tuttle Email (DE 38-17)).

Jones promptly responded to the Board's investigation letter, and February 7, 2019, the assigned board investigator met with Jones for an interview. (Def. Resp. Stmt. Facts (DE 37) ¶ 27). What was discussed during that interview is disputed. Jones contends the investigator advised him that "giving a client an aerial photograph that contains geospatial metadata," "stitching aerial photographs together to create an orthomosaic map," and giving a client aerial images on which he had drawn lines approximating property boundaries all would qualify as the unlicensed practice

6

of surveying.  (Jones Decl. (DE 38-3) ¶¶ 30-32).  The board investigator denies having offered

Jones guidance on what he legally could and could not do.  (Casey Dep. (DE 20) 44:15-45:3).

Jones thereafter was informed by letter dated June 13, 2019:

> After a thorough consideration of the investigative materials, the Board's Review Committee has determined that there is sufficient evidence to support the charge that 360 Virtual Drone Services, LLC is practicing, or offering to practice, surveying in North Carolina, as defined in G.S. 89C-3(6) without being licensed with this Board.

> At its regular meeting on June 12, 2019 the Board concurred with the recommendation of the Review Committee, which was to place 360 Virtual Drone Services, LLC on notice that practicing, or offering to practice, land surveying in North Carolina, as defined in G.S. 89C-3(7) without being licensed with this Board and to place the company on notice that practicing, or offering to practice land surveying in North Carolina without being licensed with the Board, is a violation of G. S. 89C-24, 55B and 57D.

> If the company fails to come into compliance, further action may be pursued by the Board as authorized in G. S. 89C-10(c) and 89C-23 to apply to the court for an injunction or pursue criminal prosecution. The activities include, but are not limited to: mapping, surveying and photogrammetry; stating accuracy; providing location and dimension data; and producing orthomosaic maps, quantities, and topographic information. In addition, marketing disclaimer is not appropriate as the services still fall within the practice of land surveying.

(Def. Resp. Stmt. Facts (DE 37) ¶ 35).  The letter also noted the following:

> You are hereby notified that the opinion expressed herein is not a final legal determination. An occupational licensing board does not have the authority to order discontinuance of current practices. Only a court may determine that the law has been violated or is being violated and, if appropriate, impose a remedy or penalty for the violation. Further, pursuant to G.S. 150B-4, and per Board Rule 21 NCAC 56 .1205, you may have the right, prior to initiation of any court action by the occupational licensing board, to request a declaratory ruling regarding whether your particular conduct is lawful.

(Pl. Resp. Stmt. Facts (DE 45) ¶ 33).

In response to the Board's June 13, 2019, letter, Jones stopped developing his mapping

business.  (Def. Resp. Stmt. Facts (DE 37) ¶ 36).  He ceased offering aerial maps and declined jobs

to capture images for others intending to make such maps.  (Id.).  Jones "refrained from branching

out into other mapping-related work as well—for instance, using aerial images to create 3D digital

models." (Id.). He additionally stopped adding lines on real-estate marketing images to approximate property boundaries. (Id.).

The Board's present position is that plaintiffs cannot provide clients with "aerial orthomosaic maps" unless they are stripped of location information and any data by which a recipient could make measurements on the maps. (Id. ¶ 39). Unlicensed persons also cannot provide clients with three-dimensional digital models of land or structure. (Id. ¶ 46). They can, however, produce "marketing images that contain lines indicating the approximate position of property boundaries." (Id. ¶ 52).

## COURT'S DISCUSSION

A.    Standard of Review

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).[2]

Once the moving party has met its burden, the non-moving party then must "come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). Only disputes between the parties over facts that might affect the outcome of the case properly preclude entry of summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (holding that a factual dispute is "material" only if it might affect the outcome of the suit and "genuine" only if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party).

---

[2]    Internal citations and quotation marks are omitted from all citations unless otherwise specified.

8

"[A]t the summary judgment stage the [court's] function is not [itself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. In determining whether there is a genuine issue for trial, "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [non-movant's] favor." Id. at 255; see United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) ("On summary judgment the inferences to be drawn from the underlying facts contained in [affidavits, attached exhibits, and depositions] must be viewed in the light most favorable to the party opposing the motion.").

Nevertheless, "permissible inferences must still be within the range of reasonable probability, . . . and it is the duty of the court to withdraw the case from the [factfinder] when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." Lovelace v. Sherwin-Williams Co., 681 F.2d 230, 241 (4th Cir. 1982). Thus, judgment as a matter of law is warranted where "the verdict in favor of the non-moving party would necessarily be based on speculation and conjecture." Myrick v. Prime Ins. Syndicate, Inc., 395 F.3d 485, 489 (4th Cir. 2005). By contrast, when "the evidence as a whole is susceptible of more than one reasonable inference, a [triable] issue is created," and judgment as a matter of law should be denied. Id. at 489-90.

