**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 23-1472

360 VIRTUAL DRONE SERVICES LLC; MICHAEL JONES,

Plaintiffs – Appellants,

v.

ANDREW L. RITTER, in his official capacity as Executive Director of the North Carolina Board of Examiners for Engineers and Surveyors; JOHN M. LOGSDON, in his official capacity as member of the North Carolina Board of Examiners for Engineers and Surveyors; JONATHAN S. CARE, in his official capacity as member of the North Carolina Board of Examiners for Engineers and Surveyors; DENNIS K. HOYLE, in his official capacity as member of the North Carolina Board of Examiners for Engineers and Surveyors; TOYNIA E.S. GIBBS, in her official capacity as member of the North Carolina Board of Examiners for Engineers and Surveyors; VINOD K. GOEL, in his official capacity as member of the North Carolina Board of Examiners for Engineers and Surveyors; CEDRIC D. FAIRBANKS, in his official capacity as member of the North Carolina Board of Examiners for Engineers and Surveyors; BRENDA L. MOORE, in her official capacity as member of the North Carolina Board of Examiners for Engineers and Surveyors; CAROL SALLOUM, in her official capacity as member of the North Carolina Board of Examiners for Engineers and Surveyors; ANDREW G. ZOUTWELLE, in his official capacity as member of the North Carolina Board of Examiners for Engineers and Surveyors,

Defendants – Appellees.

Appeal from the United States District Court for the Eastern District of North Carolina, at Raleigh. Louise W. Flanagan, District Judge. (5:21−cv−00137−FL)

Argued: January 23, 2024                    Decided: May 20, 2024

Before AGEE, WYNN, and THACKER, Circuit Judges.

———————————

Affirmed by published opinion.  Judge Wynn wrote the opinion, in which Judge Agee and Judge Thacker joined.

———————————

**ARGUED:**  Samuel Bracken Gedge, INSTITUTE FOR JUSTICE, Arlington, Virginia, for Appellants.  Douglas William Hanna, FITZGERALD HANNA & SULLIVAN, PLLC, Raleigh, North Carolina, for Appellees.  **ON BRIEF:**  David G. Guidry, GUIDRY LAW FIRM PLLC, Charlotte, North Carolina; James T. Knight II, INSTITUTE FOR JUSTICE, Arlington, Virginia, for Appellants.

WYNN, Circuit Judge:

Michael Jones and his wholly owned company, 360 Virtual Drone Services LLC ("Plaintiffs"), would like to provide customers with aerial maps and 3D digital models containing measurable data. But the North Carolina Board of Examiners for Engineers and Surveyors ("Board") has taken the position that doing so would constitute engaging in the practice of land surveying without a license, in violation of the North Carolina Engineering and Land Surveying Act ("Act"). Plaintiffs sued various members of the Board in their official capacities, arguing that the restriction on their ability to offer these services without first obtaining a surveyor's license violates their First Amendment rights.

The district court granted summary judgment for Defendants. We conclude that the Board has not violated Plaintiffs' First Amendment rights and therefore affirm.

## I.

The following facts are undisputed, except as noted.

## A.

North Carolina regulates land surveying through the North Carolina Engineering and Land Surveying Act. N.C. Gen. Stat. § 89C-1 to -2. The Act "declare[s]" "the practice of land surveying" in North Carolina "to be subject to regulation in the public interest," specifically, "[i]n order to safeguard life, health, and property, and to promote the public welfare." *Id.* § 89C-2. The Board's Rule 30(b)(6) witness explained that the Act effectuates these purposes in part by assuring the public that "licensed work" is "going to be above [the level of] incompetence, gross negligence, and misconduct" and by "establishing a

minimum level of competence" for licensure. J.A. 300–01.[1] The Act creates the Board "to administer [its] provisions," including by investigating violations of the surveyors' rules of professional conduct and taking disciplinary actions where they are violated. N.C. Gen. Stat. § 89C-4; *see id.* § 89C-20 to -22.

Obtaining a surveyor's license is a rigorous process. An applicant must (1) "be of good character and reputation," as established through "five character references . . . , three of whom are professional land surveyors or individuals acceptable to the Board, with personal knowledge of the applicant's land surveying experience"; (2) "submit exhibits, drawings, plats, or other tangible evidence of land surveying work executed by the applicant under proper supervision and which the applicant has personally accomplished or supervised"; (3) submit to an interview "if the Board determines it necessary"; and (4) meet one of several different combinations of "education, technical, and land surveying experience." *Id.* § 89C-13(b), (b)(1a). For example, an individual who has completed a high school diploma or its equivalent but who lacks an associate or bachelor-of-science degree in surveying must demonstrate "a record satisfactory to the Board of *nine years or more* of progressive practical experience under a practicing professional land surveyor"— or seven years, plus the completion of "a Land Surveyor Apprenticeship"—and must pass at least two examinations. *Id.* § 89C-13(b)(1a)(d)–(d1) (emphasis added).

Practicing land surveying without a license exposes an individual to civil and criminal misdemeanor liability. *Id.* § 89C-23. The same is true for a "firm, partnership,

---

[1] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

organization, association, corporation, or other entity using or employing the words . . . 'land surveyor' or 'land surveying,' or any modification or derivative of those words in its name or form of business or activity." *Id.*; *see id.* § 89C-24 (providing for the licensure of corporations and business firms). The Act does, however, provide some exceptions to the licensing requirement, such as that unlicensed individuals may "[e]ngag[e] in . . . land surveying as an employee or assistant under the responsible charge of a . . . professional land surveyor." *Id.* § 89C-25(4). None of the Act's exceptions are applicable here.