B.      Analysis

1.      Plaintiffs' Article III Standing

Defendants contend plaintiffs have not suffered an injury in fact and the court accordingly lacks standing. This is not correct. Plaintiffs have standing.

The United States Constitution extends the subject matter jurisdiction of the federal judiciary to "cases" or "controversies." U.S. Const. art. III, § 2, cl. 1. "Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy. Spokeo, Inc. v. Robins, 578 U.S.

330, 338 (2016). Thus, lack of standing is a deficiency that places litigation outside the court's subject matter jurisdiction. See S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC, 713 F.3d 175, 185 (4th Cir. 2013).

The party invoking federal jurisdiction bears the burden of established the following three elements, together amounting to the "irreducible constitutional minimum of standing:"

> First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'" Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

Lujan v. Defs. of Wildlife, 504 U.S. 555, 560-61 (1992). "[E]ach element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." Susan B. Anthony List v. Driehaus, 573 U.S. 149, 158 (2014). Standing requirements are somewhat more relaxed in First Amendment cases, which leniency manifests itself most commonly in the injury-in-fact requirement. Cooksey v. Futrell, 721 F.3d 226, 235 (4th Cir. 2013); see Secretary of State of Md. v. Joseph H. Munson Co., Inc., 467 U.S. 947, 956 (1984); Benham v. City of Charlotte, N.C., 635 F.3d 129, 135 (4th Cir. 2011). The injury-in-fact requirement is the element primarily at issue here.

Plaintiffs seek to enjoin the Board from enforcing N.C. Gen. Stat. §§ 89C-2, 89C-3(7), 89C-23, and 89C-24 against the creation of two- and three-dimensional maps with geospatial data or otherwise allowing for measurements of the land pictured.

The United States Court of Appeals for the Fourth Circuit recognizes two ways in which litigants may establish the requisite ongoing injury when seeking to enjoin government regulation. First, they may allege an intention to engage in a course of conduct arguably affected with a

10

constitutional interest, but proscribed by a statute, and that there exists a credible threat of prosecution thereunder.  Abbott v. Pastides, 900 F.3d 160, 176 (4th Cir. 2018); see Susan B. Anthony, 573 U.S. at 159.  "Second, they may refrain from exposing themselves to sanctions under the policy, instead making a sufficient showing of self-censorship—establishing, that is, a chilling effect on their free expression that is objectively reasonable."  Abbott, 900 F.3d at 176; see Cooksey, 721 F.3d at 235 ("In First Amendment cases, the injury-in-fact element is commonly satisfied by a sufficient showing of self-censorship, which occurs when a claimant is chilled from exercising h[is] right to free expression.").  "Either way, a credible threat of enforcement is critical; without one, a putative plaintiff can establish neither a realistic threat of legal sanction if he engages in the speech in question, nor an objectively good reason for refraining from speaking and self-censoring instead."  Id.

Under the first approach, although the plaintiff need not engage in conduct that arguably violates the law to satisfy the injury-in-fact requirement, intentions to engage in the conduct must be concrete.  See Susan B. Anthony, 573 U.S. at 159.  "'[S]ome day' intentions—without any description of concrete plans, or indeed even any specification of when the some day will be—do not support a finding of the actual or imminent injury."  Lujan, 504 U.S. at 564 (emphasis in original).  "To establish a credible threat of prosecution, plaintiffs must allege fears of state prosecution that are not imaginary or speculative and are actual and well-founded [enough to establish] that the statute will be enforced against them."  Maryland Shall Issue, Inc. v. Hogan, 971 F.3d 199, 217 (4th Cir. 2020).

The second approach requires plaintiffs to make sufficient showing of self-censorship, by establishing a "chilling effect" on their free expression.  Cooksey, 721 F.3d at 235.  "[S]ubjective or speculative accounts of such a chilling effect, however, are not sufficient."  Benham, 635 F.3d at 135; Laird v. Tatum, 408 U.S. 1, 13-14 (1972) ("Allegations of a subjective 'chill' are not an

11

adequate substitute for a claim of specific present objective harm or a threat of specific future harm."). "Any chilling effect . . . must be objectively reasonable." Benham, 635 F.3d at 135. "Government action will be sufficiently chilling when it is likely [to] deter a person of ordinary firmness from the exercise of First Amendment rights." Id.

In accordance with the first approach, plaintiffs have demonstrated concrete and particular intention to create two-dimensional, orthomosaic maps and maps otherwise facilitating measurement, for instance by scale bar. Prior to receiving notice from the Board, plaintiffs advertised on their website "video, pictures, and orthomosaic maps (Measurable Maps) of [construction] sites. (Def. Resp. Stmt. Facts (DE 37) ¶ 10). On one occasion, plaintiff Jones created an orthomosaic map and pitched it to a repeat client. (Id. ¶ 12). Although the client chose to pass, plaintiffs continued to advertise the service on the website. Id. Plaintiff Jones also previously had provided clients with aerial maps with scale bars included allowing for basic measurement of the land. (Jones Decl. (DE 38-3) ¶ 38). Plaintiffs' intent to create these products thus cannot be described as conjectural or hypothetical.