The Act defines the "[p]ractice of land surveying," in relevant part, as "[p]roviding professional services such as . . . mapping, assembling, and interpreting reliable scientific measurements and information relative to the location, size, shape, or physical features of the earth, improvements on the earth, the space above the earth, or any part of the earth," including where "the gathering of information for the providing of these services is accomplished . . . by aerial photography, . . . and the utilization and development of these facts and interpretations into an orderly survey map, plan, report, description, or project." *Id.* § 89C-3(7), (7)(a). The Act specifies that "[t]he practice of land surveying includes," among other things, "[l]ocating, relocating, establishing, laying out, or retracing any property line, easement, or boundary of any tract of land;" "[d]etermining the configuration or contour of the earth's surface or the position of fixed objects on the earth's surface by measuring lines and angles and applying the principles of mathematics or *photogrammetry*;" and "[c]reating, preparing, or modifying electronic or computerized data, including land information systems and geographic information systems relative to

5

the performance of the practice of land surveying." *Id.* § 89C-3(7)(a)(1), (5), (7) (emphasis added).

At issue here is the regulation of photogrammetry, which "is the art, science, and technology of obtaining reliable information about physical objects and the environment through processes of recording, measuring, and interpreting photographic images and patterns of recorded radiant electromagnetic energy and other phenomena." J.A. 277. Such images can be collected by drone using visual cameras, infrared sensors, and Light Detection and Ranging ("LiDAR") sensors, depending on the data needed. J.A. 69; *see* J.A. 78–79 (noting that infrared sensors can collect images that, when stitched together, "allow[] a client to see a comprehensive map of the temperature of various objects across a large area" and that drones can be used to create 3D or topographical maps using visual images or LiDAR).

Photogrammetry's work product can include orthomosaic maps and 3D models. Both forms of work product provide measurable, image-based data, but an orthomosaic map is created with solely top-down images, while producing a 3D model requires images from other angles. "Because of lens distortion, a single image taken straight down from above" does not "provide reliable measurements," but "[b]y combining multiple, overlapping images into one composite image"—an orthomosaic map—"points that appear in multiple images can be triangulated and measurements become possible." J.A. 71; *accord* J.A. 69 ("Orthomosaic (or 'ortho') mapping is the process of creating a composite aerial image from many smaller images that are combined and tiled into an image showing

a larger area than any single original image depicts."). Orthomosaic maps can be used to take volumetric or two-dimensional measurements and to draw property boundaries.

B.

Jones began providing photography and videography services in North Carolina around 2016, and in 2017, he founded 360 Virtual Drone Services LLC, through which he offered a variety of drone-photography services to paying clients. Jones has never had formal instruction in drone piloting or photography—he has a GED, and his prior professional experience is in welding and information technology—but taught himself those skills using the internet. He also took an exam to be certified by the Federal Aviation Administration to pilot the drone. Through his company, Jones offered standard photography and videography services—for example, for weddings. So far, so good.

The trouble came when Jones also began offering aerial mapping services through his LLC, despite lacking a surveyor's license in North Carolina (or any other state). On his website, Jones explicitly advertised that he could create orthomosaic maps and noted that they could be used, for example, by "construction companies [to] monitor the elevation changes, volumetrics for gravel/dirt/rock, and watch the changes and progression of the site as it forms over time." J.A. 201. His website also stated that his company "cater[ed] to many industries such as solar, roofing, construction, marketing and advertising, commercial & residential real estate, search and rescue, agriculture, thermal inspection, Orthomosaic maps, ground footage, and more." J.A. 177.

It is unclear from the record whether Jones ever actually provided an orthomosaic map to a paying customer. *Compare* J.A. 505 (Jones's February 22, 2022, deposition

testimony as the Rule 30(b)(6) witness for 360 Virtual Drone Services, stating that he had never "provided any services in the field of photogrammetry . . . for paying customers"), *and* J.A. 936 (Plaintiffs agreeing that "[i]t is undisputed that 360 Virtual Drone Services LLC never provided a measurable orthomosaic map or 3D digital model to a paying customer"), *with* J.A. 662 (Jones stating in his July 21, 2021, deposition that he generated somewhere between five and fifteen orthomosaic maps for paying customers). But he did complete an orthomosaic map to pitch to a client and provided paying customers with various products that appear to implicate the Act, including the raw aerial images and data the customers needed to create thermal and aerial maps themselves; aerial images with associated location data, including elevation data; and aerial photographs where Jones had drawn rough property lines using Photoshop. Jones has never produced a 3D model for a client because it is beyond his current skill set, but he avers that he would like to learn how to do so in the future.

In a December 2018 letter, the Board informed Jones that it was opening an investigation into whether 360 Virtual Drone Services was practicing land surveying without a license. Jones responded by email in January 2019, noting that he had added a disclaimer to his website, and he met with the Board's investigator in person the following month. Nevertheless, the Board sent another letter in June 2019 indicating that in its view, Jones was acting in violation of the Act. Following these interactions, Jones "stopped trying to develop [his] mapping business," though he has continued to provide non-map aerial images and videos for clients. J.A. 91. And while the Board has since "disavow[ed] any intent to initiate enforcement proceedings against Plaintiffs based on the act of producing

a PDF image of a map that does not contain measurable information" or "an aerial photograph, without measurable information, that includes lines indicating the approximate position of property lines for marketing purposes," J.A. 489–90; *accord* J.A. 547, Jones would like to be able to engage in the full range of mapping activities that he was pursuing before receiving the Board's December 2018 letter.

Accordingly, Jones and 360 Virtual Drone Services LLC sued the Board in March 2021, alleging facial and as-applied violations of their free-speech rights under the First Amendment. They sought declaratory and injunctive relief.