Plaintiffs also have demonstrated a credible threat of prosecution where they previously were investigated by the Board for advertising and creating these products, and where the Board still maintains that aerial mapping conveying location data about distances, coordinates, volumes, and elevations falls under the definition of surveying. (See Def. Resp. Stmt. Facts (DE 37) ¶ 39 ("The Board's current position is that Plaintiffs can create aerial orthomosaic maps but cannot give the maps to anyone if the maps contain location information, georeferenced data, or any information that a recipient could use to make measurements on the maps."); (Def. Resp. (DE 42) at 3 ("The commercial products Plaintiffs seek to offer to consumers falls under the definition of land surveying.").

12

J.A. 970

Whereas plaintiffs previously have advertised and produced orthomosaic, or measurable, maps for clients, plaintiff Jones has not made three-dimensional models for clients.  Prior to the investigation, however, he had begun practicing making such models for himself with images captured by his drone.  Once Jones understood following the investigation that the Board considered three-dimensional mapping unlawful in the absence of a surveyors' license, he stopped developing that part of his business:

> I'm not going to expose myself to having the Board come after me again, so I'm not going to develop a 3D model side of my business while it's illegal. But if I could do it without the Board coming after me, I would start building up my skills with 3D modeling and start developing a 3D modeling side of my mapping business too.

(Jones Decl. (DE 38-3) ¶ 39).

Article III does not require a plaintiff to "first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights." Steffel v. Thompson, 415 U.S. 452, 459 (1974); see MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 128-129 (2007) ("[W]here threatened action by government is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat.") (emphasis in original).

Here, plaintiff Jones has proffered evidence that he intended to create three-dimensional maps for clients, and indeed had begun practicing their production, but his efforts were "chilled" by the Act and the Board acting pursuant to it.  Where the Board has expressed, and still maintains that construction of such three-dimensional models falls under land surveyance, the chilling effect plaintiffs experienced was "non-speculative and objectively reasonable."  Cooksey, 721 F.3d at 236.  Indeed, the Board cautioned plaintiffs that if the company continued with its practices the Board could pursue further action including criminal prosecution.  Such is "likely to deter a person of ordinary firmness from" continuing to create three-dimensional models.  Id.

13

In sum, plaintiffs have established injury in fact with respect to creation of two-dimensional and three-dimensional maps with geospatial data. With injury-in-fact established, the causation and redressability elements of standing easily are satisfied here. Plaintiffs declare that if not for the Act and the Board's interventions they would offer orthomosaic maps to clients again and would develop their business with respect to three-dimensional modeling. (Jones Decl. (DE 38-3) ¶¶ 34, 38-39). An injunction against enforcement of the challenged sections of the Act would remove the threat to plaintiffs' planned activities, satisfying the redressability requirement. Plaintiffs accordingly have standing.

In opposition, defendants contend plaintiffs must establish that they previously have engaged in the course of conduct arguably affected with a constitutional interest and that they have ceased engaging in those activities out of fear of liability. Defendants argue plaintiffs cannot make that showing respect to orthomosaic maps and three-dimensional models as the only service plaintiffs in fact ceased providing were aerial photos with approximate property boundaries. Defendants, however, mischaracterize both the evidence on record and the appropriate standard. First, the record shows that plaintiffs did in fact produce an orthomosaic map for a client. Though the client passed, the map still was produced and was offered, demonstrating a concrete intention to engage in that part of the market. Though plaintiffs had not similarly created a three-dimensional for a client, plaintiff Jones created models for himself, and the record reflects that his endeavors reasonably were chilled by the Board's investigations.

Where the court has subject matter jurisdiction, it proceeds to the merits.

2.     First Amendment

Under the Act, as interpreted and enforced by the Board, only licensed land surveyors may create aerial orthomosaic maps three-dimensional digital models of land and structures; and aerial images containing location, distance, volumetric, and elevation data. See N.C. Gen. Stat. §§ 89C-

14

2, 89C-3(7), 89C-23, and 89C-24; (Def. Stmt. Resp. Stmt. Facts (DE 43) ¶ 39).  Plaintiffs contend that on their face and as applied to them, challenged provisions of the Act violate the right to create, use, and disseminate information under the First Amendment. The court disagrees.