The parties cross-moved for summary judgment, and the district court granted the Board's motion while denying Jones's. *360 Virtual Drone Servs. LLC v. Ritter*, No. 5:21-CV-137-FL, 2023 WL 2759032, at *1 (E.D.N.C. Mar. 31, 2023). The court concluded that Jones had standing to challenge the statute based on his desire to create "two-dimensional and three-dimensional maps with geospatial data." *Id.* at *7. And it concluded that the Engineering and Land Surveying Act implicated the First Amendment. *Id.* at *9. But it found that the challenged provisions constituted "a generally applicable licensing regime that restricts the practice of surveying to those licensed" and primarily regulated *conduct* rather than *speech*, such that intermediate scrutiny applied. *Id.* at *11. Finally, the court concluded that the Act survived intermediate scrutiny. *Id.* at *12–14. Plaintiffs timely appealed, pursuing only their as-applied (not facial) challenge to the Act.[2]

---

[2] At oral argument, Plaintiffs' counsel conceded that "on its face, North Carolina's surveying licensing law doesn't violate the First Amendment." Oral Argument at 2:21–2:25, *360 Virtual Drone Servs. LLC v. Ritter*, No. 23-1472 (4th Cir. Jan. 23, 2024), https://www.ca4.uscourts.gov/OAarchive/mp3/23-1472-20240123.mp3.

II.

"We review a grant of summary judgment de novo, applying the same legal standards as the district court while viewing all facts and reasonable inferences therefrom in the light most favorable to the nonmoving party. Summary judgment is appropriate when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Reyes v. Waples Mobile Home Park Ltd. P'ship*, 91 F.4th 270, 276 (4th Cir. 2024) (citation omitted) (quoting Fed. R. Civ. P. 56(a)).

We agree with the district court that Jones possesses standing to challenge the Act as applied to him. *See 360 Virtual Drone Servs.*, 2023 WL 2759032, at *6–7 (citing *Abbott v. Pastides*, 900 F.3d 160, 176 (4th Cir. 2018)). And the core facts are essentially undisputed. So this appeal hinges on two questions of law: what level of scrutiny we must apply in evaluating the Act's constitutionality as applied to Plaintiffs, and whether the Act can survive that scrutiny. Applying intermediate scrutiny, we conclude that it can.

III.

"The First Amendment, applicable to the States through the Fourteenth Amendment, prohibits the enactment of laws 'abridging the freedom of speech.'" *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (quoting U.S. Const. amend. I). But, as with many other cherished constitutional freedoms, "[l]aws that impinge upon speech receive different levels of judicial scrutiny depending on the type of regulation and the justifications and purposes underlying it." *Stuart v. Camnitz*, 774 F.3d 238, 244 (4th Cir. 2014). So, "because not every interference with speech triggers the same degree of scrutiny

10

under the First Amendment, we must decide at the outset the level of scrutiny applicable"
here. *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 637 (1994).

Plaintiffs argue that we should apply either strict scrutiny or the form of intermediate
scrutiny this Court has applied to content-neutral regulations of the time, place, and manner
of speech. We disagree. Because the Act is a regulation of professional conduct that only
incidentally impacts speech, our precedent requires that we apply a more relaxed form of
intermediate scrutiny that mandates only that the restriction be "sufficiently drawn" to
protect a substantial state interest.

A.

"[I]t has been the practice of different states, from time immemorial, to exact in
many pursuits a certain degree of skill and learning upon which the community may
confidently rely[.]" *Dent v. West Virginia*, 129 U.S. 114, 122 (1889). Thus, it is well
established that the "practice" of professions like medicine is "subject to reasonable
licensing and regulation by the State." *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S.
833, 884 (1992), *overruled on other grounds by Dobbs v. Jackson Women's Health Org.*,
597 U.S. 215 (2022); *accord Stuart*, 774 F.3d at 247 ("The state may establish licensing
qualifications[.]" (citing *Dent*, 129 U.S. at 122)). But that does not mean "that all regulation
of speech in the [professional] context merely receives rational basis review." *Stuart*, 774
F.3d at 249. "Speech is not unprotected merely because it is uttered by 'professionals.'"
*Nat'l Inst. of Fam. & Life Advocs. v. Becerra* (*NIFLA*), 585 U.S. 755, 767 (2018). To the
contrary, the precedent of this Court and the Supreme Court establish that professional

11

regulations—like other regulations implicating speech—are subject to various levels of scrutiny, depending on their nature.

The Supreme Court's 2018 decision in *National Institute of Family & Life Advocates v. Becerra* ("*NIFLA*") provides a useful starting point. *NIFLA* involved a challenge at the preliminary-injunction stage to California statutes requiring licensed and unlicensed pregnancy clinics to post certain notices. *Id.* at 760–61, 765. Relevant here is its discussion of the provision applicable to licensed clinics, which were being compelled to speak (by posting certain notices) as part of the regulation of their profession. The notice requirement was thus content based. *Id.* at 766.

Normally, a content-based regulation of speech as speech would be subject to strict scrutiny. *Id.* (citing *Reed*, 576 U.S. at 163). But in *NIFLA*, "the Ninth Circuit did not apply strict scrutiny because it concluded that the notice regulate[d] 'professional speech,'" which it treated as "a separate category of speech . . . subject to different rules."[3] *Id.* at 766–67. The Supreme Court rejected that categorical treatment of "professional speech," noting that it "ha[d] not recognized 'professional speech' as a separate category of speech" entitled to lesser protections. *Id.* at 767. However, the Court did not ultimately resolve whether strict scrutiny applied to the notice requirement for licensed clinics because it concluded that the requirement "[could ]not survive even intermediate scrutiny." *Id.* at 773; *accord id.* (leaving open "the possibility that some . . . reason exists" to "treat[] professional

---

[3] This Court, too, had adopted the "professional speech doctrine" before *NIFLA*. *E.g.*, *Moore-King v. County of Chesterfield*, 708 F.3d 560, 569 (4th Cir. 2013), *abrogated by NIFLA*, 585 U.S. 755.

speech as a unique category that is exempt from ordinary First Amendment principles"); *cf. Stuart*, 774 F.3d at 248 (pre-*NIFLA*, declining to "conclusively determine whether strict scrutiny ever applies" in situations involving "content-based regulation of speech" in the professional context because the regulation in question failed intermediate scrutiny).