"The First Amendment, applicable to the States through the Fourteenth Amendment, prohibits laws that abridge the freedom of speech." Nat'l Inst. of Fam. & Life Advocs. v. Becerra, 138 S. Ct. 2361, 2371 (2018).  As an initial matter, where plaintiffs raise both an as applied and facial challenge, a threshold consideration is the difference between these challenges:

> The difference between a facial challenge and an as-applied challenge lies in the scope of the constitutional inquiry. Under a facial challenge, a plaintiff may sustain its burden in one of two ways. First, a plaintiff asserting a facial challenge "may demonstrate 'that no set of circumstances exists under which the law would be valid, or that the law lacks any plainly legitimate sweep.'" Second, a plaintiff asserting a facial challenge may also prevail if he or she "show[s] that the law is 'overbroad because a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" Under either scenario, a court considering a facial challenge is to assess the constitutionality of the challenged law "without regard to its impact on the plaintiff asserting the facial challenge." In contrast, an as-applied challenge is "based on a developed factual record and the application of a statute to a specific person[.]"

Educ. Media Co. at Virginia Tech v. Insley, 731 F.3d 291, 298 n.5 (4th Cir. 2013).  Plaintiffs suggest that their facial challenge rests upon much the same argument and evidence as their as applied challenge, contending that their First Amendment rights have been abridged by the Board, and other similarly situated drone owners have been harmed by the Board in much the same way.[3] Their facial and as applied challenge thus collapse into one initial inquiry for the court: did the Board violate plaintiffs' First Amendment rights?  Only upon that violation being established must the court consider whether other drone owners have been similarly harmed, and whether the

---

[3]     Plaintiffs fail to make specific argument with respect to their facial challenge in their motion for summary judgment. (But see Compl. (DE 1) ¶ 112 ("On their face, N.C. Gen. Stat. §§ 89C-2, 89C-3(7), 89C-23, and 89C-24 sweep up a broad swath of speech, including orthomosaic images, 3D digital models, oblique aerial images, and images containing data about locations, distances, elevations, and sizes of land or objects.  In this way, North Carolina's land-surveying licensing law is substantially overbroad, as it sweeps in significant amounts of speech that North Carolina has no conceivable interest in regulating.").

15

J.A. 973

application of the rules against plaintiffs and those drone owners is numerically "substantial" as compared to "the statute's plainly legitimate sweep," thus rendering the challenged provisions facially unconstitutional. Educ. Media Co., 731 F.3d at 298 n.5. The court accordingly will first determine whether the statutes as applied to plaintiffs violate their First Amendment right to freedom of speech.

"An individual's right to speak is implicated when information he or she possesses is subjected to restraints on the way in which the information might be used or disseminated." Sorrell v. IMS Health Inc., 564 U.S. 552, 568 (2011). The "First Amendment draws no distinction between the various methods of communicating ideas," and case law establishes photographs and videos, as well as the process of their capture, are speech protected by the First Amendment. Superior Films, Inc. v. Dep't of Educ., 346 U.S. 587, 589 (1954) (Douglas, J., concurring); see Burstyn v. Wilson, 343 U.S. 495, 502 (1952) (holding that movies are a protected form of speech); Citizens United v. Fed. Election Comm'n, 558 U.S. 310, 336 (2010) ("Laws enacted to control or suppress speech may operate at different points in the speech process."). The court sees no reason for distinguishing under the First Amendment between images captured by earlier technology and those captured remotely by drone. See United States v. Miller, 982 F.3d 412, 417 (6th Cir. 2020) ("Courts often must apply the legal rules arising from fixed constitutional rights to new technologies in an evolving world."); Nat'l Press Photographers Ass'n v. McCraw, 594 F. Supp. 3d 789, 804 (W.D. Tex. 2022) ("[C]ourts have never recognized a distinction between the process of creating a form of pure speech (such as writing or painting) and the product of these processes (the essay or the artwork) in terms of the First Amendment protection afforded . . . . This reasoning holds just as true for photographs and videos captured by drone[.]" (emphasis added)).

16

Thus, the court holds as a matter of law that plaintiffs have established that the use of drones to capture images for the purpose of conveying "orthomosaic" or "measurable" information is protected expression and, by regulating this activity, the Act implicates the First Amendment.

As a general matter, in determining whether a regulation abridges the freedom of speech courts distinguish between content-based and content-neutral regulations of speech. Reed v. Town of Gilbert, 576 U.S. 155, 163 (2015). "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." Id. "Some facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated speech by its function or purpose." Id. Content-based regulations are "presumptively unconstitutional" and subject heightened scrutiny. Id. "[A] law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of animus toward the ideas contained in the regulated speech." Id. at 165.

By comparison, content-neutral speech regulations are those that are "justified without reference to the content of the regulated speech." City of Renton v. Playtime Theatres, Inc., 475 U.S. 41, 47, 49 1986 (emphasis omitted in the first quotation). These regulations are subject to a lesser scrutiny under the First Amendment, requiring that they be "narrowly tailored to serve the government's legitimate, content-neutral interests." Ward v. Rock Against Racism, 491 U.S. 781, 798 (1989). But see Reed, 576 U.S. at 166 (strict scrutiny applies to a law neutral on its face if the purpose or justification for it is content-based).