In reaching this conclusion, the Supreme Court recognized that it "*ha[d]* afforded less protection for professional speech" in one relevant circumstance, although that circumstance did not "turn[] on the fact that professionals were speaking."[4] *NIFLA*, 585 U.S. at 768 (emphasis added). Specifically, Supreme Court precedent allowed States to "regulate professional conduct, even [where] that conduct incidentally involves speech." *Id.* But, the Court concluded, that circumstance did not apply to the licensed-clinic notice at issue in *NIFLA*. That is, the required notice fell outside the context of "professional conduct." *Id.* at 770. This was because the requirement "applie[d] to all interactions between a covered facility and its clients, regardless of whether a medical procedure [was] ever sought, offered, or performed." *Id.* So, it "regulate[d] speech as speech." *Id.*

The first question before us, therefore, is whether the Act—as applied to Plaintiffs—is a regulation of "speech as speech," or a regulation of professional conduct subject to "less protection." *Id.* at 768, 770; *cf. Vizaline, L.L.C. v. Tracy*, 949 F.3d 927, 931 (5th Cir. 2020) (remanding for district court to analyze whether the licensing requirements at issue "regulate only speech, restrict speech only incidentally to their regulation of non-

---

[4] The Supreme Court also recognized a second circumstance where less protection applied—"to some laws that require professionals to disclose factual, noncontroversial information in their 'commercial speech'"—but that circumstance is not at issue in the case at bar. *NIFLA*, 585 U.S. at 768.

expressive professional conduct, or regulate only non-expressive conduct"). Of course, "drawing the line between speech and conduct can be difficult," *NIFLA*, 585 U.S. at 769, and "[t]here are few absolutes in the difficult area of professional regulation and professional expression," *Stuart*, 774 F.3d at 255. However, this case provides an opportunity to sketch some of the applicable principles that can serve as guideposts through this thicket.

Because *NIFLA* did not itself involve a regulation of professional conduct subject to reduced First Amendment protections, it did not elaborate much on what such a regulation might look like. But it did provide a helpful example: the requirement, upheld in *Planned Parenthood of Southeastern Pennsylvania v. Casey*, that doctors give women seeking abortions certain information. *NIFLA*, 585 U.S. at 769–70 (citing *Casey*, 505 U.S. at 884). The Supreme Court held in *Casey*, and reiterated in *NIFLA*, that the law challenged in *Casey* regulated professional *conduct* because it "regulated speech only 'as part of the *practice* of medicine, subject to reasonable licensing and regulation by the State.'" *Id.* at 770 (quoting *Casey*, 505 U.S. at 884). And, the Court concluded, the law merely aimed to support the patient's informed consent to a medical procedure. *Id.*; *see Stuart*, 774 F.3d at 250–55 (distinguishing a similar, but more extreme, law from the one at issue in *Casey* and concluding that that law violated the First Amendment).

More recently, in *Capital Associated Industries, Inc. v. Stein*, this Court considered a challenge to a professional-practice restriction after *NIFLA*. *Cap. Associated Indus., Inc. v. Stein*, 922 F.3d 198, 207 (4th Cir. 2019). In that case, the plaintiff challenged North Carolina's unauthorized practice of law ("UPL") statute—specifically, its ban on the

practice of law by corporations. *Id.* at 202. The plaintiff was a trade association that "want[ed] to provide legal services to its members" through its call center, but could not do so "because state law forbid[] corporations from practicing law"—even if the call-center staff member was themselves an attorney. *Id.* The district court granted summary judgment to the defendants. *Id.* We affirmed, concluding that the statute was a regulation of professional conduct that only incidentally burdened speech. *Id.* at 202, 207.

In so concluding, we emphasized that the ban on the practice of law by corporations was "part of a generally applicable licensing regime that restricts the practice of law to bar members and entities owned by bar members" and stated that "any impact the UPL statutes have on speech is incidental to the overarching purpose of regulating who may practice law." *Id.* at 207. We also noted that "the practice of law has communicative and non-communicative aspects," but that the statutes "don't target the communicative aspects of practicing law, such as the advice lawyers may give to clients. Instead, they focus more broadly on the question of who may conduct themselves as a lawyer." *Id.* at 208. We concluded by saying that "[l]icensing laws inevitably have some effect on the speech of those who are not (or cannot be) licensed. But that effect is merely incidental to the primary objective of regulating the conduct of the profession." *Id.*; *accord Del Castillo v. Sec'y, Fla. Dep't of Health*, 26 F.4th 1214, 1226 (11th Cir.) (upholding license requirement for nutritionists as regulation of "occupational conduct"), *cert. denied sub nom. Del Castillo v. Ladapo*, 143 S. Ct. 486 (2022).

To be sure, "*NIFLA* rejected the proposition that First Amendment protection *turns on* whether the challenged regulation is part of an occupational-licensing scheme."

*Vizaline*, 949 F.3d at 932 (emphasis added). So "the fact that the Act 'generally functions' as a regulation on professional conduct" cannot be dispositive; rather, the court must evaluate the particular provision at issue and determine whether it "targets 'speech as speech,' rather than professional conduct that just so happens to sweep up speech." *Nutt v. Ritter*, --- F.Supp.3d ---, No. 7:21-CV-00106-M, 2023 WL 9067799, at *14 (E.D.N.C. Dec. 20, 2023) (quoting *NIFLA*, 585 U.S. at 770). Put another way, our reference in *Capital Associated Industries* to the fact that the challenged law was "part of a generally applicable licensing regime" could not be (and was not) the end of the inquiry; it was a descriptive statement that helped to contextualize a provision that we otherwise concluded was a regulation of conduct. *Cap. Associated Indus.*, 922 F.3d at 207.