Relevant to the instant action, however, is recognition by the Supreme Court of the United States in Nat'l Inst. of Fam. & Life Advocs. v. Becerra ("NIFLA"), 138 S. Ct. 2361 (2018) that while the Court's precedents "did not recognize such a tradition for a category called 'professional

17

speech,'" pursuant to which category the lower courts had applied lesser standards of scrutiny to professionals' speech to clients,

> [t]his Court has afforded less protection for professional speech in two circumstances . . . . First, our precedents have applied more deferential review to some laws that require professionals to disclose factual, noncontroversial information in their "commercial speech." See, e.g., Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio, 471 U.S. 626, 651 (1985); Milavetz, Gallop & Milavetz, P.A. v. United States, 559 U.S. 229, 250 (2010); Ohralik v. Ohio State Bar Assn., 436 U.S. 447, 455-456 (1978). Second, under our precedents, States may regulate professional conduct, even though that conduct incidentally involves speech. See, e.g., id., at 456; Planned Parenthood of Southeastern Pa. v. Casey, 505 U.S. 833, 884 (1992) (opinion of O'Connor, Kennedy, and Souter, JJ.).

Id. at 2372 (internal citations omitted in part) (holding neither exception was implicated in the case).

In Capital Associated Industries, Inc. v. Stein, the Fourth Circuit applied the latter of those two exceptions, holding that North Carolina's ban on the practice of law by corporations fit within NIFLA's exception for professional regulations that incidentally affect speech. 922 F.3d 198, 207 (4th Cir. 2019). The plaintiff, Capital Associated Industries ("CAI"), was a trade association of employers with the mission of "fostering successful employment relationships." Id. at 202. One of its most popular services was a call center by which members could speak to human resources experts. Id. CAI wanted to expand its offerings so it could answer questions regarding employment and labor law, as well as offer help in drafting legal documents. Id. To that end, CAI sued state prosecutors to enjoin the enforcement of state unauthorized practice of law statutes against it, contending in relevant part that the statutes unlawfully burdened its freedom of speech. Id.

The Fourth Circuit compared the ban on corporations practicing law to other laws regulating professions previously considered by the Supreme Court:

> Many laws that regulate the conduct of a profession or business place incidental burdens on speech, yet the Supreme Court has treated them differently than

18

restrictions on speech. For example, while obtaining informed consent for abortion procedures implicates a doctor's speech, the state may require it "as part of the practice of medicine, subject to reasonable licensing and regulation." Planned Parenthood of Se. Pa. v. Casey, 505 U.S. 833, 884 (1992) (opinion of O'Connor, Kennedy, & Souter, JJ.). Bans on discrimination, price regulations, and laws against anticompetitive activities all implicate speech—some may implicate speech even more directly than licensing requirements. But the Supreme Court has analyzed them all as regulations of conduct. See Expressions Hair Design v. Schneiderman, 137 S.Ct. 1144, 1150-51 (2017); Rumsfeld v. Forum for Acad. & Inst. Rights, Inc., 547 U.S. 47, 62 (2006); Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 502 (1949).

Id. at 207-08. In determining that the unauthorized practice of law statutes similarly targeted conduct rather than speech, the Fourth Circuit found significant that the statutes did not "target the communicative aspects of practicing law, such as the advice lawyers may give to clients." Id. at 208. "Instead, they focus more broadly on the question of who may conduct themselves as a lawyer." Id.

Looking to the specific provisions challenged, section 89C-2 declares that "[i]n order to safeguard life, health, and property, and to promote the public welfare, the practice of engineering and the practice of land surveying . . . [are] subject to regulation in the public interest," pursuant to which it is:

> unlawful for any person to practice or to offer to practice engineering or land surveying in this State, as defined in the provisions of this Chapter, or to use in connection with the person's name or otherwise assume or advertise any title or description tending to convey the impression that the person is either a professional engineer or a professional land surveyor, unless the person has been duly licensed.

N.C. Gen. Stat. § 89C-2. Section 89C-3(7) defines the practice of land surveying as

> professional services such as consultation, investigation, testimony, evaluation, planning, mapping, assembling, and interpreting reliable scientific measurements and information relative to the location, size, shape, or physical features of the earth, improvements on the earth, the space above the earth, or any part of the earth, . . . and the utilization and development of these facts and interpretations into an orderly survey map, plan, report, description, or project,

N.C. Gen. Stat. § 89C-3(7), enumerating activities included.

Section 89C-23 describes penalties for violating the Act:

19

J.A. 977

Any person who shall practice, or offer to practice, engineering or land surveying in this State without first being licensed in accordance with the provisions of this Chapter, or any person, firm, partnership, organization, association, corporation, or other entity using or employing the words "engineer" or "engineering" or "professional engineer" or "professional engineering" or "land surveyor" or "land surveying," or any modification or derivative of those words in its name or form of business or activity except as licensed under this Chapter or in pursuit of activities exempted by this Chapter, or any person presenting or attempting to use the certificate of licensure or the seal of another, or any person who shall give any false or forged evidence of any kind to the Board or to any member of the Board in obtaining or attempting to obtain a certificate of licensure, or any person who shall falsely impersonate any other licensee of like or different name, or any person who shall attempt to use an expired or revoked or nonexistent certificate of licensure, or who shall practice or offer to practice when not qualified, or any person who falsely claims that the person is registered under this Chapter, or any person who shall violate any of the provisions of this Chapter, in addition to injunctive procedures set out hereinbefore, shall be guilty of a Class 2 misdemeanor.