Indeed, in *Billups v. City of Charleston*—another post-*NIFLA* case—this Court considered a generally applicable licensing regime that we concluded was directed at speech, not conduct. *Billups v. City of Charleston*, 961 F.3d 673 (4th Cir. 2020). There, we held that a city ordinance requiring tour guides offering paid tours in Charleston's historic districts to obtain a license—which necessitated passing a test and jumping through other hoops—imposed a burden on speech that was more than incidental because it "completely prohibit[ed] unlicensed tour guides from leading visitors on paid tours—an activity which, by its very nature, depends upon speech or expressive conduct." *Id.* at 683.

Read together, *Capital Associated Industries* and *Billups* help to draw the boundary lines around what constitutes a conduct-focused professional regulation. The fact that a regulation falls within a generally applicable licensing regime does not automatically mean it is aimed at conduct, as *Billups* demonstrates. But the fact that a regulation directs or

prohibits particular speech in the professional context does not automatically mean it is aimed at speech, either, as *Capital Associated Industries* and *Casey* establish. *Cf.* 2 Rodney A. Smolla, *Smolla & Nimmer on Freedom of Speech* § 20:37.40 (3d ed. 1996 & Supp. 2024) ("While a state may require a law license to practice law, . . . a state may not require a license to write a law review article, or operate a website devoted to commentary and critique on legal issues.").

Further, contrary to Plaintiffs' suggestion, *see* Opening Br. at 33–34, finding the line between speech and conduct is not as simple as asking whether the prohibition is literally one against verbal or written "speech," on the one hand, or one against "conduct" (i.e., nonverbal action) on the other. To the contrary, this line is quite blurry, since of course nonverbal action can constitute speech for constitutional purposes (e.g., a silent protest) and written or verbal speech can constitute professional conduct (e.g., writing a prescription). *See NIFLA*, 585 U.S. at 769 (acknowledging that "drawing the line between speech and conduct can be difficult"); Smolla, *supra*, § 20:37.40 ("The point at which the profession of ideas becomes the practice of a profession remains murky at best in modern First Amendment jurisprudence, an ongoing work-in-progress.").

Instead, in drawing the line between a regulation aimed at professional conduct that incidentally burdens speech and one aimed at speech as speech, a variety of factors may come into play.

For example, courts are more likely to view a licensing regime limiting who may engage in certain professional conduct as conduct-focused for purposes of the First Amendment analysis where the conduct carries legal, health, economic, or public-safety-

17

related consequences, such as in the realms of law, medicine, accounting, and engineering. *E.g.*, *Stuart*, 774 F.3d at 247 ("The state's power to prescribe rules and regulations for professions, including medicine, has an extensive history."); *NIFLA*, 585 U.S. at 769 (medicine); *Dent*, 129 U.S. at 122 (medicine); *Cap. Associated Indus.*, 922 F.3d at 207 (law); *Crownholm v. Moore*, No. 23-15138, 2024 WL 1635566, at *2 (9th Cir. Apr. 16, 2024) (per curiam) (surveying); *Del Castillo*, 26 F.4th at 1226 (dietetics and nutrition); *Tingley v. Ferguson*, 47 F.4th 1055, 1082 (9th Cir. 2022) (psychotherapy), *cert. denied*, 144 S. Ct. 33 (2023); *cf. Billups*, 961 F.3d at 682–83 (regulation was *not* conduct-focused where the licensing regime was aimed at giving tours, the practice of which does not carry any of the aforementioned consequences).

Factors that courts have considered in concluding that a licensing regime is aimed at speech *as speech*—not conduct—include (1) where the regulation is aimed at speech taking place in a traditionally public sphere, *e.g.*, *Billups*, 961 F.3d at 683 ("The Ordinance undoubtedly burdens protected speech, as it prohibits unlicensed tour guides from leading paid tours—in other words, speaking to visitors—on certain public sidewalks and streets[,] . . . . where First Amendment rights are at their apex." (citing *Frisby v. Schultz*, 487 U.S. 474, 480–81 (1988))); and (2) where the regulation appears to regulate some kind of unpopular or dissenting speech, *e.g.*, *NIFLA*, 585 U.S. at 771 (noting the risk that Government regulation of professional speech can be used "to suppress unpopular ideas or information" (quoting *Turner Broad. Sys.*, 512 U.S. at 641)); *Stuart*, 774 F.3d at 246 (noting that "the statement compelled" in that case was "ideological"); *Cap. Associated Indus.*, 922 F.3d at 208 (emphasizing, in concluding that the licensing regime at issue was

conduct-focused, that the statutes did *not* "target the communicative aspects of practicing law, such as the advice lawyers may give to clients"); *Otto v. City of Boca Raton*, 981 F.3d 854, 859 (11th Cir. 2020) ("[T]he First Amendment has no carveout for controversial speech.").

So, for example, *Capital Associated Industries* involved a classic regulation of conduct with an incidental burden on speech: the law prohibited certain entities from offering legal services or advice (speech that has economic and legal consequences), and had no readily apparent implications for unpopular or dissenting speech. *Cap. Associated Indus.*, 922 F.3d at 207–08. And the speech in *Casey*—although compelling speech and thus foreclosing some forms of dissent, on a subject that is hotly disputed—carried legal and health-related consequences and was made in a private, doctor-patient relationship, and thus fell on the conduct end of the spectrum. *NIFLA*, 585 U.S. at 769–70 (citing *Casey*, 505 U.S. at 884). By contrast, although the regulation in *Billups* did not impact the content of licensed tour guides' speech, that speech had no economic, legal, public-safety, or health-related consequences and was made in a traditional public space, and thus was being regulated *as* speech. *Billups*, 961 F.3d at 677, 683.