N.C. Gen. Stat. § 89C-23. Finally, section 89C-24 provides for the licensure of corporations and business firms that engage in the practice of engineering or land surveying. N.C. Gen. Stat. § 89C-24.

Akin to the regulations at issue in Stein, the challenged provisions of the Act are part of a generally applicable licensing regime that restricts the practice of surveying to those licensed. See Stein, 922 F.3d at 207; Goldfarb v. Va. State Bar, 421 U.S. 773, 792 (1975) ("We recognize that the States have . . . broad power to establish standards for licensing practitioners and regulating the practice of professions.")). Although surveying, like the practice of law, has "communicative and non-communicative aspects," the Act does not control what surveyors may tell their clients, instead "focus[ing] more broadly on the question of who may conduct themselves as a [surveyor]." Stein, 922 F.3d at 208; see N.C. Gen. Stat. § 89C-13 (providing general requirements for licensure).

Thus, consistent with Stein, the provisions at issue here fit within NIFLA's exception for professional regulations that regulate conduct with an incidental impact on speech. Stein, 922 F.3d at 208. "Licensing laws inevitably have some effect on the speech of those who are not (or cannot

J.A. 978

be) licensed," like plaintiffs. Id. "But that effect is merely incidental to the primary objective of regulating the conduct of the profession." Id.

The court in Stein held that "intermediate scrutiny" is the appropriate standard for reviewing conduct regulations that incidentally impact speech, reasoning as follows:

> Although the Court's cases have not been crystal clear about the appropriate standard of review, we do know that the state actors involved were not required to demonstrate a compelling interest and narrow tailoring. And NIFLA itself provides ample support for the view that strict scrutiny shouldn't apply to the UPL statutes. As noted, the NIFLA Court chose not to decide whether strict or intermediate scrutiny applied to the law at issue. 138 S.Ct. at 2375-77. But the Court did highlight laws regulating "professional conduct" as an area in which it "has afforded less protection for professional speech." Id. at 2372 (emphasis added). Thus, we can say with some confidence that the standard for conduct-regulating laws can't be greater than intermediate scrutiny.

Id. at 208-09. Citing to NIFLA, the court required that the defendant show "a substantial state interest" in regulating the unauthorized practice of law and a solution that is "sufficiently drawn" to protect that interest. Id. at 209.

The court held that North Carolina's ban on the practice of law by corporations survived that standard, concluding that "North Carolina's interest in regulating the legal profession to protect clients is at least substantial." Id.

> Professional integrity could suffer if the state allows lawyers to practice on behalf of organizations owned and run by nonlawyers and to collect legal fees from clients. Nonlawyers would likely supervise lawyers representing third-party clients at CAI, which could compromise professional judgment and generate conflicts between client interests and the corporation's interests.

Id. The court held that the state's "solution" was "sufficiently drawn" to protect that interest where the state had "proscrib[ed] law practice by organizations that pose the most danger, while exempting organizations that pose little danger." Id.

Applying Stein and NIFLA here, North Carolina also has a "substantial state interest" in regulating the unauthorized practice of surveying. As a general matter, the regulation of the practice of surveying safeguards property rights, which rights governments have a legitimate

21

interest in protecting. <u>McCullen v. Coakley</u>, 573 U.S. 464, 486 (2014) ("We have, moreover, previously recognized the legitimacy of the government's interests in . . . protecting property rights[.]"); <u>see</u> <u>In re Suttles Surveying, P.A.</u>, 227 N.C. App. 70, 76 (2013) ("As N.C. Gen. Stat. § 89C–2 makes clear, the Legislature intended its rules on the practice of surveying to protect property interests in North Carolina.").

That interest expressly is declared in section 89C-2, wherein it provides that the practice of land surveying is "subject to regulation in the public interest" in order to "safeguard life, health, and property, and to promote the public welfare." N.C. Gen. Stat. § 89C-2. The record evidence reflects that the Act establishes a minimum level of competence, thereby protecting the public from negligence, incompetence, and professional misconduct. <u>See</u> N.C. Gen. Stat. § 89C-13 (creating education, examination, and experience requirements for licensure); (Defs. 30(b)(6) Test. (DE 39-5) 10:15-25, 11:1-8 ("We're [] establishing a minimum level of competence via the three E's – the education, exam, and experience.")); <u>see also</u> <u>Ohralik v. Ohio State Bar Ass'n</u>, 436 U.S. 447, 460 (1978) ("[T]he State bears a special responsibility for maintaining standards among members of the licensed professions."). The Act also protects the public from misrepresentations as to professional status or expertise, and additionally creates a system of accountability by instilling with the Board authority to hold licensees accountable for malpractice.