B.

The distinction between a regulation aimed at conduct that incidentally burdens speech, and a content-neutral regulation of speech as speech, matters because it carries consequences for our level of scrutiny. As noted above, typically, a content-*based* regulation of speech *as speech* would trigger strict scrutiny. *Reed*, 576 U.S. at 163–64. But where "[a] statute[] regulate[s] *conduct*, we need not engage with . . . descriptors" like

"content-based and identity-based." *Cap. Associated Indus.*, 922 F.3d at 209 n.4 (emphasis added). Instead, we analyze regulations of conduct—as well as content-neutral regulations of speech—under intermediate scrutiny. But our case law spells out at least two distinct intermediate-scrutiny tests, which carry quite different burdens.[5]

Specifically, and as detailed further below, there is a distinction between (1) the traditional intermediate-scrutiny test we applied in our decisions in *Reynolds v. Middleton*, 779 F.3d 222 (4th Cir. 2015), and *Billups*, 961 F.3d 673, in reliance on the Supreme Court's decisions in *McCullen v. Coakley*, 573 U.S. 464 (2014), and *Ward v. Rock Against Racism*, 491 U.S. 781 (1989), and (2) the loosened intermediate-scrutiny test for professional-conducted-focused regulations we applied in our decision in *Capital Associated Industries*, 922 F.3d 198, in reliance on the Supreme Court's decision in *NIFLA*, 585 U.S. 755.

We note at the outset that the other circuits to have evaluated the applicable level of scrutiny for conduct-focused regulations post-*NIFLA* have applied rational basis review, not intermediate scrutiny. *See Del Castillo*, 26 F.4th at 1226 (11th Cir.) (concluding, based

---

[5] It is not unprecedented to recognize variable intermediate scrutiny tests. In *United States v. Marzzarella*, the Third Circuit stated that "[i]n the First Amendment speech context, intermediate scrutiny is articulated in several different forms." *United States v. Marzzarella*, 614 F.3d 85, 97 (3d Cir. 2010) (collecting cases), *abrogated on other grounds by N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022). We recognized the same in *United States v. Chester*, which cited *Marzzarella*'s discussion of the "various forms of intermediate scrutiny." *United States v. Chester*, 628 F.3d 673, 683 (4th Cir. 2010) (citing *Marzzarella*, 614 F.3d at 98), *abrogated on other grounds by Bruen*, 597 U.S. 1. To be sure, both *Chester* and *Marzzarella* spoke of these "various forms" as still "essentially shar[ing] the same substantive requirements." *Id.* (quoting *Marzzarella*, 614 F.3d at 98). But we conclude that *NIFLA* and *Capital Associated Industries*, both of which were decided after *Marzzarella* and *Chester*, recognized requirements different from the earlier line of cases.

on pre-*NIFLA* Eleventh Circuit law, that "[b]ecause the [challenged] Act is a professional regulation with a merely incidental effect on protected speech, it is constitutional under the First Amendment," and thus affirming the district court's rejection of the plaintiff's First Amendment claim—which had applied rational basis review—without the need for further analysis (cleaned up)); *Tingley*, 47 F.4th at 1077 (9th Cir.) (applying rational basis review, based on pre-*NIFLA* Ninth Circuit law); *Crownholm*, 2024 WL 1635566, at *2 & n.2 (9th Cir.) (applying rational basis review to a post-*NIFLA* challenge to a land-surveying act, and dismissing a reference to intermediate scrutiny in another post-*NIFLA* case as dicta); *EMW Women's Surgical Ctr., P.S.C. v. Beshear*, 920 F.3d 421, 436 (6th Cir. 2019) (rejecting intermediate scrutiny).[6]

We are, of course, bound by our Circuit's prior decisions on this point. But we note the fact that other circuits have applied rational basis review to make clear that our Circuit has not gone out on a limb in applying a lower form of intermediate scrutiny to conduct-focused licensing regimes than to content-neutral time, place, and manner regulations. To the contrary, that we apply intermediate scrutiny at all means the law in our Circuit is more rigorous for legislatures to satisfy than it is in other circuits.

---

[6] *Cf. Vizaline*, 949 F.3d at 934 (5th Cir.) (declining to express any "view on what level of scrutiny might be appropriate for applying [the challenged] licensing requirements to [the plaintiff]'s practice"); *Hines v. Quillivan*, 982 F.3d 266, 272 (5th Cir. 2020) (same); *Brokamp v. James*, 66 F.4th 374, 392 (2d Cir. 2023) (applying intermediate scrutiny, but only after assuming without deciding that the professional services at issue "consist[ed] only of speech *without any non-verbal conduct*" (emphasis added)), *cert. denied*, 144 S. Ct. 1095 (2024); *Otto*, 981 F.3d at 868 (11th Cir.) (applying strict scrutiny because the ordinances in question were "content-based regulations of speech").

Turning to the two lines of cases relevant for intermediate scrutiny, in *Reynolds v. Middleton*, we followed the classic formulation from *Ward v. Rock Against Racism*—echoed in *McCullen v. Coakley*—that in the context of a challenge to a "[c]ontent-neutral time, place, and manner regulation[]," intermediate scrutiny means that the "restrictions must be narrowly tailored to serve a significant government interest and leave open ample alternative channels of communication." *Reynolds*, 779 F.3d at 225–26 (cleaned up); *accord McCullen*, 573 U.S. at 477 (citing *Ward*, 491 U.S. at 791). We stated that the Supreme Court's "rejection of the Commonwealth [of Massachusetts]'s narrow-tailoring arguments [in *McCullen*] makes it clear that intermediate scrutiny . . . require[s] the government to present *actual evidence* supporting its assertion that a speech restriction does not burden substantially more speech than necessary." *Reynolds*, 779 F.3d at 229 (emphasis added); *see McCullen*, 573 U.S. at 496. Thus, the government's "argument unsupported by the evidence will not suffice to carry [its] burden." *Reynolds*, 779 F.3d at 229.