> When somebody gets licensed, what we're telling the citizens of North Carolina is they have met a minimum level of competence, and the work they're going to receive from that licensee meets that minimum level of competence. If it doesn't, again, then the board by statute has the ability to remedy the situation.

(Defs. 30(b)(6) Test. (DE 39-5) 10:15-25, 11:1-8); <u>see</u> N.C. Gen. Stat. § 89C-10 (instilling with the Board the power to investigate licensees); N.C. Gen. Stat. § 89C-21 ("The Board may reprimand the licensee, suspend, refuse to renew, refuse to reinstate, or revoke the certificate of licensure, require additional education or, as appropriate, require reexamination, for any engineer

22

or land surveyor, who is found guilty of . . . [f]raud or deceit . . . [g]ross negligence, incompetence, or misconduct in the practice of the profession[.]")

On the record before it, and as applied to plaintiffs, the Act is "sufficiently drawn" to that interest where plaintiffs' actions only are restricted to the extent they seek to create maps or models conveying location information or property images capable of measurement.  Stein, 922 F.3d at 209.  Where plaintiffs seek only to convey images, including images with lines indicating the position of property boundaries, the Act does not apply.  See N.C. Gen. Stat. § 89C-3(7); (Def. Resp. Stmt. Facts (DE 37) ¶ 52).  Though "[a]nother state legislature might balance the interests differently," "intermediate scrutiny requires only a reasonable fit between the challenged regulation and the state's interest—not the least restrictive means."  Stein, 922 F.3d at 209-10.  As defendants have established a reasonable fit between the Act and a substantial government interest, the Act survives intermediate scrutiny.

Plaintiffs in opposition describe the challenged provisions of the Act as content and identity-based restrictions on speech.  Where the court has determined that the statutes regulate conduct, however, the court "need not engage with these descriptors."  Stein, 922 F.3d at 209 n.4 (rejecting the same argument).  Plaintiffs also argue defendants fail to satisfy intermediate scrutiny under Billups v. City of Charleston, S.C., 961 F.3d 673 (4th Cir. 2020) as they have not demonstrated that "less-speech-restrictive alternatives" actually were "tried and considered" and deemed inadequate before enacting the Act.  Id. at 681.  The court in Billups, however, did not analyze the regulation in issue under the NIFLA's exception for regulations of professional conduct with an incidental effect on speech, pursuant to which states have "broader authority" to regulate.  Stein, 922 F.3d at 207.  Under that exception, the Fourth Circuit in Stein did not require that defendants demonstrate consideration of alternatives, instead looking only for a "reasonable fit," even where "[a]nother state legislature might balance the interests differently."  Id. at 209-

23

J.A. 981

210.  Compare id. at 208-209 (holding that state actors in NIFLA and related cases "were not required to demonstrate a compelling interest and narrow tailoring" and requiring instead that the defendant show "a substantial state interest" and a solution that is "sufficiently drawn" to protect that interest), with Billups, 961 F.3d at 685 (requiring that the regulation be "narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information").

Pursuant to the NIFLA exception as applied by Stein, the Act is constitutional as applied to plaintiffs, and defendants' motion for summary judgment on plaintiffs' as-applied challenge is accordingly allowed.  Where plaintiffs' facial challenge was based upon others similarly situated to plaintiffs, that challenge too fails on the same basis.

**CONCLUSION**

Based on the foregoing, defendants' motion for summary judgment (DE 31) is GRANTED and plaintiffs' motion for summary judgment (DE 35) is DENIED.  Judgement shall be entered in favor of defendants, and each side shall bear its own costs.  The clerk is DIRECTED to close this case.

SO ORDERED, this the 31st day of March, 2023.

LOUISE W. FLANAGAN
United States District Judge

24

UNITED STATES  DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

360 VIRTUAL DRONE SERVICES, LLC )
and MICHAEL JONES )
                 Plaintiffs, )
  )
v. )
  )
ANDREW L. RITTER, in his official )
capacity as member of the North Carolina )
Board of Examiners for Engineers and )
Surveyors, JOHN M. LOGSDON, )
in his official capacity as member of the )
North Carolina Board of Examiners for )
Engineers and Surveyors, DENNIS K. )
HOYLE, in his official capacity as member )
of the North Carolina Board of Examiners )
for Engineers and Surveyors, RICHARD M. )
BENTON, in his official capacity as member )
of the North Carolina Board of Examiners )
for Engineers and Surveyors, CARL M. )
ELLINGTON, JR., in his official capacity )
as member of the North Carolina Board of )
Examiners for Engineers and Surveyors, )
CEDRIC D. FAIRBANKS, in his official )
capacity as member of the North Carolina )
Board of Examiners for Engineers and )
Surveyors, BRENDA L. MOORE, )
in her official capacity as member of the )
North Carolina Board of Examiners for )
Engineers and Surveyors, CAROL )
SALLOUM, in her official capacity as )
member of the North Carolina Board of )
Examiners for Engineers and Surveyors and )
ANDREW G. ZOUTWELLE, in his )
official capacity as member of the North )
Carolina Board of Examiners for Engineers )
and Surveyors )
                Defendants )