In *Billups*, we concluded that "[r]ead together, *Reynolds* and *McCullen* establish the following rule: To prove that a content-neutral restriction on protected speech is narrowly tailored to serve a significant governmental interest, the government must, inter alia, present evidence showing that—before enacting the speech-restricting law—it 'seriously undertook to address the problem with less intrusive tools readily available to it.'" *Billups*, 961 F.3d at 688 (quoting *McCullen*, 573 U.S. at 494); *accord People for the Ethical Treatment of Animals, Inc. v. N.C. Farm Bureau Fed'n, Inc.*, 60 F.4th 815, 831 (4th Cir.),

*cert. denied*, 144 S. Ct. 325, and *cert. denied sub nom. Stein v. People for the Ethical Treatment of Animals, Inc.*, 144 S. Ct. 326 (2023).

Yet in evaluating North Carolina's UPL statute in *Capital Associated Industries*, we noted that in Supreme Court cases "review[ing] restrictions on conduct that incidentally burden speech," "the state actors involved *were not required to demonstrate a compelling interest and narrow tailoring*." *Cap. Associated Indus.*, 922 F.3d at 208 (emphasis added). Rather, "[t]o survive intermediate scrutiny" in such a case, "the defendant must show 'a substantial state interest' and a solution that is 'sufficiently drawn' to protect that interest." *Id.* at 209 (quoting *NIFLA*, 585 U.S. at 773). Further, the defendant need only show "a 'reasonable fit between the challenged regulation' and the state's interest—not [that the regulation is] the least restrictive means" for achieving its goal. *Id.* at 209–10 (quoting *United States v. Chester*, 628 F.3d 673, 683 (4th Cir. 2010), *abrogated on other grounds by N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022)). And, in resolving the legality of the UPL statute at issue in *Capital Associated Industries*, we relied on common sense—not specific evidence—to conclude that the defendant had met this burden. *Id.* at 209–210.

*NIFLA* and *Capital Associated Industries* suggest that the burden for defendants in cases involving regulations aimed at professional conduct that incidentally burden speech is not exceedingly high. *See NIFLA*, 585 U.S. at 768 (referring to "less protection"); *Cap. Associated Indus.*, 922 F.3d at 207 ("We recognize that the States have . . . broad power to establish standards for licensing practitioners and regulating the practice of professions." (quoting *Goldfarb v. Va. State Bar*, 421 U.S. 773, 792 (1975))). In *Capital Associated*

*Industries*, we concluded that the form of intermediate scrutiny we found to apply was "a sensible result, as it fits neatly with the *broad leeway* that states have to regulate professions." *Cap. Associated Indus.*, 922 F.3d at 209 (emphasis added).

The upshot is that for most content-neutral restrictions on speech, intermediate scrutiny requires the government to produce "actual evidence supporting its assertion that a speech restriction does not burden substantially more speech than necessary." *Reynolds*, 779 F.3d at 229. But where the restrictions are primarily aimed at professional conduct and only incidentally burden speech, intermediate scrutiny does *not* require such evidence, and instead just requires that the restriction be "sufficiently drawn" to protect "a substantial state interest." *Cap. Associated Indus.*, 922 F.3d at 209 (quoting *NIFLA*, 585 U.S. at 773).

IV.

Applying the principles established above to the facts of this case, we conclude that the Act survives Plaintiffs' as-applied First Amendment challenge.

A.

First, applying the non-exhaustive list of factors we set out above for distinguishing between licensing regulations aimed at conduct and those aimed at speech as speech—whether the speech carries economic, legal, public-safety, or health-related consequences; whether the speech takes place in a traditionally public space; and whether the regulation seeks to quell unpopular or dissenting speech—we conclude that, as applied to Plaintiffs, the relevant provisions of the Act are aimed at conduct.

As applied to Plaintiffs, the challenged portions of the Act prevent an unlicensed and untrained person who is not acting under the supervision of a licensed surveyor from

selling two- or three-dimensional maps or models of areas of land that contain measurable data. This is conduct that classically falls under the surveying profession. And it carries economic and legal consequences. When an individual provides a map or 3D model of land with a scale bar or other measurable data, there is an implied accuracy. Plaintiffs' expert conceded that "[t]here[ was] the potential for" errors in the form of "provid[ing] a faulty work product to [a] client who's relying on [the business] to provide accurate information," which could impact the client—for example, related to calculating "the amount of fencing they might need"—as well as "their neighbors, if it's an issue involving boundaries or real estate." J.A. 900–01. Indeed, experience shows that even very minor discrepancies in measurements can create significant liability issues. *E.g.*, *Brandao v. DoCanto*, 951 N.E.2d 979, 982–83 (Mass. App. Ct. 2011) (affirming judgment ordering defendants to remove portion of condominium structure due to 13.2-inch encroachment).

The speech at issue also takes place in the private sphere, not on public sidewalks like with the tour guides in *Billups*. And there is no suggestion that the map or modeling data Plaintiffs would like to produce constitutes unpopular or dissenting speech, nor that the Act directs surveyors' speech once licensed. *See 360 Virtual Drone Servs.*, 2023 WL 2759032, at *11 ("Although surveying, like the practice of law, has 'communicative and non-communicative aspects,' the Act does not control what surveyors may tell their clients, instead 'focus[ing] more broadly on the question of who may conduct themselves as a [surveyor].'" (alteration in original) (quoting *Cap. Associated Indus.*, 922 F.3d at 208)).