**JUDGMENT**
No. 5:21-CV-137-FL

**Decision by Court.**

This action came before the Honorable Louise W. Flanagan, United States District Judge, for

J.A. 983

consideration of the defendants' and plaintiffs' cross motions for summary judgment.

**IT IS ORDERED, ADJUDGED AND DECREED** in accordance with the court's order entered March 31, 2023, and for the reasons set forth more specifically therein, it is ordered that defendant's motion for summary judgment is GRANTED.

<u>**This judgment Filed and Entered on March 31, 2023, and Copies To:**</u>
Samuel B. Gedge / James T. Knight / David Glen Guidry (via CM/ECF Notice of Electronic Filing)
Douglas W. Hanna (via CM/ECF Notice of Electronic Filing)

March 31, 2023                    PETER A. MOORE, JR., CLERK


                                   /s/ Sandra K. Collins
                                  (By) Sandra K. Collins, Deputy Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION**

| | |
|---|---|
| 360 VIRTUAL DRONE SERVICES LLC and MICHAEL JONES, | ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) ) |
| ANDREW L. RITTER, in his official capacity as Executive Director of the North Carolina Board of Examiners for Engineers and Surveyors; and JOHN M. LOGSDON, JONATHAN S. CARE, DENNIS K. HOYLE, TOYNIA E.S. GIBBS, VINOD K. GOEL, CEDRIC D. FAIRBANKS, BRENDA L. MOORE, CAROL SALLOUM, and ANDREW G. ZOUTWELLE, in their official capacities as members of the North Carolina Board of Examiners for Engineers and Surveyors, | ) ) ) Case No.: 5:21-cv-00137-FL ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) |

---

**PLAINTIFFS' NOTICE OF APPEAL**

---

Plaintiffs 360 Virtual Drone Services LLC and Michael Jones hereby appeal to the

United States Court of Appeals for the Fourth Circuit from this Court's final judgment in this

action entered on March 31, 2023 (ECF 51). Plaintiffs 360 Virtual Drone Services LLC and

Michael Jones also appeal from this Court's order in this action (ECF 50, entered March 31,

2023) granting Defendants' motion for summary judgment and denying Plaintiffs' motion for

summary judgment.[*]

---

[*] Toynia E.S. Gibbs and Vinod K. Goel are automatically substituted as parties in their official capacity for Defendants Richard M. Benton and Carl M. Ellington, Jr., respectively. *See* Fed. R. Civ. P. 25(d); *see also* Fed. R. App. P. 43(c)(2).

-1-

Dated: April 25, 2023.

Respectfully submitted,

/s/ Samuel B. Gedge
Samuel B. Gedge (VA Bar No. 80387)*
James T. Knight II (DC Bar No. 1671382)*
INSTITUTE FOR JUSTICE
901 North Glebe Road, Suite 900
Arlington, VA 22203
Phone: (703) 682-9320
Fax: (703) 682-9321
E-mail: sgedge@ij.org
      jknight@ij.org
*Special Appearance pursuant to Local Rule 83.1(e)*

/s/ David G. Guidry
David G. Guidry
MAINSAIL LAWYERS
338 South Sharon Amity Rd., #337
Charlotte, NC 28211
Phone: (917) 376-6098
Fax: (888) 501-9309
E-mail: dguidry@mainsaillawyers.com
State Bar No.: 38675
*Local Civil Rule 83.1(d) Counsel for Plaintiffs*

*Attorneys for Plaintiffs*

-2-

J.A. 986

## CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of April, 2023, a true and correct copy of the

foregoing Plaintiffs' Notice of Appeal was electronically filed with the Clerk of Court using the

CM/ECF system, which will send notification of such filing and, pursuant to Local Civil Rule

5.1(e), shall constitute service upon, the following:

Douglas W. Hanna (NC Bar No. 18225)
Fitzgerald Hanna & Sullivan, PLLC
3737 Glenwood Avenue, Suite 375
Raleigh, NC 27612
Telephone: (919) 863-9091
Facsimile: (919) 863-9095
E-mail: dhanna@fhslitigation.com

*Attorney for Defendants*

/s/ Samuel B. Gedge
Samuel B. Gedge (VA Bar No. 80387)

-3-

J.A. 987

## CERTIFICATE OF SERVICE

I hereby certify that on June 28, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ Samuel B. Gedge
Samuel B. Gedge

*Counsel for Appellants*