Accordingly, the factors we have identified all point to the conclusion that the Act regulates professional conduct and only incidentally burdens speech.

B.

Second, we must apply the appropriate form of intermediate scrutiny to the facts before us. Again, for a conduct-based regulation, intermediate scrutiny does not require the state actors "to demonstrate a compelling interest and narrow tailoring," nor that the regulation is "the least restrictive means." *Cap. Associated Indus.*, 922 F.3d at 208, 210. Instead, they "must show 'a substantial state interest' and a solution that is 'sufficiently drawn' to protect that interest"—that is, that there is "a 'reasonable fit between the challenged regulation' and the state's interest." *Id.* at 209–10 (first quoting *NIFLA*, 585 U.S. at 773; then quoting *Chester*, 628 F.3d at 683). They can, but need not, point to specific record evidence to support this contention.

Plaintiffs do not dispute that protecting property interests and promoting the public welfare by assuring the public that the work performed by surveyors conforms to a minimum level of competence are substantial state interests. Nor could they. As the district court rightfully stated, "[a]s a general matter, the regulation of the practice of surveying safeguards property rights, which rights governments have a legitimate interest in protecting," and in this case "[t]he record evidence reflects that the Act establishes a minimum level of competence, thereby protecting the public from negligence, incompetence, and professional misconduct." *360 Virtual Drone Servs.*, 2023 WL 2759032, at *12 (first citing *McCullen*, 573 U.S. at 486 ("We have . . . previously recognized the legitimacy of the government's interest[] in . . . protecting property rights[.]"); then citing *In re Suttles Surveying, P.A.*, 742 S.E.2d 574, 578–79 (N.C. Ct. App. 2013) ("[A]s N.C. Gen. Stat. § 89C-2 makes clear, the Legislature intended its rules on the

practice of surveying to protect property interests in North Carolina."); then citing N.C. Gen. Stat. § 89C-13 (creating education, examination, and experience requirements for licensure); and then citing *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 460 (1978) ("[T]he State bears a special responsibility for maintaining standards among members of the licensed professions.")).

So the only question is whether, as applied to Plaintiffs, the challenged provisions are sufficiently drawn to protect those substantial state interests. We agree with the district court that they are. *Id.* at *13 ("[T]he Act is 'sufficiently drawn' to th[e protected] interest where [P]laintiffs' actions only are restricted to the extent they seek to create maps or models conveying location information or property images capable of measurement.").

Our decision in *Capital Associated Industries* is again instructive. That case involved a more draconian law than the one at issue here, which we nevertheless upheld. Under the challenged UPL law, "when legal issues ar[o]se, [the plaintiff]'s [call center] experts ha[d] to steer the conversation elsewhere, end the conversation, or refer the [association] member to outside counsel"—*even when the individual speaker was an attorney*. *Cap. Associated Indus.*, 922 F.3d at 202. Nevertheless, we concluded that "[b]arring corporations from practicing law" was "sufficiently drawn to protect" North Carolina's "interest in regulating the legal profession to protect clients." *Id.* at 209.

In so holding, we did not impose a heavy burden on North Carolina. Rather, we noted several potential issues in the absence of the regulation—"[p]rofessional integrity could suffer," and "[n]onlawyers would likely supervise lawyers representing third-party clients at [Capital Associated Industries], which could compromise professional judgment

27

and generate conflicts between client interests and the corporation's interests"—and explained that the law was a reasonable fit because it "proscrib[ed] law practice by organizations that pose the most danger, while exempting organizations that pose little danger." *Id.*

Similarly, the Act in this case protects the professional integrity of surveyors: a surveying license is not easy to obtain, and there is a public interest in ensuring there is an incentive for individuals to go through that rigorous process and become trained as surveyors. Further, the Act protects consumers from potentially harmful economic and legal consequences that could flow from mistaken land measurements. Tellingly, when asked how a client would be "protected" in the absence of the Act "against somebody who really doesn't know what they are doing but is [offering] the client services in the field of photogrammetry," Plaintiffs' expert responded, "That's up to the client"—meaning, he agreed, "buyer beware." J.A. 902. We agree with the Board that the First Amendment doesn't require the State to accept this caveat-emptor view of regulating surveying.

At the same time, the Act limits its scope to activities that fall within the traditional practice of surveying. So, for example, Plaintiffs may still engage in the activities that fall within their area of experience and expertise—namely, taking aerial photos—and can even draw rough property lines in certain circumstances. *See* J.A. 489–90, 547. They only may not provide the sort of measurable data that falls within the realm of the profession of surveying.

And while perhaps a disclaimer would suffice to resolve the concerns in this case, the Board does not have to show that the regulation is "the least restrictive means" available

28

to protect the substantial interests at play. *Cap. Associated Indus.*, 922 F.3d at 210. The wisdom of the State's policy choices among the options permitted by the Constitution are, of course, beyond the purview of this Court.

V.

States do not have a constitutional blank check when it comes to licensing regimes. As *NIFLA* and *Billups* demonstrate, merely placing a regulation aimed at speech into a licensing regime does not insulate it from scrutiny as a regulation of speech. *E.g.*, *NIFLA*, 585 U.S. at 773 (rejecting the idea that "States [have] unfettered power to reduce a group's First Amendment rights by simply imposing a licensing requirement"). And even where a regulation is in fact aimed at professional conduct, States must still be able to articulate how the regulation is sufficiently drawn to promote a substantial state interest. But where, as here, the State carries that burden, we can ask no more of the State, and its licensing requirement will survive First Amendment scrutiny.

*AFFIRMED*